# EXHIBIT 4

Filed: 8/9/2022 3:10 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 67110883
By: Shailja Dixit
8/9/2022 3:46 PM

**IN THE DISTRICT COURT**
**FOR THE STATE OF TEXAS**

**Galveston County**

22-CV-1495
**No.______________**

Galveston County - 56th District Court

**STEVEN HARVEY**
***Petitioner*(s),**

v.

**DWIGHT D. SULLIVAN, Galveston County Clerk, MARK HENRY, Galveston County Judge, DARRELL APFFEL, Galveston County Commissioner Precinct 1, JOE GIUSTI, Galveston County Commissioner Precinct 2, STEPHEN D. HOLMES, Galveston County Commissioner Precinct 3, ROBIN ARMSTRONG, Galveston County Commissioner Precinct 4. *Respondent(s)***

# PETITION FOR DECLARATORY JUDGMENT AND EMERGENCY RELIEF AGAINST ELECTRONIC VOTING SYSTEMS AND DESTRUCTION OF RECORDS

*TO THE HONORABLE COURT:*

COME NOW, PETITIONERS Steven Harvey, (hereinafter collectively referred to as "Petitioners"), file this Petition for Declaratory and Injunctive Relief against electronic voting systems with preservation of records barring Defendants from using computerized equipment to administer the collection, storage, counting,



Status Conference - 11/10/2022

and tabulation of votes in any election indefinitely until proper investigations and reconciliation of the elections for 2020 general, 2021 special, and 2022 primaries are conducted.

## PARTIES AND SERVICE

Petitioners are all Galveston County, Texas citizens and registered voters who voted in the Nov 2020 election and intend to vote in the Nov 2022 elections.

Petitioner

STEVEN HARVEY
12511 32nd Street,
Santa Fe,Tx. 77510
email scharvey69@yahoo.com;
phone 409-599-5691
*Pro Se.*

Respondents

DWIGHT D. SULLIVAN
600 59th Street, Suite 2001,
Galveston, Texas 77551,
phone (409)766-2200;

MARK HENRY
722 Moody, Suite 200,
Galveston, Texas 77550,
phone (409)766-2244;

DARREL APFFEL
P.O.Box 8327,
Bacliff, Texas 77518,
phone (409)770-5474;

JOE GIUSTI
11730 Hwy.6,

Santa Fe, Texas 77510,
phone (409)770-5475;

STEPHEN D. HOLMES
9850-A Emmett F. Lowry Expressway SuiteA100,
Texas City, Texas 77591,
phone (409)770-5806;

ROBIN ARMSTRONG
174 Calder Road,
League City, Texas 77573
phone (281)316-8744.

## MEMORANDUM OF POINTS AND AUTHORITIES

The right to vote and know that one's vote is fairly and accurately counted is foundational to our democracy. With this case Petitioners seek to eliminate the black box voting system that has developed in this country as it is used in this State. Texas voters no longer know whether their vote has been accurately tabulated or manipulated, and there can be no spot check within reasonable levels of confidence. This is a violation of Petitioners' Constitutional rights.

Petitioner(s) have a vested interest in protecting the quality, accuracy, and effectiveness of our individual votes to ensure our representative servants are lawfully elected by the consent of the governed for the protection against tyranny and for healthy maintenance of our Republican form of government afforded to us by our ancestors and for the benefit of our successors.

For centuries, American voters recorded their votes by hand on paper ballots and were counted by human beings. In the last two decades, all states including Texas adopted electronic, computerized voting systems. Expert analyses, studies, and investigations have determined that even the most sophisticated computers can be and have been hacked. The equipment used in our elections is often assembled

or made in countries like China which grants unauthorized access to foreign nations. Indeed, countries such as Russia, China, and Iran have thousands of highly trained individuals whose sole function is to penetrate commercial and government computers in the United States— including our election systems. Countries like France have responded to these threats by banning the use of computerized voting machines due to their inherent security flaws and opaqueness.

Experience has now proven the move to computerized voting in Texas was a mistake – an unnecessary, unsecure change that opened election results to manipulation by unauthorized persons. This is not a partisan issue. Experts across the political spectrum have long sounded the alarm about the inherent lack of both security and transparency in computerized voting systems such as those used in Texas. It is time to reverse this mistake. The right to vote is constitutionally guaranteed. Computerized voting systems leave an open door for votes to be changed, deleted, or fabricated in violation of constitutional requirements. A return to the tried-and-true paper ballots of the past – and of the present, in countries like France, Taiwan, and Israel – is necessary.

Petitioners submit this memorandum and related expert declarations and documentary evidence in support of their request that this Court enter an emergency injunction barring Respondents from using computerized equipment to administer the collection, storage, counting, and tabulation of votes in any election for the protection of the Petitioners' voice and will through elections (U.S. CONST. 1st AMEND., TEX. CONST. art. VI § 2) and the preservation of records of the elections for 2020 general, 2021 special, and 2022 primaries until such time that proper accounting of said elections are conducted.

## CONSTITUTIONAL QUESTIONS

The specific questions brought before this court are:

a. If the electronic voting systems are not lawfully certified in compliance with voting system standards, does it impede the Petitioner(s)' lawful vote in elections? TEX. CONST. art 6 § 4, US CONST. amend XIV.

b. If the electronic voting systems and their various devices are not lawfully certified, does it cause the Petitioner(s) to cast illegal ballots? 52 U.S.C. § 10307(a), Due Process Clause.

c. Since Texas officials presented uncertified voting systems as certified, did they abridge the Petitioner(s)' federally protected right to vote, as well as affronted TEX. PEN. CODE § 37.03, § 37.09, § 37.10, 18 U.S.C. § 245

d. Would it dilute the expressed intent and effectiveness of the Petitioner(s)' voice if the electronic voting systems and their various devices are vulnerable to hacking, tampering, and algorithmic preprogramming? TEX. CONST. art 6 § 4, Right to Vote Clause.

e. If the electronic voting systems are unreliable mechanisms for accurately collecting, retaining, and communicating the expression of the Petitioner(s)' vote, is it acceptable to injure the Petitioner(s)' voice and will under the Constitutional premise of the consent of the governed.? Declaration of Independence, Guarantee Clause.

f. Were Constitutionally protected free and fair elections negatively impacted by Texas officials' modification of election laws? TEX. ELEC. CODE § 276.019 and TEX. CONST. art 1 § 28.

g. If the acting representative servants were unlawfully elected as a result of unreliable, unlawful vote collection devices are they acting in their official capacity? TEX. CONST. art I § 19 and § 29.

h. Would they not, then, be impersonating public servants? TEX. PEN. CODE § 37.11.

i. The "elected" officials within the Texas courts prevent a fair hearing of cases involving the election. Where can Petitioner(s) find an objective perspective without

being denied redress of grievances? TEX. CONST. art I § 3, § 13 § 27, and US CONST. amend I.

j. What is the Constitutional remedy for the usurpation of the Petitioner(s)' role as the underlying governmental authority, and for forcing the Petitioner(s) to participate in their own servitude through fraudulent policies, systems, and measures? TEX. CONST. art I § 29, US CONST. amend XIII § 1 and US CONST. amend X.

## PRELIMINARY STATEMENT

This action is not an election contest case. It is an action to bring transparency, fairness, honesty, and exemplary quality to Texas elections and to hold responsible those government officials who violate the equal protection and due process rights of Petitioners (and all Texas citizens) guaranteed by the Texas Constitution. Petitioners seek redress under Texas law only. Petitioners need not, and do not, seek redress under any federal law. Petitioners (and all Texas citizens) have a fundamental legal right to the clearly established principles of election equality, integrity, accurateness, honesty, and justice.

Texas law recognizes the clearly established principle of one-citizen, one-vote. This is the bedrock of Texas law and the most cherished and valuable right of any Texas citizen, including Petitioners, guaranteed by the Texas Constitution. "The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing - one person, one vote." Reynolds v. Sims, 377 U.S. 533, 558 (1964). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily

abridges this right." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Texas law adopts these fundamental principles. This case seeks to enforce these clearly established fundamental principles of Texas law.

"In any state-adopted electoral scheme, '[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" (Curling v. Raffensperger, 397 F. Supp. 3d 1334, 1404 (N.D. Ga. 2019) (quoting Bush v. Gore, 531 U.S. at 104–05, 121 S.Ct. 525(2000)). Thus, it is the paramount duty of all government, with respect to election justice, to ensure that one-citizen, one-vote is clearly and proactively protected. This foundational principle of Texas law and its constitutional republic is at issue.

In Texas, election officials must preserve election information and such information must be transparent to the citizens if democracy and a constitutional republic are to be upheld. For these reasons, pursuant to federal law, 52 U.S.C. § 20701, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general…election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives… are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…

Petitioner(s) seek a Declaratory Order that the Respondents adhere to the constitutionally protected process of collecting and counting votes that ensures integrity and transparency. This is to require hand-marked paper ballots that can be cast with anonymity, following all Texas state election laws, and hand-counted by residents of the state of Texas, not machines as Texas Election law specifies. (TEX. CONST. art. VI § 4 and TEX. ELEC. CODE Chp. 65). Additionally, Petitioner(s)

seek redress for the abuse and devastation of our Constitutional rights and protections by our elected officials. Computerized equipment is, by nature, vulnerable to manipulation by unauthorized persons. The true results of an election that relies upon computerized equipment can never be known with full confidence, and Petitioners' constitutional rights to vote will be denied if computerized equipment is used.

## JURISDICTION AND VENUE

Pursuant to TEX. GOV. CODE § 24.008 and TEX. CONST. art. V § 8, jurisdiction and venue are proper in this Court as Respondents, electronic voting machines and devices, ballots, and related documentation and information are located within Galveston County, Texas. At all times pertinent to this action, the acts complained of by Petitioner(s) have occurred in and have continued to occur in Galveston County, Texas. This action arises under Article I, Section 3 of the Texas Constitution (Equal Protection); Article I, §§ 17 and 19 of the Texas Constitution (Due Process); TEX. GOV. CODE § 24.011; and the Texas Election Code. For these reasons, this Court has subject matter jurisdiction over this action.

## NATURE OF THIS ACTION

This is an action in law and equity under the Texas Constitution for violation of Petitioners' Equal Protection and Due Process rights by Respondents. Petitioners seek only equitable, injunctive, and declaratory relief against Respondents for violation of Petitioners clearly established Equal Protection and Due Process rights guaranteed to them by and through the Texas Constitution. Petitioners do not seek damages.

## STANDING

Voters have standing and are not barred by sovereign immunity claims to challenge an unconstitutional voting system, in spite of what the SoS or other government officials might claim. As stated in Andrade v. NAACP of Austin, 345 S.W.3d 1, 8 (Tex. 2011), "The Secretary urges a blanket rule that would ensure no voter ever has standing to challenge a voting system. We think the Secretary overreaches in that respect. The voters assert a denial of equal protection — a claim voters often have standing to bring." *See Baker v. Carr, 369 U.S. 186, 206, 82 S.Ct. 691, 7L.Ed.2d 663 (1962)* (noting that voters have standing to bring equal protection challenges to complain of vote dilution, and observing that "[m]any of the cases have assumed rather than articulated the premise in deciding the merits of similar claims"). For example, the Supreme Court has permitted Virginia residents to sue for a declaration that Virginia's poll tax was unconstitutional. *Harper v. Va. State Bd. Of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)* (holding that poll tax violated the equal protection clause)." *Dec. of Ind. and Preamble to the U.S. CONST.*

## FACTUAL ALLEGATIONS

### *HART INTERCIVIC VERITY*

1. No universal definition exists for what constitutes a "paper ballot", thus enabling vendors and their surrogates to characterize "machine-marked paper printouts from ballot marking devices" (BMD) as "paper ballots".
2. The machine-marked ballot is then counted on a separate scanner.

3. Most independent cybersecurity election experts caution against putting these insecure BMDs between voters and their ballots and instead recommend hand-marked paper ballots as primary voting system.[1]

4. Currently "hybrid" systems that combine both a BMD and a scanner into a single unit are considered more controversial.

5. The Verity Touch Writer DUO is a daisy chained configuration comprised of a Verity controller device, a proprietary cord, and is capable of connecting up to twelve BMD devices.[2]

6. The software application, Verity Relay, is a remote transmission software application that receives election data transmissions sent by Verity Scan device (tabulator) unit that scans the ballots, Verity Touch Duo scanner firmware, and digital scanner devices that are equipped with the Relay modem accessory. Per the contract obtained through PIA requests, it appears that Tarrant County purchased this capability.

7. Two manufacturers of the voting machines utilized in Texas, ES&S and Hart, testified before the House Administration Committee that some tabulators have wireless modem capabilities.[3]

8. Several aspects/components of Hart InterCivic's Verity Voting are concerning when in close proximity to the internet.

9. One known county contract of the Hart InterCivic tabulators indicates that (9) nine of the add-on modems were purchased.

[1] https://whowhatwhy.org/politics/elections/philly-ignores-cybersecurity-and-disability-access-in-voting-system-selection/ Last visited 06/21/22

[2] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf See page 21 Last visited 06/21/22

[3] https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 Last visited 06/21/22

a. Per Hart contract, a modem kit is required for electronic transmission from Verity Scan.

C. Voting Devices continued

| | | | Price breakdown per year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | | | Year 2 | | | Year 3 | | |
| Component | Version | Description | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) |
| Relay Modem Kit | | Modem kit required for electronic transmission from Verity Scan. May be shipped separately pending customer carrier selection; invoicing and testing will be independent if shipped separately. | $ 500 | 9 | $ 4,500 | | | | | | |
| AutoBallot Kit | | Barcode scanner kit for automatic Verity access code creation from VR/electronic poll book data | $ 419 | 400 | $ 167,600 | | | | | | |
| License & Support for Verity Hardware | | Annual License & Support Fee | $471,880 | 1 | $ 471,880 | $471,880 | 1 | $471,880 | $471,880 | 1 | $ 471,880 |
| TOTAL | | | $ | | 13,303,792 | $ | | 471,880 | $ | | 471,880 |

b. On August 1, 2019, the SoS Office sent a letter of approval for the above contract, which included the add-on modems, to Heider Garcia. (Relay Modem Kit).

c. The Relay Modem Kit is listed as required by Hart for the ENR to function but is not a listed component on the SoS examination or on the certification.

10. Brandon Hurley, a SOS appointed examiner, pointed out the connectivity capabilities of this make and version of voting system in his examination report.[4]

11. The exact component that allows these connectivity capabilities was not identified in Hurley's report. The visuals of Verity Voting, however, as well

---

[4] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf

as several item descriptions in SLI Compliance's testing report could be points of vulnerability given the lack of compliance with VVSG.[5] See 1.6.1 Block Diagram

[5] https://www.eac.gov/sites/default/files/voting_system/files/Attachment%20F1%20-%20Hart%20Verity%20Voting%202.4%20Modification%20Test%20Plan%20As%20Run%20v1.2.pdf Last visited 06/21/22

## 1.6 Scope of Testing

### 1.6.1 Block Diagram




Overview of the diagram:

- The components are displayed as touch points of data access, transfers, and verification.
- Dotted lines show the flow of data and air gaps using vDrives and are also used to separate the deployment models shown within the polling place.
- Verity Print is a ballot production device that provides unmarked printed ballots.
- Verity Touch Writer and Scan may be installed in polling places to support paper-based voting.
- Verity Controller, Touch Writer Duo, and Scan may be installed in polling

EAC Modification Test Plan v1.2
Document No. HRT-19003-CTP-01 Page 17 of 33 [6]

6 https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf
Last visited 06/21/22.

12. "Air-gapping" measures are intended to prevent internet/network access. Several experts have presented testimonies and demonstrations that contradict "air-gapping" as fail safe.

13. "Most traditional air gaps involve what is popularly known as a "sneakernet," a physical method of transferring data, e.g., a Wi-Fi dongle or USB port."[7]

> At this point, human nature takes over. Even well-intentioned users will accidentally leave doors unlocked or USB ports unguarded. They may get lazy and neglect to follow security procedures. One worrisome example of this risk occurs on merchant ships and naval vessels, whose mechanical control and navigation systems are air-gapped because, well, they're on a ship and generally not connected to the Internet (though even that is starting to change.) Once a ship is docked, however, a malicious actor can gain access to the ship and use a USB stick to insert malware into the system. When a ship undergoes maintenance, and hundreds of semi- or non-vetted workers are aboard the vessel while the regular crew is away, it's easy to see how an air gap will fall apart.

[7] https://www.rubrik.com/insights/what-is-an-air-gap-and-why-is-it-important Last visited 06/21/22

> **2.5 Materials**
>
> Items identified in the table reflect materials required to perform hardware, software, telecommunications, security, accuracy and integrated system tests in a manner that reflects real world use and needs.
>
> The following test materials are required for the performance of testing including, as applicable, test ballot layout and generation materials, test ballot sheets, and any other materials used in testing.
>
> - Ballots & blank ballot grade paper
> - Thumb drives
> - USB dongles
> - Ballot marking pens
> - Printer paper rolls

[8]

14. Further, Brandon Hurley noted an *over vote* issue "….bring up a warning when more than one candidate can be voted for in a specific race. However, when you make your selection to continue, there is an automatic de-selection of another candidate chosen rather than allowing the voter to decide who gets deselected……. led to a voter confusion….casting of an unintended vote without voter's knowledge."[9]

***HART INTERCIVIC BALLOT ISSUES***

15. Hood County District Attorney Matthew Mills contacted Attorney General Ken Paxton requesting clarification of ballot numbering issues associated with the use of Hart InterCivic voting systems.

16. Mills pointed out the following issues with electronic voting systems, specifically Hart's hybrid voting system.[10]

    a. Questions arising about compliance with election code.[11]

    b. Who has the authority to select the method for numbering ballots?

---

8 https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EA Last visited 06/21/22

9 https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf#search=hart%202.4.2

10 https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/24/22

11 See Tex. Elec Code § 520.62

17. Texas Secretary of State legal director of the elections division informed election administrators of two ways to comply.[12]

  a. First method: Pre-print numbers on blank ballot stock, email deems "simplest and easiest way"

  b. Second method: The voting machine generates random numbers on blank ballots.

18. Mills poses (3) three questions regarding the ballot numbering issues with Hart.

[13]

> The relevant language in § 52.062 is the following: "[t]he ballots prepared by each authority responsible for having the official ballot prepared." Does this indicate that using pre-printed numbers on blank ballot stock is the only legal way to comply with the statute? Or does the machine generation method also comply with the numbering requirement?

  a. A memorandum from a staff attorney, Chuck Pinney, to the Director of Elections, Keith Ingram, dated May 18, 2020, states machine-generated numbering on the Hart Verity 2.4 system complies with Texas ballot numbering requirements.

  b. According to Elec. Code Ann § 31.032 the election commission has the authority to appoint an election administrator as well as suspend or terminate the administrator under § 31.037. Under § 31.039, the commissioners court maintains authority over various budgetary issues including salary and staffing.

    i. A 1988 Tex. Att'y Gen. Op. No. LO-88-62 (1988)[14] the AG's office opined that election administrators should be "largely independent of both the commissioners court and election

---

[12] https://www.sos.texas.gov/elections/forms/sysexam/chuck-pinney-hart-2.4.pdf See page 3 Last visited 06/22/22

[13] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 12 Last visited 06/22/22

[14] https://www2.texasattorneygeneral.gov/opinions/opinions/47mattox/lo/1988/pdf/lo1988062.pdf Last visited 06/22/22

commission.", essentially stating that the elections commission does not possess the authority to suspend an elections administrator.

ii. Senate Bill 12333 from 2011 may render the AG opinion moot which gave new authority to elections commissions to suspend elections administrators.

iii. In 1997, the San Antonio Court of Appeals provided a different conclusion in Krier v. Navarro, 952 S.W.2d 25. The elections administrator was greatly restricted in the exercise of his duties from "…selecting polling places and early voting sites, issuing orders calling for elections, adopting a voting system, selecting election judges and phone bank clerks…leasing voting systems…The evidence presented establishes that the governmental functions performed by Navarro were not exercised 'largely independent of the control of others."*Id*

Assuming the reasoning in *Krier* is correct, is the method of ballot numbering akin to "adopting a voting system," which is controlled by the commissioners court? Or has the commissioners court already determined the voting system by purchasing voting equipment, and the elections administrator may then determine which method of ballot numbering is appropriate?

Chapter 52 of the Election Code contains various provisions for the preparation of ballots. Under § 52.001, ballots are for the "vote in *an election*." (emphasis added) Does the suggestion in the director's advisory that jurisdictions may conduct subsequent elections with ballot numbers starting higher than "1" comply with § 52.062? Or should ballots begin with the number "1" for each election?

c. On October 23, 2019, Keith Ingram of the Texas Secretary of State office published Election Advisory 2019-23. Sec. 13(1)(a)(iv)(1)[15].

---

[15] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

The director suggests that jurisdictions *MAY* start with the number "1" and then start subsequent elections with ballots with much higher starting numbers. *(Emphasis added)* See below Election Advisory 2019-23, which reads as follows:

iv. The jurisdiction can pre-number the ballots and split them into batches for each election, with each batch beginning with a number that ends in the number "1". Those batches must be no smaller than units of 100, though a jurisdiction could batch in larger units if needed (1000, 10,000, etc.).

1. **Example:** For the November election, the jurisdiction could use ballots 1-1500, and for the May election that jurisdiction could then use ballots 1501-2400, and for the following November election the jurisdiction could use ballots 2401-4200, etc.

19. Is the Director of Elections advising jurisdictions to ignore Tex. Elec Code § 52.001?

20. Hood County Attorney Matthew Mills raises three very specific questions concerning the numbering of the ballots in which Hart InterCivic voting systems does not comply in accordance with Tex. Elec Code.[16]

21. In response to Mills' request for an opinion regarding numbering of the ballots, Roger B. Borgelt of Borgelt Law provided an opinion to the Attorney General's office on July 29, 2021.[17]

22. The Texas legislature is constitutionally required to provide for ballot numbering in Texas.[18]

23. The Texas legislature passed the consecutive ballot number statute 35 years ago[19] and provides integrity of the ballot by detecting counterfeited, missing, or duplicate ballots.

24. Tex. Elec Code § 52.062 requires consecutive ballot numbering consecutively beginning with number "1" and is referenced in (6) six other Election Code provisions, therefore making it an established mandatory procedure.

---

[16] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009

[17] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 3 Last visited 06/22/22

[18] See Tex. Con. Article 6 Sec. 4

[19] See Tex. Elec Code § 52.062

**a. § 51.006. PREPARING BALLOTS FOR DISTRIBUTION**

The authority responsible for distributing election supplies shall package and seal each set of ballots before their distribution and shall mark the package with the number of ballots enclosed and the range of the ballot serial numbers.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.47; Acts 1991, 72nd Leg., ch. 554, Sec. 18, eff. Sept. 1, 1991.

**b. § 51.007. RECORD OF BALLOT DISTRIBUTION**

(a) As soon as practicable after the ballots are packaged for distribution, the authority responsible for distributing election supplies shall prepare a record of the number of ballots and the range of serial numbers on the ballots to be distributed to each presiding judge and the early voting clerk.

(b) The authority shall preserve the record for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.48; Acts 1991, 72nd Leg., ch. 554, Sec. 19, eff. Sept. 1, 1991.

**c. § 51.008. SUPPLEMENTING DISTRIBUTED BALLOTS**

(a) The authority responsible for distributing election supplies shall retain a reserve of ballots to supplement the distributed ballots and on election day may reallocate previously distributed ballots among the polling places.

(b) The authority shall enter on the record of ballot distribution the number of ballots reserved and the number of ballots distributed from the reserve to each polling place. The range of serial numbers on the ballots shall be included in the record.

(c) If distributed ballots are reallocated, the authority shall indicate the reallocation on the record of ballot distribution and shall issue a receipt to each presiding election judge showing the number of ballots and the range of serial numbers on the ballots taken from the judge's polling place for redistribution. Each presiding judge shall indicate on the ballot register any reallocation of ballots affecting that polling place.

(d) The authority shall retain the undistributed reserve for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**d. § 51.010. FAILURE TO DISTRIBUTE OR DELIVER SUPPLIES**

(a) A person commits an offense if the person is responsible for distributing election supplies for an election and intentionally fails to distribute any of the supplies by the deadline prescribed by Section 51.004(b).

(b) A person commits an offense if the person is entrusted with the delivery of election supplies for use at polling places and intentionally

fails to deliver any of the supplies within the time specified by the person who entrusted the delivery to the person.

(c) An offense under this section is a Class C misdemeanor.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 864, Sec. 46, eff. Sept. 1, 1997.

**e. § 62.007. EXAMINING BALLOTS**

(a) An election officer shall unseal the ballot package, remove the ballots, and examine them to determine whether they are properly numbered and printed.

(b) An unnumbered or otherwise defectively printed ballot shall be placed in ballot box no. 4.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**f. § 62.009. DISARRANGING BALLOTS FOR VOTERS' SELECTION**

(a) As needed for voting, an election officer shall disarrange a supply of the ballots so that they are in random numerical order.

(b) The disarranged ballots shall be placed face down on a table in a manner preventing an election officer or other person from ascertaining the number of a ballot selected by a voter.

(c) The provisional ballots shall be placed separately from the regular ballots.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 1078, Sec. 6, eff. Sept. 1, 1997; Acts 2003, 78th Leg., ch. 1315, Sec. 22, eff. Jan. 1, 2004.

25. As noted above in Election Advisory 2019-23, the SoS notates that jurisdiction using ES&S and Hart InterCivic systems does not comply with § 52.062.[20]

i. **ES&S ExpressVote – Tracking Ballot Numbers Through the ExpressVote Activation Card Printer/ExpressLink Software**

1. Each ExpressVote Activation card printer that is assigned to a specific polling place will be given a two to three digit alpha code. This code will be printed on each Ballot Card as it is generated for the voter.
2. In addition to the alpha code, each polling place will print a randomly generated serial number between 1 to 99,999 on the card along with the identifying information related to the election.
3. The system will generate a report showing which ballots (based on their serial number) were used at each location. This report must be retained with your precinct election records.
4. For tracking purposes, you will continue to have the presiding judge fill out the Ballot Register (PDF), and the original and duplicate forms will be returned in the applicable envelopes. The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the exception of notating the serial number of the ballot ranges.

26. Randomized ballot numbering procedures will cause jurisdictions to violate several election codes.[21]

27. In the same advisory[22] the SoS Office does not advise how jurisdictions will comply with the following Tex. Elec Codes:

   **a.** § 51.010 – how will officials distribute serial numbered range records to polls.

   **b.** § 62.007 - how officials at polls determine if ballots are properly numbered.

   **c.** § 62.009 – how will election judges place numbered ballots face down.

[20] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[21] See Tex. Elec Code § 52.062, 51.006, 51.008
[22] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

28. Allowing voting machines to generate random text values on ballots will cause confusion and violate several Tex. Elec Code statues, and these violations are punishable by law.[23]

29. The SoS is provided the authority to prescribe "operating procedures" related to voting systems. The Tex. Elec Code does not provide the SoS the authority to advise election administrators to ignore any sections of the Election Code, as law and procedure are not the same.

30. The Legislative Branch did not provide the SoS the authority to ignore Tex. Election code nor the authority to advise to jurisdiction to do the same, which is a violation of Tex. Con. Art. 6 Sec. 4. in regards to numbering of the tickets/ballots. No authority grants the SoS defendants the ability to *interpret* Tex. Elec Code for the following:

   **a.** Advising jurisdictions to ignore Tex. Elec Code § 52.062.

   **b.** Hindering jurisdictions' ability to "detect and punish fraud and preserve the purity of the ballot box. ….as randomized ballot numbers prevent election judges from recording, validating, and tracking the official ballot serial number ranges they were in possession of, personally distributed, and retained at their polling locations, again violating Tex. Con. Art. 6, Sec 4."[24]

31. The Election Code specifically assigns the SoS duties[25] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code.[26]

---

[23] See Tex. Elec Code § 51.010(c), § 51.007(b), 51.008 (d) and 13 TAC § 7.125(a)(10) and Tex. Penal Code § 37.10(3)

[24] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/22/22

[25] See Elec. Code § 31.003

[26] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)

32. The SoS Defendants and County Officials disregard for Tex. Elec. Code in their guidance to jurisdictions violates the Separation of Powers clause of Art. 2 Sec. 1 of the Texas Constitution.

33. The Texas Constitution provides that only the Legislature can suspend laws, not the SoS, a member of the Executive Branch.

34. These actions are in contradiction to the Election Code and its interpretation and application to ensure uniformity across the state of Texas in all voting systems.[27]

35. By suspending laws and authorizing exceptions to the Election Code, the SoS Defendants have and continue to unlawfully modify election law.[28]

36. The Legislature provided a very clear and specific mandate: prepare and distribute detailed and comprehensive written directives and instructions that comply with the Election Code to state and local election authorities.[29]

37. The SoS Defendants' and County Officials' defiance of Election Code knowingly caused the Plaintiff(s), registered voters of Texas to:

    **a.** Cast a vote under false pretense[30]

    **b.** Prevent a cast of a legal vote in which Plaintiff(s) are eligible to vote.[31]

    **c.** Cause the ballot not to reflect the intent of the Plaintiff(s)/voter[32]

    **d.** Defendants committed the offense while acting in the capacity of an elected official.[33]

---

[27] See Tex. Elec Code § 122.032

[28] See Tex. Elec Code § 276.019. UNLAWFUL ALTERING OF ELECTION PROCEDURES - A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code.

[29] See Elec. Code § 31.003

[30] See Tex. Elec Code 273.013(1)

[31] See Tex. Elec Code 273.013(2)

[32] See Tex. Elec Code 273.013(6)

[33] See Tex. Elec Code 273.013(b)(1)

38. Randomized ballot numbering generated by Hart InterCivic Verity 2.4 results in multiple violations of election law, the Texas Constitution, and the Texas Penal Code.

***HART INTERCIVIC ESLATE***

39. During the 2018 midterms a number of "straight-ticket" voters complained that Hart's eSlate system had switched their choices to the opposite party. [34]

40. Others reported that the Hart eSlate machines appear to remove any selection for the U.S. Senate. [35]

41. In 2008, the Texas Democratic Party sued then-Secretary of State Roger Williams over a similar straight ticket voting error affecting the same Hart eSlate machine.[36]

42. April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification.[37]

43. California Secretary of State Debra Bown released results of the state's review of the voting systems used in the state.[38]

    a. Red Team, led by UC Davis computer scientist Mathew Bishop, was tasked with examining security vulnerabilities and found that Hart InterCivic could be compromised. Many of the attacks could be mitigated but *not all*. *(Emphasis added)*

    b. Red Team also noted that they did not have enough time to fully examine the systems and were confident that further examination would reveal additional security vulnerabilities in the voting system.

---

[34] https://techcrunch.com/2018/10/26/texas-voting-machines-changing-votes-hart-eslate/ Last visited 06/21/22
[35] https://www.houstonchronicle.com/news/politics/texas/article/Voting-machine-errors-changed-some-Texans-13339298.php Last visited 06/21/22
[36] https://www.austinchronicle.com/news/2008-08-08/658341/ Last visited 06/21/22
[37] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[38] https://www.wired.com/2007/07/ca-releases-res/ Last visited 06/23/22

c. Samples of the kinds of attacks the team was able to conduct on the Hart InterCivic System:

> 1. Election Management System. The testers did not test the Windows systems on which the Hart election management software was installed because Hart does not configure the operating system or provide a default configuration. Hart software security settings provide a restricted, Hart-defined environment that the testers bypassed, allowing them to run the Hart software in a standard Windows environment. They also found an undisclosed account on the Hart software that an attacker who penetrated the host operating system could exploit to gain unauthorized access to the Hart election management database. 2. eScan. The testers were able to overwrite the eScan firmware. The team also accessed menus that should have been locked with passwords. Other attacks allowed the team to alter vote totals; these attacks used ordinary objects. The team, in cooperation with the source code review team, was able to issue administrative commands to the eScan.
>
> 3. JBC. The team developed a surreptitious device that caused the JBC to authorize access codes without poll worker intervention. The team verified that the mobile ballot box (MBB) card can be altered during an election. The team also found that post-election safeguards to prevent the altered data on a tampered MBB card from being counted can be easily bypassed.
> 4. eSlate. The testers were able to remotely capture the audio from a voting session on an eSlate with audio enabled, thereby providing an attack that violates voter privacy.
> The team was also able to force an eSlate to produce multiple barcodes after printing
> "BALLOT ACCEPTED" on the VVPAT records. This could cause a county that used bar code readers to read the VVPAT to produce erroneous vote totals.

44. Brandon Hurley, a SoS examiner, notates on his examination report dated February 19, 2008: "…January 18, 2008, all of the appointed Examiners gather with Hart officials for remainder of the inspection and testing of the 6.2.1 System…. The examiner and the Hart officials held a lengthy discussion concerning past published issues and issues in other states that have come up with the Hart Intercivic 6.2.1 System and its predecessors. In particular, a previous "decertification" by the California Secretary of State was discussed…Hart officials represented that California immediately recertified the system after it was decertified."[39]

[39] https://www.sos.texas.gov/elections/forms/sysexam/brandonhurley.pdf#search=hart%206.2.1 Last visited 06/23/22

45. Hurley further noted: "…recommendation is conditioned on satisfactory answers being provided by Hart to the Secretary of State's office in response to the list provided to Hart on February 6, 2006. The answers to these questions are due from Hart on February 22, 2008. If any of the questions or additional issues, then I would suspend this recommendation pending the resolution of such issues."

46. Tom Watson, a SoS examiner, notates on his examination report the following:

a. "Tally, Rally, and SERVO employ the "secure desktop" feature which is supposed to prevent access to the operating system by the operator during the election processing. A flaw in the "secure desktop" was discovered during the Tally examination. The standard Windows file dialog is used to select a file when exporting VR data…This is a significant flaw because it allows an operator to delete files or launch a program that could manipulate the data files."

b. "…but there is a security issue. The file dialog flaw is significant and must be corrected."

47. Stephen Berger prepared a report for the SoS on Hart InterCivic Voting System Version 6.2.1 in which he recommended that this system NOT be certified until Hart InterCivic addressed the issues he cited below.[40]

a. Conditions of Certification

i. "All files installed with the system must be filed with the NIST NSRL. Hart InterCivic's response is egregiously deficient. To support incoming inspection of new systems a list of all files installed is need so that the new system can be verified as having

[40] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 Last visited 06/23/22

only the system as certified. Pre and post election checks to confirm that software has not been changed or tampered with are recommended. To do this local jurisdictions must have HASH codes of all static files. Further, to avoid the system having a single point vulnerability the non-static files, that change with use, should be evaluated by an entity other than the vendor. Why non-static files change should be understood by state and local authorities. Election officials should make their own independent determination that files that change with use and are not included in pre and post election checks are appropriate and do not represent a security vulnerability."

ii. In response to the question:

"Beyond the files installed with the Hart software, what other files in the operating system and elsewhere do the applications in the Hart 6.2.1 system use?"

Hart responded:

"Like most Windows based software, System 6.2.1's HVS applications make broad use of Windows resources, including hundreds of DLLs and other executable files. Hart would be happy to provide information on the identification of each of these individual files and there respective purpose and characteristics (e.g. why does its HASH code value change from one day to the next or one install to the next), but the information was not required during the original ITA and NASED certification testing, nor during subsequent "

"In its response Hart illustrates the importance of this point. The Hart software makes "broad use of Windows resources, including hundreds of DLLs and other executable files". Each of those files represents a potential vulnerability, an opportunity to introduce malicious code into the system. For that very reason it is essential that the information be available to verify these files both in the certification process and pre and post election. Past

deficiencies are no reason to propagate a vulnerability into the future. Being able to confirm that the software certified at the national and state level is identical to that installed and used in elections is one of the most significant improvements to total election system security that can be made. Implementing such checks requires not modification or recertification of a voting system, unlike many changes. The tools to verify HASH codes are readily available and do not require extensive training to use. It is hard to imagine why a change that is this beneficial is being resisted."

iii. In response to the HASH code issue, Hart InterCivic states:

"These criteria have been imposed on Hart HASH code submissions by arrangements agreed between Hart and NIST in the absence of other specific authoritative requirements for vendor reference files."

"This statement is inaccurate and misleading. This examiner has met personally and had multiple telephone conversations with NIST NSRL staff. NIST NSRL will HASH and post any files a vendor gives them to post."

iv. "Although the Hart InterCivic system is NASED certified it fails to meet some requirements for NASED certification dealing with operating system configuration. A secure configuration of the operating systems provided must be provided with instructions on how to check the configuration. To assure that the system is adequately secure Hart must specify an operating system configuration, with adequate safeguards to assure that the Hart applications will only run in a secure configuration of the operating system. The configuration should be consistent with industry practice as represented in the NIST security configuration checklist for its operating system, Windows 2000 Professional?"

v. In response to questions about the Hart Intercivic recommended configuration, the company stated:

"Setup and configuration of HVS application computers is accomplished only by qualified Hart technical personnel and includes all Windows updates as of the date of the install."

> "This practice is not acceptable. Voting system applications use many operating system functions. Changes to the operating system should only be made after approve by the Texas Director of Elections after appropriate review. Further, safeguards are needed to assure that only the approved update is installed on systems. The current practice potentially allows additional software to be installed under the guise that it is part of the operating system update."
>
> "To assure a secure election system there should never be a point at which individuals from a single organization can change software. At a minimum individuals from two different organizations should approve and verify any changes to the operating system. In the case of operating system upgrades it would be preferable that the vendor recommend and the Director of Elections approve any patches to the operating system. Then that the vendor install the patches and the local jurisdiction have the tools and information to verify that the system delivered to them have only certified software, including the version and updates to the operating system. Further local jurisdictions should have the tools and information to confirm that no additional software has been added to the system."

vi. Recommended administrative use procedures for this system are needed.

48. Hart InterCivic has a history of issues regarding hash validations, including version 6.2.1, yet the SoS's office did certify without publishing answers regarding if condition had been met.

49. Berger's report listed a multitude of security flaws presented in the Hart InterCivic 6.2.1 voting system.

3. **VSS 2002 Vol. 1 Sec. 2.2.5.3**

"**2.2.5.3 COTS General Purpose Computer System Requirements**

Further requirements must be applied to COTS operating systems to ensure completeness and integrity of audit data for election software. These operating systems are capable of executing multiple application programs simultaneously. These systems include both servers and workstations (or "PCs"), including the many varieties of UNIX and Linux, and those offered by Microsoft and Apple. Election software running on these COTS systems is vulnerable to unintended effects from other user sessions, applications, and utilities, executing on the same platform at the same time as the election software.

"Simultaneous processes" of concern include unauthorized network connections, unplanned user logins, and unintended execution or termination of operating system processes. An unauthorized network connection or unplanned user login can host unintended processes and user actions, such as the termination of operating system audit, the termination of election software processes, or the deletion of election software audit and logging data. The execution of an operating system process could be a full system scan at a time when that process would adversely affect the election software processes. Operating system processes improperly terminated could be system audit or malicious code detection.

To counter these vulnerabilities, three operating system protections are required on all such systems on which election software is hosted. First,

**25 of 33**

**Version: 2.0**
**Date: March 3, 2008** [41]

50. These security vulnerabilities provide access to election system in a way in which vote totals may be altered.

51. The SoS's office issued a "Preliminary Statement" on April 30, 2009 under the conditions the examiners discovered two potential security concerns and advised security protocols to follow to mitigate these vulnerabilities.

52. If these security protocols are not followed, then it is theoretically possible to have access to the operating system and run or delete other programs. Jurisdictions are advised to (1) restrict usage of the voting system[42] and (2) restrict what software is loaded onto the voting system computer.

53. The SoS's office further "conditioned" the certification of version 6.2.1 by applying procedures for jurisdictions. (1) Two-person access with one person login on Windows 2000 OS and one person to start the application. (2) Two-

[41] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 See page 25 Last visited 06/23/22
[42] Election Advisory 2008-09, Section 5(f)(i-iii)

person control team on the Tally when open. (3) Windows 2000 audit logs which tracks log-ons and attempts. (4) Windows 2000 to harden operating systems. (5) Jurisdiction must file an initial written confirmation with the SoS that they are in compliance with the procedures.[43]

54. By the SoS's current website, there are 35 counties utilizing this version of Hart.[44]

## Galveston County

55. On December 1,2018 SOS approved Hart InterCivic 2.0 for use in Texas. On December 4 ,2018 Galveston County contracted with Hart to implement version 2.0. The contract was signed by Galveston County on December 10,2018. Galveston County states that Hart InterCivic 2.4.2 was used on November 3,2020. No contract available in SOS's office for using Hart InterCivic 2.4.2.

## DECLARATIONS FROM AUTHORITIES

56. The Affidavit of Terpsehore Maras attests that the 2017 elections is null and void due to lack of Election Assistance Commission (EAC) certifications of Voting Systems and the Voting System Test Laboratories (VSTL) used to certify the Voting Systems. (APPENDIX P-1) [45]

> RULE: Section 231(b) of the Help America Vote Act (HAVA) of 2002 (*42 U.S.C. §15371(b)*) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC

[43] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[44] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf Last visited 06/23/22
[45] https://storage.courtlistener.com/recap/gov.uscourts.wied.92717/gov.uscourts.wied.92717.9.13.pdf

considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA § 231(b)(1). However, consistent with HAVA § 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

57. CONCLUSION: This affidavit presents unambiguous evidence of:

a. Foreign interference
b. Complicit behavior by the previous administrations from 1999 to present to hinder the voice of the American people
c. Knowingly and willingly colluding with foreign powers to manipulate the outcome of the 2020 election
d. Foreign nationals, through investments and interests, assisted in the creation of the Dominion software
e. Akamai Technologies merged with a Chinese company that makes and distributes the COTS components of election machines
f. US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections
g. The EAC failed to abide by standards set in HAVA ACT 2002
h. The IG of the EAC failed to address complaints since their appointment regarding vote integrity
i. Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

j. Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then
k. The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.
l. AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations

58. This is a summary of the Declaration of Mr. J. Alex Halderman regarding the case of Curling et al v. Raffensperger et al.[46] Mr. Halderman makes these claims under oath, and this summary will neither make inferences from nor inflate his statements. APPENDIX P-2

59. The DRE machines do not create a paper record of each vote. Paperless DRE machines are notoriously vulnerable to cyber attacks that can cause a multitude of issues. Votes can be changed or erased. Extra votes can be cast, and machines can be made to not work at all. He goes on to state that paperless DRE machines do not provide even adequate security against cyber attacks.

60. Mr. Halderman claims the 2016 presidential election was subject to multiple attempts to interfere with and undermine the election process through cyberspace. He cites incidents such as compromised email accounts belonging to the Democratic National Committee and John Podesta. He also cites attempted intrusions into election-related systems via cyberspace in at least eighteen States. Voter data was successfully exfiltrated in two states, and in a

[46] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Halderman

subset of those eighteen, attackers could have altered or deleted voter registration data.

61. Shawn Smith, retired Military officer with a Master's degrees in National Security Affairs and in Aeronautical Science, filed a declaration on 6/8/2022 into Kari Lake, et al. v. Katie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt)[47]. APPENDIX P-3

62. He states: "I have been asked to testify about the threat of the compromising of our supply chain and attack(s) to U.S. national security systems and critical infrastructure, in particular to election related systems, including voting systems and consequently, to elections." As noted in other expert affidavits and declarations, Smith describes the vulnerability of the United States' critical systems resulting from compromised supply chains, which includes U.S. elections. He states that it is his, "conclusion that U.S. elections are critically vulnerable to exploitation by foreign adversaries through compromising of our computerized election systems through supply chains."

63. "Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in 50 states, much less over our 3,000 U.S. Counties. Hart InterCivic appears to use Hewlett-Packard computers, which are remanufactured and assembled overseas, containing overseas-manufactured components, built by foreign workers, and all without U.S government oversight and "effectively no safeguards in the entirety of the testing and certification regime for voting systems"

[47] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith

64. "ES&S is owned by the private equity firm McCarthy Group, which doesn't disclose the information of investors, including if any other investments or financial interests, have a controlling interest in ES&S."

65. The Declaration of John R. Mills and the testimony of Mr. Mills regarding the use of remote access operations for the unlawful entry and purposes into computer networks was requested. The information is unclassified and based on his personal experience, publicly available reporting, and open-source information. (APPENDIX P-4)

66. Remote access operations are designed to gain access to computer networks to avoid detection and residual forensic evidence. This is accomplished via implanted malware, other software, and/or algorithms that facilitate access to the targeted system.

67. Electronic election infrastructure is considered critical infrastructure and can be subjected to remote access operations. A successful remote access operation could change vote totals, rendering elections null and void. Mr. Mills states he has very low confidence in the security of American election critical infrastructure.

68. Mr. Mills states there is no independent third-party review of electronic voting systems. The level of expertise by those officials who review or access these systems is woefully inadequate.

69. He states contractors use intellectual property rights or contractual terms to deny any third-party review of the election systems they provide.

70. Mr. Mills points out that ES&S has admitted to building in remote access to their machines. He goes on to state that many of the security procedures designed to restrict the ability of remote access operations are not being used.

71. Mr. Mills concludes by assessing the current voting process has become over-sophisticated and asks why this is necessary for elections. He raises legitimate

questions of why counties are spending inordinate amount of resources on a technology environment without an evaluation of whether it is truly required. He further assesses there are no checks and balances on sworn elected officials and states the entire notion of electronic voting machines needs to be revisited.

72. The Declaration of Douglas Logan (APPENDIX P-5) concurs with the aforementioned affidavits and presents evidence from DEFCON Reports (Exhibits A, B, C).

73. See Appendix P-6 for issues related to the accreditation of electronic voting systems.

74. See Appendix P-7 for foreign countries involved in election infrastructure, manipulation, and supply chain management.

## FAILURES, NEGLECT, AND OFFENSIVE VIOLATIONS

UNDER 42 U.S.C. §1985, 42 U.S.C. §1986, GUARANTEE CLAUSE,
28 U.S.C §1367

Respondent County Officials: Dwight D. Sullivan, Galveston County Clerk, Mark Henry, Galveston County Judge, Darrell Apffel, Galveston County Commissioner Precinct 1, Joe Giusti, Galveston County Commissioner Precinct 2, Stephen D. Holmes, Galveston County Commissioner Precinct 3, Robin Armstrong, Galveston County Commissioner Precinct 4 have violated state and federal law with violations that include:

a. Operating systems lacking proper certifications.
b. Unmonitored network communications.
c. Restricting access to public information.
d. Concealing and refusing to release voting system software/firmware versions.

e. Once informed of any problematic issues with voting systems/software, proceeded with elections without informing the public nor issued any public statement as the malfunction continued to affect casting of ballots during the election.

f. Under the advice of SoS, violated Tex. Elec Code § 52.062 requiring the numbering of ballots, which produced a violation of Art. 1 § 28.

g. Under the advice of SoS, violated Tex. Const. Art. 6 § 4 by providing for numbering of tickets specifically reserved for the Legislative Branch.

h. Impeded election workers and staff from the ability to "detect and punish fraud and preserve the purity of the ballot box." Randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations, violating Tex. Const. Art. 6 § 4.

i. Set off a chain reaction of violations of several ballot numbering statues that are not only illegal but also criminally punishable in the election code. Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and Tex. Penal Code § 37.10(3)

j. Certified not only the November 3, 2020 election results but every subsequent election after receiving evidence from constituents that cast doubt on the integrity of the ballot.

k. Knowingly remiss in their duties, acting under the color of law, and are in violation of Texas statute. These officials did not acknowledge the expiration of certification of accreditations of VSTLs nor the lack of legal signature per HAVA, thereby continuing to allow these voting machines to be used in county elections since 2020. What is confirmed

is that Pro V&V and SLI Compliance were ***Not Accredited*** VSTL. *(Emphasis added)*

l. Under the guise of ‘protecting the vote’, County Officials with undisputed knowledge of HAVA have nefariously sought to suppress the violations of federal and state law from Petitioner. After multiply attempts in the form of PIA(s), the county actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

m. Officials and employees, under the directive of the SoS office, withheld from the public that the malfunctions of the voting equipment/software were not resolved but were, in fact, affecting multiply counties during the elections.

n. Acting under the color of law, administered elections with non HAVA complaint voting system equipment, software, and modifications for the state of Texas that have been used in state and federal elections from 2020 through 2022, violating Tex. Elec. Code § 122.032, § 52.062, Tex. Admin. Code § 81.60 and § 81.61, and are also apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. 20971.

o. By Officials’ own admission via the State of Texas’ Secretary of State website regarding education of the HAVA, they knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation from the EAC.

p. Respondents’ duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

q. Respondents have, by their actions, demonstrated an intention to continue to allow these same failures to be repeated in future elections.

# EMERGENCY RELIEF IS NECESSARY

The Constitution requires that elections be free, fair, and accurately counted. Changing reported votes or vote totals in a public election violates Petitioners' fundamental right to vote and Petitioners' rights under the Due Process clause and the Equal Protection clause. The only way to prevent these violations is to refrain from using vulnerable Electronic Voting Systems to administer future elections, including the 2022 November Election. The relief requested by Petitioners is the only way to eliminate the likelihood that Texas election results will be secretly changed by malicious programs hidden in Electronic Voting Systems. Accordingly, a emergency relief is appropriate and necessary to remedy the impending violations of Petitioners' constitutional rights. "In order to obtain a restraining order a plaintiff must establish (1) 'that he is likely to succeed on the merits,' (2) 'that he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in his favor,' and (4) 'that an injunction is in the public interest.'" Hernandez v. Sessions, 872 F.3d 976, 989-90 (9th Cir. 2017) (quoting Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008)). "Under our 'sliding scale' approach, 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" Hernandez, 872 F.3d at 990 (quotations omitted). Petitioners meet each of the four elements here. Due to irreparable harm to Petitioners' personal property (my vote) and under principles of the balance of equity, Petitioners are entitled to emergency writ of injunction. TEX. CIV. PRAC. & REM. CODE § 65.011, TEX. ELEC. CODE § 273.081.

### A. Petitioners Are Likely to Succeed on the Merits.

Petitioners will prevail on the merits of their claims because the right to vote and have one's vote counted correctly together with all other votes is a basic right

guaranteed by multiple constitutional provisions, and the use of Electronic Voting Systems as Texas intends grossly infringes that right.

Voting is an indisputable right "of the most fundamental significance under our constitutional structure." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (internal quotation marks and citation omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Therefore, states may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. Baker v. Carr, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest." Curling, 493 F. Supp. 3d at 1280 (citing Burdick, 504 U.S. at 434). "Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562 (1964).

The scope of the right to vote requires states to adopt methods of voting, vote collection, vote counting, and vote tallying that ensure fair, accurate, and secure counting of all legal ballots and exclude any attempt to change the total results reported to differ from the true sum of the votes legally cast. The fundamental right to vote is "the right of qualified voters within a state to cast their ballots and have them counted." United States v. Classic, 313 U.S. 299, 315 (1941). It necessarily encompasses the right to have all votes counted accurately. "Every voter's vote is entitled to be counted once. It must be correctly counted and reported." Gray v. Sanders, 372 U.S. 368, 380 (1963). Because the significance of a vote is inherently

comparative – the meaning of a vote is destroyed by improper inflation of opposing vote totals, just as much as if the vote itself was wrongfully prevented – a state's entire system of collecting, counting, and tallying votes must prevent any manipulation of the reported totals.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds, 377 U.S. at 555. See also United States v. Saylor, 322 U.S. 385, 386 (1944) ("'[T]he free exercise and enjoyment of the rights and privileges guaranteed to the citizens by the Constitution and laws of the United States'" entails "the right and privilege . . . to have their expressions of choice given full value and effect by not having their votes impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified.").

A voting system that counts ballots cast by some voters using different standards from ballots cast by other voters also violates the Equal Protection rights of the voters. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104-05 (2000); Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). Electronic Voting Systems are inherently vulnerable to improper manipulation of votes and vote totals. They cannot be effectively secured against improper manipulation. Therefore, they cannot be constitutionally used to administer Texas elections.

**B. Petitioners Will Suffer Irreparable Harm Absent Emergency Relief.**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990,

1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); Hernandez, 872 F.3d at 994-95. Texas's intended use of Electronic Voting Systems in future elections, including the 2022 Election, will deprive Petitioners of their constitutional rights. Petitioners and all Texas voters will suffer irreparable harm absent the grant of preliminary relief. Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioners if the requested injunctive relief is not granted Immediate preservation of ballots, followed by a thorough forensic examination of each ballot by highly qualified, independent document examiners, will serve to restore the public's confidence in the state's election process. Petitioners show that a basic tenet of a free republic requires that the counting and tabulation of fraudulent ballots cannot be allowed to stand unchallenged.

### C. The Balance of Equities Favors an Injunction.

The balance of equities favors entering the injunction sought by Petitioners. It will cause little, if any, harm to the Respondents, because the system currently intended to be used already calls for the creation of paper ballots. TEX. CONST. art. VI § 4, TEX. ELEC. CODE Chp. 65. By Texas law, the Respondents are already able to carry out the relief sought by Petitioners. The requested injunction would merely require the use of hand counting for all voters and all contests. In contrast, failing to enter the injunction and permitting use of the currently intended system would inflict immeasurable harm. In addition to the deprivation of Petitioners' constitutional rights, the true election results would never be known with certainty, casting a shadow of illegitimacy over the subsequent official acts of the winning candidates. If the defining feature of self-government is the selection of governing officials by majority vote, then conducting an "election" process in which the people cannot confidently know which candidate received the majority vote means intentionally casting aside self-government. That enormous harm would be felt by

all persons, whether citizen, voter, or neither, because it would bring into dispute the governance of the public authorities. The resulting loss of legitimacy and increase in political strife would be felt by all.

The Petitioners seek to have the Court ensure, by an appropriate Order, the safe-keeping and non-spoliation of all original ballots and all other related election information – tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic election equipment, including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR) archives, project database backups, and any other form of backups – from the November 2020 election until such time that an extensive forensic inspection by qualified independent document examiners and experts is conducted to determine which ballots are original and which are counterfeit, if any. Petitioners request all other and further relief, at law and in equity, which the Court deems necessary to ensure accurate certifications of the elections occur in the State of Texas, given that the current certification is plagued with demonstrable errors. Petitioners show that the preservation of records and evidence – with subsequent investigation – will have the resulting benefit of ensuring that Galveston County implements the necessary changes, safeguards and best practices to ensure that future elections are conducted in strict accordance with Texas law.

### D. The Requested Injunction Is in the Public Interest.

The public interest requires free, fair, and accurately counted elections in which the votes of all legal voters are counted equally and are not diluted by altered

votes or phantom votes. This is also the constitutional right of Petitioners and all Texas voters. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." Hernandez, 872 F.3d at 996 (quoting Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005)). Further, eliminating even the appearance of unsecure elections serves the public interest. "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008). The use of Electronic Voting Equipment creates large, invisible risks of vote dilution and/or alteration. Therefore, the injunction against the use of this equipment sought by Petitioners strongly serves the public interest. The principle that a federal court should not cause confusion among voters by enjoining state election laws immediately before an election, Purcell v. Gonzalez, 549 U.S. 1 (2006), does not apply in these circumstances.

The 2022 Election is four months away. "When an election is 'imminen[t]' and when there is 'inadequate time to resolve . . . factual disputes,'" Purcell will "often" (though "not always") prompt courts to "decline to grant an injunction to alter a State's established practice." Ohio Republican Party v. Brunner, 544 F.3d 711, 718 (6th Cir. 2008). The 2022 Election is upcoming, but not so imminent that inadequate time remains to allow for the relief sought by Plaintiffs. In light of the clear risk that illegal manipulation of vote totals may occur through unauthorized access to electronic election equipment, another policy affirmed by Purcell weighs in favor of granting injunctive relief:

Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will be disenfranchised.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555 (1964). Purcell, 549 U.S. at 4.

Furthermore, it is the objective of these Petitioners to evidence preserved for investigations and inspection in order to answer the question, once and for all, whether there was corruption and in the end to restore the public confidence in the principle of one-citizen one-vote, The public's faith and trust in this core principle is essential to the future of Texas and the Republic. Petitioners do not seek to overturn or contest the General Election of 2020—but rather to discover uncontroverted evidence of an accurate account of legal, not counterfeit ballots, and to play a role in fashioning a remedy in order to prevent the harm and injury from occurring in the future.

## PETITIONER(S) FACE DIFFICULT CIRCUMSTANCES

The Secretary (s) of State, the Deputy Secretary of State, the Election Director and the County Election Administrator(s) and County Officials knowingly allowed Texans to vote on networked machines that were not certified due to lack of accredited VSTL(s) since the November 3, 2020 elections. This onerous conduct renders the results void. The Respondents continued to certify election results knowing they violated Texans' civil liberties, subsequently forcing Petitioner(s) into fraudulent contracts with illegally elected government officials. Officials were provided unlawful power to enforce actions under the color of law and used this power to coerce and subject Petitioner(s) into servitude through unlawful elections. Petitioner(s)' liberty to determine our own course and way of life has been strong-armed from us. "The secretary of State has no authority to pass upon the question of

negligence or freedom from negligence. He has no discretion but is obliged to act as the law provides." *DeVries v. Secretary of State, 329 Mich. 68 (1950). 44 N.W.2d 872.*

Petitioner(s) are entitled to free and fair elections of our representatives, affirmed by the U.S. Constitution, Article 1. The government provides the means by which we exercise that Right. Petitioners do not have an alternate means of ensuring our election process. Therefore, we are burdened by the system put in place through our elected officials. In Rice v. Cayetano, the Court ruled the Fifteenth Amendment, "...reaffirms the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." The Court did not specify the 15th Amendment applies only to a protected class, but rather it applies to everyone.[48]

As part of their sworn duty, our elected officials have an imperative responsibility to guarantee protection of the election process from any form of fraud or profiteering as this could lead to discrimination of voters, regardless of classification. Additionally, when elected officials fail to provide the level of protection necessary to secure the election franchise, it is the Right and Duty of the American people to correct this deficiency. The Court cannot deny this Right to the people when the injury is widespread. It is infeasible to imagine an entire population advancing on the Court for relief.

Failure to perform their sworn duty has allowed discrimination to occur across the equality of races in the State of Texas. This violates the Right to Vote Clause of the Fifteenth Amendment. Furthermore, by failing to protect against private interference (i.e.: vendor voting systems, Scytl, et al) of the election process by not adhering to Federal election/ voting system certification standards (HAVA 2002), and the most basic cyber security defense and hardening frameworks, Respondents

[48] http://cdn.loc.gov/service/ll/usrep/usrep528/usrep528495/usrep528495.pdf

failed to comply with 18 USC Section 245(1)(a). Therefore, Respondents do not comply with the Enforcement clause of the Fifteenth Amendment.[49]

Each day Petitioner(s) has suffered irreparable harm living under a government that no longer represents we the people and deprives us, the Petitioners, and all voters of the state of Texas, of the Republic that the Constitution of the State of Texas and United States Constitution outline as protection from a tyrannical government. The general public benefits from the remedy against the constitutional infringements where any citizen can bring a case before the court as long as it impacts the public interest, and benefits the general public, not just the Petitioner. *Assoc. Indus. of New York v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943).*

It is our constitutional duty to invoke our authority as free persons to petition and address this court regardless of the outcome of this complaint, it serves as notice to all acting officials and non-officials within our government that we demand justice for any and all criminal behavior and fraud. 'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' *Baker v. Carr 369 US 186, 208 (1962) citing 364 U.S. at 347, 81 S.Ct. at 130.57.*

*Sherar v. Cullen, 481 F 946* (1973), “There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights.” “No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it.” *Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958).* Although Respondents may assert immunity against these claims, the Constitutional theory is that we the people are the sovereigns, the state and federal

---

49 https://uscode.house.gov/view.xhtml?req=(title:18%20section:245%20edition:prelim)%20OR%20(granuleid:USC-prelim-title18-section245)&f=treesort&num=0&edition=prelim

officials only our agents. As Judge P. Higginbotham dissented, "the 11th Amendment does not bar these claims under the 14th Amendment… The role of the Court in protecting the most vital right of a democratic government: the right to vote; should not be denying the right to vote." *Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit.*

The immediate injury continues as Texas officials continue to allow us to vote in another election conducted on uncertified and networked machines is a violation of our 1st, 14th, and 15th amendment rights and a violation of Tex. Elec. Code §52.062, §122.01(3)(4), § 129.054(a) (b)(c), § 122.031(c) and United State Code 52 U.S.C. § 20511 (2)(a)(b)**,** which is criminal. The Petitioner(s) stand to lose more of our freedoms as each day passes without resolution.

However, knowing what we, the Petitioners, now recognize as the illegality of the certifications, did the Petitioners cast an illegal ballot unknowingly at the time? Since 2020, we have been **Forced** to continue this illegal practice by our own government due to their reckless disregard for the law and constitution. Our only remedy thus far has been:

a. Notify the proper authorities in our respective counties and our state government in pursuant with Tex. Elec. Code § 273 in which the Petitioners have made many attempts for over a year.
b. Not to participate in unlawful elections and thereby denied our right to vote as our last alternative.
c. Seek legal means via the Peoples' court.

This brings us here today as we seek redress of our 1st, 14th, and 15th amendment rights under 42 U.S.C. § 1983, "taking on the mantel of the sovereign," guarding for all of us the individual liberties enunciated in the Constitution. Section 1983 represents a balancing feature in our governmental structure whereby

individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa. 1973).

We, the people, have the Right to elect our representatives. The government provides the means by which we exercise that Right. The Framers could not foresee the day computerized touch screens or FROG ciphers would be used any more than they could an AR-15. But we, the people, have the Right to ensure elections are free and fair. We are not just ensured the Right to CAST the vote. We, the people, are guaranteed the Right to ELECT our government. This entire process must be guaranteed. Anything that circumvents that process is inherently infringing upon the Right we are granted to pursue life, liberty, and the pursuit of happiness.

We maintain a Right to defend ourselves and others from attack. We also maintain the same Right to defend our election process when it is subject to profiteering by actors who would seek to abolish our sovereignty in favor of a dictatorship. We, the people, carry this Right and every other Right in the same manner we would a physical firearm. Every single Right we enjoy, as affirmed in the Constitution, is a weapon and protection against tyranny. A violation of one Right is a violation of all Rights. We exercise our free will and choose, through our Rights, to remain free. As Justice Oliver Wendell Holmes put it: “We do not inquire what the legislature meant; we ask only what the statute means.”

## COUNTS

### COUNT I - Violation of Procedural Due Process UNDER TEX. CONST. art. I § 17, § 19, 42 U.S.C. §1983, 28 U.S.C. §1331dp (1st, 14th, and 15th Amendments)

(Seeking declaratory and injunctive relief against All Defendants)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. *42 U.S.C. §1983.* For this matter, Respondents violated the federally protected rights of voting. *18 U.S.C. 245.* In the instant case, Respondents unquestionably acted under the color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the First Amendment to the Constitution, no official may abridge the freedom of speech. The Fourteenth Amendment applies the protections of the First and Fifteenth Amendment to state actors. U.S. Const. Ann., Amendment XIV. Under the Fifteenth Amendment to the Constitution, the right to vote for each citizen of the United States shall not be denied or abridged by any state on account of servitude by those in power without due process of law. U.S. Const. Ann., Amendment XV.

Petitioners have constitutionally protected interests in the benefits that come from the right to vote. Petitioners have been subjected to the illegal voting systems/equipment, software, and modifications. We have also been hindered in our ability to pursue our First Amendment right to legal elections without being subjected to casting an illegal vote that violates federal and state laws. Respondents knowingly certified voting system/equipment, software, and modifications, which unlawfully deprives Petitioners of these and other constitutionally protected interests without due process of law.

Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose these communications to the public nor gave notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioners

prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas laws, Federal laws, and other applicable laws. Such deprivation violates the First, Fourteenth, and Fifteenth Amendments of the United States Constitution, thereby depriving Petitioners guaranteed civil rights in regard to casting a "legal" vote. Despite Respondents' knowledge of voting systems noncompliance with state and federal law, Respondents intend to continue to utilize these non-compliance systems in future elections. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, which also includes suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.06.*

**COUNT II - Violation of Substantive Due Process**
**UNDER TEX. CONST. art. I § 3, 42 U.S.C. §1983, 18 U.S.C. §245**
**(Fourteenth Amendment, Equal Rights)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a Petitioner must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. 42 U.S.C. §1983. For this matter, Respondents violated the federally protected rights of voting. *18 U.S.C. §245*. In the instant case, Respondents unquestionably acted under the color of state law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the Fourteenth Amendment of the Constitution, and as established by state law, including the state created Accardi doctrine, Petitioners have a fundamental right to cast a ballot and vote in a legal and fair election. Petitioners were harmed and

continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. ELEC. CODE § 276.013(a)(4)*

**COUNT III – Deprivation of Civil Rights**

**UNDER TX Const. Art. I, § 13 and Art. I, § 19,**

**42 U.S.C §1983vp, 28 U.S.C. 1985**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him, in his land, goods, person, or reputation, shall have remedy by due course of law." Article 1, § 19 of the Texas Constitution affords the people of Texas the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law. Petitioners have constitutionally protected interests in the benefits that come from the right to vote and not being subject to the illegal voting systems/equipment, software, and modifications. This includes the ability to pursue our First Amendment right to legal elections without being subjected to casting illegal votes in violation of both state and federal laws.

Respondents knowingly approved voting system/equipment, software, and modifications unlawfully, which deprives Petitioners of these and other constitutionally protected interests without due process of law. Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose to the public and gave no notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioners prior to certifications. Such deprivation was

arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas and Federal laws and other applicable laws. Such deprivation violates Article 1, § 13 and Article 1, § 19 of the Texas Constitution thereby depriving Petitioner civil rights regarding casting a "legal" vote. *TEX. PEN. CODE § 37.03, § 37.10.* Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications.

**COUNT IV – Deprivation of Constitutional Rights**

**UNDER TX Const. Art. I, § 13 and TX Const. Art. I, § 19,**

**28 U.S.C. 1331vc**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." Article 1, § 19 of the Texas Constitution affords the people of Texas the right to be free from violations of the substantive due process rights, and no person may be deprived of life, liberty, or property without due process of law. Under Article 1, § 19 of the Texas Constitution, and as established by state law including the state created Accardi doctrine, Petitioners have a fundamental right to cast ballots and vote in a legal and fair election. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE §39.03(2).*

**COUNT V – Voting Rights Violation**

**UNDER TEX. CONST. art. VI § 2 to Count V,**
**52 U.S.C § 20511 (2)(a)(b), 52 U.S.C. §10101, 28 U.S.C. 1943**
**(First and Fourteenth Amendment)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 20511(a)(b) of Title 52-Voting and Elections, a plaintiff must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioners to be deprived of a federally protected right. *42 U.S.C. §1983*. In the instant case, Respondents unquestionably acted under the color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statues for the State of Texas. Under the First and Fourteenth Amendment to the Constitution, and as established by state law including the state created Accardi doctrine, Petitioners have a fundamental right to cast a ballot and vote in a legal and fair election. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.02.*

**COUNT VI – DECLARATORY JUDGMENT**
**UNDER 28 TEX. CIV. PRAC. & REM. CODE § 37.003, § 37.004 (a)(b),**
**28 U.S.C. § 2201**

(Against All Respondents)

Petitioners incorporate the foregoing paragraphs as set forth in full herein: Respondents conduct has and will continue to violate the rights of citizens of Texas, as set forth above. The Court has the authority pursuant to 28 U.S.C. § 2201 to issue an Order enjoining the State from conducting an election in which the votes are not accurately or securely tabulated. If the State of Texas proceeds with the forthcoming

election as described above, it will violate the rights of Texans by conducting an unsecure, vulnerable electronic voting systems that are susceptible to manipulation and intrusion. If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an election on illegally certified voting systems in violation of both the State of Texas and Federal election laws. The Court should issue an Order enjoining the State from using any electronic voting system and respective devices to include, but not limited, to poll pads, tabulators, printers, etc.

Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioners if the requested emergency relief against the destruction of the 2020 general election records does not occur. The Court should issue order enjoining officials from the spoilation, destruction, alteration of all records including, but not limited to: paper ballot, absentee ballots, tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic, election equipment (including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR)archives, project database backups, and any other form of backups). *TEX. ELEC. CODE § 66.02, § 66.058*; and further, to order a thorough independent forensic examination of each ballot by highly qualified document examiners, will serve to restore the public's confidence in the state's election process. *See Karen Wiseman v. Tarrant County, Texas and Heider Garcia (2021) No. 096-330696-21, Texas*.

## PRAYER FOR RELIEF

WHEREFORE, “For there is no authority except from God, and the authorities that exist are appointed by God.” *Romans 13:1* (NKJV). Petitioners pray that the Court grant the following relief:

a. ASSUMES jurisdiction of this action in the interest of justice.

b. ISSUES and EXPEDITES judgement TEX. GOV. CODE § 23.302;

c. Vacates and sets aside all uncertified and illegal voting systems/equipment, software, and modifications and implements a precinct level hand-marked paper ballot and hand counting system as permissible by Tex. Elec. Code Chp 65.

d. DECLARES that the Respondents have violated the Texas Constitution Equal Protection Clause;

e. DECLARES that the Respondents have violated the Texas Constitution Due Process Clause;

f. GRANTS an emergency injunction prohibiting Respondents from requiring or permitting voters to have votes cast or tabulated using any electronic voting systems, pollbooks, or devices.

g. GRANTS an emergency injunction prohibiting Respondents from destruction/deletion of any and all election records created under Title 8 of the Tex. Elec Code to include all paper ballots created by voting systems, USB devices, memory cards, electronic storage devices, mail in ballots, tabulation tapes, USB final counts from precincts and all other election records not specifically stated from the 2020, 2021, and 2022 elections.

h. DECLARES that the Respondents approval of all voting system/equipment, software, and modifications are void and without legal force or effect;

i. DECLARES that the institution of the approval policies is arbitrary, capricious, and based on negligence and disregard, in accordance with law and without observance of both the required procedure and Accardi doctrine;

j. DECLARES that the approvals and the actions taken by Respondents are in violation of the Constitution and contrary to the laws of the United States and the State of Texas;

k. Temporarily restrains, as well as preliminarily and permanently enjoins Respondents, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing and/or enforcing the certifications of all voting systems/equipment, software and modifications that are not in compliance with the applicable law;

l. ORDERS to unseal absentee ballots, absentee ballot return envelopes, the absentee ballot election reports, and other paper and electronic information election materials from the General Election 2020 and to permit Petitioners to review, examine, inspect, and duplicate such materials including, but not limited to electronic images of electronic drives used by Respondents in the General Election;

m. ORDERS Respondents to terminate all employees, agents, and contractors shown to have had knowledge of or acquiesced in the improper acts described herein;

Grant such other and further relief as may be just, equitable, and proper, including, without limitation, an award of any attorneys' fees and costs to Petitioners.

Respectfully submitted this 6th day of August,2022.

By: /s/ *Steven Harvey*

Steven Harvey
12511 32nd Street,
Santa Fe Texas 77510,
email scharvey69@yahoo.com,
phone 409-599-5691

## Affidavit

Pursuant to 28 U.S.C. 1746, I, Steven Harvey, make the following declaration:

**Affiant** supports in writing a cause that demonstrates Respondents' actions as outlined above in this complaint/petition violate several state and federal laws, which are against The People of Texas, and also , against the peace and dignity of the State.

1. In Galveston County a voting system was used that was not properly certified or approved by the SOS and a foreign owned company called Scytl was used for vote reporting.

2. I believe my vote could have been changed and possibly illegal votes casted.

3. If this continues I cannot trust that my vote will be counted correctly.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this August 6, 2022

**Affiant**: /s/ *Steven Harvey*

Steven Harvey
12511 32nd street,
Santa Fe Texas 77510,
email scharvey69@yahoo.com,
phone 409-599-5691

# APPENDIX LIST

1. Declaration of Terpsehore Maras
2. Declaration of Alex Halderman
3. Declaration of Shawn Smith
4. Declaration of John R. Mills
5. Declaration of Douglas Logan
6. Accreditation in Texas
7. Foreign Infrastructure in Texas

# APPENDIX P-1

Declaration of Terpsehore Maras

**Declaration of [redacted]**

Pursuant to 28 U.S.C Section 1746, I, [redacted], make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.
2. I have been a private contractor with experience gathering and analyzing foreign intelligence and acted as a LOCALIZER during the deployment of projects and operations both OCONUS and CONUS. I am a trained Cryptolinguist, hold a completed degree in Molecular and Cellular Physiology and have FORMAL training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, Predictive Analytics among others.
3. I have operational experience in sources and methods of implementing operations during elections both CONUS and OCONUS
4. I am an amateur network tracer and cryptographer and have over two decades of mathematical modeling and pattern analysis.
5. In my position from 1999-2014 I was responsible for delegating implementation via other contractors sub-contracting with US or 9 EYES agencies identifying connectivity, networking and subcontractors that would manage the micro operations.
6. My information is my personal knowledge and ability to detect relationships between the companies and validate that with the cryptographic knowledge I know and attest to as well as evidence of these relationships.
7. In addition, I am WELL versed due to my assignments during my time as a private contractor of how elections OCONUS (for countries I have had an assignment at) and CONUS (well versed in HAVA ACT) and more.
8. On or about October 2017 I had reached out to the US Senate Majority Leader with an affidavit claiming that our elections in 2017 may be null and void due to lack of EAC certifications. In fact Sen. Wyden sent a letter to Jack Cobb on 31 OCT 2017 advising discreetly pointing out the importance of being CERTIFIED EAC had issued a certificate to

Pro V & V and that expired on Feb 24, 2017. No other certification has been located.



United States Election Assistance Commission

Certificate of Accreditation

**Pro V&V, Inc.**
**Huntsville, Alabama**

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

February 24, 2017

Date: 2/24/15

*Acting Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **1501**

9. Section 231(b) of the Help America Vote Act (HAVA) of 2002 (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA Section 231(b)(1). However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.


United States Department of Commerce
National Institute of Standards and Technology

NVLAP®

**Certificate of Accreditation to ISO/IEC 17025:2017**

NVLAP LAB CODE: 200978-0

**Pro V&V**
Huntsville, AL

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services, listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-03-26 through 2021-03-31
*Effective Dates*

DEPARTMENT OF COMMERCE • UNITED STATES OF AMERICA

*For the National Voluntary Laboratory Accreditation Program*

10.

11. VSTL's are VERY important because equipment vulnerabilities allow for deployment of algorithms and scripts to intercept, alter and adjust voting tallies.

12. There are only TWO accredited VSTLs (VOTING SYSTEM TEST LABORATORIES). In order to meet its statutory requirements under HAVA §15371(b), the EAC has developed the EAC's Voting System Test Laboratory Accreditation Program. The procedural requirements of the program are established in the proposed information collection, the EAC **Voting System Test Laboratory Accreditation Program Manual**. Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants. The procedural requirements of this Manual will supersede any prior laboratory accreditation requirements issued by the EAC. This manual shall be read in conjunction with the EAC's **Voting System Testing and Certification Program Manual** (OMB 3265-0019).

# MICHIGAN

*State Participation:*

**Requires Testing by an Independent Testing Authority.** MI requires that voting systems are certified by an independent testing authority accredited by NASED and the board of state canvassers.

*Applicable Statute(s):*

"An electronic voting system shall not be used in an election unless it is approved by the board of state canvassers … and unless it meets 1 of the following conditions: (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers. (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers." MICH. COMP. LAWS ANN § 168.795a (2009).

*Applicable Regulation(s):*

MI does not have a regulation regarding the federal certification process.

*State Certification Process:*

The Secretary of State accepts requests from persons/corporations wishing to have their voting system examined. The requestor must pay the Secretary of State an application fee of $1,500.00, file a report listing all of the states in which the voting system has been approved and any reports that these states have made regarding the performance of the voting system. The Board of State Canvassers conducts a field test involving Michigan electors and election officials in simulated election day conditions. The Board of State Canvassers shall approve the voting system if it meets all of the state requirements. MICH. COMP. LAWS ANN § 168.795a (2009).

*Fielded Voting Systems:*

*[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].*
http://www.michigan.gov/sos/0,1607,7-127-1633_8716_45458---,00.html



13.

# WISCONSIN

*State Participation:* **Requires Testing by a Federally Accredited Laboratory.** WI requires that its voting systems receive approval from an independent testing authority accredited by NASED verifying that the voting systems meet all of the recommended FEC standards.

*Applicable Statute(s):* "No ballot, voting device, automatic tabulating equipment or relating equipment and materials to be used in an electronic voting system may be utilized in this state unless it is approved by the board [of election commissioners]." WIS. STAT.ANN. § 5.91 (West 2009).

*Applicable Regulation(s):* "An application for approval of an electronic voting system shall be accompanied by all of the following … [r]eports from an independent testing authority accredited by the national association of state election directors (NASED) demonstrating that the voting system conforms to all the standards recommended by the federal elections commission." WIS. ADMIN. CODE GAB § 7.01 (2009).

*State Certification Process:* The Board of Election Commissioners accepts applications for the approval of electronic voting systems. Once the application is completed, the vendor must set up the voting system for three mock elections using: (1) offices, (2) referenda questions and (3) candidates. A panel of local election officials can assist the Board in the review of the voting system. The Board conducts the test using a mock election for the partisan primary, general election, and nonpartisan election. The Board may also require that the voting system be used in an actual election as a condition of the approval. WIS. ADMIN. CODE GAB §§ 7.01, 7.02 (2009).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://elections.state.wi.us/section.asp?linkid=643&locid=47



14.

U.S. Election Assistance Commission

# GEORGIA

*State Participation:* **Requires Federal Certification.** GA requires that its voting systems are tested to EAC standards by EAC accredited labs and certified by the EAC.

*Applicable Statute(s):* "Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine may request the Secretary of State to examine the machine. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $ 250.00. The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine." GA CODE ANN. § 21-2-324 (2008).

*Applicable Regulation(s):* "Prior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC. These EAC Qualification Certificates must indicate that the proposed voting system has successfully completed the EAC Qualification testing administered by EAC approved ITAs. If for any reason, this level of testing is not available, the Qualification tests shall be conducted by an agency designated by the Secretary of State. In either event, the Qualification tests shall comply with the specifications of the *Voting Systems Standards* published by the EAC." GA. COMP. R. & RES. 590-8-1-.01 (2009).

*State Certification Process:* After the voting system has passed EAC Qualification testing, the vendor of the voting system submits a letter to the Office of the Secretary of State requesting certification for the voting system along with a technical data package to the certification agent. An evaluation proposal is created by the certification agent after a preliminary view of the Technical Data Package and sent to the vendor. Any additional EAC ITA testing identified in the evaluation proposal is arranged by the vendor and the certification agent will perform all other tests identified in the evaluation proposal. The certification agent submits a report of their findings to the Secretary of State. Based on these findings the Secretary of State will make a final determination on whether to certify the voting system. GA. COMP. R. & RES. 590-8-1-.01 (2009).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.sos.georgia.gov/Elections/



15.

# PENNSYVANIA

*State Participation:* **Requires Testing by a Federally Accredited Laboratory.** PA requires that its voting systems are approved by a federally recognized independent testing laboratory as meeting federal voting system standards.

*Applicable Statute(s):* "Any person or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any electronic voting system, may request the Secretary of the Commonwealth to examine such system if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government." 25 PA. CONS. STAT. ANN. Code § 3031.5 (West 2008).

*Applicable Regulation(s):* PA does not have a regulation regarding the federal certification process.

*State Certification Process:* The Secretary of State examines voting systems, upon request, once the voting systems have received approval by a federally recognized independent testing authority. The person(s) requesting the examination of the voting system are responsible for the cost of the examination. After the examination, the Secretary of State issues a report stating whether or not the voting systems are safe and compliant with state and federal requirements. If the voting systems are deemed safe and compliant by the Secretary of State then the systems may be adopted and approved for use in elections by each county through a majority vote of its qualified electors. 25 PA. CONS. STAT. ANN. Code §§ 3031.5, 3031.2 (West 2008).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.votespa.com/HowtoVote/tabid/74/language/en-US/Default.aspx



16.

U.S. Election Assistance Commission

# ARIZONA

| | |
|---|---|
| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** AZ requires that its voting systems are HAVA compliant and approved by a laboratory that is accredited pursuant to HAVA. |
| *Applicable Statute(s):* | "On completion of acquisition of machines or devices that comply with HAVA, machines or devices used at any election for federal, state or county offices may only be certified for use in this state and may only be used in this state if they comply with HAVA and if those machines or devices have been tested and approved by a laboratory that is accredited pursuant to HAVA." ARIZ. REV. STAT. § 16-442(B) (2008). |
| *Applicable Regulation(s):* | AZ does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State appoints a committee of three people that test different voting systems. This committee is required to submit their recommendations to the Secretary of State who then makes the final decision on which voting system(s) to adopt. ARIZ. REV. STAT. § 16-442(A) and (C) (2008). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.azsos.gov/election/equipment/default.htm |



17.

18. **Pro V& V** and **SLI Gaming** both lack evidence of EAC Accreditation as per the Voting System Testing and Certification Manual.

19. **Pro V& V** is owned and Operated by Jack Cobb. Real name is Ryan Jackson Cobb. The company ProV&V was founded and run by Jack Cobb who formerly worked under the entity of Wyle Laboratories which is an AEROSPACE DEFENSE CONTRACTING ENTITY. The address information on the EAC, NIST and other entities for Pro V& V are different than that of what is on ProV&V website. The EAC and NIST (ISO CERT) issuers all have another address.






20. VSTLs are the most important component of the election machines as they examine the use of COTS (Commercial Off–The-Shelf)
21. "Wyle became involved with the testing of electronic voting systems in the early 1990's and has tested over 150 separate voting systems. Wyle was the first company to obtain accreditation by the National Association of State Election Directors (NASED). Wyle is accredited by the Election Assistance Commission (EAC) as a Voting System Testing Laboratory (VSTL). Our scope of accreditation as a VSTL encompasses all aspects of the hardware and software of a voting machine. Wyle also received NVLAP accreditation to ISO/IEC 17025:2005 from NIST." Testimony of Jack Cobb 2009
22. COTS are preferred by many because they have been tried and tested in the open market and are most economic and readily available. COTS are also the SOURCE of vulnerability therefore VSTLs are VERY important. COTS components by voting system machine manufacturers can be used as a "Black Box" and changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient in operation, cost efficient for production, end of life (EOL) and even complete reworks to meet new standards. They key issue in this is that MOST of the COTS used by Election Machine Vendors like Dominion, ES&S, Hart Intercivic, Smartmatic and others is that such manufacturing for COTS have been outsourced to China which if implemented in our Election Machines make us vulnerable to BLACK BOX antics and backdoors due to hardware changes that can go undetected. This is why VSTL's are VERY important.
23. The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability. Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates.
24. As per the COTS hardware components that are fixed, and origin may be cloaked under proprietary information a major vulnerability exists since once again third-party support software is dynamic and requires FREQUENT updates. The hardware components of the computer components, and election machines that are COTS may have slight updates that can be overlooked as they may be like those designed that support the other third -party software. COTS origin is important and the US Intelligence Community report in 2018 verifies that.
25. The Trump Administration made it clear that there is an absence of a major U.S. alternative to foreign suppliers of networking equipment. This highlights the growing dominance of

Chinese manufacturers like Huawei that are the world's LARGEST supplier of telecom and other equipment that endangers national security.

26. China, is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server that Dominion Software.

28 046 Madrid

**Asian offices**

| | | |
|---|---|---|
| **Akamai Technologies - India**<br>111, Brigade Court<br>Koramangala Industrial Area<br>Bangalore 560 095, India | Telephone:<br>Fax:<br>Regional Manager: | 91-80-575-99222<br>91-80-575-99209<br>Stuart Spiteri |
| **Akamai Technologies - China**<br>Suite 1560, 15th Floor<br>NCI Tower<br>12A Jianguomenwai Avenue<br>Chaoyang District,<br>Beijing 100022<br>China | Telephone:<br>Fax:<br>Regional Manager: | 86-10-8523-3097<br>86-10-8523-3001<br>Stuart Spiteri |
| **Akamai Japan K.K.**<br>The Executive Centre Japan K.K.<br>15F Tokyo Ginko Kyokai building<br>1-3-1 Marunouchi, Chiyoda-ku, Tokyo 100-0005 | Telephone:<br><br><br>Fax:<br>Regional Manager: | 81-3-3216-7200 (Centre)<br>81-3-3216-7300 (Akamai direct)<br>81-3-3216-7390 (Centre)<br>Stuart Spiteri |
| **Akamai Technologies - Singapore**<br>Akamai, Regus Centre, 36-01 UOB Plaza 1<br>80 Raffles Place<br>Singapore 048624<br>Driving directions | Telephone:<br>Fax:<br>Regional Manager: | +65 6248 4614<br>+65 6248-4501<br>Stuart Spiteri |
| **Akamai Technologies - Australia and New Zealand**<br>201 Sussex St<br>Tower 2, Level 20<br>Sydney, NSW 2000, Australia<br>info@au.akamai.com | Telephone:<br>Fax:<br>Regional Manager: | 61 2 9006 1325<br>61 2 9475 0343<br>Stuart Spiteri |

*ptt.gov* resolves to 4.30.228.74. According to our data this IP address belongs to *Level 3 Communications* and is located in *Alexandria, Virginia, United States*. Please have a look at the information provided below for further details.

| 4.30.228.74 | |
|---|---|
| **ISP/Organization** | Level 3 Communications |
| **Location** | Alexandria 22304, Virginia (VA), United States (US) |
| **Latitude** | 38.8115 / 38°48′41″ N |
| **Longitude** | -77.1285 / 77°7′42″ W |
| **Timezone** | America/New_York |
| **Local Time** | Thu, 12 Jul 2018 19:27:40 -0400 |

27. 


28. L3 Level Communications is federal contractor that is partially owned by foreign lobbyist George Soros. An article that AP ran in 2010 – spoke out about the controversy of this that has been removed. (LINK) "As for the company's other political connections, it also appears that none other than George Soros, the billionaire funder of the country's liberal political infrastructure, owns 11,300 shares of OSI Systems Inc., the company that owns Rapiscan. Not surprisingly, OSI's stock has appreciated considerably over the course of the year. Soros certainly is a savvy investor." Washington Examiner re-write.


a23-78-81-34.deploy.static.akamaitechnologies.com (23.78.81.34)
4.15.158.158
ae-11.edge2.Chicago10.Level3.net
cer-edge-20.inet.qwest.net
10.40.50.7
207.89.33.137
10.238.0.1
DeviceDHCP.Home
localhost
172.22.88.14
hu0-5-0-4.ccr21.cle04.atlas.cogentco.com
be2717.ccr41.ord01.atlas.cogentco.com
be2765.ccr41.ord03.atlas.cogentco.com
att.ord03.atlas.cogentco.com
cgcil22crs.ip.att.net
n54ny21crs.ip.att.net
12.122.115.105
12.244.79.30
michigan.gov (23.78.200.73)

29.




30.

31. **L-3 Communication** Systems-East designs, develops, produces and integrates communication systems and support equipment for space, air, ground, and naval applications, including C4I systems and products; integrated Navy communication systems; integrated space communications and RF payloads; recording systems; secure communications, and information security systems. In addition, their site claims that MARCOM is an integrated communications system and The Marcom® is the foundation of the Navy's newest digital integrated voice / data switching system for affordable command and control equipment supporting communications and radio room automation. The MarCom® uses the latest **COTS** digital technology and open systems standards to offer the command and control user a low cost, user friendly, solution to the complex voice, video and data communications needs of present and future joint / allied missions. Built in reliability, rugged construction, and fail-safe circuits ensure your call and messages will go through. Evidently a HUGE vulnerability.

32. Michigan's government site is thumped off Akamai Technologies servers which are housed on **TELIA AB** a foreign server located in Germany.
33. Scytl, who is contracted with AP that receives the results tallied BY Scytl on behalf of Dominion – During the elections the AP reporting site had a disclaimer.
    AP – powered by SCYTL.

**Advertisements**

**Basic Tracking Info**

| | |
|---|---|
| Domain: | Michigan.gov<br>[ Whois Lookup - Domain Country - Domain To IP] |
| IP Address: | 23.78.81.34<br>[IP Blacklist Check] |
| Reverse DNS: | 34.81.78.23.in-addr.arpa |
| Hostname: | a23-78-81-34.deploy.static.akamaitechnologies.com |
| Nameservers: | a12-67.akam.net >> 184.26.160.67<br>a11-66.akam.net >> 84.53.139.66<br>a1-35.akam.net >> 193.108.91.35<br>a5-66.akam.net >> 95.100.168.66<br>a18-64.akam.net >> 95.101.36.64<br>a24-65.akam.net >> 2.16.130.65 |

**Location For an IP: Michigan.gov**

| | |
|---|---|
| Continent: | North America (NA) |
| Country: | United States (US) |
| Capital: | Washington |
| State: | Unknown |
| City Location: | Unknown |
| ISP: | Akamai Technologies |
| Organization: | Akamai Technologies |
| AS Number: | AS1299 Telia Company AB |
| something went wrong! | something went wrong! |

**Geolocation on IP Map**

| | |
|---|---|
| Time Zone: | America/North_Dakota/Center |
| Local Time: | 13:48:46 |
| Timezone GMT offset: | -21600 |
| Sunrise / Sunset: | 07:27 / 17:12 |

**Extra Information for an IP: Michigan.gov**

| | |
|---|---|
| Continent Lat/Lon: | 46.07305 / -100.546 |
| Country Lat/Lon: | 38 / -98 |
| City Lat/Lon: | (37.751) / (-97.822) |
| IP Language: | English |

34. "Scytl was selected by the Federal Voting Assistance Program of the U.S. Department of Defense to provide a secure online ballot delivery and onscreen marking systems under a program to support overseas military and civilian voters for the 2010 election cycle and beyond. Scytl was awarded 9 of the 20 States that agreed to participate in the program (New York, Washington, Missouri, Nebraska, Kansas, New Mexico, South Carolina, Mississippi and Indiana), making it the provider with the highest number of participating States." PDF
35. According to DOMINION : 1.4.1Software and Firmware The software and firmware employed by Dominion D-Suite 5.5-Aconsists of 2 types, custom and commercial off the shelf (COTS). COTS applications were verified to be pristine or were subjected to source code review for analysis of any modifications and verification of meeting the pertinent standards.
36. The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS.
37. The purpose of VSTL's being accredited and their importance in ensuring that there is no foreign interference/ bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" .
38. Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door.
39. The actual use of trapdoor commitments in Bayer-Groth proofs demonstrate the implications for the verifiability factor. This means that no one can SEE what is going on during the process of the "shuffling" therefore even if you deploy an algorithms or manual scripts to fractionalize or distribute pooled votes to achieve the outcome you wish – you cannot prove they are doing it! See STUDY : "The use of trapdoor commitments in Bayer-Groth proofs and the implications for the verifiability of the Scytl-SwissPost Internet voting system"
40. **Key Terms**
41. **UNIVERSAL VERIFIABILITY**: Votes cast are the votes counted and integrity of the vote is verifiable (the vote was tallied for the candidate selected) . **SCYTL FAILS UNIVERSAL VERIFIABILITY** because no mathematical proofs can determine if any votes have been manipulated.
42. **INDIVIDUAL VERIFIABILITY**: Voter cannot verify if their ballot got correctly counted. Like, if they cast a vote for ABC they want to verify it was ABC. That notion clearly discounts the need for anonymity in the first place.

43. To understand what I observed during the 2020 I will walk you through the process of one ballot cast by a voter.
44. STEP 1 |Config Data | All non e-voting data is sent to Scytl (offshore) for configuration of data. All e-voting is sent to CONFIGURATION OF DATA then back to the e-voting machine and then to the next phase called CLEANSING. **CONCERNS**: Here we see an "OR PROOF" as coined by mathematicians – an "or proof" is that votes that have been pre-tallied parked in the system and the algorithm then goes back to set the outcome it is set for and seeks to make adjustments if there is a partial pivot present causing it to fail demanding manual changes such as block allocation and narrowing of parameters or self-adjusts to ensure the predetermined outcome is achieved.
45. STEP 2|CLEANSING | The Process is when all the votes come in from the software run by Dominion and get "cleansed" and put into 2 categories: invalid votes and valid votes.
46. STEP 3|Shuffling /Mixing | This step is the most nefarious and exactly where the issues arise and carry over into the decryption phase. Simply put, the software takes all the votes, literally mixes them a and then re-encrypts them. This is where if ONE had the commitment key- TRAPDOOR KEY – one would be able to see the parameters of the algorithm deployed as the votes go into this mixing phase, and how algorithm redistributes the votes.
47. This published PAPER FROM University College London depicts how this shuffle works. In essence, when this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes when mixed.

48.

## Background - ElGamal encryption

- Setup: Group $\mathcal{G}$ of prime order q with generator g
- Public key: $pk = y = g^x$
- Encryption: $\mathcal{E}_{pk}(m; r) = (g^r, y^r m)$
- Decryption: $\mathcal{D}_x(u, v) = vu^{-x}$
- Homomorphic:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(M; R) = \mathcal{E}_{pk}(mM; r + R)$$

- Re-rencryption:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(1; R) = \mathcal{E}_{pk}(m; r + R)$$

49. When this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes.

50. When the votes are sent to Scytl via Dominion Software EMS (Election Management System) the Trap Door is accessed by Scytl or TRAP DOOR keys (Commitment Parameters).

51. 


52. The encrypted data is shifted into Scytl's platform in the form of ciphertexts – this means it is encrypted and a key based on commitments is needed to read the data. The ballot data can only be read if the person has a key that is set on commitments.

53. A false sense of security is provided to both parties that votes are not being "REPLACED" during the mixing phase. Basically, Scytl re-encrypts the ballot data that comes in from Dominion (or any other voting software company) as ciphertexts. Scytl is supposed to prove that votes A, B, C are indeed X, Y, Z under their new re-encryption when sending back the votes that are tallied coding them respectively. This is done by Scytl and the Election Software company that agrees to certain

"Generators" and therefore together build "commitments."

```
public CommitmentParams(final ZpSubgroup group, final int n) {
    group = group;
    h = GroupTools.getRandomElement(group);
    commitmentlength = n;
    g = GroupTools.getVectorRandomElement(group,
this.commitmentlength);
    }

    // from getRandomElement(group)
Exponent randomExponent = ExponentTools.getRandomExponent(group.getQ());
return group.getGenerator().exponentiate(randomExponent);
```

54. Scytl and Dominion have an agreement – only the two would know the parameters. This means that access is able to occur through backdoors in hardware if the parameters of the commitments are known in order to alter the range of the algorithm deployed to satisfy the outcome sought in the case of algorithm failure.

55. Trapdoor is a cryptotech term that describes a state of a program that knows the commitment parameters and therefore is able change the value of the commitments however it likes. In other words, Scytl or anyone that knows the commitment parameters can take all the votes and give them to any one they want. If they have a total of 1000 votes an algorithm can distribute them among all races as it deems necessary to achieve the goals it wants. (Case Study: Estonia)

56. 


57. Within the trapdoor this is how the algorithm behaves to move the goal posts in elections without being detected by this proof . During the mixing phase this is the algorithm you would use to

"reallocate" votes via an algorithm to achieve the goal set.




58. STEP 4|Decryption would be the decryption phase and temporary parking of vote tallies before reporting. In this final phase before public release the tallies are released from encrypted format into plain text. As previously explained, those that know the trapdoor can easily change any votes that the randomness is applied and used to generate the tally vote ciphertext. Thus in this case, Scytl who is the mixer can collude with their vote company clients or an agency (-------) to change votes and get away with it. This is because the receiver doesn't have the decryption key so they rely solely on Scytl to be ***honest*** or free from any foreign actors within their backdoor or the Election Company (like Dominion) that can have access to the key.

59. In fact, a study from the University of Bristol made claim that interference can be seen when there is a GREAT DELAY in reporting and finalizing numbers University of Bristol : How not to Prove Yourself: Pitfalls of the Fiat-Shamir Heuristic and Applications to Helios

60. "Zero-knowledge proofs of knowledge allow a prover to convince a verifier that she holds information satisfying some desirable properties without revealing anything else." David Bernhard, Olivier Pereira,and Bogdan Warinschi.

61. Hence, you can't prove anyone manipulated anything. The TRAP DOOR KEY HOLDERS can offer you enough to verify to you what you need to see without revealing anything and once again indicating the inability to detect manipulation. **ZERO PROOF of INTEGRITY OF THE VOTE.**
62. Therefore, if decryption is challenged, the administrator or software company that knows the trap door key can provide you proof that would be able to pass verification (blind). This was proven to be factually true in the case study by The University of Melbourne in March. White Hat Hackers purposely altered votes by knowing the parameters set in the commitments and there was no way to prove they did it – or any way to prove they didn't.
63. IT'S THE PERFECT THREE CARD MONTY. That's just how perfect it is. They fake a proof of ciphertexts with KNOWN "RANDOMNESS" .This rolls back to the integrity of the VOTE. The vote is not safe using these machines not only because of the method used for ballot "cleansing" to maintain anonymity but the EXPOSURE to foreign interference and possible domestic bad actors.
64. In many circumstances, manipulation of the algorithm is NOT possible in an undetectable fashion. This is because it is one point heavy. Observing the elections in 2020 confirm the deployment of an algorithm due to the BEHAVIOR which is indicative of an algorithm in play that had no pivoting parameters applied.
65. The behavior of the algorithm is that one point (B) is the greatest point within the allocated set. It is the greatest number within the A B points given. Point A would be the smallest. Any points outside the A B points are not necessarily factored in yet can still be applied.
66. The points outside the parameters can be utilized to a certain to degree such as in block allocation.
67. The algorithm geographically changed the parameters of the algorithm to force blue votes and ostracize red.
68. Post block allocation of votes the two points of the algorithm were narrowed ensuring a BIDEN win hence the observation of NO Trump Votes and some BIDEN votes for a period of time.

69. 
ARIZONA
"FIXING" THE VOTE
BIDEN INJECTION
Nov. 3rd
8:06:40 pm
+143,100 votes
(Maricopa & Pima)
NUMBER OF VOTES PROCESSED & THE TIME AT WHICH THEY PROCESSED
ELECTION DAY
NOV 4 - 10
NOV 3 - NOV 10
*DATA SOURCED FROM NEW YORK TIMES
SUMMARY
- Mathematical evidence of the seeding "injection" of votes at the beginning
- A spike means that a large number of votes were injected into the totals
- A normal vote pattern would look like a natural progression – smooth without extreme jumps

70. Gaussian Elimination without pivoting explains how the algorithm would behave and the election results and data from Michigan confirm FAILURE of algorithm.




71. The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as :

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

72.

73. Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX"

74. Observing the elections, after a review of Michigan's data a spike of 54,199 votes to Biden. Because it is pushing and pulling and keeping a short distance between the 2 candidates; but then a spike, which is how an algorithm presents; - and this spike means there was a pause and an insert was made, where they insert an algorithm. Block spikes in votes for JOE BIDEN were NOT paper

ballots being fed or THUMB DRIVES. The algorithm block adjusted itself and the PEOPLE were creating the evidence to BACK UP the block allocation.

75. I have witnessed the same behavior of the election software in countries outside of the United States and within the United States. In -------, the elections conducted behaved in the same manner by allocating BLOCK votes to the candidate "chosen" to win.

76. Observing the data of the contested states (and others) the algorithm deployed is identical to that which was deployed in 2012 providing Barack Hussein Obama a block allocation to win the 2012 Presidential Elections.

77. The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection.

78.




79. In Georgia during the 2016 Presidential Elections a failed attempt to deploy the scripts to block allocate votes from a centralized location where the "trap-door" key lay an attempt by someone using

the DHS servers was detected by the state of GA. The GA leadership assumed that it was "Russians" but later they found out that the IP address was that of DHS.

80. In the state of Wisconsin, we observed a considerable BLOCK vote allocation by the algorithm at the SAME TIME it happened across the nation. All systems shut down at around the same time.

81. 


82. In Wisconsin there are also irregularities in respect to BALLOT requests. (names AND address Hidden for privacy)

83.

| F | G | H | V | W | X | Y | AB | AC | AD | AG | AH | AI | AJ | AK | AL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | |
| Active | Registered | Regular | Brown County | 10/23/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 10/23/2020 | 10/23/2020 | | |
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted In Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Received In Persor | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Email | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Mail | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | | 11/02/2020 | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/02/2020 | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | FPCA | Military | | Official | Active | Not Returned | Mail | 11/02/2020 | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | FPCA | Military | | Official | Active | Returned | Email | 11/02/2020 | 11/03/2020 | | |
| Active | Registered | Regular | Brown County | 11/03/2020 | Voted In Person | Regular | | Official | Inactive | Voter Spoiled | Voted In Person | 11/03/2020 | 11/03/2020 | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | Certification insufficient | Federal Absent | Active | Returned, to be Rejected | Mail | 11/03/2020 | 11/03/2020 | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | | Official | Active | Not Returned | Mail | 11/03/2020 | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/03/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Active | Registered | Regular | Brown County | 11/03/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |

84.

85. I can personally attest that in 2013 discussions by the Obama / Biden administration were being had with various agencies in the deployment of such election software to be deployed in ----- in 2013.

86. On or about April 2013 a one year plan was set to fund and usher elections in -----.

87. Joe Biden was designated by Barack Hussein Obama to ensure the ----- accepted assistance.

88. John Owen Brennan and James (Jim) Clapper were responsible for the ushering of the intelligence surrounding the elections in -----.

89. Under the guise of Crisis support the US Federal Tax Payers funded the deployment of the election software and machines in ------ signing on with Scytl.

**The White House**

Office of the Press Secretary

For Immediate Release April 21, 2014

SHARE THIS:

TWITTER

FACEBOOK

EMAIL

# FACT SHEET: U.S. Crisis Support Package for Ukraine

President Obama and Vice President Biden have made U.S. support for Ukraine an urgent priority as the Ukrainian government works to establish security and stability, pursue democratic elections and constitutional reform, revive its economy, and ensure government institutions are transparent and accountable to the Ukrainian people. Ukraine embarks on this reform path in the face of severe challenges to its sovereignty and territorial integrity, which we are working to address together with Ukraine and our partners in the international community. The United States is committed to ensuring that Ukrainians alone are able to determine their country's future without intimidation or coercion from outside forces. To support Ukraine, we are today announcing a new package of assistance totaling **$50 million** to help Ukraine pursue political and economic reform and strengthen the partnership between the United States and Ukraine.

90.

91. Right before the ----- elections it was alleged that CyberBerkut a pro-Russia group infiltrated --- central election computers and **deleted key files**. These actions supposedly rendered the vote-tallying system inoperable.
92. In fact, the KEY FILES were the Commitment keys to allow Scytl to tally the votes rather than the election machines. The group had disclosed emails and other documents proving that their election was rigged and that they tried to avoid a fixed election.
93. The elections were held on May 25, 2014 but in the early AM hours the election results were BLOCKED and the final tally was DELAYED flipping the election in favor of -----.
94. The claim was that there was a DDoS attack by Russians when in actual fact it was a mitigation of the algorithm to inject block votes as we observed was done for Joe Biden because the KEYS were unable to be deployed. In the case of -----, the trap-door key was “altered”/deleted/ rendered ineffective. In the case of the US elections, representatives of Dominion/ ES&S/ Smartmatic/ Hart Intercivic would have to manually deploy them since if the entry points into the systems seemed to have failed.
95. The vote tallying of all states NATIONWIDE stalled and hung for days – as in the case of Alaska that has about 300K registered voters but was stuck at 56% reporting for almost a week.
96. This “hanging” indicates a failed deployment of the scripts to block allocate remotely from one location as observed in ------ on May 26, 2014.
97. This would justify the presence of the election machine software representatives making physical appearances in the states where the election results are currently being contested.
98. A Dominion Executive appeared at the polling center in Detroit after midnight.
99. Considering that the hardware of the machines has NOT been examined in Michigan since 2017 by Pro V& V according to Michigan’s own reporting. COTS are an avenue that hackers and bad actors seek to penetrate in order to control operations. Their software updates are the reason vulnerabilities to foreign interference in all operations exist.
100. The importance of VSTLs in underrated to protect up from foreign interference by way of open access via COTS software. Pro V& V who’s EAC certification EXPIRED on 24 FEB 2017 was contracted with the state of WISCONSIN.
101. In the United States each state is tasked to conduct and IV& V (Independent Verification and Validation) to provide assurance of the integrity of the votes.
102. If the “accredited” non-federal entities have NOT received EAC accreditation this is a failure of the states to uphold their own states standards that are federally regulated.
103. In addition, if the entities had NIST certificates they are NOT sufficing according the HAVA ACT 2002 as the role of NIST is clear.
104. Curiously, both companies PRO V&V and SLI GAMING received NIST certifications OUTSIDE the 24 month scope.

105. PRO V& V received a NIST certification on 26MAR2020 for ONE YEAR. Normally the NIST certification is good for two years to align with that of EAC certification that is good for two years.

106.

United States Department of Commerce
National Institute of Standards and Technology

NVLAP®

**Certificate of Accreditation to ISO/IEC 17025:2017**

**NVLAP LAB CODE: 200978-0**

**Pro V&V**
Huntsville, AL

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services, listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-03-26 through 2021-03-31
*Effective Dates*

DEPARTMENT OF COMMERCE • UNITED STATES OF AMERICA

*For the National Voluntary Laboratory Accreditation Program*

107. The last PRO V& V EAC accreditation certificate (Item 8) of this declaration expired in February 2017 which means that the IV & V conducted by Michigan claiming that they were accredited is false.

108. The significance of VSTLs being accredited and examining the HARDWARE is key. COTS software updates are the avenues of entry.

109. As per DOMINION'S own petition, the modems they use are COTS therefore failure to have an accredited VSTL examine the hardware for points of entry by their software is key.

| | | | |
|---|---|---|---|
| *Compact Flash Cards | ***SanDisk Ultra:<br>SDCFHS-004G<br>SDCFHS-008G<br>RiData:<br>CFC-14A<br>RDF8G-233XMCB2-1<br>RDF16G-233XMCB2-1<br>RDF32G-233XMCB2-1<br>SanDisk Extreme:<br>SDCFX-016G<br>SDCFX-032G<br>SanDisk:<br>SDFAA-008G | | Memory device for ICP and ICE tabulators. |
| *Modems | Verizon USB Modem Pantech UMW190NCD<br><br>USB Modem MultiTech MT9234MU<br><br>CellGo Cellular Modem E-Device 3GPUSUS<br><br>AT&T USB Modem MultiTech GSM MTD-H5<br>Fax Modem US Robotics 56K V.92. | | Analog and wireless modems for transmitting unofficial election night results. |

110.

111. For example and update of Verizon USB Modem Pantech undergoes multiple software updates a year for it's hardware. That is most likely the point of entry into the systems.

112. During the 2014 elections in ---- it was the modems that gave access to the systems where the commitment keys were deleted.

113. SLI Gaming is the other VSTL "accredited" by the EAC BUT there is no record of their accreditation. In fact, SLI was NIST ISO Certified 27 days before the election which means that PA IV&V was conducted without NIST cert for SLI being valid.



United States Department of Commerce
National Institute of Standards and Technology

NVLAP®

**Certificate of Accreditation to ISO/IEC 17025:2017**

NVLAP LAB CODE: 200733-0

**SLI Compliance**
Wheat Ridge, CO

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services, listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-10-07 through 2020-12-31
*Effective Dates*

*For the National Voluntary Laboratory Accreditation Program*

114.

115. In fact SLI was NIST ISO Certified for less than 90 days.

116. I can personally attest that high-level officials of the Obama/Biden administration and large private contracting firms met with a software company called GEMS which is ultimately the software ALL election machines run now running under the flag of DOMINION.

117. GEMS was manifested from SOE software purchased by SCYTL developers and US Federally Funded persons to develop it.

118. The only way GEMS can be deployed across ALL machines is IF all counties across the nation are housed under the same server networks.

119. GEMS was tasked in 2009 to a contractor in Tampa, Fl.

120. GEMS was also fine-tuned in Latvia, Belarus, Serbia and Spain to be localized for EU deployment as observed during the Swissport election debacle.

121. John McCain's campaign assisted in FUNDING the development of GEMS web monitoring via WEB Services with 3EDC and Dynology.

Image# 13941014755

**SCHEDULE B-P**
**ITEMIZED DISBURSEMENTS**

Use separate schedule(s) for each category of the Detailed Summary Page

FOR LINE NUMBER: (check only one)
[X] 23 [ ] 24 [ ] 25 [ ] 26 [ ] 27a [ ] 27b [ ] 28a [ ] 28b [ ] 28c [ ] 29

PAGE 7358 / 8595

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
JOHN MCCAIN 2008, INC.

**A.** Full Name (Last, First, Middle Initial): 3EDC LLC
Mailing Address: 211 NORTH UNION ST STE 200
City: ALEXANDRIA State: VA Zip Code: 22314
Purpose of Disbursement: WEB SERVICE
Candidate Name:
Category/Type:
Office Sought: [ ] House [ ] Senate [ ] President
State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify)
Date of Disbursement: 03 17 2008
Transaction ID : SB23.10515
Amount of Each Disbursement this Period: 399916.09

**B.** Full Name (Last, First, Middle Initial): A FARE EXTRAORDINAIRE
Mailing Address: 2035 MARSHALL
City: HOUSTON State: TX Zip Code: 77098
Purpose of Disbursement: FACILITY RENTAL/CATERING
Candidate Name:
Category/Type:
Office Sought: [ ] House [ ] Senate [ ] President
State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify)
Date of Disbursement: 03 17 2008
Transaction ID : SB23.10049
Amount of Each Disbursement this Period: 23697.69

**C.** Full Name (Last, First, Middle Initial): ADMINISTAFF
Mailing Address: PO BOX 203332
City: HOUSTON State: TX Zip Code: 77216
Purpose of Disbursement: INSURANCE
Candidate Name:
Category/Type:
Office Sought: [ ] House [ ] Senate [ ] President
State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify)
Date of Disbursement: 03 06 2008
Transaction ID : SB23.10117
Amount of Each Disbursement this Period: 483.68

**Subtotal Of Receipts This Page** (optional) ▶ 424097.46

**Total This Period** (last page this line number only) ▶

122.

123.

124. AKAMAI Technologies services SCYTL.

125. AKAMAI Technologies Houses ALL foreign government sites. (Please see White Paper by Akamai.)

126. AKAMAI Technologies houses ALL .gov state sites. (ref Item 123 Wisconsin.gov Example)




127.

128. Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY.

129. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers.




130.

131. AKAMAI Technologies has locations around the world.

132. AKAMAI Technologies has locations in China (ref item 22)

133. AKAMAI Technologies has locations in Iran as of 2019.

134. AKAMAI Technologies merged with UNICOM (CHINESE TELECOMM) in 2018.

135. AKAMAI Technologies house all state .gov information in GERMANY via TELIA AB.

136. In my professional opinion, this affidavit presents unambiguous evidence:

137. That there was Foreign interference, complicit behavior by the previous administrations from 1999 up until today to hinder the voice of the people and US persons knowingly and willingly colluding with foreign powers to steer our 2020 elections that can be named in a classified setting.

138. Foreign interference is present in the 2020 election in various means namely,

139. Foreign nationals assisted in the creation of GEMS (Dominion Software Foundation)

140. Akamai Technologies merged with a Chinese company that makes the COTS components of the election machines providing access to our electronic voting machines.

141. Foreign investments and interests in the creation of the GEMS software.

142. US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections.

143. The EAC failed to abide by standards set in HAVA ACT 2002.

144. The IG of the EAC failed to address complaints since their appointment regarding vote integrity

145. Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

146. Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then.

147. The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

148. AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations.

149. For all the reasons above a complete failure of duty to provide safe and just elections are observed.

150. For the people of the United States to have confidence in their elections our cybersecurity standards should not be in the hands of foreign nations.

151. Those responsible within the Intelligence Community directly and indirectly by way of procurement of services should be held accountable for assisting in the development, implementation and promotion of GEMS.

152. GEMS ------- General Hayden.

153. In my opinion and from the data and events I have observed -------------------- with the assistance of SHADOWNET under the guise of L3-Communications which is MPRI. This is also confirmed by us.army.mil making the statement that shadownet has been deployed to 30 states which all

happen to be using Dominion Machines.

FAIRFAX, Va. -The Virginia National Guard's Bowling Green-based 91st Cyber Brigade completed the nationwide rollout of its ShadowNet enterprise solution July 19, 2019, with the integration of the 125th Cyber Protection Battalion into the solution's virtual private network. ShadowNet is a custom-built private cloud-based out of the brigade's data center in Fairfax, Virginia, that uses VPN connectivity to provide its aligned units with 24-hour, seven-days-a-week remote access to critical cyber training at both the collective and individual levels. The brigade successfully integrated its three other cyber protection battalions - the 123rd, 124th, and 126th Cyber Protection Battalions - into the ShadowNet platform last January.

"I'm extremely proud to announce that the Soldiers of the 91st Cyber Brigade have completed the construction and rollout of ShadowNet, a world-class enterprise solution designed to propel operational innovation in the field of cyber training," said Col. Adam C. Volant, commander of the 91st Cyber Brigade. "ShadowNet will allow us to leverage the expertise of cyber professionals across our four cyber protection battalions to build Soldier-centric programs and collective training environments that deliver breakthroughs in exercise complexity and cost efficiency. Its robust

OCTOBER 26, 2020
**U.S. Army STAND-TO! | Army Readines Training**

SEPTEMBER 12, 2019
**September 2017 Nominative Sergeant Major Assignments**

SEPTEMBER 12, 2019
**DA ANNOUNCES ROTATIONAL DEPLOYMENTS**

154. Based on my research of voter data – it appears that there are approximately 23,000 residents of a Department of Corrections Prison with requests for absentee ballot in Wisconsin. We are currently reviewing and verifying the data and will supplement.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 23230 | Gutierrez | Mary | Jane | | (262)994-9050 | |
| 23231 | 23231 | Hansen | Luann | M | | (262)994-9050 | |
| 23232 | 23232 | Neberman | John | C | | (262)994-9050 | |
| 23233 | 23233 | Reynolds | Devi | J | | (262)994-9050 | |
| 23234 | 23234 | Rieckhoff | Kathryn | Susan | | (262)994-9050 | |
| 23235 | 23235 | Edwards | Mark | Landon | | (262)994-9050 | |
| 23236 | 23236 | Pfeiffer | Joseph | Patrick | | (262)994-9050 | |
| 23237 | 23237 | Hines | Dianna | K | | (262)994-9050 | |
| 23238 | 23238 | Beachem | Janice | F | | (262)994-9050 | |
| 23239 | 23239 | Blackstone | Thomas | Wayne | | (262)994-9050 | |
| 23240 | 23240 | Braun | Patricia | Ann | | (262)994-9050 | |
| 23241 | 23241 | Smith | Raymond | L | | (262)994-9050 | |
| 23242 | 23242 | Meyer | Steven | R | | (262)994-9050 | |
| 23243 | 23243 | Vincent | Herbert | | | (262)994-9050 | |
| 23244 | 23244 | Guajardo | Juan | P | | (262)994-9050 | |
| 23245 | 23245 | Wallace | Kirk | R | | (262)994-9050 | |
| 23246 | 23246 | Kaplan | Bernard | L | | (262)994-9050 | |
| 23247 | 23247 | Bahrs | Michelle | M | | (262)994-9050 | |
| 23248 | 23248 | Shattuck | Elizabeth | L | | (262)994-9050 | |
| 23249 | 23249 | Munoz | Rosalio | S | JR | (262)994-9050 | |
| 23250 | 23250 | Strunk | Amy | C | | (262)994-9050 | |
| 23251 | 23251 | Schendel | Michael | P | JR | (262)994-9050 | |
| 23252 | 23252 | Mack | Kimberly | N | | (262)994-9050 | |
| 23253 | 23253 | Spikes | Debra | A | | (262)994-9050 | |
| 23254 | 23254 | Busarow | Suzanne | M | | (262)994-9050 | |
| 23255 | 23255 | Oliver | Timmy | | | (262)994-9050 | |
| 23256 | 23256 | Wember | Jimmy | Dean | | (262)994-9050 | |
| 23257 | 23257 | Kosterman | Michael | Richard | | (262)994-9050 | |
| 23258 | 23258 | Szaradowski | Paul | M | | (262)994-9050 | |
| 23259 | 23259 | Oliver | Dale | | | (262)994-9050 | |
| 23260 | 23260 | Derango | Nancy | | | (262)994-9050 | |
| 23261 | 23261 | Smith | Arthur | J | | (262)994-9050 | SMITH24.3059@YAHOO |
| 23262 | 23262 | Brown | Michael | Edward | | (262)994-9050 | |

155.



Exhibit 13

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Executed this November 29th, 2020.

[redacted]

[redacted]

# APPENDIX P-2

Alex Halderman Declarations

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. I have reviewed the "Letter Report" prepared by Pro V&V concerning version 5.5.10.32 of the Dominion BMD software (Dkt. No. 939). The report makes clear that Pro V&V performed only cursory testing of this new software. The company did not attempt to independently verify the cause of the ballot display problem, nor did it adequately verify that the changes are an effective solution. Pro

V&V also appears to have made no effort to test whether the changes create new problems that impact the reliability, accuracy, or security of the BMD system.

3. This superficial testing is deeply concerning, because Pro V&V's characterization of the source code changes indicates that they are considerably more complicated than what Dr. Coomer previously testified was the threshold for considering a change to be "de minimis": "literally a one-line configuration change in some config file that would have no material impact on the system" (Dkt. No. 905 at 102:18-103:14). Instead, Pro V&V states that Dominion made two kinds of changes and modified lines in five different source code files. In general, changes that affect more lines of source code or more source code files are riskier than smaller change, as there is a greater likelihood that they will have unintended side-effects. Changes to source code files, as Dominion made here, also tend to be riskier than changes to "config[uration] files."

4. The nature of the changes gives me further reason for concern. According to Pro V&V, one change involved changing a "variable declaration" to modify the "type" of a variable. A variable's type determines both what kind of data it holds and how operations on it function. Although changing a variable declaration often involves differences in only one line of source code, the effect is a change to how the program operates everywhere the variable is used, which could involve

many parts of the source code and span multiple files. For this reason, changing a variable's type frequently introduces new bugs that are difficult to detect. I have often experienced such problems while writing software myself.

5. It is not possible to evaluate the effects of such a change by analyzing only the lines of source code that have been modified. Yet Pro V&V's description of its "source code review" is consistent with having done nothing more. The company could have engaged an expert in the specific programming language to analyze the quality of the changes and look for subtle side-effects throughout the code, but it appears that they did not.

6. Instead, the report states that "Pro V&V conducted functional regression testing." Regression testing has a well-defined meaning in computer science: checking that a change to a system does not break its existing functionality. After a change to a voting system like this, rigorous regression testing is essential for ensuring that the system's reliability, accuracy, and security are not degraded. Yet the testing Pro V&V describes performing is not regression testing at all. Instead, the company focused entirely on checking whether the ballot display problem was fixed and makes no mention of testing any other functionality whatsoever.

7. Even for this limited purpose, Pro V&V's testing methodology is inadequate. They first tried to observe the error while using the current version of the BMD software, 5.5.10.30. They managed to trigger it using an artificial test ballot but failed to reproduce it using the real ballot design from Douglas County (where the problem was observed during L&A testing) even after 400 attempts.[1] They then performed the same checks using the 5.5.10.32 software. Pro V&V's basis for concluding that the new software corrects the problem is that they were unable to trigger the error with either ballot after 400 tries. Yet this ignores the obvious possibility that the error might simply be eluding them, as it did with the Douglas County ballot under version 5.5.10.30.

8. That is the full extent of the testing described in Pro V&V's report. They did not test that the other functionalities of the machine are not impacted by the change. They did not test that the BMD selected and printed results accurately, nor did they test that security was unaffected. Tests only answer the questions you ask. Here—regardless of what Pro V&V intended—the only questions asked were: "Is the stated error observed when using the old software?" and "Is the stated error observed when using the new software?" They did not ask, "Is Dominion correct

---

[1] It is curious that Pro V&V was unable to reproduce the problem experienced in Douglas County, but they appear not to have made any effort to investigate this.

about the cause of the problem?" They did not ask, "Does this change absolutely and completely fix the issue?" Most importantly, they never asked or answered the key question for determining whether the change is de minimis, "Will these modifications have any impact on the rest of the voting system's functionality?"

9. Even if the change does correct the bug without introducing new problems, it still represents a significant security risk, because of the possibility that attackers could hijack the replacement software to spread malware to Georgia's BMDs.

10. Defendants say they will guard against this using hash comparisons, but the hash comparison process they have described is inadequate in several ways.[2] As I have previously explained, examining the hash that the BMD displays on screen provides no security, because malware on the BMD could be programmed to calculate and display the expected hash. Although the State now says it will perform some acceptance testing at a central facility, such testing has limited value at best. Even if performed correctly—by securely computing the hash of the software using a device that is assuredly not affected by malware—acceptance testing can only

---

[2] The Pro V&V report lists the hash of a file named ICX.iso, which presumably contains the APK as well as other files. Without access to the ICX.iso file, I cannot confirm whether that the software purportedly being installed on the BMDs is the same as the software Pro V&V built and tested.

confirm that the new software was not modified between Pro V&V and the test facility. It does not ensure that the new software actually matches Dominion's source code or that it will not be modified during later distribution to counties or installation on the tens of thousands of BMDs statewide.

11. The report mentions that Pro V&V performed a "trusted build" of the new software. This refers to the process by which Pro V&V compiled the source code to produce the APK file for distribution and installation throughout Georgia. The result of compiling source code, often called a software "binary," is in a non-human readable format, and it is not possible in general to confirm that a binary faithfully matches source code from which it was purportedly compiled. As a result, if Pro V&V were to modify the BMD software to introduce malicious functionality—or if attackers who infiltrated their systems were to do so[3]—there

---

[3] Notably, Pro V&V's website (http://www.provandv.com/) does not support HTTPS encryption, and modern web browsers warn users that it is not secure, as shown below. In my experience, organizations that fail to support HTTPS are likely to be ignoring other security best practices too, which increases the likelihood of attackers successfully infiltrating their systems.



would be no readily available way for the State or Dominion to detect the change. The State's election security experts themselves have emphasized the risk of election manipulation by so-called "insiders."

12. Defendants state that Pro V&V has submitted the report to the EAC to seek approval for a de minimis change. The EAC's de minimis software change process was introduced less than a year ago, and, as far as I am aware, it has only been invoked on one or two occasions so far. In my opinion, the EAC cannot make an informed determination as to whether the new Dominion software meets the de minimis standard based on the information contained in Pro V&V's report, and I sincerely hope the agency demands more rigorous testing before allowing the software to be used under its certification guidelines.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 3rd day of October, 2020 in Ann Arbor, Michigan.

J. ALEX HALDERMAN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**DECLARATION OF J. ALEX HALDERMAN**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

J. ALEX HALDERMAN declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is J. Alex Halderman. I am a Professor of Computer Science and Engineering and the Director of the Center for Computer Security and Society at the University of Michigan in Ann Arbor, Michigan. I submit this Declaration in support of Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg (the "Curling Plaintiffs").

2. I have a Ph.D., a Master's Degree, and a Bachelor's Degree in Computer Science, all from Princeton University.

3. My research focuses on computer security and privacy, with an emphasis on problems that broadly impact society and public policy. Among my areas of research are software security, network security, and election cybersecurity.

4. I have authored more than 80 articles and books. My work has been cited in more than 6,900 scholarly publications. I have served on the program committees for 30 research conferences and workshops, and I co-chaired the USENIX Electronic Voting Technology Workshop, which focuses on electronic voting security. I received the John Gideon Award for Election Integrity from the Election Verification Network, the Alfred P. Sloan Foundation Research Fellowship, the IRTF Applied Networking Research Prize, and the University of Michigan College of Engineering 1938 E Award for teaching and scholarship.

5. I have published peer-reviewed research analyzing the security of electronic voting systems used in numerous U.S. states as well as in other countries. I have also investigated methods for improving the security of electronic voting, such as efficient techniques for testing whether electronic vote totals match paper vote records. I have testified before the U.S. Senate Select Committee on Intelligence on the subject of cybersecurity and U.S. elections.

6. I have performed extensive hands-on security testing of the AccuVote TS and TSX electronic voting machines, which I understand are the two models of electronic voting machines used in Georgia. I published a peer-reviewed security evaluation of the AccuVote TS[1], and I performed a source code review of the AccuVote TSX as part of a study commissioned by the Secretary of State of California.[2] These studies discovered dozens of serious security vulnerabilities in the AccuVote hardware and software.

7. My curriculum vitae, including a list of honors and awards, research projects, and publications, is attached as Exhibit A.

**Context: Cyberattacks, the 2016 Presidential Election, and Upcoming Elections**

8. The 2016 presidential election was subject to unprecedented cyberattacks apparently intended to interfere with the election and undermine confidence in the voting process. For example, attackers broke into the email system of the Democratic National Committee and, separately, into the email account of John Podesta, the chairman of Secretary Clinton's campaign. Exhibits

---

[1] Ariel J. Feldman, J. Alex Halderman & Edward W. Felten, *Security Analysis of the Diebold AccuVote-TS Voting Machine*, Princeton University (2006), http://usenix.org/events/evt07/tech/full_papers/feldman/feldman.pdf.

[2] Joseph A. Calandrino et al., *Source Code Review of the Diebold Voting System*, University of California, Berkeley (2007), http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf.

B and C. The attackers leaked private messages from both hacks. Attackers also attempted to breach election-related systems in at least 18 states, including Georgia. Exhibit D.[3] In at least two states, Illinois and Arizona, these attackers successfully infiltrated the voter registration systems and stole voter data. Exhibit E. The U.S. Senate Select Committee on Intelligence has concluded that, in a small number of states, the attackers were in a position to alter or delete voter registration data.[4] Exhibit F. The Department of Homeland Security has stated that senior officials in the Russian government commissioned these attacks. Exhibit G.

9. Russia has sophisticated cyber-offensive capabilities, and it has shown a willingness to use them to hack elections elsewhere. For instance, according to published reports, during the 2014 presidential election in Ukraine, attackers linked to Russia sabotaged Ukraine's vote counting infrastructure, and Ukrainian officials succeeded only at the last minute in defusing vote-stealing malware that could

---

[3] Kim Zetter, *Was Georgia's Election System Hacked in 2016?*, POLITICO Magazine (July 18, 2018), https://www.politico.com/magazine/story/2018/07/18/mueller-indictments-georgia-voting-infrastructure-219018.

[4] Senate Intelligence Committee, *Russian Targeting of Election Infrastructure During the 2016 Election: Summary of Initial Findings and Recommendations*, at 1-2 (May 9, 2018), https://www.burr.senate.gov/imo/media/doc/RussRptInstlmt1-%20ElecSec%20Findings,Recs2.pdf.

have caused the wrong winner to be announced. Exhibit H. Countries other than Russia also have similarly sophisticated cyberwarfare capabilities.

10. In May 2018, the U.S. Senate Select Committee on Intelligence, charged with investigating cybersecurity threats to U.S. election infrastructure, reported its findings and recommendations.[5] The committee found serious vulnerabilities, including that "voting systems across the United States are outdated, and many do not have a paper record of votes as a backup counting system that can be reliably audited, should there be allegations of machine manipulation."[6] Moreover, "Paperless Direct Recording Electronic (DRE) voting machines"—the type used in Georgia—"are at highest risk for security flaws."[7]

11. Director of National Intelligence Dan Coats and Secretary of Homeland Security Kristjen Nielsen have warned as recently as August 2, 2018, that Russia is continuing to pursue its goal of interfering in our elections, including the upcoming midterm elections in November.[8]

12. Foreign governments could attempt to hack American voting machines to achieve a variety of goals, including undermining voter confidence

---

[5] *Id.*
[6] *Id.* at 4.
[7] *Id.*
[8] Brian Ries & Meg Wagner, White House press briefing, CNN (Aug. 2, 2018), https://www.cnn.com/politics/live-news/whpb-08-02-18/h_b4373e9f04f5da63237586ce450a0962.

and causing fraudulent outcomes. They could sabotage the machines to prevent them from functioning on Election Day, or to cause them to produce obviously incorrect results when votes are counted. They could also infiltrate the machines with malicious software in order to cause them to produce plausible but fraudulent results. I have written demonstration malicious software that executes these attacks against the models of electronic voting machines used in Georgia.

**The Vulnerability of Georgia's Voting Machines to Cyberattack**

13. More than 70% of American voters have their votes recorded on some form of paper, which provides permanent evidence of their intent in the event of a post-election audit or recount—33 states have a paper ballot, or at least a paper trail, for every vote. In Georgia, except for absentee voting, all ballots are cast on paperless[9] direct-recording electronic (DRE) computer voting machines that do not create a paper record of each vote. Georgia is one of only five states to use paperless machines statewide.[10]

---

[9] In election technology contexts, "paperless" refers to machines that lack a voter-verifiable paper record of each ballot. Although Georgia's machines print a paper summary of the election totals after polls close, they are still considered "paperless," since this summary tape does not provide a way for the voter to confirm that his or her vote has been properly recorded.

[10] Verified Voting, The Verifier – Polling Place Equipment – November 2018, https://www.verifiedvoting.org/verifier/ (last accessed Aug. 7, 2018).

14. Paperless DRE voting machines have been repeatedly shown to be vulnerable to cyberattacks that can change or erase votes, cast extra votes, or cause the machines to fail to operate on election day. Since paperless DREs do not generate a physical record of the vote, these attacks may be difficult or impossible to detect or to reverse. There is a broad scientific consensus that paperless DREs do not provide adequate security against cyberattacks.

15. To my knowledge, Georgia exclusively uses Premier/Diebold (Dominion) AccuVote TS and TSX voting machines. These particular models are probably the most well-studied by security researchers of any voting machines in the world. Over the past 15 years, I and other experts have repeatedly documented serious cybersecurity problems with these machines, in peer-reviewed and state-sponsored research studies. The vulnerabilities that affect Georgia's machines include numerous hardware and software security flaws, as well as architectural weaknesses that cannot be repaired through software updates. As a result, every DRE in use in Georgia is vulnerable to cyberattacks.

16. These voting machines are computers with reprogrammable software. An attacker who can modify that software by infecting the machines with malware can cause the machines to provide any result of the attacker's choosing. In tests, I have demonstrated that, in just a few seconds, anyone can install vote-stealing

malware on these voting machines that will silently alter all records of every vote.[11]

17. The first major study of these machines was carried out in 2003 by Kohno, Stubblefield, Rubin, and Wallach, who studied a leaked version of the source code and found many design errors and vulnerabilities.[12] Public concern in light of Kohno's study led the state of Maryland to authorize two security studies. The first, by SAIC, reported that the system was "at high risk of compromise."[13] The second, conducted by RABA, a security consulting firm, confirmed many of Kohno's findings and suggested design changes to the Diebold system.[14] A further security assessment was commissioned by the Ohio Secretary of State and carried

---

[11] A video documenting this result is publicly available. Hack247, *Princeton University Diebold Machine Hacking*, YouTube (Nov. 7, 2006), https://www.youtube.com/watch?v=2Vvq_YseZVc.
[12] Tadayoshi Kohno et al., *Analysis of an Electronic Voting System*, *in* IEEE Symposium on Security and Privacy, IEEE Computer Society Press (Feb. 27, 2004), http://avirubin.com/vote.pdf.
[13] Science Applications International Corporation, Risk Assessment Report: Diebold AccuVote-TS Voting System and Processes, SAIC-6099-2003-261 (Sept. 2, 2003).
[14] RABA Technologies, *Trusted agent report: Diebold AccuVote-TS voting system*, (Jan. 20, 2004), http://euro.ecom.cmu.edu/program/courses/tcr17-803/TA_Report_AccuVote.pdf.

out by Compuware.[15] It examined several DRE systems, including the AccuVote TS, and identified a number of high-risk security problems.

18. In 2006, independent security researcher Harri Hursti examined the hardware and firmware of AccuVote TS and TSX systems. He discovered problems with a software update mechanism that could allow malicious parties to infect the machines with malicious code.[16] Also in 2006, I and collaborators at Princeton obtained an AccuVote TS from a private party and reverse engineered its hardware and software.[17] Our study confirmed the results of the earlier security reviews and discovered a variety of additional serious vulnerabilities.

19. We demonstrated the vulnerabilities of the AccuVote TS by developing a piece of malware (malicious software) that could infect the machines and steal votes. The malware modifies all of the vote records, audit logs, and protective counters stored by the machine, so that even careful forensic examination of the files would find nothing amiss. The malware was programmed to inspect each ballot as it was cast and modify the minimum number of votes

---

[15] Compuware Corp., *Direct recording electronic (DRE) Technical Security Assessment Report* (Nov. 21, 2003), http://www.sos.state.oh.us/sos/hava/compuware112103.pdf.

[16] Harri Hursti, *Diebold TSx Evaluation Security Alert: May 11, 2006 Critical Security Issues with Diebold TSx*, IssueLab (May 11, 2006), https://www.issuelab.org/resources/1294/1294.pdf.

[17] Feldman, *supra* note 1.

necessary to ensure that the attacker's favored candidate always had at least a certain percentage of the vote total.

20. We also developed a voting machine virus that could spread the vote-stealing malware automatically and silently from machine to machine during normal pre- and post-election activities. The virus propagated via the removable memory cards that election officials use to program the ballot design before every election and to offload election results. By exploiting vulnerabilities in the AccuVote software, an infected memory card can spread the voting machine virus to the machine.

21. Once installed, the virus copies itself to every memory card inserted into the infected machine. If those cards were inserted into other machines, they too would become infected. As a result, an attacker could infect a large population of machines while only having temporary physical access to a single machine or memory card.

22. In 2007, the Secretary of State of California organized a comprehensive election security examination, the California Top-to-Bottom Review (TTBR[18]), which examined systems including the AccuVote TSX. I was part of a team of six experts who spent approximately 30 days examining the

[18] Cal. Sec'y of State, *Top-to-Bottom Review*, http://www.sos.ca.gov/elections/voting-systems/oversight/top-bottom-review/ (last accessed Aug. 7, 2018).

source code to the AccuVote system. Also in 2007, the Secretary of State of Ohio conducted a similar security study and source code review (Project EVEREST[19]), which also covered the AccuVote TSX system.

23. Both studies found additional, extremely serious security vulnerabilities. The TTBR report documents 24 serious security issues in the AccuVote TSX. These include software flaws, including buffer-overflow vulnerabilities, that attackers could exploit to install malicious software on the voting machines and on the election management back-end systems used to design and tabulate ballots. These flaws could be exploited to spread a vote-stealing virus that would propagate even more efficiently and be more difficult to detect than the virus developed in my 2006 study.

24. Some of the software vulnerabilities that affect the AccuVote machines can be corrected by improving the AccuVote software. For example, more recent versions of the AccuVote software have been modified to properly authenticate software updates, closing one of several routes by which malware could infect the machines. However, other vulnerabilities reflect deeper architectural problems that cannot be corrected through software changes. Since all

---

[19] Ohio Sec'y of State, *EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing* (Dec. 7, 2007), http://www.patrickmcdaniel.org/pubs/everest.pdf.

records of the vote are under software control, if there is any way for malware to infect the machine, the election results can be compromised.

25. The software that performs election functions on the AccuVote TS and TSX is called BallotStation. I understand that the machines used in Georgia use BallotStation version 4.5.2!, which I understand was developed in 2005. This software predates the California and Ohio studies, which examined version 4.6 in 2007. Therefore, it is almost certain that the serious vulnerabilities discovered in these studies remain uncorrected in the software on Georgia's machines.

26. I myself have developed demonstration vote-stealing malware that exploits vulnerabilities in BallotStation 4.3, 4.4, and 4.6—versions that closely predate and follow the software version used in Georgia.[20] Based on my examination of changes in the software that occurred between versions 4.4 and 4.6, I believe that similarly serious vulnerabilities are all but certain to affect Georgia's machines.

27. Moreover, the AccuVote TS and TSX machines rely on Windows CE as their operating system. This software has not been supported by Microsoft in

[20] I recently demonstrated for the New York Times an attack that can remotely steal votes on the AccuVote TSX. The demonstration machine used BallotStation 4.6. *See* Matteen Mokalla, Taige Jensen & J. Alex Halderman, I Hacked an Election. So Can the Russians., N.Y. Times (Apr. 5, 2018), https://www.nytimes.com/video/opinion/100000005790489/i-hacked-an-election-so-can-the-russ%20ians.html.

several years[21] and has been shown to have significant vulnerabilities itself, beyond those of the election-specific software.[22] Georgia's machines apparently have not had this operating system software updated since at least 2005.

28. Based on the results of the TTBR, California decertified the Accuvote TSX in 2007.[23] This was the case even though California's machines, unlike Georgia's, produced a voter-verifiable paper trail that could be used to detect and correct vote-stealing attacks. Georgia's machines have no such protection and apparently have not received software updates to correct any of the many security flaws discovered over the last 13 years, yet they remain in use.

**Vulnerabilities in Georgia's Machines Could Be Used to Attack Elections on a Wide Scale**

29. The security features built into Georgia's voting machines are inadequate to defend against cyberattacks. Whether voting machines are connected to the Internet is irrelevant. Sophisticated attackers, such as nation-states, have developed a variety of techniques for attacking non-Internet-connected

---

[21] Microsoft, Inc., *Search product lifecycle*, https://support.microsoft.com/en-us/lifecycle/search (search "Microsoft Windows CE .NET 4.0").
[22] CVE Details, Microsoft > Windows Ce: Vulnerability Statistics, https://www.cvedetails.com/product/1079/Microsoft-Windows-Ce.html?vendor_id=26 (last accessed Aug. 7, 2018).
[23] Cal. Sec'y of State, *Withdrawal of Approval of Diebold Election Systems, Inc.* (revised Oct. 25, 2007), http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-102507.pdf.

systems.[24] There are several routes by which such attackers might infect Georgia's machines with malicious software.

30. Shortly before each election, poll workers must program every voting machine in Georgia with the ballot design, including the names of the races and candidates. This ballot programming is copied to each machine on a removable memory card, similar to the memory card used in a digital camera. If an attacker can modify the ballot programming files, the attacker can piggyback on the pre-election programming process to spread malicious software to the machines.

31. Ballot programming files are typically created by election officials on a regular desktop computer in a government office, or by an election service vendor that creates programming for voting machines across many jurisdictions. The computer software that generates the ballot programming files is called an election management system (EMS). If attackers can access the EMS, they can tamper with the ballot programming files it generates, and thereby spread a vote-stealing attack to voting machines across all jurisdictions serviced by the EMS.

---

[24] A well-known example of this ability, which is known as "jumping an air gap," is the Stuxnet computer virus, which was created to sabotage Iran's nuclear centrifuge program by attacking factory equipment that was not directly connected to the Internet. Kim Zetter, *An Unprecedented Look At Stuxnet, The World's First Digital Weapon*, Wired (Nov. 3, 2014), https://www.wired.com/2014/11/countdown-to-zero-day-stuxnet/.

32. Moreover, I understand that the primary vendor of Georgia's voting machines has recently announced it installed remote access software on EMS's it sold during the time period in which Georgia purchased its election machines.[25] Any remote access to the software installed on Georgia's election management systems creates a wide open door for hackers.

33. Furthermore, a local attacker with physical access to the machines can additionally tamper with them by manipulating the machines' removable memory cards. Access to these cards is protected using a low security lock that can be picked using only a paperclip or BIC pen.[26] The machines would have to be perfectly safeguarded at all times, beginning from the time they are manufactured, to avoid the possibility of being infected with malware that would stealthily affect future elections.

34. Here is one example of how an attack could proceed. Suppose a foreign government were to attempt to hack Georgia's voting machines to influence the outcome of an election. First, the attackers would probe state offices

---

[25] Kim Zetter, Top Voting Machine Vendor Admits It Installed Remote-Access Software on Systems Sold to States, Motherboard (July 17, 2018https://motherboard.vice.com/amp/en_us/article/mb4ezy/top-voting-machine-vendor-admits-it-installed-remote-access-software-on-systems-sold-to-states?__twitter_impression=true.

[26] Shown in this video demonstration: Matt Bernhard, Breaking into a voting machine using a pen, YouTube (Oct. 25, 2016), https://www.youtube.com/watch?v=vqNJL0fYwSk.

(or the offices of election service vendors) well in advance to find ways to break into the election management computers. Next, when it was clear which systems were most vulnerable and which races were the closest, the attackers would hijack the pre-election programming process to spread malware into voting machines in parts or all of the state. This malware would be designed to manipulate the machines to shift a few percent of the vote to favor the attacker's desired candidate. One would expect a skilled attacker's work to leave no visible signs.

**Procedural Safeguards Are Inadequate to Protect Georgia's Elections**

35. Procedural safeguards used by Georgia to protect its voting equipment are inadequate to guard against manipulation of the election outcome via cyberattack.

36. I understand that one safeguard used in Georgia is tamper-evident seals. These seals are designed to indicate whether someone has opened the chassis of the voting machine. Tamper evident seals do not protect against remote electronic attackers, and may not even defend against local attackers. The types of seals typically used for voting equipment can be bypassed without detection using

readily available tools.[27] For some seals, these include screwdrivers and hair dryers. By bypassing the seals, an attacker with physical access to the voting machines can modify their internal programming to make them output fraudulent results.

37. I understand that Georgia also employs so-called "logic and accuracy" (L&A) testing. In L&A testing, officials cast a small number of votes with known selections, then check whether the machine's output reflects the correct totals. This form of testing is designed to detect errors in the ballot design or counting logic. It provides little or no benefit against deliberate attacks.

38. Much as Volkswagen's emission systems were designed to detect that they were being tested by the EPA and to only cheat while not under test, malware that has infected a voting machine can be programmed to detect and circumvent L&A testing. For example, L&A testing on the AccuVote TS and TSX voting machines is typically performed by putting the machines into a special "test mode" that is not used during regular voting. Malware can detect that the machine is in test mode and suppress cheating until actual voting begins. Similarly, both models of voting machine have digital clocks. Malware can be programmed to cheat only

---

[27] Andrew W. Appel, Security Seals on Voting Machines: A Case Study, ACM Transactions on Information and System Security (2011), https://www.cs.princeton.edu/~appel/voting/SealsOnVotingMachines.pdf.

at the moment polls close on Election Day, so that testing performed at an earlier or later time would show nothing amiss. I myself have programmed malware for the AccuVote TS and TSX voting machines that uses methods similar to these to avoid detection during L&A testing.

39. I understand that Georgia also employs a testing technique known as "parallel testing." Officials select a small number of voting machines that have been prepared for use in the election and set them aside for testing. Over the course of Election Day, workers cast votes with known selections on these machines. At the end of the day, they compare the results produced by the machines to the known-correct totals.

40. Parallel testing provides limited and insufficient protection against attacks. Like L&A testing, it can be defeated if malware can detect that testing is taking place. Workers who are casting scripted votes are likely to behave differently from real voters, such as by taking less time to read instructions, and malware could be programmed to detect such differences.

41. In any event, parallel testing that occurs during or after the election is necessarily too late to prevent attackers from sabotaging the election. If the testing reveals, at the close of the election, that the machines were counting incorrectly,

there will likely be no way to recover the true results, since the machines used in Georgia have no paper backup records.

42. However it is practiced, the most that parallel testing can establish is that the specific machines that were tested counted correctly during the test. If only a fraction of machines are programmed to cheat—or if all the machines are programmed to cheat only a fraction of the times they are powered on—parallel testing would have a low probability of detecting the fraud. Such fraud could affect a sufficient number of votes to change the outcome of a close race.

43. Another proposed method of detecting fraud is to look for statistical anomalies or outliers in the election results and to re-examine the machines or election data in those localities. This approach is inadequate for several reasons.

44. First, it is difficult or impossible to *rule out* electronic fraud by re-examining the machines. At best, it is possible that careful digital forensics would reveal evidence of fraud if it indeed occurred. However, it is also possible that a carefully constructed attack would leave no forensic traces, or that what traces there were would be missed by a cursory re-examination.

45. For example, if the machines were infected by malware during voting, such malware could alter all records of the votes then erase itself when polls close. In this case, nothing would appear to be amiss even if officials re-tallied all the

election data from the machine. I myself have written malware that behaves this way on the AccuVote TS.

46. Second, even if a careful forensic examination proved that fraud occurred, it would likely be impossible to determine the true vote totals. Suppose that an investigation showed that certain machines were infected with malware that flipped a random percentage of votes from one candidate to another as they were being recorded. Since Georgia's machines have no paper record of individual ballots, the voters' choices would be permanently lost.

47. Third, a stealthily executed attack would not create tell-tale anomalies or draw attention to specific locations or machines. For instance, an attack that shifted a small fraction of the vote uniformly across an entire house district would be difficult to distinguish from bias in pre-election polling.

48. Finally, as with parallel testing, investigation after the election is no help if the attacker's intention is to sabotage the voting process. Disruptive attacks—such as preventing machines from turning on in jurisdictions that favor a particular candidate—could cause a partisan shift in the election outcome.

**<u>Adopting Paper Ballots and Post-Election Audits Is the Only Practical Way to Safeguard Elections in Georgia</u>**

49. In light of the threat of cyberattacks intended to affect the outcome of the upcoming election; the profound vulnerability of Georgia's voting machines to cyberattack; and the fact that a skilled attacker would leave no outwardly visible evidence of an attack, the only way to reliably safeguard Georgia's voting system against future cyberattacks is to generate and examine physical evidence of voter intent, in the form of a voter-verifiable paper trail. Such a paper trail is not available today in Georgia—except for absentee ballots—given Georgia's 100% electronic system. Only five states, including Georgia, continue to rely exclusively on such paperless machines.

50. Optical-scan paper ballots are the most widely used voting method in the United States, and they are the most secure technology available for casting votes. In this style of voting system, the voter fills out a paper ballot that is scanned and counted by a computer and retained in a ballot box. (Voters with accessibility needs complete their ballots using assistive technology, such as a ballot marking device provided at the polling place.) This process results in two independent records of each vote: a digital record created by the scanner, and a physical record in the form of the paper ballot.

51. By combining physical and electronic records of each vote, optical-scan paper ballots can achieve a level of security that is much greater than that of electronic voting or traditional hand-counting. The paper ballots provide an individual, physical record of the voter's selections that cannot be changed by malware or other forms of cyberattack, even if the computer scanners used to read the ballots are compromised. At the same time, the digital records provide a safeguard against low-tech attacks, such as physically stuffing the ballot box.

52. In a post-election audit, officials can use random sampling to efficiently confirm that the paper and digital records reflect the same election outcome. Although a high-tech attacker might still manipulate the digital records, and a group of low-tech criminals with sufficient physical access might manipulate some of the paper records, altering *both* sets of records in a way that reflected the same election outcome would require a truly extraordinary conspiracy.

53. The paper ballots already used in Georgia (for absentee voters) and other states can be audited or counted much more easily and reliably than the punched card paper ballots that were recounted in Florida during the 2000 presidential election. Punched card ballots are fragile, so each time they are counted, the record of voters' intent may be inadvertently altered. They are also difficult to interpret, sometimes requiring a magnifying glass to discern whether

the voter intended to make a mark. Georgia's optically scanned absentee ballots are a completely different technology. They create a persistent and readily interpretable record of voters' intent that does not suffer from these problems, and they can be counted and audited efficiently.

54. In March, Congress provided $380 million in new funding to the States under the Help America Vote Act, including more than $10 million to Georgia. The appropriation included a joint explanatory statement of Congress's intent: "states may use this funding to: replace voting equipment that only records a voter's intent electronically with equipment that utilizes a voter-verified paper record; implement a post-election audit system that provides a high-level of confidence in the accuracy of the final vote tally. . . ."[28]

55. Furthermore, in May, the U.S. Senate Select Committee on Intelligence recommended that "States should rapidly replace outdated and vulnerable voting systems. At a minimum, any machine purchased going forward should have a voter-verified paper trail." In addition, "States should consider implementing more widespread, statistically sound audits of election results."

56. Many states have implemented or are implementing these protections.

---

[28] U.S. Election Assistance Comm'n, HAVA Funds Background (Mar. 30, 2018), https://www.eac.gov/assets/1/6/2018_HAVA_Funds_background.pdf.

**Georgia Should Replace DREs With Paper Ballots and Appropriate Post-Election Audits**

57. All of Georgia's votes (that are not cast via absentee ballot) are recorded on DRE voting machines that do not generate any paper record of the individual votes. The only practical way to safeguard Georgia's upcoming election is to discontinue the use of Georgia's DREs, require the use of optical scan paper ballots throughout Georgia, and mandate auditing of the results to ensure that the optical scanners were not attacked with malware to infect the automated counting of the ballots.

Dated: August 7, 2018
Ann Arbor, Michigan

J. ALEX HALDERMAN

# EXHIBIT A

# J. Alex Halderman

Professor, Computer Science and Engineering
*University of Michigan*

2260 Hayward Street
Ann Arbor, MI 48109 USA
(*office*) +1 734 647 1806
jhalderm@eecs.umich.edu
J.AlexHalderman.com

August 7, 2018

## Research Overview

My research focuses on computer security and privacy, with an emphasis on problems that broadly impact society and public policy. Topics that interest me include software security, network security, data privacy, anonymity, surveillance, electronic voting, censorship resistance, computer forensics, ethics, and cybercrime. I'm also interested in the interaction of technology with politics and international affairs.

### Selected Projects

'17: Weaknesses in TLS interception middleboxes
'16: Let's Encrypt HTTPS certificate authority
'16: DROWN: Attacking TLS with SSLv2
'15: Weak Diffie-Hellman and the Logjam attack
'14: Understanding Heartbleed's aftermath
'14: Security problems in full-body scanners
'14: Analysis of Estonia's Internet voting system
'13: ZMap Internet-wide network scanner
'12: Widespread weak keys in network devices
'11: Anticensorship in the network infrastructure
'10: Hacking Washington D.C.'s Internet voting
'10: Vulnerabilities in India's e-voting machines
'10: Reshaping developers' security incentives
'09: Analysis of China's Green Dam censorware
'09: Fingerprinting paper with desktop scanners
'08: Cold-boot attacks on encryption keys
'07: California's "top-to-bottom" e-voting review
'07: Machine-assisted election auditing
'06: The Sony rootkit: DRM's harmful side effects
'03: Analysis of MediaMax "shift key" DRM

## Positions

– **University of Michigan**, Ann Arbor, MI
  Department of Electrical Engineering and Computer Science,
  Computer Science and Engineering Division

  *Professor* ... (2016–present)
  *Associate Professor* ... (2015–2016)
  *Assistant Professor* ... (2009–2015)

  *Director*, Center for Computer Security and Society (2014–present)

– Censys; Co-founder and Chief Scientist (2017–present)

## Education

– Ph.D. in Computer Science, Princeton University, June 2009
  Advisor: Ed Felten
  Thesis: *Investigating Security Failures and their Causes: An Analytic Approach to Computer Security*
  Doctoral committee: Andrew Appel, Adam Finkelstein, Brian Kernighan, Avi Rubin

– A.B. in Computer Science, *summa cum laude*, Princeton University, June 2003

## Honors and Awards

– Merit Network's Eric Aupperle Innovation Award (2017)
(“named for Merit's first president, recognizes individuals that enhance their work by using networking and related technologies in exciting ways”)

– Pwnie Award in the category of “Best Cryptographic Attack”
for “DROWN: Breaking TLS using SSLv2,” Black Hat 2016

– Finalist for 2016 Facebook Internet Defense Prize
for “DROWN: Breaking TLS using SSLv2”

– Named one of Popular Science's “Brilliant 10” (2015) (“each year *Popular Science* honors the brightest young minds reshaping science, engineering, and the world”)

– **Best Paper Award** of the 22nd ACM Conference on Computer and Communications Security
for “Imperfect Forward Secrecy: How Diffie-Hellman Fails in Practice” (2015)

– Pwnie Award in the category of “Most Innovative Research”
for “Imperfect Forward Secrecy: How Diffie-Hellman Fails in Practice,” Black Hat 2015

– IRTF Applied Networking Research Prize for “Neither Snow Nor Rain Nor MITM... An Empirical Analysis of Email Delivery Security” (2015)

– Alfred P. Sloan Research Fellowship (2015)

– University of Michigan College of Engineering 1938 E Award (2015) (“recognizes an outstanding teacher in both elementary and advanced courses, an understanding counselor of students who seek guidance in their choice of a career, a contributor to the educational growth of the College, and a teacher whose scholarly integrity pervades his/her service and the profession of Engineering”)

– Morris Wellman Faculty Development Assistant Professorship (2015)
(“awarded to a junior faculty member to recognize outstanding contributions to teaching and research”)

– **Best Paper Award** of the 14th ACM Internet Measurement Conference
for “The Matter of Heartbleed” (2014)

– **Best Paper Award** of the 21st USENIX Security Symposium
for “Mining Your Ps and Qs: Detection of Widespread Weak Keys in Network Devices” (2012)

– Runner-up for 2012 PET Award for Outstanding Research in Privacy Enhancing Technologies
for “Telex: Anticensorship in the Network Infrastructure” (2012)

– John Gideon Memorial Award from the Election Verification Network
for contributions to election verification (2011)

– **Best Student Paper** of the 17th USENIX Security Symposium
for “Lest We Remember: Cold Boot Attacks on Encryption Keys” (2008)

– Pwnie Award in the category of “Most Innovative Research”
for “Lest We Remember: Cold Boot Attacks on Encryption Keys,” Black Hat 2008

– Charlotte Elizabeth Procter Honorific Fellowship, Princeton University (2007)
(“awarded in recognition of outstanding performance and professional promise, and represents high commendation from the Graduate School”)

– National Science Foundation Graduate Research Fellowship (2004–2007)
– **Best Paper Award** of the 8th International Conference on 3D Web Technology for "Early Experiences with a 3D Model Search Engine" (2003)
– Princeton Computer Science Department Senior Award (2003)
– Accenture Prize in Computer Science, Princeton University (2002)
– Martin A. Dale Summer Award, Princeton University (2000)
– USA Computing Olympiad National Finalist (1996 and 1997)

## Refereed Conference Publications

[1] **403 Forbidden: A Global View of Geoblocking**
Allison McDonald, Matthew Bernhard, Benjamin VanderSloot, Will Scott, J. A. Halderman, and Roya Ensafi
To appear in *Proc. 18th ACM Internet Measurement Conference* (IMC), October 2018.

[2] **Scalable Remote Measurement of Application-Layer Censorship**
Benjamin VanderSloot, Allison McDonald, Will Scott, J. A. Halderman, and Roya Ensafi
To appear in *Proc. 27th USENIX Security Symposium*, August 2018.
Acceptance rate: 19%, 100/524.

[3] **Tracking Certificate Misissuance in the Wild**
Deepak Kumar, Zhengping Wang, Matthew Hyder, Joseph Dickinson, Gabrielle Beck, David Adrian, Joshua Mason, Zakir Durumeric, J. A. Halderman, and Michael Bailey
*Proc. 39th IEEE Symposium on Security and Privacy* ("Oakland"), May 2018.

[4] **Initial Measurements of the Cuban Street Network**
Eduardo Pujol, Will Scott, Eric Wustrow, and J. A. Halderman
*Proc. 17th ACM Internet Measurement Conference* (IMC), London, November 2017.
Acceptance rate: 23%, 42/179.

[5] **Public Evidence from Secret Ballots**
Matthew Bernhard, Josh Benaloh, J. A. Halderman, Ronald L. Rivest, Peter Y. A. Ryan, Philip B. Stark, Vanessa Teague, Poorvi L. Vora, and Dan S. Wallach
*Proc. 2nd International Joint Conference on Electronic Voting* (E-Vote-ID), Bregenz, Austria, October 2017.

[6] **Understanding the Mirai Botnet**
Manos Antonakakis, Tim April, Michael Bailey, Matt Bernhard, Elie Bursztein, Jaime Cochran, Zakir Durumeric, J. A. Halderman, Luca Invernizzi, Michalis Kallitsis, Deepak Kumar, Chaz Lever, Zane Ma, Joshua Mason, Damian Menscher, Chad Seaman, Nick Sullivan, Kurt Thomas, and Yi Zhou
*Proc. 26th USENIX Security Symposium*, Vancouver, BC, August 2017.
Acceptance rate: 16%, 85/522.

[7] **Security Challenges in an Increasingly Tangled Web**
Deepak Kumar, Zane Ma, Zakir Durumeric, Ariana Mirian, Joshua Mason, J. A. Halderman, and Michael Bailey
*Proc. 26th World Wide Web Conference* (WWW), April 2017.
Acceptance rate: 17%, 164/966.

[8] **The Security Impact of HTTPS Interception**
Zakir Durumeric, Zane Ma, Drew Springall, Richard Barnes, Nick Sullivan, Elie Bursztein, Michael Bailey, J. A. Halderman, and Vern Paxson
*Proc. 24th Network and Distributed Systems Symposium* (NDSS), February 2017.
Acceptance rate: 16%, 68/423.

[9] **Measuring Small Subgroup Attacks Against Diffie-Hellman**
Luke Valenta, David Adrian, Antonio Sanso, Shaanan Cohney, Joshua Fried, Marcella Hastings, J. A. Halderman, and Nadia Heninger
*Proc. 24th Network and Distributed Systems Symposium* (NDSS), February 2017.
Acceptance rate: 16%, 68/423.

[10] **An Internet-Wide View of ICS Devices**
Ariana Mirian, Zane Ma, David Adrian, Matthew Tischer, Thasphon Chuenchujit, Tim Yardley, Robin Berthier, Josh Mason, Zakir Durumeric, J. A. Halderman, and Michael Bailey
*Proc. 14th IEEE Conference on Privacy, Security, and Trust* (PST), Auckland, NZ, December 2016.

[11] **Implementing Attestable Kiosks**
Matthew Bernhard, J. A. Halderman, and Gabe Stocco
*Proc. 14th IEEE Conference on Privacy, Security, and Trust* (PST), Auckland, NZ, December 2016.

[12] **A Security Analysis of Police Computer Systems**
Benjamin VanderSloot, Stuart Wheaton, and J. A. Halderman
*Proc. 14th IEEE Conference on Privacy, Security, and Trust* (PST), Auckland, NZ, December 2016.

[13] **Measuring the Security Harm of TLS Crypto Shortcuts**
Drew Springall, Zakir Durumeric, and J. A. Halderman
*Proc. 16th ACM Internet Measurement Conference* (IMC), Santa Monica, November 2016.
Acceptance rate: 25%, 46/184.

[14] **Towards a Complete View of the Certificate Ecosystem**
Benjamin VanderSloot, Johanna Amann, Matthew Bernhard, Zakir Durumeric, Michael Bailey, and J. A. Halderman
*Proc. 16th ACM Internet Measurement Conference* (IMC), Santa Monica, November 2016.
Acceptance rate: 25%, 46/184.

[15] **DROWN: Breaking TLS using SSLv2**
Nimrod Aviram, Sebastian Schinzel, Juraj Somorovsky, Nadia Heninger, Maik Dankel, Jens Steube, Luke Valenta, David Adrian, J. A. Halderman, Viktor Dukhovni, Emilia Käsper, Shaanan Cohney, Susanne Engels, Christof Paar, and Yuval Shavitt
*Proc. 25th USENIX Security Symposium*, Austin, TX, August 2016.

Acceptance rate: 16%, 72/463.
**Tied for highest ranked submission.**
Pwnie award for best cryptographic attack.
Facebook Internet Defense Prize finalist.

[16] FTP: The Forgotten Cloud
Drew Springall, Zakir Durumeric, and J. A. Halderman
*Proc. 46th IEEE/IFIP International Conference on Dependable Systems and Networks* (DSN), Toulouse, June 2016.
Acceptance rate: 22%, 58/259.

[17] Android UI Deception Revisited: Attacks and Defenses
Earlence Fernandes, Qi Alfred Chen, Justin Paupore, Georg Essl, J. A. Halderman, Z. Morley Mao, and Atul Prakash
*Proc. 20th International Conference on Financial Cryptography and Data Security* (FC), Barbados, February 2016.

[18] Imperfect Forward Secrecy: How Diffie-Hellman Fails in Practice
David Adrian, Karthikeyan Bhargavan, Zakir Durumeric, Pierrick Gaudry, Matthew Green, J. A. Halderman, Nadia Heninger, Drew Springall, Emmanuel Thomé, Luke Valenta, Benjamin VanderSloot, Eric Wustrow, Santiago Zanella-Béguelin, and Paul Zimmermann
*Proc. 22nd ACM Conference on Computer and Communications Security* (CCS), Denver, CO, October 2015.
Acceptance rate: 19%, 128/659.
**Best paper award. Perfect review score.**
Pwnie award for most innovative research.

[19] Censys: A Search Engine Backed by Internet-Wide Scanning
Zakir Durumeric, David Adrian, Ariana Mirian, Michael Bailey, and J. A. Halderman
*Proc. 22nd ACM Conference on Computer and Communications Security* (CCS), Denver, CO, October 2015.
Acceptance rate: 19%, 128/659.

[20] Neither Snow Nor Rain Nor MITM... An Empirical Analysis of Email Delivery Security
Zakir Durumeric, David Adrian, Ariana Mirian, James Kasten, Elie Bursztein, Nicholas Lidzborski, Kurt Thomas, Vijay Eranti, Michael Bailey, and J. A. Halderman
*Proc. 15th ACM Internet Measurement Conference* (IMC), Tokyo, October 2015.
Acceptance rate: 26%, 44/169.
**IRTF Applied Networking Research Prize winner.**

[21] The New South Wales iVote System:
Security Failures and Verification Flaws in a Live Online Election
J. A. Halderman and Vanessa Teague
*Proc. 5th International Conference on E-Voting and Identity* (VoteID), Bern, Switzerland, September 2015.

[22] The Matter of Heartbleed
Zakir Durumeric, Frank Li, James Kasten, Johanna Amann, Jethro Beekman, Mathias Payer, Nicolas Weaver, David Adrian, Vern Paxson, Michael Bailey, and J. A. Halderman
*Proc. 14th ACM Internet Measurement Conference* (IMC), November 2014.
Acceptance rate: 23%, 43/188
**Best paper award.**
Honorable mention for Best dataset award.

[23] Security Analysis of the Estonian Internet Voting System
Drew Springall, Travis Finkenauer, Zakir Durumeric, Jason Kitcat, Harri Hursti, Margaret MacAlpine, and J. A. Halderman
*Proc. 21st ACM Conference on Computer and Communications Security* (CCS), Scottsdale, AZ, November 2014.
Acceptance rate: 19%, 114/585.
**Highest ranked submission.**

[24] Efficiently Auditing Multi-Level Elections
Joshua A. Kroll, Edward W. Felten, and J. A. Halderman
*Proc. 6th International Conference on Electronic Voting* (EVOTE), Lochau, Austria, October 2014.

[25] Security Analysis of a Full-Body Scanner
Keaton Mowery, Eric Wustrow, Tom Wypych, Corey Singleton, Chris Comfort, Eric Rescorla, Stephen Checkoway, J. A. Halderman, and Hovav Shacham
*Proc. 23rd USENIX Security Symposium*, San Diego, CA, August 2014.
Acceptance rate: 19%, 67/350.

[26] TapDance: End-to-Middle Anticensorship without Flow Blocking
Eric Wustrow, Colleen Swanson, and J. A. Halderman
*Proc. 23rd USENIX Security Symposium*, San Diego, CA, August 2014.
Acceptance rate: 19%, 67/350.

[27] An Internet-Wide View of Internet-Wide Scanning
Zakir Durumeric, Michael Bailey, and J. A. Halderman
*Proc. 23rd USENIX Security Symposium*, San Diego, CA, August 2014.
Acceptance rate: 19%, 67/350.

[28] Elliptic Curve Cryptography in Practice
Joppe W. Bos, J. A. Halderman, Nadia Heninger, Jonathan Moore, Michael Naehrig, and Eric Wustrow
*Proc. 18th Intl. Conference on Financial Cryptography and Data Security (FC)*, March 2014.
Acceptance rate: 22%, 31/138.

[29] Outsmarting Proctors with Smartwatches: A Case Study on Wearable Computing Security
Alex Migicovsky, Zakir Durumeric, Jeff Ringenberg, and J. A. Halderman
*Proc. 18th Intl. Conference on Financial Cryptography and Data Security (FC)*, March 2014.
Acceptance rate: 22%, 31/138.

[30] **Analysis of the HTTPS Certificate Ecosystem**
Zakir Durumeric, James Kasten, Michael Bailey, and J. A. Halderman
*Proc. 13th ACM Internet Measurement Conference (IMC)*, Barcelona, Spain, October 2013.
Acceptance rate: 24%, 42/178.

[31] **ZMap: Fast Internet-Wide Scanning and its Security Applications**
Zakir Durumeric, Eric Wustrow, and J. A. Halderman
*Proc. 22nd USENIX Security Symposium*, Washington, D.C., August 2013.
Acceptance rate: 16%, 45/277.

[32] **CAge: Taming Certificate Authorities by Inferring Restricted Scopes**
James Kasten, Eric Wustrow, and J. A. Halderman
*Proc. 17th Intl. Conference on Financial Cryptography and Data Security (FC)*, April 2013.

[33] **Mining Your Ps and Qs: Detection of Widespread Weak Keys in Network Devices**
Nadia Heninger, Zakir Durumeric, Eric Wustrow, and J. A. Halderman
*Proc. 21st USENIX Security Symposium*, pages 205–220, Bellevue, WA, August 2012.
Acceptance rate: 19%, 43/222.
**Best paper award.**
Named one of *Computing Reviews'* Notable Computing Books and Articles of 2012.

[34] **Attacking the Washington, D.C. Internet Voting System**
Scott Wolchok, Eric Wustrow, Dawn Isabel, and J. A. Halderman
In Angelos D. Keromytis, editor, *Financial Cryptography and Data Security (FC)*, volume 7397 of *Lecture Notes in Computer Science*, pages 114–128. Springer, 2012.
Acceptance rate: 26%, 23/88.
**Election Verification Network John Gideon Memorial Award.**

[35] **Telex: Anticensorship in the Network Infrastructure**
Eric Wustrow, Scott Wolchok, Ian Goldberg, and J. A. Halderman
*Proc. 20th USENIX Security Symposium*, pages 459–474, San Francisco, CA, August 2011.
Acceptance rate: 17%, 35/204.
**Runner-up for 2012 PET Award** for Outstanding Research in Privacy Enhancing Technologies.

[36] **Internet Censorship in China: Where Does the Filtering Occur?**
Xueyang Xu, Z. Morley Mao, and J. A. Halderman
In Neil Spring and George F. Riley, editors, *Passive and Active Measurement*, volume 6579 of *Lecture Notes in Computer Science*, pages 133–142. Springer, 2011.
Acceptance rate: 29%, 23/79.

[37] **Absolute Pwnage: Security Risks of Remote Administration Tools**
Jay Novak, Jonathan Stribley, Kenneth Meagher, and J. A. Halderman
In George Danezis, editor, *Financial Cryptography and Data Security (FC)*, volume 7035 of *Lecture Notes in Computer Science*, pages 77–84. Springer, 2011.
Acceptance rate: 20%, 15/74.

[38] **Security Analysis of India's Electronic Voting Machines**
Scott Wolchok, Eric Wustrow, J. A. Halderman, Hari K. Prasad, Arun Kankipati, Sai Krishna Sakhamuri, Vasavya Yagati, and Rop Gonggrijp
*Proc. 17th ACM Conference on Computer and Communications Security (CCS)*, pages 1–14. ACM, Chicago, IL, October 2010.
Acceptance rate: 17%, 55/320.
**Highest ranked submission.**

[39] **Sketcha: A Captcha Based on Line Drawings of 3D Models**
Steve Ross, J. A. Halderman, and Adam Finkelstein
*Proc. 19th International World Wide Web Conference (WWW)*, pages 821–830. ACM, Raleigh, NC, April 2010.
Acceptance rate: 12%, 91/754.

[40] **Defeating Vanish with Low-Cost Sybil Attacks Against Large DHTs**
Scott Wolchok, Owen S. Hofmann, Nadia Heninger, Edward W. Felten, J. A. Halderman, Christopher J. Rossbach, Brent Waters, and Emmett Witchel
In *Proc. 17th Network and Distributed System Security Symposium (NDSS)*. Internet Society, San Diego, CA, February–March 2010.
Acceptance rate: 15%, 24/156.

[41] **Fingerprinting Blank Paper Using Commodity Scanners**
William Clarkson, Tim Weyrich, Adam Finkelstein, Nadia Heninger, J. A. Halderman, and Edward W. Felten
*IEEE Symposium on Security and Privacy ("Oakland")*, pages 301–314. IEEE, May 2009.
Acceptance rate: 10%, 26/254.

[42] **Lest We Remember: Cold-Boot Attacks on Encryption Keys**
J. A. Halderman, Seth D. Schoen, Nadia Heninger, William Clarkson, William Paul, Joseph A. Calandrino, Ariel J. Feldman, Jacob Appelbaum, and Edward W. Felten
*Proc. 17th USENIX Security Symposium*, pages 45–60, San Jose, CA, July 2008.
Acceptance rate: 16%, 27/170.
**Best student paper award.**
Pwnie award for most innovative research.

[43] **Harvesting Verifiable Challenges from Oblivious Online Sources**
J. A. Halderman and Brent Waters
*Proc. 14th ACM Conference on Computer and Communications Security (CCS)*, pages 330–341. ACM, Washington, D.C., October 2007.
Acceptance rate: 18%, 55/302.

[44] **Lessons from the Sony CD DRM Episode**
J. A. Halderman and Edward W. Felten
*Proc. 15th USENIX Security Symposium*, pages 77–92, Vancouver, BC, August 2006.
Acceptance rate: 12%, 22/179.

[45] A Convenient Method for Securely Managing Passwords
J. A. Halderman, Brent Waters, and Edward W. Felten
*Proc. 14th International World Wide Web Conference (WWW)*, pages 471–479. ACM, Chiba, Japan, May 2005.
Acceptance rate: 14%, 77/550.

[46] New Client Puzzle Outsourcing Techniques for DoS Resistance
Brent Waters, Ari Juels, J. A. Halderman, and Edward W. Felten
*Proc. 11th ACM Conference on Computer and Communications Security (CCS)*, pages 246–256. ACM, Washington, D.C., October 2004.
Acceptance rate: 14%, 35/251.

[47] Early Experiences with a 3D Model Search Engine
Patrick Min, J. A. Halderman, Michael Kazhdan, and Thomas Funkhouser
*Proc. 8th International Conference on 3D Web Technology (Web3D)*, pages 7–18. ACM, Saint Malo, France, March 2003.
**Best paper award.**

## Book Chapters

[48] Practical Attacks on Real-world E-voting
J. A. Halderman
In Feng Hao and Peter Y. A. Ryan (Eds.), *Real-World Electronic Voting: Design, Analysis and Deployment*, pages 145–171, CRC Press, December 2016.

## Journal Publications

[49] Lest We Remember: Cold-Boot Attacks on Encryption Keys
J. A. Halderman, Seth D. Schoen, Nadia Heninger, William Clarkson, William Paul, Joseph A. Calandrino, Ariel J. Feldman, Jacob Appelbaum, and Edward W. Felten
*Communications of the ACM*, 52(5):91–98, 2009.

[50] A Search Engine for 3D Models
Thomas Funkhouser, Patrick Min, Michael Kazhdan, Joyce Chen, J. A. Halderman, David P. Dobkin, and David Jacobs
*ACM Transactions on Graphics (TOG)*, 22(1):83–105, 2003.

## Refereed Workshop Publications

[51] An ISP-Scale Deployment of TapDance
Sergey Frolov, Fred Douglas, Will Scott, Allison McDonald, Benjamin VanderSloot, Rod Hynes, Adam Kruger, Michalis Kallitsis, David G. Robinson, Nikita Borisov, J. A. Halderman, and Eric Wustrow
*Proc. 7th USENIX Workshop on Free and Open Communications on the Internet* (FOCI), August 2017.

[52] Content-Based Security for the Web
Alexander Afanasyev, J. A. Halderman, Scott Ruoti, Kent Seamons, Yingdi Yu, Daniel Zappala, and Lixia Zhang
*Proc. 2016 New Security Paradigms Workshop* (NSPW), September 2016.

[53] Umbra: Embedded Web Security through Application-Layer Firewalls
Travis Finkenauer and J. A. Halderman
*Proc. 1st Workshop on the Security of Cyberphysical Systems (WOS-CPS)*, Vienna, Austria, September 2015.

[54] Replication Prohibited: Attacking Restricted Keyways with 3D Printing
Ben Burgess, Eric Wustrow, and J. A. Halderman
*Proc. 9th USENIX Workshop on Offensive Technologies (WOOT)*, Washington, DC, August 2015.

[55] Green Lights Forever: Analyzing the Security of Traffic Infrastructure
Branden Ghena, William Beyer, Allen Hillaker, Jonathan Pevarnek, and J. A. Halderman
*Proc. 8th USENIX Workshop on Offensive Technologies (WOOT)*, San Diego, CA, August 2014.

[56] Zippier ZMap: Internet-Wide Scanning at 10Gbps
David Adrian, Zakir Durumeric, Gulshan Singh, and J. A. Halderman
*Proc. 8th USENIX Workshop on Offensive Technologies (WOOT)*, San Diego, CA, August 2014.

[57] Internet Censorship in Iran: A First Look
Simurgh Aryan, Homa Aryan, and J. A. Halderman
*Proc. 3rd USENIX Workshop on Free and Open Communications on the Internet (FOCI)*, Washington, D.C., August 2013.

[58] Illuminating the Security Issues Surrounding Lights-Out Server Management
Anthony Bonkoski, Russ Bielawski, and J. A. Halderman
*Proc. 7th USENIX Workshop on Offensive Technologies (WOOT)*, Washington, D.C., August 2013.

[59] Crawling BitTorrent DHTs for Fun and Profit
Scott Wolchok and J. A. Halderman
*Proc. 4th USENIX Workshop on Offensive Technologies (WOOT)*, Washington, D.C., August 2010.

[60] Can DREs Provide Long-Lasting Security?
The Case of Return-Oriented Programming and the AVC Advantage
Steve Checkoway, Ariel J. Feldman, Brian Kantor, J. A. Halderman, Edward W. Felten, and Hovav Shacham
*Proc. 2009 USENIX/ACCURATE/IAVoSS Electronic Voting Technology Workshop / Workshop on Trustworthy Elections (EVT/WOTE)*, Montreal, QC, August 2009.

[61] You Go to Elections with the Voting System You Have:
Stop-Gap Mitigations for Deployed Voting Systems
J. A. Halderman, Eric Rescorla, Hovav Shacham, and David Wagner
In *Proc. 2008 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT)*, San Jose, CA, July 2008.

[62] In Defense of Pseudorandom Sample Selection
Joseph A. Calandrino, J. A. Halderman, and Edward W. Felten
*Proc. 2008 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT)*, San Jose, CA, July 2008.

[63] Security Analysis of the Diebold AccuVote-TS Voting Machine
Ariel J. Feldman, J. A. Halderman, and Edward W. Felten
*Proc. 2007 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT)*, Washington, D.C., August 2007.

[64] Machine-Assisted Election Auditing
Joseph A. Calandrino, J. A. Halderman, and Edward W. Felten
*Proc. USENIX/ACCURATE Electronic Voting Technology Workshop (EVT)*, Washington, D.C., August 2007.

[65] Privacy Management for Portable Recording Devices
J. A. Halderman, Brent Waters, and Edward W. Felten
*Proc. 2004 ACM Workshop on Privacy in the Electronic Society (WPES)*, pages 16–24, ACM, Washington, D.C., October 2004.
Acceptance rate: 22%, 10/45.

[66] Evaluating New Copy-Prevention Techniques for Audio CDs
J. A. Halderman
In Joan Feigenbaum, editor, *Digital Rights Management*, volume 2696 of *Lecture Notes in Computer Science*, pages 101–117. Springer, 2003.

## Selected Other Publications

[67] U.S. Senate Testimony Regarding Russian Interference in the 2016 U.S. Elections
J. A. Halderman
Testimony before the U.S. Senate Select Committee on Intelligence, June 21, 2017.

[68] Here's How to Keep Russian Hackers from Attacking the 2018 Elections
J. A. Halderman and J. Talbot-Zorn
*The Washington Post*, June 21, 2017.

[69] Want to Know if the Election was Hacked? Look at the Ballots
J. A. Halderman
Posted on Medium, November 23, 2016. (Read by over a million people.)

[70] The Security Challenges of Online Voting Have Not Gone Away
Robert Cunningham, Matthew Bernhard, and J. A. Halderman
*IEEE Spectrum*, November 3, 2016.

[71] **TIVOS: Trusted Visual I/O Paths for Android**
Earlence Fernandes, Qi Alfred Chen, Georg Essl, J. A. Halderman, Z. Morley Mao, and Atul Prakash
Technical report, Computer Science and Engineering Division, University of Michigan, Ann Arbor, MI, May 2014.

[72] **Tales from the Crypto Community: The NSA Hurt Cybersecurity. Now It Should Come Clean**
Nadia Heninger and J. A. Halderman
*Foreign Affairs*, October 23, 2013.

[73] **Ethical Issues in E-Voting Security Analysis**
David G. Robinson and J. A. Halderman
In George Danezis, Sven Dietrich, and Kazue Sako, editors, *Financial Cryptography and Data Security*, volume 7126 of *Lecture Notes in Computer Science*, pages 119–130. Springer, 2011. Invited paper.

[74] **To Strengthen Security, Change Developers' Incentives**
J. A. Halderman
*IEEE Security & Privacy*, 8(2):79–82, March/April 2010.

[75] **Analysis of the Green Dam Censorware System**
Scott Wolchok, Randy Yao, and J. A. Halderman
Technical report, Computer Science and Engineering Division, University of Michigan, Ann Arbor, MI, June 2009.

[76] **AVC Advantage: Hardware Functional Specifications**
J. A. Halderman and Ariel J. Feldman
Technical report, TR-816-08, Princeton University Computer Science Department, Princeton, New Jersey, March 2008.

[77] **Source Code Review of the Diebold Voting System**
J. A. Calandrino, A. J. Feldman, J. A. Halderman, D. Wagner, H. Yu, and W. Zeller
Technical report, California Secretary of State's "Top-to-Bottom" Voting Systems Review (TTBR), July 2007.

[78] **Digital Rights Management, Spyware, and Security**
Edward W. Felten and J. A. Halderman
*IEEE Security & Privacy*, 4(1):18–23, January/February 2006.

[79] **Analysis of the MediaMax CD3 Copy-Prevention System**
J. A. Halderman
Technical report, TR-679-03, Princeton University Computer Science Department, Princeton, New Jersey, October 2003.

## Selected Legal and Regulatory Filings

[80] **Request for DMCA Exemption: Security Research**
Petition to the U.S. Copyright Office of Ed Felten and J. Alex Halderman, represented by Elizabeth Field, Justin Manusov, Brett Hildebrand, Alex Kimata, and Blake Reid, regarding the Seventh Triennial Section 1201 Proceeding, 2017–18.

[81] **Request for DMCA Exemption: Security Research**
Petition to the Librarian of Congress of S. M. Bellovin, M. Blaze, E. W. Felten, J. A. Halderman, and N. Heninger, represented by Andrea Matwyshyn, regarding the U.S. Copyright Office 2014–2015 DMCA Anticircumvention Rulemaking, Nov. 2014.
(*Outcome:* Requested exemption granted in part.)

[82] **Request for DMCA Exemption: Games with Insecure DRM and Insecure DRM Generally**
Petition to the Librarian of Congress of J. A. Halderman, represented by B. Reid, P. Ohm, H. Surden, and J. B. Bernthal, regarding the U.S. Copyright Office 2008–2010 DMCA Anticircumvention Rulemaking, Dec. 2008.
(*Outcome:* Requested exemption granted in part.)

[83] **Request for DMCA Exemption for Audio CDs with Insecure DRM**
Petition to the Librarian of Congress of E. Felten and J. A. Halderman, represented by D. Mulligan and A. Perzanowski, regarding the U.S. Copyright Office 2005–2006 DMCA Anticircumvention Rulemaking, Dec. 2005.
(*Outcome:* Requested exemption granted in part.)

## Patents

[84] **Controlling Download and Playback of Media Content**
Wai Fun Lee, Marius P. Schilder, Jason D. Waddle, and J. A. Halderman
U.S. Patent No. 8,074,083, issued Dec. 2011.

[85] **System and Method for Machine-Assisted Election Auditing**
Edward W. Felten, Joseph A. Calandrino, and J. A. Halderman
U.S. Patent No. 8,033,463, issued Oct. 2011.

## Speaking

### Major Invited Talks and Keynotes

– **U.S. Senate Testimony Regarding Russian Interference in the 2016 U.S. Elections**
Testimony before the U.S. Senate Select Committee on Intelligence, June 21, 2017.

– **Recount 2016: A Security Audit of the U.S. Presidential Election**
Keynote talk, NDSS 2017, February 27, 2017.

– **Recount 2016: An Uninvited Security Audit of the U.S. Presidential Election**
33c3, Hamburg, December 28, 2016.

– **Elections and Cybersecurity: What Could Go Wrong?**
  Keynote speaker, Merit Security Summit, Ypsilanti, MI, November 7, 2016.

– **Let's Encrypt**
  Invited speaker, TTI/Vanguard conference on Cybersecurity, Washington, D.C., Sept. 28, 2016.

– **Elections and Cybersecurity: What Could Go Wrong?**
  Keynote speaker, 19th Information Security Conference (ISC), Honolulu, September 9, 2016.

– **Internet Voting: What Could Go Wrong?**
  Invited speaker, USENIX Enigma, San Francisco, January 27, 2016.

– **Logjam: Diffie-Hellman, Discrete Logs, the NSA, and You**
  32c3, Hamburg, December 29, 2015.

– **The Network Inside Out: New Vantage Points for Internet Security**
  Invited talk, China Internet Security Conference (ISC), Beijing, September 30, 2015.

– **The Network Inside Out: New Vantage Points for Internet Security**
  Keynote speaker, ESCAR USA (Embedded Security in Cars), Ypsilanti, Michigan, May 27, 2015.

– **Security Analysis of the Estonian Internet Voting System**
  31c3, Hamburg, December 28, 2014.

– **The Network Inside Out: New Vantage Points for Internet Security**
  Keynote speaker, 14th Brazilian Symposium on Information Security and Computer Systems (SBSeg), Belo Horizonte, Brazil, November 4, 2014.

– **Empirical Cryptography: Measuring How Crypto is Used and Misused Online**
  Keynote speaker, 3rd International Conference on Cryptography and Information Security in Latin America (Latincrypt), Florianópolis, Brazil, September 2014.

– **Healing Heartbleed: Vulnerability Mitigation with Internet-wide Scanning**
  Keynote speaker, 11th Conference on Detection of Intrusions and Malware and Vulnerability Assessment (DIMVA), London, July 10, 2014.

– **Fast Internet-wide Scanning and its Security Applications**
  30c3, Hamburg, December 28, 2013.

– **Challenging Security Assumptions.** Three-part tutorial. 2nd TCE Summer School on Computer Security, Technion (Haifa, Israel), July 23, 2013.

– **Verifiably Insecure: Perils and Prospects of Electronic Voting**
  Invited talk, Computer Aided Verification (CAV) 2012 (Berkeley, CA), July 13, 2012.

– **Deport on Arrival: Adventures in Technology, Politics, and Power**
  Invited talk, 20th USENIX Security Symposium (San Francisco, CA), Aug. 11, 2011.

– **Electronic Voting: Danger and Opportunity**
  Keynote speaker, ShmooCon 2008 (Washington, D.C.), Feb. 15, 2008.

Selected Talks (2009–present)

- **The Security Impact of HTTPS Interception.** Invited talk, GOTO Copenhagen, Oct. 2, 2017.
- **Let's Encrypt: A Certificate Authority to Encrypt the Entire Web.** Invited talk, Summer school on real-world crypto and privacy, Croatia, June 9, 2017; Invited talk, Cubaconf, Havana, April 25, 2016.
- **Cybersecurity and U.S. Elections** Invited speaker, Global Election Summit, San Francisco, May 17, 2017; Invited speaker, Wolverine Caucus Forum, Lansing, February 21, 2017; Invited speaker, CSE Science on Screen at Michigan Theater, Ann Arbor, January 25, 2017.
- **The Legacy of Export-grade Cryptography in the 21st Century.** Invited talk, Summer school on real-world crypto and privacy, Croatia, June 9, 2016.
- **Logjam: Diffie-Hellman, Discrete Logs, the NSA, and You.** Invited talk, NYU Tandon School of Engineering, April 8, 2016 [host: Damon McCoy]; Invited talk, UIUC Science of Security seminar, February 9, 2016 [host: Michael Bailey].
- **The Network Inside Out: New Vantage Points for Internet Security.** Invited talk, Qatar Computing Research Institute, Doha, May 24, 2015; Invited talk, University of Chile, Santiago, April 8, 2015; Invited talk, Princeton University, October 15, 2014; Invited talk, U.T. Austin, March 9, 2014.
- **Decoy Routing: Internet Freedom in the Network's Core.** Invited speaker, Internet Freedom Technology Showcase: The Future of Human Rights Online, New York, Sep. 26, 2015.
- **The New South Wales iVote System: Security Failures and Verification Flaws in a Live Online Election.** 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 3, 2015; Invited talk, IT Univ. of Copenhagen, Sep. 1, 2015; Invited talk (with Vanessa Teague), USENIX Journal of Election Technologies and Systems Workshop (JETS), Washington, D.C., Aug. 11, 2015.
- **Security Analysis of the Estonian Internet Voting System.** Invited talk, 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 3, 2015; Invited talk, Google, Mountain View, CA, June 3, 2014; Invited talk, Copenhagen University, June 12, 2014.
- **Indiscreet Tweets.** Rump session talk; 24th USENIX Security Symposium, Washington, D.C., August 12, 2015.
- **How Diffie-Hellman Fails in Practice.** Invited talk, IT Univ. of Copenhagen, May 22, 2015.
- **Influence on Democracy of Computers, Internet, and Social Media.** Invited speaker, Osher Lifelong Learning Institute at the University of Michigan, March 26, 2015.
- **E-Voting: Danger and Opportunity.** Invited talk, University of Chile, Santiago, April 7, 2015; Keynote speaker, 14th Brazilian Symposium on Information Security and Computer Systems (SBSeg), Belo Horizonte, Brazil, November 3, 2014; Crypto seminar, University of Tartu, Estonia, October 10, 2013; Invited speaker, US–Egypt Cyber Security Workshop, Cairo, May 28, 2013; Invited speaker, First DemTech Workshop on Voting Technology for Egypt, Copenhagen, May 1, 2013; Invited keynote, 8th CyberWatch Mid-Atlantic CCDC, Baltimore, MD, Apr. 10, 2013;

Case 3:21-cv-03072-TDB Document 1-4 Filed 08/07/18 Page 41 of 83

Invited speaker, Verifiable Voting Schemes Workshop, University of Luxembourg, Mar. 21, 2013; Invited speaker, MHacks hackathon, Ann Arbor, MI, Feb. 2, 2013; Public lecture, U. Michigan, Nov. 6, 2012.

– **Internet Censorship in Iran: A First Look.** 3rd USENIX Workshop on Free and Open Communications on the Internet (FOCI), Aug. 13, 2013.
– **Mining Your Ps and Qs: Detection of Widespread Weak Keys in Network Devices.** Invited talk, NSA, Aug. 8, 2013; Invited talk, Taiwan Information Security Center Workshop, National Chung-Hsing University (Taichung, Taiwan), Nov. 16, .2012
– **Securing Digital Democracy.** U. Maryland, Apr. 8, 2013 [host: Jonathan Katz]; CMU, Apr. 1, 2013 [host: Virgil Gligor]; Cornell, Feb. 28, 2013 [host: Andrew Myers].
– **Telex: Anticensorship in the Network Infrastructure.** Invited speaker, Academia Sinica (Taipei), Nov. 14, 2012 [host: Bo-Yin Yang]; TRUST Seminar, U.C., Berkeley, Dec. 1, 2011 [host: Galina Schwartz]; Think Conference, Nov. 5, 2011; Ideas Lunch, Information Society Project at Yale Law School, Oct. 26, 2011; Invited speaker, Committee to Protect Journalists Online Press Freedom Summit (San Francisco), Sept. 27, 2011.
– **Deport on Arrival: Adventures in Technology, Politics, and Power.** Guest lecture, U-M School of Art and Design, Nov 5, 2012 [host: Osman Khan]; Invited speaker, CS4HS Workshop, U. Michigan, Aug. 21, 2012; Invited speaker, U. Michigan IEEE, Feb. 15, 2012.
– **Attacking the Washington, D.C. Internet Voting System.** Invited speaker, International Foundation for Election Systems (IFES), Nov. 2, 2012 [host: Michael Yard]; Invited speaker, IT University of Copenhagen, May 11, 2012 [host: Carsten Schürmann].
– **Voter I*Don't*.** Rump session talk; 21st USENIX Security Symposium (Bellevue, WA), Aug. 8, 2012; Rump session talk; EVT/WOTE '12 (Bellevue, WA), Aug. 6, 2012 [with Josh Benaloh].
– **Reed Smith's Evening with a Hacker.** Keynote speaker (New Brunswick, NJ), Oct. 20, 2011.
– **Are DREs Toxic Waste?** Rump session talk, 20th USENIX Security Symposium (San Francisco), Aug. 10, 2011; Rump session talk, EVT/WOTE '11 (San Francisco), Aug. 8, 2011.
– **Security Problems in India's Electronic Voting Machines.** Dagstuhl seminar on Verifiable Elections and the Public (Wadern, Germany), July 12, 2011; Harvard University, Center for Research on Computation and Society (CRCS) seminar, Jan. 24, 2011 [host: Ariel Procaccia]; U. Michigan, CSE seminar, Nov. 18, 2010 [with Hari Prasad]; MIT, CSAIL CIS Seminar, Nov. 12, 2010 [with Hari Prasad; host: Ron Rivest]; Distinguished lecture, U.C. San Diego, Department of Computer Science, Nov. 9, 2010 [with Hari Prasad; host: Hovav Shacham]; U.C. Berkeley, Center for Information Technology Research in the Interest of Society (CITRIS), Nov. 8, 2010 [with Hari Prasad; host: Eric Brewer]; Google, Inc., Tech Talk (Mountain View, CA), Nov. 5, 2010 [with Hari Prasad; host: Marius Schilder]; U.C., Berkeley TRUST Security Seminar, Nov. 4, 2010 [with Hari Prasad; host: Shankar Sastry]; Stanford University, CS Department, Nov. 3, 2010 [with Hari Prasad; host: David Dill]; Princeton University, Center for Information Technology Policy, Oct. 28, 2010 [with Hari Prasad, host: Ed Felten]; University of Texas at Austin, Department of Computer Science, Aug. 27, 2010 [host: Brent Waters].

– **Ethical Issues in E-Voting Security Analysis.** Invited talk, Workshop on Ethics in Computer Security Research (WECSR) (Castries, St. Lucia), Mar. 4, 2011 [with David Robinson].

– **Electronic Voting: Danger and Opportunity.** Invited speaker, "Interfaces 10: Technology, Society and Innovation," Center for Technology and Society (CTS/FGV) (Rio de Janeiro), Dec. 2, 2010 [host: Ronaldo Lemos]; Invited speaker, Conference on "EVMs: How Trustworthy?," Centre for National Renaissance (Chennai, India), Feb. 13, 2010; Google, Inc., Tech Talk (Mountain View, CA), Jan. 10, 2008; Star Camp (Cape Town, South Africa), Dec. 8, 2007; Lehigh University, Nov. 27, 2007; Princeton OiT Lunch-'n-Learn, Oct. 24, 2007; University of Waterloo (Canada), Feb. 28, 2007.

– **A New Approach to Censorship Resistance.** Think Conference, Nov. 7, 2010.

– **Practical AVC-Edge CompactFlash Modifications can Amuse Nerds [PACMAN].** Rump session, 19th USENIX Security Symposium (Washington, D.C.), Aug. 11, 2010; Rump session, EVT/WOTE '10 (Washington, D.C.), Aug. 9, 2010.

– **Legal Challenges to Security Research.** Guest lecture, Law 633: Copyright, U. Michigan Law School, Apr. 7, 2010; Invited talk, University of Florida Law School, Oct. 12, 2006.

– **Adventures in Computer Security.** Invited talk, Greenhills School, grades 6–12 (Ann Arbor, MI), Mar. 8, 2010.

– **The Role of Designers' Incentives in Computer Security Failures.** STIET Seminar, U. Michigan, Oct. 8, 2009.

– **Cold-Boot Attacks Against Disk Encryption.** Invited speaker, SUMIT 09 Security Symposium, U. Michigan, Oct. 20, 2009.

– **On the Attack.** Distinguished lecture, U.C. Berkeley EECS, Nov. 18, 2009.

### Selected Other Speaking (2010–present)

– Panelist: **"Critical Infrastructure" Designation for Election Operations: Risks, Mitigations, & Import for 2018.** Election Verification Network Conference, Miami, March 16, 2018.

– Panelist: **The Technology of Voting: Risks & Opportunities.** U.C. Irvine Cybersecurity and Policy Research Institute, March 13, 2018.

– Panelist: **Election Law Conflicts and the Vulnerability of our Election Systems.** Co-panelists: Stephen Berzon, Holly Lake, Harvey Saferstein. Ninth Circuit Judicial Conference, July 18, 2017.

– **Congressional Briefing: Free, Automated, and Open Web Encryption.**
August 8, 2017; hosted by Congressional Cybersecurity Caucus.

– **Congressional Briefing: Strengthening Election Cybersecurity.** Co-panelists: James Woolsey, Lt. Col. Tony Shaffer, Lawrence Norden, Susan Greenhalgh, James Scott; moderator: Karen Greenberg. May 15, 2017.

– Moderator: **Apple & the FBI: Encryption, Security, and Civil Liberties.** Panelists: Nate Cardozo and Barbara McQuade. U-M Dissonance Speaker Series, April 12, 2016.

– Moderator: **Privacy, IT Security and Politics.** Panelists: Ari Schwartz and David Sobel. U-M ITS SUMIT_2015, Oct. 22, 2015.

– Panelist: **The Future of E-Voting Research.** 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 4, 2015.

– Moderator: **Panel on Research Ethics.** 24th USENIX Security Symposium, Washington, D.C., August 13, 2015.

– Panelist: **Theories of Privacy in Light of "Big Data."** Michigan Telecommunications and Technology Law Review Symposium on Privacy, Technology, and the Law, University of Michigan Law School, Feb. 21, 2015.

– Panelist: **Measuring Privacy**. Big Privacy symposium, Princeton University CITP, Apr. 26, 2013 [moderator: Ed Felten].

– Panelist: **Civil Society's Challenge in Preserving Civic Participation**. The Public Voice workshop: Privacy Rights are a Global Challenge, held in conjunction with the 34th International Conference of Data Protection and Privacy Commissioners, Punta del Este, Uruguay, Oct. 22, 2012 [moderator: Lillie Coney].

– Panelist: **Election Technologies: Today and Tomorrow**. Microsoft Faculty Summit (Redmond), July 17, 2012 [moderator: Josh Benaloh].

– Panelist: **Is America Ready to Vote on the Internet?** CSPRI Seminar, George Washington University (Washington, D.C.), May 16, 2012 [moderator: Lance Hoffman].

– Panelist: **Technical Methods of Circumventing Censorship**. Global Censorship Conference, Yale Law School, Mar. 31, 2012.

– Panelist: **Internet Voting**. RSA Conference (San Francisco), Mar. 1, 2012 [moderator: Ron Rivest].

– Panelist: **The Law and Science of Trustworthy Elections**. Association of American Law Schools (AALS) Annual Meeting, Jan. 5, 2012 [moderator: Ron Rivest].

– Panelist: **Connecticut Secretary of State's Online Voting Symposium** (New Britain, CT), Oct. 27, 2011 [moderator: John Dankosky].

– Panelist: **Cyber Security / Election Technology**. Overseas Voting Foundation Summit, Feb. 10, 2011 [moderator: Candice Hoke].

– ~~Tutorial speaker/organizer: **Security Issues in Electronic Voting**, ICISS (Gandhinagar, India), Dec. 15, 2010~~ [canceled under threat of deportation].

– Invited testimony: On **D.C. Board of Elections and Ethics Readiness for the Nov. 2010 General Election**. D.C. Council Hearing, Oct. 8, 2010.

– Panelist and organizer: **India's Electronic Voting Machines**. EVT/WOTE (Washington, D.C.), Aug. 9, 2010.

– Panelist: **Ethics in Networking and Security Research**. ISOC Network and Distributed System Security Symposium (San Diego, CA), Mar. 2, 2010 [moderator: Michael Bailey].

# Advising and Mentoring

## Graduate Students

- Allison McDonald (Ph.D. in progress)
- Matthew Bernhard (Ph.D. in progress)
- Benjamin VanderSloot (Ph.D. in progress)
- David Adrian (Ph.D. in progress)
- Andrew Springall (Ph.D. 2018; went on to software engineering position at Google)
- Rose Howell (M.S. 2018)
- Zakir Durumeric (Ph.D. 2017; Google Ph.D. Fellowship in Computer Security; accepted tenure-track faculty position at Stanford)
- Travis Finkenauer (M.S. 2016; went on to security position at Juniper Networks)
- Eric Wustrow (Ph.D. 2016; accepted tenure-track faculty position at U. Colorado, Boulder)
- James Kasten (Ph.D. 2015; went on to software engineering position at Google)
- Scott Wolchok (M.S. 2011; went on to software engineering position at Facebook)

## Post Docs

- Will Scott (2017–18)
- Colleen Swanson (2014–15)

## Doctoral Committees

- Denis Bueno (C.S. Ph.D. expected 2018, Michigan) «««< HEAD
- Andrew Springall (C.S. Ph.D. 2018, Michigan; chair) =======
- Kyong Tak Cho (C.S. Ph.D. 2018, Michigan)
- Andrew Springall (C.S. Ph.D. 2018, Michigan; chair)
- Armin Sarabi (E.E. Ph.D. 2018, Michigan) »»»> cafe174a0ef54b0c9772a62bcca30a9a006dba03
- Zakir Durumeric (C.S. Ph.D. 2017, Michigan; chair)
- Armin Sarabi (E.E. Ph.D. 2017, Michigan)
- Eric Crockett (C.S. Ph.D 2017, Georgia Tech)
- Kassem Fawaz (C.S. Ph.D. 2017, Michigan)
- Amir Rahmati (C.S. Ph.D. 2017, Michigan)
- Earlence Fernandez (C.S. Ph.D. 2017, Michigan)
- Huan Feng (C.S. Ph.D. 2016, Michigan)
- Jakub Czyz (C.S. Ph.D. 2016, Michigan)
- Eric Wustrow (C.S. Ph.D. 2016, Michigan; chair)
- James Kasten (C.S. Ph.D. 2015, Michigan; chair)
- Jing Zhang (C.S. Ph.D. 2015, Michigan)
- Katharine Cheng (C.S. Ph.D. 2012, Michigan)
- Matt Knysz (C.S. Ph.D. 2012, Michigan)
- Zhiyun Qian (C.S. Ph.D. 2012, Michigan)

– Xin Hu (C.S. Ph.D. 2011, Michigan)
– Ellick Chan (C.S. Ph.D. 2011, UIUC)

### Undergraduate Independent Work

– 2017: Gabrielle Beck, Alex Holland
– 2016: Ben Burgess, Noah Duchan, Mayank Patke
– 2015: Ben Burgess, Rose Howell, Vikas Kumar, Ariana Mirian, Zhi Qian Seah
– 2014: Christopher Jeakle, Andrew Modell, Kollin Purcell
– 2013: David Adrian, Anthony Bonkoski, Alex Migicovsky, Andrew Modell, Jennifer O'Neil
– 2011: Yilun Cui, Alexander Motalleb
– 2010: Arun Ganesan, Neha Gupta, Kenneth Meagher, Jay Novak, Dhritiman Sagar, Samantha Schumacher, Jonathan Stribley
– 2009: Mark Griffin, Randy Yao

## Teaching

– **Introduction to Computer Security**, EECS 388, University of Michigan
Terms: Winter 2017, Fall 2016, Fall 2015, Fall 2014, Fall 2013, Fall 2011, Fall 2010, Fall 2009
Created new undergrad security elective that has grown to reach >750 students/year. An accessible intro, teaches the security mindset and practical skills for building and analyzing security-critical systems.

– **Computer and Network Security**, EECS 588, University of Michigan
Terms: Winter 2016, Winter 2015, Winter 2014, Winter 2013, Winter 2012, Winter 2011, Winter 2010, Winter 2009
Redesigned core grad-level security course. Based around discussing classic and current research papers and performing novel independent work. Provides an intro. to systems research for many students.

– **Securing Digital Democracy**, Coursera (MOOC)
Designed and taught a massive, open online course that explored the security risks—and future potential—of electronic voting and Internet voting technologies; over 20,000 enrolled students.

## Professional Service

### Program Committees

– 2017 ACM Conference on Computer and Communications Security (CCS '17)
– 2017 ISOC Network and Distributed Systems Security Symposium (NDSS '17)
– 2016 ACM Internet Measurement Conference (IMC '16)
– 2016 USENIX Security Symposium (Sec '16)
– 2016 International Joint Conference on Electronic Voting (E-VOTE-ID '16)
– 2016 Workshop on Advances in Secure Electronic Voting (Voting '16)
– 2015 ACM Conference on Computer and Communications Security (CCS '15)
– 2015 ACM Internet Measurement Conference (IMC '15)
– 2015 USENIX Security Symposium (Sec '15)

– 2014 ACM Conference on Computer and Communications Security (CCS '14)
– 2014 USENIX Security Symposium (Sec '14)
– 2013 ACM Conference on Computer and Communications Security (CCS '13)
– **Program co-chair**, 2012 Electronic Voting Technology Workshop/Workshop on Trustworthy Elections (EVT/WOTE '12)
– 2012 Workshop on Free and Open Communications on the Internet (FOCI '12)
– 2012 IEEE Symposium on Security and Privacy ("Oakland" '12)
– 2012 International Conference on Financial Cryptography and Data Security (FC '12)
– 2011 Workshop on Free and Open Communications on the Internet (FOCI '11)
– 2011 Electronic Voting Technology Workshop (EVT/WOTE '11)
– 2010 ACM Conference on Computer and Communications Security (CCS '10)
– 2010 USENIX/ACCURATE/IAVOSS Electronic Voting Technology Workshop (EVT '10)
– 2010 USENIX Security Symposium (Sec '10)
– 2010 IEEE Symposium on Security and Privacy (Oakland '10)
– 2010 International World Wide Web Conference (WWW '10)
– 2009 ACM Conference on Computer and Communications Security (CCS '09)
– 2009 ACM Workshop on Digital Rights Management (DRM '09)
– 2009 ACM Workshop on Multimedia Security (MMS '09)
– 2009 USENIX Workshop on Offensive Technologies (WOOT '09)
– 2009 International World Wide Web Conference (WWW '09)
– 2008 ACM Conference on Computer and Communications Security (CCS '08)
– 2008 ACM Workshop on Privacy in the Electronic Society (WPES '08)
– 2008 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT '08)
– 2008 International World Wide Web Conference (WWW '08)

## Boards

– Board of Directors for the Internet Security Research Group (2014–present)
– Board of Advisors for the Verified Voting Foundation (2012–present)
– External Advisory Board for the DemTech Project, IT University of Copenhagen (2011–present)
– Advisory Council for the Princeton University Department of Computer Science (2012–2014)

## Department and University Service

– Faculty Advisor for Michigan Hackers student group (2012–present)
– CSE Graduate Affairs Committee (member, 2014–2017)
– CSE Undergraduate Program Advising (CS/ENG) (2011–2017)
– Faculty Senate, Rules Committee of the Senate Assembly (member, 2011–12)
– CSE Graduate Admissions Committee (member, 2010–11)
– CSE Graduate Committee (member, 2009–10)

# EXHIBIT B

APRIL GLASER SECURITY 07.27.16 9:30 AM

# HERE'S WHAT WE KNOW ABOUT RUSSIA AND THE DNC HACK



GETTY IMAGES

**AS THE DEMOCRATIC** National Convention continues its week-long stay in Philadelphia, accusations of Russian hacking continue to cloud the proceedings. At this point, it seems likely that Russia is responsible. What's less clear is what that will mean going forward.

It's been a bad stretch for the Democratic National Committee. Hackers broke into its servers months ago, stealing private emails, opposition research, and campaign correspondence. Last Friday, Wikileaks made nearly 20,000 of those private emails public, revealing embarrassing details of the political machine's inner workings. DNC official allege that the Russian government is behind the breach. The *New York Times* reports that US intelligence agencies increasingly share that opinion. According to a number of top cybersecurity researchers, they're probably right.

## A Brief History of a Hack

News of the hack of the Democratic National Committee first broke in mid-June. That’s when Crowdstrike, a firm that analyzes threats to network security, revealed that the DNC had called it in to inspect the party’s servers, where it found “two separate Russian intelligence-affiliated adversaries present in the DNC network.” Crowdstrike released a comprehensive report of its findings on June 14, which accompanied a *Washington Post* article detailing the attacks. One of the hacking groups, Crowdstrike found, had access to the DNC servers for almost a year.

A day after that report, someone calling themselves Guccifer 2.0 (an allusion to notorious hacker Guccifer) claimed responsibility for the hack in a blog post. Through the blog and an accompanying Twitter account, Guccifer 2.0 refuted Crowdstrike’s claims that this was a Russian operation, instead calling himself a “lone hacker.” He also claimed to have handed much of the DNC bounty to Wikileaks.

The following week, two cybersecurity firms, Fidelis Cybersecurity and Mandiant, independently corroborated Crowdstrike’s assessment that Russian hackers infiltrated DNC networks, having found that the two groups that hacked into the DNC used malware and methods identical to those used in other attacks attributed to the same Russian hacking groups.

But some of the most compelling evidence linking the DNC breach to Russia was found at the beginning of July by Thomas Rid, a professor at King’s College in London, who discovered an identical command-and-control address hardcoded into the DNC malware that was also found on malware used to hack the German Parliament in 2015. According to German security officials, the malware originated from Russian military intelligence. An identical SSL certificate was also found in both breaches.

The evidence mounts from there. Traces of metadata in the document dump reveal various indications that they were translated into Cyrillic. Furthermore, while Guccifer 2.0 claimed to be from Romania, he was unable to chat with Motherboard journalists in coherent Romanian. Besides which, this sort of hacking wouldn’t exactly be outside of Russian norms.

“It doesn’t strain credulity to look to the Russians,” says Morgan Marquis-Boire, a malware expert with CitizenLab. “This is not the first time that Russian hackers has been behind intrusions in US government, and it seems unlikely that it will be the last.” Last year Russian hackers were able to breach White House and State

Department email servers, gleaning information even from President Obama’s Blackberry.

Meanwhile, the Kremlin has denied Russian involvement in the DNC breach. But the reverberations continue; DNC Chairwoman Debbie Wasserman Schultz will resign at the end of the week, after emails revealed what many view as the unfair treatment of Bernie Sanders.

## From Russia With Love

As compelling as the evidence is, there’s still a small amount of room to argue that Guccifer 2.0 was a lone actor, an individual motivated by hacktivist ideals of dismantling state power. He wouldn’t be the first. And in a recent interview on NBC, Julian Assange of Wikileaks gave a soft disavowal of claims that his whistleblowing organization is in cahoots with Russian intelligence, “Well, there is no proof of that whatsoever,” he said. “We have not disclosed our source, and of course, this is a diversion that’s being pushed by the Hillary Clinton campaign.”

This is, of course, the same Assange who boasts responsibility for helping find Snowden a home in Russia and Wikileaks publicly criticized the Panama Papers for implicating Putin in financial misdeeds. He’s also an outspoken frequent critic of Hillary Clinton’s time at the State Department. A damning document dump the weekend before Clinton’s nomination arguably aligns with both Russian interests and his own.

If the allegations do prove correct, this is an unprecedented step for Russia. Hacking is nothing new, but publicizing documents to attempt to sway an election certainly is. Putin would clearly prefer a Trump presidency. The billionaire Republican candidate is a longtime admirer of Putin’s, and has publicly stated that he wouldn’t necessarily defend NATO allies against a Russian invasion. To top it all off, Trump’s campaign manager, Paul Manafort, formerly worked as an advisor to Viktor Yanukovych, the Russian-backed President of Ukraine before he was ousted in 2014.

“Due to the nature and timing of this hack, it all seems very political,” says Marquis-Boire.

And there’s a whole lot of election left—and likely more leaks to come with it. On Sunday, a Twitter user asked Wikileaks if more DNC leaks were on their way. The reply: “We have more coming.”

Case 3:21-cv-00337-... Document 1-4 Filed ... Page 51 of 83
Case 3:22-cv-0298-... Document 1-... Filed ... Page 158 of 549

**Update:** In a press conference Wednesday, Republican presidential candidate Donald Trump invited Russia to retrieve "missing" emails from Hillary Clinton's campaign and release them. Cybersecurity experts described the remarks as "unprecedented" and "possibly illegal."

Case 1:17-cv-03307 Document 1-4 Filed in TXSD on 08/07/18 Page 51 of 283

# EXHIBIT C

Case 3:22-... Page ... of 549

The New York Times | http://nyti.ms/2eqNSVY

ELECTION 2016 Full Results | Exit Polls | Trump's Cabinet

# Private Security Group Says Russia Was Behind John Podesta's Email Hack

By NICOLE PERLROTH and MICHAEL D. SHEAR OCT. 20, 2016

SAN FRANCISCO — At the start of 2014, President Obama assigned his trusted counselor, John D. Podesta, to lead a review of the digital revolution, its potential and its perils. When Mr. Podesta presented his findings five months later, he called the internet's onslaught of big data "a historic driver of progress." But two short years later, as chairman of Hillary Clinton's presidential campaign, Mr. Podesta would also become one of the internet's most notable victims.

On Thursday, private security researchers said they had concluded that Mr. Podesta was hacked by Russia's foreign intelligence service, the GRU, after it tricked him into clicking on a fake Google login page last March, inadvertently handing over his digital credentials.

For months, the hackers mined Mr. Podesta's inbox for his most sensitive and potentially embarrassing correspondence, much of which has been posted on the WikiLeaks website. Additions to the collection on Thursday included three short

email exchanges between Mr. Podesta and Mr. Obama himself in the days leading up to his election in 2008.

Mr. Podesta's emails were first published by WikiLeaks earlier this month. The release came just days after James R. Clapper Jr., the director of national intelligence, and the Department of Homeland Security publicly blamed Russian officials for cyberattacks on the Democratic National Committee, in what they described as an effort to influence the American presidential election.

To date, no government officials have offered evidence that the same Russian hackers behind the D.N.C. cyberattacks were also behind the hack of Mr. Podesta's emails, but an investigation by the private security researchers determined that they were the same.

Threat researchers at Dell SecureWorks, an Atlanta-based security firm, had been tracking the Russian intelligence group for more than a year. In June, they reported that they had uncovered a critical tool in the Russian spy campaign. SecureWorks researchers found that the Russian hackers were using a popular link shortening service, called Bitly, to shorten malicious links they used to send targets fake Google login pages to bait them into submitting their email credentials.

The hackers made a critical error by leaving some of their Bitly accounts public, making it possible for SecureWorks to trace 9,000 of their links to nearly 4,000 Gmail accounts targeted between October 2015 and May 2016 with fake Google login pages and security alerts designed to trick users into turning over their passwords.

Among the list of targets were more than 100 email addresses associated with Hillary Clinton's presidential campaign, including Mr. Podesta's. By June, 20 staff members for the campaign had clicked on the short links sent by Russian spies. In June, SecureWorks disclosed that among those whose email accounts had been targeted were staff members who advised Mrs. Clinton on policy and managed her travel, communications and campaign finances.

Independent journalism.
More essential than ever.
Subscribe to the Times

Two security researchers who have been tracking the GRU's spearphishing campaign confirmed Thursday that Mr. Podesta was among those who had inadvertently turned over his Google email password. The fact that Mr. Podesta was among those breached by the GRU was first disclosed Thursday by Esquire and the Motherboard blog, which published the link Russian spies used against Mr. Podesta.

"The new public data confirming the Russians are behind the hack of John Podesta's email is a big deal," Jake Sullivan, Mrs. Clinton's senior policy adviser, said Thursday. "There is no longer any doubt that Putin is trying to help Donald Trump by weaponizing WikiLeaks."

The new release of Mr. Podesta's email exchange with Mr. Obama from 2008 made clear that Mr. Obama's team was confident he would win.

In one of the emails, Mr. Podesta wrote Mr. Obama a lengthy memo in the evening on Election Day recommending that he not accept an invitation from President George W. Bush to attend an emergency meeting of the Group of 20 leaders.

"Attendance alongside President Bush will create an extremely awkward situation," the memo said. "If you attempt to dissociate yourself from his positions, you will be subject to criticism for projecting a divided United States to the rest of the world. But if you adopt a more reserved posture, you will be associated not only with his policies, but also with his very tenuous global standing."

The White House did not respond to questions about the email.

***Correction: October 22, 2016***

An article on Friday about suspected email hacking by Russia's foreign intelligence service misstated the name of one organization that first disclosed that a presidential counselor, John D. Podesta, was among those whose accounts were breached. The blog is Motherboard, not VICE Motherload.

Nicole Perlroth reported from San Francisco, and Michael D. Shear from Washington.

*Follow The New York Times's politics and Washington coverage on* Facebook *and* Twitter*, and sign up for the* First Draft politics newsletter.

Case 3:22-... Document ... Filed ... Page ... of 549

A version of this article appears in print on October 21, 2016, on page A14 of the New York edition with the headline: Private Security Group Says Russia Was Behind Hack of Clinton Campaign Chairman.

---

© 2016 The New York Times Company

# EXHIBIT D

Case ... Page 168 of 549



advertisement
NBC NIGHTLY NEWS WITH LESTER HOLT



**NEWS** AUG 30 2016, 4:54 AM ET

# Russians Hacked Two U.S. Voter Databases, Officials Say

by **ROBERT WINDREM**, **WILLIAM M. ARKIN** and **KEN DILANIAN**

SHARE

Hackers based in Russia were behind two recent attempts to breach state voter registration databases, fueling concerns the Russian government may be trying to interfere in the U.S. presidential election, U.S. intelligence officials tell NBC News.

The breaches included the theft of data from as many as 200,000 voter records in Illinois, officials say.

The incidents led the FBI to send a "flash alert" earlier this month to election officials nationwide, asking them to be on the lookout for any similar cyber intrusions.

One official tells NBC News that the attacks have been attributed to Russian intelligence agencies.

"This is the closest we've come to tying a recent hack to the Russian government," the official said.

That person added that "there is serious concern" that the Kremlin may be seeking to sow uncertainty in the U.S. presidential election process.



Voters cast their ballots at ChiArts High School on March 15 in Chicago, Illinois. Scott Olson / Getty Images

Two other officials said that U.S. intelligence agencies have not yet concluded that the Russian government is trying to do that, but they are worried about it.

Case [illegible] Page 169 of 549

They said the Russians have long conducted cyber espionage on political targets. The question now is whether they are moving into a covert intelligence operation designed to destabilize the U.S. political process.

The alert, first reported by Yahoo News, provided IP addresses associated with the hack attempts, though it did not mention Russia.

One of the IP addresses was involved in both breaches, the FBI alert said.

"The FBI is requesting that states contact their Board of Elections and determine if any similar activity to their logs, both inbound and outbound, has been detected," the alert said.

The bulletin does not identify the targeted states, but officials told NBC News they were Illinois and Arizona. Illinois officials said in July that they shut down their state's voter registration after a hack. State officials said Monday the hackers downloaded information on as many 200,000 people.

State officials told the Chicago Tribune they were confident no voter record had been deleted or altered.

In Arizona, officials said, hackers tried to get in using malicious software but were unsuccessful. The state took its online voter registration down for nine days, beginning in late June, after malware was discovered on a county election official's computer. But the state concluded that the system was not successfully breached.

Those incidents led Homeland Security Secretary Jeh Johnson to host a call earlier this month with state election officials to talk about cybersecurity and election infrastructure.

Johnson said DHS isn't aware of any specific cyber threat against election-related networks, but he urged officials to examine how to better secure their systems, according to a summary of the call put out by the department.

U.S. intelligence officials have previously said Russian intelligence agencies were behind hacks into the Democratic National Committee and related organizations. There has been a long running debate among intelligence analysts about what Russia is up to.

Voting systems have not been considered "critical infrastructure," by the Department of Homeland Security, so they are not subject to federal government protections.

Independent assessments have found that many state and local voting system are extremely vulnerable to hacking.

ROBERT WINDREM

WILLIAM M. ARKIN

KEN DILANIAN

**TOPICS** U.S. NEWS, INVESTIGATIONS, SECURITY, WORLD

**FIRST PUBLISHED** AUG 29 2016, 6:05 PM ET

**NEXT STORY** Trump's Victory Has Fearful Minorities Buying Up Guns

More to Explore Sponsored Links by Taboola

**A Solution That Puts Snoring to Bed**
My Snoring Solution

**Tiny Device Transforms Old Computer into a Blazingly Fast PC**
Xtra-PC

**You Don't Need to Remember You Passwords Anymore Thanks to This Device**
Everykey

**SPONSORED CONTENT**

Your Warrington Grocery Store is 70% Mo... Blue Apron

Harry's Releases New Blade, Keeps

**MORE FROM NBC NEWS**


© 2016 NBCNEWS.COM

# EXHIBIT E

# U.S. official: Hackers targeted voter registration systems of 20 states




In this June 5, 2015, file photo, the Homeland Security Department headquarters in northwest Washington. A Homeland Security Department official says hackers have targeted the voter registration systems of more than 20 states in recent months. FBI Director James Comey told lawmakers this week that the agency is looking "very, very hard" at Russian hackers who may try to disrupt the U.S. election. (Susan Walsh / AP)

By **Tribune news services**

SEPTEMBER 30, 2016, 4:42 PM | WASHINGTON

Hackers have targeted the voter registration systems of more than 20 states in recent months, a Homeland Security Department official said Friday.

The disclosure comes amid heightened concerns that foreign hackers might undermine voter confidence in the integrity of U.S. elections. Federal officials and many cybersecurity experts have said it would be nearly impossible for hackers to alter an election's outcome because election systems are very decentralized and generally not connected to the internet.

ADVERTISING



The official who described detecting the hacker activity was not authorized to speak publicly on the subject and spoke to The Associated Press on condition of anonymity. It was unclear, the official said, whether the hackers were foreign or domestic, or what their motives might be. ABC News earlier reported that more than 20 states were targeted.

The FBI last month warned state officials of the need to improve their election security after hackers targeted systems in Illinois and Arizona. FBI Director James Comey told lawmakers this week that the agency is looking "very, very hard" at Russian hackers who may try to disrupt the U.S. election.

Last month, Donald Trump, the GOP nominee for president, suggested that he feared the general election "is going to be rigged."

The Homeland Security Department has stepped up its outreach to states and localities, but it is up to them to ask for help. So far, 19 states have expressed interest in a general "cyber hygiene" scan of key websites — akin to ensuring that windows in a home are properly closed, according to another Homeland Security official directly involved in securing local elections who also was not authorized to speak publicly about ongoing efforts.

The FBI has detected a variety of "scanning activities" that are early indications of hacking, Comey told the House Judiciary Committee this week.

The FBI held a conference call on Friday with the local officials who run elections in the battleground state of Florida. Meredith Beatrice, a spokeswoman for Secretary of State Ken Detzner, called it an "informational call related to elections security," but a person on the call who was not authorized to discuss it and requested anonymity said authorities had seen evidence of someone probing a local elections website.

Homeland Security Secretary Jeh Johnson spoke to state election officials by phone last month, encouraging them to implement existing technical recommendations to secure their election systems and ensure that electronic voting machines are not connected to the internet.

DHS is offering states more comprehensive, on-site risk and vulnerability checks. Only four states have expressed interest in the assessment, and because the election is only weeks away, the department will likely only be able to conduct an assessment of one state before Election Day on Nov. 8, the official said.

Two of the hacking attempts involved efforts to mine data from the Arizona and Illinois voter registration systems, according to Kay Stimson, a spokeswoman for the National Association of Secretaries of State. She said in Arizona a hacker tried to probe voter registration data, but never infiltrated the system, while in Illinois hackers got into the system, but didn't manipulate any data.

These systems have "nothing to do with vote casting or counting," Stimson said in an email. "While it is theoretically possible to disrupt an election by infiltrating a voter registration system, their compromise would not affect election results" and there are system controls in place to catch any fraud.

Rep. Henry Johnson, D-Ga., introduced two bills earlier this month that would require voting systems be designated as critical infrastructure and limit purchases of new voting systems that don't provide paper ballots, among other measures. It's unlikely the bills will be passed before the election.

The Homeland Security Department is already considering designating voting systems as critical infrastructure in the future, though it is unlikely to happen before the election, the second official said.

A presidential directive released in 2013 details 16 sectors that are considered critical infrastructure, including energy, financial services, healthcare, transportation, food and agriculture, and communications. The designation places responsibilities on the Homeland Security secretary to identify and prioritize those sectors, considering physical and cyber threats. The secretary is also required to conduct security checks and provide information about emerging and imminent threats.

*Associated Press*

Copyright © 2016, Chicago Tribune

**This article is related to:** Jeh Johnson, James Comey

# EXHIBIT F

theguardian

# Senators call for declassification of files on Russia's role in US election

Eight members of Senate intelligence committee hint that government may still hold secret information 'concerning the Russian government'




The eight senators did not directly accuse the Russian government or Donald Trump of wrongdoing. Photograph: Timothy A Clary/AFP/Getty Images

**Spencer Ackerman in New York**

Thursday 1 December 2016 11.07 EST

All of the Democratic and Democratic-aligned members of the Senate intelligence committee have hinted that significant information about Russian interference in the US presidential election remains secret and ought to be declassified.

The eight senators, including the incoming ranking member Mark Warner of Virginia, wrote to Barack Obama to request he declassify relevant intelligence on the election. They did not directly accuse the Russian government or President-elect Donald Trump, a Republican, of wrongdoing in the letter.

“We believe there is additional information concerning the Russian government and the US election that should be declassified and released to the public. We are conveying specifics through classified channels,” wrote Warner and his colleagues Ron Wyden of Oregon, Martin Heinrich of New Mexico, Mazie Hirono of Hawaii, Barbara Mikulski of Maryland and independent Angus King of Maine.

Jack Reed of Rhode Island, an honorary and non-voting member of the committee due to his seat as ranking member of the Senate armed services committee, also signed the letter, which was dated Tuesday and publicly released on Wednesday. No Republican joined the declassification call.

The outgoing ranking Democrat, Dianne Feinstein of California, signed the classified version of the letter sent to Obama.

Neither the terse letter nor discussions with sources on Capitol Hill detailed the particular intelligence concerning the Russians, its strength or its impact on the outcome of the election. Thus far, no credible evidence of vote fraud or electoral malfeasance exists, despite an evidence-free claim from Trump himself.

A spokesman for Wyden, Keith Chu, said the senator believed the intelligence needed to be declassified “immediately”, as it was in the “national interest that the American public should see it”.

It is understood this is the first declassification request by eight senators in at least twelve years.

On 7 October, the US director of national intelligence and the secretary of homeland security took the rare step of directly accusing Russia’s “senior-most” officials of ordering the breach of the Democratic National Committee’s digital networks. Director James Clapper and Secretary Jeh Johnson accused the Russians of attempting to “interfere” in the US election, something the Obama administration had previously suggested but did not allege publicly.

The FBI has acknowledged investigating such interference, but has reportedly not established any link to Trump or his campaign. Two US officials have told the Guardian that the FBI was reluctant to sign off on Clapper and Johnson’s public allegation.

Yet Harry Reid, the outgoing Democratic Senate leader, asserted without evidence in October that the FBI director, James Comey, “possess[es] explosive information about close ties and coordination between Donald Trump, his top advisers, and the Russian government”.

Unusually for any presidential nominee, and particularly for a Republican, Trump has exhibited a warmth toward the Russian president, Vladimir Putin, that has prompted a widespread expectation Trump will tilt US foreign policy toward Russia. Trump and Putin spoke soon after Trump’s electoral victory in a phone call heralded by the Kremlin.

There was no immediate comment from the White House or Clapper's office as to whether Obama would order the declassification or whether the intelligence agencies even support such a move.

## Since you're here ...

... we have a small favour to ask. More people are reading the Guardian than ever but far fewer are paying for it. And advertising revenues across the media are falling fast. So you can see why we need to ask for your help. The Guardian's independent, investigative journalism takes a lot of time, money and hard work to produce. But we do it because we believe our perspective matters - because it might well be your perspective, too.

Fund our journalism and together we can keep the world informed.

Become a Supporter
Make a contribution
More news

## Topics

US elections 2016 Russia US politics US Senate

Save for later Article saved
Reuse this content

# EXHIBIT G

# Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security

**Release Date:** October 7, 2016

For Immediate Release
DHS Press Office
Contact: 202-282-8010

The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations. The recent disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks and by the Guccifer 2.0 online persona are consistent with the methods and motivations of Russian-directed efforts.

These thefts and disclosures are intended to interfere with the US election process. Such activity is not new to Moscow—the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. We believe, based on the scope and sensitivity of these efforts, that only Russia's senior-most officials could have authorized these activities.

Some states have also recently seen scanning and probing of their election-related systems, which in most cases originated from servers operated by a Russian company. However, we are not now in a position to attribute this activity to the Russian Government. The USIC and the Department of Homeland Security (DHS) assess that it would be extremely difficult for someone, including a nation-state actor, to alter actual ballot counts or election results by cyber attack or intrusion. This assessment is based on the decentralized nature of our election system in this country and the number of protections state and local election officials have in place. States ensure that voting machines are not connected to the Internet, and there are numerous checks and balances as well as extensive oversight at multiple levels built into our election process.

Nevertheless, DHS continues to urge state and local election officials to be vigilant and seek cybersecurity assistance from DHS. A number of states have already done so. DHS is providing several services to state and local election officials to assist in their cybersecurity. These services include cyber “hygiene” scans of Internet-facing systems, risk and vulnerability assessments, information sharing about cyber incidents, and best practices for securing voter registration databases and addressing potential cyber threats. DHS has convened an Election Infrastructure Cybersecurity Working Group with experts across all levels of government to raise awareness of cybersecurity risks potentially affecting election infrastructure and the elections process. Secretary Johnson and DHS officials are working directly with the National Association of Secretaries of State to offer assistance, share

information, and provide additional resources to state and local officials.

# # #

Last Published Date: October 7, 2016

# EXHIBIT H

Passcode
Modern field guide to security and privacy

namecheap Unbelievable domain deals for Black Friday. Buy now
About these ads

WORLD | PASSCODE

# Ukraine election narrowly avoided 'wanton destruction' from hackers (+video)

A brazen three-pronged cyber-attack against last month's Ukrainian presidential elections has set the world on notice – and bears Russian fingerprints, some say.

By **Mark Clayton**, Staff writer | JUNE 17, 2014

Save for later
Share Tweet E-mail More



David Mdzinarishvili/Reuters | View Caption

A three-pronged wave of cyber-attacks aimed at wrecking Ukraine's presidential vote – including an attempt to fake computer vote totals – was narrowly defeated by government cyber experts, Ukrainian officials say.

The still little-known hacks, which surfaced May 22-26, appear to be among the most dangerous cyber-attacks yet deployed to sabotage a national election – and a warning shot for future elections in the US and abroad, political scientists and cyber experts say.

National elections in the Netherlands, Norway, and other nations have seen hackers probe Internet-tied election systems, but never with such destructive abandon, said experts monitoring the Ukraine vote.

Recommended: **How much do you know about cybersecurity? Take our quiz.**

"This is the first time we've seen a cyber-hacktivist organization act in a malicious way on such a grand scale to try to wreck a national election."

namecheap Unbelievable domain deals for Black Friday. Buy now
About these ads

Popular Now
1 Does this crab have the most crushing claws?
2 7 recipes for green bean casserole
3 Does your dog remember what you did?
4 With Nikki Haley pick, Trump sends different message
5 Why Hillary Clinton lost the white women's vote

Follow Passcode
Passcode covers security and privacy in the digital age. Sign up below to stay up to date with Passcode news, columnists, and upcoming events. Read more about us.
E-mail address SIGN-UP

Michael B. Farrell
Passcode Editor | Michael is an editor and writer based in Boston.
Sara Sorcher
Passcode Deputy Editor | Sara covers security and privacy policy from DC.
Jack Detsch
Staff writer | Jack is the Mark Clayton Fellow in Cybersecurity

malicious way on such a grand scale to try to wreck a national election," says Joseph Kiniry, an Internet voting systems cyber-security expert. "To hack in and delete everything on those servers is just pillaging, wanton destruction."

That wanton destruction began four days ahead of the national vote, when CyberBerkut, a group of pro-Russia hackers, infiltrated Ukraine's central election computers and deleted key files, rendering the vote-tallying system inoperable. The next day, the hackers declared they had "destroyed the computer network infrastructure" for the election, spilling e-mails and other documents onto the web as proof.



**TEST YOUR KNOWLEDGE** | How much do you know about cybersecurity? Take our quiz.



**IN PICTURES** | Ukraine: 10 years in 30 images




**VIDEO** | Ukraine election results

A day later, government officials said the system had been repaired, restored from backups, and was ready to go. But it was just the beginning.

Only 40 minutes before election results were to go live on television at 8 p.m., Sunday, May 25, a team of government cyber experts removed a "virus" covertly installed on Central Election Commission computers, Ukrainian security officials said later.

If it had not been discovered and removed, the malicious software would have portrayed ultra-nationalist Right Sector party leader Dmytro Yarosh as the winner with 37 percent of the vote (instead of the 1 percent he actually received) and Petro Poroshenko (the actually winner with a majority of the vote) with just 29 percent, Ukraine officials told reporters the next morning.

Curiously, Russian Channel One aired a bulletin that evening declaring Mr. Yarosh the victor with 37 percent of the vote over Mr. Poroshenko with 29 percent, Ukraine officials said.

"Offenders were trying by means of previously installed software to fake election results in the given region and in such a way to discredit general results of elections of the President of Ukraine," the Ukrainian Security Service (SBU) said in a statement.

Still, there was more to come.

In the wee hours of the morning after polls closed, as results flowed in from Ukrainian election districts, Internet links feeding that data to the vote tally system were hit with a barrage of fake data packets – known as distributed denial of service (DDoS) attacks. So from about 1 to 3 a.m. on May 26, election results were blocked, delaying the finally tally until the early


Paul F. Roberts
Correspondent | Paul covers critical infrastructure and the Internet of Things.


Jaikumar Vijayan
Correspondent | Jaikumar is an award-winning technology reporter.


Nadya T. Bliss
Columnist | Nadya directs the Global Security Initiative at Arizona State Uni...


Lorrie Faith Cranor
Columnist | Lorrie is chief technologist at the Federal Trade Commission


Dan Geer
Columnist | Dan is chief information security officer for In-Q-Tel.


Jason Healey
Columnist | Senior Research Scholar, Columbia University SIPA


Sascha Meinrath
Columnist | Sascha founded the Open Technology Institute.


Lysa Myers
Columnist | Lysa Myers is a security researcher at ESET.


Bruce Schneier
Columnist | Bruce is a noted cryptographer and security expert.


Evan Selinger
Columnist | Evan is a philosophy professor at Rochester Institute of Technology.


Melanie Teplinsky
Columnist | Melanie teaches information privacy law at American University.

Nicole Wong

Columnist | Nicole served as deputy chief technology officer at the White House.



SUBSCRIBE

morning, a preliminary report by international election observers recounted.

An analysis of the DDoS attack by Arbor Networks, a Burlington, Mass., cyber-security company, ties it to CyberBerkut.

In the end, international observers declared Ukraine's vote "a genuine election." But US researchers say it's clear that Ukraine dodged a major cyber-bullet.

"We've seen vote fraud before in Ukraine, including a rigged computer system in 2004," says Peter Ordeshook, a California Institute of Technology political scientist. "But this wasn't an effort to steal the election outcome, so much as to steal the election itself – by entirely discrediting it in the eyes of key segments of the population in Ukraine and in Russia, too."

While it was well understood across most of Ukraine and internationally that the far-right candidate Yarosh had little political support, the faked results would have lent credibility to Russian-inspired accounts that the popular revolt last fall against the Ukraine government was fomented by ultra-nationalists.

"In that light, the cyber fakery looks incredibly clumsy from the outside because no one there would have believed it," Dr. Ordeshook says. "But these faked results were geared for a specific audience in order to feed the Russian narrative that has claimed from the start that ultra-nationalists and Nazis were behind the revolution in Ukraine."

If the virus with the faked computer results had not been discovered, it would have fomented unrest across the volatile ethnic-Russian Donetsk region now under the shadow of Russian forces on the border with Ukraine, he says. Such spurious results also would have undermined the credibility of the new Ukraine government and could have paved the way for Russian military action, say political scientists who monitor Ukraine elections.



About these ads

The Ukraine hack is a stark warning for the US and other democracies that use the Internet for tabulation and even direct voting, election security experts say. One clear lesson, they say, is to always have paper ballots to back up election results – like Ukraine – and to avoid Internet voting.

"The Ukraine attack story demonstrates there is no shortage of methods which a determined adversary will make use of to sabotage an election," says Pamela Smith, president of the Verified Voting Foundation, a US group that has researched US election systems security.

In the runup to the election, President Obama on May 2 warned Russia not to interfere or the US "will not have a choice but to move forward with additional, more severe sanctions."

Since then, US officials appear reluctant to make too much of the attacks. References to the cyber-attacks have been brief and oblique. With anonymity cloaking cyber-attacks across the Internet, it's difficult to tell

anonymity cloaking cyber-attacks across the Internet, it's difficult to tell how deeply involved Russia's government might have been.

Ukraine experienced "cyber-attacks on the Central Election Commission of the kind that generally would require outside support," Victoria Nuland, assistant secretary of State for European affairs, acknowledged in a May 27 interview on the Charlie Rose show. Mark Green, a former congressman, said in Senate testimony June 6 that he had been told by a US diplomat of a failed Russian cyber-attack on the election.

Ukrainian officials have been unabashed in throwing blame at Russia, saying that arrests were made in the case, although no names have yet been made public.

"It was prepared in advance and stored on Russian (Internet) re-sources," Volodymyr Zverev, head of the Ukraine's Administration of Public Service of Special Communication and Protection of Information said of the malware that was intended to deliver the fake election results, according to Interfax-Ukraine. "They wanted to, and made the preparations, but they did not succeed."

While Russian hacktivists appear to be linked to at least some of the attacks, not everyone agrees the Russian government had a hand in the most devious element. Internet security expert Mr. Kiniry, for instance, says there is no solid proof yet to back the Ukrainian government claim of a virus carrying fake election results.

Others say Russia's paw prints are all over the attack.

"Did Russia attempt to sway the Ukrainian Presidential Election? I honestly don't know the answer to that," says Jeffery Stutzman, CEO of Red Sky Alliance, a cyber-security group in New Hampshire.

But, he adds, "the idea that these guys were trying to poison the election result by compromising the election commission computers is amazing to me – and this coincidence with the Russian channel showing the same fake results – is just too much. If it walks like a duck and quacks like one, maybe it's a duck."

## Next up



PASSCODE

**How much do you know about cybersecurity? Take our quiz.**

**Major cyber-assaults on Ukraine, then Moscow, on eve of Crimea vote (+video)**

How Iran duped high-ranking US officials with fake website

How Iran duped high-ranking US officials with fake website

US indicts five in China's secret 'Unit 61398' for cyber-spying on US firms (+video)



About these ads

Share Tweet E-mail More Print/Reprints

About these ads
Sponsored Content by LockerDome




How the Great Bubble Burst of 2017 Can Make You




Global Galleries



Latest News



Doing Good





Photos of the day 11/23



Does your dog remember what you did?



DIFFERENCE MAKER He's championed cleanup of the Chesapeake Bay for four decades

IQ Test: What is your IQ?
Answer 30 Questions to find out! View Your IQ Report Go to iq-tests-online.com
About these ads

The Christian Science Monitor

STAY CURRENT. GO FAR.
DISCOVER THE MONITOR DIFFERENCE

ABOUT | CONTACT US | SUBSCRIBE | E-READERS | ADVERTISE WITH US | CAREERS | FIND US ONLINE
CONTENT MAP | TEXT | CORRECTIONS | REPRINTS & PERMISSIONS | MULTIMEDIA | A CHRISTIAN SCIENCE PERSPECTIVE

© The Christian Science Monitor. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF J. ALEX HALDERMAN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. State Defendants characterize Georgia's BMD-based election system as "an electronic voting system used throughout the country,"[1] and they remark that BMDs are used in "six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego,

[1] State Defendants' Response in Opposition to Curling Plaintiffs' Fourth Motion for Preliminary Injunction, Dckt. 821 at 1.

California; Dallas, Texas; and Riverside, California."[2] These statements are misleading. The vast majority of jurisdictions that use BMDs use hand-marked paper ballots as the primary method of voting and reserve BMDs for accessibility purposes—including four of the six localities that State Defendants cite (all but Los Angeles and Dallas).[3] I explained in my previous declaration that BMDs are much safer when used by only a small fraction of voters, as in these localities.[4]

3. The map below shows the primary in-person voting technology that will be used in each U.S. county this November. The great majority of states, counties, and voters will use hand-marked paper ballots with BMDs available for accessibility (shown in dark green).

[2] *Id*. at 19.
[3] Verified Voting, *The Verifier*, https://verifiedvoting.org/verifier/ (accessed Aug. 30, 2020.)
[4] Decl. of J. Alex Halderman (Aug. 19, 2020), Dckt. 785-2 at 47-50.




**Primary Polling-Place Equipment by County, November 2020**

(Data/image: Verified Voting, *The Verifier*, https://verifiedvoting.org/verifier/.)

4. State Defendants further characterize Georgia's BMD-based election system as "a system recommended by the National Academy of Sciences and the U.S. [*sic*.] Intelligence Committee."[5] Again, this statement is misleading. Both the

---

[5] Dckt. 821 at 1.

National Academies[6] and the Senate Select Committee on Intelligence[7] recommended the use of voter-verified paper ballots, as opposed to paperless DREs or DREs with VVPAT printers. These recommendations were based on testimony heard in 2017 and 2018, including my own testimony to each body. At the time, only about 1% of voters lived in jurisdictions with BMDs as the primary method of voting, while nearly a quarter of voters used paperless DREs. Moreover, there had been little research about whether BMD ballots were accurately verified by voters. An election system like Georgia's, which uses barcode-based BMDs for nearly all in-person voters statewide, was not specifically addressed in either report.

---

[6] National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy* (2018) at 80, available at http://nap.edu/25120. "Elections should be conducted with human-readable paper ballots. These may be marked by hand or by machine (using a ballot-marking device); they may be counted by hand or by machine (using an optical scanner). […] Voting machines that do not provide the capacity for independent auditing (e.g., machines that do not produce a voter-verifiable paper audit trail) should be removed from service as soon as possible."

[7] U.S. Senate Select Committee on Intelligence, "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure" (June 2019) at 59, available at https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf. "As states look to replace HAVA-era machines that are now out of date, they should purchase more secure voting machines. Paper ballots and optical scanners are the least vulnerable to cyber attack; at minimum, any machine purchased going forward should have a voter-verified paper trail and remove (or render inert) any wireless networking capability."

5. The Academies' 2018 report also notes that "[w]ell designed, voter-marked [i.e., marked by hand] paper ballots are the standard for usability for voters without disabilities. Research on VVPATs has shown that they are not usable/reliable for verifying that the ballot of record accurately reflects the voter's intent, but there is limited research on the usability of BMDs for this purpose. […] Additional research on ballots produced by BMDs will be necessary to understand the effectiveness of such ballots."[8] It goes on to call on the National Science Foundation and other federal agencies to fund research to "determine voter practices regarding the verification of ballot marking device–generated ballots and the likelihood of voters, both with and without disabilities, will recognize errors or omissions."[9]

6. Last year, with National Science Foundation funding, my research group conducted an extensive study on this question, which I discuss at length in a previous declaration.[10] Our study was peer reviewed and published in January 2020 at the IEEE Symposium on Security and Privacy,[11] which is the most selective top-tier

---

[8] *Securing the Vote* at 79-80.
[9] *Id*. at 124.
[10] Decl. of J. Alex Halderman, Dckt. 682 (Dec. 16, 2019) at 25-33.
[11] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" in *Proceedings of the 41st IEEE Symposium on*

publication venue for computer security research. The work received special commendation from the review committee as the best research paper with a graduate student as the first author to appear in this year's symposium. The main findings of the study were that 60% of voters failed to review their ballots at all, and voters only reported 6.6% of misprinted ballots caused by a hacked BMD. We also tested a variety of procedural interventions, including those practiced in Georgia, to see how much they improved verification, but the magnitude of the improvements was likely too small to allow election officials to reliably detect BMD attacks in close races.

7. Other recent research, which State Defendants' and their expert Dr. Gilbert cite favorably,[12] actually confirms the key results from my study. It found that although voters *who do* review BMD printouts often are able to spot errors, few voters review the printouts at all, which is corroborated by field reports from polling place observers. These findings are further bolstered by previous research in the contexts of VVPATs and DRE review screens, which found that voters are also unlikely to catch errors when using those technologies.[13]

---

*Security and Privacy* (2020), https://jhalderm.com/pub/papers/bmd-verifiability-sp20.pdf.

[12] Dckt. 821 at 11, "there is other research indicating that voters can detect manipulation of ballots."

[13] This literature is summarized in Bernhard et al., § II.B.

8. On this basis, I find it misleading for State Defendants to say that "the science is not yet settled" regarding whether voters accurately verify BMD printouts.[14] Although science is always open to new evidence, there are now several studies that strongly support the proposition that the voter population does not verify BMD printouts accurately enough to allow reliable detection of misprinting attacks. To my knowledge, there is no research at all that suggests the contrary.

9. State defendants incorrectly ascribe my technical conclusions about the relative security of different voting technologies to mere personal preference.[15] This mistakes cause for effect. Like other security experts, I generally recommend hand-marked paper ballots over DRE and all-BMD systems *because* only a primarily hand-marked system can be strongly defended in practice using existing technology. My recommendations would change as appropriate if technological breakthroughs or compelling new scientific results were to alter the security analysis.

10. State Defendants misread my earlier testimony and erroneously conclude that I have changed my views about BMD auditability: "While Dr.

---

[14] Dckt. 821 at 11.
[15] *Id*. at 17. "Dr. Halderman's opinions are based on his personal beliefs that hand-marked paper ballots are a superior election system. He simply decided, as a policy matter, that the only acceptable election system is hand-marked paper ballots and reasons backward from that conclusion."

Halderman previously agreed that a sufficient audit of a BMD-generated ballot can 'detect and correct' the kinds of hypothetical hacking attacks about which he warns, [Doc. 619-2 at ¶¶ 6-7], he now says that no audit of any BMD system would ever be enough to satisfy him, [Doc. 785-2 at ¶ 51]."[16] There is no contradiction. Both declarations discuss two styles of attack: (1) changing both the barcode and the human-readable text and (2) changing only the barcode. Both declarations explain that the first kind of attack could not be detected by any kind of audit of the printouts, since all the records of the voter's intent would be fraudulent.[17] Both declarations also explain that the second kind of attack *could* be detected with a sufficiently rigorous audit that compared the contents of the barcode to the human-readable text,[18] but, to my knowledge, Georgia has no plans to conduct such an audit.

11. State Defendants falsely claim that "the evidence demonstrates that Georgia's new BMD system is completely separate from the DRE/GEMS systems, down to hand-entry from original source documents[.]"[19] To my knowledge, the only

---

[16] Dckt. 821 at 19.
[17] Dckt. 619-2 at 12; Dckt. 785-2 at 41.
[18] Dckt. 619-2 at 6-7; Dckt. 785-2 at 31-35. I was slightly imprecise in Dckt. 619-2 when I said that a sufficiently rigorous audit could "correct" a barcode-only attack in addition to detecting it. That is only the case if the auditors are somehow able to establish that the barcodes and not the human-readable text have been manipulated, but both would be suspect in the event that the BMDs had been hacked.
[19] Dckt. 821 at 8.

"evidence" for this claim appears to come from Mr. Coomer and Dr. Gilbert, but Dr. Gilbert never examined the Georgia system, and it is unclear what personal knowledge Mr. Coomer has, as there is no evidence he has conducted or participated in an examination of the Georgia system. In any event, neither could know what the workers with access to Georgia's technology are doing day to day, such as connecting USB devices to it that were connected to the prior system or connecting components to the Internet.

12. [redacted]

[20] [redacted]

[redacted]

13. While State Defendants are correct that the "Dominion system has been the subject of penetration testing" in other states,[24] they neglect to point out that this testing revealed a slate of serious vulnerabilities that likely remain unmitigated in the Dominion hardware and software used in Georgia. My previous declaration cites the results of penetration tests commissioned by the California Secretary of State, which found that attackers could modify the Dominion software installation files and "it would be possible to inject more lethal payloads into the installers", that the anti-virus software was insufficient or non-existent, and that the BMDs had

---

[21] Hamilton decl.
[22] The public facing portion of the ENR system is located at https://results.enr.clarityelections.com/GA/
[23] Dckt. 723 at 15 (Throop Decl.).
[24] Dckt. 821 at 10.

vulnerabilities that "would be open to a variety of actors including a voter, a poll worker, an election official insider, and a vendor insider," among other problems.[25]

14. In the context of evidence that I discuss in my previous declarations regarding vulnerabilities in the Dominion equipment uncovered by certification testing in Texas,[26] State Defendants state incorrectly that the security problems "primarily relate to the optical scanners (ICP units), not the BMDs, which Curling Plaintiffs advocate the State continue using."[27] This is misleading. Both Texas and California found serious weaknesses impacting the BMDs, including the use of dangerously obsolete software and means by which the software could be manipulated by attackers. Both also found serious weaknesses impacting the scanners. Vulnerabilities in the BMDs are relevant to the relief that Plaintiffs' seek with respect to the use of hand-marked paper ballots, which are the only practical countermeasure to some BMD-based attacks. Vulnerabilities in the scanners are a threat to Georgia elections however the ballots are marked, and they are relevant to Plaintiffs' requested relief regarding rigorous auditing of the scanners' tallies.

---

[25] Dckt. 785-2 at 21-27.
[26] *Id*. at 19.
[27] Dckt. 821 at 8, fn. 7.

**Status of Forensic Testing**

15. Plaintiffs have asked me to update the Court about the status of the forensic analyses that I am performing on their behalf. My work is still in progress, but there are several preliminary findings I can report.

16. In December 2019, I received a copy of a forensic image created by the FBI of the server at the KSU Center for Election Systems.

17. In late July, I began a limited analysis of log files from approximately 4500 sequestered memory cards from Cobb, DeKalb, and Fulton counties to extract DRE serial numbers for statistical sampling. On August 13, 2020, shortly after the Court granted permission for a forensic examination of the memory cards, I began creating forensic images and have so far imaged around 25% of the cards.

18. On August 25, I received forensic images of the internal memory from six AccuVote-TS DREs from Athens-Clarke County. To facilitate imaging these machines, I created a software patch for the DREs' bootloader software, which a forensic technician programmed into a read-only memory chip and physically inserted into each DREs. On August 30, I received forensic images of three memory cards associated with those DREs.

19. To my knowledge, this is the first time that detailed forensic analysis of large parts of a state-wide DRE system has been conducted. Due to the scope and

complexity of the work, my analysis is necessarily still in an initial phase. I have had to developed specialized software and techniques to efficiently image and analyze the thousands of memory cards and the proprietary data formats of the DRE system.

20. The objective of my analysis is to determine the security posture of the DRE-based system as it was operated in Georgia. Although older and newer versions of the AccuVote DRE software have been shown to suffer from critical exploitable vulnerabilities, forensic analysis allows for direct confirmation that vulnerabilities were present in the specific hardware and software configuration Georgia used. The analysis also allows me to more fully assess what opportunities attackers would have had to spread malware through the Georgia system and manipulate election results.

21. As a secondary objective, the analysis may also uncover evidence that the election system was successfully compromised. However, one of the key deficiencies of paperless voting systems is that successful attacks might not leave forensic evidence, since well designed malware would remove the electronic records of its presence once its task was complete. Although there is a possibility that attackers were careless and did leave some digital traces, absence of evidence cannot support a strong conclusion that the system was not attacked.

22. Moreover, the digital records to which Plaintiffs have access are badly incomplete. Thus far, they have received memory cards from only three counties,

and most of these cards have records from only a single election. Only six DREs have been imaged, all from a single county. Log files from the CES server from before November 10, 2016 were erased prior to the server begin imaged by the FBI, severely limiting forensic visibility into the period of Russia's documented attacks against state election systems in the leadup to the 2016 election.[28] While these data sources provide abundant insight into how the DRE-based system was operated and ways in which it was vulnerable, finding a "smoking gun" proving that a Georgia election result was stolen by hackers is akin to finding the proverbial needle in a haystack, even assuming it occurred and left some trace in the data.

23. Nevertheless, there is evidence that hackers penetrated the system. My initial analysis of the CES server image has confirmed the principal findings that Logan Lamb described in his January 16, 2020 declaration.[29] The most important finding is that the CES server likely was compromised by an external attacker in December 2014. Mr. Lamb describes this evidence in detail.[30] Determining what actions the outside party took on the server is difficult, given the amount of time that elapsed before the server was imaged, but my analysis is ongoing.

---

[28] Suppl. Decl. of Logan Lamb, Dckt. 699-10 at 21-23.
[29] *Id*. at 11.
[30] *Id*. at 13-20.

24. Even if nothing more can be determined about the apparent attack, the evidence shows that the CES server was vulnerable to unauthorized access from the Internet for many years. Additionally, the FBI image shows that the CES server housed security-critical data, including installation files for the BallotStation software that ran on every DRE, the hash verification software that CES ran on its GEMS servers, and election databases. An outside attacker who infiltrated the server and compromised these files could have spread malicious software to the GEMS servers and DREs.

25. My initial analysis of the AccuVote-TS memory images confirms several severe vulnerabilities in the DREs themselves.

26. The bootloader software used in the DREs is version 1.0.2 and dates from June 2002. This software is critical to the DREs' security, since it runs every time they are powered on and controls sensitive operations such as loading the operating system and installing software updates. That it was not updated for 18 years demonstrates that Georgia's DRE systems were subject to an even wider range of vulnerabilities than had been previously established.

27. The version of the BallotStation election software installed on the DREs is 4.5.2!, which displays a 2004 copyright date. This confirms that the Georgia BallotStation software was not materially updated since that time.

28. The installed BallotStation software matches the contents of the installer file "BS_CE-TSR6-4-5-2!-DS.ins" found on CES's Internet-facing server. This is consistent with the assertion that copies of the software to be installed on the DREs were stored on the vulnerable CES server, where they could have been modified by an attacker. Although I have thus far been unable to determine whether the installation files on the server were modified by attackers, they had the opportunity to do so.

29. By analyzing the bootloader and BallotStation software, I have so far been able to confirm the presence of several critical vulnerabilities.

a) The vulnerability discovered by Harri Hursti in 2006 and described by Michael Shamos as "one of the most severe security flaws ever discovered in a voting system" is present in the DREs software that was used in Georgia until this year.

b) The vulnerabilities I exploited in a 2007 study to create vote-stealing malware that spreads from machine-to-machine as a computer virus[31] is present in the DREs software that was used in Georgia until this year.

---

[31] Ariel J. Feldman, J. Alex Halderman, and Edward W. Felten, "Security Analysis of the Diebold AccuVote-TS Voting Machine," in *Proc. USENIX/ACCURATE Electronic Voting Technology Workshop* (2007).

c) The vulnerability I exploited to demonstrate a vote-stealing attack to the Court in 2018 is present in the DREs software that was used in Georgia until this year.

30. All the memory cards and DREs I have analyzed use the same encryption key, `F2654hD4`. This is the default encryption key that was installed on the AccuVote DREs at the factory. It was publicly revealed by security researchers in 2003.[32]

31. Changing the encryption key to a different, secret value would have been straightforward for the state, but Georgia instead continued to use the manufacturer's default key for 17 years after that key was leaked to the public. Since the key was publicly known during that period, all confidentiality and integrity protections provided by the cryptography were completely negated. For instance, anyone with access to the memory cards could have read or modified any of the election data they contained.

32. The election log files from the county memory cards record that those cards were used in 1945 separate DREs in Cobb County, 1982 in DeKalb County,

[32] Tadayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach, "Analysis of an Electronic Voting System," in *IEEE Symposium on Security and Privacy* (2004), § 4.4. Available at https://avirubin.com/vote.pdf.

and 2123 in Fulton County. Analysis of the logs shows that all three counties engaged in practices that would have facilitated spreading viral malware throughout their election systems.

a) County workers sometimes reused the same card in hundreds of machines for testing and training purposes. For example, in DeKalb, one memory card was sequentially inserted into at least 288 DREs. If any of those DREs was infected with viral malware, the malware could have spread to the other DREs during this operation by exploiting the confirmed vulnerabilities I discuss above.

b) In each of Fulton and Cobb counties, a single DRE was used to process data from more than a thousand different cards. If that DRE was infected with malware, it could have spread directly to over a thousand other DREs.

c) Each county used only a small number of DREs to program memory cards from the GEMS server. In Fulton, every election represented in the log files was prepared using one of only 17 machines; in Cobb, 28 machines; and in DeKalb, 28 machines. These DREs would provide a centralized point from which to launch an attack. If they were infected

with malware, the malware could have spread directly to all other DREs in the counties.

33. Despite the assertion that Georgia operated a uniform voting system across all counties, the three counties represented in my analysis had starkly different practices for maintaining their memory cards. This indicates that counties developed their own *ad hoc* processes for important security tasks. Some of these county-specific processes would have further facilitated the spread of malware.

d) Although Fulton and DeKalb counties appear to have erased their cards before each election, Cobb County did not, and some cards I examined contained election data from as long ago as 2004. This failure to erase the cards means that if they were infected, malware could continue to spread to new machines for many election cycles.

e) DeKalb County appears to have erased cards by overwriting them with the contents of other cards—most likely by using a machine designed for duplicating the cards. Around 8% of the DeKalb cards I have analyzed so far are identical to other DeKalb cards. This practice could rapidly spread malware if the cards used as a source for the duplication were infected.

34. The log files from the memory cards record hundreds of instances of technical malfunctions, including data corruption, software crashes, and machines freezing and needing to be restarted during voting. There also appear to be frequent instances of human error and procedural deviation, such as failing to correctly perform logic and accuracy testing.

35. These findings directly confirm the vulnerability of the DRE system and reveal additional ways that malware could have spread through it, beyond those already in evidence. Since my analysis is still in an early stage, it is likely that additional problems will be uncovered as the work proceeds.

**Rebuttal of Declaration of Jack Cobb[33]**

36. Mr. Cobb gives only a partial history of certification tests that apply to Georgia's Dominion equipment.[34] His company, Pro V&V, appears never to have performed penetration testing on the Dominion equipment nor any security testing on the version of the Dominion system used in Georgia (5.5A). Although he states that his company performed certification tests for the U.S. Election Assistance Commission ("EAC") for version 5.5 of the software, EAC certification testing

[33] Decl. of Jack Cobb (Aug. 25, 2020), Dckt. 821-6.
[34] *Id*. at 5.

involves only limited security evaluation and not penetration testing. I find it interesting that Mr. Cobb points to security tests performed by another company, SLI Compliance, as part of certification testing for Pennsylvania, but that he neglects to point to later tests performed by the same company for California, which found a number of serious vulnerabilities.[35] I discuss these vulnerabilities and their impact in my previous declaration.[36] I also find it interesting that despite the fact that Pro V&V had never performed penetration testing of the Dominion system, the Secretary of State hired Pro V&V to perform certification tests for the State of Georgia.[37]

37. In reference to my August 19, 2020, declaration, Mr. Cobb opines that I "clearly [do] not understand the specific setup and nature of the Dominion system or its security features."[38] His first example concerns the QR codes (barcodes) printed on the BMD ballots. Based on his company's role in certifying the Dominion system for the EAC and the State of Georgia, I would expect Mr. Cobb to have a detailed technical understanding of these barcodes, which are central to the security

---

[35] California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019) at 29, https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510staff-report.pdf.
[36] Decl. of J. Alex Halderman (Aug. 19, 2020), Dckt. 785-2 at 21-27.
[37] Cobb decl. at 6.
[38] *Id*. at 9.

of votes cast using Dominion BMDs. Indeed, Mr. Cobb states that during the limited testing that his company conducted for the Secretary of State, "Pro V&V also verified the contents of the QR code which includes a digital signature and is encrypted."[39] He later states that, "In this system, the election files, including the QR codes, are digitally signed and encrypted."[40]

38. These technical claims about the Dominion QR codes used in Georgia are entirely wrong. Based on my own analysis of the QR codes from ballot images provided by Fayette County during discovery, which I understand to be scans of ballots cast during the June 9, 2020 election, no portion of the QR codes is encrypted.[41] I am prepared to demonstrate that the contents can be read and understood without the use of a secret key, thus proving they are not encrypted.

39. Moreover, Dominion QR codes do not include a digital signature, but rather what is known as a message authentication code ("MAC"). A MAC provides

---

[39] *Id*. at 6.
[40] *Id*. at 9.
[41] In my previous declaration, I myself incorrectly described the QR codes as "encrypted" (Dckt. 785-2 at 7(a), 32). My understanding at the time, before I had received a Georgia BMD ballot with which to conduct my own tests, was based on the California Secretary of State's test report. California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019): "The QR code is encrypted" (p. 14); "The ICX ballot marking device uses an encrypted QR code" (p. 28).

somewhat similar protections to a digital signature but is weaker in important aspects. The distinction between digital signatures and MACs is an elem-entary concept that I regularly test students about in introductory security classes.

40. Mr. Cobb's errors about these basic facts regarding the Dominion system and its security are troubling. They lead me to believe either that Mr. Cobb does not understand the specific setup and nature of the Dominion system or its security features, that he is not telling the truth when he states that his laboratory "verified the contents of the QR code" while testing the system for Georgia, or that Pro V&V's tests of critical aspects of the system were poorly conducted.

41. Mr. Cobb goes on to imply that the Dominion voting system software cannot be altered by attackers without detection, because the BMDs have "a built-in feature that will generate a SHA-256 hash value at any point before and during voting to allow for easy checks to determine if it matches with Georgia's version."[42] This view again reflects a misunderstanding of fundamental security concepts, such as what hash values are and how they can be used to verify the integrity of software.

42. In the security field, a hash value is a number that is calculated based on the contents of a file by applying an algorithm that is designed so that it is

[42] Cobb decl. at 7.

extremely difficult for an attacker to generate another file with different content that yields the same hash value. Given two files, I can apply a hash algorithm to compute the hash value of each file, and if the hash values are identical, I can conclude that the files' contents are also identical.

43. The scenario Mr. Cobb describes is completely different. Instead of Mr. Cobb calculating the hash values of the files on the BMD, he describes a scenario where the software on the BMD calculates *its own* hash value, which is then compared to the hash value of the software that is supposed to be installed—in essence, asking the BMD itself whether it is malicious. This is akin to a bouncer asking bar patrons to card themselves. If the BMD *has* been attacked and is running malicious software, that software can simply lie about its hash value.

44. Hash values are not trustworthy if the system used to compute and display them is compromised. In this case, the software running on the BMD is computing and displaying its own hash. If the software has been compromised because the machine has been infected with malware, the compromised software could display whatever hash the attacker has programmed—including the hash of the uncompromised software. This mechanism may have utility for administrative compliance (e.g., checking which version of the software is supposedly installed), but it has little or no value for deterring attacks.

45. Mr. Cobb also says his firm helped Georgia "perform acceptance testing of each BMD using a hash value. This ensured that the BMD had not been altered and had the correct software installed at the time it was accepted by the State."[43] Here, acceptance testing refers to checking the hash of the software on the machine at the time it is delivered from the manufacturer. Mr. Cobb does not specify the procedure he used to conduct these tests, but verifying the integrity of software running on an embedded device such as the ICX BMD is difficult to do securely. If there is already malware on the device, that malware can conceal its presence from other software using what is known as a rootkit. Therefore, computing hash values on the device itself is not a reliable method of acceptance testing. Nor can one simply remove the storage medium and hash it using a trusted computer, since the flash storage chips in the ICX are permanently integrated into the circuitry. In any event, Mr. Cobb only describes checking the integrity of the BMD software when the BMDs were first delivered, so this testing could not prevent the software from being altered later by attackers. Nor could it detect any subsequent attack.

46. Mr. Cobb also mistakenly concludes that "[i]f a QR code was somehow manipulated on the BMD (which I have never seen occur in any context using the

---

[43] *Id*. at 8.

Dominion system), the digital signature would also be altered and it would not be accepted by the scanner." Again, the QR codes do not contain a digital signature, but rather a MAC. Even then, the data protected by the MAC is the same in every ballot that has the same votes. This means, for example, that an attacker can simply duplicate the QR code from a ballot with votes he favors in order to produce another ballot with those same votes that will be accepted and counted by the scanner. This is an important security flaw that Pro V&V should have been aware of after reviewing the contents of the QR codes. Dominion could have designed the QR codes in a way that would have allowed the scanners to detect and prevent such duplication, but did not do so.

47. Mr. Cobb goes on to imply that malware cannot be spread to scanners or BMDs from the election management system ("EMS"), because "the election files, including the QR codes, are digitally signed and encrypted," and if the digital signatures do not match, "decryption fails and nothing is loaded on the machine."[44] Once again, this assertion is technically nonsensical, even aside from the fact that the QR codes are neither signed nor encrypted. Although the ballot programming that workers copy to the BMDs and scanners from the EMS may be encrypted and

---

[44] *Id*. at 10.

signed, this has no relevance to whether malware can spread from the EMS as part of those files. The EMS *generates* the ballot programming files. Therefore, malware running on the EMS could arbitrarily alter their contents before the encryption and signatures are applied, ensuring that the BMDs would accept the files as genuine.

48. In a similar vein, Mr. Cobb asserts that, "If a QR code was somehow manipulated on the BMD […], the digital signature would also be altered and it would not be accepted by the scanner."[45] This is, again, nonsense. First, the QR code contains a MAC rather than a digital signature. A MAC is a number that works similarly to a hash, except that its value can only be computed with knowledge of a secret key. Each QR code contains a MAC of the vote data that is computed using a secret key that is shared by the BMD and the scanner. The scanner reads the QR code, extracts the vote data and MAC, and uses the secret key to compute the correct MAC of the vote data. If the MAC from the QR code is different from the computed MAC, the scanner should reject the ballot.

49. This implies that in order to print *any* ballots that the scanner will accept, the software on the BMD must have access to the secret key. Therefore, if the BMD is infected with malware that modifies the operation of the software, the

[45] *Id*. at 11.

malware too will have access to the secret key, and will be able to generate QR codes that the scanner will accept as valid for whatever ballot choices the attacker prefers.

**Rebuttal of Declarations of Juan E. Gilbert**

50. State Defendants have refiled a declaration from Dr. Juan E. Gilbert November 13, 2019.[46] I respond to Dr. Gilbert's assertions in my declaration of December 16, 2019.[47]

51. In a brief supplemental declaration, Dr. Gilbert makes several additional statements that require clarification.[48]

52. Dr. Gilbert correctly notes new SEB rules require poll workers to verbally instruct voters to review their ballots.[49] As Dr. Gilbert points out, my own peer-reviewed research measured the effect of such instructions on verification and error detection rates and found them to have a small positive effect. However, even with such instructions, voters failed to detect about 86% of errors on BMD printouts (vs. 93% without instructions). As my study explains, voters would have to verify

[46] Decl. of Juan E. Gilbert, Dckt. 821-2, originally 658-3.
[47] Decl. of J. Alex Halderman (Dec. 19, 2019), Dckt. 682 at 16, 38-49.
[48] Supp. Decl. of Juan E. Gilbert, Dckt. 821-7.
[49] *Id*. at 7(A).

their ballots much more carefully than that in order to reliably detect outcome-changing fraud in close elections.

53. Dr. Gilbert also notes that SEB rules require reminding voters that a sample ballot is available to help with verification. My study suggests that voters who use a sample ballot do detect errors more reliably. However, the gain will be limited to the fraction of voters who can be induced to use a sample ballot. I am not aware of any research that shows verbal reminders are effective in this regard, and I would be surprised if they were.

54. Dr. Gilbert highlights a new SEB rule that holds that if, in any recount or audit, “a discrepancy is found between the voter’s choice indicated by the printed text on the ballot and the result tabulated by the ballot scanner, the printed text shall control and be counted.”[50] However, this rule does not provide an effective defense against BMD misprinting attacks. An attacker could cause a BMD to alter both the barcodes read by the scanners and the human readable text, in which case there would be no disagreement. And if there were a discrepancy between the barcodes and the human-readable ballot text, the reliably of both records would be in doubt, because either might have been altered.

---

[50] *Id*. at 7(B).

55. Dr. Gilbert cites a recent study by Byrne and Whitmore, which I also cite in my previous declaration.[51] Byrne and Whitemore's results are generally in agreement with my own BMD research (although, unlike my study, theirs has not been peer reviewed). Both studies find that few voters are likely to spot errors on BMD printouts. Of 108 participants who voted on a hacked BMD, Byrne and Whitemore report that only 17.5% detected alterations to the printout. This average includes both voters who were heavily primed to review their ballots through repeated verbal and written instructions and voters who were not. Unsurprisingly, the study finds that verification performance is much better among voters who actually examine their ballots, but the fact remains that only 23% of their subjects did so. This is further evidence that voters do not reliably detect errors on BMD printouts.

56. Dr. Gilbert questions why I "make no mention of interventions which foster higher review rates."[52] As I have discussed, the magnitude of the improvements that have been measured by these studies for practical kinds of interventions are simply too small to reliably uncover cheating in close elections.

---

[51] *Id*. at 8-11.
[52] *Id*. at 11 and 13.

57. Dr. Gilbert's assertion that barcode manipulation attacks could occur with hand-marked paper ballots defies common sense.[53] Although timing marks or the placement of vote targets could be manipulated, this kind of problem would be detected during routine logic and accuracy testing. Election workers would simply need to perform L&A testing with one ballot and flip through the remaining stack of blank ballots to verify that they are all the same.

58. Dr. Gilbert argues that BMD barcode manipulation attacks are "an unlikely avenue for a bad actor since, as other scholars have recently noted, such an attack is unlikely to go undetected in a jurisdiction conducting RLAs[.]"[54] The only scholar Dr. Gilbert cites for this proposition is Dr. Dan Wallach, who, like Dr. Gilbert, is the creator of a BMD system that use barcodes. The proposition is incorrect. While it is true that "an audit which recognizes a single inconsistent barcode/text combination would signal a significant problem", in order to find even a single inconsistency, the audit would have to sample at least one manipulated ballot *and* actually compare the barcode to the text. Georgia has announced no plans to inspect the barcodes during its intended audits. Even if it did, the proposed Georgia RLA is designed to target only a single race to be selected by the SOS every two

---

[53] *Id*. at 12.
[54] *Id*. at 12.

years. There is no assurance that it will select enough ballots to uncover barcode-based cheating in races that are not targeted. For instance, if the Democratic Presidential Preference Primary had been selected for audit statewide (as it was in Fulton county), the probability that the audit would have detected barcode-based fraud sufficient to change the outcome of another state-wide race with a 1% margin of victory would be only around 30%, and that's under the counterfactual assumption that the auditors decoded the barcodes. In elections where no RLA was conducted (as in every election but the November general election in even years), the probability would be 0%.

59. Contrary to Dr. Gilbert's repeated implications, the issue is not whether interventions can improve voter verification rates *at all*, but whether they can ensure that *sufficiently many* voters carefully review their ballots.[55] The effectiveness of verification for detecting attacks increases dramatically only when the rate of verification is high. When the rate is low, as appears to be the case based on a growing number of studies, small increases (like those my study found were achieved by instructing voters to verify their ballots) have little utility.

[55] *Id*. at 13.

60. Moreover, the security of Georgia's voting system depends on whether voters are likely to spot errors when using the actual BMDs operated by the state—not theoretical future BMDs with transparent screens like those conceived by Dr. Gilbert or hypothetical interventions that somehow raise voters' verification performance well beyond the levels measured thus far. In fact, that Dr. Gilbert sees a need for such BMDs seems to indicate that he recognizes the unreliability of the ballots generated by the BMDs used in Georgia, lest there would be no need for transparent screens.

61. Dr. Gilbert and I agree that scanners can be hacked and that rigorous RLAs are necessary.[56] However, he fails to acknowledge that BMDs, particularly when they are used as the primary method of voting, as in Georgia, create a second place, in addition to the scanners, where outcome-changing attacks could succeed, multiplying the opportunities for attackers. In the absence of rigorous audits of a kind not now contemplated in Georgia, barcodes greatly magnify this risk. Dr. Gilbert does not seem to seriously dispute either claim.

---

[56] *Id.* at 14.

**Rebuttal of Declaration of Mark Riccobono**

62. State Defendants have refiled a declaration from Mark Riccobono, president of the National Federation of the Blind, dated August 1, 2019.[57] I respond to Mr. Riccobono's assertions in my declaration of December 16, 2019.[58]

**Remarks on Declaration of David Hamilton**[59]

63. [redacted]

64. [redacted]

[57] Decl. of Mark Riccobono, Dckt. 821-8, originally 658-4.
[58] Decl. of J. Alex Halderman (Dec. 19, 2019), Dckt. 682 at 34-37.
[59] [redacted]
[60] [redacted]
[61] [redacted]

65. [redacted]

66. [redacted]

67. [redacted]

---

62 [redacted]

63 [redacted]

[redacted]

68. [redacted]

[64] As the Court noted, the "assessment of the eNet voter registration systems and database rang serious alarm bells." Dckt. 579 at 76.

[65] Dckt. 579 footnote at 74. "On July 1, 2019 the SOS took over hosting eNet's voter registration database that creates the express pollbooks, but continued its

[redacted]

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 1st day of September, 2020 in Rushland, Pennsylvania.

________________________________

J. ALEX HALDERMAN

contract with PCC for licensed use of the PCC software and for PCC's maintenance and support of the PCC application."

[66] [redacted]

[67] [redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. I have reviewed the expert disclosures prepared by Dr. Juan Gilbert and Dr. Benjamin Adida for State Defendants. Neither Dr. Gilbert not Dr. Adida offers any rebuttal to the numerous, critical vulnerabilities in Georgia's BMDs that I described in my July 1, 2021 expert report. Dr. Adida did not respond to my report at all; State Defendants reissued prior declarations from him previously provided in this litigation. Neither of them disputes the presence of any of the serious

vulnerabilities I detail in my report or the steps I describe for exploiting those vulnerabilities to alter individual votes and election outcomes in Georgia. Nor does either of them claim to have examined any of the voting equipment used in Georgia to evaluate whether the vulnerabilities I identified—or others—have been exploited in any past election. Although each of them presumably could do this with the permission of State Defendants, who I understand engaged them as experts in this case, there is no indication either has undertaken any such inquiry or asked to do so. As a result, neither Dr. Gilbert nor Dr. Adida has anything to say about the reliability of the voting equipment used in Georgia elections. This is surprising, given that they have had at least the last year to examine Georgia's voting equipment.

3. State Defendants urgently need to engage with the findings in my report and address the vulnerabilities it describes before attackers exploit them. Nothing in Dr. Gilbert's or Dr. Adida's responses indicates that State Defendants understand the seriousness of these problems or have taken any measures to address them and their implications for the Plaintiffs' individual votes in future elections. Established practice in the security field would require State Defendants to promptly subject Georgia's voting system to rigorous testing in response to my report, to assess the extent and significance of each of the vulnerabilities I described, and to identify and *promptly implement* specific measures (where possible) to eliminate or mitigate each

of those vulnerabilities. Neither Dr. Gilbert nor Dr. Adida indicates any such efforts on their own part or on the part of State Defendants or anyone else. Again, Dr. Adida did not respond to my report.

4. In my report—a 25,000-word document that is the product of twelve weeks of intensive testing of the Dominion equipment provided by Fulton County—I find that Georgia's BMDs contains multiple severe security flaws. Attackers could exploit these flaws to install malicious software, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. I explain in detail how such malware, once installed, could alter voters' votes while subverting all the procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs). Finally, I describe working proof-of-concept malware that I am prepared to demonstrate in court.

5. My report concludes, *inter alia*, that Georgia's BMDs are not sufficiently secured against technical compromise to withstand vote-altering attacks by bad actors who are likely to target future elections in the state; that the BMDs' vulnerabilities compromise the auditability of Georgia's paper ballots; that the BMDs can be compromised to the same extent as or more easily than the DREs they replaced; and that using these vulnerable BMDs for all in-person voters, as Georgia

does, greatly magnifies the level of security risk compared to using hand-marked paper ballots and providing BMDs to voters who need or request them.

**Reply to Declaration of Dr. Juan Gilbert**

6. Rather than engage with the facts in my report, Dr. Gilbert responds largely with vague generalities. He gives no indication that he has ever used an ICX BMD, let alone tested its security. He begins by conceding that "any computer can be hacked," but he contends that "this general statement is largely irrelevant," because hand-marked paper ballot systems use computers too (to scan the ballots) (¶ 6). His position is inconsistent with accepted standards for election security and with the facts of the particular voting system used in Georgia.

7. My testing has shown that the BMDs used in Georgia suffer from specific, highly exploitable vulnerabilities that allow attackers to change votes despite the State's purported defenses. There is no evidence that Georgia's ballot scanners suffer from the same extraordinary degree of exploitability, nor does Dr. Gilbert contend they do. He ignores the relative ease with which Georgia's BMDs can be hacked, including by a voter in a voting booth in mere minutes. That extreme difference in security as compared to other voting technologies, particularly hand-marked paper ballots, is far from "irrelevant" as Dr. Gilbert implies.

8. Furthermore, even if the scanners were just as insecure as the BMDs, Georgia's practice of requiring essentially all in-person voters to use highly vulnerable BMDs would needlessly give attackers *double* the opportunity to change the personal votes of individual Georgia voters, since malware could strike either the BMDs or the scanners. Accepted standards in election security compel reducing points of attack for bad actors, not unnecessarily expanding them—a point Dr. Gilbert ignores.

9. Lastly, Dr. Gilbert also ignores that accepted election security protocols include an effective measure to protect against hacks of ballot scanners when the ballots are hand-marked rather than generated by BMDs—namely, reliable risk-limiting audits (RLAs), which would have a high probability of detecting any outcome-changing attack on the scanners. Not only do Georgia's BMDs defeat the efficacy of RLAs, but Dr. Gilbert continues to ignore the fact that Georgia requires an RLA of just one statewide contest every two years (and, to my knowledge, has not adopted specific, adequate procedures to ensure a reliable RLA for that one audit every other year).

10. Dr. Gilbert goes on to discuss issues related to voter verification of BMD ballots (which I respond to below). Yet he fails to address the potential for attackers to cheat by changing only the QR codes printed by Georgia's BMDs.

Voters cannot read the QR codes, but they are the only part of the ballots that the scanners count. My report details several routes by which malicious hardware or software can manipulate the QR codes and cause the recorded votes to differ from voters' selections. In principle, a rigorous risk-limiting audit would be likely to detect such an attack if the attacker changed enough votes to alter the outcome of the contest being audited, but again Georgia rules require such an audit in only a single statewide contest once every two years. As my report explains, this leaves the vast majority of elections and contests in Georgia vulnerable to QR code (and others) attacks, yet Dr. Gilbert says nothing about this threat.

11. Instead, Dr. Gilbert focuses exclusively on a different threat: attacks that change *both* the QR codes and the ballot text. In addition to the barcode-only attacks I just discussed, my report demonstrates that Georgia's BMDs can be manipulated so that both the barcodes and the printed text indicate the same fraudulent selections. No audit or recount can catch such fraud, because all records of the voter's intent would be wrong. The only reliable way to detect it would be if enough voters carefully reviewed their ballots, noticed that one or more selections differed from their intent, and reported the problems to election officials, *and* if Georgia officials then discerned from the pattern of voter reports that the BMDs were systematically misbehaving. Thus, Dr. Gilbert is mistaken when he contends that the distinction

between "voter-verifiable" and "voter-verified" paper ballots "only matters in principle" (¶ 7). All BMD ballots are potentially voter-verifiable, but unless enough BMD ballots are actually voter-*verified*, BMD-based attacks could alter election outcomes even in the rare instances where the State conducts a risk-limiting audit. And unless *every* BMD ballot is actually voter-*verified*, BMD-based attacks could alter individual voters' selections without detection..

12. A large body of recent scientific evidence has established that few voters are likely to catch errors caused by malicious BMDs. I have reviewed this evidence in previous declarations.[1] It comes from both field observations (which report how long real voters review their ballots during real elections) and laboratory tests (which report the fraction of errors that subjects detect when voting on hacked BMDs in simulated elections). These methodologies are complementary, and results to-date from all studies of both kinds point to a low rate of voter-verification.

13. Dr. Gilbert criticizes field observations because "[t]ime spent reviewing a ballot has little to do with whether it was actually verified" (¶ 9). This claim is inconsistent with accepted election security principles. Of course, they are not exactly the same question, but obviously the time spent reviewing a ballot can

---

[1] *Halderman decl.* (Dec. 16, 2019), Dkt. 682 at 23-33; *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 6-8, 55.

provide important insight into whether it was likely verified. For example, we can conclude that a voter who spends only a second or two reviewing a lengthy, complicated ballot is unlikely to have reliably verified each of their selections on the ballot. And of course, the same is true for a voter who spends no time at all reviewing their ballot. Review time is both practical to measure and clearly correlated with the error detection success, making it a valuable and relevant metric, as multiple studies confirm.

14. Dr. Gilbert seems to contend, without evidence, that a casual glance is sufficient to review Georgia-style ballots because selections are printed together with party affiliations (¶ 9). He cites no research (and I am unaware of any) that supports this conclusion, particularly when, as in Georgia, the party affiliations are printed in small type and in a different horizontal position for each contest. A real BMD ballot is reproduced on page 15 of my expert report. This is just one example of such a ballot; they can be longer and more confusing. Dr. Gilbert provides no basis for believing that voters would likely catch deliberate errors caused by compromised BMDs when voting such a ballot.

15. Dr. Gilbert references my award-winning peer-reviewed study about voter verification behavior, which found very poor rates of error detection and

reporting in a mock election using BMDs that my team hacked (¶ 10).[2] He contends that my study "ignores the reaction to such manipulation in an actual election, particularly one as heated in the public domain as the 2020 Election." (¶ 11). He does not explain how or why such circumstances would be expected to materially increase voter verification of their respective BMD ballots, nor does he cite any support for his claim to believe they would. And, just last week, the Atlanta Journal-Constitution obtained a study (under the Georgia Open Records Act) commissioned by the Secretary of State's Office in which researchers from the University of Georgia observed Georgia voters during the November 2020 election and reported how long they spent reviewing their BMD ballots.[3] Although it appears the Secretary of State had this study at the time of Dr. Gilbert's response to my report, he does not address or acknowledge it. The new study suggests that voters in the real world review their ballots *even less carefully* than voters in recent laboratory studies—despite the reminders election workers are supposed to give them to carefully review

---

[2] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" In *41st IEEE Symposium on Security and Privacy* (May 2020). Available at https://ieeexplore.ieee.org/document/9152705.

[3] Mark Niesse, "Under half of Georgia voters checked their paper ballots, study shows," *Atlanta Journal-Constitution* (July 27, 2021). Available at https://www.ajc.com/politics/under-half-of-georgia-voters-checked-their-paper-ballots-study-shows/6HSVHHFOBRBDPODRZXLIBTUS64/.

their ballots at the polling sites, which Dr. Gilbert emphasizes as a remedy for poor voter verification of BMD ballots.[4]

16. The University of Georgia researchers report that 20% of voters they observed did not check their ballots at all.[5] Only about 49% examined their ballots for at least one second, and only 19% did so for more than five seconds. This is significantly worse performance than observed in my study, which found that when voters were verbally prompted to review their ballots before casting them, as should occur in Georgia, 63% of voters reviewed their ballots for only *two* seconds or more, compared to 19-49% in the new study.

17. This suggests that laboratory studies like mine tend to *overestimate* the rate at which real Georgia voters would detect errors on their BMD ballots. Since real Georgia voters were observed to review their ballots even less carefully than the

---

[4] Secretary Raffensperger appears to disagree with Dr. Gilbert about the value of measuring voter review time for assessing voter verification performance. He told the Atlanta Journal-Constitution that the new study "shows voters do indeed review their ballots for accuracy before casting them" and offers "proof the votes that were counted were for the candidates the voters intended." (*Id.*). I agree that the new study provides valuable insights about voter behavior, but, contrary to the Secretary's pronouncements, the results indicate that real Georgia voters are even less likely to detect errors caused by compromised BMDs than previous studies have suggested.

[5] Audrey A. Haynes and M.V. Hood III, "Georgia Voter Verification Study" (January 22, 2021). Available at https://s3.documentcloud.org/documents/21017815/gvvs-report-11.pdf.

participants in my study, it is reasonable to infer that real voters would catch an even smaller fraction of errors. The participants in my study who were similarly prompted to review their ballots caught 14% of errors. Therefore, real voters in Georgia are likely to catch substantially less than 14% of errors.

18. How often would voters have to detect errors on their BMD ballots to effectively safeguard against attacks? The answer depends on the margin of victory, since an outcome-changing attack would need to change fewer votes in a close contest. The model from my study shows that, given the margin of victory from the 2020 Presidential contest in Georgia, voters would need to have detected 46% of errors for there to be even one error report per 1000 voters, under a hypothetical scenario where the election outcome had been changed by hacked BMDs.[6] The University of Georgia observations show that barely 49% of voters looked at their ballots for even a second, let alone studied them carefully enough to reliably spot errors.

---

[6] To reiterate, the November presidential race was the only state-wide contest subjected to a risk-limiting audit. In other contests, attackers could change the outcome by tampering with only the ballot QR codes, and voters would have no practical way to detect this manipulation regardless of how diligently they reviewed their ballots.

19. Dr. Gilbert performs a similar calculation using the baseline error detection rate measured in my study. He finds that an outcome changing attack on Georgia's Presidential contest would have resulted in only 832 voters noticing that their BMD ballots showed the wrong selection. Dr. Gilbert suggests that there have not been such complaints from any voters, and says he finds it implausible that so many voters would have "simply not said anything or otherwise simply corrected their ballot and thought nothing of it then or since" (¶ 12).

20. This is an oddly constructed hypothetical, since Curling Plaintiffs do not claim here that the Presidential outcome was altered by hacking the BMDs. And Dr. Gilbert does not indicate any effort to determine the total number of spoiled ballots in Georgia's Presidential contest, which he presumably could have explored with State Defendants. Neither does he provide any basis to believe there were only 832 or fewer spoiled ballots. But suppose for the sake of argument that the Presidential election outcome in Georgia had been altered by hacking the BMDs, and there *were* complaints from the 832 voters that Dr. Gilbert has calculated. What then? It seems all but certain that these complaints would have been dismissed or drowned out in the cacophonous aftermath of the election or simply disregarded by election workers at the polling sites as voter errors. Yet the official count, the risk-limiting audit, and the recount would all have found the wrong winner, and there would be no

way to recover any altered vote or correct the election outcome short of rerunning the election. With a mere 832 complaints among 5 million participating voters (amidst a sea of other complaints, real and imagined), it is unlikely that poll workers or election officials, including State Defendants, would realize or even suspected there was a systemic problem with the BMDs, and it is completely implausible that they would take the drastic but necessary step of asking Georgians to vote again. Georgia's election system is susceptible to this extraordinary risk as long as it remains vulnerable to the attacks I described in my report (and potentially others).

21. To get to the point of making a decision to rerun an election, State Defendants (among others, perhaps) would first need to know how many voters discovered a problem when verifying their ballots. As Dr. Gilbert points out, the number of spoiled BMD ballots provides an upper bound on the number of voters who discovered and corrected an error (¶ 12). He does not say how many spoiled ballots there actually were in November 2020. If State Defendants knew the number was less than 832, they likely would have shared this fact with Dr. Gilbert, and he would have stated it in his report. It is reasonable to infer that either there were more than 832 spoiled ballots (and the attack is plausible) or State Defendants *do not know* how many BMD ballots were spoiled during the election, eight months later, despite

what Dr. Gilbert acknowledges those ballots would suggest about the reliability of the election.

22. That State Defendants may not know this information is consistent with gaps in other important election data that Georgia counties report to the Secretary of State. State Defendants recently produced electronic data (election projects) that I understand were required to be returned to them by counties after the November 2020 and January 2021 elections. In both elections, a large fraction of counties failed to return any data, returned the wrong data, or omitted data necessary for assessing the security and integrity of the result, such as election databases or ballot images. More than six months after these elections, the Secretary of State has not been able to assemble these electronic records and has not indicated any effort or willingness to do so. Yet the only way that State Defendants could use the number of spoiled ballots as a defense against BMD-based cheating would be if the poll workers accurately tracked it, counties accurately aggregated it, and the Secretary's Office received such data from across the state before the election result was determined. Even then, it is unlikely that the Secretary would be prepared to react by *rerunning the election* if the number of spoiled ballots exceeded the number predicted in an outcome-changing attack.

23. Given the ineffectiveness of such defenses and the critical security problems in Georgia's BMDs, I (like Dr. Appel) recommend that BMDs be reserved for voters who need or request them, as is the case in most states. Dr. Gilbert responds by claiming, without evidence, that "[d]isabled voters are even less likely to identify an error on their printed ballot" (¶ 14). I am unaware of any study that supports this sweeping indictment of voters with disabilities, which encompasses a vast array of disabilities that would not impact the ability of the voter to identify an error on their printed ballot in any way. He also contends that blind voters cannot detect errors on their ballot at all, but this is not true. Many blind voters use assistive technology to read printed text and likely could do so to verify their ballots. Moreover, only some voters who need BMDs are blind. For instance, those with motor impairments that prevent them from marking a ballot by hand would not necessarily have any greater difficulty verifying the printed text than any other voter. In any case, if BMDs are used primarily by voters with disabilities (as in most jurisdictions that use BMDs), they will represent a *much* smaller target,[7] and an

---

[7] Although Dr. Gilbert cites a figure that would imply that 10% of Georgians who voted in 2020 were disabled, data from Maryland, where BMDs are available upon request, suggests that only about 1.8% of voters would request to use BMDs if they were offered a hand-marked ballot first. (*Halderman decl.*, Aug. 19, 2020, Dkt. 785-2 at 49.) Dr. Gilbert's citation to the number of all Georgia voters with disabilities is highly misleading since, again, very few of those voters would be

outcome-changing attack on any given election will be detectable with a much lower rate of voter error detection than when all in-person voters use BMDs as they do in Georgia today. This in turn creates a strong disincentive for bad actors to attempt hacking an election (the risk likely is not worth the reward when the outcome is highly unlikely to be changed), which means individual votes would be less likely to be altered by hacking.

24. In his only direct response to my expert report, Dr. Gilbert states that he is not aware that I have "provided equipment marred by 'undetectable' hacks to any other independent researcher" (¶ 15).[8] This is a curious and ironic criticism coming from Dr. Gilbert, since he evidently chose not to evaluate my findings through an examination of the voting equipment himself, which he does not explain. Moreover, Dr. Gilbert misreads my report. It does not claim that malicious software infecting a BMD would be undiscoverable by any possible means. If an individual BMD is

---

unable to vote on a hand-marked paper ballot, consistent with the number reported in Maryland.

[8] Dr. Gilbert ignores that, as I understand it, State Defendants have objected to my report and the underlying work being shared with third parties (except Dominion), including other independent researchers, with whom I am eager to share my work for review. I am confident in my findings and believe they should be shared promptly with appropriate election security researchers and officials in an effort to mitigate the critical vulnerabilities in Georgia's voting equipment that I describe. I invite Dr. Gilbert to join me in seeking State Defendants' consent to do that.

*known* to contain malware, there will likely be some level of detailed forensic scrutiny that can detect where the malware is, perhaps requiring months of expert analysis per machine at extraordinary expense. It would be completely infeasible to perform this level of analysis on every machine before every election, much less between an election and the deadline for certification of its results. (And after manipulating ballots, malware could remove all traces of its presence from a machine, defeating any possible post-election examination of the device.) What my report shows is that vote-stealing malware of the type I have constructed would not be detected by any of the defenses that State Defendants purport to practice. I describe in detail how such malware would defeat QR code authentication, logic and accuracy testing, on-screen hash validation, and external APK validation (as was used by Pro V&V after the November election). Dr. Gilbert offers no rebuttal to these findings. He does not dispute them or even address them.

25. Moreover, there is already an example of an "undetectable" attack entered into testimony: exploitation of the Drupal vulnerability discovered by Logan Lamb in the Center for Election Systems server. As Lamb attested, the developers of the primary tool for detecting this vulnerability stated that "[n]either [the defensive tool] nor an expert can guarantee a website has *not* been compromised. They can only

confirm with certainty a website *has* been compromised."[9] Furthermore, the Drupal developers state that any server running the vulnerable software after the initial disclosure of the vulnerability should be assumed to have been compromised unless it was patched within *hours* of disclosure. According to the timeline presented in Lamb's declaration, he found the KSU server to be in a vulnerable state on August 28, 2016, nearly two years after the initial announcement of the critical vulnerability (October 15, 2014).[10] The KSU server image also contains evidence that a second vulnerability, the so-called Shellshock flaw, was exploited on December 2, 2014.[11] This vulnerability was publicly disclosed more than two months earlier and widely publicized in the media as a critical vulnerability, yet the KSU server remained unpatched.

26. An attacker who compromised the KSU server could therefore have maintained undetected access to the compromised server. Since the server remained in a vulnerable state undetected for almost two years, it is highly likely that it was successfully attacked at some point in time. An attacker who did so would have been able to move laterally to other systems within the CES network and to other

---

[9] *Lamb decl.*, Dkt. 258-1 at 19.
[10] See "Drupal Core - Highly Critical - Public Service announcement" (Oct. 29, 2014), available at https://www.drupal.org/PSA-2014-003.
[11] *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 23.

components of Georgia's voting system. As I have previously pointed out, many election system components that could have been compromised in this way are still in use in Georgia today, where they provide a means by which attackers could spread vote-stealing malware to the BMDs.

27. Rather than address the many threats to Georgia's voting system. Dr. Gilbert persists in drawing illogical comparisons between BMDs and hand-marked paper ballots. For instance, he questions why Plaintiffs have presented no research "regarding voters' proclivity to review [hand-marked paper ballots] to ensure their ballots are marked and will count as intended" (¶ 8). Much like Dr. Gilbert's earlier testimony that "[i]n essence, a BMD is nothing more than an ink pen,"[12] one does not need expertise in election security to find fault with this reasoning. Preventing voters from making accidental mistakes is a completely different problem from preventing their selections from being deliberately and systematically changed by an attacker who has compromised the BMDs. There is abundant evidence that voters do sometimes make errors whether filling out a ballot by hand or by machine. Bad ballot design exacerbates this problem with both voting modalities, but following ballot design best practices can greatly reduce it. Both

[12] *Gilbert decl.*, Dkt. No. 658-3 at 60.

BMDs and scanners that count hand-marked ballots can also be configured to reject overvotes and to warn voters about undervotes, the most common kinds of voter errors. Moreover, unlike older technologies for counting hand-marked ballots, the scanners used in Georgia (when properly configured) can detect improperly or incompletely marked bubbles and present them to human operators to adjudicate whether the marks should count as votes. Election officials can use all of these options to help protect voters from their own mistakes, but none of them offers protection against a BMD that deliberately changes the selections printed on a voter's ballot (or those encoded in the ballot barcode). The central problem with Georgia's highly vulnerable BMD system—that attackers can change all records of the voter's intent without being detected by election officials—has no parallel in a hand-marked paper ballot system.

28. Dr. Gilbert concludes as he started, with vague and sweeping generalities. "Simply put, BMD elections systems are no more insecure than [hand-marked] systems" (¶ 16). It is unclear whether he is claiming that *all* BMD systems are at least as secure as all hand-marked systems or merely that some specific BMD system (such as the one he recently developed himself to address some of the reliability problems that exist with Georgia's BMDs) is at least as secure as some hand-marked system, but this is of little consequence. The only BMD system that is

relevant here is the Dominion ICX as used in Georgia. As my expert report details, Georgia's BMD system suffers from numerous, severe vulnerabilities. These vulnerabilities would have little potential to change election outcomes if use of BMDs were limited to voters who need or request them, as Curling Plaintiffs desire, and they would be far less likely to affect the personal votes of individual Georgia voters.

**Reply to Declarations of Dr. Benjamin Adida**

29. The declarations by Dr. Adida that State Defendants have submitted predate my expert report, so Dr. Adida's opinions are not informed by the critical vulnerabilities in Georgia's BMD equipment that my analysis has revealed or by anything else in my lengthy, detailed report. Nor are they informed by any events that occurred in the year since he first provided these declarations, such as any aspect of the November 2020 election in Georgia or the Secretary of State's study indicating that few voters verified their respective ballots in that election.

30. Nevertheless, Dr. Adida's first declaration is correct that "Running a risk-limiting audit is one of the most important advances states can take in improving election integrity—without an RLA, we are effectively trusting computerized scanners to count our paper ballots" (Dkt. 834-2 at ¶ 5). This is true, but, as my expert report shows, without a risk-limiting audit Georgia is also trusting its critically

vulnerable BMDs to generate ballots with QR codes that correctly reflect voters' selections. Obviously compromised BMDs and compromised scanners could change individual votes and election outcomes. But again, nothing suggests that Georgia's scanners suffer from such easily exploitable critical vulnerabilities as the BMDs do.

31. Dr. Adida and I also agree that RLAs are important for discovering whether compromised BMDs have manipulated enough ballot QR codes to change the outcome of an election (¶ 12). Although RLAs are, as Dr. Adida says, "of the utmost importance" (¶ 6), Georgia does not require an RLA in the vast majority of elections and the vast majority of contests, leaving both election outcomes and individual voters' votes susceptible to manipulation via BMD malware. Additionally, it is insufficient for states to merely (in Dr. Adida's words) "take meaningful steps to implement RLAs"; rather, states have to *actually conduct* reliable RLAs, which Georgia does not intend to do for the vast majority of its elections (or perhaps any of its elections, depending on the reliability of the audit procedures it implements).

32. In his second declaration, Dr. Adida refers to a "dispute amongst academics regarding whether voters verify their ballots using ballot-marking devices" (Dkt. 912-1 at ¶ 11). This statement reflects a misunderstanding of the state of research today. I am not aware of any scientific research that supports the proposition that Georgia voters would likely detect more than a small fraction of

errors caused by BMD malware. In contrast, the past two years have seen a wave of laboratory studies and multiple field observation studies addressing this question, all of which strongly indicate the opposite, that few voters carefully review their ballots and so the vast majority of errors caused by BMD malware would likely to go undiscovered and uncorrected. Although there once was uncertainty about whether most voters carefully verify their BMD ballots, there is no longer any serious scientific dispute that they do not. It is the hallmark of good science (and of good public policy) that it evolves based on new evidence, such as the University of Georgia study commissioned by the Secretary of State that I discussed above—which Dr. Adida has not addressed.

33. Georgia's election system needs to evolve as well. Due to the critical vulnerabilities in Georgia's BMDs that are described in my expert report, Georgia voters face an extreme risk that BMD-based attacks could manipulate their individual votes and alter election outcomes. Even in the rare contests for which the State requires a risk-limiting audit, the scientific evidence about voter verification shows that attackers who compromise the BMDs could likely change individual votes and even the winner of a close race without detection. Georgia can eliminate or greatly mitigate these risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving

BMDs for voters who need or request them. Absent security improvements such as this, it is my opinion that Georgia's voting system does not satisfy accepted security standards. Neither Dr. Gilbert nor Dr. Adida offers a contrary opinion in their respective declarations, instead ignoring the critical issue of whether the *voting system used in Georgia*—which neither claims to have examined—reliably protects the right to vote for individual Georgia voters.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 2nd day of August, 2021 in Rushland, Pennsylvania.

J. ALEX HALDERMAN

# APPENDIX P-3

Declaration of Shawn Smith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Kari Lake, *et al.*,<br>Plaintiffs,<br>v.<br>Katie Hobbs, Arizona Secretary of State, *et al.*,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:22-cv-00677-JJT |

**Declaration of Shawn A. Smith**

I, SHAWN A. SMITH, declare under penalty of perjury that the following is true and correct:

1. I have personal knowledge of the matters set forth below and could and would testify competently to them if called upon to do so.

2. My name is Shawn A. Smith. I am a retired military officer. I have Master's degrees in National Security Affairs from the Naval Postgraduate School and in Aeronautical Science from Embry-Riddle Aeronautical University. I have held an active Top Secret security clearance since 1992 and have been cleared for Sensitive Compartmented Information since 1996.

3. My military occupational specialty was space and missile operations, and I have extensive experience over 25+ years of active duty service in operating, specifying requirements for, planning the procurement of, training, testing, and commanding the employment of complex, computer-based military weapon systems.

4. My military service included significant experience in Special Technical Operations, involving advanced technology, at every level from tactical employment through operational planning, national-level policy, Presidential tasking, and requirements definition and procurement of future sensitive capabilities. I have

conceived, and advised agencies within the United States Government on, opportunities and technical approaches for supply chain compromise to affect foreign adversaries' ability to wage war against the United States, and to benefit United States national security.

5. My final active duty assignment prior to retirement in 2017 was for four years as the Senior Military Evaluator for Space and Intelligence, Surveillance, and Reconnaissance systems in the office of the Director, Operational Test & Evaluation, under the Office of the Secretary of Defense. In that role, I was responsible to execute the Director's oversight of operational testing of all non-satellite communications space systems in the Department of Defense, including the Global Positioning System, the Space-Based Infrared System, the Space Fence, the Geosynchronous Space Situational Awareness Program, and many others. Execution of that oversight required subject-matter expertise in the space domain, in the technologies involved in each system, in Scientific Test and Analysis Techniques to determine adequate and efficient test designs, and in the threat capabilities and modus operandi of foreign nation states, with respect to U.S. national security.

6. After retirement, I continued to support the Director, Operational Test & Evaluation as a consultant to adversarial assessment project teams which reviewed the results of cyber threat conduct against U.S. governmental and non-governmental national security targets by foreign adversaries, drew conclusions about the risks and impacts of that conduct, and wrote recommendations for responsive and preventive changes in technology, force structure, and defense policy, which the Director provided under his signature to the heads of the military Departments, the Secretary of Defense, and the President of the United States.

7. I have been asked to testify about the threat of supply chain compromise and attack to U.S. national security systems and critical infrastructure, in particular to election-related systems, including voting systems and, consequently, to elections. This

declaration will define and describe supply chain compromise threats, provide examples, explain that they have become pervasive and sophisticated, affecting and placing at risk the supply chain for U.S. computer systems and components, and explain the consequent ramifications for and vulnerability of U.S. election and voting systems. The information presented is unclassified and based upon my personal experiences, publicly available reporting, studies, events, incidents, policy, and de-classified U.S. Government information.

8. Given my background, experience, education, and training, and now my exposure to and understanding of the technology employed in U.S. election systems, my conclusion is that U.S. elections are critically vulnerable to exploitation by foreign adversaries through supply chain compromise of our computerized election systems.

9. Although elements of the U.S. Government appear keenly aware of the risk of supply chain compromise to our critical systems, that awareness does not appear to extend to any agency responsible for the procurement, security, certification, or use of election and voting systems, nor to imbue them with any capacity to respond effectively. Whether or not they are aware, their conduct reflects no defensive adaptation or response to that risk to protect the security and integrity of U.S. election systems or the elections using them. Given the proliferation of supply chain threats and the origin of so many attacks with deliberate, well-funded, large-scale, targeted foreign nation governmental programs, the near-universal foreign sourcing of our computers and computer components, and this lack of awareness and/or response in agencies responsible for U.S. election and voting systems, it is highly likely that numerous supply chain compromises have already been introduced to our election and voting systems and it is improbable and unwarranted to assume those compromises have not been introduced.

10. In fact, targeting U.S. voting and election systems must be an extraordinarily high priority for foreign powers; it is inconceivable that, given the opportunity, foreign

powers would not have taken the opportunity to exercise control or influence over U.S. elections, elected leadership, and thus U.S. foreign and domestic policy through supply chain attacks on U.S. election systems.

11. A "supply chain" is the aggregate of organizations, activities, people, and resources required to produce and provide a service or product. With respect to national security computer and communication systems and critical infrastructure, including election-related and voting systems, the supply chain includes computer hardware, hardware components, software, and firmware, as well as mechanisms for delivery of services, updates, modifications, and maintenance of those aggregate devices and networks comprised of or including that hardware, software, and firmware.

12. A "supply chain compromise" or "supply chain attack" (used interchangeably, throughout, though a compromise is technically one potential outcome or result from an attack) is the deliberate introduction of flaws, covert access or functionality, malicious code, and other undesirable attributes into a product or service, without the knowledge of the consumer or customer intended to receive or use the product or service, in the supply chain lifecycle of the product or service. A compromise or attack can be intended to make a device, network, or service unreliable, accessible to unauthorized parties, or to fail or behave differently when locally or remotely commanded, or when triggered autonomously by singular conditions or combinations of criteria (such as time, system state, user state, geolocation, etc.).

13. For integrated circuits (also known as "computer chips," such as the central processing unit (CPU) of a computer workstation or server), components, and computing systems, the "supply chain lifecycle" stages include "1. Conceptual, 2. Design, 3. Integration, 4. Fabrication, 5. Testing, 6. Provisioning, and 7. Deployment," and there are methods and types of attack unique or common to each of those stages. Of those stages, the Manufacturing stage is subject to the greatest variety of attack methods, including Insider Threats, Trojan Circuitry, Trojan Components, Design Alterations,

Component Replacement, Reverse Engineering, Unauthorized Disclosure, and Attacks on Design Networks.[1] According to MITRE,[2] "supply chain compromise can take place at any stage of the supply chain including: Manipulation of development tools, Manipulation of a development environment, Manipulation of source code repositories (public or private), Manipulation of source code in open-source dependencies, Manipulation of software update/distribution mechanisms, Compromised/infected system images (multiple cases of removable media infected at the factory), Replacement of legitimate software with modified versions, Sales of modified/counterfeit products to legitimate distributors, and Shipment interdiction."[3] MITRE's 2013 "Supply Chain Attack Framework and Attack Patterns" Technical Report identified 89 different attacks across and specific to the acquisition and lifecycle phases for national security systems, with all but 22 of those attacks applicable to phases prior to operational use and support.[4]

14. Supply chain compromise is no longer a hypothetical risk; it is pervasive, sophisticated, and widespread, and the most urgent, important question is not whether our computer systems are at risk of supply chain attack, but what is the precise extent of undetected supply chain attack. A 2018 global software supply chain survey reported that 66% of senior information technology (IT) decision-makers and security professionals had experienced a software supply chain attack.[5] By 2021, 93% of

---

[1] https://www.intel.com/content/dam/www/public/us/en/documents/white-papers/supply-chain-threats-v1.pdf

[2] MITRE is a Federally-funded research and development center which operates, among other centers, the National Cybersecurity FFRDC (NCF), sponsored by the National Institute of Standards, advising the Federal government on cybersecurity threats and mitigation.

[3] https://attack.mitre.org/techniques/T1195/.

[4] https://www.mitre.org/sites/default/files/publications/supply-chain-attack-framework-14-0228.pdf

[5] https://www.crowdstrike.com/resources/wp-content/brochures/pr/CrowdStrike-Security-Supply-Chain.pdf

companies surveyed had suffered a cybersecurity supply chain breach, and 97% of companies had been negatively impacted by cybersecurity breaches in their supply chain.[6] Supply chain attack is so pervasive that it must be assumed to threaten and affect all computers, computer components, hardware with embedded electronics, software, and firmware, to the extent that any aspect of them is accessible, at any time in their lifecycle from conception through end-of-life, to malicious or self-interested domestic or non-governmental actors but especially to foreign nation states and their agents.

15. A 2020 National Counterintelligence and Security Center report stated: "The exploitation of key supply chains by foreign adversaries—especially when executed in concert with cyber intrusions and insider threat activities—represents a complex and growing threat to strategically important U.S. economic sectors and critical infrastructure. Foreign adversaries are attempting to access our nation's key supply chains at multiple points—from concept to design, manufacture, integration, deployment, and maintenance—by inserting malware into important information technology networks and communications systems. The increasing reliance on foreign-owned or controlled hardware, software, or services as well as the proliferation of networking technologies, including those associated with the Internet of Things, creates vulnerabilities in our nation's supply chains. By exploiting these vulnerabilities, foreign adversaries could compromise the integrity, trustworthiness, and authenticity of products and services that underpin government and American industry, or even subvert and disrupt critical networks and systems, operations, products, and weapons platforms in a time of crisis."[7]

---

[6] https://www.bluevoyant.com/resources/managing-cyber-risk-across-the-extended-vendor-ecosystem/

[7] National Counterintelligence and Security Center, "Supply Chain Risk Management: Reducing Threats to Key U.S. Supply Chains," 20200925, at:

16. The National Institute of Standards and Technology's (NIST) Information Technology Laboratory (ITL) discussed the risk of information and communications technology (ICT) supply chain attacks in a June, 2015 publication, stating:

"Without effective security processes and practices throughout the life cycle of a system, intentional and unintentional vulnerabilities can be placed into systems. The systems may then be exploited by attackers who insert malicious content, capture data, or take other advantages, resulting in untrustworthy products or services, unanticipated failure rates, or compromise of federal missions and information."[8]

17. The Office of the Director of National Intelligence agreed, in a 2021 report: "Global trends indicate supply chain risk management is becoming one of the most prevalent areas of cybersecurity vulnerability. The increasing volume and scale of supply chain compromises and rapid advancement of technology makes standardizing a Supply Chain Risk Management (SCRM) practice crucial for organizations to protect against current supply chain threats and prepare for the future."[9]

18. The Department of Commerce (DoC) is similarly aware; in 2021, the DoC's Office of the Inspector General (OIG) stated, in a report on FirstNet Authority's management of security for the Nationwide Public Safety Broadband Network (NPSBN) that "Cyber threats to critical infrastructure, such as the NPSBN, pose a significant risk for 'wide scale or high-consequence events' that could harm or disrupt services essential to U.S. economy, business, and communities." The OIG asked MITRE to assess NPSBN security risks and MITRE concluded "The NPSBN security architecture may be susceptible to supply chain attacks due to FirstNet Authority's inability to validate AT&T's Supply Chain

---

https://www.dni.gov/files/NCSC/documents/supplychain/20200925-NCSC-Supply-Chain-Risk-Management-tri-fold.pdf

[8] https://csrc.nist.gov/CSRC/media/Publications/Shared/documents/itl-bulletin/itlbul2015-06.pdf

[9] Office of DNI, April 2021, Annual Threat Assessment of the U.S. Intelligence Community, and Homeland Security, October 2020, Homeland Threat Assessment

Risk Management (SCRM)," because "FirstNet had not performed supply chain risk assessment" for NPSBN since its inception in 2017 and "Consequently...has limited visibility into the NPSBN supply chain and is not fully aware of the level of risk it has taken on."[10]

19. The supply chain threat against computers, computer components, computer networks, and computer-enabled systems and infrastructure is particularly dire, for several reasons. In the first place, the U.S. no longer manufactures the majority of computer chips or hardware it uses. While in 1990 the U.S. manufactured 37% of the world's semiconductors, or computer chips, by 2019 the U.S. made just 12% of world semiconductors and 8% of U.S. computing hardware, and those numbers have continued to fall.[11] Many of the computer chips and hardware in use in the U.S. may be designed in the U.S., but those designed components and devices are then manufactured, tested, integrated and configured mostly overseas, using foreign raw materials and foreign labor, with little to no U.S. government oversight to ensure that no supply chain compromise occurs. The People's Republic of China (PRC), in particular, is estimated to manufacture about 70% of U.S. mobile phones[12] and 90% of the world's personal computers,[13] and the PRC is the primary source for U.S. computer imports.[14] Secondly, the convergence of exponentially-increased computer complexity, power, and miniaturization and the meteoric increase and ubiquity of embedded computers in

---

[10] https://www.oversight.gov/report/DOC/FirstNet-Authority-Must-Increase-Governance-and-Oversight-Ensure-NPSBN-Security

[11] https://www.semiconductors.org/wp-content/uploads/2020/09/Government-Incentives-and-US-Competitiveness-in-Semiconductor-Manufacturing-Sep-2020.pdf

[12] https://www.androidauthority.com/70-percent-us-smartphones-made-in-china-1146888/

[13] https://archive.ph/2i0ur

[14] The U.S. imports three times as many computers from the PRC as the U.S. exports, total, to all countries. https://oec.world/en/profile/bilateral-product/computers/reporter/usa

connected and connectable devices, from smartphones to appliances to industrial control systems to vehicles to wearable electronics ensures that the opportunities for malicious actors to reach and compromise targeted systems and networks proliferate at a scale unmatched *and unmatchable* by U.S. governmental and private industry detection and defensive capability.

20. The supply chain threat for critical computer-based infrastructure is so severe and extensive that the computer networks of the Cybersecurity and Infrastructure Security Agency (CISA), the very U.S. government institution responsible for critical infrastructure security, were compromised by software supply chain attacks in 2020, the SolarWinds SUNBURST[15] and SUPERNOVA[16] attacks, for ten months or more without detection and, even then, that compromise only became known to CISA due to the intervention of a private company.[17] It may be true that CISA successfully defended its own networks and other critical U.S. infrastructure against many, or most attacks, but that possibility is irrelevant under conditions in which a single successful attack means failure or catastrophe. This is the threat environment for computer-based critical infrastructure, and the offense has the advantage- perhaps permanently.

21. In light of CISA's inability to defend even its own computer systems from nation-state-level supply chain attacks from March through December 2020, little credence can be given to CISA's July 2020 declaration that the 2020 election would "be the most secure election in modern history,"[18] and its declaration in November 2020 that the 2020 election was the "most secure in American history."[19] Many public officials and media have repeated and cited those claims as rationale for their own confidence in

---

[15] https://www.cisa.gov/uscert/ncas/alerts/aa20-352a
[16] https://www.cisa.gov/uscert/ncas/analysis-reports/ar21-112a
[17] https://www.mandiant.com/resources/sunburst-additional-technical-details
[18] https://www.meritalk.com/articles/krebs-says-2020-will-be-the-most-secure-election-yet-still-recommends-backup-paper-ballots/
[19] https://www.youtube.com/watch?v=YzBJJ1sxtEA

election security, and for their unwillingness to undertake or support independent investigation.

22. For the public and for public officials such as state and local election officials, to whom much of the computer technology intertwined in the fabric of our society, including carelessly so in our election and voting systems, is sufficiently complex to be incomprehensible, the claims made by officials such as CISA's head and their repetition by trusted institutions and media impede public awareness, and thus, adequate public and governmental response to the supply chain threat.

23. Because the SolarWinds supply chain attack is relatively well-known to the public,[20] it is most unusual and most distinguished from other supply chain attacks by that very fact. Most such attacks are never brought to the public's attention. Other recent significant supply chain attacks largely unknown to the public include the insertion of malware into the software utilities on USB flash drives included with solar electric monitoring devices in widespread use,[21] the insertion of malware into the USB flash drives included with IBM network storage systems,[22] the insertion of keylogger[23] malware into the installation files of personal computer utility software in widespread

---

[20] Not that the public necessarily understands what happened in the attack, but the term "Solarwinds" is familiar enough that members of the public with no computer or cyber expertise may be able to associate the term with "hacking."

[21] https://download.schneider-electric.com/files?p_enDocType=Technical+leaflet&p_File_Name=SESN-2018-236-01+Conext+USB+Malware.pdf&p_Doc_Ref=SESN-2018-236-01

[22] https://www.ibm.com/support/pages/storwize-usb-initialization-tool-may-contain-malicious-code

[23] A keylogger records the keystrokes on victims' computers, and relays the keystrokes to the perpetrators, thereby allowing the perpetrator to, e.g., obtain victim username and passwords and access the victims' sensitive accounts and information. Keyloggers may be introduced through hardware, such as USB device, cable, and keyboard keyloggers, introduced by vendors in the supply chain or by interdiction of shipments.

use,[24] insertion of malicious code in a JavaScript module which was being downloaded by approximately two million victims per week,[25] a series of eight different zero-day vulnerability attacks executed by Chinese hackers against Google, Adobe, and Microsoft services and infrastructure, using 18 different command and control servers,[26] and the reported compromise of U.S. company Super Micro's PRC-manufactured motherboards through covert insertion of hardware during the manufacturing, integration, or shipping phase, affecting U.S. companies including Amazon and Apple,[27] which Super Micro has denied and has denied is possible.[28] Seventeen individuals, including 6 former senior national security officials, have confirmed the Super Micro supply chain compromise occurred, and security researchers have demonstrated it is possible.[29] If true, the Super Micro compromise would have affected not only Amazon and Apple, but dozens of other companies, and potentially U.S. military warships, the Department of Homeland Security, and both houses of Congress.[30]

24. The Super Micro attack reflects an instructive pattern:

a. a U.S. company, products of which are manufactured overseas, in the PRC, and used by other U.S. companies and government agencies;

---

24 https://blog.avast.com/new-investigations-in-ccleaner-incident-point-to-a-possible-third-stage-that-had-keylogger-capacities

25 https://www.trendmicro.com/vinfo/dk/security/news/cybercrime-and-digital-threats/hacker-infects-node-js-package-to-steal-from-bitcoin-wallets

26 https://web.archive.org/web/20190717233006/http://www.symantec.com/content/en/us/enterprise/media/ security_response/whitepapers/the-elderwood-project.pdf

27 https://archive.ph/2i0ur

28 https://www.cyberscoop.com/supermicro-bloomberg-big-hack-investigation-no-tampering/

29 https://securityledger.com/2019/01/more-questions-as-expert-recreates-chinese-super-micro-hardware-hack/

30 https://archive.ph/2i0ur

b. an emerging report that the products may be compromised through supply-chain hardware and/or software insertion attacks;

c. denial by both the company and its customers that any compromise has occurred or is possible, in particular because of the company's and customers' procedural or technical "safeguards;" and

d. independent expert investigation demonstrating that the compromise is possible, or that it has, in fact, occurred.

25. The first public reporting on the alleged Super Micro supply chain compromise was in October, 2018, but the attack itself took place years earlier and was reportedly first detected by a private company and reported to the Federal government in 2015. The Federal government reportedly chose to notify only "a small number of important Supermicro customers."[31] The public, whose data and services and lives and businesses would have been dependent on the integrity of those companies' and institutions' Super Micro-equipped infrastructure, was left vulnerable.

26. Part of the reason for the public's lack of awareness of the severity and pervasiveness of supply chain compromise threats is that malicious cyber activity is commonly portrayed in media as a real-time or near-real-time function of opportunistic "hackers," which are usually presented as some malicious non-governmental organization or individual hobbyist. In fact, the most severe threat posed to computer systems, including all computer-enabled and –embedded systems[32] are nation state-operated or –sponsored advanced persistent threat (APT) groups.

---

[31] https://archive.ph/2i0ur

[32] Most people don't think of a power plant or a passenger aircraft as a computer, but all modern utility-scale power plants and passenger aircraft are, to some extent if not fully, computer-controlled. The threshold at which those become not, e.g. an "airplane with computers" but a "computer which flies" is not clear, but certainly when most or all critical functions for the vehicle, facility, or process are controlled by or must have the reliable operation of computers to function, the facility or vehicle must be

27. MITRE has identified over 120 sophisticated cyber threat groups in unclassified publications, including 18 named and dozens of other probable APTs.[33] There may well be more threat groups, including APTs, identified in classified fora and publications. Publicly known APTs include Iranian, North Korean, and other foreign nations' cyber threat teams, but primarily the APTs are associated with one of two countries: Russia and the PRC, and the number of PRC APTs far exceeds the number of Russian APTs.

28. What distinguishes APTs from the popular cultural portrayal and public misconception of the cyber threat as comprised of real-time/near-real-time "hackers," is that the APTs are organizations composed of multiple, sometimes hundreds or thousands, of state-trained, state-sponsored cyber experts engaged in deliberate years- and decades-long campaigns to not only discover and exploit vulnerabilities in targeted institutions and systems, but to create those vulnerabilities. The APTs are not merely opportunistic actors, finding the occasional misconfiguration which allows access to a system discovered or targeted in real-time, but sophisticated, methodical creators of vulnerability which may employ 25 or more distinct, known attack techniques against a single target,[34] creating novel attacks and tools tailored to their targets or to leverage vulnerabilities they have installed in hardware and software they and affiliates have compromised through supply chain attacks.

29. Mandiant, the same company that discovered and reported the SolarWinds supply-chain attack in 2020, after it had been operating undetected on CISA's networks for ten months, also released a detailed public report in 2013 on the PRC's APT1.

---

considered, for cyber-defensive purposes, to actually BE a computer. In fact, former United States Air Force Chief of Staff, General David Goldfein, has been quoted as describing the F-35, Joint Strike Fighter, as "a computer that happens to fly." https://breakingdefense.com/2018/04/a-computer-that-happens-to-fly-usaf-raf-chiefs-on-multi-domain-future/

[33] https://attack.mitre.org/groups/

[34] https://businessinsights.bitdefender.com/chinese-apt-targeting-asian-government-institutions

Although that report was widely distributed in the cybersecurity community, posted or mentioned tens of thousands of times online, it remains largely unknown to the American public, and likely unknown to most public officials. Mandiant estimated that APT1, also known as Unit 61398 of the PRC's military (People's Liberation Army (PLA)), has manpower in the "hundreds, and perhaps thousands," including human resources functions sufficiently extensive and sophisticated to not only recruit top university graduates in cybersecurity and computer engineering, English linguistics, and software programming, but to groom them through recommended coursework. The report showed APT1, Unit 61398, as part of the PRC military's PLA General Staff Department (GSD) (akin to the U.S. Department of Defense's Joint Staff), occupying a compound that includes a 12-story headquarters, medical clinic, kindergarten, and guesthouses, with technical infrastructure partly equipped by China Telecom[35] for "national defense." APT1 resources include not only cyber operators, but linguists, open source researchers and partnerships with other PLA-controlled Bureaus and with research institutes within the Chinese Academy of Sciences.[36]

30. The 2013 Mandiant report showed APT1 targeting and compromising at least 141 organizations in the U.S. and other English-speaking western nations from 2006 through the end of 2012, including at least 16 organizations in the Information Technology sector, at least six organizations in the High-Tech Electronics sector, and 10 organizations in the Public Administration sector, which APT1 began to focus on in 2009,

---

[35] China Telecom Corp, LTD is a subsidiary of PRC state-owned China Telecommunications Corporation. It is the second largest wireless carrier in the PRC, with more subscribers than the entire U.S. population, and helps implement the PRC CCP's social credit/monitoring/conduct program. CTC was listed and traded on the NYSE and did business in the United States until delisted from the NYSE, prohibited from investment by U.S. entities, and prohibited from doing business in the U.S. in January, 2021, along with 34 other CCP-controlled parent companies and over 1,100 of their subsidiaries, by Executive Order 13959 of President Trump.

[36] http://www.mandiant.com/apt1

after spending at least three years compromising the Information Tech and High-Tech Electronics sectors.[37] The scale of this compromise, from one APT alone, is staggering. Mandiant reported that APT1 stole 6.5 terabytes of compressed intellectual property (IP) data from a single organization in a 10-month period.[38] When that 6.5 terabytes is uncompressed, it is roughly equivalent to the information contained in the 26 million books of the Library of Congress circa 2000.[39] APT1's resources were sufficient to compromise at least 17 new targets in 10 different industries in a single month in 2011. The cyberoperators themselves are not reading all the compromised, exfiltrated data; it is distributed to other APTs, and to state-owned and -controlled research institutes and corporations, to be studied for purposes from vulnerability exploitation to counterfeiting to contractual, political, and financial leverage.

31. One of the other APTs to which APT1 distributes exfiltrated, compromised, stolen IP data from U.S. companies and governmental and non-governmental organizations is APT17, a threat group specializing in supply-chain compromise, run by the PRC's Jinan Bureau of the Chinese Ministry of State Security (MSS).[40]

32. The MSS is responsible for foreign intelligence and counterintelligence operations, but is much more similar to the former Soviet KGB than to the U.S. CIA. Like the KGB and CIA, the MSS collects and analyzes information on foreign adversaries, from both open sources and espionage, and works with its nation's military intelligence services in a two-way exchange of information. Unlike the CIA, but like the KGB, the

---

[37] Ibid.

[38] http://160592857366.free.fr/joe/ebooks/ShareData/A%20Comparitive%20Study%20of%20Text%20Compression%20Algorithms.pdf

[39] https://www2.sims.berkeley.edu/research/projects/how-much-info/how-much-info.pdf#page=110

[40] https://www.cfr.org/cyber-operations/apt-17

MSS is as focused on what the KGB called "active measures,"[41] as on intelligence collection. For example, at the peak of KGB operations in the U.S., which the USSR and KGB had designated the "Main Enemy," the KGB had not only infiltrated and stolen technical and scientific information from the U.S. that enabled the USSR's ultimate development of nuclear weapons, but had also infiltrated the U.S. Departments of Treasury and State, the White House, and U.S. Congress, using those infiltrators to influence and change U.S. foreign and national security policy.[42]

33. The MSS, or its precursor known as the "Ministry of Public Security" (MPS),[43] infiltrated the U.S. Department of the Army during WWII, before the Department of Defense existed, and later the CIA, and some of that infiltration went undetected for four decades, passing critical information to the PRC, e.g. directly affecting Nixon's 1972 rapprochement with the PRC.[44] The Cox Report in 1999 concluded that the PRC, through MSS espionage targeting U.S. national laboratories over an approximately 20 year period, had "obtained at least basic design information on several modern U.S. nuclear reentry vehicles...a variety of U.S. weapon design concepts and weaponization features, including those of the neutron bomb."[45] In 2020, a former CIA officer was arrested for spying for the PRC's MSS from 2001 through 2020, in cooperation with a relative who

---

[41] "Active Measures" include not only disinformation and influence operations, but active subversion of both organizations, societies, governments, and discrete efforts (e.g., the Manhattan Project) to demoralize and undermine identified enemies, but also, importantly, sabotage. https://www.cia.gov/static/79ba0e7b5cfc2541728b7d646353fc13/active-measures-and-information-wars.pdf and "Active Measures, The Secret History of Disinformation and Political Warfare," Thomas Rid, Library of Congress ISBN: 978-0-374-28726-9

[42] https://thescholarship.ecu.edu/bitstream/handle/10342/6426/NCLA%20FSB%20KGB-Final.pdf?sequence=1

[43] "Ministry of Public Security" (MPS), before 1983; now largely separate; MSS merged the Central Investigation Department and MPS' counter-intelligence organization.

[44] https://www.courtlistener.com/opinion/506679/in-the-case-of-united-states-v-larry-wu-tai-chin-united-states-of-america/

[45] https://sgp.fas.org/news/dci042199.html

had been a CIA officer in the 1970s.[46] In each of these cases, the MSS' recruitment and use of infiltrators and technical collection against the U.S. were not discovered until long after the damage to U.S. national security had been done. These publicized incidents are a small subset of the total incidents discovered, and it can reasonably be assumed that discovered incidents are only a portion of total incidents.[47]

34. In 2020, the U.S. Department of Justice indicted five APT41 operatives who helped hack more than 100 U.S. companies, and the FBI was well-aware that the operatives were working for the MSS.[48,49] The FBI's and DOJ's public statements acknowledge APT41's supply chain attacks and association with the MSS.[50]

35. CISA has acknowledged, as early as October 2020, that APTs have targeted not only Federal government, but state, local, tribal, and territorial (SLTT) government, critical infrastructure, and elections organizations, including successful APT establishment of unauthorized access to election support systems.[51] With respect to that unauthorized access to election support systems, CISA stated "...however, CISA has

---

[46] https://www.justice.gov/opa/pr/former-cia-officer-arrested-and-charged-espionage

[47] MSS active measures in the U.S. are not often or deeply covered in U.S. media, and are therefore reduced or non-existent in the public awareness. For example, the MSS is also responsible for the recruitment of Senator Dianne Feinstein's long-time driver as an operative, as well as Fang Fang (aka Christine Fang), who reportedly had a romantic relationship with Representative Eric Swalwell and other government officials in the U.S., and who placed at least one intern in Swalwell's Congressional office.

[48] https://www.justice.gov/opa/press-release/file/1317206/download

[49] https://www.fbi.gov/wanted/cyber/china-mss-guangdong-state-security-department-hackers

[50] The inconsistency of US Government (USG) reporting and warnings on PRC APT groups is of some concern. Although MITRE's ATT&CK database information for APT41, et al, is unambiguous regarding APT41's campaign of supply chain attacks (https://attack.mitre.org/groups/G0096/), contemporaneous CISA alerts in the National Cyber Awareness System make no mention of APT41's supply-chain attack techniques (https://www.cisa.gov/uscert/ncas/alerts/aa22-131a)

[51] https://www.cisa.gov/uscert/ncas/alerts/aa20-283a

no evidence to date that integrity of elections data has been compromised,"[52] but CISA's credibility in their conclusion must be tempered by knowledge that this was during the same period that CISA was unaware that its own networks had been compromised.

36. Mandiant again reported on APT41 activity in March 2022, stating that systems, particularly internet-facing web applications, of at least six U.S. state governments had been attacked and compromised by APT41 over an eight month period in 2021 and 2022.

37. The above discussion covered only a subset of the activity of three of eighteen named APTs acknowledged in unclassified sources, among over 120 named, sophisticated cyber threat groups acknowledged in unclassified sources and engaged, relentlessly, in the development and exploitation of vulnerabilities in western, and particularly U.S., critical and national security systems. It is the tip of the iceberg. In the year 2000, the U.S. was dominant in cyber; now, due to foreign advances in capability, the off shoring of our electronics and computer manufacturing, our monumental expansion of dependence on computers and networked systems, and our naivety with respect to their vulnerability, we are vulnerable beyond comprehension. We face an offensive cyber juggernaut, and supply chain attacks are the most difficult of all threats, often impossible, to detect, prevent, and mitigate.

38. In a May 2022 Alert, CISA advised Managed Service Providers (MSP) and their customers, to mitigate the expected increased targeting of MSPs and their customers by APTs, to enable/improve monitoring and logging processes, enforce multifactor authentication, manage internal architecture risks and segregate internal networks, apply the principle of least privilege, deprecate obsolete accounts and infrastructure, apply updates, backup systems and data, develop and exercise incident response and

[52] Ibid.

recovery plans, understand and proactively manage supply chain risk, promote transparency, and manage account authentication and authorization.[53]

39. As applied to computerized voting systems, which fall under CISA's protective mandate, and for which voting system vendors function as MSPs with state and local public officials as "customers," CISA's alert is like advising the ordinary consumer to implement enterprise security policy changes on their personal electronics. Those public officials responsible for the voting systems have little idea what CISA's recommendations mean, and they lack the ability to implement CISA's recommendations. More importantly, the complexity of the devices means that the policy changes at best present a superficial veneer of increased security, like fresh paint over rust. With computerized systems, what is not secure from inception can never be secured.

40. The time-sensitive nature of elections, the exceedingly small windows of time for the public or candidates to gather facts and challenge election results, the strong incentives of public officials and related institutions to dismiss public concerns and queries, and the rarity and delay in public access to voting system monitoring and logging processes means that no satisfactory "incident response and recovery plan" for an election system compromised by a supply chain attack is possible.

41. Arrayed against the offensive cyber threat juggernaut, for elections, is an ecosystem of organizations led by a Federal agency, the U.S. Election Assistance Commission (EAC), the priorities of which are illustrated by the fact that it has devoted its resources to passing out named awards for "Creative and Original 'I Voted'

53 https://www.cisa.gov/uscert/ncas/alerts/aa22-131a

Stickers,"[54] but has only just now in 2022 pledged to add "Supply chain risk management and security testing" to voting system manufacturer agreements.[55]

42. The NIST is the technical body and agency identified in Title 52, U.S.C.[56] to advise the EAC, and NIST has repeatedly recommended,[57] at least as early as 2012,[58] to secure ICT against supply chain attacks. The EAC, however, has effectively provided no standards, procedures, or safeguards to implement those recommended protections for election systems and elections.[59] Many states use the Federal Election Commission's 2002 Voting System Standards (VSS) as their minimum statutory basis for certification of voting systems, but the VSS doesn't even mention supply chain security.

43. The VSS does not specify standards, procedures, or safeguards to protect election systems and elections against supply chain attacks, stating only that voting system vendors must "Ensure that components provided by external suppliers are free from damage or defect that could make them unsatisfactory for their intended purpose."[60] Nor do the EAC's first successor standards to the VSS, the 2005 Voluntary Voting System Guidelines (VVSG) mention or describe supply chain attack risks, or methods or

---

[54] U.S. Election Assistance Commission Chairman Donald Palmer, presentation "Updates – Colorado County Clerks Association," January 2022, obtained through Colorado Open Records Act.

[55] Ibid.

[56] https://www.law.cornell.edu/uscode/text/52/20971

[57] https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=918801

[58] https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=913338

[59] The EAC actually published a draft "Election Operations Assessment – Threat Trees and Matrices and Threat Instance Risk Analyzer (TIRA)" document in December, 2009, but the document was focused on taxonomy and methods of representing attack actions and scope, rather than on actionable mitigation of risk, leading to "recommended controls" for supply chain attack such as "establish chain of custody and system and services acquisition controls."

[60] https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

standards for mitigation in election systems.[61] The same is true for the 2015 VVSG Version 1.1. Nearly all certified voting systems in use in the United States have been certified to the 2015 or prior standards; i.e., the voting systems used in U.S. elections have no and have had no supply chain security, nor any testing or verification of that security.

44. U.S. voting methods have careened from manually-hand-counted paper ballots at the precinct-level to increasingly centralized mechanical, electro-mechanical, electronic, and now computer-based and completely computerized voting, with a relentless institutional pressure toward not only computerized, but remote and even mobile computerized voting. All while the institutions intended and required to safeguard and secure elections and elections systems lag further and further behind the event horizon beyond which they can neither understand nor control the technology involved, or the inherent risks in that architecture. An apt comparison would be like watching an organization and system of rules and standards built to regulate horse-drawn carriage safety failing to recognize its anachronism, and failing to adapt, in the face of ubiquitous internal-combustion engine automobile and jet turbine aircraft transportation.

45. The latest version of the VVSG,[62] Version 2.0 approved in February 2021, finally acknowledges supply chain risk management as a necessity, but treats the threat as if it can be mitigated by paperwork, the way vehicle speeds are "limited" by speed limit signs. These standards are barely better than the EAC's non-existent standards for electronic poll books, centralized statewide voter registration systems, and election auditing systems.

---

[61] https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.0_Volume_1.PDF

[62] https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf

46. These are the requirements of VVSG 2.0, Section 14.3-A, Supply chain risk management strategy: "The voting system's documentation must contain a supply chain risk management strategy that at minimum includes the following:

1. a reference to the to the template or standard used, if any, to develop the supply chain risk management strategy;
2. the assurance requirements to mitigate supply chain risks
3. the contract language that requires suppliers and partners to provide the appropriate information to meet the assurance requirements of the supply chain risk management strategy;
4. the plan for reviewing and auditing suppliers and partners; and
5. the response and recovery plan for a supply chain risk incident."

47. Accompanying the EAC's VVSG are a published set of "test assertions" for the VVSG, which are meant to translate each VVSG requirement into an unambiguous, specific, testable condition so that the Voting System Testing Lab (VSTL) may verify the conformance of a given voting system to the VVSG standard. Here's what the EAC's VVSG Test Assertions state for supply chain security of voting system components: "2.1.1-A – General build quality, ...TA211A-2: IF components from third-party suppliers are used for their intended purpose within the voting system, THEN the voting system manufacturer MUST ensure that third-party suppliers document the quality assurance procedures used to ensure components supplied from third parties are free from damage or defect."[63]

48. The correlating EAC Testing and Certification Program Manuals and VSTL Program Manuals intended to ensure that VSTLs are capable of properly testing voting systems to verify their conformance with VSS and VVSG, and that their tests ensure the security

---

63 https://www.eac.gov/sites/default/files/TestingCertification/VVSG_2_0_Test_Assertions_1_0.pdf

and integrity of voting systems, do not address supply chain attack threats or their mitigation or their assessment, at all. Instead, the program manuals and certification program requirements reflect an assumption that "commercially available models of general purpose information technology equipment" and "production models of special purpose information technology equipment," and "ancillary devices" can be trusted.[64] Security testing guidelines do not even require VSTLs to review the publicly available common vulnerabilities and exploits (see Appendix 3) associated with commercial hardware and software, and the latest VVSG requires only that: "The underlying system platform generally needs to be free of well-known vulnerabilities before certification, *unless the certification authority allows it*." (emphasis added). "Generally," "unless allowed" is not a standard that can reasonably be assumed to ensure voting system integrity; it is a loophole precisely as large as the standard, itself.

49. Eight years after Mandiant's 2013 report on APT1, six years after the NIST's 2015 warning about supply chain vulnerability and attack, and five years after the Department of Homeland Security declared election infrastructure to be "critical infrastructure" of the U.S.,[65] it is inexplicable that the EAC, responsible for security standards for voting systems, has yet to promulgate standards which reflect the advanced persistent threat against them and their supply chains. The EAC's standards of accreditation for VSTLs do not even ask, let alone require, awareness in the VSTLs of supply chain vulnerabilities in computerized voting systems, much less awareness or proficiency in the detection of supply chain compromises, or in their assessment of effective mitigation, where even possible, by voting system vendors.

50. For those, like myself, with experience in government office or working closely with government agencies in regulated, technically complex domains, the EAC's

[64] https://www.eac.gov/voting-equipment/manuals-and-forms

[65] https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical

immensely inadequate response is unsurprising and potentially attributable to two phenomena: bureaucracy and regulatory capture. Bureaucracy is merely a fact of life for any government enterprise; except in the most unusual, extraordinary, and rare circumstances, the government, particularly the Federal government, does not adapt well or quickly. Its organizations and agencies are often preoccupied by struggles over autonomy and funding, rather than focused on public interest. Consensus is more important than quality; constituency in power corridors is more important than service. These are truisms for anyone who has worked in or had more than incidental contact with governmental bureaucracy.

51. In this case, because the EAC is intended and authorized to provide a degree of regulation to the election industry, it is subject to and fully entangled in regulatory capture, which is the corruption of a regulatory authority and agency by sympathy toward and influence from the industry it is intended to regulate. In addition to the typical "revolving door" where individuals rotate directly from the election industry or associated non-profits in and out of EAC positions, one need look no further than the EAC's Technical Guidelines Development Committee (TGDC), an advisory body established by HAVA to "assist the (EAC) in the development of (VVSG)." Its fifteen appointed members include far more lawyers, politicians, public affairs, and psychology grads than computer scientists or software experts, at a 4:1 ratio, and those few computer scientists and software experts include, e.g., the director for software development at one of the largest U.S. voting system vendors. The American National Standards Institute (ANSI) representative is a public affairs specialist. The NIST representative and chair is a physicist.[66] This bodes ill for the likelihood of significant or influential cyber technical expertise shaping the technical guidelines for voting system

---

66 https://www.eac.gov/sites/default/files/tgdc/TGDC_Roster_as_of_October_18_2021.pdf

standards at the EAC and that is evident in TGDC's recommendations. Although the NIST Security and Transparency Subcommittee was recommending to the TGDC that no wireless devices be permitted on voting systems as early as 2006,[67] the TGDC in 2020 still recommended a "compromise position" with no prohibition on wireless devices for the latest, 2021 VVSG.[68] This "compromise" illustrates the pressure placed on a regulatory agency to acquiesce to the regulated industry's preference as opposed to fulfilling its charter, in this case, attempting to ensure the security of computerized voting systems.

52. Permitting wireless devices in computerized voting systems is irrational and indefensible in light of the known and persistent threats to those systems. The Federal government's Security Technical Implementation Guide (STIG), published in 2011, covering wireless systems requires removal of wireless radios from all computers used to transfer, receive, store, or process classified information,[69] stating "simply disabling the transmit capability is an inadequate solution." The fact that wireless capability has been allowed to continue in voting systems and the reasons for that compromise illustrate key effects which characterize and shape government regulation and conduct, broadly, and the security of election and voting systems, specifically. In particular, it is not only that EAC staff and advisors rotate in and out of the elections industry, so that they may develop affinity and sympathy which interfere with their effective action to secure voting systems. It is also that rapid advancement of technology and the inverse

---

67 https://www.nist.gov/system/files/documents/itl/vote/DraftWhitePaperOnWirelessInVVSG2007-20061120.pdf

68 https://www.eac.gov/sites/default/files/TestingCertification/VVSG_2_Dispelling_Misinformation.pdf

69 https://www.stigviewer.com/stig/final_draft_general_wireless_policy/2011-09-30/finding/V-19813

relationship of illiteracy in a domain to capacity to recognize that illiteracy, play a significant role failing to address such threats.

53. For example, in 2013, a computer security consultant presented a practical demonstration using an Android phone application he'd authored to remotely attack and take control of a commercial aircraft in flight, exploiting two common avionics information services, known as Automatic Dependent Surveillance-Broadcast (ADS-B) and Aircraft Communications Addressing and Reporting System (ACARS).[70] Back in 2010, the Federal Aviation Administration (FAA) had mandated that all aircraft, including commercial passenger aircraft, military fighter and transport aircraft, and even Air Force One, employ ADS-B in U.S. airspace.[71] ACARS is not mandated by the FAA, but is one of several aircraft data link systems approved for use in U.S. airspace, which allows operators to access particular airspace planning and operations features, critical for efficient operations.[72] ACARS use by U.S. commercial and military aircraft is widespread.

54. In 2016, the FAA used a joint Government-industry working group to develop recommendations to increase cybersecurity for aircraft systems; among its 30 recommendations was "detecting vulnerabilities in (ADS-B)"—the system that was shown three years earlier to be exploitable to help an attacker to take control of commercial aircraft in flight using a smartphone. Despite the demonstrated vulnerability, and despite the cybersecurity working group's recommendation, the vulnerability was not only not addressed, it was expanded through mandated ADS-B adoption.

55. In 2019, a computer security consultant firm presented their findings of critical exploitable vulnerabilities in the Boeing 787 which could include supply chain attack and

---

[70] https://www.helpnetsecurity.com/2013/04/10/hijacking-airplanes-with-an-android-phone/
[71] https://www.law.cornell.edu/cfr/text/14/91.225
[72] https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_90-117_(E-update).pdf

misuse of aircraft data link systems to take control of an aircraft, in flight.[73] In the same year, the Department of Transportation Inspector General noted that the FAA had still not implemented the ADS-B cybersecurity recommendation discussed above.[74] Despite the FAA having a cybersecurity testing and certification program[75] which is, by all appearances, significantly more capable and comprehensive than the EAC's regime for voting systems, and despite the FAA being well-aware of identified catastrophic cyber risks to in-flight aircraft, the FAA has not implemented the 2016 recommendations regarding ADS-B and aircraft data systems risks. A 2021 Government Accountability Office (GAO) report helps explain why; the FAA's Cybersecurity Steering Committee (CSC) receives technical reports and discusses vulnerabilities, but does not follow up or through.[76] The CSC members, as it turns out, have almost no practical cybersecurity experience, beyond program management and policy recommendations, leaving them unable to adequately assess and address, from a technical perspective, what is a credible and plausible, even urgent threat.[77] In other words, technical illiteracy suppresses recognition of technical risk; people have a blind spot for what they do not understand.

56. The EAC has demonstrated inadequate awareness, comprehension, and response to the clear and present danger posed by foreign nation states' supply chain attacks against the computers and components used in U.S. voting systems. It cannot be relied upon to protect U.S. elections by competently examining voting systems, prior to use,

---

73 https://i.blackhat.com/USA-19/Wednesday/us-19-Santamarta-Arm-IDA-And-Cross-Check-Reversing-The-787-Core-Network.pdf

74 https://www.oig.dot.gov/sites/default/files/FAA%20Cybersecurity%20Program%20Final%20Report%5E03.20.19.pdf

75 https://www.faa.gov/air_traffic/technology/cas/ct/

76 https://www.gao.gov/assets/gao-21-86.pdf

77 https://www.linkedin.com/pulse/cybersecurity-aviation-government-where-weve-been-we-today-natke/?trackingId=6iUunn6TTvW5nN23Na%2BjMw%3D%3D

for indicators of compromise and vulnerability. Nor can we rely upon the expertise and professionalism of EAC-accredited VSTLs and their staff, particularly in the absence of adequate EAC standards, to protect U.S. elections by competently examining our voting systems for indicators of supply chain compromise. In federal court testimony in 2020, the Laboratory Director (and corporate principal) for Pro V&V, one of only two accredited VSTLs in the U.S., stated that he had no "specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis."[78] The EAC accredited a VSTL led by someone with no specialized expertise in cybersecurity testing or analysis or risk analysis.

57. These same VSTLs, with no specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis, have been responsible to not only conduct initial and modification testing, but to assess proposed engineering change orders (ECO) from voting system vendors, and to recommend to the EAC whether those changes may be implemented without testing, as "de minimis."[79] The EAC has approved at least 150 of these engineering changes to currently certified voting systems. One ECO, representative of many, perfectly epitomizes the inconceivable inadequacy and unsuitability of this approach and the utter ignorance or disregard for cybersecurity risk the approach entails: DVS ECO 100833.[80] DVS ECO 100833 was "analyzed" in April,

---

[78] *Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1277 (N.D. Ga. 2020).

[79] A "De minimis" change, according to the EAC, is a change to a certified voting system's hardware, software, TDP, or data, the nature of which will not materially alter the system's reliability, functionality, capability, or operation. I.e., if a vendor submits a recommended or requested change for approval as a de minimis change, a VSTL then provides analysis and a recommendation to the EAC on whether the change should be approved as a "de minimis" change, and then the EAC approves the request, and the change, as a modification to the certified system configuration which neither invalidates the certification (of conformance with voting system certification standards or guidelines) nor requires additional testing.

[80] https://www.eac.gov/sites/default/files/eoc-documents/ECO%20Analysis%20Form%20100833.pdf

2022, and approved, as recommended by Pro V&V, by the EAC within three days of Pro V&V's recommendation. DVS ECO 100833 affects four different DVS D-Suite EAC-certified versions, and at least 17 different versions certified at the state level, including D-Suite voting systems used in Arizona, California, Georgia, Iowa, Louisiana, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Pennsylvania, Tennessee, Utah, Virginia, and Washington states.

58. In other words, this ECO affects the voting systems in states which represent over half the population of the U.S. What was the "de minimis" change approved in this ECO? A completely different CPU on the aValue ImageCast X motherboard, and a new Basic Input/Output System (BIOS), which is the firmware that controls basic functions for the CPU, motherboard, and respective computer. In other words, the vendor proposed, the VSTL recommended, and the EAC approved a modification, without testing, to a voting system which involved the complete replacement of what are probably the two most critical, fundamental components which determine the function and security of a computer. This would be like the FAA allowing an aircraft manufacturer to change the wing design and engine design for a passenger aircraft, without additional testing.

59. It is difficult to convey the magnitude of inadequacy of the EAC's guidelines and response to the threat of supply chain attack facing voting and election systems. In order to protect against supply chain attack and compromise for computers and computer components, including software and firmware it is necessary to have qualified experts monitor, without exception or hiatus: the purity of every single material used in your device; the digital design templates and controls for fabrication; the fabrication of every single component, the resulting fabricated components, the assembly of all those components, composed of materials you have verified, according to your design, into a finished product. The same vigilance must be applied to uninterrupted expert monitoring of the finished product itself, including configuration, maintenance, and

updates, including 100% of installed code, for its entire lifecycle from concept through end-of-use. Only then is there even a reasonable chance to secure a system against supply chain attack. And, if all those measures are not vigilantly undertaken, then there is a reasonable chance of an undetected supply chain attack. None of those measures are or have been in place for our voting systems.

60. In comparison, the Department of Commerce Inspector General formally expressed concern that the FirstNet Authority had not conducted a supply chain risk assessment for the NPSBN in its four years of existence. How immeasurable is our risk if the EAC and state governments have not conducted a supply chain risk assessment for U.S. election and voting systems in the 20 years since the EAC was created?

61. What Peter Neumann, Principal Scientist at the Computer Science Laboratory of SRI International, wrote in 1995 seems prescient and still applicable: "Existing standards for designing, testing, certifying and operating computer-based vote-counting systems are inadequate and voluntary, and provide few hard constraints, almost no accountability, and no independent expert evaluations. Vendors can hide behind a mask of secrecy with regard to their proprietary programs and practice, especially in the absence of controls. Poor software engineering is thus easy to hide. Local election officials are typically not sufficiently computer-literate to understand the risks. In many cases, the vendors run the elections. Providing sufficient assurances for computer-based election integrity is an extremely difficult problem. Serious risks will always remain and some elections will be compromised."[81] Neumann wrote that expert assessment before the majority of U.S. computers and computer components were manufactured overseas, and before the threat became so pervasive that nearly 100% of companies had been affected by supply chain attacks.

---

[81] Peter G. Neumann, "Computer Related Risks," 1995. ISBN: 020155805X.

62. The situation is worse than it first seems. Decades ago, many states had their own voting system examiners, of varying capability. However, most of the voting systems at that time were electro-mechanical or had relatively simple embedded computers. The complexity of modern computer-based voting systems and the relentless advance of cyber threat actor capabilities now demands a skillset for cybersecurity that few, if any, states and localities possess or can afford. Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in our 50 states, much less our over 3,000 U.S. counties. A trade organization's annual report shows a cybersecurity workforce gap in the U.S. of 377,000 skilled professionals,[82] and state and county government cybersecurity position salaries typically top out at or below the median starting salaries for the same skillset in the private sector. States and counties are thus exposed to vast unmitigated cybersecurity risk in our election and voting systems.

63. The lack of skilled, qualified expert cybersecurity personnel at state and local government helps explain the insecure state of our nation's centralized statewide voter registration systems. An August, 2020 Center for Election Innovation and Research (CEIR) report, "Voter Registration Database Security (VRDB)," concluded:

a. Only 25 states reported meeting an eight-character password length requirement to access their VRDB.
b. Only 15 states required multi-factor authentication to access their VRDB.
c. Only 27 of 29 responding states "currently conduct systems audits," and many of those states audited their systems less than once per year.[83]

---

[82] https://www.isc2.org//-/media/ISC2/Research/2021/ISC2-Cybersecurity-Workforce-Study-2021.ashx

[83] The inadequacy of any auditing approach, other than "persistent, constant, and real-time" for an internet-connected device or service cannot be overstated. The SolarWinds

d. Only 26 of 28 responding states reported monitoring both successful and unsuccessful login attempts.

e. Only 19 of 24 states monitored signatures of database injection threats.

f. A Cloudflare Area 1 Security report stated "less than half of America's local election officials use even basic protections to ward off the threat of phishing," and "The federal government has immense resources and capability, but little authority. Local officials...find themselves in the crosshairs of nation-state cyber warfare without the knowledge or tools to fight back...from a cybersecurity perspective this complex system is a cluster[REDACTED] of vulnerability."

64. The futility of "Logic and Accuracy Tests" (LAT) that vendors and government election officials rely upon as a verification and demonstration of voting system security perfectly illustrates the nexus of false assurance, technical illiteracy, and unmitigated risk inherent in our current architecture of technology, procedures, and standards. First instituted when voting machines were mechanical or electro-mechanical, a LAT made perfect sense; when a machine is barely or un-reconfigurable, a simple demonstration with a few repetitions, particularly with prior testing, is sufficient to verify the function of a mechanical system. As the machine becomes more complex, and particularly when the machine is computerized, reconfigurable by code, amenable to covert and

---

SUNBURST software supply-chain compromise malware was deployed in February 2020 on thousands of corporate, institutional, and U.S. government systems, including on networks within the Departments of Defense, Homeland Security, Justice, and Treasury which are monitored in real-time by skilled cyber defenders using intrusion-prevention and –detection tools tuned to their systems and networks. The malware was not detected until 13 December 2020, after nearly 10 months of operation, and even then was not detected by any of those government agencies or their billions of dollars in cyber defense capability. The U.S. Government only, and finally, became aware of SUNBURST because Mandiant's FireEye team detected SUNBURST on their own systems and notified the USG of the attack signature.

undisclosed functions and functionality, and when the tester doesn't even have full access to all available controls on the system under test, a LAT's adequacy diminishes to zero. This is not new information; in 2004, an associate professor of computer science at Rice University stated in his testimony before an Ohio Legislature committee that "while 'logic and accuracy testing' can sometimes detect flaws, it will never be comprehensive; important flaws will always escape any amount of testing."[84]

65. A March, 2022 EAC report underscores this point. Despite certification of the DVS D-Suite 5.5-B voting system by an EAC-accredited VSTL, and despite the "trusted build" procedures recommended by the EAC, and despite the conduct of a LAT by county staff, some precinct-level ImageCast Precinct (ICP) DVS tabulators in Williamson County, TN in an October, 2021 municipal election did not properly tabulate the votes from a large number of ballots, nor include them in the final tally the machines produced.[85] An EAC "investigation," with no independent examiners involved, reported "the direct cause of the anomaly was inconclusive," but also that the system had outdated configuration files ("erroneous code") installed and that post-investigation ECOs for modified ICP software source code "fixed" the problem. Obvious deficiencies in the EAC's report and process include that:

a. There is evidence of the failure of internal controls (e.g., certification, trusted build, LAT), but the EAC has not acknowledged the failures nor initiated the external, independent audit which an internal control failure should trigger;

---

[84] https://votingmachines.procon.org/questions/is-logic-and-accuracy-testing-an-effective-method-of-assuring-that-electronic-voting-machines-are-operating-properly-before-an-election/

[85] https://www.eac.gov/sites/default/files/TestingCertification/EAC_Report_of_Investigation_Dominion_DSuite_5.5_B.pdf

b. The correct election results in Williamson County were finally obtained by rescanning ballots on a central scanner and then verifying the tallies with a hand-count, but the EAC didn't complete its report until over five months after the affected election and didn't notify other users, much less the public, of the problem with the D-Suite 5.5-B (and 5.5-C), so the public should have no confidence in any other election result tabulated on those systems, in any jurisdiction, and also no confidence in the EAC.

c. Had the Williamson County staff not noticed the anomaly, they would have reported inaccurate election results, and only after hand-counting did they have confidence in their results. In other words, no safeguard professed by the EAC or election officials or the election industry functioned properly to prevent or detect the introduction of erroneous code in our computerized voting systems, and the mechanism for producing trustworthy results was a hand-count of paper ballots. If our voting systems were passenger aircraft, they would all be grounded.

66. The fact of that anomaly, the EAC report, and its findings is almost non-existent in any news source, over six months after the election, over a month after the report, and on the precipice of new primary elections, so the American public remains, by-and-large, uninformed regarding the failure of the voting system safeguards and the possibility of erroneous software that would change their election results.

67. It is the same with the declarations of J. Alex Halderman, a professor of computer science at the University of Michigan and a widely-recognized expert on voting system security whose written testimony in the case of Curling v. Raffensperger in the U.S. District Court for the Northern District of Georgia expose a number of critical points[86], including:

---

[86] https://gaverifiedvoting.org/pdf-litigation/20200819-785_2-Declaration-Alex-Halderman.pdf

a. "The Director of Product Strategy and Security for Dominion Voting Systems does not dispute that its products can be hacked by sufficiently capable adversaries."

b. "Software of the size and complexity of the Dominion code inevitably has exploitable vulnerabilities."

c. "Nation-state attackers often discover and exploit novel vulnerabilities in complex software."

d. "...the Dominion software used in Georgia utilizes a wide range of outdated off-the-shelf software..." and "outdated software components are a security risk because they frequently contain known, publicly documented vulnerabilities"

e. "Malware could potentially be introduced in several ways, including: ...(b) through an attack on the hardware or software supply-chain"

f. "Rigorous post-election audits are necessary in order to reliably prevent attacks that compromise election results by manipulating ballot scanners" and "post-election audits are not sufficient to detect attacks against BMDs, since such attacks could change both the printed and electronic records of the votes."

g. Halderman discovered multiple severe security flaws in Georgia's Dominion Voting Systems which would also affect voting systems in numerous other states, and which, if exploited, would subvert "all procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs)."[87]

[87] https://www.documentcloud.org/documents/21038844-20210802-expert-rebuttal-declaration-of-j-alex-halderman

68. Halderman explicitly refers to RLAs as one of the subvertible "procedural protections practiced by states." The election industry is increasingly adopting and promoting RLAs as their preferred approach to verify election accuracy and integrity. The premise of RLAs is that, by comparing a small, randomly-selected sample of the total individual digital cast vote records (CVR) for an election to ballot images and original paper ballots, where available, election officials can *efficiently* confirm, to a degree of statistical confidence, that voting systems correctly tabulated the election results. Paraphrased, RLAs assert "if we find no error in this random sample, then we can assume no error[88] in the total calculation, with X confidence."

69. The concept behind RLA comes from industrial quality control acceptance sampling originated to spot check production bullet quality in World War II. RLAs are attractive to many election officials for their "efficiency," in time and cost, compared to alternative and traditional post-election auditing. Indeed, much of the election industry and many public officials refer to RLAs by the marketing label "gold standard" for post-election audits, even referring to them as "forensic risk-limiting audits," which is deeply misleading. There are profound differences between RLAs and "forensic audits;" see Appendix 5 for a brief comparison.

70. Whatever their "efficiency," RLAs do not offer a panacea for election auditing. Philip Stark, Professor of Statistics at the University of California, Berkeley, and the "father" of the RLA, is a critic of the way RLAs have been oversold through overstated validity, inappropriate application, and non-adherence to required principles stated, "Whitewashing inherently untrustworthy elections by overclaiming what applying RLA procedures to an untrustworthy paper trail can accomplish sets back election integrity.

[88] More accurately, "little error," or "too little error to have affected the race/issue outcome."

This is security theater, not election integrity."[89] Professor Stark expressed that opinion in a two-and-a-half page resignation letter from the board of Verified Voting (VV), writing "Instead, we're saying, 'Don't worry: VV will teach you to sprinkle magic RLA dust and fantasies about parallel testing on your untrustworthy election. All will be fine; you can use our authority and reputation to silence your critics.'"

71. The flaws inherent in RLAs as a safeguard for election accuracy and integrity far exceed Stark's concerns. In the first place, RLAs are spot check sampling; even where appropriate for an industrial production process, which elections are not,[90] spot check sampling was always intended as a supplement to a broader quality control plan, not as a substitute for that comprehensive, adequate quality control plan. Second, auditing is an academic and professional discipline with a body of theoretical and philosophical standards, including among seven assumed postulates that: "An audit requires independence and freedom," and "Auditors are skilled judges who are able to measure and compare actual performance against standards of accountability." Neither of these is true of an RLA, which relies upon opaque, untested, uncertified software running on opaque, untested, uncertified hardware, with no transparency to the public, executed by public officials with no independence and no expertise in either auditing or the computer software and hardware involved. RLAs, despite the name, do not satisfy the criteria for audits.

---

[89] https://www.stat.berkeley.edu/~stark/Preprints/vv-resign-19.pdf?utm_source=JangoMail&utm_medium=Email&utm_campaign=Are+all+audits+created+equal%3f+(341331552)&utm_content=

[90] Industrial processes, e.g., manufacturing, often involve machine production and spot check sampling at the batch or lot level to verify manufacturing quality. Those industrial processes are designed to detect error, not deliberate sabotage – the equivalent of fraud in an election. Spot checks provide little chance of detecting sabotage, if the individual saboteur is cognizant of the spot check approach, because the saboteur can avoid sabotaging the spot checked samples, influence the sample selection to avoid sabotaged products, or spoil or change the spot check records.

72. An election audit must be able to do more than check that voting system computers can successfully execute addition for a small subset of ballots cast. The purpose of auditing elections is to satisfy the legal obligations of election officials that elections are free and fair, and to provide a warranted, transparent basis for public confidence that election results accurately reflect the sum of votes cast by eligible voters in a given contest, race, or ballot issue. An adequate audit should confirm or refute each of the following four statements:

a. No ineligible voters' ballots, nor ineligible ballots (e.g., a subsequent, illicit ballot cast from an otherwise eligible voter, or a ballot cast too late to be counted, or without proper credential verifying eligibility) were counted.
b. Each eligible voter's cast ballot was counted, and only once.
c. All legitimate ballots were counted accurately.
d. Tallies for each contest, race, or ballot issue accurately reflect the sum of votes on eligible voters' cast ballots; no more and no less.

73. In other words, election audits must be able to detect fake voters, fake ballots, and fake ballot counts. The adequacy of any audit method is a function of the extent to which the audit method can or cannot confirm or refute those four statements, and the question of efficiency should be a distant consideration, after adequacy to answer the four statements is confirmed. An RLA is completely incapable of detecting fake voters and fake ballots, and is unlikely to detect fake ballot counts, in part because RLAs not only rely upon black-box RLA software and hardware, so that the "randomness" of "random" CVR selections must be in question, but because they rely upon data provided by the voting systems themselves to identify and select CVRs for comparison and are executed without independence, expertise, or access to full forensic evidence.

74. In financial auditing, required of all publicly-traded companies to assure investors and regulators that company financial statements are authentic and accurate, a method like RLA would be considered an "internal control." Internal controls are a management

tool for process monitoring, not a substitute for independent external auditing by skilled experts with full access to all evidence. Regardless of how a recount or a partial recount for post-election audits is conducted, recounting ballots cannot detect fake voters or fake ballots, and is unlikely to detect the sophisticated, complex manipulation possible through supply chain attack.

75. Arizona is one of several states that allow for or require limited hand count post-election audits, under the assumption that they can reduce or eliminate risk of erroneous or fraudulent machine counts for the entire election. Arizona's approach to hand counts entails several inherent weaknesses, from an auditing standpoint. The first, again, is the "spot check" approach to limited sampling, in that Arizona only requires counties to hand count a small subset of ballots from a small subset (2% of precincts or 2 precincts, whichever is greater) of jurisdictions. This means that as many as 98% of precincts are not hand count audited. Since early voting (mail-in and drop box) ballots in Arizona are returned to counties and not precincts, counties must also hand count 1% of the total early ballots cast, or approximately 5,000 early ballots, whichever is less.[91] This means that in Maricopa County, AZ, where only 5,165 early ballots were hand counted out of more than 1.9 million "early votes" cast in 2020, less than three tenths of one percent of the early votes were hand counted in the post election audit.

76. The method of hand counting prescribed by the Arizona Secretary of State's Election Procedures Manual makes that small proportion of hand counting auditing even less valuable. There are two generally-recognized methods of hand counting,

---

[91] https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf

called "Sort-and-Stack,"[92] and "Read-and-Mark,"[93] respectively. The Arizona Secretary of State requires the Sort-and-Stack method. The Sort-and-Stack method is known to be significantly more error-prone than Read-and-Mark, with a mean error rate between 35 percent and 78% greater than Read-and-Mark. When total error, including standard error (or uncertainty in error) is included, Sort-and-Stack can have a total error rate in excess of 2.5 percent.[94] Given this error rate, it is remarkable that Maricopa County's 2020 hand count audit report shows zero differences between the hand count and machine count, for 5,165 early voting ballots.

77. Making matters worse, the Arizona Secretary of State's procedures do not require video recording of hand counting, and prohibit video recording of the ballot content for hand counts, so there is no opportunity for citizens to verify that even those extremely-limited hand counts are accurate. That is, if the hand count post election audit is even conducted; Arizona's procedures allow the county officer in charge of elections to cancel the hand count and use the electronic tabulation of ballots as the

---

[92] Sort-and-Stack is a hand count method which counts one race at a time by placing each ballot to be audited into a stack which corresponds to the vote choice in the race being audited. For example, in a race between Candidate A and Candidate B, there would be one stack for each candidate, comprised of ballots sorted into those stacks. After sorting, the total quantity of ballots in each stack would represent the vote totals for those candidates.

[93] Read-and-Mark is a hand count method which counts a single, multiple, or all races and issues on a ballot by having one or more counters read the marks on the ballot, either simultaneously or in turn, and then mark a tally sheet formatted to show aggregate marks, corresponding to ballot votes, for each candidate.

[94] Stephen N. Goggin, Michael D. Byrne, and Juan E. Gilbert, *Post-Election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence*, 11 Election L.J. 36 (2012), *available at* https://www.liebertpub.com/doi/epdf/10.1089/elj.2010.0098.

official count, by simply removing Hand Count Board members until there are too few to conduct the hand count.[95]

78. Numerous independent forensic examination reports mirror Professor Halderman's findings, including reports from Antrim County, MI,[96] and Maricopa County, AZ,[97] and Mesa County, CO,[98,99,100] which all show critical security vulnerabilities, non-compliance with published voting system standards, and anomalies and phenomena attributable to unauthorized and malicious activity, and which demonstrate that existing safeguards for U.S. voting system security are ineffective to detect even simple misconfiguration, much less more complex and sophisticated supply chain attacks of the kind that CISA could not detect in its own networks for ten months or more. The pattern is clear: no one who has asserted that U.S. voting systems are secure has been independent and expert, with access to full forensic evidence; every single independent expert with access to forensic evidence in an election or election system has concluded that the voting systems are not secure.

79. The first four appendices to this Declaration show, respectively, 1) voting systems used in Arizona's five largest counties, by population; 2) ownership of the companies which provide those voting systems; 3) some known, published vulnerabilities of components, mostly software, of those voting systems; and 4) country of manufacture or origin for a representative sampling of computers and computer hardware

---

[95] Arizona Secretary of State, 2019 Elections Procedures Manual, p. 214, available at https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf

[96] https://www.depernolaw.com/all-expert-reports.html

[97] https://www.azsenaterepublicans.com/cyber-ninjas-report

[98] https://useipdotus.files.wordpress.com/2021/09/21.09.21-amended-exhibit-f-ex-f-1-1.pdf

[99] https://useipdotus.files.wordpress.com/2022/03/mesa-county-forensic-report-no.-2.pdf

[100] https://useipdotus.files.wordpress.com/2022/03/mesa-3-report.pdf

components used in those voting systems. These counties represent 6.46 million, or 85%, of Arizona's 7.6 million residents, and include Maricopa, the fourth largest county, by population, in the U.S. The voting systems used in these counties represent three of the top four U.S. voting system vendors, whose voting systems are used to cast and or tabulate over 80% of votes in U.S. elections. The third largest U.S. voting system vendor, not shown in the appendices, is Hart InterCivic; unlike the Dell computers used in ES&S, DVS, and Unisyn voting systems, Hart InterCivic seems to use Hewlett-Packard (HP) computers. It is a difference without distinction, as HP computers are also manufactured and assembled overseas, primarily in the PRC, of overseas-manufactured components, by foreign workers, with no U.S. government oversight and effectively no safeguards in the entirety of the testing and certification regime for voting systems. The voting system vendors all use "Commercial, Off-The-Shelf" (COTS) software with collectively thousands of known vulnerabilities that might be exploited before or after delivery of voting system components.

80. If these systems used in Arizona are compromised through supply chain attacks, for which there is ample, undetectable opportunity, then it is reasonable to conclude that U.S. elections are compromised through supply chain attacks. And it is reasonable to conclude that we do not know whether these systems have been compromised. Without access to comprehensive real-time and post-election data, and a cadre of cyber expertise that exceeds U.S. workforce quantity and quality resources, we may never know. This is true not only because supply chain attacks can be extraordinarily difficult to detect,[101] but also because the safeguards inherent in the U.S. voting system testing and certification regime are practically non-existent, and because the nation in which

[101] Supply chain attacks may be impossible to detect in complex computer systems without external validation and real-time data, like trying to determine if a drunk driver crossed over a lane divider on a deserted highway at night, at an undetermined time, without video evidence or telematics from the vehicle or occupant electronic devices.

most of the systems and their components are manufactured and assembled is engaged in a decades-long campaign to infiltrate, corrupt, and compromise western, and especially U.S., computers and computer-based systems, including government and election systems. There is no reason to suspect, much less believe, that Arizona's voting systems have not been compromised by supply chain attack. There is every reason to believe that they would already have been attacked and compromised. Overseas manufacture and supply, without oversight, provides both opportunity and means. The prospect of influencing or controlling U.S. policy provides incentive or motive. There is no effective deterrent. The attack either has happened or will happen.

81. In summary, the complexity, adoption, and connectivity of computers and computer-enabled systems in the U.S. have increased exponentially over the last decade, but the overseas manufacturing, assembly, integration, and configuration of the majority of U.S. computers and computer components, and significant proportions of the software supply chain, including those used in our voting systems, exposes those systems to the advanced persistent threat of massive, well-funded, decades-long nation-state efforts to subvert U.S. national security. Those advanced persistent threats are known to have targeted and penetrated all aspects of the USG, our state governments, defense industry, advanced technology industries, and our election systems, including the principal USG organization responsible to defend election systems against that threat. The American public is largely unaware of the juggernaut of nation-state offensive cyber warfare, including supply chain attacks, arrayed against their voting systems and elections, and due to the categorization of election and voting systems as "critical infrastructure," and the bias of the associated government and non-government institutions against sharing vulnerability and compromise information, our public officials and public are hearing almost exclusively what is simply not true: that our voting systems are both securable and secure.

I declare under penalty of the perjury laws of the United Sates that the foregoing is true and correct and that this declaration was executed this 7th day of June 2022.

Shawn A. Smith

5 Appendices

Appendix 1. Voting Systems of Arizona Largest 5 Counties, by Population

Appendix 2 – Voting System Vendor Ownership

Appendix 3 – Known Voting System Vulnerabilities

Appendix 4 – Country of Manufacture or Origin for Voting System Components

Appendix 5 – Comparison of Risk-Limiting Audit and Full, Independent Forensic Audit

Appendix 1. Voting Systems of Arizona Largest 5 Counties, by Population:

| County | Population | Voting System | ePollBook |
|---|---|---|---|
| Maricopa | 4.5M | Democracy Suite (D-Suite) 5.5-B<br>Ballot Marking Device (BMD) – ImageCast X (ICX)<br>Optical Scanner (OS) - ImageCast Precinct (ICP)<br>OS – ImageCast Central (ICC)<br>Internet Voting System (UOCAVA)<br>Election Management System (EMS) - EMS | Robis-AskED |
| Pima | 1.05M | ES&S EVS 6.0.4.0<br>OS - DS850<br>BMD – ExpressVote<br>Internet Voting System (UOCAVA)<br>EMS - Electionware | Tenex-PrecinctCentral |
| Pinal | 450K | ES&S EVS 6.0.4.0<br>OS – DS850<br>BMD – ExpressVote<br>EMS – Electionware<br>Internet Voting System (UOCAVA) | KNOWINK – Poll Pad |
| Yavapai | 242K | Unisyn OpenElect 2.2 Voting System (OVS)<br>BMD - OpenElect Freedom Vote<br>BMD – OpenElect OVI-VC<br>Unisyn – OpenElect 2.2<br>Internet Voting System (UOCAVA) | ES&S - ExpressPoll |

| | | | |
|---|---|---|---|
| Mohave | 218K | EMS- OpenElect Central Suite (OCS)<br>ES&S EVS 6.0.4.0<br>OS – DS850<br>BMD – ExpressVote<br>Internet Voting System (UOCAVA)<br>EMS - Electionware | Robis - AskED |

Appendix 2 – Voting System Vendor Ownership

| Company | Ownership | Notes |
|---|---|---|
| Unisyn Voting Solutions | International Lottery & Totalizator Systems (ILTS), Inc (CA) merged w/ILTS (DE) (2014), owned by Berjaya Lottery Management (H.K.) Limited | Berjaya Chairman Vincent Tan has close business ties to Huawei/ZTE and PRC CCP leadership |
| Election Systems & Software (ES&S) | U.S.* | *Private equity firm McCarthy Group, which does not disclose investors' information, including any other investments or financial interests, owns a controlling interest in ES&S. |
| Dominion Voting Systems (DVS) | U.S.* | *According to DVS, it is a U.S. company. It was founded in Toronto, by Canadians. Its U.S. patents were mostly filed by Canadians, though they have since been assigned to Dominion Voting |

| | | |
|---|---|---|
| | | Systems, Inc., incorporated in the U.S. as branches of a home corporation originally filed in Delaware. Its U.S. trademark registrations are held by Dominion Voting Systems Corporation of Toronto, Canada. Controlling interest was acquired by Staple Street Capital, a private investment firm which does not disclose its investors, in 2018. Dominion, while owned/controlled by Staple Street Capital, collateralized its patents through Hong Kong Shanghai Banking Corporation (HSBC)'s Toronto office in 2019, and UBS Securities LLC, a division of UBS Americas, Inc, under UBS Group AG (Swiss) invested $400M in Staple Street Capital III, |

| | | |
|---|---|---|
| | | L.P. in October, 2020, at the same time that UBS AG was allowed by the PRC's Office of Financial Stability and Development Committee and the State Administration of Foreign Exchange to increase its ownership in UBS Securities China from 51 percent to 100 percent. |

Appendix 3 – Known Voting System Vulnerabilities

Not a single one of the CVE-listed, known vulnerabilities for hardware and software identified in this appendix were noted or analyzed in any certification testing report for the respective voting systems.

| System | Tests/Audits/Examination | Known Vulnerabilities |
| --- | --- | --- |
| DVS D-Suite 5.5B | | a. Election Management System (EMS) uses Microsoft (MS) Windows Server[102] 2012 R2 Standard – 2,042 vulnerabilities in CVE, 153 in 2022 alone.[103]<br>b. EMS clients use Windows 10 – 2,693 vulnerabilities in CVE, 204 in 2022 alone.<br>c. EMS uses MS .NET framework – over 10 years old – 56 vulnerabilities in CVE since release.<br>d. EMS uses Visual J#, discontinued by MS in 2007, unsupported since 2017, with a single known critical vulnerability in CVE snice 2004. |

[102] Windows Server Remote Desktop Gateway vulnerability – pre-authentication, no user interaction, Win Remote Desktop Client Vuln. This was Jan 14, 2020. https://www.cisa.gov/uscert/ncas/alerts/aa20-014a

[103] CVE is Common Vulnerabilities and Exposures, a MITRE database of known computer software and hardware vulnerabilities at https://cve.mitre.org/

e. EMS uses MS Visual C++ 2013 Redistributable, with 28 known vulnerabilities in CVE.

f. EMS uses Java Runtime Environment (JRE) 7 Update 80 and 8 Update 144 – there are 256 known vulnerabilities in JRE published in CVE since 2015.[104] The current version of JRE is 333, and each version update typically addresses security vulnerabilities.

g. EMS uses MS SQL Server 2016 Standard, MS SQL Server 2016 Service Pack (SP) 1, and MS SQL Server 2016 SP1 Express with Advanced Services – with 11 known vulnerabilities in CVE.

h. EMS uses Adobe Reader DC, with 118 known vulnerabilities in CVE.

i. EMS uses MS Access Database Engine 2010, with 8 known vulnerabilities in CVE.

j. EMS uses Open XML SDK 2.0 for MS Office, with 81 known vulnerabilities in CVE.

[104] https://www.oracle.com/java/technologies/javase/8u77-relnotes.html

k. EMS uses NetAdvantage Win Forms 2011 and WPF 2012.1 with 1 known vulnerability in CVE.

l. EMS uses NLog, with one known vulnerability in CVE.

m. EMS uses iTextSharp, with one known vulnerability in CVE.

n. EMS, ImageCast Precinct (ICP), and ImageCast Central (ICC) use OpenSSL, with two known vulnerabilities in CVE.

o. EMS and ImageCast X (ICX) use SQLite, with 46 known vulnerabilities in CVE.

p. EMS uses Lame, with 15 known vulnerabilities in CVE.

q. EMS uses Speex, with two known vulnerabilities in CVE.

r. EMS uses Ghostscript, with 9 known vulnerabilities in CVE.

s. EMS uses Apache Batik, with 6 known vulnerabilities in CVE.

t. EMS uses Apache Avalon, retired by Apache in 2010, and no longer supported for any purpose, including security patches.

| | | | |
|---|---|---|---|
| | | | u. EMS uses Apache FOP, with one known vulnerability in CVE.<br>v. EMS and ICX use Entity Framework, with one known vulnerability in CVE.<br>w. ICP uses Zlib, with one known vulnerability in CVE.<br>x. EMS uses Visual Studio 2015, with 24 known vulnerabilities in CVE.<br>y. Adjudication uses MS Enterprise Library, with one known vulnerability in CVE.<br>z. D-Suite uses Dell Optiplex 7440 All In One computers, with one known vulnerability in CVE. Serial HVNRFB2,[105]<br>aa. D-Suite uses Dell servers with iDRAC9, with 15 known firmware vulnerabilities in CVE. |
| ES&S EVS 6.0.4.0 | | | a. Uses Windows 7 SP1, with over 2,000 known vulnerabilities in CVE. |

[105] Dell OptiPlex 7440 All-in-One computers HVNRFB2, HVNQFB2, HVNPFB2, listed as exemplar in the "Test Report for EAC 2005 VVSG Certification Testing Dominion Voting Systems Democracy Suite (D-Suite) Version 5.5-B Voting System," EAC Project Number: DVS-DemSuite5.5-B, Version: Rev. 02, Date: 08/21/2019

| | | |
|---|---|---|
| | | b. Uses Windows Server 2008 R2, with over 2,200 known vulnerabilities in CVE.<br>c. Uses Symantec Endpoint Protection, with 10 known vulnerabilities in CVE.<br>d. Uses OpenSSL, with over 50 known vulnerabilities in CVE.<br>e. Uses Dell Latitude E6430 with one known vulnerability in CVE which allows local users to bypass the Secure Boot protection and gain privileges to write to physical memory.<br>f. Uses Dell Optiplex 5040, 5050, and 7020, with one known vulnerability in CVE which allows local users to conduct EFI flash attacks bypassing BIOS security. |
| Unisyn OVS 2.2 | | a. Uses CentOS open source Linux distribution, with over 1,000 known vulnerabilities in the Linux kernel in the last five years in CVE.<br>b. Uses Java JRE, with over 200 known vulnerabilities in the last five years in CVE. |

c. Uses Android 4.4.4., with over 100 known vulnerabilities in CVE.

d. Uses Apache-Tomcat, with over 100 known vulnerabilities in CVE.

e. Uses MySQL, with over 100 known vulnerabilities in CVE.

f. Uses OpenSSL, with over 100 known vulnerabilities in CVE.

g. Uses OpenVPN, with over 30 known vulnerabilities in CVE.

Appendix 4 – Country of Manufacture or Origin for Voting System Components

This list is a non-comprehensive, representative sample; the full list of hardware components is hundreds of items long per voting system and requires not only serial numbers, but physical inspection, to verify precise configuration. In many cases, the country of manufacture can be confidently asserted without serial numbers or physical inspection because those components or systems are only manufactured in that location.

| System | Component | Notes |
|---|---|---|
| DVS D-Suite 5.5B | Dell Optiplex 7440 All-in-One HVNRFB2 | - Assembled in Brazil<br>- Motherboard manufactured in China – includes internal mini PCIe slot for wireless card and "Password Jumper" that allows removal or reset of BIOS password<br>- Incorporates Intel Management Engine for out-of-band (non-user/non-local-controlled, remote management) in chipset; labeled as "MEBX, disabled," but Dell confirms that "the ME is not really disabled," and the configuration is controlled by whomever has BIOS access[106] |

[106] https://downloads.dell.com/manuals/all-products/esuprt_laptop/esuprt_latitude_laptop/latitude-d630_user%27s%20guide%204_en-us.pdf

| | | |
|---|---|---|
| DVS D-Suite 5.5B | Dell PowerEdge R630 4Z07T52[107],[108] | - Final assembly in the PRC, Mexico, Brazil, India, or Malaysia[109]<br>- Intel Xeon E5-2623 v3 processor manufactured at Ocotillo plant, Chandler, AZ, which employed over 200 foreign engineers on H1B Visas, including BIOS engineers from PRC[110]<br>- Dell part 4TD8G – DVD+/-RW SATA Internal Drive manufactured in Huizhou, PRC<br>- Dell part 2T9KH – Broadcom 5720 Quad Port 1 GbE Base-T, network interface card – manufactured in PRC |

[107] The configuration for 4Z07T52, Dell PowerEdge R630, used as a test article for D-Suite 5.5-B EAC 2005 VVSG Certification Testing, did not incorporate an integrated Dell Remote Access Controller (iDRAC), or UEFI BIOS Boot Mode, or Avocent royalty (enables remove keyboard-video-mouse (KVM)) as part of the vendor (Dell) configuration, but the deployed (in use by U.S. states and counties) D-Suite R630s used for EMS servers frequently are configured with iDRAC, UEFI BIOS Boot Mode, and Avocent royalties (e.g. Dell R630 HMVCVD3, deployed by Dominion Voting Systems in Mesa County, Colorado).

[108] Dell's support site page for 4Z07T52 shows 25 "URGENT" severity driver and firmware updates available for this R630 model.

[109] https://i.dell.com/sites/csdocuments/Corporate_corp-Comm_Documents/en/dell-suppliers.pdf

[110] https://www.myvisajobs.com/GreenCard/SearchLCA.aspx?E=Intel%20Corporation&WC=chandler&CT=China&Y=2015&PN=2

| | | |
|---|---|---|
| DVD D-Suite 5.5B | Dell PowerEdge R640 JMP9CM2 | - Dell part KMCCD – PERC H730 Integrated RAID Controller – manufactured in PRC[111]<br>- Dell part 1R8CR – 16GB RDIMM memory modules, manufactured in either PRC or in South Korea<br>- Dell part R1XFC – Intel i350 Quad Port network interface card – manufactured in Malaysia, with on-board components manufactured in PRC<br>- Dell part 1MW70 – Trusted Platform Module 2.0, manufactured in PRC<br>- Dell part 4TD8G – DVD+/-RW SATA Internal Drive manufactured in Huizhou, PRC. |

---

[111] Dell's FY18 Supply Chain Sustainability Progress Report states that Dell has "nearly 750" Tier 1 suppliers, of which it "has worked with nearly 150...to make certain they use industry best practices to mitigate counterfeit components, tainted software, and intellectual property theft and improve their firmware and software engineering practices and physical site security," and that "the average score for suppliers that completed our program last year improved from 57% with their initial evaluation to 98%." So, 57% of 150 of roughly 750 Dell suppliers (just over 10% of Dell's suppliers) scored well on a supply chain security self-audit in 2017. I.e., nearly 90% of Dell, used almost exclusively by U.S. voting system vendors for U.S. voting systems, suppliers scored poorly on supply chain security self-audit in 2017. https://i.dell.com/sites/doccontent/corporate/corp-comm/en/Documents/ser-report-fy18.pdf?newtab=true

Case 2:22-cv-00706-JLT-DB Document 1-4 Filed 06/08/22 PageID Page 59 of 69

| | | |
|---|---|---|
| | | - Dell part 7H4CN – PERC H730P RAID Controller – manufactured in PRC[112]<br>- Dell part V2KWT – 1.2TB 10K Self-Encrypting Hard-Drive – manufactured in Suzhou, PRC<br>- Dell part 385-BBKS – integrated Dell Remote Access Controller(iDRAC9) – embedded in R640 server motherboard, manufactured in PRC<br>- Dell part VM51C – 16GB RDIMM memory, manufactured in PRC<br>- Dell part CRT1G – R640 motherboard, manufactured in PRC |
| DVS D-Suite 5.5B | Dell Precision T3420 4TB3MN2 | - Dell part 210-AFLH – chassis includes LGA1151 motherboard, manufactured in PRC<br>- Dell part M0VW4 – RDIMM memory, manufactured in Malaysia<br>- Dell part C7F2G – SATA hard drive, manufactured in PRC or Philippines<br>- Dell part PNDVV – DVD/+/-RW optical drive, manufactured in PRC |

[112] The PERC H730P RAID Controller incorporates a lithium battery and integrates with iDRAC to allow remote management of equipped servers, including server hard drives, even while the server appears to be powered off. https://i.dell.com/sites/doccontent/shared-content/data-sheets/en/Documents/PowerEdge-RAID-Controller-H730P-Spec-Sheet.pdfCD

| | | |
|---|---|---|
| DVS D-Suite 5.5B | Dell Optiplex 9030 All-in-One CF73S52 | - Dell part GPFNK – Intel Dual-Band 7260 Wi-Fi/Bluetooth wireless networking card, manufactured in PRC<br>- Dell part TKK79 – wireless antenna cable, manufactured in PRC<br>- Dell part 9M9FK – DVD +/-RW optical drive, manufactured in PRC<br>- Dell part C7F2G – SATA hard drive, manufactured in PRC or Philippines<br>- Dell part NWMX1 – RDIMM memory, manufactured in PRC or South Korea |
| DVS D-Suite 5.5B | Dell PowerConnect 2808 Network Switch 3S2P971 | - Manufactured in PRC |
| ES&S EVS 6.0.4.0. | EMS Standalone Dell 5580 Or E6430 | - Manufactured in PRC<br>- Motherboard manufactured in PRC<br>- AC power adapters manufactured in PRC<br>- TPM manufactured in PRC |
| ES&S EVS 6.0.4.0. | EMS Networked Client Optiplex 5040, 5050, 7020 | - Assembled in PRC, Mexico, or Brazil<br>- Motherboard manufactured in PRC |
| ES&S EVS 6.0.4.0. | EMS Networked Server PowerEdge T420 | - Assembled in either PRC or Mexico<br>- Motherboard manufactured in PRC |

| | | |
|---|---|---|
| | PowerEdge T630 | - Hard drives, memory modules, I/O ports, power supply all manufactured in PRC<br>- If equipped w/ iDRAC7, manufactured in PRC<br>- If equipped with TPM, manufactured in PRC |
| ES&S EVS 6.0.4.0. | OpenElect Voting Optical Scan (OVO) system<br>Jetway Motherboard JNF9D-2550 | - Manufactured in PRC<br>- Uses NM10 chipset, manufactured in PRC under contract for Intel<br>- Uses Realtek RTL8111EVL[113] PCI-E Gigabit Ethernet ports, manufactured in PRC under contract for Realtek, a Taiwanese company<br>- Uses Fintek F71869A Super IO input/output controller chip, manufactured in PRC under contract for Fintek, a Taiwanese company<br>- Uses PowerVR SGX 545 integrated graphics processor; PowerVR is manufactured in PRC under |

[113] The driver files that were employed in the Stuxnet supply-chain attack against Iranian centrifuges at Natanz used a certificate belonging to Realtek Semiconductor: https://web.archive.org/web/20120708081604/http://www.symantec.com/content/en/us/enterprise/media/security_response/whitepapers/w32_stuxnet_dossier.pdf

| | | |
|---|---|---|
| | | contract for Imagination Tech, a UK firm owned by Canyon Bridge Capital, a private equity firm headquartered in the U.S. but funded by PRC government-controlled China State Council. |
| Unisyn OVS 2.2 | OpenElect Voting Central Scan (OVS) Dell Precision laptop or Dell Optiplex desktop computer | - Precision laptop manufactured in PRC<br>- Optiplex desktop manufactured in PRC or Mexico with motherboard manufactured in PRC |

Appendix 5 – Comparison of Risk-Limiting Audit and Full, Independent Forensic Audit

Ability of each type of audit to affirm and provide a basis for public confidence that election results accurately reflect the sum of votes cast by eligible voters in a given contest, race, or ballot issue, with respect to the "Four Statements."

| | Risk-Limiting Audit (RLA) | Full, Independent Forensic Audit (FIFA) |
|---|---|---|
| No ineligible voters' ballots or ineligible ballots counted | Not Answered.<br><br>1. Voters are never canvassed to either confirm that voters listed by State as having voted actually voted, or to identify voters whose ballots were cast but not counted.<br><br>2. Voter registration rolls demonstrably inaccurate (e.g. hundreds of thousands of mailed-out ballots returned as "undeliverable" by the U.S. Postal Service). | Partially or Fully Answered (depending on extent of canvassing).<br><br>1. Voter verification (canvass) of registered voters and of voters listed as having voted in a given election on State records, based upon statistical sampling technique of precincts and counties can provide estimate of roll and voter history accuracy to a selected confidence level, but to eliminate the risk of counting ineligible voters' ballots and the risk of uncounted ballots from eligible voters, a jurisdiction must either vote only in-person with government photo ID and accurate rolls to confirm |

| | | |
|---|---|---|
| | | eligibility and identity, or conduct a complete canvass of all registered voters to compare with voting records.<br><br>2. Hand-count and forensic examination of ballot envelopes to verify that each counted mail-in ballot has a corresponding human-signed ballot envelope, with signatures verified as authentic by qualified questioned document examiners. |
| Each eligible cast ballot counted once | Not Answered.<br>1. RLA has no ability to detect ballots counted multiple times, because so few (as a proportion of total cast and counted) physical ballots are compared to the machine-generated CVRs and to ballot images, and the ballot images and ballots are not compared to one another to identify duplicates. | Fully-answered.<br>1. Hand-count of 100% of paper ballots with batch tally artifacts.<br><br>2. Comparison of hand-count tallies to machine-generated tallies.<br><br>3. If hand-count tallies and machine tallies differ, then batch-by-batch comparison to find mismatched batches. Then |

2. No conduct of full hand-count to provide basis of comparison.

(RLA perversely becomes less adequate with larger margins of victory, because the statistical approach assumes that fewer ballots need be sampled, rather than recognizing the obvious risk that, if a margin of victory is larger, it may be a function of greater, more-extensive fraud or error.)

hand-recount of mismatched batches. If still mismatched, then comparison of paper ballots to ballot images. Then comparison of ballot images to CVR, and CVRs to reported results.

4. Forensic examination of paper ballots to verify that all counted ballots were marked by a human, vs. machine-marked, and that ballots indicated as mail-in show artifacts of folding. Verification of ballot security measures (watermark, discrete numbering, etc.), for each ballot, if applicable.

(Dependent on validity of either full canvass of registered voters in the audit jurisdiction, or on statistical validity of sampling approach to identify eligible voters whose cast

| | | |
|---|---|---|
| | | ballots were not counted.)<br><br>Note: some voting system vendors offer a re-tabulation of ballot images produced by their own or other voting system vendors' optical scan tabulation systems; these are inadequate because they never incorporate forensic examination of the paper ballots or comparison of the entirety of paper ballots to the ballot images. It would be like counting potentially counterfeit bills to determine how much authentic currency one held. |
| All legitimate ballots counted accurately | Partially Answered (being charitable).<br>1. Secretaries of State establish risk-limit (statistical theory-based percentage likelihood that RLA will not detect that machine-count of ballots was inaccurate, based upon very small sample). | Fully-answered.<br>1. As described above.<br><br>2. In addition, cyber forensic audit of voting machines to verify that only authorized users took only authorized actions on the voting systems, and that no penetration, |

2. Secretaries of State tout involvement of "bipartisan election judges" in RLA but, in fact, all the audit boards do is check that the very, very small sample of paper ballots selected by the black-box of Secretary of State-run RLA software/hardware match the CVR. They also allegedly verify the chain-of-custody, but chain-of-custody is lost for both mail-in and drop-box ballots before the counties receive the ballots.

Election officials frequently assert that RLAs "ensure to a high degree of certainty that election outcomes are correct." In fact, at best, an RLA can confirm that an electronic voting machine correctly tabulated the votes on ballots examined, and to some degree of statistical certainty/probability, that the electronic voting machine correctly tabulated the votes on compromise, misuse or error occurred in the voting systems.

| | | |
|---|---|---|
| | ballots not examined. To the degree that the selection of ballots to be examined is truly random, and to the extent that all types of ballots pose equivalent risk of error or fraud (e.g. from different precincts, scanned on different scanners, or with different settings), and to the extent that there are no mechanisms to circumvent or frustrate random selection of certain ballots, then the statistical assertion may be valid. | |
| Tallies accurately reflect the sum of votes on eligible voters' cast ballots | Only Partially Answered, as described above. | Fully Answered, as described above. |
| Auditor Independence | None. | Full. |
| Auditor Freedom | None. All rules prescribed by Secretaries of State. | Full (dependent on court order, contract, or authorization from governing body of jurisdiction). |

| | | |
|---|---|---|
| Auditor Skill | Variable, but low. Audit boards and election judges involved are trained by Secretaries of State, which are mostly attorneys with no auditing expertise or credentialling; audit boards are effectively under control of election officials in jurisdiction. | Both highly-skilled and insufficiently-skilled are available. |
| Auditor Standards | None. EAC promulgates no standards and no accreditation for auditing. Among institutions which promote or offer credentialing and continuing education for election officials, RLA is promoted and the issues of conflict of interest, expertise and skill in the audit methods, tools, and evidence, and independence are never raised. | Professional licensure, certification, and credentialing. |

# APPENDIX P-4

Declaration of John R. Mills

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Kari Lake; Mark Finchem,

Plaintiffs,

v.

Kathleen Hobbs, as Arizona Secretary of State; Bill Gates; Clint Hickman; Jack Sellers; Thomas Galvin; and Steve Gallardo, in their capacity as members of the Maricopa County Board of Supervisors; Rex Scott; Matt Heinz; Sharon Bronson; Steve Christy; Adelita Grijalva, in their capacity as members of the Pima County Board of Supervisors,

Defendants.

No. 2:22-cv-00677-JJT

**DECLARATION OF JOHN R. MILLS**

I, John R. Mills, declare under penalty of perjury that the following is true and correct:

1. I have personal knowledge of the matters set forth below and could and would testify competently to them if called upon to do so.

**Introduction**

2. I am Colonel, USAR, (Retired), John R. Mills and also Former Director of Cybersecurity Policy, Strategy, and International Affairs, Office of the Secretary of Defense, Senior Civilian (Retired). My dual career as an Active and Reserve member of the U.S. Army as well as a senior civilian in the Department of Defense has given me a unique opportunity for almost 40 years to participate directly in, provide oversight of, or be aware of a vast array of the planning and use of a wide range of U.S. cybersecurity-related instruments of national power. I have held Top Secret, Sensitive Compartmented Information (SCI) security clearances since approximately 1988. I have also been an adjunct Professor and have taught graduate level cybersecurity law and policy since 2013 at the University of Maryland, Global Campus. My last uniform position in the Department of Defense was in Homeland Defense and I often served as a liaison with Department of Homeland Security to coordinate the national response to complex emergencies and threats to the Homeland (real events and exercises).

3. I have been asked in this case to testify on the development, capabilities, and uses of "remote access operations" for unlawful entry and purposes into computer networks. The information presented is unclassified and based upon my personal experiences, publicly available reporting, studies, events, incidents, best practices, and de-classified U.S. Government information.

4. Remote access operations refer generally to the activities used to access computer networks, data centers, and other equipment, conducted in a manner to avoid detection and avoid leaving behind

forensic evidence of the access. Remote access operations are often enabled by planted malware, enabling software, and/or algorithms in the targeted computer system.

5. Remote access operations are different from remote maintenance monitoring which is intended by network designers for transparent and auditable access to network enabled devices for maintenance and updates. However, remote maintenance monitoring can be subverted or co-opted for reasons not in accordance with remote maintenance monitoring tenets, design intent, network owners/operators, or lawful access/purpose.

6. From the 1980s to the present, the capabilities, scope, and scale of remote access operations to collect or alter data have greatly expanded. The offense in remote access operations (the person or government seeking unauthorized access to a computer network) normally has a decided advantage against defenders (the person or government seeking to prevent unauthorized access).

7. The U.S. Government conducts remote access operations through the entities described in Executive Order 12333[1], as described in the articulation of the U.S. Intelligence Community[2] roles, missions, and organization, and as directed by a sitting President. The U.S. Intelligence Community is enabled by and often operates in close coordination with the Department of Defense and Federal Law Enforcement for these operations.

8. Other countries, organizations, and individuals have also developed remote access operation capabilities with varying degrees of sophistication. Such capabilities have been expanding at an accelerating rate in the past 20 years. These operations have become ubiquitous through nation state and private actors.

---

[1] Presidential Executive Order 12333 United States Intelligence Activities (As amended by Executive Orders 13284 (2003), 13355 (2004) and 13470 (2008)); https://irp.fas.org/offdocs/eo/eo-12333-2008.pdf

[2] EPIC.org, "Background on Executive Order 12333"; https://archive.epic.org/privacy/surveillance/12333/

9. Electronic election infrastructure is one example of critical infrastructure[3] which can be subjected to remote access operations. Foreign remote access operation capabilities threaten critical infrastructure in the United States, such as election systems.

10. A successful remote access operation conducted against U.S. election infrastructure could change vote totals reported by the election equipment, thereby nullifying the election as an expression of the collective will of the voters.

11. The employment of machine-based algorithms to access electronic voting systems in the United States to impose a pre-determined election outcome through remote access operations is well within the capabilities of many nation-state actors such as China, Russia, Iran, and Venezuela, as well as even non-nation state actors.

12. I have reviewed the Mesa County Forensic Reports (Reports 1, 2, and 3) concerning the examination of images of the hard drives of the Dominion Voting System (DVS) Democracy Suite (D-Suite) version 5.11-CO Election Management System (EMS) server of Mesa County, Colorado. The DVS D-Suite EMS server in that configuration was used for all Mesa County elections held in 2020 and through May 2021, including the November 2020 General Election, and the April 2021 Grand Junction Municipal Election.

13. My conclusions from reviewing these Reports are detailed below, and in my opinion, the evidence found on the Mesa County server is consistent with either remote access operations and/or the employment of sophisticated algorithms.

**Summary**

---

[3] CISA Website, Election Infrastructure as Critical Infrastructure, https://www.cisa.gov/election-security

14. The U.S. Government has pioneered and advanced the art and techniques of remote access operations targeting critical infrastructure.

15. Based on my personal experience the United States Government has the capability to project significant effects[4] toward critical infrastructure worldwide—including election systems. This same capability (to project effects) now exists in other countries, such as China, Russian, Iran, North Korea, and Venezuela, and these foreign powers now use these same, similar, and improved remote access operation methodologies to advance their own national agendas.

16. These operations have created a growing talent base of personnel, software, and network enabled capabilities that are becoming ubiquitous in the hands of companies and personnel outside of the U.S. Government.

17. I have served as a sworn election official and understand the U.S. election process at the county level. With that experience and my professional experience, I have very low confidence in the security of American election critical infrastructure. In my professional opinion, assertions by the U.S. Intelligence Community, Homeland Security, and other law enforcement officials that they have the situational awareness and capability to defend the election environment against remote access operations with a high level of confidence are unsupported and, in some cases, may be false. Several publicly known breaches of critical infrastructure are presented later in this document. One of the most damaging and egregious was the breach of the Office of Personal Management which created catastrophic results. The full resources and full spectrum of the U.S. Government were available to detect, prevent, stop, mitigate, or otherwise address the attack on this critical infrastructure, yet the attackers circumvented all measures designed to stop them.

---

[4] "Effects" is an operator's and planner's term of art which implies the ability to degrade, exfiltrate, manipulate, change, or destroy.

18. My professional opinion is that the statement "The November 3rd election was the most secure in American history" asserted on November 12, 2020 on the Cybersecurity and Infrastructure Security Agency ("CISA") website, had little, if any, basis in fact.[5]

19. In my professional opinion, based upon substantial experience on national cyber capabilities, cybersecurity, planning, policy, strategy, and review, and establishment of actionable recommendations for mitigation, policy, procedure, process, and remediation of multiple, large scale breaches and attacks on major critical network systems, and with my knowledge of the election process, the statements made by CISA referred to above, to be properly, independently, and holistically assessed must include a factual establishment and public release of the actual National Intelligence Collection priorities at the time of the November 2020 election, and the precise and specific signatures and indicators the national intelligence collection system (and law enforcement), and their capabilities were supposedly tracking, monitoring for, sensoring for, and otherwise tuned to monitor, collect, and defend the 2020 election.[6] The broad assertions and statements by Mr. Krebs and others also presume an ability to detect these remote access operations in an extremely timely manner with extremely high confidence—which is simply not realistic at this point in time and have a poor track record.

20. Regarding the Mesa County Forensic Reports, the findings are consistent with previous, publicly known, computer network intrusions, breaches, exfiltrations, and compromises of data integrity conducted via remote access operations by sophisticated actors, likely nation state level, with intimate, insider knowledge of the machines, networks, operating systems, and complete architecture of the information technology environment including off premise, "cloud" based storage and

---

[5] CISA, Joint Statement, November 12, 2020, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election

[6] The code name of the operation(s), their planning documents, establishment of inter-agency roles and missions, and all coordinating instructions to include the detailed guidance on factual Intelligence Collection priorities, including signatures and indicators, must be made public.

processing. There are three key themes that the findings can be grouped into for proper understanding and context by the reasonably informed layperson.

a. Complex and large-scale changes to data conducted at an operating system level that are not detectable to a top-level operator of the system who does not have deep, technical knowledge of the operating system. An analogy is expecting the driver of a vehicle to be able to conduct complex diagnostics and complete repair of the entirety of their car, including modern advanced, embedded information technology.

b. Computer data base changes of significant complexity, scope, and scale that indicate sophisticated automated algorithms, remotely conducted via network access (which may include wireless elements, or unique methods of entry). More simply stated, the person(s) conducting these activities did not need to physically touch the machines or off-site servers nor manually, hands on keyboard, manipulate lines of code or data, instead these were automated operations, done remotely, with algorithms to adjust data, from operating sites potentially across the world.

c. Complicated operations described in these reports, even with advanced algorithms, are still resource intensive from a planning and execution perspective and are greatly enabled and simplified by an insider who already knows, to a line of code level, the operating system, network architecture, security measures, and all related matters. In unembellished terms, a trusted insider who can unlock the right doors and know which switches to flip, is one of the most desired assets sought after by the mission planner. In the cybersecurity world, this is what is known as the "Witting Insider."

**Relevant Experience and Qualifications**

21. I have defended our Country since 1983. My service for our Nation ranges from the tactical level in combat to the strategic at the Office of the Secretary of Defense (DOD). I am a school trained and qualified Military Intelligence Officer, Psychological Operations Officer (PSYOP – a Special Operations Community Branch), Civil Affairs Officer (also a Special Operations Community Branch), and Public Affairs Officer. My role has essentially been as a national security strategic planner since approximately 2001. My service at the senior levels of the U.S. Government has included complex inter-agency proceedings and deliberations on cyber and cybersecurity and other government operations across the spectrum of instruments of national power; international partner negotiation of sensitive information sharing agreements (including the Five Eyes (FVEYS[7])); and representing the Department of Defense at the National Security Council from mid 2008 to mid 2009 as NS/HSPD-54/23.[8]

22. In my uniformed service, civilian service, and post-U.S. Government service I have worked, planned, implemented, observed, and made recommendations in American elections and foreign elections. I have served as a sworn election official in my home county, Prince William County Virginia, multiple times, including the November 2020 election, where 74% of the votes were cast by absentee ballot in one of several forms. This meant that 74% of the ballots were handled at what is known as the Central Absentee Precinct (CAP), where thumb drives were used and re-used with few

---

[7] "The Five Eyes was formally founded in the aftermath of the Second World War, through the multilateral agreement for co-operation in signals intelligence (SIGINT), known as the UKUSA Agreement, on 5 March 1946." Since this original agreement, Canada, Australia, New Zealand have been added as well as other countries for unique functional topics. https://ukdefencejournal.org.uk/the-five-eyes-the-intelligence-alliance-of-the-anglosphere/

[8] Department of Homeland Security, Fact Sheet: Preventing and Defending Against Cyber Attacks, October 18, 2011; https://www.dhs.gov/news/2011/10/18/preventing-and-defending-against-cyber-attacks

chain of custody procedures. The use of a thumb drive is a key enabler in cyber intrusions based upon the Agent BTZ[9] and possibly Stuxnet[10]. I have also had the opportunity to brief Commonwealth level officials in 2022 on a number of points of concern on the security of voting in Virginia, including machines, cloud enabled storage and processing of voting data, voting rolls, and other matters.

**Taiwan Election in January 2020**

23. An exemplar of the conduct of a fair, transparent, and trusted elections was the January 11, 2020, election in Taiwan. Taiwan is subject to continuous acts of aggression and coercion by the Communist government of China, and its elections are a point of potential vulnerability to Chinese Communist interference.

24. I was a senior Cyber Liaison from the Department of Defense to the Taiwan Ministry of National Defense's Computer Emergency Response Team from 2014 to 2018. Often my meetings included representatives of the Taiwan National Security Council, Taiwan's analogue to the U.S. National Security Council. In this role, I learned much about the issues Taiwan faces from China.

25. After I retired from the military, I had the opportunity to provide advice for the January 2020 elections in Taiwan. One of my recommendation was to make the process as simple and transparent as possible by relying on paper ballots, hand counting, and minimization of any election machines. I advised that ballots be tabulated (when not hand counted) as transparently as possible. I advised that tabulation machines should have no other feature other than to tabulate the ballot. The machines should have no features other than simple tabulation, and no connectivity sub-components such as Bluetooth, modems, or anything else. Such a configuration limits remote access operations to unique

---

[9] Council on Foreign Relations, Cyber-Operations, "Agent.btz", November 2008 https://www.cfr.org/cyber-operations/agentbtz
[10] CNET, Stuxnet delivered to Iranian nuclear plant on thumb drive", April 12, 2012, https://www.cnet.com/news/stuxnet-delivered-to-iranian-nuclear-plant-on-thumb-drive/

access methods such as 110- or 220-volt power cords (i.e., wall power that the machine is plugged into)[11].

26. The Taiwanese executed their election in 2020 flawlessly. A new law was passed,[12] and arrests were made of foreign influence operatives who were accepting foreign payments for influence of elections. The election was conducted in a model of transparent processes using manual processes to the greatest degree possible, enabled by the simplest of election machines and technology. The counting of ballots was done live, on television broadcasts, with multiple observers from both parties, showing the ballot as marked, before the ballot was passed through, and Jumbo-Tron Screens showing how the counts changed with each ballot after being passed through the tabulator.

**The History of Remote Access Operations**

27. Since the Second World War and the 1947 and 1949 National Security Acts,[13] the U.S. Intelligence Community and the U.S. Government have sought, for purposes of national defense, to obtain information from and send information into regions controlled by hostile governments. Remote access operations flow from this practice.

28. In the early days of computer networks, connectivity often relied upon "dial up" connections through common copper phone that linked the computers. There were no firewalls, gateways, or cybersecurity, and really no thought to security at the time[14]. The thought of a non-compliant or hostile participant was not really considered. Why would anyone be malign?.

---

[11] The Hacker News, "Hacker can steal data from air-gapped computers through Power Lines, April 12, 2018, https://thehackernews.com/2018/04/hacking-airgap-computers.html

[12] ABC News, "Taiwan passes law targeting Chinese Political Interference, December 31, 2019, https://abcnews.go.com/International/wireStory/taiwan-passes-law-targeting-chinese-political-interference-67996333

[13] DNI, "National Security Act of 1947", https://www.dni.gov/index.php/ic-legal-reference-book/national-security-act-of-1947

29. Eventually, information technology engineers created worms[15] out of curiosity. In the 1980s threat actors (and the U.S. Government) began to realize the exploitation or mayhem that could be inflicted over computer networks. Much of the activity centered on intercepting and decrypting message traffic. The CIA and NSA entered this world as well as the Department of Justice and the Federal Bureau of Investigation. The Soviet Union was the nation that presented the greatest immediate threat, but China was silently learning, and non-nation state actors ("hacktivists") and organized crime were also beginning to learn, study, and exploit the rapidly developing internet. Today there are malign actors,[16] many of them,[17] who pursue remote access operations.

30. In 2003 the White House issued the National Strategy to Secure Cyber Space, which prioritized securing our networks and ensuring American freedom of movement through other networks and the cyber environment. People, programs, and resources were assembled to accomplish this strategy. In 2005, the Joint Functional Component Command Network Warfare (JFCC-NW) was established. In my office in the Pentagon, I began accumulating memos and documents concerning cyber security.

31. In and after 2002, my responsibilities included overseeing the pursuit of Al Qaeda members hiding in Yemen. We relied upon remote access to all forms of critical infrastructure, communications networks, emissions, and signatures around the world. Our technology and methods were labor and resource intensive, quite manual, and lacked automation to do this with multiple target tracks simultaneously. For high priority intelligence targets, these remote operations could be done, but not on a scale of tens and hundreds of thousand simultaneous surveillance operations.

---

[15] Norton, https://us.norton.com/internetsecurity-malware-what-is-a-computer-worm.html

[16] Cybercrime Magazine, "The History of Cybercrime And Cybersecurity, 1940 – 2020", November 30, 2020; https://cybersecurityventures.com/the-history-of-cybercrime-and-cybersecurity-1940-2020/

[17] Center for Strategic and International Studies, "Significant Cyber Incidents"; https://www.csis.org/programs/strategic-technologies-program/significant-cyber-incidents

32. As time passed, capabilities increased. It was an iterative learning process, with a dizzying exponential increase in "points of presence" (where information was gathered from) and simultaneous remote access operations.

33. The intent of remote access operations was to establish full spectrum dominance of all forms of communication, information technology, and cyber in and around Iraq to project effects. Were these effects used to influence elections? According to a Foreign Affairs article,[18] it was discussed but ultimately not implemented according to those interviewed. The wording in the article implies in my opinion a declination of President Bush to approve a covert finding for the CIA to directly engage on the election and perhaps the direct method of manipulating vote tallies.

34. As time went on in Iraq and chaotic civil war broke out among several factions, we attempted different lines of effort to help establish civil society. Part of this was efficiently generating and delivering cyber effects into Iraq and relevant areas outside of Iraq. General Stan McChrystal, who was now with the Joint Special Operations Command, refined the art form of integrating Remote Access Operations to directly support his Commander's objectives.

35. I was working as both a Joint Staff J-5 Middle East Staff Officer and an Office of the Secretary of Defense Senior Civilian involved in the deliberations to develop and approve the Executive Order for Countering the Adversary Use of the Internet.[19] These efforts encapsulated the operational and directive authority for a family of worldwide remote access operations as well as what would become PPD-20,[20] a follow on authority for the use of remote access operations which, in theory made the

[18] Foreign Affairs, "When the CIA Interferes in Foreign Elections A Modern-Day History of American Covert Action" June 21, 2020

[19] Committee on Armed Services, U.S. Senate, "Foreign Cyber Threats to the United States", January 5, 2017; https://irp.fas.org/congress/2017_hr/cyber-threats.pdf

[20] Executive Office of the President, "Fact Sheet on Presidential Policy Directive 20", January 2013; https://irp.fas.org/offdocs/ppd/ppd-20-fs.pdf

authority and approval of remote access more agile and responsive to a greater spectrum of senior leaders.

36. A culture of remote access capabilities has now become ubiquitous and perhaps commoditized, with former government employees alleged to be making use of the same techniques and tools in private activities after leaving government service. What was nurtured in classified environments has escaped, one way or another, into the wild.[21]

37. There is also distinct mimicry of American methods by foreign governments including China, Russia, Iran, and Venezuela. During my almost 40 years of experience, the phenomenon has recurred – we lead and innovate, our competitors then copy us. A computer virus called Stuxnet was planted by someone into the Iranian nuclear environment, and Agent BTZ was planted right back onto U.S. Government networks in a seemingly copycat attack, leveraging very similar techniques. The Chinese Communist government especially, fastidiously, and laboriously studies and analyzes everything, everything we say and do. If we possibly used remote access operations to enter critical infrastructure and influence events, the Chinese surely studied our efforts and applied these same capabilities and strategies. Starting with China's relentless intellectual property theft in the 1990s and Russia's cyber aggression against Estonia in 2007, these governments have used remote access operation tactics, techniques, and procedures they often watched, studied, and learned from us.

38. The U.S launched a Comprehensive National Cybersecurity Initiative (CNCI)[22] in 2008, as described in the Presidential Directive attached hereto as Exhibit A.

---

[21] Atlantic Council, "Surveillance Technology at the Fair: Proliferation of Cyber Capabilities in International Arms Markets", November 8, 2021; https://www.atlanticcouncil.org/in-depth-research-reports/issue-brief/surveillance-technology-at-the-fair/

[22] FAS.ORG; De-classified Text of HS/NSPD-54/23: Cybersecurity Policy; https://irp.fas.org/offdocs/nspd/nspd-54.pdf

39. CNCI included the development of significant new remote access capabilities. Portions of paragraph 47 of the CNCI document (pages 12-13) are partially redacted and possibly point to additional capabilities. The CNCI effort was a disruptive, historical inflection point for collection of information on a massive scale never seen before. From 2007 forward, the ability to penetrate networks, and manipulate or gain information on scale, expanded exponentially. Robust remote access operations can range across several functional activities and can possibly include exfiltration or manipulation of data on a large scale of critical infrastructure —including electronic voting systems.

40. There were 12 publicly announced initiatives in the CNCI program. I was a key player in the de-classification of the 12 CNCI initiatives. It was my job from 2007 – 2014 to act as the senior DoD lead working in conjunction with OMB, the DNI, DHS, and the DOJ to ensure these CNCI funds were properly deployed, obligated, implemented, and effectiveness measured.

41. Behind the veil of the 12 announced CNCI initiatives, other capabilities lurked involving big data collection, sorting, and analysis on a scale never before seen—capabilities now seen as routine with Amazon and Google search. An unprecedented ability emerged to access, exfiltrate, analyze, and change information in critical infrastructure, which includes electronic election systems. Foreign governments have once again, studied, and replicated these efforts.

42. While significant people, programs, and resources were being generated by CNCI, the Chinese government conducted a massive remote access penetration and exfiltration operation focused on the U.S. federal Office of Personnel Management. The operation yielded massive amounts of information and illustrated how American critical infrastructure involving electronic systems can be penetrated through remote access operations.

43. The OPM breach demonstrated the ease with which a foreign government could access a U.S. Government "trusted" critical infrastructure network, install enabling malware, and exfiltrate data on a massive scale. CNN reported 21.5 million Americans were exposed in this breach which started,

perhaps around 2013, just as CNCI was hitting full operational capability. The crown jewel of this massive theft through remote access was hundreds of thousands or more SF-86's —the key U.S. Government form that comprehensively documents a person's history and background for those seeking or renewing a security clearance. These files contained expansive details about everyone who has or had security clearances. There is no reason to believe that our electronic election systems infrastructure could not be similarly penetrated and manipulated.

44. Another example of a nation state using remote access operations to penetrate a critical infrastructure network is the more recent SolarWinds breach, in which enabling malware was planted into software updates which created broad and pervasive presence through many customer networks using Solar Winds Orion software. SolarWinds showed the relative ease of cybersecurity offense penetrating the defense and spreading broadly, perhaps for years, and establishing a decisive position to monitor, surveil, steal, and manipulate data. This breach also illustrates how thousands of systems can be hacked in a coordinated fashion, and shows how the belief that our electronic voting systems are more secure by being purportedly decentralized is a false notion.

45. From about 2008 – 2014, I was one of a small group of inter-agency players involved in a group called the CRG. The purpose of this group was to work the hardest problem set of weaknesses of the American cyber critical infrastructure to foreign remote access operations and turn these into opportunities for American counter moves back into the threat environment to hold our adversaries at risk. In approximately 2014, because of shifting priorities, I no longer attended the CRG meetings, but I often heard updates of their work in in regular internal cyber coordination meetings. In 2016, references to Russian and Chinese interference into the American election process began. The references identified their intrusions into campaign networks. Iran was also a regular threat nation identified.

**Cybersecurity Weakness in U.S. Elections**

46. In all my election work in U.S. elections, in Bosnia, in Iraq, and in assessment of Taiwan elections the principles of the Carter Center for Democracy, and their recommended best practices for free and fair elections, have served as the guideposts. The Carter Center Manual, Chapters 8 – 10,[23] is considered the gold standard in the conduct of democratic elections. In my professional opinion, American elections deviate substantively from the best practices endorsed by the Carter Center with respect to cybersecurity.

47. The Carter Center mandates review of electronic voting technologies by an independent body (P.152). There is no pervasive implementation of qualified independent bodies provided with uniform minimum standards at the county or state level to review election technologies that I am aware of. Currently, county election personnel rely entirely on their contractors for administration of election technologies. I have never come across a county where the sworn election officials know how to access or see network activity beyond the operator level of any election machine or related information technology component. There is no independent, third-party verification and validation I have ever come across. Contractors often assert intellectual property rights or contractual terms and conditions to deny any third-party review of the network/cloud environment beyond the election machine. For example, it has been publicly reported that "a software update [was] installed to address a glitch in Georgia's voting machines" just a few weeks prior to the November 2020 election.[24] It does not appear that this "update," and its purpose or effect, was ever reviewed by any qualified independent bodies.

---

[23] The Carter Center, "Election Obligations and Standards"; https://www.cartercenter.org/resources/pdfs/peace/democracy/cc-OES-handbook-10172014.pdf
[24] AP News, "With time short, judge mulls Georgia voting system changes", October 7, 2020, https://apnews.com/article/technology-senate-elections-georgia-elections-voting-machines-6a6be19f168a719e68c107c7426df9f3

48. In my professional experience, there often is a monoculture of singular narratives in the national security world that are established and once established are rarely, if ever questioned, challenged, or further investigated. I have experienced this mentality in countless senior level meetings within the Pentagon, the Inter-Agency, and the White House. This strong conformance to a singular narrative incorporated outright hostility to any notion that China interfered in the November 2020 election. On January 7, 2021, the Director of National Intelligence concluded in an unclassified memorandum that "CIA Management took actions 'pressuring [analysts] to withdraw their support" for findings regarding China's actions to "interfere" in the election.[25] The DNI concluded that the CIA's actions violated Intelligence Community Tradecraft Standards.

**Failure of the U.S. Government to Secure the American Election Environment**

49. Recent assertions by federal government officials on the security of U.S. election critical infrastructure against remote access operations are misguided, in my opinion. While these leaders and personnel are of high caliber and well meaning, they simply do not understand the election system, process, nor equipment.

50. Around the November 2020 election, representatives of CISA, including Chris Krebs, Director of CISA, made strong assertions of election security such as "[t]he November 3rd election was the most secure in American history." In my professional opinion, such statements are false because, in my observations and decades of experience within government, the U.S. Government does not have the people, programs, or resources to have a comment on the true resilience and security of the election critical infrastructure.

---

[25] DNI John Ratcliffe Memo, January 7, 2021; Views on Intelligence Community Election Security Analysis; https://context-cdn.washingtonpost.com/notes/prod/default/documents/6d274110-a84b-4694-96cd-6a902207d2bd/note/733364cf-0afb-412d-a5b4-ab797a8ba154.#page=1

51. In addition, two things Mr. Krebs did significantly undermined his credibility. First was his tweet on November 18, 2020, where Mr. Krebs backtracked on his previous assertion of that the November 2020 election was secure.




52. The second was Mr. Krebs's congressional testimony on February 10, 2021,[26] where his statement was replete with comments on the shortage of people, programs, or resources to provide effective cybersecurity of the American election environment. From Mr. Krebs's statement, it is hard to reconcile his February 10, 2021, statement with the statement he approved from November 12, 2021:

> It is hard to overstate the massive scope of the critical infrastructure security and resilience challenge. The levers government has at its disposal to change behaviors, on the other hand, is underwhelmingly small. This leads to three conditions limiting the ability of government and industry to collectively improve critical infrastructure cybersecurity: (1) lack of a deep understanding of what is truly systemically important across the economy, (2) a need for more meaningful methods for operational engagement with industry to address risk; and (3) insufficient funding and investment in security improvements.

---

[26] Christopher C. Krebs Testimony before Committee on Homeland Security, February 10, 2021, https://docs.house.gov/meetings/HM/HM00/20210210/111152/HHRG-117-HM00-Wstate-KrebsC-20210210.pdf

53. In my professional experience and opinion, it is of low probability that the national intelligence collection system was specifically looking for Chinese intervention into any election system infrastructure or components. The catastrophic Target Corporation retail store breach demonstrated how a threat actor can remotely obtain access into key information of an enterprise through related but different critical infrastructure such as facility climate control networks. The Target Corporation breach was closely followed and studied within the U.S. Government. It is of note that none other than Chris Krebs identified this capability of remote access through a related system in a 2014 article on the Target Breach.[27]

54. In my professional opinion, assertions by state and federal officials that electronic election systems in our Country are secure from remote access operations have little basis in fact and are false. My opinion is further supported by other computer science experts such as University of Michigan Professor J. Alex Halderman.[28]

55. In my professional experience and opinion, all components of the American election system at all levels, but especially the crucial and foundational county level, including information technology, election machines, network architecture, ballot design and handling and all related matters are for more complicated than necessary and are void of transparency and understandability for the sworn election officer charged with running the entire process. Far greater public trust and confidence as well as significant cost savings can be had by re-introducing manual processes overseen by trusted, sworn election officers.

---

[27] KrebsonSecurity, Target hackers Broke in via HVAC Company, February 14, 2015, https://krebsonsecurity.com/2014/02/target-hackers-broke-in-via-hvac-company/

[28] Declaration of J. Alex Halderman in support of Motion for Preliminary Injunction, Civil Action No. 1:17-CV-2989-AT stating 16 states using Dominion machines can have votes "stolen" by "nefarious actors" and begging the court unseal his report on these issues to allow CISA to try and fix these vulnerabilities before the 2022 election.

**Strong Indicators of Sophisticated, Automated, and Nation State Level and/or Witting Insider Enablement of Access**

56. As I read the Mesa County report from the perspective of my experience in assessing large breaches, intrusions, and exfiltrations, the techniques, complexity, and sophistication of the events identified in the report screamed about advanced capabilities, including possibly Artificial Intelligence and the all-important enablement by what we would call the "witting" insider when assessing major network intrusions. The unwitting insider being the personality who clicks on a spear phishing link, or uses simple passwords or stores them, unsecure on documents, or visible in some way. Cameras on computers can be accessed and often times anything in an office space is visible – including handwritten passwords on sticky notes. In reviewing the entire Department of Defense and Intelligence Community environment from 2014 to 2018, we identified that more than 90% of breaches traced to one of three vulnerabilities: Lack of Two Factor Authentication (2FA); Spear phishing, or the Insider threat. That 90% doesn't necessarily include vulnerabilities in firewalls, anti-virus programs, or operating systems.

57. One of the key areas of concern over cyber vulnerability include remote access to the election machines. Remote access to networks and systems has been built in from almost the beginning of the information technology age. Even in early operating systems, the need to update software and firmware was identified, and the intuitive design feature was to create a "backdoor" to remotely assess system performance, conduct maintenance, and update software/data sets. All of this makes sense when viewed from cost efficiencies, ease of access, and the operational usage. This capability was prevalent in the 1990s when I was involved with the first generation of automated, computer based, air traffic control, and aids to air navigation. However, those intent on conducting mischief and mayhem also immediately picked up on this functionality that could be flipped into ingress points into the network environment.

58. ES&S has admitted to building in remote access to their machines. As with many remote access procedures for maintenance, it does not appear this Mesa County access was or is 2FA enabled. Many remote access procedures have no password, use an obvious common password, or have not changed the password literally for years or decades over concern of the system crashing if the password was changed. An inspection of the machines is required by Colorado Election Statute, but this legal obligation implies that the inspector has an informed understanding of the machines, and a nominal visual inspection would likely identify the Election Machine modems, which may be able to operate in a wireless state.

59. A Sworn Election Official, knowing the wireless ability of the election machines would further be led to the intuitive conclusion of securing their wired and wireless environment and would use a Wireshark or similar tool to detect wireless traffic and conduct forensics to determine what machines are talking to what networks. All of these activities fall reasonably within the realm of the statute required "Inspection". Requirement to know these things is commensurate with the complexity of the equipment being overseen, which begets the question as to why these election machines are so sophisticated and complex.

60. The report also flagged two additional modus operandi that immediately stood out in my mind; artificial intelligence enabled swapping of data and the insider. On the first issue, although roughly 25,000 ballots to be scanned may be considered a small number, the commensurate data sets identified in the report imply advanced computing ability to create, maintain, and update this data and the ability to project it through the network to the right machines. This is above the ability of humans on keyboard to orchestrate such activity. A human may design the original algorithms, but actual Artificial Intelligence activities learn and adapt at faster speeds than humans. The report describes activities that broach areas beyond immediate human enabled activities.

61. The Mesa County situation also points to one of the big three reasons identified earlier for network breaches: The Witting Insider. This is the most dangerous of the three reasons identified earlier and despite the many stories in media about breaking into computer networks, this is the one with the highest probability and the one that inflicts the greatest amount of damage. Please think about the Edward Snowden episode which is still reverberating to this day. The reality is that any Intelligence Preparation of the Battlefield (IPB) or Operational Preparation of the Environment (OPE) for military or intelligence operations immediately lays down the greatly desired aspect of leveraging the knowledge of an insider which often is irreplaceable and frankly, sensitive national security operations are unexecutable without this insider.

62. The factual reality of the need for an insider, points right back at the Election Machine Company. With Sworn Officials apparently hermetically sealed off from any modicum of knowledge of how the election machines work (including the EMS systems), the actuality and likelihood of successful of network enabled placement of new data sets onto the machines could simply not have been accomplished without a witting, compliant insider. The representatives of the Election Machine Companies are the logical persons of interest. Furthermore, even if they weren't, their inability to detect, understand, and report these intuitively suspicious network activities means they are not compliant to the terms, meaning, spirit, or intent of the contract with the county or Colorado law.

**Intentional Over-Sophistication of Voting Machine Equipment and Processes**

63. With the preceding analysis, another intuitive conclusion is drawn. Why is the voting process so complicated? Also, why are counties spending so much time and resources on an information technology environment? Has anyone conducted an evaluation of the cost, time, and motion spend on automated systems versus hand counting of ballots? Any such evaluation must include accounting for the greater likelihood of unintended outcomes.

64. With the apparent lack of knowledge from the Sworn Officials, there appeared to be no checks and balances or quality control measure to detect or measure the magnitude of such errors, deviations, or breakdown of processes in Mesa County. Simply put, it is very likely that simple counting by hand will be faster, more accurate, and far less expensive than the current process. Yes, from a credit card company perspective with billions of daily transactions, advanced, AI enabled, conduct of the network makes sense. We should not be fooled by technology. There's a right time and place for advanced computing systems, data storage, processing, networks, and cloud instantiations. We need to be thoughtful and discerning on which provides better service to our citizenry. The entire precept of electronic voting machines needs to be re-visited.

I declare under penalty of the perjury laws of the State of Virginia and the United Sates that the foregoing is true and correct and that this declaration was executed this 25th day of May 2022 in Woodbridge, Virginia

Colonel, USAR (Retired) John R. Mills
May 25, 2022

# EXHIBIT A

2

~~TOP SECRET~~

THE WHITE HOUSE

WASHINGTON

January 8, 2008

NATIONAL SECURITY PRESIDENTIAL DIRECTIVE/NSPD–54
HOMELAND SECURITY PRESIDENTIAL DIRECTIVE/HSPD–23

Subject: Cybersecurity Policy (U)

Purpose

(1) This directive establishes United States policy, strategy, guidelines, and implementation actions to secure cyberspace. It strengthens and augments existing policies for protecting the security and privacy of information entrusted to the Federal Government and clarifies roles and responsibilities of Federal agencies relating to cybersecurity. It requires the Federal Government to integrate many of its technical and organizational capabilities in order to better address sophisticated cybersecurity threats and vulnerabilities. (U)

(2) This directive (a) provides an enduring and comprehensive approach to cybersecurity that anticipates future cyber threats and technologies and involves applying all elements of national power and influence to secure our national interests in cyberspace and (b) directs the collection, analysis, and dissemination of information related to the cyber threat against the United States and describes the missions, functions, operations, and coordination mechanisms of various cyber operational organizations throughout the Federal Government. (U)

(3) This directive furthers the implementation of the *National Strategy for Homeland Security*, Homeland Security Presidential Directive-5 (HSPD-5) (*Management of Domestic Incidents*), Homeland Security Presidential Directive-7 (HSPD-7) *(Critical Infrastructure Identification, Prioritization, and Protection)*, Homeland Security Presidential Directive-8 (HSPD-8) (*National Preparedness*), Executive Order 13434 of May 17, 2007, (*National Security Professional Development*), and (b)(1) OGA ~~(S//NF)~~

(4) Actions taken pursuant to this directive will improve the Nation's security against the full spectrum of cyber threats and, in particular, the capability of the United States to deter, prevent, detect, characterize, attribute, monitor, interdict, and otherwise protect against unauthorized access to National Security Systems, Federal systems, and private-sector critical infrastructure systems. ~~(S//NF)~~

~~TOP SECRET~~
Reason: 1.4 (c) (d) (e) (g)
Declassify on: 1/05/2043

Declassified in Part
Authority EPIC v. NSA, FOIA Case #58987 (06/05/2014)
By NH NARA, Date 09/11/2014

## Background

(5) The electronic information infrastructure of the United States is subject to constant intrusion by adversaries that may include foreign intelligence and military services, organized criminal groups, and terrorists trying to steal sensitive information or damage, degrade, or destroy data, information systems, or the critical infrastructures that depend upon them. Cyber criminals are intent on malicious activity, including the manipulation of stock prices, on-line extortion, and fraud. These activities cost American citizens and businesses tens of billions of dollars each year. Hackers and insiders have penetrated or shut down utilities in countries on at least three continents. Some terrorist groups have established sophisticated on-line presences and may be developing cyber attacks against the United States. ~~(S//NF)~~

(6) The United States must maintain unrestricted access to and use of cyberspace for a broad range of national purposes. The expanding use of the Internet poses both opportunities and challenges. The ability to share information rapidly and efficiently has enabled huge gains in private sector productivity, military capabilities, intelligence analysis, and government effectiveness. Conversely, it has created new vulnerabilities that must be addressed in order to safeguard the gains made from greater information sharing. ~~(S//NF)~~

## Definitions

(7) In this directive:

(a) "computer network attack" or "attack" means actions taken through the use of computer networks to disrupt, deny, degrade, manipulate, or destroy computers, computer networks, or information residing in computers and computer networks; ~~(S)~~

(b) "computer network exploitation" or "exploit" means actions that enable operations and intelligence collection capabilities conducted through the use of computer networks to gather data from target or adversary automated information systems or networks; ~~(S)~~

(c) "counterintelligence" means information gathered and activities conducted to protect against espionage, other intelligence activities, sabotage, or assassinations conducted by or on behalf of foreign governments or elements thereof, foreign organizations, foreign persons, or international terrorist activities; (U)

(d) "cyber incident" means any attempted or successful access to, exfiltration of, manipulation of, or impairment to the integrity, confidentiality, security, or availability of data, an application, or an information system, without lawful authority; (U)

(e) "cyber threat investigation" means any actions taken within the United States, consistent with applicable law and Presidential guidance, to determine the identity, location, intent, motivation, capabilities, alliances, funding, or methodologies of one or more cyber threat groups or individuals; (U)

(f) "cybersecurity" means prevention of damage to, protection of, and restoration of computers, electronic communications systems, electronic communication services, wire communication, and electronic communication, including information contained therein, to ensure its availability, integrity, authentication, confidentiality, and non-repudiation; (U)

(g) "cyberspace" means the interdependent network of information technology infrastructures, and includes the Internet, telecommunications networks, computer systems, and embedded processors and controllers in critical industries; (U)

(h) "Federal agencies" means executive agencies as defined in section 105 of title 5, United States Code, and the United States Postal Service, but not the Government Accountability Office; (U)

(i) "Federal systems" means all Federal Government information systems except for (i) National Security Systems of Federal agencies and (ii) Department of Defense information systems; (U)

(j) "information security incident" means a "computer security incident" within Federal Government systems (as described in National Institute of Standards and Technology Special Publication 800-61 "Computer Security Incident Handling Guide") or critical infrastructure systems that is a violation or imminent threat of violation of computer security policies, acceptable use policies, or standard computer security practices; (U)

(k) "information system" means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information; (U)

(l) "intrusion" means unauthorized access to a Federal Government or critical infrastructure network, information system, or application; (U)

(m) "National Security System" means any information system (including any telecommunication system) used or operated by an agency, an agency contractor, or other organization on behalf of an agency, where the function, operation, or use of that system involves (i) intelligence activities, (ii) cryptologic activities related to national security,

(iii) command and control of military forces, (iv) equipment that is an integral part of a weapon or weapon systems, or (v) critical to the direct fulfillment of military or intelligence missions; or is protected at all times by procedures established for information that have been specifically authorized under criteria established by an Executive Order or an Act of Congress to be kept classified in the interest of national defense or foreign policy. This definition excludes any system that is designed to be used for routine administrative and business applications such as payroll, finance, or logistics and personnel management applications; (U)

(n) (b)(1) OGA ~~(S//NF)~~

(o) "secure" means to defend and protect both military and civilian Government-owned networks; (U)

(p) "State" and "local government" when used in a geographical sense have the meanings ascribed to them in section 2 of the Homeland Security Act of 2002 (section 101 of title 6, United States Code); and (U)

(q) "US-CERT" means the United States Computer Emergency Readiness Team in the National Cyber Security Division of the Department of Homeland Security (DHS). (U)

<u>Policy</u>

(8) Federal agencies shall, consistent with this directive, increase efforts to coordinate and enhance the security of their classified and unclassified networks; increase protection of the data on these networks; and improve their capability to deter, detect, prevent, protect against, and respond to threats against information systems and data. (U)

(9) Federal agencies shall, as required by law, protect the confidentiality, integrity, and availability of information stored, processed, and transmitted on their information systems, and shall ensure the authentication of access to such systems as required. Federal agencies shall take appropriate measures to reduce the risk to these systems and adequately deter, reduce, and limit the loss of information or the operational degradation of information systems that are critical to the national security, national economic security, or public health or safety. (U)

(10) The Federal Government shall increase efforts with critical infrastructure sectors to enhance the security of their information networks. (U)

Policy Coordination

(11) Consistent with National Security Policy Directive-1 (NSPD-1) (*Organization of the National Security Council System*) and Homeland Security Presidential Directive-1 (HSPD-1) (*Organization and Operation of the Homeland Security Council*), the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism shall be responsible to the President for interagency policy coordination on all aspects of cybersecurity. ~~(S)~~

(12) The CSC PCC shall ensure ongoing coordination of the U.S. Government policies, strategies, and initiatives related to cybersecurity; shall monitor actions to implement this directive; and shall keep informed the Assistants to the President referenced in paragraph 11 of this directive. (U)

(13) The National Cyber Response Coordination Group (NCRCG) consists of senior representatives from Federal agencies that have roles and responsibilities related to preventing, investigating, defending against, responding to, mitigating, and assisting in the recovery from cyber incidents and attacks. In the event of a cyber incident, the NCRCG will convene to harmonize operational response efforts and facilitate information sharing consistent with HSPD-5 and the National Response Framework. The NCRCG shall provide advice to the CSC PCC, as appropriate. (U)

Roles and Responsibilities

(14) (b)(1) OGA

~~(TS)~~

(15) Unless otherwise directed by the President with respect to particular matters, the Secretary of Homeland Security shall lead the national effort to protect, defend, and reduce vulnerabilities of Federal systems and the Secretary of Defense shall provide support to the Secretary of Homeland Security with respect to such assignment. The Secretary of Homeland Security shall:

(a) Manage and oversee, through US-CERT, the external access points, including access to the Internet, for all Federal systems;

(b) Provide consolidated intrusion detection, incident analysis, and cyber response capabilities to protect Federal agencies' external access points, including access to the Internet, for all Federal systems;

(c) In coordination with the Director of OMB, set minimum operational standards for Federal Government Network Operations Centers (NOCs) and Security Operations Centers

(SOCs) that enable DHS, through US-CERT, to direct the operation and defense of external access points, including Internet access points, for all Federal systems, which the Secretary will certify and enforce; and

(d) Utilize the National Infrastructure Protection Plan process, in accordance with HSPD-7, to disseminate cyber threat, vulnerability, mitigation, and warning information to improve the security and protection of critical infrastructure networks owned or operated by Federal agencies; State, local, and tribal governments; private industry; academia; and international partners. (U)

(16) The Director of OMB shall:

(a) Direct, to the extent practicable and consistent with national security, the reduction and consolidation of Federal Government external access points, including Internet access points, for all Federal systems; (U)

(b) Annually assess, in coordination with the Secretary of Homeland Security, network security best practices of Federal agencies, recommend changes to policies or architectures that should be applied across the Federal Government, and ensure Federal agencies comply with standards and policies if adopted by the Director; and (U)

(c) Within 180 days after the effective date of this directive, draft an implementation plan, in coordination with the Secretary of Homeland Security, for an agency accountability process to ensure compliance with and the maintenance of mandatory network security practices by Federal agencies. (U)

(17) The Secretary of State, in coordination with the Secretaries of Defense, the Treasury, Commerce, and Homeland Security, the Attorney General, and the DNI, shall work with foreign countries and international organizations on international aspects of cybersecurity. (U)

(18) The Secretary of Commerce shall prescribe, in accordance with applicable law, information security standards and guidelines for Federal systems. (U)

(19) The Secretary of Energy, as authorized in the Atomic Energy Act of 1954 (AEA), as amended, shall, after coordination with the Secretary of Defense and the DNI, prescribe information security standards and guidelines pertaining to the processing of restricted data, as defined in the AEA, in all Federal agencies, as appropriate. (U)

(20) The Secretary of Defense and the DNI shall provide indications and warning information to DHS regarding threats originating or directed from outside the United States. (U)

(21) The DNI analyzes and integrates all intelligence possessed or acquired by the U.S. Government pertaining to cybersecurity. The DNI, as the head of the intelligence community and consistent with section 1018 of the Intelligence Reform and Terrorism Prevention Act (Public Law 108-458), shall implement the policies and initiatives set forth in this directive within and throughout the intelligence community through the DNI's statutory budget, tasking, and intelligence information sharing authorities, in order to ensure appropriate resource allocation and integration of all cybersecurity efforts and initiatives within and throughout the intelligence community. (U)

(22) [redacted] (b)(1) OGA ~~(S//NF)~~

(23) The Secretary of Defense has responsibility for directing the operation and defense of the Department of Defense's information enterprise, including monitoring of malicious activity in its networks. The Secretary of Homeland Security is responsible for protecting Federal systems by supporting information assurance strategies within Federal agencies through the following: compiling and analyzing security incident information across the Federal Government; informing and collaborating with Federal, State, local, tribal agencies, private critical infrastructure sectors, and international partners on threats and vulnerabilities; providing vulnerability mitigation guidance; supporting public and private incident response efforts; and serving as a focal point to protect U.S. cyberspace. (U)

(24) The Secretary of Homeland Security, supported by the Director of US-CERT, and the heads of Sector-Specific Agencies, as defined by and consistent with HSPD-7, shall conduct outreach to the private sector on cybersecurity threat and vulnerability information. (U)

(25) The heads of all Federal agencies, to the extent permitted by law and necessary for the effective implementation of the cybersecurity mission, shall support and collaborate with the Secretary of Homeland Security. Further, all Federal agencies shall align their own network operations and defense capabilities to provide DHS with visibility and insight into the status of their Federal systems and shall respond to DHS direction in areas related to network security, allowing DHS to effectively protect the Federal Government network enterprise. Federal agencies shall continue to execute their responsibilities to protect and defend their networks. (U)

Implementation

(26) The Secretary of Homeland Security shall establish a National Cybersecurity Center ("Center"), headed by a Director, to coordinate and integrate information to secure U.S. cyber networks and systems. To ensure a comprehensive approach to cybersecurity and anticipate future threats, other cyber activities shall inform, enable, and enhance cybersecurity activities as appropriate, and in accordance with the implementation plan described in paragraph 28 of this directive. ~~(S)~~

(27) The Secretaries of Defense and Homeland Security, the Attorney General, and the DNI shall collocate at the Center certain representatives from their respective cybersecurity organizations. Other Federal Government cyber organizations [redacted] (b)(1) OGA shall be collocated or virtually connected as appropriate. ~~(TS//NF)~~

(28) Not later than 90 days from the date of this directive, the Secretary of Homeland Security, in coordination with the Secretary of Defense, the Attorney General, the Director of OMB, and the DNI, shall, through the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism, submit to me for approval an implementation plan that includes details on how authorities will be applied, a concept of operations, and the allocation of required resources for the Center. (U)

(29) The Director of the Center shall:

(a) Be appointed by the Secretary of Homeland Security with the concurrence of the Secretary of Defense, after consultation with the Attorney General and the DNI, and is supervised by the Secretary of Homeland Security; (U)

(b) Have coordination authority over the directors of the cybersecurity organizations participating in the Center, which means the Director has the authority to require consultation between the offices, departments, or agencies collocated in or virtually connected to the Center; however, this authority does not allow the Director to compel agreement or to exercise command; rather, it creates a consultative structure; (U)

(c) Support the Secretaries of Defense and Homeland Security, the Attorney General, and the DNI in executing their respective cyber missions, including [redacted] (b)(1) OGA and investigation and prosecution of cyber crime; ~~(TS//NF)~~

(d) Ensure that Federal agencies have access to and receive information and intelligence needed to execute their respective cybersecurity missions, consistent with applicable law

and the need to protect national security; (U)

(e) Advise within the executive branch on the extent to which the cyber program recommendations and budget proposals of agencies conform to cybersecurity priorities; (U)

(f) When appropriate, recommend and facilitate the adoption of common doctrine, planning, and procedures across all cyber mission areas; and (U)

(g) Not direct or impede the execution of law enforcement, intelligence, counterintelligence, counterterrorism, [redacted] (b)(1) OGA [redacted] ~~(S//NF)~~

(30) Each Federal agency operating or exercising control of a National Security System shall share information about information security incidents, threats, and vulnerabilities with the US-CERT to the extent consistent with standards and guidelines for National Security Systems and the need to protect sources and methods. (U)

(31) The National Cyber Investigative Joint Task Force (NCIJTF) shall serve as a multi-agency national focal point for coordinating, integrating, and sharing pertinent information related to cyber threat investigations, with representation from the Central Intelligence Agency (CIA), National Security Agency (NSA), the United States Secret Service (USSS), and other agencies, as appropriate. Under the authority of the Attorney General, the Director of the Federal Bureau of Investigation (FBI) shall be responsible for the operation of the NCIJTF. This authority does not allow the Director of the FBI to direct the operations of other agencies. The Director of the FBI shall ensure that participants share the methodology and, to the extent appropriate, case information related to criminal cyber intrusion investigations among law enforcement organizations represented in the NCIJTF in accordance with paragraphs 32 – 33. (U)

(32) The Attorney General shall, by March 1, 2008, develop and publish an initial version of the Attorney General Guidelines for the NCIJTF, in coordination with the heads of other executive departments and agencies as appropriate. (U)

(33) Within 90 days of the date of this directive, the Attorney General shall submit to the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism an operational plan for the NCIJTF. (U)

Comprehensive National Cybersecurity Initiative

(34) To achieve the goals outlined in this directive, the Federal Government needs an integrated and holistic national approach that builds upon strengths and addresses vulnerabilities in our current cybersecurity practices. This effort shall include the actions directed in paragraphs 35 – 46. (U//~~FOUO~~)

(35) The Director of OMB shall within 90 days of the date of this directive, after consultation with the Secretary of Homeland Security, submit to the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism a detailed plan for the reduction and consolidation by June 30, 2008, of Federal Government external access points, including Internet access points. (U)

(36) The Secretary of Homeland Security shall accelerate deployment of the Einstein program to all Federal systems and shall, after consultation with the Attorney General, enhance the Einstein program to include full-packet content and protocol signature detection. The Secretary of Homeland Security, in consultation with the Director of OMB, shall deploy such a system across the single network enterprise referenced above and consistent with paragraph 16 (a) of this directive no later than December 31, 2008. ~~(S//NF)~~

(37) Within 120 days of the date of this directive, the Secretary of Defense with respect to Department of Defense information systems and the Secretary of Homeland Security with respect to Federal systems, after consultation with the Attorney General,and the Director of OMB, shall develop and submit, through the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism, for my approval an implementation plan to deploy active response sensors across the Federal systems. Such a plan shall also address relevant legal and policy issues of the active response sensor capability. ~~(TS)~~

(38) Within 90 days of the date of this directive, the Director of the Office of Science and Technology Policy (OSTP), after consulting the National Science and Technology Council (NSTC) and the DNI, shall within 90 days of the effective date, develop a detailed plan to coordinate classified and unclassified offensive and defensive cyber research. (U//~~FOUO~~)

(39) Within 45 days of the date of this directive, the DNI, in coordination with the Secretaries of Defense and Homeland Security and the Attorney General, shall submit to the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism a detailed plan, including standard operating and notification procedures, to connect the following cyber centers: NCIJTF; NSA/CSS Threat Operations Center; Joint Task Force-Global Network Operations; Defense Cyber Crime Center; US-CERT; and Intelligence Community Incident Response Center. Within 180 days of this directive, these centers shall be

connected as part of the National Cybersecurity Center. ~~(S//NF)~~

(40) Within 180 days of the date of this directive, the DNI and the Attorney General shall develop a cyber counterintelligence plan, including required resources, that comprehensively reflects the scope and extent of cyber threats. This plan should be consistent with the *National Counterintelligence Strategy of the United States*. (U//~~FOUO~~)

(41) Within 180 days of the date of this directive, the Secretary of Defense and the DNI shall develop a detailed plan to address the security of Federal Government classified networks, including specific recommended measures that will significantly enhance the protection of these networks from the full spectrum of threats. ~~(S//NF)~~

(42) Within 180 days of the date of this directive, the Secretary of Homeland Security, in coordination with the Secretary of Defense, the Director of the Office of Personnel Management, and the Director of the National Science Foundation, shall, within 180 days of the effective date, submit to the Director of the Office of Management and Budget, the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism a report including a strategy and recommendations for prioritizing and redirecting current educational efforts to build a skilled cyber workforce. The report should consider recommendations by such groups as the National Infrastructure Advisory Council, the President's Council of Advisors on Science and Technology, and the National Security Telecommunications Advisory Committee. The report should focus on training the existing cyber workforce in specialized skills and ensuring skilled individuals for future Federal Government employment. (U//~~FOUO~~)

(43) Within 120 days of the effective date of this directive, the Director of the OSTP, after consultation with the NSTC and the DNI, shall develop a plan to expand cyber research and development in high-risk, high-return areas in order to better protect our critical national interests from catastrophic damage and to maintain our technological edge in cyberspace. (U//~~FOUO~~)

(44) Within 270 days of the date of this directive, the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism shall define and develop a comprehensive and coordinated strategy to deter interference and attacks in cyberspace for my approval. ~~(S//NF)~~

(45) Within 180 days of the date of this directive, and consistent with the National Infrastructure Protection Plan and National Security Directive 42 (NSD 42) (*National Policy for the Security of National Security Telecommunication and Information Systems*), the Secretaries of Defense and Homeland Security, in coordination with the Secretaries of the Treasury, Energy, and Commerce, the Attorney General, the DNI, and the Administrator of General Services shall develop a

detailed strategy and implementation plan to better manage and mitigate supply chain vulnerabilities, including specific recommendations to:

(a) Provide to Federal Government and defense acquisition processes personnel access to all source intelligence community vendor threat information;

(b) Reform the Federal Government and defense acquisition processes and policy to enable threat information to be used within acquisition risk-management processes and procurement decisions; and

(c) Identify and broadly implement industry global sourcing risk-management standards and best practices, acquisition lifecycle engineering, and test and evaluation risk mitigation techniques. ~~(S)~~

(46) Within 180 days of the date of this directive, the Secretary of Homeland Security, in consultation with the heads of other Sector-Specific Agencies as outlined in HSPD-7, and consistent with the National Infrastructure Protection Plan, shall submit, through the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism, for my approval a report detailing policy and resource requirements for improving the protection of privately owned U.S.-critical infrastructure networks. The report shall detail how the Federal Government can partner with the private sector to leverage investment in intrusion protection capabilities and technology, increase awareness about the extent and severity of cyber threats facing critical infrastructure, to enhance real-time cyber situational awareness, and encourage specified levels of intrusion protection for critical information technology infrastructure. (U//~~FOUO~~)

(47) Implementing the Comprehensive National Cybersecurity Initiative will require key enablers in the following key areas to ensure success.

(a) The DNI, in coordination with, as appropriate, the Secretaries of State, the Treasury, Defense, Commerce, Energy, and Homeland Security, and the Attorney General, and the Director of OMB, shall:

(i) Monitor and coordinate the implementation of paragraphs 35 through 47 (the "Comprehensive National Cybersecurity Initiative" or "Initiative") of this directive;

(ii) Recommend such actions as the DNI judges necessary to implement the Initiative to:

(A) the President; and

(B) the heads of Federal agencies as appropriate, and the Director of the Office of Management and Budget, for action within their respective authorities; and

(iii) Report not less often than quarterly to the President, through the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism, on implementation of the Initiative, together with such recommendations as the DNI deems appropriate. (U)

(b) The Secretary of Homeland Security and the Attorney General shall ensure adequate support for agents, analysts, and technical infrastructure to neutralize, mitigate, and disrupt illegal computer activity domestically. ~~(S)~~

(c) The Secretary of Defense, the Attorney General, the Secretary of Homeland Security, the DNI, and other heads of Federal agencies as appropriate shall increase predictive, behavioral, information, and trend analyses to better understand and anticipate foreign cyber and technology developments. ~~(S//NF)~~

(d) (b)(1) OGA ~~(S//NF)~~

(e) (b)(1) OGA ~~(S//NF)~~

(f) (b)(1) OGA ~~(TS)~~

(g) The Secretary of Defense and the DNI shall increase Information Assurance to protect National Security Systems against intrusion and attack by implementing defenses to significantly reduce current malicious activity and enable network defenders to focus more effectively on more sophisticated threats. Additionally, by strengthening enterprise-wide cross-domain capabilities and utilizing strong identity protection, the

Federal Government will begin to enable greater information sharing among the key cyber organizations. (U//~~FOUO~~)

(48) Within 180 days of the date of this directive, the Director of OMB, in coordination with the heads of all executive departments and agencies, shall perform a comprehensive risk assessment for the loss, manipulation, or theft of all data currently residing on Federal government unclassified networks. The assessment should assume that adversaries have the capability and intent to either capture the data or disrupt mission applications residing on unclassified networks. The assessment should recommend a prioritized description of which data and applications should be migrated to more secure networks. ~~(S//NF)~~

(49) Within 120 days of the date of this directive, the Secretaries of State, Defense, and Homeland Security, the Attorney General, and the DNI shall submit to the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism a joint plan for the coordination and application of offensive capabilities to defend U.S. information systems. (U//~~FOUO~~)

(50) Within 120 days of the date of this directive, the Attorney General and the Secretary of Homeland Security, after coordination with the Secretary of Defense and the DNI, shall submit to the Assistant to the President for National Security Affairs and the Assistant to the President for Homeland Security and Counterterrorism a plan for the coordination and application of law enforcement capabilities to better support investigations of cyber incidents in United States networks. (U//~~FOUO~~)

Budget

(51) For all future budgets, the heads of all executive departments and agencies shall submit to the Director of OMB, concurrent with their budget submissions, an integrated budget plan to implement the cybersecurity actions described in this directive, consistent with such instructions as the Director of OMB may provide. (U)

General

(52) To the extent of any inconsistencies between this directive and the *National Strategy to Secure Cyberspace* (2003), this directive shall govern. (U)

(53) This directive:

(a) Shall be implemented consistent with applicable law and the authorities of executive departments and agencies, or heads of such departments and agencies, vested by law

Case 3:22ec2v-20D3370067D7cuJTenDd-e4meFtl40 09/1e4/26/08/22SDPageage 36139of 549



(including for the protection of intelligence sources and methods), and subject to the availability of appropriations;

(b) Shall not be construed to impair or otherwise affect the functions of the Director of OMB relating to budget, administrative, and legislative proposals;

(c) Shall not be construed to alter, amend, or revoke any other NSPD or HSPD currently in effect;

(d) Shall not be construed to apply to special activities as defined in section 3.4(h) of Executive Order 12333 of December 4, 1982;

(e) Shall be implemented in a manner to ensure that the privacy rights and other legal rights of Americans are recognized; and

(f) Is intended only to improve the internal management of the executive branch of the Federal Government, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person. (U)



# APPENDIX P-5

Declaration of Douglas Logan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Kari Lake, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 2:22-cv-00677-JJT |
| Katie Hobbs, Arizona Secretary of State, *et al.*, | ) | |
| Defendants. | ) | |

## Declaration of Douglas Logan

Pursuant to 28 U.S.C §1746, I, Douglas Logan, make the following declaration.

1. I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration.
2. I reside in Sarasota County, Florida.
3. I have over 18 years of experience generically within the Information Technology discipline, and over 10 years of experience specifically focused in Cyber Security in the area of Application Security.
4. I have held the certifications, Certified Information Systems Security Professional (CISSP), GIAC Certified Incident Handler (GCIH), and GIAC Web Application Penetration Tester (GWAPT).
5. I have developed cyber security programs and lead cyber security related services for the federal government, as well as Fortune 500 companies including JPMorgan Chase and Bank of America in areas including ethical hacking, malicious code detection, code review, and threat modeling.

6. I have authored training material in the areas of Web Application Penetration Testing, and Mobile Penetration Testing and have taught classes at Fortune 500 companies on these topics, in addition to teaching these topics to hundreds of students in the US Cyber Challenge program.
7. I have served as the Chief Technologist for the US Cyber Challenge, where I was responsible for helping design and manage a program to help identify and grow the next generation of Cyber Security experts for the United States.
8. I have personally overseen or conducted application vulnerability assessments on over 2,000 software applications. These applications represent all major industries, as well as the federal government and include web, mobile, and embedded applications.
9. I have evaluated Dominion voting machine software deployments in Antrim, Michigan, Maricopa County, Arizona, and Georgia. All versions of the software utilized were substantially similar, with no easily discernable visible differences between the versions of software utilized.
10. I was the primary author of the Maricopa County Election Audit report[1] commissioned by the Arizona State Senate, which included voting machine analysis and findings that I personally contributed.
11. I have worked with law enforcement related to election audit matters, including helping present data to a judge to argue for the issuance of a criminal search warrant.
12. I have talked with election workers across the country to determine common problems encountered, and normal practices.

---

[1] https://www.azsenaterepublicans.com/audit

13. I have worked with state politicians in multiple states to advocate election reform and correct misconceptions about the security of electronic voting machines.

14. My declaration highlights the long history of significant weaknesses in voting machines in the United States that continues through today, and the danger that using this technology poses.

**Term Definitions & Background**

15. In broad terms, "electronic voting machines", "electronic voting systems", "electronic election equipment" and "electronic election management systems" refer to any computerized devices or equipment utilized to cast, print, count, tabulate, process, and/or store ballot images and/or election results. These are generically referred to within this declaration as "voting machines", the "election management system" or by the vendor's specific name for the device and defined within its context.

16. "Source code" or generically "code" refers to the human discernable instructions written in a programming language by a programmer that, when deployed as a "computer program", "firmware" or "operating system", tells a computerized device, such as an electronic voting machine, how to operate, "think" and process data.

Case 2:22-cv-00677-JJT Document 39 Filed 06/08/22 Page 4 of 30

17. A "computer program", or more generically a "program" is a distinct set of computer instructions created from the source code that tells a computerized device how to perform a given function or set of capabilities. In the case of compiled programming languages, the "computer program" is the output of running the source code through a compiler to change the human discernable source code into a format which the computer can more directly understand. That output is what is deployed on the computerized system. In the case of interpretive programming languages, the source code itself is the "computer program" and is deployed to the computerized device and is translated to computer instructions at run-time by another program called an "interpreter". All "computer programs" associated with "electronic voting machines" that I've seen have been from compiled languages, and there is not any "source code" on the devices.

18. "firmware" or an "operating system" is a specialized "computer program" designed to allow a computerized device to turn on, and potentially run other "computer programs".

19. "erroneous code" is "source code" which when run as a "computer program" does not perform what could be reasonably be determined as the expected behavior and intention of the program. This can be caused by a "bug", or due to "malicious code".

20. A "bug" is when a programmer makes one or more unintentional mistakes when writing the "source code" which causes an adverse behavior in the program. This could be because the programmer had a typo, logic error, or otherwise failed to account for a situation that would occur when the program was deployed and running.

21. "malicious code" is "source code" purposely written to cause some adverse behavior by a "malicious actor". "Malicious code" can be inserted into an otherwise legitimate program to make it a "malicious program" by modifying the underlying "source code" or program; or it can exist as a stand-alone "malicious program" on the computerized device.

22. A "malicious program" is a "computer program" that is created or otherwise contains "malicious code", and therefore performs some adverse behavior. The "malicious program" can be written to cause the device to perform tasks immediately, or at a conditional time in the future

23. A "malicious program" can perform any action that a computer program on the computerized device has access to do. This includes, but is not limited to, modifying other programs or data, deleting other programs or data, preventing programs or the computerized device from working properly, or exfiltrating data on the device. A "malicious program" can also be written to delete traces it ever ran, including putting things back to the state they were before it ran, or deleting itself.

24. A malicious program can be added to a computerized device directly by a malicious actor who gains temporary access to the device; through a legitimate program that has been made malicious before it was installed on the computerized system; or through another malicious program that accesses the system via a computer network, such as either a local network or the internet, or storage media, such as a USB device.

Case 2:22-cv-00677-JJT Document 1-4 Filed 04/26/22 Page 6 of 30

25. A "secure baseline" is a set of initial configurations for a computerized device or application that defaults to a defined standard to protect the confidentiality, integrity, and availability of the device. These typically includes guidance for implementing all known best practices for the technology including, but not limited to: password complexity, multi-factor authentication, user account management, administrator account management, log level, log management, log retention, patch management, application run levels, and other secure configurations including the disabling of features or functionality that could increase the attack surface. There are a number of defined industry standard baselines that are frequently used including, but not limited to the Center for Internet Security (CIS) Benchmarks, the Defense Information Systems Agency (DISA) Security Technology Implementation Guides (STIG), and Microsoft Security Baselines.

26. There was no indication that any system I reviewed, which were primarily Dominion systems, had implemented any known "secure baseline".

27. While all aspects of a "secure baseline" are important for ensuring the security of the device, log level, log management and log retention are critical for "incident response". A log is a file that records data about access to or changes made to a computerized system, such as when files were opened, changed, or deleted, and what user accessed the system to view, change, or delete data. Key concepts for log management typically implemented across all the baselines include increasing the default log level so that critical actions are properly logged, configuring logs with larger maximums before they roll-over and auto-delete,[2] and storing logs outside of the computerized device where they are generated so a compromise of that device cannot delete the logs. Failing to do so can result in a situation where the data needed to determine if any type of breach occurred does not exist.

28. None of the systems I reviewed, which were primarily Dominion systems, appeared to implement any of the best practices associated with maintaining logs. As an example, this meant that when files were deleted on a Windows system, there was no log entry generated within the Windows Event Logs; the logs on the system could and were easily rolled over (meaning data from one time period was overwritten and destroyed by data from a later time period); and an individual with "administrative access" to the system had a large window of time to delete the only copy of the logs.

[2] A computer will often limit the amount of data that a log file can store, to prevent the log file from consuming too much of the computer's storage. When the log file reaches the maximum permitted data size, it typically "rolls over" by automatically deleting the oldest data in the file to make room for a new entry.

29. "incident response" is the formal process of investigation that is conducted in response to a breach or a suspected breach of a computerized device or series of computerized devices. It involves evaluating all of the available data to determine if a breach actually occurred; how the breach occurred; what happened during the breach; and when possible, who conducted the breach. Proper incident response is only possible when the appropriate data exists. Without the appropriate data to review, most notably log files, it can be impossible to determine conclusively if a breach even occurred.

30. "Cybersecurity" is the practice of ensuring the confidentiality, availability, and integrity of computerized devices and the data that resides on them. This includes preventing changes being made to the computer programs or data on a device by any person who is not authorized to made changes by the owner of the device, and to detect/remediate any unauthorized changes that are made.

31. "Application Security" is the area of Cybersecurity that specifically addresses "source code" and "computer programs".

32. "Hacking" is the process by which the misconfiguration of a "computerized device" or "erroneous code" on the device is exploited to cause some adverse behavior that impacts the confidentiality, integrity or availability of the computerized device. This can be performed ethically with the permission of the computerized device owner, or by a malicious actor with malicious intent.

33. "Administrative access" to a computer or computer system means a person knows the necessary passwords to access critical functions of the software and make authorized changes to the system or software. "Administrative access" gives a person control over the computer or system without needing to hack it to do so.

34. Any person who gains sufficient access to add or update a program on electronic equipment that is part of an electronic voting system, has the ability to control the behavior of that equipment – such as the ability to cause the equipment to change, delete, or fabricate votes.

35. Malicious actors who wish to control the outcome of an election without regard to the actual votes cast by voters can create and save to the memory or storage of an electronic device, a malicious program that instructs the device to report that a particular candidate received a majority of the votes, or to report that votes cast for one candidate were instead votes cast for another candidate.

36. Malicious programs can be configured to be extremely subtle choosing not to alter all votes, or to only alter votes from specific precincts, on specific times or on specific days. They could even be configured to only be triggered after a certain type of ballot comes through, or a certain set of ballots in sequence. These types of subtle triggers would be impossible to detect in a Logic and Accuracy test.

37. To prevent electronic devices from manipulating votes, the devices must be absolutely secured against the introduction of any malicious programs, including programs from the voting machine vendor that could potentially be built on "malicious code" and therefore are now "malicious program(s)".

38. This means that voting machine programs must go through the proper cybersecurity testing and computerized devices must be configured to Cybersecurity best practices so that access is controlled, systems are up-to-date with the latest patched versions of computer programs, and all actions on the system are properly logged so actions on the computerized device can be validated.

39. Proper cybersecurity testing includes all voting machine programs going through regular, independent 3rd party source code review as well as ethical hacking or penetration testing engagements by qualified personnel where real-world deployments are tested for exploitable security vulnerabilities. Current vulnerabilities found across voting machine vendors, as can be seen through evidence referenced in this declaration, heavily suggest that this practice is not happening.

40. Even in a well-designed and properly secured computer system, the factor of human error can lead to cybersecurity breaches.

41. Ultimately it is individual employees or officials who must choose secure passwords, keep their passwords secret, refrain from activating malware by opening email attachments or clicking on unsafe internet links, refrain from connecting computer hardware to portable computer memory media or computer networks, maintain software up-to-date, and a host of other mundane cybersecurity practices – including remembering what cybersecurity practices must be observed.

42. Experience has shown that humans err on these practices, through ignorance, forgetfulness, neglect, and even intention, simply because it is less demanding to ignore the proper procedure.

**Context: Cyber Security Conference Shows Vulnerable Voting Machines**

43. Since 2017, a Cyber Security conference, "DEFCON", has hosted a "Voting Machine Hacking Village" where voting machines from major vendors have been displayed and made available for participants to attempt to compromise. Conference participants had a maximum of 2.5 calendar days to work with these machines, mixed in with the rest of their conference activities. A report issued by conference organizers after the 2017 conference stated, "By the end of the conference, every piece of equipment in the Voting Village was effectively breached in some manner. Participants with little prior knowledge and only limited tools and resources were quite capable of undermining the confidentiality, integrity, and availability of these systems." A copy of the DEFCON 2017 report is attached as Exhibit A.

44. The statement "undermining the confidentiality, integrity, and availability of these systems" means the participants found methods by which votes could potentially be changed on such systems.

45. The DEFCON Report from the Voting Machine Hacking Village from 2018 shows that significant vulnerabilities remained, and that vulnerabilities that had been reported prior had not been fixed. The summary of the 2018 report stated,

- A voting tabulator that is currently used in 23 states is vulnerable to be remotely hacked via a network attack. Because the device in question is a high-speed unit designed to process a high volume of ballots for an entire county, **hacking just one of these machines could enable an attacker to flip the Electoral College and determine the outcome of a presidential election.**
- A second critical **vulnerability in the same machine was disclosed to the vendor a decade ago**, yet that machine, which was used into 2016, still contains the flaw.
- Another machine used in 18 states was able to be hacked in only two minutes, while it takes the average voter six minutes to vote. **This indicates one could realistically hack a voting machine in the polling place on Election Day within the time it takes to vote.**
- Hackers had the ability to **wirelessly reprogram, via mobile phone, a type of electronic card used by millions of Americans to activate the voting terminal to cast their ballots**. This vulnerability could be exploited to take over the voting machine on which they vote and cast as many votes as the voter wanted.

A copy of the DEFCON 2018 report is attached as Exhibit B.

46. The DEFCON 2019 report repeats similar high-level bullets, showing no noticeable improvements from prior years.:

- Commercially available voting system hardware used in the U.S. remains vulnerable to attack.
- There is an urgent need for paper ballots and risk-limiting audits.
- New Ballot Marking Device (BMD) products are vulnerable.

A copy of the DEFCON 2019 report is attached as Exhibit C.

47. All three reports highlight that there are a variety of ways that voting machines are compromised, even new systems are vulnerable when built, individuals with limited or no experience were able to compromise these systems, and those individuals were able to find these vulnerabilities in three days or less. This suggests that voting machine vendors are not undergoing the same standard security testing that is common and normal in the United States, for example, in the financial services industry.

**Antrim, MI: Dominion Configuration Allocates Votes to the Wrong Candidate**

48. Antrim County, Michigan initially misreported its vote totals for the 2020 presidential election. Antrim County later issued a revised count that was dramatically different, with the vote total for one candidate increasing significantly and the total for another candidate decreasing significantly.

49. In early 2021, the Michigan Secretary of State engaged J. Alex Halderman, a professor of computer science at the University of Michigan, to provide a technical explanation of what happened in Antrim. Professor Halderman's report[3] outlines a number of failures in the way the election was conducted, but specifically highlights some very alarming problems with the way that Antrim's electronic Election Management System, supplied by Dominion Voting Systems, tallies results.

50. Halderman stated that the Dominion software used numerical values to identify each candidate on the tabulators, and also used numerical values to identify the candidates on the Election Management System (EMS) Server where vote totals are aggregated for the official results. These numbers are supposed to match so that when the tabulator counts the votes for Candidate A, those results are attributed to Candidate A on the EMS Server. Halderman stated that in a number of precincts in Antrim County, MI the numbers had become misaligned due to improper device configurations. As a result, candidate Jorgenson's votes in those precincts were initially attributed to candidate Trump, Trump's votes attributed to candidate Biden, and Biden's votes marked as undervotes.

---

3 https://web.archive.org/web/20210327143045/https://content.govdelivery.com/attachments/MISOS/2021/03/26/file_attachments/1736734/Antrim.pdf

51. Halderman attributed this issue to "user error," since the county clerk employee creating the configuration files for the tabulators did not follow Dominion's recommended procedure for implementing ballot configuration changes. Specifically, after making a small ballot change in one precinct, the county employee remade the tabulator configuration files for that one precinct, but did not remake the configuration files for every other tabulator in every other precinct. The county employee presumptively assumed that since nothing changed on the ballots associated with those precincts, there was no reason to update the configuration files for the tabulator. However, Halderman's analysis was that this ballot change created a mismatch in any precinct that showed up in the Dominion software after the precinct that had the ballot change, so that votes for each candidate were misattributed. Halderman viewed this as a "human error" while acknowledging, "The election software also could have done more to help election staff avoid making mistakes that could lead to erroneous results." [4]

52. It is my professional opinion that Halderman's statement that more could have been done by the election software is a gross understatement. As a comparison, I typically see more validation implemented in commercial inventory control software. The primary purpose of election software is to make sure votes for a candidate are properly counted and attributed to the intended candidate. Failing to do any type of validation on the importing of results to be sure that the intended candidate receives the proper tallies at best constitutes gross negligence.

---

[4] J. Alex Halderman, Analysis of the Antrim County, Michigan November 2020 Election Incident at 3 (March 26, 2021) available at https://web.archive.org/web/20210327143045/https://content.govdelivery.com/attachments/MISOS/2021/03/26/file_attachments/1736734/Antrim.pdf

53. Subsequent analysis of the Dominion system has shown how exploitable the design flaw identified by Halderman is. Working with Dominion equipment, expert Jeff Lenberg was able to alter configuration files for a tabulator or settings on the EMS to intentionally cause the system to wrongly attribute votes to a favored candidate. In his testing Lenberg further caused the poll tape to output the manipulated results, thereby leaving no clear indication anything had been tampered with.

54. Halderman's and Lenberg's work show that to alter election results in the Dominion system, all that would be required is a small change on the media used in the tabulator. This could be accomplished through a malicious program, or by a person with temporary access to these cards. The only evidence that tampering had occurred would potentially be a copy of the media used in the tabulator or a full hand count of the ballots in an affected batch.

55. Many counties reuse the media utilized for configuring the tabulator from one election to the next. Such reuse means that at the time of the next election the evidence of previous tampering would be destroyed.

56. In Antrim County, MI this problem was identified because the reported results were so significantly different from the expected results based on historical trends, prompting an investigation. It is highly likely that this problem would go undetected in a county where the normal margins between candidates was less predictable; and it is in fact very likely this *has* happened elsewhere and gone undetected. The assumption that the county employee made in only creating the configuration files for the tabulator where a change happened is a reasonable assumption to make. It is unlikely this is the first time someone made this mistake, and yet it is the first time a mistake was publicly detected.

**Voting Machine Software Fails to Implement Best Practices**

57. I was given access to the Antrim County Dominion election equipment in connection with post-election litigation for which I provided expert witness services. After analyzing the equipment, I concluded it exhibited a large number of failures in implementing secure coding practices, application security design principles, and cyber security best practices. Specifically:

   a. The Dominion Election Management System software did not follow application security best practices known for over 15 years, and widely adopted across industries.

   b. Operating System credentials used generic accounts that multiple people knew and did not change from year to year. These credentials provided more than enough access and the tooling for any of the individuals who possessed them to change election results.

   c. The systems had not been configured to any type of secure baseline. Lack of a secure baseline increases the chances the systems could be compromised and also means that the appropriate logs required to respond to a suspected breach would not exist on the system, making it nearly impossible to determine if election results were tampered with just by looking at the election equipment.

d. The system had Microsoft SQL Server Management Studio installed, which allows the direct editing of data in the election results database. This software is installed separately from Microsoft SQL Server and is not listed on the Election Assistance Commission's list of approved software. It was unclear what business purpose it could serve on this particular system. The Dominion software already has capabilities within it that could handle any normal expected use case for Microsoft SQL Server Management Studio.

58. These failings are indicative of an immature cyber security program that has not implemented the necessary steps to ensure secure software is created and cannot ensure the integrity of the votes tallied on the systems.

**Maricopa County, AZ: Failure to Follow Best Practices & Failure to Preserve Logs and Data**

59. The audit of the 2020 election results in Maricopa County, Arizona was the largest and most comprehensive election audit conducted to date. In addition to reviewing the actual voting machine systems used during the election, it involved a full hand-counting of all 2.1 million ballots, and forensic imaging and a forensic paper analysis of all the ballots. I served as the project lead who ran this audit.

60. Maricopa County used electronic election equipment supplied and supported by Dominion Voting Systems.

61. The audit's findings related to the Dominion electronic equipment used to case and tabulate ballots in the election included the following:

a. Operating System credentials used generic accounts that multiple people knew and did not change from year to year. These credentials provided more than enough access and the tooling for any of the individuals who possessed them to change election results.

b. The systems had not been configured to any type of secure baseline. Lack of a secure baseline increases the chances the systems could be compromised and also means that the appropriate logs required to respond to a suspected breach would not exist on the system, making it nearly impossible to determine if election results were tampered with just by looking at the election equipment.

c. Computer logs related to the equipment's performance during the election were lost, and files were deleted. In most cases it was not possible to determine who performed the actions because the required information to do so did not exist.

d. Information was withheld by the County and never provided to allow an analysis of this data. This included routers and log data, in addition to other requested election equipment.

62. While the Splunk logs and router data were later reviewed by Special Master John Shadegg's team, the scope of their review did not cover the time period where the audit detected files deleted, nor did it appear the County stored the necessary net flow data required to make any determination related to internet connectivity. This did not stop their report from stating there was no indication of deletion of files or internet connections. All participants besides Shadegg were prevented from saying anything about the analysis done due to a non-disclosure agreement.

63. The events in Maricopa County illustrate the unsecure practices surrounding electronic voting machines and voting equipment that are standard in Arizona and across the country that could result in the purposeful or accidental altering of election results. In Arizona, as in other states, after-the-fact review found that generic user accounts were used in the electronic election equipment, poor passwords were implemented, and there was insufficient logging to tell what actions had been done and by whom. Specifically in Arizona, every single Windows account on every system analyzed had the exact same password, including for users who could alter results. Election data had been purged and files deleted, and it was not easily attributable to any individual. This setup would make it difficult to detect, let alone respond to, any type of election result problems or mistakes.

64. While this and other aspects of the audit have been claimed by media to have been refuted, the rebuttal of Maricopa County's response has never been fully addressed. A copy of Maricopa County's response to the audit is attached as Exhibit D. The rebuttal to this response can be found as Exhibit E.

**Williamson County, TN: Insufficient Technical Oversight Over Voting Machine Code & Changes**

65. On November 3, 2021, the federal Election Assistance Commission (EAC) received a report from the Tennessee Secretary of State related to an anomaly from the October 26, 2021 municipal elections in Williamson County, Tennessee. The Tennessee report stated that the close poll reports from 7 of the 18 ICP tabulators used during the election did not match the number of ballots scanned. The election results were validated via a hand-count of ballots, but the EAC launched an investigation into what had caused the tabulating problem, and later issued a report related to the investigation.[5]

66. The equipment used in Williamson County, Tennessee, and investigated by the EAC was part of the D-Suite 5.5-B system supplied by Dominion Voting Systems.

67. The EAC report stated that the first step in the investigation was to validate that the proper version of all files was included on the system. This same process is typically part of the pre-election certification of the machines for use in an election. However, even though these systems had presumptively gone through the certification process, the EAC accredited voting system vendors Pro V&V and SLI Compliance hired to perform the analysis determined that two configuration files used by Williamson County were not the correct versions and were from a prior version. This was later determined to not be significant for the cause of the issue, but shows that the certification processes missed identifying differences that it should have found.

---

5 https://www.eac.gov/sites/default/files/voting_system/files/EAC_Report_of_Investigation_Dominion_DSuite_5.5_B.pdf

68. Pro V&V and SLI Compliance were able to reproduce the erroneous results and found that the anomaly corresponded with either the error in the log, "QR code signature mismatch" or "Ballot format or id is unrecognizable."

69. Despite the work being conducted by two EAC accredited vendors, Pro V&V and SLI Compliance, and with representatives present from Dominion, the EAC, the Tennessee Secretary of State, and Williamson County staff, they were unable to determine the cause of this erroneous behavior.

70. The manufacturer, Dominion, submitted a Root Cause Analysis to the EAC stating "erroneous code is present in the EAC certified D-Suite 5.5-B and D-Suite 5.5-C systems." Dominion stated that when a certain part of a QR code was misread, the ICP interpreted the ballot as provisional and thereafter marked **all** ballots subsequently scanned as provisional, leaving these ballots out of the close poll report totals. Dominion's solution was to submit revised code that would reset the provisional flag within the tabulator after a ballot was scanned as provisional, so that subsequent ballots would not automatically be flagged as provisional.

71. A QR code is a defined standard for matrix barcodes which is capable of storing a significant amount of data within a small amount of space. This standard is very resilient and has error correction built into the standard[6]. Depending on the level of error correction implemented, a QR code can have from 7% to 30% of the QR code fully obstructed or damaged and the QR code can still be read properly. This is because a QR code essentially holds the data in it twice. It is in the QR code once in its normal format, and one other time as a polynomial representation of the data[7]. This error correction is robust enough that even at 7% error correction a QR code should fail to be read and error out rather than ever have values within it misread.

72. Dominion utilizes QR codes on ballots printed out of their ICX Ballot Marking Device (BMD) to represent all of the choices the voter made. In some states such as Georgia and Tennessee these ICX BMDs are utilized by all voters. In other states most voters will fill out a standard bubble fill ballot by hand and the ICX BMD will only be utilized for accessibility voters. In all cases the filled out ballot, whether by hand or by the BMD, will subsequently be fed through the ICP tabulator in order to be official cast and tallied.

---

[6] https://www.qrcode.com/en/about/error_correction.html
[7] https://blog.qrstuff.com/2011/12/14/qr-code-error-correction

73. The QR codes utilized by Dominion utilizes Level M of error correction, which offers 15% of redundancy. This can be seen in the photo to the right, which is a Dominion QR code from a Georgia ballot. The hockey puck like black box that has been highlighted by a red box is the indicator that this level of error correction is in the QR code[8].

74. At 15% error correction it would be extremely unlikely for a QR code to have a value in it misread. Credit cards utilize a single digit in the credit card number as a checksum to make sure the credit card was read properly. This is simple, yet sufficient to make sure when you swipe your credit card it either errors out and needs to be reswiped, or your account is charged and not someone else's. The level of validation in a QR code is significantly more complicated and sophisticated. Dominion's ICP tabulators are also fully capable of spitting a ballot back out and forcing the user to refeed the ballot in the case where something is not read correctly. As a result, Dominion's explanation that the QR code was misread is insufficient to adequately explain what occurred.

75. Even taking that into the consideration, per the description of the Engineering Change Order, Dominion's code change did not do anything to fix the situation which caused a ballot to be misread. The revised code simply reset the provisional flag for subsequent ballots so the error code would not impact everything afterwards

[8] https://blog.qrstuff.com/2011/12/14/qr-code-error-correction

76. The EAC report states, "Modified ICP source code was submitted by Dominion that resets the provisional flag following each voting session. The ECO analysis included source code review to confirm the change to both systems and to ensure no other code is changed." This appears to mean that the original ballot that was misread would still be misread and may be erroneously flagged as provisional, and not counted.

77. Yet the EAC report clearly states that testing after the change was implemented showed that the fix resulted in all ballots being properly counted and no errors in the log: "This software was then tested for accuracy by processing two thousand ballots printed by an ICX, utilizing the same election definition used in Williamson County, TN on October 26, 2021. The analysis and testing of the ECOs has demonstrated that the anomaly was successfully fixed. No instance of the anomaly or the associated error or warning messages in the ICP audit logs were observed during the testing." This either means that ballots that were utilized to test the fix never would have triggered the error condition in the first place, or it means that the misreading of a ballot did not impact the ballot itself but only impacted subsequent ballots.

78. If ballots were utilized to test the fix that never would have triggered the error condition, it means that it is unknown if this issue is actually fixed. More importantly, it suggests either gross technical incompetence by whoever performed the testing in not realizing that the test case did not validate the fix; or a knowing and willful misrepresentation to the EAC that the code changes were validated. In either case, by accepting the fixes from Dominion as resolving the issue, the EAC demonstrated a lack of technical competence to properly oversee the necessary actions needed to ensure the integrity of electronic voting machines.

79. If ballots were in fact used in the test case to validate the fix that would have created this error condition, but all the results came back properly and validated that the code change did fix the issue, this would indicate that misreading of a QR code ONLY impacted subsequent ballots and not the current ballot being processed. This would be an extremely abnormal programming error to accidentally occur and highly suggests intentional malicious code. The source code needs to be thoroughly reviewed by qualified personnel to determine the origins of this erroneous code and the reason it was put in place.

80. In summary, Dominion machines in Williamson County, TN failed to properly tally votes in a significant way. This ended up in an EAC investigation where they stated that "erroneous code" was in the Dominion software that had caused that issue. This same code has been utilized in elections across the country for quite some time with an unknown impact. The EAC accepted an explanation from the voting machine Dominion that doesn't make technical sense and let the voting machine vendor define the root cause and create the code to fix the issue. This code was either insufficiently tested to validate the issue was fixed, or the original code was a strong indication of a subversion of the voting equipment. In either case, the EAC demonstrated inadequate oversight to properly ensure the integrity of votes tallied in electronic voting machines.

## The Insufficiency of Air Gaps

81. It is commonly argued that deficient cyber security practices concerning electronic election equipment are insignificant because these systems are "air-gapped" and not connected to any type of external computer networks.

82. There is substantial evidence that many election systems are not actually protected by "air-gapping." In Maricopa County, the analysis of the equipment revealed significant indications that the Election Management network had connections to the internet at times. Both Dominion[9] and ES&S Software[10] advertise that their systems support modems of various types and modem support is part of Dominion's contract for Michigan.[11]

83. Even a properly "air-gapped" system is not safe from malicious code being copied into it. For example, computers in nuclear reactors are air-gapped to increase their security, yet the Stuxnet malicious code infected computers in a nuclear reactor in Iran, ultimately causing damage to the reactor. To do so, the Stuxnet code spread through computers in Iran until it copied itself to a system connected to a portable USB drive that was later also used on the nuclear reactor computer network. The Stuxnet code copied itself onto the USB drive and then onto the nuclear reactor network computers. Inside the air-gapped network, the Stuxnet code slowed down the nuclear reactor without causing a nuclear meltdown.

84. The same or a similar technique could be used to compromise "air-gapped" electronic voting machines, and in fact, electronic voting systems routinely utilize USB Drives and other portable media to transfer results, configuration files, and ballot images from one system to the next

---

[9] https://www.michigan.gov/-/media/Project/Websites/sos/01holland/071B7700117_Dominion.pdf

[10] https://web.archive.org/web/20150920041547/https://sos.idaho.gov/elect/Clerk/DS200%20Procedures/ESS_EVS5000_SOP00_DS200_Operator%20Guide.pdf

[11] https://www.michigan.gov/-/media/Project/Websites/sos/01holland/071B7700117_Dominion.pdf

## Conclusions

85. There is an extreme lack of cyber security maturity in the election software and equipment industry, which has not implemented best practices that have been known for more than 20 years and have been adopted and applied in most major industries in the United States.

86. The repetitive nature of severe vulnerabilities detected across multiple voting machine vendors over many years indicates that proper cybersecurity testing, such as secure code review and penetration testing are not being performed on a regular basis by competent personnel, and/or what is detected is not being remediated. Without proper cybersecurity testing and the prompt remediation of what is detected it is impossible for voting machine software to be secure.

87. The problem is further complicated by the fact that many election workers operating election systems are older[12] and have inadequate technical knowledge, forcing them to fully rely on the voting machine vendor or their subcontractors to perform the most basic tasks.

   a. Maricopa County has stated that it employs two Dominion individuals full-time in order to run its elections. These individuals do everything from configuring the elections to making backups and taking them offsite.

   b. Michigan uses a company called Election Source to build its elections. Local county officials have little understanding of the machines they use.

---

[12] https://www.eac.gov/documents/2017/11/15/eavs-deep-dive-poll-workers-and-polling-places

c. In Antrim County, the county clerk was quick to state the county had made a mistake and the problem was human error, even though she could not give any details as to why but merely relied on the vendor's analysis.[13] The technical explanation eventually provided by the Secretary of State, written by Professor Halderman, at best indicated extremely poorly written software.

d. The Williamson County, TN EAC report makes it very clear that the EAC lacks the needed technical knowledge to fully monitor and validate that identified issues are properly remediated by voting machine vendor.

88. Because election abnormalities directly affect partisan political interests, investigations related to electronic election equipment, in my experience, rapidly become heated and toxic. This makes it harder to conduct an adequate investigation, because one side has incentive to keep the investigation from finding anything. The complexity of the electronic equipment and software gives interested parties ample opportunity to obfuscate the investigation.

89. Without an understanding on how computer systems and election systems work or how to detect unauthorized modification of code on a system, elected officials, law enforcement officials, and court officials are not well-equipped to deal with controversies related to electronic election equipment.

[13] https://www.youtube.com/watch?v=S9uMlrnAVwo

90. The end result is that current electronic voting systems (1) are unsecure and can be compromised by individuals with no experience with voting equipment with less than three days of work, (2) are built and deployed without the proper safeguards for accountability to allow a proper investigation to happen, (3) are difficult to audit after the fact because they are too complicated for elected officials, law enforcement, and the courts to easily understand.

91. It is my professional opinion, for all of the reasons outlined, it is impossible for electronic voting machines to be properly secured by the 2022 elections, and that they should not be used. Something so essential to democracy should not be more complicated than the average American, law enforcement, and the courts can easily understand and handle in a timely manner.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 7, 2022.

Douglas J Logan

# EXHIBIT A

# DEFCON 25 Voting Machine Hacking Village

*Report on Cyber Vulnerabilities in*

*U.S. Election Equipment, Databases, and Infrastructure*

**September 2017**

**Co-authored by:**
Matt Blaze, University of Pennsylvania
Jake Braun, University of Chicago & Cambridge Global Advisors
Harri Hursti, Nordic Innovation Labs
Joseph Lorenzo Hall, Center for Democracy & Technology
Margaret MacAlpine, Nordic Innovation Labs
Jeff Moss, DEFCON

# Forward

I've spent my entire adult life in the national security arena: Europe during the Cold War, the Balkans in the 1990s, the Middle East since 9/11, in the Pentagon, the White House, and most recently at NATO headquarters in Brussels. I've studied national security at West Point and at Harvard. So, why am I now introducing a report on cyber hacking of our voting systems?

The answer is simple: last year's attack on America's voting process is as serious a threat to our democracy as any I have ever seen in the last 40+ years – potentially more serious than any physical attack on our Nation. Loss of life and damage to property are tragic, but we are resilient and can recover. Losing confidence in the security of our voting process – the fundamental link between the American people and our government – could be much more damaging. In short, this is a serious national security issue that strikes at the core of our democracy.

This report makes one key point: our voting systems are not secure. Why is this so serious? Why must we act now? Why is this a national security issue? First, Russia has demonstrated successfully that they can use cyber tools against the US election process. This is not an academic theory; it is not hypothetical; it is real. This is a proven, credible threat. Russia is not going away. They will learn lessons from 2016 and try again. Also, others are watching. If Russia can attack our election, so can others: Iran, North Korea, ISIS, or even criminal or extremist groups. Time is short: our 2018 and 2020 elections are just around the corner and they are lucrative targets for any cyber opponent. We need a sense of urgency now. Finally, this is a national security issue because other democracies – our key allies and partners – are also vulnerable.

Thousands of state and local election officials are responsible for administering elections but they are often overburdened and under-resourced. It is not their job alone to deal with this national security threat.

This important report highlights the problems that demand our attention and solutions. The "Voting Village" at DEFCON in July 2017 was not intended to be something to entertain hackers. It was intended to make clear how vulnerable we are. The report describes clearly why we must act with a sense of urgency to secure our voting systems.

For over 40 years I voted by mailing an absentee ballot from wherever I was stationed around the world. I assumed voting security was someone else's job; I didn't worry about it. After reading this report, I don't feel that way anymore. Now I am convinced that I must get involved. I hope you will read this report and come to the same conclusion.

Douglas E. Lute
*Former U.S. Ambassador to NATO*
*Lieutenant General, U.S. Army, Retired*

# Contents


Introduction 4

On the Eve of DEFCON: The State of Our Election Security Landscape 6

Voting Village Goals 7

Equipment 7

Limitations 8

Technical Findings & “Accomplishments” 8

Impact & Lessons Learned 14

Next Year’s Voting Village: Moving Forward 16

Conclusion 17

Acknowledgements 17

APPENDIX #1: Partial List of Attending Individuals & Organizations 18

# Introduction

Since its founding in 1993, DEFCON has become one of the world's largest, longest-running, and best-known hacker conferences. This year's DEFCON was held July 27-30, 2017 in Las Vegas and drew a record-breaking 25,000 participants. For the first time, DEFCON featured a Voting Machine Hacking Village ("Voting Village") to highlight cyber vulnerabilities in U.S. election infrastructure – including voting machines, voter registration databases, and election office networks. The voting machines available in the Voting Village were paperless electronic voting machines, and at a time when a number of U.S. voting jurisdictions are either committed to or considering purchasing newer equipment based on auditable paper records,[1] open examination of these types of systems could not be timelier. The event was organized by several cyber, voting equipment, and national security experts, along with DEFCON founder Jeff Moss.

The Voting Village acquired and made available to participants over 25 pieces of election equipment including voting machines and electronic poll books. Most models are still widely used in U.S. state and local elections today (with the exception of the AVS WinVote, described below). The Voting Village also featured a mock back-office training "range" to simulate databases and networks of real-world election administrators.

Hacking into voting machines is not new, but previously it was conducted in only in very limited academic or industrial settings under strict controls and publications restrictions. DEFCON's Voting Village represented the first occasion where mainstream hackers were granted unrestricted access to explore and share any discovered vulnerabilities. Legal restrictions including the 1998 Digital Millennium Copyright Act (DMCA)[2] and, to some extent, the Computer Fraud and Abuse Act, made such activities subject to criminal or civil liability.

A consequence of the limited access to voting machine hardware in the past, is that doubts have been frequently raised about if the various vulnerabilities identified in previous studies would be practical for technologists of ordinary skill to discover and exploit. At the DEFCON event, however, thousands of participants were invited to engage with and explore voting equipment and the network simulator in an environment free of restriction for the first time.

The results were sobering. **By the end of the conference, every piece of equipment in the Voting Village was effectively breached in some manner. Participants with little prior knowledge and only limited tools and resources were quite capable of undermining the confidentiality, integrity, and availability of these systems**, including:

- The first voting machine to fall – an AVS WinVote model – was hacked and taken control of remotely in a matter of minutes, using a vulnerability from 2003, meaning that for the entire time this machine was used from 2003-2014 it could be completely controlled remotely, allowing changing votes, observing who voters voted for, and shutting down the system or otherwise incapacitating it.
- That same machine was found to have an unchangeable, universal default password – found with a simple Google search – of "admin" and "abcde."
- An "electronic poll book", the Diebold ExpressPoll 5000, used to check in voters at the polls, was found to have been improperly decommissioned with live voter file data still on the system; this data

[1] Jenni Bergal, "Russian Hacking Fuels Return to Paper Ballots", *Huffington Post Stateline*, (Oct. 3, 2017), http://www.huffingtonpost.com/entry/russian-hacking-fuels-return-to-paper-ballots_us_59d39962e4b092b22a8e398d

[2] U.S. Copyright Office Summary, The Digital Millennium Copyright Act of 1998, December 1998, https://www.copyright.gov/legislation/dmca.pdf

should have been securely removed from the device before reselling or recycling it.[3] The unencrypted file contained the personal information – including home residential addresses, which are very sensitive pieces of information for certain segments of society including judges, law enforcement officers, and domestic violence victims – for 654,517 voters from Shelby County, Tennessee, circa 2008.

**Moreover, a closer physical examination of the machines found, as expected, multiple cases of foreign-manufactured internal parts (including hardware developed in China), highlighting the serious possibility of supply chain vulnerabilities.** This discovery means that a hacker's point-of-entry into an entire make or model of voting machine could happen well before that voting machine rolls off the production line. With an ability to infiltrate voting infrastructure at any point in the supply chain process, then the ability to synchronize and inflict large-scale damage becomes a real possibility. Also, as expected, many of these systems had extensive use of binary software for subcomponents that could completely control the behavior of the system and information flow, highlighting the need for greater use of trusted computing elements to limit the effect of malicious software. In other words, a nation-state actor with resources, expertise and motive – like Russia – could exploit these supply chain security flaws to plant malware into the parts of every machine, and indeed could breach vast segments of U.S. election infrastructure remotely, all at once.




Given the federal government's recent designation[4] of election systems as critical infrastructure – and in light of what is known about the Russian attempts to infiltrate election networks in at least 21 states in the 2016[5] Presidential Election – it is overwhelmingly evident that election security is now an extension of *national security*. In addition to Russia, other state and private actors (including Iran, North Korea, organized crime, terrorist groups, and even lone-wolf hackers) also possess the technical capability to attack our voting systems or credibly sow distrust in election results. Organized crime is also a serious threat in the larger cybercrime ecosystem and they may also have motives to attack election systems or provide such services for hire, which we've seen in areas like botnets, ransomware, and malware distribution. **The bottom line is: No matter the level of nation-state hacking or interference in 2016, if our enemy's goal is to shake public confidence about the security of the vote, they may already be winning.** And with critical

---

[3] Michelle De Mooy, Joseph Jerome, and Vijay Kasschau, "The Legal, Policy, and Technical Landscape Around Data Deletion", *Center for Democracy & Technology*, (2017) https://cdt.org/files/2017/02/2017-02-23-Data-Deletion-FNL2.pdf

[4] See Presidential Policy Directive (PPD) 21: https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[5] Congressional Testimony of Jeanette Manfra, then-Acting Deputy Under Secretary for Cybersecurity and Communications, National Protection and Programs Directorate, U.S. Department of Homeland Security, and Dr. Samuel Liles, Acting Director, Cyber Division, Office of Intelligence and Analysis, U.S. Department of Homeland Security, for a hearing entitled "Russian Interference in the 2016 U.S. Elections," before the Select Committee on Intelligence, United States Senate, on June 21, 2017. Link here: https://www.intelligence.senate.gov/sites/default/files/documents/os-jmanfra-062117.PDF

elections in 2018 and 2020, efforts to hack American democracy will only continue unless safeguards are put in place.

The encouraging news is that a growing, diverse group of stakeholders are embracing election security as national security. As evidenced by the robust, diverse turnout at the Voting Village, understanding cyber threats to our democracy is not just a "hacker thing." Bipartisan stakeholders from federal, state, and local government participated in the Voting Village. Advocacy groups, private sector businesses, think tanks, and national security, intelligence, and military leaders also contributed to the event. The level of interest and support from these groups and individuals parallels an outside movement that views election security as a national security imperative. Many are pressing for policy solutions and practical efforts that leverage best practices already embraced by the cybersecurity community, tailored to the unique nature of elections.[6]

## On the Eve of DEFCON: The State of Our Election Security Landscape

For years, computer science and cybersecurity experts have been sounding the alarm on U.S. election infrastructure which can best described as a patchwork of aging, insecure voting systems that vary from state-to-state. As their research has shown, among the most vulnerable voting systems are Direct Recording Electronic (DRE) voting machines. These systems utilize digital touch-screen technology and record votes on the internal memory of the machine, with no paper backup. Cautions about DREs have prompted some changes and a few victories. For example, in 2015 just weeks before a primary election, the State of Virginia decommissioned use of the AVS WinVote (a DRE machine featured at the Voting Village) because of a litany of problems including its Windows operating system, unchangeable default password, the ability to hack the machine remotely, and the fact that its results were transmitted via wireless connections.

There is still more work to be done. Currently there are five states – Delaware, Georgia, Louisiana, New Jersey and South Carolina – that are still operating entirely on paperless systems. Another 9 are partially paperless, making a total of 14 states that are still operating in a highly vulnerable manner.[7] Yet even when leaders recognize change is needed, other competing policy priorities or lack of resources at the state and local level can impede action.




Election security threats grew even more urgent this past election cycle when Government officials confirmed that a foreign adversary, Russia, attempted to interfere in the 2016 United States Presidential Election via "a multi-faceted approach intended to undermine confidence in our democratic process." According to U.S. intelligence official reports, Russia targeted voter registration databases in at least 21 states and sought to infiltrate the networks of voting equipment vendors, political parties, and at least one local election board.[8]

[6] Zetter, Kim. "Virginia Finally Drops America's 'Worst Machine'" *Wired*. August 17, 2015. Link: https://www.wired.com/2015/08/virginia-finally-drops-americas-worst-voting-machines/

[7] Verified Voting, "Voting Equipment in the United States" https://www.verifiedvoting.org/resources/voting-equipment/

[8] Congressional Testimony of Jeanette Manfra, National Protection and Programs Directorate, U.S. Department of Homeland Security, and Dr. Samuel Liles, Acting Director, Cyber Division, Office of Intelligence and Analysis, U.S. Department of Homeland Security, for a hearing entitled

Case 2:22-cv-03706-SRB Document 1-4 Filed 09/14/22 Page 8 of 138

Election administration has always been the constitutional responsibility of state and local jurisdictions. But when Russia – which has also been known to hack elections abroad[9] – decided to meddle in the 2016 U.S. election, it changed the game. The conversation has now been elevated to the level of military and homeland security experts who are increasingly getting involved to help dissect the motives, capabilities and implications of cyberattacks launched at the U.S. and our democracy, as well as assess what kinds of deterrents are available (beyond the scope of this report).

## Voting Village Goals

It is through the lens of the complex election security landscape – and on the heels of the Russian 2016 attacks – that Voting Village organizers presented the idea for the village to DEFCON. Media coverage and Congressional testimony on the Russian hacks has helped to advance awareness regarding cyber threats to elections. Yet Voting Village organizers believed there was still much to unpack. Their belief was that the hacker community, if given unfettered access to voting machines and equipment, would be able to enrich the basis of knowledge. As the largest gathering of hackers in the world, DEFCON would also provide the ideal forum to shine the national spotlight on any findings.

To that end, the goals of the DEFCON Voting Village were to:

- Provide examples of working voting systems for security researchers to evaluate, attack, and otherwise study;
- Educate and raise public awareness about the machinery of U.S. democracy, from the machines to how election technology interacts with legal, market, and normative barriers in elections that do not exist in general purpose computing contexts;
- Stimulate a discussion and ideas regarding how security researchers and hackers can help to make our election infrastructure more safe and secure;
- Create a forum to engage with other non-hacker stakeholders, including federal, state, and local policymakers who will be essential to implementing changes and reforms;
- Provide a training opportunity for state and local elections IT staff to learn about their networks and machines in use in this jurisdiction. For many, the village represented the first opportunity for election officials to study and inspect the very machines they are using in their daily operations, yet have not been legally permitted to study previously.

## Equipment

The Voting Village organizers procured a variety of voting equipment for examination. A recent DMCA waiver issued by the Library of Congress made it easier for the Voting Village to obtain the hardware for research purposes. Previous such an act was difficult, and in some cases illegal under the DMCA (of course, cyber criminals would not be so constrained by US law). Most of the equipment in the Village was purchased by DEFCON on secondary markets, such as eBay. The machines featured in the Village included:

- AVS WinVote DRE (software version 1.5.4 / hardware version N/A)
- Premier AccuVote TSx DRE (TS unit, model number AV-TSx, firmware 4.7.8)
- ES&S iVotronic DRE (ES&S Code IV 1.24.15.a, hardware revision 1.1)

---

"Russian Interference in the 2016 U.S. Elections," before the Select Committee on Intelligence, United States Senate, on June 21, 2017. Link: https://www.intelligence.senate.gov/sites/default/files/documents/os-jmanfra-062117.PDF

[9] Koval, Nikolay. "Revolution Hacking." *Cyber war in perspective: Russian aggression against Ukraine* (2015): 55-58. https://ccdcoe.org/sites/default/files/multimedia/pdf/CyberWarinPerspective_Koval_06.pdf

- PEB version 1.7c-PEB-S
- Sequoia AVC Edge DRE (version 5.0.24)[10]
- Diebold Express Poll 5000 electronic pollbook (version 2.1.1)[11]

The Voting Village also featured a "cyber range" – a simulator that created a mock virtual "election official's office" and network, built with the guidance and assistance of a large U.S. election jurisdiction staff who ensured quality control and real-world likeness. This range provided a training opportunity for state and local leaders in attendance to better understand the threats to their specific systems and domains, as well as learned best practices to protect their information and networks. The range was operated by CyberBit – a Ft. Meade, Maryland-based cyber training facility that, beyond DEFCON, has provided multiple industry-tailored training services to government and private sector entities.

## Limitations

There were significant limitations of the work at the Voting Village, including:

- Participants had no access to source code, operational data or other proprietary information that is not otherwise legally and publicly available. An actual nefarious actor might have little difficulty obtaining these materials.
- The Voting Village provided only a sample of voting technologies. Organizers obtained what they could get their hands on quickly, legally, and affordably. The most recently used system available was the AVS WinVote, which was decertified by the State of Virginia in 2014. A number of other systems, however, are still in use in U.S. elections including the AccuVote-TSx, Sequoia AVC Edge, and ES&S iVotronic.
- The Village had no access to optical scan or DRE systems with a Voter-Verified Paper Audit Trail (VVPAT). These systems, and those involving ballot marking devices, are the most software-independent and auditable systems, and are increasingly popular and heavily used.
- Finally, there was no access to any backend provisioning, counting, or voter registration systems. These kinds of systems are not generally available on the open market. This is especially significant as the evidence from the 2016 election seems to indicate strongly that these types of voting technologies – not voting machines themselves – were the primary target of Russian hacker attacks.

## Technical Findings & "Accomplishments"

**AVS WinVote**

The Advanced Voting Solutions (AVS) WinVote is a DRE voting system that utilizes touch-screen technology to make a voting selection, and then transmits a voter's choice via a wireless local area network (LAN). The AVS WinVote system was the only system in the Village that had been earlier decertified (in Virginia). It was also the most easily compromised. In addition, physical access to the machine proved just as easy of a path to complete compromise.

Carsten Schürmann, a democracy-tech researcher who hails from Denmark, was able to hack into the AVS WinVote within minutes remotely over Wi-Fi. The WinVote broadcasts its own Wi-Fi access point to which modern operating systems can easily connect. Using commonly available network tools (e.g., Wireshark)

[10] "PEB" stands for Personal Electronic Ballot, which functions similarly to a portable memory pack. It is used to authorize a new voting session by poll-workers and, when the polls close, poll workers move summary data from each machine onto the PEB. The PEBs are then transported to election headquarters or their contents transmitted via a computer network.

[11] An Electronic Pollbook is a system that essentially replaces the spiral-bound lists of registered voters in every polling place by putting that functionality into a laptop, tablet, or kiosk-like computing platform.

Schürmann determined immediately that the WinVote had a specific IP address and was able to use a vulnerability from 2003 (CVE-2003-0352[12]) and preinstalled attack payloads in Metasploit (a vulnerability analysis and penetration testing tool) to gain access to the filesystem and escalate privileges to an admin user – meaning he could make the machine think he was an administrator of the system, not simply a mere voter or poll-worker. Once he had this access, Schürmann was able to do anything on the system, from running code, to changing votes in the database, to turning the machine off remotely. This vulnerability had clearly been in the system since 2003, allowing anyone within 150-300 feet of a polling place complete control of any WinVote machine while it was being used. For $50, a hand-held high gain antenna could be purchased that would extend that range to over 1,000 feet and through walls.




Physical access to the machine afforded similar ease-of-access. The locked panel on the front of the device was easily picked or opened with readily available keys that could be purchased easily and cheaply online. The locked cover was easily bypassed without paying attention to the lock as well (by simply compromising the plastic hinge). The physical security protecting the USB port was ineffective and also irrelevant, due to the findings in the next paragraph.

While examining the case further, DEFCON hackers noticed that there were 2 unprotected, uncovered USB ports on the back of the machine. These were within easy reach of a voter, and unfortunately the privacy screen for the AVS WinVote is so private that it would be difficult to tell if someone was tampering with USB ports on the back of the machine while voting. There was no USB keyboard around in the Voting Village – a natural place to start with an unprotected USB port – but after an errand to a local electronics supply store to obtain one, all hackers had to do was to simply attach the keyboard, type “`ctrl-alt-del`” and the Windows task manager would pop up. At that point, they could type “`alt-f run`” and run any software they wanted to, including software on a USB stick that is inserted into the other USB slot on the back of the machine. As one hacker, Nick, remarked, "With physical access to back of the machine for 15 seconds, an attacker can do anything."

**AccuVote-TSx**

The AccuVote-TSx is touch screen DRE voting machine, manufactured by Premier/Diebold, that records votes on internal flash memory. In much the same way that an ATM works, voters insert a card into the machine and then pick their choice on a touchscreen. Votes are then recorded to internal electronic computer storage.[13]

As is natural in any DEFCON Village structured around hardware artifacts, Voting Village hackers seemed to spend more time on platforms other than the AccuVote-TSx. Just as with the ES&S iVotronic below, much of

[12] See: http://www.cve.mitre.org/cgi-bin/cvename.cgi?name=can-2003-0352

[13] Verified Voting, “Premier/Diebold (Dominion) AccuVote TS & TSx” https://www.verifiedvoting.org/resources/voting-equipment/premier-diebold/accuvote-tsx/

the work around this machine focused on examining the details of the internal hardware layout and examining the "firmware" – software that runs the low-level hardware functions and is not changed as often as the voting software itself.

Joe Fitzpatrick, Schuyler St. Leger, Ryan (@rqu45 on Twitter), Wasabi, and Ayushman were all involved in examining the innards of the TSx. First, Wasabi noticed that a particular chip (an EPROM chip) was wired to the machines battery controller, and removing this chip caused the machine to be completely inoperable. If not protected carefully, removing such chips from TSx machines could be used to selectively shut down voting in certain areas (assuming physical access and time necessary to open the case of the machine undetectably, remove the chip, and put the machine back together). This chip was socketed rather than soldered in place, making removal quite easy.




Wasabi also noticed that the `NK.bin` file (the main executable or "kernel" for the Windows CE operating system) had local networking and modem support, which would ideally be removed for software in jurisdictions that do not use those functions. Similarly, Ayushman noticed that there was a `.ini` configuration file that seemed to have passwords, users, and the modem configuration for the device, which he suspected could be changed (since there is little access control) with a serial (DB9) connection to the device. After the conference it was confirmed that connecting the debug jumped on the PCB would still activate the boot loader console on the DB9 VIBS.

Fitzpatrick, St. Leger, and Ryan focused on analyzing the firmware of the device and mapping the pins on the chips to functions useful for chip debugging tools. The TSx has what is called a JTAG interface which is a plug on the circuit board typically used during the manufacturing process to check correct functionality. However, after the unit is sold, the JTAG interface is still available and provides convenient access to the processor and the rest of the system. They noticed the TSx processor is an ARMv5 chip and common chip debuggers only go back as far as ARMv6. Therefore, they had to locate an older debugger in order to map the functionality of each pin and interact with the software. There are further details about this work available in the raw notes from the Voting Village on github.[14]

**ES&S iVotronic**

Like other DRE machines, the iVotronic, manufactured by ES&S, features a touch-screen interface and records votes in internal memory. A poll worker uses a device called a PEB (roughly the size of a deck of playing cards) to enable voting for each voter. PEBs are also used to store and aggregate the final vote tallies from all machines that are then physically transported to election headquarters. In some configurations, the PEB tally can be alternatively transmitted to headquarters over a computer network.[15]

---

[14] See: https://github.com/josephlhall/dc25-votingvillage-report/blob/master/notes-from-folks-redact.md#premier-accuvote-tsx

[15] Verified Voting, "Election Systems and Software (ES&S) iVotronic" https://www.verifiedvoting.org/resources/voting-equipment/ess/ivotronic/

Similar to the AccuVote-TSx, many of the interesting findings about the iVotronic related to examining the internals of the various components. Hackers in the Village examined the PEB device, the PEB readers, and the iVotronic DRE machine.

A hacker named Scott Brion examined the PEB and PEB reader. He found the PEB contains an 8-bit processor, EPROM (non-volatile storage, not easy to update), flash memory (non-volatile storage, easy to update), an infrared communications port (IRdA), a magnet, serial pins and a battery. The PEB reader – a device that serves as an interface for reading PEBs one by one to transfer contents – contained similar elements, including an 8-bit processor, EPROM, USB port, serial pins, and an IRdA receiver port. Brion was able to establish communication to the firmware through the serial PINs, however nothing of value was obtained (in some cases "security fuses" may have been intentionally blown by the manufacturer to prevent analysis and readout of firmware). With a bit of research, it became clear that green PEBs were "supervisor" units used to start and end elections on a set of machines and the security fuses are blown on those, preventing analysis and extraction of firmware on those units. However, the red PEBs, used to accumulate election data and authorize each new voter to vote did not have their security fuses blown, so the firmware analysis proceeded on those units. This is likely an inferior security design as the red PEBs actually accumulate and transmit vote totals, which is exactly what an attacker seeking to change an election result would attack by changing the firmware in a PEB or swapping a PEB out with a clandestine attacker PEB.

Another Village participant, Kris Hardy, also focused on attacking the PEBs and PEB readers as possible ways to get into the iVotronic in a way that could be undetectable (and mimic the goals of a malicious election attacker). Hardy and his colleagues (who asked not to be identified) used a PICkit 3 chip debugger/programmer and were able to identify several PEB chips that were configured without their security fuses blown (meaning the chips could be easily analyzed and interacted with). They were able to extract firmware from one of the chips, which they were able to decompile (a process that turns binary computer code into source code that humans can read – the opposite of "compiling" source code software into a binary executable). The contents looked promising but they did not have time to fully examine the firmware before the Village had to close. They recorded the chip pin-outs (mapping the pins to functionality on a debugger/programmer) in an online github repository for future researchers.[16]




**Sequoia AVC Edge**

The Sequoia AVC Edge, a Dominion product, is another widely-used DRE machine where voters insert a "smart-card" into the machine (a credit card-sized card that authorizes a voter to vote), pick their voting choice on a touchscreen, and then the results are recorded on the machine's internal storage. When polls close, the votes for a particular machine are written to a "PCMCIA" flash memory card which is removed from the system and either physically transported to election headquarters or their contents transmitted via computer network.[17]

[16] See: https://github.com/josephlhall/dc25-votingvillage-report/blob/master/notes-from-folks-redact.md#ess-ivotronic

[17] Verified Voting, "Sequoia (Dominion) AVC Edge" https://www.verifiedvoting.org/resources/voting-equipment/sequoia/avc-edge/

*Note:* As is the case with opportunistic hacking projects like the Voting Village, some equipment will receive more attention than others; in this case, the Sequoia AVC Edge did not attract as much attention as other systems. Below, we describe what are less findings and more features of what hackers found remarkable about this system.



Members of the University of Houston Cybersecurity Club – Tsukinaki and Joe (no last names given) – spent some time with the Sequoia AVC Edge. Through their investigation, it was determined that the AVC Edge has an internal CompactFlash (CF) card running on the pSOS operating system, a real-time operating system developed in 1989, before many of the Voting Village participants were born. This particular operating system has traditionally been used heavily in retail and kiosk equipment.

The Houston team also found that the Edge records data as a hex file; meaning it was difficult to figure out what the contents were without a bit more additional information or reverse-engineering of the file format (a labor-intensive activity not well-suited for the Village). Voting results were stored on the CF card, but then also sent to flash storage on a PCMCIA card in a slot in the back of the machine. It was obvious from the data that this particular AVC Edge was from the 24th precinct of Washington DC, which hackers got by just running the command strings on the data. In this process, one could definitely see the slate of candidates and such, though no voter identities or similar personal voter data was viable. (This was expected as no voter identity could make it from the pollbook process to the voting machine).

Hackers then tried to boot the operating system image in a virtual machine, but did not get too far; One could see a menu in the PSOS boot file – that is, could see the strings, but could not get it to boot. There was a RAM file that seemed to give them a "file not found" in the boot sequence. Nick used a utility called `binwalk` – a firmware reverse-engineering and analysis tool – to examine the firmware and it appeared that there may be use of an *8-bit cipher* (eight (8) bits is exceedingly insecure).

**Diebold ExpressPoll 5000**

While the devices detailed above are types of vote-recording and vote-casting equipment, the Village also had available an electronic pollbook (the ExpressPoll 5000), which is still currently used in states like Ohio to check in voters on Election Day. At the Voting Village, the pollbook was subject to a significant degree of scrutiny by participants, including:

***Voter Data Leakage***

On day 1 in the Voting Village, it was discovered that the ExpressPoll units obtained were not properly decommissioned and still contained voter records. Specifically, 650k voter records from Shelby County, Tennessee were still present on the pollbooks, containing names, addresses, dates of birth, driver's license numbers and a number of other potentially sensitive fields. Village organizers secured the data, removed it from the units available in the village, and one village organizer began a process of disclosure to Shelby County so that they could be aware of the issue.




***Technical Findings***

The unit did not have much in the way of physical security protections, allowing someone with a screwdriver to remove and replace the election media, or simply remove it to accomplish a denial-of-service attack. The default username and password for this unit was available with a simple google search. There were also two USB ports that seemed unprotected.

The ExpressPoll runs on an obsolete embedded operating system, Windows CE 5, and validates no input or software updates (it would load without any prompting or checking both a new bootloader – commands that tell the system how to start up – and OS image – the operating system the device runs after start-up). This could allow attackers to inject a new bootloader (which appears to be proprietary) or Windows CE image without detection. Similarly, the unit reads a file "`ExPoll.resources`" that contains all the parameters for the election that could also be injected with parameters chosen by an attacker. When the pollbook software is launched, this file is loaded into memory and then saved to non-volatile storage for use in future elections. Village hackers were able to change the parameters in this file, get it to load and have their own parameters loaded (in this case they "bricked" – rendered inoperable – an ExpressPoll unit, but were confident that further testing would have resulted in successful modification of pollbook parameters).

Hackers attempted to crash the main application by loading large amounts of data into the database fields, but this only slowed the device, instead of crashing the main application and potentially allowing further access. The unit's networking seemed to be well-locked down with essentially only data being broadcast from the unit and hackers were unable to make a successful connection and inject data through the network interface.




There was some hope that changing the `Consolidation_ID` on a smartcard that the unit writes to in order to authorize a voter would have silently discarded that voter's vote, but that was not possible to test without a smart card reader/writer, which was unavailable.

The device keeps an event log with login, logout, power, load, and open events. However, this log would not be sufficient to prevent tampering; it is only written by the device and does not reflect any file changes that occur on the storage media (and, of course, is not integrity protected).

## Impact & Lessons Learned

The technical findings of the Voting Village were not entirely new. As stated, hackers and researchers have breached these voting machines before under various circumstances. However, this experiment allowed mainstream hackers more time and access than ever before, generating several "real-world" lessons that policymakers should consider moving forward:

**Lesson #1: Even with limited resources, time, and information, voting systems can be hacked.**
The DEFCON Voting Village showed that technical minds with little or no previous knowledge about voting machines, without even being provided proper documentation or tools, can still learn how to hack the machines within tens of minutes or a few hours. Past official studies such as the California Top-To-Bottom Review[18] and the Ohio EVEREST Review,[19] conducted over ten years ago had significant restrictions on what participating researchers were allowed to try. Those studies were also done in a "white box" environment where researchers had access to source code, documentation, and equipment under strict non-disclosure agreement.

In the case of the DEFCON Voting Village, hackers had to create, copy, or cobble together their own tools though, in turn, they were given permission to fully experiment and take risks that may result in the machines being destroyed in the process.

The good news is, freedom to take such risks accelerates the process and can lead to completely new discoveries of new vulnerabilities. The bad news is, if relative rookies can penetrate a machine or system in a matter of hours, it becomes incredibly difficult to deny that a skilled, nefarious hacker – including sophisticated cyber criminals or nation-state attackers – with unlimited time and resources, could not do the same.

**Lesson #2: Foreign-made parts introduce serious supply chain concerns.**
"Phishing" scams via email are common, and for good reason: When successful, phishing can provide inside access to a machine, account, system or network without the hacker actually having physical access to the machine. Information can then be stolen or exploited in some fashion, without the victim ever knowing that entry has occurred. U.S. intelligence reports reveal that Russians were not only interested in hacking into voter databases but also into other aspects of the election, including the software supply chain. According to that report, Russian hackers affiliated with Russian military intelligence – the GRU – sent phishing emails to employees at a voting services company that provides state and local election offices with voter registration systems, comprising at least one account on that vendor's system that was then used to send spear-phishing emails to 120 local and state election officials.[20] Given the typical successes of a well-designed spear-phishing attack, we can be almost certain that one or more election officials fell victim to this attack, although we do not know what access and damage might have resulted (as this information is likely still classified).

Good cyber hygiene can help prevent some of these remote attacks. However, during the Voting Village, the extensive use of foreign-made computer parts – frankly, as expected given how many commercial computing devices are manufactured overseas – within the machines opened up a serious set of concerns that are very relevant in other areas of national security and critical infrastructure: the ability of malicious actors to hack our democracy remotely, and well before it could be detected. A frequent argument raised about the

[18] See: http://www.sos.ca.gov/elections/voting-systems/oversight/top-bottom-review/
[19] See: https://www.eac.gov/assets/1/28/EVEREST.pdf
[20] National Security Agency, "Report on Russian Spear-Phishing" November 2016. Parts redacted. https://assets.documentcloud.org/documents/3766950/NSA-Report-on-Russia-Spearphishing.pdf

defensibility of election systems is that the diversified, decentralized nature of our election infrastructure provides at least some protection from wide-scale hacks. But via a supply chain originating overseas, voting equipment and software can be compromised at the earliest of stages in manufacturing process. For example, foreign actors could design or plant a virus in software, memory, or even a small microchip that could affect an entire make/model of voting machine, theoretically allowing them to be compromised in one coordinated attack. To be sure, while we've known for over a decade that some voting machines have hardware manufacturing and/or assembly in foreign countries, less is known about sourcing of software. We do know, for example, of one case when Election Systems & Software failed to disclose it was manufacturing products in a sweatshop in the Philippines in 2007.[21]

One additional implication of foreign parts includes inability to limit insider threats. Cyberattacks originating from inside an organization are a serious concern. Yet U.S. election officials, vendors, or those involved in the voting administration process can be vetted to some degree. This is not the case when the process involves foreign components and facilities, including complicated but common relationships such as subcontractors further subcontracting work out to other entities. To be sure, there are very few entities – the Department of Defense, the National Security Agency, and large tech companies such as Google and Facebook – that have the ability and resources to design, develop, and manufacture entire computer systems on their own; a controlled supply-chain is a first step towards reducing these kinds of threats, but it would be best if voting systems moved to more trusted system design.

**Lesson #3: This was more than a "hacker" stunt and showed that a diverse community of stakeholders must be engaged.**

Organizers did not maintain a precise count of how many entered the Voting Village but estimate that the number exceeded several thousand. In just three days, the Voting Village expanded the number of people who have now had first-hand experience and knowledge of these systems. By Sunday, the attendees who started hacking on Friday had become the experts and they were teaching and helping the new people who just started on Sunday. Exponentially expanding the knowledge base in this regard is sure to have great impact on the solutions and policy-making process. Remarkably, many of the hackers that stayed in the Voting Village for a considerable amount of time at DEFCON 25 were young, between the ages of 16-19, demonstrating to organizers that this kind of civic infrastructure hacking may be a promising way to reach out to younger elements of the information security community.

Additionally, given the wide scope of stakeholders involved in election security, Voting Village organizers believed it was essential the Village did not come to be seen only as a "hacker thing." Organizers reached out to and involved hundreds of other "non-hackers" in the event, ranging from senior leaders of NGOs, to cyber and voting experts, to elected officials to national security leaders. Staff from U.S. Senate Homeland Security & Governmental Affairs Committee and representatives from National Institute for Standards & Technology (NIST), the U.S. Department of Homeland Security (DHS) and the National Governors Association (NGA) attended.[22] Members of the U.S. Congressional Cyber Caucus including Representative Will Hurd (R-TX) and Representative Jim Langevin (D-CT) also visited the Voting Village.

The Voting Village also intentionally encouraged state and local election officials to attend. For many of them in attendance, the Village was their first opportunity to look themselves into the machines – machines they are required to use and manage, but have been prohibited to study in depth – and find answers to their own

[21] Kim Zetter, "ES&S Failed to Disclose Manila Manufacturer to Fed Agency," *WIRED News*, August 14, 2007. https://www.wired.com/2007/08/ess-failed-to-d/

[22] APPENDIX #1: Partial List of Attending Individuals & Organizations

questions and learn more about that equipment. Moving forward, it will be critical to incorporate all of these stakeholders into the security and solutions discussion.

**Lesson #4: The Village challenged major criticisms – and reiterated the need for policy change.**
Finally, the Voting Village helped to dispel a few long-circulating criticisms – as well as helped to affirm what election security advocates have been arguing for years: There is urgent need for federal, state and local election officials to implement measures to secure U.S. election infrastructure.

First, though voting machine manufacturers have historically denied claims that their machines are insecure, some have suggested the Voting Village demonstration did not constitute a "true" test because it was not conducted in a real election setting. Yet, enemy hackers are certainly not operating in a "sanctioned" environment and if a voting machine can be hacked by a relative novice in a matter of minutes at DEFCON, imagine what a savvy and well-resourced adversary could do with months or years.

Second, there is a common misconception that the internet is required for voting machines to be hacked. Obviously, the WinVote hacked at DEFCON is particularly vulnerable because it creates a local network that is completely unprotected. But even for the machines in the Village (or real world) that do not, they are still not as distant from the internet as it may seem, and many contain software and hardware that can be used to connect them to the internet. Before each election, the ballots need to be created via a software application, which runs on a desktop computer or is web-based. From there, the formatted ballot is transferred and uploaded to voting machines through memory cards or USB sticks. And even well before election day – indeed before a voting machine is assembled, sold to a government, and brought online for an election – the foreign parts in the machines suggest multiple voting systems could be compromised by laying the seeds of future attacks in supply chain processes. This new revelation heightens concerns, and more must be done to protect our systems at every point in the process, including across the supply chain.

Finally, another common argument is that voting systems are insulated to a degree by the diversity and decentralized nature of our election infrastructure. It is true voting systems do vary greatly from state to state, making it difficult to penetrate multiple voting machines simultaneously. Yet, the confirmation of foreign-made parts and software raises the possibility that hackers could take remote control of at least an entire line of voting machines at a later point, with the right level of access in the supply chain. And as pointed out, machines also touch the internet and non-networked forms of data transmission (USB sticks, etc.) at various other points in the process, potentially weakening resilience if not done very carefully. Yet even if that did not happen, the Voting Village helped to show that simply manipulating a voter file (or in the Village's case, poll book data) could create enough problems or long lines to affect an election outcome.

## Next Year's Voting Village: Moving Forward

The Voting Village will return to DEFCON in 2018. Organizers hope to expand the event next year to potentially cover a number of distinct areas in addition to hands-on hacking of voting equipment, including:

- **Closed-Loop System:** We would like to have a closed-loop system on which we can run an entire mock election using actual voting technologies. This would include voter registration, ballot generation, a mock polling place (with rules of engagement), and results reporting. This addition would allow us to go a step beyond just looking at the machinery of democracy on the technology level.

- **Election Tech Range:** Election officials and voting system manufacturers have some of their own

security technologies, compositions, or solutions that they find work well in defending against certain threats. We would like to invite election officials and voting system vendors to come and get advice and even testing of their tech. A good example would be if an election official or manufacturer would like to get feedback on a particular security system or challenge security researchers to evaluate it and give feedback on how it could be improved.

- **Election Tech Challenges:** There are a number of activities in elections that are difficult to secure. Some small fraction of votes are cast by email, fax, and web and a larger fraction cast on paper through vote-by-mail. We would like to set up examples of these technologies and challenge Voting Village attendees to demonstrate what failures can happen and to what extent those can be avoided.

- **Election Technology Usable Security Evaluations**: A secure voting system can still be highly usable. We would like to invite usable security researchers to join the village to build up a resource of usability and needs assessment conclusions and profiles of past, existing, and future voting technologies.

- **Request for Donation of Machines, Software, Databases, etc.**: DEFCON has embraced the notion that the DEFCON hacker community's role in the election security debate is one of providing a public service. To that end, DEFCON is offering to test any clerk or secretary of state's election administration equipment and provide training for their IT staff at DEFCON 26. Our door is always open to those who want to make their voting process more secure.

## Conclusion

DEFCON organizers believe the Voting Village was vital to growing the base of knowledge, expanding the circle of stakeholders beyond hackers, and shining a national spotlight on the serious cybersecurity weaknesses of U.S. election infrastructure.

The next step is to make clear that this is a conversation that cannot "stay in Vegas." It is imperative that leaders at the federal, state and local level come to understand this threat as a national security imperative and work together – leveraging the support of the national security and cybersecurity community – to better defend and protect the vote from cyberattacks in the upcoming elections in 2018 and 2020. Americans need the reassurance that their democracy is safe, starting at the ballot box.

## Acknowledgements

A number of individuals and organizations contributed to the Voting Village and to this report. A special thanks to:

- Organizers, subject-matter-experts and other visionaries who turned the Voting Village concept into a reality and helped to author this report, including especially Sandy Clark.
- ISP/CyberBit and the Cook County, Illinois Clerk's Office for supporting the cyber back-office simulator at the Voting Village;
- Speakers who contributed to the Voting Village discussions including representatives from the Center for Democracy and Technology, Center for Election Integrity, the Center for Internet Security, the National Governors Association, the U.S. National Institute for Standards and Technology (NIST), and Verified Voting.

## APPENDIX #1: Partial List of Attending Individuals & Organizations

Representatives attended the event from a variety of organizations including:

- Atlantic Council
- Aries Security
- Cisco
- Center for Internet Security
- Election Assistance Commission (EAC)
- IBM
- McAfee
- Microsoft
- Multi-State Information Sharing & Analysis Center (MS-ISAC)
- National Institute for Standards & Technology (NIST)
- National Governors Association (NGA)
- Nordic Innovation Labs
- Rochester Institute of Technology
- University of Buffalo
- University of Pennsylvania
- University of Texas San Antonio
- US-Computer Emergency Readiness Team (US-CERT)
- U.S. Department of Homeland Security (DHS)
- U.S. Senate Homeland Security & Governmental Affairs Committee
- U.S. Representative Will Hurd, Congressional Cyber Caucus (R-TX)
- U.S. Representative Jim Langevin, Congressional Cyber Caucus (D-CT)
- Verified Voting

# EXHIBIT B

# DEF CON 26

# Voting Village

*Report on Cyber Vulnerabilities in*

*U.S. Election Equipment, Databases, and Infrastructure*




**September 2018**

**Co-authored by:**
Matt Blaze, University of Pennsylvania
Jake Braun, University of Chicago
Harri Hursti, Nordic Innovation Labs
David Jefferson, Verified Voting
Margaret MacAlpine, Nordic Innovation Labs
Jeff Moss, DEF CON

# Contents


| | |
|---|---|
| Introduction | 3 |
| New Findings on the Eve of the 2018 Midterm Elections | 5 |
| Media Overview | 8 |
| Equipment | 9 |
| Limitations | 10 |
| "Election Security is National Security" | 11 |
| Technical Findings | 13 |
| Forensic Studies - AVS WINVote | 23 |
| Recommendation: Make A Crisis Communications Plan Before Your Website is Hacked | 27 |
| Conclusion | 30 |
| Next Steps | 31 |
| End Notes | 32 |
| Acknowledgements | 34 |
| APPENDIX #1: Partial List of Attending Individuals & Organizations | 35 |
| APPENDIX #2: Biographical Information: Voting Village Speakers | 36 |
| APPENDIX #3: Don't Take Our Word For It | 42 |
| APPENDIX #4: Firewall Democracy: Best Practices for Securing America's Vulnerable Voting Infrastructure | 46 |

## Introduction – "Election officials have plenty to learn from hackers"

**By: Alex Padilla, Secretary of State, California**
Originally published: *The Hill,* August 19, 2018[1]
(reproduced with permission of the author)

Every year, DEFCON convenes thousands of hackers who attempt to breach the security of important technologies in an effort to expose vulnerabilities. For the past two years, this has included voting machines in a room dubbed the "Voting Village."

Rather than watch from the sidelines, or read about the findings in the news, I wanted to see for myself. So, I went to DEFCON. I listened, I observed and I had the opportunity to address attendees.

While it's important to constantly search for and understand the vulnerabilities of any voting system, a unifying message at the conference — from hackers to elections officials alike — is that we must be on alert and Congress must invest more to better secure our elections.

Threats to the integrity of our elections are constantly evolving. Not too long ago, a primary focus for election officials was securing voting machines. Today, cyber attack vectors have expanded — and so must our defenses.

This includes protecting our state voter registration databases, county election management systems, election night reporting websites, state and local government social media accounts and ensuring the information voters consume is accurate.

Intelligence officials tell us that the "warning lights are blinking red" — and our adversaries are getting more sophisticated. It's clear to me, as California's chief elections official, that we cannot become complacent.

That's why attending DEFCON was important. Though, as my secretary of State colleagues are right to point out, the environment under which voting machines were "hacked" at DEFCON do not precisely reflect real-world conditions.

On Election Day, voting machines aren't left on tables to be opened or exposed for hours on end, and there isn't unlimited public access to equipment at polling places or county offices.

Still, we could learn a lot from friendly hackers. Their insight can help us stay one step ahead of those who seek to undermine our democracy. It forces us to take second, third and fourth looks at systems. Elections officials must constantly scrutinize, test, adapt and upgrade security measures.

But no matter how much we learn or how much we innovate, we cannot succeed without adequate resources. Election administrations in America has been historically underfunded and understaffed. The burden of funding for election administration typically falls on the limited budgets of local governments.

---

[1] Padilla, Alex. "Election Officials Have Plenty to Learn from Hackers." The Hill. August 21, 2018. Accessed September 25, 2018. https://thehill.com/opinion/cybersecurity/402458-election-officials-have-plenty-to-learn-from-hackers.

States have a responsibility when it comes to properly funding election administration, including security. I'm proud that in California we secured $134 million in this year's budget to upgrade or replace voting systems plus additional funding for the creation of the offices of Election Cybersecurity and Enterprise Risk Management.

We're also updating hardware and software, monitoring our networks around the clock, and we've strengthened communications and information-sharing channels with federal authorities.

Still, we can and must do better.

You may have heard that Congress recently appropriated $380 million for election security nationwide. Not quite. Remember butterfly ballots and hanging chads? The recent federal appropriation was simply the final disbursement of money originally approved in 2003 to address the debacle of the 2000 presidential election in Florida.

There has been no new additional funding authorized to address our modern security challenges. To make matters worse, this month, the Republican majorities in both the House and the Senate defeated measures that would have appropriated $250 million for election security grants to states.

Meanwhile, they approved a $700-plus billion national defense appropriation — with not one cent for shoring up our nation's election systems.

Protecting our elections from foreign interference is a matter of national security. That's why our election infrastructure has been designated as critical infrastructure by the Department of Homeland Security.

For elections officials to implement needed election security measures, state and local governments need ongoing funding from federal and state budgets. We can't let up, and we can't rely on dated equipment. The stakes for our democracy are too high.

Until Congress takes our requests seriously and makes the necessary investments to further fortify our voting equipment and systems, election officials must think and act outside the box.

While I'm told I was the first secretary of state to attend DEFCON, I'm confident I won't be the last. We have a responsibility to learn from hackers, particularly those wanting to help. We owe it to the nation to do all we can to protect our elections.

Nothing short of our democracy is at stake.

## New Findings on the Eve of the 2018 Midterm Elections

Back for its second year at DEF CON, the world's largest and best-known hacker conference, the Voting Machine Hacking Village (Voting Village) dramatically expanded its hands-on activities and audience in advance of the 2018 midterm elections. When the Voting Village first launched in 2017 - and was attended by thousands of white hat hackers, government leaders, and media - it aimed to identify vulnerabilities within the U.S. election infrastructure. In 2017, intelligence about Russian adversaries hacking the 2016 presidential election was increasing but the severity of the threat to U.S. election infrastructure was dying down. This year, DEF CON dramatically expanded its inquiries to include more of the election environment, from voter registration records to election night reporting and many more of the humans and machines in the middle. DEF CON had a greater variety of voting machines, election officials, equipment, election system processes, and election night reporting. Voting Village participants consisted of hackers, IT and security professionals, journalists, lawyers, academics, and local, state and federal government leaders.

This year, the Voting Village made more than 30 pieces of voting machines and other equipment available to its participants. All of the equipment (with the exception of the AVS WINVote, described below) is still used throughout the United States today. The Voting Village is the only public forum in United States at which hackers have nearly unrestricted access to discover vulnerabilities in the equipment. In addition, this year the Voting Village conducted unprecedented outreach to state and local election officials, inviting them to participate in the Village's activities and receive free training from cybersecurity experts.

As was the case last year, the number and severity of vulnerabilities discovered on voting equipment still used throughout the United States today was staggering. Among the dozens of vulnerabilities found in the voting equipment tested at DEF CON, all of which (aside from the WINVote) are used in the United States today, the Voting Village found:

- A voting tabulator that is currently used in 23 states is vulnerable to be remotely hacked via a network attack. Because the device in question is a high-speed unit designed to process a high volume of ballots for an entire county, **hacking just one of these machines could enable an attacker to flip the Electoral College and determine the outcome of a presidential election**.

- A second critical **vulnerability in the same machine was disclosed to the vendor a decade ago**, yet that machine, which was used into 2016, still contains the flaw.

- Another machine used in 18 states was able to be hacked in only two minutes, while it takes the average voter six minutes to vote. **This indicates one could realistically hack a voting machine in the polling place on Election Day within the time it takes to vote.**

- Hackers had the ability to **wirelessly reprogram, via mobile phone, a type of electronic card used by millions of Americans to activate the voting terminal to cast their ballots**. This vulnerability could be exploited to take over the voting machine on which they vote and cast as many votes as the voter wanted.

Further, in partnership with two other DEF CON villages, including r00tz Asylum, which allows children (accompanied by an adult) to learn and test white hat techniques, and Capture the Packet (CTP), the most popular competition at DEF CON, young DEF CON attendees were given the opportunity to hack mock ups of secretary of state election results websites for the thirteen Presidential Battleground States. In less than

10 minutes, an 11-year old in the competition hacked into a mock up of Florida's election results website, changing its reported vote totals. The attack the children were trained to use on the sites (SQL injection) is the same attack the Senate Intelligence Committee warned was used in a majority of Russian cyber attacks on election websites in 2016.[2] Further, the Open Web Application Security Project (OWASP), one of the leading organizations on website security globally, has cited this type of attack as the top web application security risk for organizations around the world.[3] While children in the r00tz Asylum village used this vulnerability for a variation of 'de-facing,' which is generally considered to be an easily found, "show-off" attack, in the hands of more skilled and malicious adversaries the underlying vulnerability can be used to initiate much more serious types of attacks.

Aside from introducing the youngest members of the DEF CON community to issues related to civics, media, and cybersecurity, the r00tz Asylum exercise was ***the first time the voting public was made aware of how fragile our election night reporting systems are to the ultimate fake news: hacked election results***. No organization can protect a website from a determined nation-state, as was evidenced by the Iranian attacks on nearly dozens of financial institution websites from 2011 to 2013. The financial industry spends billions on cybersecurity and hires some of the best cyber defenders on the planet to protect their systems. Yet even with all their resources, they could not stop a determined nation state from hacking their websites despite two years of trying. Even more disconcerting, Russia has already executed an attack on election reporting websites in Ukraine, changing results and announcing the prefered Russian candidate won when in fact he had not. Thus democracies around the world need to prepare for this threat. DEF CON is stepping up as the first organization to publicly release Election Day crisis communication protocols (below) for election jurisdictions across the globe to train in advance of Election Day.

Over 100 election officials passed through the Voting Village over the course of three days, with many training on the KIG CyberRange generously donated to the Voting Village by Cyberbit. The CyberRange is a virtualized environment allowing election officials to be trained in defending a voter registration database and simulated state-of-the-art attacks. This year the defenses of the virtual election office were beefed up by an order of magnitude from the last year's exercise. Further, to our knowledge, this is the only capture-the-flag style training available for election officials to learn how they can protect a voter registration database from attackers already in their network.

High-profile experts lined the speaking track at the Voting Village. Speakers included leaders from the Department of Homeland Security; state and local election officials, including Alex Padilla, Secretary of State of California; Noah Praetz, Director of Elections for Cook County, Illinois; Neal Kelley, Chief of Elections and Registrar of Voters for Orange County, California; Amber McReynolds, former Director of Elections for City and County of Denver, Colorado; and the senior *New York Times* correspondent and best-selling author, David Sanger. Biographical information can be found more in detail in Appendix #2.

The unprecedented attendance of election officials at DEF CON did not happen by accident. The Voting Village sent thousands of invitations via mail and email, and even made 2,500 live phone calls to election officials across the country.

---

[2] US Senate Intelligence Committee, "Russian Targeting of Election Infrastructure During the 2016 Election: Summary of Initial Findings and Recommendations," May 8, 2018, https://www.burr.senate.gov/imo/media/doc/RussRptInstlmt1-%20ElecSec%20Findings,Recs2.pdf.

[3] "OWASP Top 10 Application Security Risks - 2017, " *Open Web Application Security Project,* Accessed September 21, 2018, https://www.owasp.org/index.php/Top_10-2017_Top_10.

Matt Blaze, co-founder of the Voting Village, said, “It’s been incredible, the response we’ve received. We’ve had over 100 election officials come through here and they expressed over and over again how much they have appreciated learning from this opportunity.”

He went on, “Before the first DEF CON Voting Village in 2017, there were only a handful of experts on voting infrastructure cybersecurity in the United States, as well as an unknown number in Russia. Now, thanks to the efforts of the Voting Village, there are thousands of experts. Now is the time to leverage that expertise to improve election security across the United States.”

Harri Hursti, another co-founder of the Voting Village, added: “It would be extremely expensive for professionals and trained experts to match the diversity of ideas, approaches, speed, and overall creativity generated by this unorganized, large group of highly skilled people working on a common objective. The reason why many industries and government agencies have implemented bug bounty programs and other ways of crowdsourcing security work is because they are incredibly effective tools to capture this energy and innovation to help to improve their own security. For the U.S. election system, the challenges at hand are much larger than just software bugs: there are fundamental design issues to sort out and fix. The innovation inherent in this kind of exercise can be of immeasurable impact.”

## Media Overview

The public and media response to the second year of the DEF CON Voting Village has been truly staggering, both in terms of its reach and in terms of the conversations it has sparked about election security. In total, the media coverage following the annual DEF CON Voting Village reached more than 2.8 BILLION people. As reflected in the Heat Map below, almost 2,000 media stories were published world wide, covering every major continent except Antarctica.




Not only did prominent publications such as *The Washington Post,* CNN, *The Wall Street Journal*, *The New Yorker*, and BBC cover the event, the Voting Village also engaged with an active audience via social media, which touched more than 146 million people. Twitter alone garnered 33,400 engagements from just one tweet on the opening day of the DEF CON Voting Village. Since July 24, 2018 and covering the dates of DEF CON, Voting Village tweets earned 1.4 million impressions, with high activity during the event itself. With a successful and active media outreach, social media accounts continued to generate interest throughout the event. With thousands of followers, the Twitter handle for the Voting Village (@VotingVillageDC) provided continual updates on what was occurring at DEF CON, engaging followers and interested parties inside and outside the event.

Other top publications that covered the event included *TIME*, *USA Today*, CNBC, *Reuters*, NBC News, *The Los Angeles Times*, ABC News, and *Politico*. Articles covered the vulnerabilities of election infrastructure and the variety of machines investigated at the event. Some news sources developed the conversation further, covering not only the threats posed to traditional election infrastructure but the rising threat of disinformation. CNN, for example, after highlighting the importance of the work being done at DEF CON, used the hacker conference as a discussion platform to voice its fear of a future influence by coordinated information warfare campaigns. Additionally, top officials from DOD, NSA, DHS and the U.S. Congress attended the Voting Village.

## Equipment

The Voting Village organizers procured a variety of voting equipment for examination. The 2015 Digital Millennium Copyright Act exemption issued by the Library of Congress for good faith security research allowed Voting Village participants to find vulnerabilities without worrying about anti-circumvention liability. Prior to 2015, hackers might have faced significant liability for some of the research described in this report. Most of the equipment in the Village was purchased by DEF CON on secondary markets, such as eBay and government surplus auctions. The machines and equipment featured in the Village included:

- Dominion: Premier/Diebold AccuVote TSx
- Dominion: Diebold AccuVote OS
  *This machine was lent to the Voting Village by an election official for display purposes only. Because it was needed for use in the midterm elections in November 2018, it was not used for any research or analysis by Voting Village participants.*
- Dominion: AVC Edge
- ES&S: ExpressPoll Tablet Electronic Pollbook
- ES&S: M650
- AVS: WINVote
- AVC Edge activation device
- ACOSJ dual interface Java card

In addition, the Voting Village also featured the KIG CyberRange powered by Cyberbit, which provided a virtual exercise that was designed to mirror an Elections Voting Office. In a safe, virtual, and isolated network, hackers were asked to use common tools to penetrate a web application behind firewalls and manipulate records. The CyberRange exercise leveraged Kali Linux, which is a common Linux distribution including a wide range of free hacking tools and used by hackers, security professionals, and researchers today. Using the Kali Linux toolset, the hackers attempted to perform attacks like SQL Injections as a means to compromise the simulated elections office and exfiltrate the data designated as the target. However, it is noteworthy that Kali Linux offers only a small subset of the tools real cyber criminals have at their disposal. Offering Kali Linux was to facilitate participation without requiring hackers to bring their own computers and tools. However, it was also a disadvantage for the attackers as they were limited to certain tools and an environment which they may not have used otherwise.

The KIG CyberRange depends upon Cyberbit simulation technology. The Range is deployed as an isolated virtual environment, giving KIG the ability to customize network configurations to mirror real-world environments and develop unique attack scenarios.

As in the real world, the virtual exercise was not timed, and hackers were encouraged to continue trying to hack the system as long as they desired. Several made it past the web application, but none were able to penetrate the last firewall to retrieve voter records. Had hackers been successful, it is possible they could have potentially altered voter polling data – changing polling data or adding/deleting records. However, no hackers were successful in getting to the data in the simulated virtual attack exercise. It is noteworthy that this year the defenses of the virtual election office were fortified using Israeli military defense software, while attack tools were limited to what is available with Kali Linux.

The Voting Village does not manufacture opportunities for hackers to easily exploit the elections system. It is a forum for experimentation to improve the security of the U.S. elections infrastructure. The fact that no

one was able to fully penetrate the last firewall in the exercise provides useful information on a way to better protect voter data. If any state or local election official would like to better understand how the CyberRange works, please reach out to votingmachinevillage@gmail.com for more information.

## Limitations

There were significant limitations of the work at the Voting Village, including:

- Participants only had access to publicly available information and the contents of the machines. In contrast, nefarious actors would not be so constrained, and could attempt to gain access to proprietary information.

- The Voting Village provided a sample of voting technologies. Organizers obtained what they could get their hands on quickly, legally, and affordably.

- The Voting Village did not provide any Election Management Systems to attendees. In a real election environment, this system is a key element as originator and aggregator of election data, and in formal studies it has been found to be the most vulnerable element, particularly in its capacity to radiate additional attack surfaces and vectors across the elections system as a whole.

- Finally, there was no access to any backend provisioning or voter registration systems. These kinds of systems are not generally available on the open market.

Case 2:22-cv-00067 Document 1 Filed 02/08/23 Page 31 of 131

## "Election Security is National Security"

**By: Rob Joyce, Senior Advisor for Cybersecurity Strategy, National Security Agency**
Originally published: *The Cipher Brief*, September 27, 2018[4]

Opinion - Many different organizations and individuals need to pull together to ensure we have secure and trustworthy elections. The distributed nature of our elections throughout the state and local governments means there are widely varying levels of expertise and resources available, even when state and local officials leverage the federal government for support. This election infrastructure can be expansive, and includes the voting machines themselves, the tabulation processes, the voter registration databases and the associated networks. Each of these requires a detailed focus from many entities to protect against adversaries seeking access to data for influence operations, threatening the availability of the services, or posing threats to the integrity of the information.

I recently caught a glimpse of the kind of offensive focus I'm talking about at the Voting Village at DEF CON 26. I witnessed private individuals donating their time to improve the security of our election processes. They've made incredible contributions, and are offering advancements for federal, state, and local election programs, as well as insights for the manufacturers of voting technology. Strongly connecting all the contributors to our election process needs to be a goal for improving election security. These connections are vitally important to ensure everyone is aware of the threats, best practices and needed improvements.

Amazing talent and expertise gathers at DEF CON with an enthusiasm to make things better. The combination of skilled cybersecurity experts in partnership with industry and the ultimate end users of the technology – state and local election officials – is a powerful alliance. . . . Steering the voting village to similar collaborative relationships will take us to the next level and address the constant erosion of trust, which only helps further the objectives of our adversaries.

Ignorance of insecurity does not bring you security. As time passes, the security of any device begins to erode. New exploitation techniques are developed. New investigative tools are created. Zero days are discovered in operating systems. The capabilities and repertoire of the exploiters grows. Developers of the security models for a device can never predict every creative idea that will be tried during exploitation. For these reasons, we need to continuously red team our devices and processes. This independent testing provides great benefit by straining assumptions and uncovering hidden flaws.

Another key aspect of securing our election processes is simply focusing on the fundamentals. As we embrace electronic technology, the basic security practices of updating and patching are critical. Having strong adherence to recommended security design practices is vital. Often, paying attention to detail in the things that we already know how to do, removes significant risk.

While DEF CON continues to foster a venue to investigate election infrastructure in the Voting Village, the focus cannot simply be about calling out the state of security in our current technology. Rather the result needs to be developing tangible actions that lead to collaborations that will make us more secure.

[4] Joyce, Rob. "Election Security is National Security." The Cipher Brief. September 27, 2018. Accessed September 27, 2018. https://www.thecipherbrief.com/column_article/election-security-is-national-security.

Election security is a matter of national security, and there's no question that progress has been made since 2016 – government-industry partnerships exist today that simply did not exist even a year ago. These security-focused engagements between election officials, the federal government, and vendors will undoubtedly contribute to making the 2018 mid-terms the most secure elections in recent memory. But there's more to be done, and securing our elections is like a race without a finish line. Together as a community – hackers, government and industry – can bring powerful assurances to a foundational component of our freedom: fair and trustworthy elections.

## Technical Findings

**Diebold ExpressPoll-5000**
The Diebold ExpressPoll-5000 is an electronic pollbook, designed for use by individual pollworkers. It is used in precincts to check voters in before they are permitted to vote. The product line currently belongs to ES&S, but the ones used at DEF CON were models running Diebold-branded software, which is also still in use in several places in the U.S. Its operating system is a version of Windows CE, a system built by Microsoft for embedded applications. The pollbook application software was version 2.0.27. The data in an ExpressPoll-5000 is stored on a removable Compact Flash card with additional ability to utilize PCIMCI cards.

The principal investigators of the ExpressPoll-5000 machines at DEF CON were Miguel S., a software engineer, and Akin O, a Nigerian application software security engineer. These investigators were able to access the file system and read and write the voter databases using SQL Lite, a free database program widely available. The investigators found entries in the database where the passwords to the ExpressPoll-5000 were stored in cleartext.

The root password for the machine was "password".

The admin password was "pasta".

There are several security mistakes here if a jurisdiction is serious about security. First, the root password is apparently unchanged from the operating system default. When setting up a new machine the first thing one should always do is assign a new root password. It also is extremely bad practice to store passwords *in the clear* (i.e. unencrypted) and in a place that will ever fall into someone else's hands (as this ExpressPoll-5000 did). Presumably any poll worker in the jurisdiction from which this machine came can use the passwords to gain control of the machine and make arbitrary changes to it.

The admin password, "pasta", is probably not the default password, i.e. it probably was changed to that when the machine was configured. But it is a poor choice because it is short, all lower-case, and contains no digits or special characters. More significantly, it does not matter what the admin password is if the root password is the default value, since the root user has more privileges than the admin user. Additionally, it demonstrates that Federal Information Processing Standard rules, as defined by the National Institute of Standards and Technology (NIST), are not enforced by the software.

**Dominion AVC Edge**
The AVC Edge is an electronic voting machine manufactured by Sequoia Voting Systems, later acquired by Dominion Voting Systems. It is a touch-screen machine with direct-recording electronic capabilities. It is activated by a smart card, and records votes on internal flash memory. Each unit contains a slot for a vote activation card. After the voter's ballot is cast, the smart card is deactivated to prevent multiple votes from being cast. Votes are subsequently documented. When polls close, the votes recorded in each machine are either physically or electronically relayed to election headquarters. It is currently in use in Arizona, California, Florida, Illinois, Louisiana, Missouri, New Jersey, Pennsylvania, Washington, and Wisconsin.

As the whole execution environment is stored on the removable storage device with no permanent physical security protections in the form of locks or even tamper-evident seals, researchers were able to simply open the machine's outer casing with common screwdrivers, gain access to the storage device slot, and

swap the device with a new device with a different operating system installation and application. Tamper-proof seals specific to a particular election would not protect against this, as an attacker would only need to swap out the removable media once during the lifetime of the device.

In the Voting Village the removable media were replaced with new media with completely different programming to verify that there were no security measures, such as secure boot or cryptographic signatures, preventing the device from accepting arbitrary new programming. Though old, the AVC Edge hardware is common; therefore there are no obstacles to creating rogue software deployments for the device.

**Dominion Premier/Diebold AccuVote TSx**

The AccuVote TSx is an electronic voting machine manufactured by Premier Voting Solutions, later acquired by Dominion Voting Systems. The product line currently belongs to ES&S, but it is unclear if the machines used at DEF CON are Dominion or ES&S products. The AccuVote TSx is currently in Alaska, Arizona, California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Missouri, Mississippi, Ohio, Pennsylvania, Tennessee, Texas, Utah, Wisconsin, and Wyoming.

During DEF CON, the Voting Village organized a mock election to demonstrate vulnerabilities in the AccuVote TSx. The software used in the demonstration was unmodified from the software that is still used widely. Additionally, there are older, potentially more vulnerable versions of the software still in use.

The mock election demonstration consisted of multiple elements:

- All voters used the same voter activation smart card without the card being reactivated with a device of any kind to allow the next voter to cast their ballot. This is because the voter activation card was programmed to automatically reset itself after activating the device, therefore allowing it to be used to cast unlimited number of ballots.

- The election was programmed without using software provided by the vendor, therefore proving that a chain of custody of the election management software does not prevent new elections from being programmed. This also indicates that third parties with no access to the election management system can create rogue election definitions which are indistinguishable from real elections.

- An attack can be distributed remotely with no physical access to the voting machine. Malware needed in this demonstration can be distributed with the ballot/election definition. This also demonstrates the mechanism enabling a wholesale attack. Depending on how a particular county's system is set up, there may be multiple centralized systems in the chain of the information flow to the voting machines, and compromising any of the links in the chain enables a wholesale attack.

- Paperless, unauditable systems are extremely vulnerable to this kind of attack, as the only record of a voter's intent is in digital form.


Precinct 0
DEFCON Special Election
This is an AccuVote TSX, a voting machine used in 18 states, some with older firmware than this.
Attackers don't need physical access to hack it. Before every election, officials create the ballot design on a central PC and copy it to every machine. We built malware that hitches a ride.
On the next screen, please vote for your preferred candidate.
Touch Next to begin.
Next


DIEBOLD
President of the United States
George Washington
Framers Party
Benedict Arnold
Redcoat Party
Previous
Instructions
1 of 1
Next


DIEBOLD
President of the United States
George Washington
Previous
Cast Ballot


ELECTION RESULTS REPORT
President of the United States
DATE: DEFCON Special Election
TIME: 14:24 08/11/2018
BALLOTS CAST 113
President of the United States
George Washington 26
Benedict Arnold 26
The Dark Tangent < 61
WE, THE UNDERSIGNED,
DO HEREBY CERTIFY THE
ELECTION WAS CONDUCTED
IN ACCORDANCE WITH THE
LAWS OF THE STATE.
******* SIGNATURES *******

As a surprise, the largest social media visibility from the village was for viral video posted by social engineer Rachel Tobac. At the time of writing, the video (https://twitter.com/racheltobac/status/1028437783050776576?lang=en) has been viewed over 2 million times. While this hack that Tobac demonstrated was known before DEF CON, we revisit it here in light of the renewed public attention. The AccuVote TSx voter activation smart card reader unit is held in the place by a flimsy piece of plastic which can be easily pulled from the main casing and re-installed. The process requires no tools, very little physical force, and can be done in a matter of seconds within the privacy shield of the voting machine. By separating the piece, an attacker gets access to the connector cable of the reader unit. If an attacker disconnects the cable, during the next start-up the voting terminal will allow the attacker to enter the system settings dialog without any authorization checks. This vulnerability allows an attacker to potentially disrupt the election process, but based on the current understanding will not affect the integrity of the votes.

**ES&S M650**

The M650 is an electronic ballot scanner and tabulator manufactured by ES&S. The ES&S M650 is used for counting both regular and absentee ballots. It launches ballots through an optical scanner to tally them, and keeps count on an internal 128 MB SanDisk Flash Storage card (pictured below). Election staff are responsible for configuring the M650 for each election. It is currently in use in Arkansas, California, Florida, Idaho, Illinois, Indiana, Kansas, Minnesota, Missouri, Montana, North Carolina, Nebraska, New Jersey, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia, and Wyoming.

The M650 runs QNX 4.2* on an Octagon 5066 Board with an AMD Am5x86 processor at 133MHz. QNX is a Real Time Operating System (RTOS) that has some loose parallels to modern-day Linux and Unix operating Systems. The version of QNX running on the M650's at DEFCON was last updated in 2008, and QNX 4.2 was released in 1996.



*Physical Security*

There is a common misconception that physical security precautions (tamper-evident seals, locks, etc.) keep voting machines safe from malicious attacks. While all equipment was shipped to us with keys, the researchers wanted proof that the locks in the machine did not inhibit access. In under a minute, a Voting Village researcher picked the lock on the back of the M650 (pictured at left) and unlocked its case, gaining full access to the computer systems and electronics via a serial connection to the main board. Features of note include two OKI Microline 9-pin dot matrix printers connected to two exposed parallel ports, an exposed ethernet jack, and a ZIP disk reader/writer. There was no other type of tamper-evident security on the machine. Physical security such as this lock, even in a small county office, is not sufficient to protect voting systems.

*Serial Terminal*

With a $10 adapter (VTC-9F to DB-9 adapter cable, item 1041), a serial connection can be established to the M650 by connecting to the main 5066 CPU board. The connection is extremely simple to establish, as it uses the default serial parameters for popular, free programs like Putty and TeraTerm (Windows), as well

as Linux commands like `screen` (where the only requirement to successfully opening a serial console is specifying a baud rate of 9600). Connecting a laptop allows root access to a serial terminal session with username 'root' and no password. There is not even minimal account security.

From this connection, an attacker can tamper with election data. All these data are stored in `/flshdr/elecdata`, the mount point for the 128MB SanDisk Flash Storage device that is on a standalone board inside the M650 computer board cage. An attacker could also conduct a denial of service (DoS) attack against the system, or display any message to the screen or printers connected to the computer.

Furthermore, there exist commercially available tools which can be used to automate an attack of this nature, as well as small, commercially available devices which can be installed into this interface to enable remote and wireless access to this port. Because the serial is not used during normal operations, adding such a device without detection is possible. Researchers estimated that it would take one to two minutes to pick the lock, carry out the installation of the attack and relock the device.



*Ethernet Port Vulnerability*
The ES&S M650 voting machine has two communication media options - Ethernet connection or Zip drive. On the side of the M650 is an RJ45 jack. This connection allows the M650 to send data over a network to a system running ES&S Unity, the election management system software.

During bootup the M650 makes a DHCP request to obtain an IP address using the DHCP client provided in the QNX TCP/IP module, dhcp.client. This DHCP client shares a substantial amount of DHCP protocol handling code with the ISC DHCP server version 1.0.0, although the client-specific portions seem to be closed source. Version 1.0.0 of the ISC DHCP server has several known buffer overflows. However, we were not able to trigger these overflows with server-provided data in this client implementation.

After obtaining an IP, the M650 sends a packet on port 6500 to the Unity server expected at a fixed IP address. This initial packet carries the following hexadecimal payload: `01 00 00 00 00 00 00 00 00 00 00 00 00 05 00 00 00 00 00 00 00 00`. The significance of this message (which is part of one of the TCP packets) is currently unknown.

*Zip Disk Vulnerabilities*
A second investigation of the M650's vulnerabilities revolved around the Zip drives and Zip disks used on the machine. The Iomega products that are used by the M650 are an old and obsolete removable disk technology. Zip disks were intended to be treated as if they were a "fat" floppy disks, but with a much larger capacity (100 MB or 250 MB compared to the 1.44 MB capacity of a common 3.5 inch "high-density" floppy).

There are eight different types of Zip drive devices, and each is different in terms of electronics, storage capacity and other aspects. As an added layer of complexity, the description of a 'super floppy' is an operating system-specific description, referring to Windows. Other operating systems commonly see the drive as more like a removable hard drive. In the M650 operating environment "Unity," the election management system uses a Windows Operating System while M650 itself uses QNX as its operating system. (Voting Village participants did not have access to Unity software.) Therefore they see and operate with the

drive and the file system(s) on it in an inconsistent way. The main difference is that a super floppy is a single file system, while the disk is not subdivided into separate sections, called partitions, which can not see each other - the hard drive type of media includes a partition table, which means that the disk can have multiple separate file systems. If the machine mounts one of the partitions assuming it is the whole disk, the computer will not be aware of the other file systems or the files stored on them.

As stated previously, the Zip drive's primary purpose is to store and transfer the election specific definitions and, ultimately, the results. However, the Zip drive also has the ability to alter or replace any and all of the programming stored on the internal storage devices. This kind of attack is called an advanced persistent threat (APT). APTs are a family of stealthy and continuous computer hack processes designed to be hard to detect, hard to clean, and potentially virally propagating.

On bootup, the M650 executes a startup script called "sysinit" (stored on the flash storage device, under /flshdr/sysinit). The sysinit script is run on every boot-up of the M650. It is responsible for starting drivers, mounting storage locations, and initiating an update. To decide if an update will be run, the machine runs this line:

```
if [ -f /dos/a/<redacted_1> -a -f /dos/a/<redacted_2>.etp -a -f
/dos/a/<redacted_3> ] ;
```

Although we have redacted the file names, they are all single, commonly used English words that can be easily guessed from the context.

In this line—one of the two checks required to perform an update—the machine runs a file presence check (-f <file>) on three files (<redacted_1>,<redacted_2>.etp, <redacted_3>) that should be on the zip disk (mounted as /dos/a/) to move on to the next step of running an update. This next step is even more trivial: a version check. The sysinit script, provided that it finds the three files listed above, runs this line to "check" version numbers:

```
if [ "$new_vers" != "$curr_vers" ] ; then
```

This line simply ensures that the new version of software (read from /dos/a/<redacted_2>.etp on the zip disk) is *not the same as the existing version* (thus the use of the != operator). The existing version is stored in (/flshdr/<redacted_2>.etp). By using the "!=" operator, the software could theoretically be downgraded as well as upgraded: a lower software version on the Zip disk would still make that "if" statement true. Following these two trivial and insecure checks, the machine continues to copy the update script to the root directory (/) and then runs:

```
display "Updating firmware to $new_vers."
/<redacted_1> &
```

Through this function, the machine checks for the presence of "<redacted_1>" (any script), "<redacted_2>.etp" and "<redacted_3>" on the Zip disk (mounted as /dos/a/) and, provided that the versions are dissimilar, runs the update script without checking any further. The lack of checks here would allow a knowledgeable attacker to run an arbitrary script on the machine - no integrity checks, passwords, or signatures are performed on any file from the Zip Disk (including the <redacted_2> script itself). The system also lacks any kind of potentially security-enhancing subsystems like sandboxing. If the

M650s are networked at the clerk's office, this vulnerability would allow a malicious actor to spread malware across the network, possibly infecting other machines.


```
+===========*  CHECK SOFTWARE CONFIGURATION  *===========+

5 11:48:14 10-Aug-2018  System Name:                M650 Client 5
5 11:48:14 10-Aug-2018  Firmware Version:           Version 2.1.0.0
5 11:48:14 10-Aug-2018  Program Installation:       Feb 13 2007 09:10:09
5 11:48:14 10-Aug-2018  Tabulator Version:          Jul 15 2005 06:16:42
5 11:48:14 10-Aug-2018  Init Version:               Jul 15 2005 06:16:47
```

Zip drives and Zip disks are discontinued end-of-life products, but the M650 depends upon this technology for loading and updating its software and firmware. This causes a number of serious security vulnerabilities. If a Zip drive in an M650 fails, it is difficult to replace. However, the Zip disks are even more problematic. Often jurisdictions have to buy them used, which means that they have already been formatted, probably on a Windows machine, and they may have files already recorded on them. Even if bought from Amazon, they in turn may have been purchased from random eBay sellers.

A Windows-formatted disk can be read by a machine running QNX. Thus, a used Windows-formatted Zip disk with files recorded on it will appear to work normally when inserted into an M650. But this necessary and useful capability opens the door to a serious security vulnerability.

The two operating systems, Windows and QNX, use different device drivers, volume drivers, and file system implementations. In fact, the QNX operating system is not on the list of officially supported operating systems for Zip disks, so presumably someone originally ported the Zip software from yet another platform, possibly Linux, with an unknown level of testing and skill. This leads to the possibility of differences in the two operating systems' use of Zip disks, and we know such differences exist at least in their handling of partition tables on Zip disks. Generally, with independent implementations on different platforms of the "same" software one always expects different behaviors in corner cases, different bugs, and different error behavior, leading to security vulnerabilities when the implementations attempt to interoperate.

One major potential security vulnerability arises from the possibility that used disks originally written on a Windows or Mac machine might be procured and used on the M650 without being reformatted. In that case the differences in operating systems provides a potential vector for attack. As described elsewhere in this report, a Zip disk is used to update the software of the M650. If there is an executable file named "update" on the disk at the time the M650 is booted (and a couple of other simple conditions are met) then the M650 will immediately run the update program. Normally the update program would install a new version of the code running on the M650, but it could do literally anything else, including inject malware to miscount votes or inject a virus that could spread among all the M650s in a jurisdiction through the exchange of Zip disks.

A clever attack on an election would start by the attacker writing a malicious QNX executable file named "update" on a bunch of Zip disks and giving those files the Windows attributes `hidden` and `system`. Then the attacker could find a way to offer those malicious disks for sale to a jurisdiction that needs more Zip disks and is having trouble buying brand new ones.

If an IT person inserts one of the malicious disks into an M650 without reformatting it first, the update file

will immediately and silently install the malicious software into the M650, thereby undermining the integrity of the election. If the IT person took the precaution of examining the contents of the Zip disk first, he or she would see nothing because the files have the `hidden` attribute. If he took the further precaution of issuing a command to delete all files from the Zip disk, the malicious files would not in fact be deleted because they are marked with the `system` attribute. Only if the disk is reformatted on a known clean machine before being inserted for the first time into an M650 would the malicious update file be destroyed.

It is very doubtful that the operators of M650s all over the U.S. are aware of the necessity of this precaution of reformatting every Zip disk before using it in the M650. As the M650s get older and Zip disks become scarcer, this vulnerability grows in importance.

This is an example of a broad class of vulnerabilities that are well-known in the computer security world — `autoplay` or `autoexecute` features in removable storage media alongside with Master Boot Record and other types of lower level attacks. We have seen attacks like it before with the auto-update feature in Diebold voting machines through their memory cards, and similar capabilities in other vendors' voting machines. We have also seen it historically with autoexecute features in CD drivers, in email clients, and in thumb drives (the latter believed to be one of the ways Stuxnet was introduced into the Natanz uranium enrichment facility in Iran). But the new feature here is that the scarcity of obsolete Zip disks will drive M650 jurisdictions to buy them from second-hand sources. Such disks must be treated as contaminated, even if they appear clean.

In other words, the M650 is simply looking for a file with a certain file name and is trusting it and executing it with the maximum level of privileges, which has never been an acceptable practice from a security point of view. This practice is made more dangerous because the different operating systems involved in making data hygienics difficult and making it possible to hide critical files, and even complete file systems, and making those potentially able to survive many commonly utilized methods of erasing content.

If the machines are disconnected from a network the attacker could initiate the printout of a false report from the report printer or Zip disk - the means used to record the totals. Of course, the attacker can also, through this vulnerability, change election data stored on the machine and create matching false digital records to be reported to the central tabulator.

Any of these vulnerabilities seriously compromises the integrity of an election. They require no passwords and necessitate only basic knowledge to successfully complete. **The dangerous update procedure was documented but file names were redacted in the 2007 EVEREST report because of the grave security risk.**[5]

Mitigation against this combination of factors would require additional measures for the secure cleaning of all residual data from the drive on the lowest level possible - not only when the drive is put into use, but also between every instance it is used in order to prevent a viral attack to utilize the drive as a distribution media in and of itself. All storage devices or removable media should be formatted before first use in any machine that is part of, or networked with, any voting system. This has to be a routine precaution faithfully practiced. Injection of malicious software through unclean media is one of the ways that it is possible to hack voting systems that are not connected to the Internet. Isolating a voting system from the Internet is

---

[5] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf.

necessary to protect it, but it is not sufficient. Malicious logic can enter by other means, and only careful diligence (or luck) can prevent it.

**Cross-Device Vulnerabilities: Smart Cards**
Several types of voting machines, including the Dominion Premier/Diebold AccuVote TSx and the Dominion AVC Edge, use smart cards to enable voters to vote on Election Day. Smart cards are commonly also referred as Java-cards, as the chip on the card is a low-powered computer which runs programs written in Java, a common programming language. When the card is plugged in, it gets its power from the connection to boot up. Once up and running, the card starts to communicate with the host computer. In the election environment, the smart card is set up for the voter to cast their ballot either by an ePollbook, such as the ExpressPoll 5000 (discussed above), or by a specialized programming device called Voter Card Encoder (VCE). It can also be used to select the voter's ballot.

Researchers in the village were able to set the VCE device to a mode accepting a new program image to be flashed in, completely replacing the old programming. However, the researchers ran out of time to create malicious demonstration image for the device. Installing new software on a VCE does not require any authentication or check mechanisms. Simply by pressing the "Off" button, the device will query if the user wants to upload a new software image.

Advances in electronics have enabled the power consumption of the chip to be reduced greatly enabling the chip to be powered wirelessly over Near-field Communication (NFC) without a physical connection. These cards are called dual-interface cards and have both a physical chip interface and a wireless NFC interface. These cards are readily available for purchase and retail for about $20. Modern mobile phones have NFC capability built-in, meaning that dual-interface cards are field-programmable by simply using a mobile phone as the programming device over wireless. The same programming is also able to communicate over the physical chip connection.

Due to a lack of security mechanisms in the smart card implementation, researchers in the Voting Village demonstrated that it is possible to create a voter activation card, which after activating the election machine to cast a ballot can automatically reset itself and allow a malicious voter to cast a second (or more) unauthorized ballots. Alternatively, an attacker can use his or her mobile phone to reprogram the smart card wirelessly. All elements of the system seem to accept smart cards with the hardcoded default password (0x01,0x02,0x03,0x04,0x05,0x06,0x07,0x08). Among other factors, the obviousness of the password makes forging smart cards easy. This password has been previously published as part of the EVEREST report in December 2007.[6]

In addition to allowing a malicious actor to vote more than once in jurisdictions where the voting terminals have more than one ballot style available, the modification of the voter activation card could also enable the malicious actor to cast multiple ballots, including for races for which the attacker is not eligible to vote at all.

**In-flight Email Ballot Modification**
Over thirty states allow at least some voters (usually overseas and military voters) to cast ballots as

[6] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf. Page 145.

attachments to an email message. This is an extraordinarily dangerous practice because email is not end-to-end encrypted, not authenticated, its headers (including the "From:" and "Date:" lines) are forgeable, and offers only "best effort" delivery, i.e no strong guarantees. Email is not remotely a secure transmission medium. Anyone who controls an email forwarding agent or email server is in a position to modify, copy, re-route, or discard any ballots he does not like. And since the ballots must be accompanied by the name of the voter, the secrecy of a ballot transmitted by email is totally compromised. Two DEF CON investigators helped demonstrate one of the innumerable kinds of potential attacks on email ballots.

The two principal investigators of email ballot modification at DEF CON were both researchers at Free & Fair, a company that provides open source elections services and systems: Dan Zimmerman, Principled Computer Scientist, and Lyell Read. Their investigation was not of any particular machines, but of general vulnerabilities inherent in email voting. In the past, Dan Zimmerman has demonstrated how a home router could be hacked to intercept an emailed ballot before it even leaves the voter's home. The malicious code in the router could modify votes arbitrarily, with neither the voter nor the election official running the server having any way to detect the problem.

In this case, the investigators demonstrated a similar hack, but instead of attacking the sending side of the communication, they attacked the *receiving* side, inside the email server such as a jurisdiction's election agency might run. They assumed that an emailed ballot consisted of three JPEG images attached to an email message, presumably to contain voter ID and authentication information, a signed oath or affirmation, and the voted ballot itself.

A modern email server has hooks to allow linking with "filter modules." The purpose of filter modules is to allow preprocessing of an email before it is delivered to the final recipients. Such modules are commonly used for spam filtering and other purposes, such as disabling URLs embedded in the email, stripping executable attachments, auto replying with a vacation message, blocking certain senders, apply classification rules, etc. An email filter can be written to do literally anything with an incoming message before it is delivered to the addressee.

The investigators wrote an email filter that modified the JPEG attachment that contained the incoming ballot. Technically the filter was a BASH script that ran the ballot through ImageMagick (an open source Linux utility for editing images) and used its `Convert` command to swap two known ovals on the ballot, before replacing it as a message attachment and delivering the email to the recipient's Inbox. The swapping of the two ovals, which represents moving a vote from one candidate to another, is just an example of the kind of arbitrary vote manipulation that could be done in an email filter. The malicious processing of the ballot would probably delay its delivery by a few milliseconds — essentially unnoticeable.

The programming of the demonstration was completed in approximately two hours, start to finish.

This hack illustrates how vulnerable email voting is to undetectable manipulation while in transit. A rogue individual (and it can easily be a single person) who maintains the email server can write and install such a filter module and later remove it after the election. It would be difficult to detect that the email ballots were manipulated to reflect the programmer's vote choices because neither voters nor election officials will see anything suspicious.

Alternatively, the email server might be remotely hacked by anyone on the Internet — criminals, domestic partisans, or foreign intelligence agencies. The hackers might install such a filter (and later remove it) and thus control the outcome of the election.

## Forensic Studies - AVS WINVote

The AVS WINVote machine is an electronic voting machine manufactured by Advanced Voting Solutions (AVS). It possesses a touch-screen voting terminal, a full color screen, as well as zoom capabilities. It is equipped with a wireless local area network and battery backup power, a printer, and modem. The AVS WINVote stands supported in a voting booth and was designed to function as a stand-alone system and it can be used as both a precinct voting device and as a non-geographic station. WINWare is the software used for election management in the WINVote system. As of the 2016 elections, the AVS WINVote is no longer in use.[7] Its reputation as "America's worst voting machine" is well-documented[8] and well-deserved.[9] Given the surfeit of information available about the WINVote's many vulnerabilities, this report will focus on new discoveries as reported at BlackHat 2018 by Carsten Schurmann, Associate Professor at the IT University of Copenhagen, and as uncovered at the DEF CON Voting Village.

The AVS WINVote machines used at the DEF CON Voting Village originally came from Virginia. The principal investigators at the Voting Village were Carsten Schurmann and Will Baggett, a computer forensic examiner. They were assisted by Minoo Hamilton, a security engineer.

The WINVote machine runs an early version of Windows XP from 2002. It thus has none of the updates (Service Packs 1, 2, and 3), bug fixes, or security patches that were offered by Microsoft in the seven subsequent years that the operating system was supported. Application of updates would require recertification of the whole system (according to Virginia law and practice).

In addition to one physical machine, the investigators had access to a total of 16 NTFS file system images from a total of eight WINVote machines, all from machines that had been used in Virginia for years, so they were able to do some comparative studies. At the end of DEF CON the investigators were still studying the WINVote system and the file system images, so this report is only inclusive of what they had discovered as of the end of the conference.

The investigators used the free forensics tool Autopsy to examine the file system images to look for anomalies. They also used various Windows utilities and a forensic undelete utility that could recover files that had been deleted but not overwritten.

*Music software and music file*
The first discovery that Schurmann made was that four of the eight machines investigated showed evidence of being used for ripping and playing music. The machines contained a copy of coolplayer.exe, an MP3 player program. One possible legitimate use of this program would be to play audio for blind voters, though there is no indication that this is the reason the program was added. However, the machines also had a copy of the "No1" CD-ripping program, a program used to copy music from an audio CD and store it as MP3 files. The WINVote does not have a CD drive, so one would have to plug a CD drive into the USB port on the

---

[7] Jeremy Epstein, "Decertifying the worst voting machine in the US," *Freedom to Tinker*, April 15, 2015, https://freedom-to-tinker.com/2015/04/15/decertifying-the-worst-voting-machine-in-the-us/.
[8] Virginia Information Technologies Agency, "Security Assessment of Winvote Voting Equipment for Department of Elections," *Wired*, April 14, 2015, https://www.wired.com/wp-content/uploads/2015/08/WINVote-final.pdf.
[9] Shaun Nichols, "Default Admin Password, Weak Wi-Fi, Open USB ports ... No Wonder These Electronic Voting Boxes are Now BANNED," *The Register,* April 17, 2015, https://www.theregister.co.uk/2015/04/17/virginia_nixes_highly_pwnable_voting_boxes/.

machine to use this program. There is evidence that this is exactly what happened at some point, because on the same four machines the investigators found copies of a Chinese-language pop song, the same one on each machine.

Since the same Chinese-language song was found on four different machines, this indicates that the song was copied onto the machines at the time the master software distribution for the WINVote was being built, i.e. from before the machines were delivered to Virginia. Most likely an engineer (presumably someone from China, or at least someone interested in Chinese music) was configuring the master software for the WINVote and also ripping CDs and listening to music while doing so. When the engineer committed the final software configuration he failed to erase the music, the MP3-player, and the CD ripper, and they were distributed along with the rest of the voting machine software to at least one jurisdiction in Virginia.

The Virginia jurisdictions that received the machines with the music and CD ripper probably never examined the application software that was installed on the machine. They apparently just accepted the system as delivered and used it for several years. There is no telling what other software, possibly malicious software, may have been installed on the WINVote machines that Virginia officials never noticed in the approximately ten years they were in use. Needless to say, the presence of such rogue files within the software image can only happen with extremely careless and unprofessional development practices and with complete negligence or disregard of any known best practices and quality controls.

*Records of past elections*

Aside from the musical discovery, the investigators found records from numerous past elections stored in a Microsoft Access Database (.mdb) file in the file system images. There were lists of candidates, voted ballot images, and vote totals. There is nothing inherently wrong with retaining data from past elections in a voting machine, since the data is not confidential, but it is a very poor management practice. First, Microsoft Access has notoriously weak security, which would not be an important point if the machines were forever isolated. However, these machines have WiFi connectivity, and as we describe below, there was clearly no prohibition on connecting the machines to the Internet.

Second, it shows that for many years the file systems of the machines were not re-initialized. The best practice would be to reinitialize the software at least once for each general election, if not for every election. That way errors in the file system do not accumulate, and any bad registry entries, bad data files (caused by I/O errors or power outages), or any software, especially any malicious software, that may have been installed since the last use would be wiped clean for the next election.

Finally, the fact that this data from past elections was still present on the voting machines as acquired by the investigators indicates that the machines were not wiped before they were disposed of by the Virginia jurisdictions that used them. It is always good practice to wipe a file system before disposing of a machine.

*Log files show election data had been transmitted over the Internet to a third party*

On at least one of the machines there are log files showing that the entire database of an election was transmitted to a third party company. It was transmitted via FTP, unencrypted and unauthenticated, to the IP address 184.69.193.146 which belonged to a server named ftp.enfocom.com. That server is still online. Today the Enfocom International Corporation is a technology company located in Calgary, Alberta, Canada, and its mission is “To be the leader in providing technology solutions in secure network services and secure software products.”

Since the data in the WINVote database is not confidential, the transmission to Enfocom does not

necessarily represent any kind of privacy breach regarding the data itself. The investigators just do not know why voting data would ever be transmitted to any third party, or why they were transmitted to Enfocom in particular. The investigators also do not know whether the IP address they used was located outside the U.S. at the time of the transmission. They did determine that apparently that particular IP address is no longer associated with Enfocom, though that is not necessarily significant.

However, the log clearly shows that there was a direct FTP connection from a voting machine to a distant server over the Internet. This is a potentially disastrous security blunder because it could enable external attackers to penetrate and control the voting machines. Established best practices are that voting machines should *never* be connected to the Internet, even briefly. This is especially true of systems running old, unpatched Windows XP, which are often penetrated and infected with malware within a few minutes of their first connection to the Internet. Furthermore, from a basic operational security point of view, discontinuing the use and blocking of unsafe protocols like FTP has been recommended for years prior to the log entries found, further demonstrating that the baseline external security measures have not been in place at all, or were deeply flawed. These log entries cast doubt upon the claim that election environments are shielded from hostile environments with external security mechanisms.

*Deleted files*
The investigators ran a forensic "undelete" utility on one of the WINVote images and were able to recover 1764 deleted files, i.e. files which were put in the Windows Recycle Bin, and the Recycle Bin emptied, but the files were never overwritten. When examined, the files appeared to be routine information, including:

- change logs for years of changes
- photos of components
- a ringtone (modem noises)
- a deleted copy of the Windows registry
- .zip file of cast vote records
- an external drive insertion log
- a directory named "crypto"

The investigators did not have time to examine these files any further, but nothing appeared suspicious. The existence of these deleted files is, however, further evidence that the file system had never been re-initialized in the many years the WINVote machine was in use.

*Physical vulnerabilities*
A fourth major vulnerability was discovered by Mixael (pseudonym), a mathematician who was also working on the WINVote machines. In this case, the investigator noticed a simple keylock on the front panel (faceplate) of the WINVote. He applied the simplest lock picking tool there is, a "jiggler key." A jiggler key is a simple metal key cut from a totally flat blank with one or more generic bumps along one or both edges. It is not specific to any particular lock — it is intended just to move the mechanical components of the cylinder in a more or less random way until the lock spontaneously opens. This only works on the simplest, cheapest locks. A pack of 10 jiggler keys is available for less than $4 on Amazon.

The investigator was able to open the lock in just about five seconds using what was in fact the simplest of his jiggler keys. He was then able to open the panel, which exposed:

- The power switch
- The USB port

- The modem port
- The printing mechanism

The investigator also noticed that there was no sensor to indicate when the faceplate was opened or closed, so even when the machine is powered on and running there was no possibility of logging the occasions when it was opened or closed.

Anyone who has a few seconds access to the WINVote machine can open the front panel. This obviously includes election officials, warehouse workers, and poll workers. And, if a voter hides the front of the machine with her body as she jimmies the lock, she may be able to open the panel without detection.

Once the panel is open, anyone with sufficient time and preparation could:

- Power the machine on or off. Powering off at the wrong moment may result in a corrupted file system or database;
- Install malicious software through the USB port. This includes malicious software which could modify vote counts arbitrarily with no logging or forensic evidence that it happened;
- Connect the machine to the Internet through the modem port. Connecting a voting machine to the Internet opens it to a host of threats, including remote login and the installation of malicious software, particularly because the WINVote runs a very early and extremely vulnerable version of Window XP; or
- Disable the print mechanism.

## Recommendation:
## Make A Crisis Communications Plan Before Your Website is Hacked

Given the scope of vulnerabilities inherent in the U.S. election system, it is vital that state and local election officials not only seek to prevent cyber attacks on their systems, but also plan how best to recover from an attack. One of the primary challenges in this new era of foreign propaganda is disseminating accurate information to constituents in a reliable manner. The following is a list of recommendations to prepare for an attack against an election results reporting website on Election Day. These recommendations are intended to ensure results are communicated in a way that engenders trust in the election results from voters. This list is tailored to specifically address a cyber attack on an election website but was largely sourced from the Local Government Association of England and Wales[10] who created these recommendations for any government crisis communications plan in response to a cyber attack. We would like to thank the Local Government Association of England and Wales for their thoughtful work on this important topic.

1. **Anticipate crisis conditions and create a crisis communications plan**
   Organizational leaders should anticipate what conditions might be created by a cyber attack on their systems, such as the publication of false election results on official websites, as happened in Ukraine,[11] or a Distributed Denial of Service (DDoS) attack that could shut down the site altogether, as happened to many U.S. banks in the Iranian attack[12] and create a plan for how to communicate with the public and other stakeholders under such conditions. This plan should be part of a local or state government's overall emergency planning. Effective crisis communications plans should include:

   - Who will be part of the crisis communications team
   - Timeline of when the crisis communications team should meet during the first hours, days, and weeks following a crisis
   - Who has ultimate authority for signing off on key messages
   - List of audiences who need to be reached during a crisis, including contact details
   - List of stakeholders to reach out to or work with during a crisis, including contact details
   - List of channels to be used to communicate messages, including multiple backup options
   - Copies of passwords needed to access official communication channels

   Needless to say, this crisis communications plan should be kept in hard copy in case of compromised systems.

2. **Prepare and practice**
   Designated crisis communications teams should practice their response processes to ensure the plan works smoothly and each team member knows his or her role during an emergency. In case of

---

[10] "Crisis Communications - Cyber Attack," Local Government Association, https://www.local.gov.uk/our-support/guidance-a nd-resources/comms-hub-communications-support/cyber-attack-crisis.
[11] Andy Greenberg, "How An Entire Nation Became Russia's Test Lab for Cyberwar, June 20, 2017, https://www.wired.com/st ory/russian-hackers-attack-ukraine/.
[12] Dustin Volz and Jim Finkle, "U.S. Indicts Iranians for Hacking Dozens of Banks, New York Dam," *Reuters*, March 24, 2016, https://www.reuters.com/article/us-usa-iran-cyber/u-s-indicts-iranians-for-hacking-dozens-of-banks-new-york-dam-idUSKCN0WQ1JF.

a cyber attack, team members should be aware of what dangers they can expect and how to report concerns about suspicious activity.

3. **Establish facts, communicate early and regularly**
During a crisis situation, the crisis communications team should proactively communicate known facts as early as possible, rather than reacting to rumor and speculation. The team should also continually update the public and other stakeholders at regular intervals to remain in control of the messaging.

4. **Identify a spokesperson**
Before a crisis event, organizational leaders should designate a senior member of the organization to act as spokesperson for the team in case of a crisis. This should be a designated team member who is not directly involved in solving the crisis, which would distract them from focusing on key messages and relaying information in a timely manner.

5. **Avoid email and website updates**
If an organization is the target of a suspected or confirmed cyber attack, team members should stop using email and website messaging immediately.

6. **Embrace traditional channels**
When digital communications platforms are compromised by a suspected or confirmed cyber attack, the designated spokesperson should utilize other communications channels to relay key messages, including holding telephone calls with local media, staging in-person press briefings, or utilizing telephone trees to share updates with staff members.

7. **Brief media outlets and elected officials**
If a cyber attack takes place, the crisis communications team alert news media and elected officials that they may experience a surge in calls from the public. These stakeholders should also receive timely updates on the crisis so they can keep members of the public who contact them informed of the situation.

8. **Use personal devices if possible**
If an organization's IT systems are compromised, employees may still have access to the organization's digital communications platforms, such as social media accounts, via their personal devices. The crisis communications team should keep hard copies of social media passwords available for this situation.

9. **Use partner and community networks**
If an organization is targeted by a cyber attack, the crisis communications team should reach out to established partner organizations for help disseminating accurate, up-to-date information on their respective digital platforms. The crisis communications team should establish these relationships before a crisis occurs.

10. **Engage with IT and legal colleagues**
Members of the crisis communications team should work closely with the organization's IT and legal team when preparing to brief the public on updates throughout the crisis. Particularly in the case of a cyber attack, technical details may be difficult to communicate clearly and understand in the appropriate technical and legal contexts.

Case 2:22-cv-00677-JJT Document 39-1 Filed 10/26/22 Page 44 of 131

**11. Communicate with employees**

In the midst of a crisis, an organization's leaders should share updates with staff members before communicating with the broader public. If staff members hear updates via social media or other channels before hearing it from their leadership team, it can damage trust within an organization and undermine efforts to control and mitigate the effects of the crisis.

**12. Respond to the new normal**

Following a crisis like a cyber attack, an organization's leaders should craft messages for stakeholders and the broader public that communicate the lessons learned from the crisis and how the organization is evolving to safeguard against such attacks in the future. Such messaging can repair trust in the organization and help other organizations protect themselves against future crises.

## Conclusion

Over the last 26 years, DEF CON, and for the last two years, the Voting Village, have operated under two core principles:

1. **It is important to derive facts through reason and inquiry rather than blind faith.**

2. **When we discover new facts, it's important we share this information with the general public so individuals can decide how best to use the information.**

We did not make these principles up ourselves. Rather, these principles are the foundation of the Enlightenment, which has guided modern science to achieve the medical, engineering, and IT advances, among others, that underpin the modern world. Since these principles have largely guided the human race toward progress for the last 500 years, we plan to continue to follow them.

These principles matter most when we put them into practice. Therefore, it is relevant to ask what new facts all the poking and inquiring into our voting systems has identified since the Voting VIllage was established.

Among the dozens of vulnerabilities identified in the last two years, four key DEF CON Voting Village findings are grave and undeniable:

1. **Supply Chain Insecurity:** The voting machine parts supply chain is global and has essentially no security procedures to determine whether the machine parts are trustworthy or pre-hacked before the machine is assembled. Thus if an adversary compromised chips through the supply chain, they could hack whole classes of machines across the U.S., remotely, all at once.

2. **Remote Attacks Proven:** Despite insistence the fact that machines are "air gapped" from the Internet protects against all remote attacks, both DEF CON 25 and 26 found exploits to hack machines remotely, requiring physical access to the machine.

3. **Hacking Faster Than Voting:** This year DEF CON also demonstrated that while, on average, it takes about six minutes to vote, machines in at least 15 states can be hacked with a pen in two minutes. It is thus possible for someone to hack a machine while voting in a polling place on Election Day.

4. **Hacks Don't Get Fixed:** Finally, we discovered that even when vendors are told about serious flaws in machines by their customers, those flaws go unfixed.

These flaws are relevant and disturbing under the best circumstances. However, the fourth flaw suggests another reason for alarm - disclosing vulnerabilities does not seem to be enough to get them fixed, even years later. For example, the M650's lack of update authentication was noted in the 2007 EVEREST report, initiated by the Secretary of State of Ohio and reported to Election Systems & Software at the same time.[13]

[13] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf.

Hackers found the same design flaw in a current M650, eleven years later. As of 2018, the M650 was used in elections in 23 states.

The failure to fix existing, reported vulnerabilities and the disconnect between the reports of election security experts and the reactions of some election equipment vendors speaks directly to the reason Voting Village was created. The Voting Village aims to increase access to election security knowledge in order to better protect American democracy and the electoral system. We believe that knowing the risks involved in how America votes is always better than sticking our heads in the sand. Although we have redacted some information from this report, it is a realistic, if pessimistic, view of how easy it is for individuals to exploit bad design and sidestep election protections. We hope that it will move the United States towards action.

## Next Steps:

1. **Congress Must Act:** The problems outlined in this report are not simply election administration flaws that need to be fixed for efficiency's sake, but rather serious risks to our critical infrastructure and thus national security. As our nation's security is the responsibility of the federal government, Congress needs to codify basic security standards like those developed by local election officials.

2. **Congress Must Fund Election Security:** National defense is not the role of state and local government. Further, no state or local government will ever be able to raise enough capital to defend itself from a determined nation state. Thus, having codified the basic security standards developed by local election officials above, Congress must finance the implementation of these security standards.

3. **Create a Crisis Communications Plan Now:** State and local government election results web pages are, by their very nature, the most insecure component of our election infrastructure. Using the crisis communications plan listed in this document, election administration teams can plan for this attack in advance so they are not scrambling for solutions if an attack happens on Election Night.

4. **National Security Leaders Must Act:** While many local election officials have worked tirelessly to advocate for Congress to act and fund robust security practices, it's not enough. National security leaders must also remind Congress daily of the gravity of this threat and national security implications. It is the responsibility of both current and former national security leaders to ensure Congress does not myopically view these issues as election administration issues but rather the critical national security issues they are.

## End Notes

**By: Noah Praetz, Director of Elections, Cook County, Illinois**

There is nothing more important to election officials than security. Period. Security yields trust and participation. We have been securing votes and voter records for a long time. The threat environment has changed dramatically, we accept the admonitions of our intelligence community, and we understand the significantly increased likelihood of a successful cyber-attack on the election infrastructure. The Secretaries of State, State Election Directors, and local election officials are committed to ensuring that the election results we release are trusted and true.

In this new environment, and in light of existential threats to American faith in democracy, election officials will marshal all available resources, and work with all possible partners, in defense of elections. Those of us who manage elections, and our vendor community, have long-standing partnerships with private security researchers. However, those partnerships are no longer enough; we are building new partnerships with a broader security research community. Building these new partnerships, with organizations like DEF CON, has proven challenging for some in our community over the past two years. Maturing this partnership will require mutual trust and appreciation of each other's roles, responsibilities, and motives. Ultimately, a successful relationship will be forged, out of necessity.

Election officials recognize that today's cyber threat environment necessitates access to the highest levels of security expertise. This talent is expensive. Therefore, we must accept that our new partners are indispensable but bring stylistic and cultural differences that we'll need to learn to manage and accept. Our new partners must accept that the security and resiliency of the election infrastructure and process demands a unique level of sensitivity and care. When other industries are alerted to issues, there are patches at hand or in a pipeline. Frequently, election technology is frozen in time by federal and state certifications that make immediate fixes impossible.

This change in attitude and posture, from election officials and security researchers alike, is a dramatic one. This cultural difference is most pronounced when the public messaging over the same information sets about election security are diametrically opposed. In the security community, exploitable vulnerabilities are a binary fact that should be publicly disclosed and remediated with updated technology as soon as possible. The election official community sees the same vulnerabilities and recognize them as something to be mitigated with physical controls and managed with audits immediately and then remediated as soon as the technology and funding is available.

Despite the differences, the goals are the same for election officials and security researchers. It's the requirement to operate elections in the time between vulnerability disclosure and vulnerability fix, and to provide trust in the process simultaneously, that causes consternation and tension.

Given the capability and intent of American adversaries, whether nation states, groups, or individuals, election officials' failure to capitalize on the expertise of the broader security research community is no longer acceptable. Likewise, given the dire need for the expertise of the security community, failure of that community to appreciate and respond to sensitivities about the sanctity and security of American elections is also no longer acceptable. We must make this relationship work.

Our elected Clerk in Cook County, Illinois, David Orr, understood this two years ago and decided to seek

help where available, to interface with experts where possible, and to be available to well-meaning Americans focused on election security.

One of our first avenues of engagement was with the organizers of the Voting Village at DEF CON in the spring of 2017. We offered consulting services on what an election office backend network might reasonably look like to ensure that the conclusions reached by the security researchers, and by extension the lessons learned by election administrators, were grounded in reality. It does little good for the community of researchers or election officials if the conclusions drawn in the reports can be readily dispelled, either in fact or in art.

After DEF CON released its report in 2017 we drafted a white paper that laid out priorities for funders like federal, state and local governments, and for election officials. It was built around an election security framework, Defend, Detect, Recover. Do everything possible to defend the myriad digital systems relied upon to run modern elections. Recognize perfect defense may not be possible all the time. Ensure that defensive shortfalls can be detected. And that business continuity, or recovery, can be established such that our elections can be run even in the event of successful cyber-attacks.

Between 2017 and 2018 the Voting Village dramatically increased their focus and shifted their research and training to more vulnerable areas that are more likely to be attacked, like emailed ballots, voter registration databases, election officials' computer networks, and informational or election night results webpages. Some election officials consulted with the organizers in some of these areas. Where there was consultation, like on the computer network and voter registration databases, the resulting research and training is more valuable. Where there was less election official participation, like on the webpages, the research was less valuable. And while the headlines about 11-year-olds hacking website were overstated, and frustrating given the websites were not actual replicas, the DEF CON Voting Village has done as much to raise awareness about our needs for resources as we have been able to do for ourselves. For that we owe some acknowledgement and credit, even as some of us have been forced to reassure our voters that not everything they have read about applies. I believe that the leaders and participants in the Voting Village and of the DEF CON project broadly, are talented committed Americans dedicated to ensuring that election officials know what they are dealing with from a product standpoint, and that we are supported in our efforts to raise the funds necessary to ensure the highest possible state of readiness.

Simultaneous to the activities of the security research community, the U.S. Department of Homeland Security created a set of councils to help drive their investments in election security. They rely on election officials at all levels and on the vendor community. I co-chair the Government Coordinating Council. In that role I have sought to bring visibility to that fact that nearly the entire profile of election security is borne by the 8,800 local election officials in this country; and though we locals find overheated rhetoric about election security difficult and angering, our real and present needs to access security expertise supersedes those frustrations.

In closing, I'll repeat, there is nothing more important to election officials than security. The security researcher community, like those who managed and attended the Voting Village at DEF CON, also care greatly about election security. We need these security researchers on our team; and we also need them to be as careful and responsible with their disclosures and language as possible. We won't always agree and there will be very uncomfortable times. But I see a strong partnership moving forward as both communities learn to work together and appreciate each other's needs and perspectives.

## Acknowledgements

A number of individuals and organizations contributed to the Voting Village and to this report. A special thanks to:

- Organizers, subject-matter-experts and other visionaries who turned the Voting Village concept into a reality and helped to author this report;
- KIG and CyberBit, for providing use of the KIG CyberRange;
- Speakers who contributed to the Voting Village discussions, including representatives from the U.S. Department of Homeland Security, Free & Fair, Verified Voting, and the University of Chicago Harris Cyber Policy Initiative; and
- The Michael and Paula Rantz Foundation, for their generous support of this work.

## APPENDIX #1: Partial List of Attending Individuals & Organizations

Representatives attended the event from a variety of organizations including:

### Voting Village Speakers

- **Diego Aranha**, Assistant Professor - Department of Engineering, Aarhus University
- **Matthew Bernhard,** PhD Candidate - Computer Science, University of Michigan; Data Science Consultant, Verified Voting Foundation
- **Matt Blaze**, Cryptographer & Associate Professor of Computer & Information Science, University of Pennsylvania
- **Jake Braun**, Executive Director, University of Chicago Harris Cyber Policy Initiative; CEO, Cambridge Global Advisors
- **Alex Halderman**, Professor of Computer Science & Engineering, University of Michigan; Verified Voting Technology Fellow
- **Jason Hill,** Director, Red Team Lead, Department of Homeland Security
- **Harri Hursti,** Co-Founder, Nordic Innovation Labs
- **Rob Karas**, Director, National Cybersecurity Assessments and Technical Services (NCATS), Department of Homeland Security
- **Neal Kelley**, Chief of Elections, Registrar of Voters, Orange County, California
- **Joe Kiniry,** Principal Scientist, Galois; Principled CEO and Chief Scientist, Free & Fair
- **Margaret MacAlpine**, Founding Partner, Nordic Innovation Labs
- **Jeanette Manfra**, National Protection and Programs Directorate (NPPD) Assistant Secretary for the Office of Cybersecurity and Communications (CS&C), DHS
- **Alejandro Mayorkas,** Partner, WilmerHale; former Deputy Secretary, U.S. Department of Homeland Security
- **Amber McReynolds**, Executive Director, National Vote at Home Coalition; former Director of Elections, City and County of Denver, Colorado
- **Alex Padilla**, Secretary of State, California
- **Noah Praetz**, Director of Elections, Cook County, Illinois
- **David Sanger**, National Security Correspondent and Senior Writer, *The New York Times*; Author, *The Perfect Weapon*

### Other Key Stakeholders in Attendance

- **Barb Byrum**, County Clerk, Ingham County, Michigan
- **Rob Joyce**, Senior Advisor for Cyber Security Strategy to the Director of the National Security Agency (NSA)
- **Brian Markus**, Co-Founder and CEO, Aries Security
- **John Odum**, City Clerk, Montpelier, Vermont
- **Nico Sell**, CEO, Wickr; Founder, r00tz Asylum

Case 3:22-cv-00307 Document 1 Filed 09/14/20 Page 56 of 133

# APPENDIX #2: Biographical Information: Voting Village Speakers

**Diego Aranha, Assistant Professor - Department of Engineering, Aarhus University**
Diego F. Aranha is an Assistant Professor in the Department of Engineering at Aarhus University. He was previously an Assistant Professor at the University of Brasília and the University of Campinas. His professional experience is in Applied Cryptography and Computer Security, with a special interest in the efficient implementation of cryptographic algorithms and security analysis of real-world systems, and includes coordinating two teams of independent researchers capable of detecting and exploring vulnerabilities in the software of the Brazilian voting machine during controlled tests organized by the national electoral authority. He received the Google Latin America Research Award twice for research on privacy, and the MIT TechReview's Innovators Under 35 Brazil Award for his work in electronic voting.

**Matthew Bernhard, PhD Candidate - Computer Science, University of Michigan; Data Science Consultant, Verified Voting Foundation**
Matt Bernhard is a third year computer science Ph.D. candidate at the University of Michigan with Professor Alex Halderman. He graduated with a B.A. in Computer Science from Rice University in 2015, where he worked with Professor Dan Wallach on STAR-Vote. He has also spent time at Microsoft Research working on remote attestation and security protocols involving secure kiosks with Josh Benaloh, and at Cloudflare working on certificate transparency and SSL/TLS features. His research interests focus on the broad social implications of technology and privacy, delving into computer security, cryptography, networks, usability, censorship, systems, and voting technology.

**Matt Blaze, Cryptographer & Associate Professor of Computer & Information Science, University of Pennsylvania**
Matt Blaze is a professor at the University of Pennsylvania, where he directs the Distributed Systems Lab and conducts research in security, privacy, surveillance, cryptography, scale, and the relationship between technology and public policy. His work has included the discovery of fundamental flaws in the Clipper chip and other surveillance systems, foundational work in network security, file encryption, trust management and two way radio security, and security evaluations of major electronic voting systems used in the US.

**Jake Braun, Executive Director, University of Chicago Harris Cyber Policy Initiative**
Jake Braun is Executive Director of the University of Chicago Harris Cyber Policy Initiative (CPI), CEO of Cambridge Global Advisors (CGA), and Co-Founder of the DEF CON Voting Village. Previously, he was the White House Liaison to the Department of Homeland Security (DHS). He has twenty years experience in national security and strategic communications initiatives.

**Alex Halderman, Professor of Computer Science & Engineering, University of Michigan; Verified Voting Technology Fellow**
J. Alex Halderman is Professor of Computer Science & Engineering at the University of Michigan and a Verified Voting Technology Fellow. His research spans computer and network security, applied cryptography, security measurement, censorship resistance, and electronic voting, as well as the interaction of technology with politics and international affairs. Halderman helped discover the cold boot attack and the TLS Logjam and DROWN vulnerabilities, and he co-founded the ZMap Project, Censys.io, and Let's Encrypt. A noted expert in election cybersecurity, he has performed numerous evaluations of real-world voting systems, both in the U.S. and around the world. After the 2016 U.S. presidential election, he advised recount initiatives in Michigan, Wisconsin, and Pennsylvania in an effort to help detect and deter

cyber attacks, and in 2017 he testified to the U.S. Senate intelligence committee about cybersecurity threats to election infrastructure. He has been named by Popular Science as one of the "brightest young minds reshaping science, engineering, and the world."

**Jason Hill, Director, Red Team Lead, Department of Homeland Security**
Jason Hill came to the Department of Homeland Security (DHS) in 2013 to help create the Nation's Red Team. Hill has over 24 years in the Information Security field and over 22 years in the Army National Guard within the cyber security domain. Hill serves as the Deputy Chief of the National Cybersecurity Assessments and Technical Services (NCATS) Risk Evaluation team and as the Chief of the Red Team conducting Red Team Assessments for Federal Government customers. Prior to DHS, Hill served as a Red Team instructor to military and Federal Government employees. He holds a B.S. in Computer Information Systems and several industry certificates.

**Harri Hursti, Co-Founder, Nordic Innovation Labs**
Harri Hursti is among the world's leading authority in data and election voting security, critical infrastructure, and network security systems. Beginning his career as one of the minds behind the first commercial, public email and online forum system in Scandinavia, he went on to cofound EUnet-Finland. Hursti has authored many studies on election security and vulnerability in both academic and corporate publications. He worked for Black Box Voting where he performed voting machine hacking tests, which became known as the Hursti Hacks. These tests were filmed and later turned into the acclaimed HBO documentary *Hacking Democracy.*

**Rob Karas, Director, National Cybersecurity Assessments and Technical Services (NCATS), Department of Homeland Security**
A certified information systems security professional with over 17 years of experience in information security in the commercial and federal sectors, Karas has extensive experience conducting risk and security assessments and managing information security programs. In his current role as Director, Karas manages the NCATS team at DHS and provides cybersecurity services to Federal Agencies, State, Local, Tribal, and Territorial governments. He is responsible for creating and identifying new services and developing the NCATS program into the civilian governments leading security services provider. Prior to joining DHS, Karas worked in the private sector for 12 years developing security operations. He holds a Bachelor of Science in Information Management from James Mason University.

**Neal Kelley, Chief of Elections, Registrar of Voters, Orange County, California**
Neal Kelley is Registrar of Voters for Orange County, California, the fifth largest voting jurisdiction in the United States. As the Chief Election Official, Kelley has led the Registrar of Voters' office through the largest cycle of elections in the County's 129-year history. He has been the recipient of numerous state and national awards for election administration and was recently awarded the "Public Official of the Year" award by the National Association of County Recorders, Election Officials and Clerks.

Kelley is an appointee of the U.S. Department of Homeland Security, Government Coordinating Council (GCC), which helps to oversee the protection of the nation's election infrastructure, Kelley holds an M.B.A. from the University of Southern California and a Bachelor of Science from the University of Redlands.

**Joe Kiniry, Principal Scientist, Galois; Principled CEO and Chief Scientist, Free & Fair**
Dr. Joseph Kiniry is a Principal Scientist at Galois and the Principled CEO and Chief Scientist of Free & Fair. Previously, he was a Full Professor at the Technical University of Denmark where he was the Head of the Software Engineering section. Since the early 2000s he has held permanent positions at four universities in

Denmark, Ireland, and The Netherlands. Dr. Kiniry has extensive experience in formal methods, high-assurance software and hardware engineering, foundations of computer science and mathematics, and information security.

**Margaret MacAlpine, Founding Partner, Nordic Innovation Labs**
Margaret MacAlpine is a system testing technologist and election auditing specialist. Her work includes projects with electronic testing of voting registration systems, election security, and election fraud. MacAlpine is a specialized technologist in testing and performing risk limiting and transitive audits on election results. Before joining Nordic Innovation Labs, MacAlpine served as an advisor for the office of the Secretary of State of California, specifically with the Risk Limiting Audit Pilot Program where she developed her expertise on the use of high-speed scanners for conducting post-election audits. In partnership with the University of Michigan, MacAlpine contributed to the research of security analysis and the Estonian internet voting system. MacAlpine earned her Bachelor of Arts from Trinity College in Hartford, Connecticut.

**Jeanette Manfra, National Protection and Programs Directorate (NPPD) Assistant Secretary for the Office of Cybersecurity and Communications (CS&C), DHS**
Ms. Manfra leads the Department of Homeland Security (DHS) mission of strengthening the security and resilience of the nation's critical infrastructure. Prior to this position, Ms. Manfra served as Acting Deputy Under Secretary for Cybersecurity and Director for Strategy, Policy, and Plans for the NPPD.

Previously, Ms. Manfra served as Senior Counselor for Cybersecurity to the Secretary of Homeland Security and Director for Critical Infrastructure Cybersecurity on the National Security Council staff at the White House. At DHS, she held multiple positions in the Office of Cybersecurity and Communications, including advisor for the Assistant Secretary for Cybersecurity and Communications and Deputy Director, Office of Emergency Communications, during which time she led the Department's efforts in establishing the Nationwide Public Safety Broadband Network.

Before joining DHS, Jeanette served in the U.S. Army as a communications specialist and a Military Intelligence Officer.

**Alejandro Mayorkas, Partner, WilmerHale; former Deputy Secretary, U.S. Department of Homeland Security**
Alejandro Mayorkas represents clients in civil litigation and internal investigations, and augments the firm's formidable strengths in strategic counseling, crisis management and national security, with a particular focus on cybersecurity.

Before joining WilmerHale, Mayorkas served as Deputy Secretary of Homeland Security, where he managed some of the most complex and critical responsibilities of government, including preventing and responding to terrorist attacks on US soil, enhancing both the government's and the private sector's cybersecurity, enforcing the nation's immigration laws, facilitating lawful trade and travel, and helping stricken communities recover from disasters. For his service as Deputy Secretary of Homeland Security, Mayorkas received the Department's Distinguished Service Award, its highest civilian honor; the US Coast Guard's Distinguished Service Award; a special commendation from the National Security Agency for his achievements in national security and, specifically, cybersecurity; and numerous additional awards and commendations.

As Deputy Secretary, Mayorkas was the Obama Administration's highest ranking Cuban American and was named to Latino Leaders' list of the nation's most influential Latinos. In 2008, The National Law Journal recognized him as one of the “50 Most Influential Minority Lawyers in America.”

Prior to becoming Deputy Secretary, Mayorkas served as Director of US Citizenship and Immigration Services, the federal agency that administers the largest legal immigration system in the world.

From 1998 to 2001, Mayorkas served as the US Attorney for the Central District of California, where he oversaw prosecutions of national significance, including the investigation and prosecution of financial fraud, violations of the Foreign Corrupt Practices Act (FCPA), public corruption, cybercrime, international money laundering, and immigration fraud. He was promoted to the Senate-confirmed position of US Attorney after having served for nearly nine years as an Assistant US Attorney specializing in the prosecution of financial fraud.

After leaving the US Attorney's Office, Mayorkas developed a civil litigation and internal investigations practice representing a wide range of corporate clients across the country.

Mayorkas serves as Chairman of the US Chamber of Commerce's Cyber Leadership Council. The Cyber Leadership Council serves as a forum for businesses to openly discuss cybersecurity policy and practices, direct Chamber advocacy and education efforts, and serve as a key voice of industry for dialogue with policymakers.

**Amber McReynolds, Director of Elections, City and County of Denver, Colorado**
A subject matter expert on elections, Amber McReynolds has been involved in the election’s office thirteen years and has been focused on improving the election experience for the people of Denver. McReynolds has played a critical role in modernizing the election model in Colorado and has taken steps to promote innovation and election efficiency in Denver. McReynolds is currently preparing to step into the executive director role of a voter-based nonprofit, National Vote at Home Institute and Coalition. McReynolds holds a Master of Science in Comparative Politics from the London School of Economics and a Bachelor of Science from the University of Illinois.

**Alex Padilla, Secretary of State, California**
Alex Padilla was sworn in as California Secretary of State on January 5, 2015. He is committed to modernizing the office, increasing voter registration and participation, and strengthening voting rights.

Padilla previously served in the California State Senate (2006-2014) where he chaired the Committee on Energy, Utilities, and Communications. As chair, he shepherded legislation to combat climate change and create a greener and more sustainable economy. He pursued an ambitious agenda in the areas of renewable energy, energy efficiency, smart grid, and broadband deployment. In 1999, at the age of 26, Padilla was elected to the Los Angeles City Council to represent the same east San Fernando Valley community where he grew up. In 2001, his colleagues elected him to the first of three terms as Council President, becoming the youngest member and the first Latino to serve in this capacity.

**Noah Praetz, Director of Elections, Cook County, Illinois**
Responsible for all matters of election administration in one of the largest jurisdictions in the country, Praetz has extensive experience in election day management, election security, and voter registration modernization. Praetz also serves on the executive committee of the Government Coordinating Council

where he represents local election officials. Additionally, he serves as co-chair of the Election Center Cyber Security Committee and is a member of the International Association of Government Officials and the Illinois Association of County Clerks and Recorders. Praetz publishes articles on cybersecurity, Election Day administration and referred law in Illinois.

Praetz began his career doing data entry prior to the 2000 presidential elections. He worked his way through the ranks in the elections department before taking the position of Deputy Director and then advancing to his current position as Director. Praetz holds a Juris Doctor from DePaul University College of Law.

**David Sanger, National Security Correspondent and Senior Writer, *The New York Times*; Author, *The Perfect Weapon***
David E. Sanger is a national security correspondent and a *Times* senior writer. In a 36-year reporting career for *The New York Times,* he has been on three teams that have won Pulitzer Prizes, most recently in 2017 for international reporting. His newest book, "The Perfect Weapon: War, Sabotage and Fear in the Cyber Age,'' examines the emergence of cyberconflict as the primary way large and small states are competing and undercutting each other, changing the nature of global power.

He is also the author of two Times best sellers on foreign policy and national security: "The Inheritance: The World Obama Confronts and the Challenges to American Power," published in 2009, and "Confront and Conceal: Obama's Secret Wars and Surprising Use of American Power," published in 2012. For The Times, Sanger has served as Tokyo bureau chief, Washington economic correspondent, White House correspondent during the Clinton and Bush administrations, and chief Washington correspondent.

Sanger spent six years in Tokyo, writing about the emergence of Japan as a major American competitor, and then the country's humbling recession. He wrote many of the first articles about North Korea's emerging nuclear weapons program.

Returning to Washington, Sanger turned to a wide range of diplomatic and national security issues, especially issues of nuclear proliferation and the rise of cyberconflict among nations. In reporting for The Times and "Confront and Conceal," he revealed the story of Olympic Games, the codename for the most sophisticated cyber attack in history, the American-Israeli effort to sabotage Iran's nuclear program with the Stuxnet worm. His journalistic pursuit of the origins of Stuxnet became the subject of the documentary "Zero Days," which made the short list of Academy Award documentaries in 2016. With his Times colleague Bill Broad, he also described, in early 2017, a parallel cyber effort against North Korea.

Sanger was a leading member of the team that investigated the causes of the Challenger disaster in 1986, which was awarded a Pulitzer in national reporting the following year. A second Pulitzer, in 1999, was awarded to a team that investigated the struggles within the Clinton administration over controlling technology exports to China. He has also won the Weintal Prize for diplomatic reporting for his coverage of the Iraq and Korea crises, the Aldo Beckman prize for coverage of the presidency, and, in two separate years, the Merriman Smith Memorial Award, for coverage of national security issues. "Nuclear Jihad," the documentary that Sanger reported for Discovery/Times Television, won the duPont-Columbia Award for its explanation of the workings of the A. Q. Khan nuclear proliferation network. That coverage was also a finalist for a Pulitzer.

A 1982 graduate of Harvard College, Sanger was the first senior fellow in The Press and National Security at the Belfer Center for Science and International Affairs at Harvard. With Graham T. Allison Jr., he co-teaches

Central Challenges in American National Security, Strategy and the Press at the Kennedy School of Government.

**Carsten Schurmann, Professor of Computer Science at IT University of Copenhagen**
With 10 years of experience conducting research in elections, Carsten Schuermann is an expert in election security. Schuermann has written over academic 60 papers, contributed to books, and hacked at DEF CON 2017 the WinVote voting machine shortly after the Voting Machine Voting village opened. Schuermann is a member of the computer science faculty at IT University of Copenhagen and leads the Center for Information Security Research. He has worked with the Carter Center, USA, Council of Europe, Venice Commission, and International IDEA (Sweden).

Before, joining the University of Copenhagen, Schuermann was a member of the Computer Science Department at Yale University. Schuermann holds a Ph.D. degree in Computer Science from Carnegie Mellon University, and a German Master in Computer Science from University of Karlsruhe.

## APPENDIX #3: Don't Take Our Word For It

The DEF CON Voting Village provides vital information about vulnerabilities in the U.S. election system to state and local election officials in order to better safeguard the foundations of our democracy. Cross-sector collaboration is critical in overcoming the challenges posed by cybersecurity threats. But you don't have to take our word for it.

**Senator James Lankford, Oklahoma**
December 21, 2017
Press Release[14]

> "Safe and free elections run by individual states are at the core of our national identity…. During the 2016 elections, Russia tried to interfere in our elections. Although they didn't change actual votes or alter the outcome, their efforts were an attack on our democracy. It is imperative that we strengthen our election systems and give the states the tools they need to protect themselves and the integrity of voters against the possibility of foreign interference. In this new digital age, we should ensure the states have the resources they need to protect our election infrastructure."

**Senator Amy Klobuchar, Minnesota**
December 19, 2017
Letter to Department of Homeland Security Secretary Kirstjen Nielsen[15]

> "We must … provide states with resources, best practices and manpower to help combat attacks and update voting technology. State and local officials are on the front lines of our democratic process. It is wrong to leave them defenseless against sophisticated cyber hackers backed by the Kremlin and other adversaries."

**Senator Bernie Sanders, Vermont**
August 13, 2018
Facebook

> "This November may be the most important election of our lifetimes, and we must do everything in our power to protect our democratic processes. Congress must move aggressively to protect our election systems from interference by Russia or any foreign power, and work closely with our democratic partners around the world to do the same."

**Senator Kamala Harris, California**
**Senator Mark Warner, Virginia**
**Senator James Lankford, Oklahoma**
**Senator Susan Collins, Maine**
August 22, 2018

---

[14] James Lankford, United States Senator for Oklahoma. "Senators Lankford, Klobuchar, Harris, Collins, Heinrich and Graham Introduce Election Security Bill." News release, December 21, 2017. Accessed September 26, 2018. https://www.lankford.senate.gov/news/press-releases/senators-lankford-klobuchar-harris-collins-heinrich-and-graham-introduce-election-security-bill.

[15] Amy Klobuchar, United States Senator for Minnesota. "Department of Homeland Security Secretary Nielsen Begins Tenure, Klobuchar, Lankford Urge Making Election Cybersecurity a Top Priority." News release, December 19, 2017. Accessed September 26, 2018. https://www.klobuchar.senate.gov/public/index.cfm/news-releases?ID=B3961145-FBA8-4B71-BA36-0EB4FAB29C0E.

Letter to Tom Burt, President, Election Systems & Software (ES&S)[16]

"The reality of these unprecedented security risks was on full display at the DEF CON cybersecurity conference, where researchers at the "Voting Village" successfully probed a variety of electronic equipment used to administer elections. We are disheartened that ES&S chose to dismiss these demonstrations as unrealistic and that your company is not supportive of independent testing. We believe that independent testing is one of the most effective ways to understand and address potential cybersecurity risks."

**Congresswoman Jackie Speier, 14th District, California**
August 13, 2018
Twitter[17]

"If an 11 yr old can change votes on a FL election system, what can a nefarious, trained Russian spy do? There are only 7 companies making election machines that contract with our states and counties, and these companies refuse to let anyone test their software! @VotingVillageDC"

**Congresswoman Tulsi Gabbard, 2nd District, Hawaii**
August 14, 2018
Press Release[18]

"Kids being able to hack into our election infrastructure in mere minutes highlights the severe vulnerabilities in our election infrastructure that threaten our American democracy. These vulnerabilities erode voter confidence and expose our election outcomes to manipulation. With the 2018 general election quickly approaching, Congress must act now to pass my Securing America's Elections Act, and work with the states to safeguard our electoral infrastructure, ensuring that each and every American vote is counted faithfully and accurately."

**Jeanette Manfra, National Protection and Programs Directorate (NPPD) Assistant Secretary for the Office of Cybersecurity and Communications (CS&C), Department of Homeland Security**
August 10, 2018
Panel at DEF CON Voting Village[19]

"We'd love it if you [DEF CON attendees] worked for us. We'd love it if you worked with us."

**Secretary of State Alex Padilla, California**
August 10, 2018
Panel at DEF CON Voting Village[20]

"While I thank the United States Congress for appropriating $340 million last month, let me be abundantly clear, we need more resources. All the things that we know we have to do, all the things

---

[16] Kamala D. Harris, Mark R. Warner, Susan M. Collins, and James Lankford to Tom Burt, President & Chief Executive Officer, Election Systems & Software, LLC. August 22, 2018. In Kamala Harris, U.S. Senator for California. August 22, 2018. Accessed September 26, 2018. https://www.harris.senate.gov/imo/media/doc/August 22 2018 - Letter to ESS.pdf.
[17] Speier, Jackie. Twitter Post. August 13, 2018, 2:49 PM. https://twitter.com/RepSpeier/status/1029122674801500160.
[18] Congresswoman Tulsi Gabbard, Hawaii's 2nd District. "Rep. Tulsi Gabbard on Vulnerability of US Election Systems Exposed at DEFCON." News release, August 14, 2018. Accessed September 26, 2018. https://gabbard.house.gov/news/press-releases/rep-tulsi-gabbard-vulnerability-us-election-systems-exposed-defcon
[19] Ng, Alfred. "US Officials Hope Hackers at Defcon Find More Voting Machine Problems." CNET. August 10, 2018. Accessed September 27, 2018. https://www.cnet.com/news/us-officials-hope-hackers-at-defcon-find-more-voting-machine-problems/.
[20] Hay Newman, Lily. "At DEFCON, the Biggest Election Threat Is Lack of Funding." WIRED. August 10, 2018. Accessed September 27, 2018. https://www.wired.com/story/defcon-election-threat-funding/.

that I'm going to learn and observe when I go down to the Village after this panel, to implement and act on all of these findings, recommendations, and discoveries we need official resources."

**Secretary of State Jay Ashcroft, Missouri**
August 14, 2018
KRCG[21]

> "I want to work with them [DEF CON Voting Village] to make examples that are real world, that actually reflect what's actually happening in the states…. All those different points of views and ways of life and background, they help different individuals to see things that other people might miss."

**Joel Miller, Linn County Auditor and Commissioner of Elections, Iowa**
August 13, 2018
Blog post[22]

> "At a recent Iowa State Association of County Auditors (ISACA) meeting in Iowa City, I heard officials from the Iowa Secretary of State's Office (SoS) discounting the value of any news or reports coming out of the Voting Machine Hacking Village at DEF CON® 26. Contrary to what the SoS said, I found the opposite. Every person I met seemed interested in elections, interested in the equipment we use, and interested in showing us the vulnerabilities of the equipment we use with an unexpected twist. That twist: What can I do to help election officials fix the problems?"

**John Odum, Montpelier City Clerk, Vermont**
July 19, 2018
GOVERNING[23]

> "Too many election administrators are putting their faith in cybersecurity tools that by themselves don't provide nearly the level of security they need."

**Joseph Holland, Santa Barbara County Registrar of Voters, California**
County of Santa Barbara website[24]

> "Attended DefCon 2017 (annual hacking conference) to observe their first ever Voting Systems Hacking Village. This was quite informative as it led to many ideas about how an election could be disrupted, including various social engineering attacks. This has led to internal discussions on how to mitigate these disruptions."

**Amber McReynolds, Executive Director, National Vote at Home Institute and Coalition**
August 14, 2018
Twitter[25]

---

[21] Lee, Kyreon. "Secretary of State Ashcroft Working toward Maintaining a Secure Election System." KRCG. August 14, 2018. Accessed September 27, 2018. https://krcgtv.com/news/local/secretary-of-state-ashcroft-working-toward-maintaining-a-secure-election-system.
[22] Miller, Joel. "DEF CON: A Confirmation about the State of Elections in Iowa." JoelMiller.us (blog), August 14, 2018. Accessed September 26, 2018. https://lcauditor.wordpress.com/2018/08/13/def-con-a-confirmation-about-the-state-of-elections-in-iowa/.
[23] http://www.governing.com/gov-institute/voices/col-election-security-use-training-tools-penetration-testing.html
[24] "Cyber Security - Frequently Asked Questions." County of Santa Barbara. Accessed September 27, 2018. https://countyofsb.org/care/elections/about/cyber-security.sbc.
[25] McReynolds, Amber. Twitter Post. August 14, 2018, 12:59 PM. https://twitter.com/AmberMcReynolds/status/1029457487051649024.

> "Thanks @D_Hawk & @washingtonpost for covering #Defcon2018 ~ Improving the security of our #election systems requires commitment, collaboration, coordination, and communication. Continuous improvement is paramount! #DenverVotes"

**Ashley Dittus, Democratic Commissioner, Ulster County Board of Elections, New York**
August 24, 2018
Email to DEF CON Voting Village

> "Thank you for the work you are doing to highlight this issue."

**Cassandra Suettinger, Village Clerk/Treasurer, Village of McFarland, Wisconsin**
August 27, 2018
Email to DEF CON Voting Village

> "We are willing to take all the help we can get in securing our elections. While the hackers at DEF CON may not have all the answers, we are eager to learn about any vulnerabilities or security flaws that we can address and mitigate."

APPENDIX #4: Firewall Democracy: Best Practices for Securing America’s Vulnerable Voting Infrastructure




FEBRUARY 2018

# Firewall Democracy: Best Practices for Securing America's Vulnerable Voting Infrastructure

A secure vote forms the bedrock of our American democracy. Yet the lessons of 2016 made clear that nefarious actors possess the cyber capabilities to meddle in elections and undermine voters' faith.

Defending democracy is not a responsibility limited to any political party. This is an American challenge requiring a united effort to prepare for the 2018 elections and beyond.

Influenced by a host of cyber, national security, and election experts, this compilation offers 12 of the most widely-embraced best practices for securing U.S. election infrastructure.

PRODUCED IN PARTNERSHIP WITH

Atlantic Council
SCOWCROFT CENTER FOR STRATEGY AND SECURITY

DEFCON



# Overview:
# Cyber Threats & Challenges To Our Democracy

In 2016, Russia – a foreign adversary – led a campaign to infiltrate voter databases in at least in 21 U.S. states, possibly more. As that intelligence comes to light, it reiterates decades of expert warnings that, beyond Russia, many hostile actors have the cyber capability to tamper with our election infrastructure, perhaps best defined as a "patchwork" of outdated, aging voting equipment, registration databases, and networks that vary by state.

The ability to address the vulnerabilities in our elections is further complicated by the multiplicity of stakeholders charged with their protection. Voting systems are under the constitutional and administrative control of 50 states and thousands of local voting jurisdictions, many of which are under-resourced when it comes to cybersecurity. Yet election security is now firmly a national security matter, necessitating an evolving role for the federal government, particularly agencies like the U.S. Department of Homeland Security (DHS).

In short, firewalling democracy for 2018 and beyond will require significant coordination and funding at all levels – local, state, and federal – and action must come urgently.

> "Russia perceives its past efforts as successful and views the 2018 U.S. midterm elections as a potential target for Russian influence operations."
> ***-Dan Coats,***
> ***Director of National Intelligence***

> "Russia's activities in the 2016 election constituted the high-water mark of their long running efforts to disrupt and influence our elections. They must be congratulating themselves for having exceeded their wildest expectations with a minimal expenditure of resource. And I believe they are now emboldened to continue such activities in the future…"
> ***-James Clapper,***
> ***Former Director of National Intelligence***

# Best Practices:
# 12 Action Items For Election Security

As the 2018 elections approach, this list of widely-accepted best practices from a variety of sources outlines **12 action items** to secure our elections.

## Safeguard Voting Equipment



- Implement **universal use of paper ballots**, marked by hand and read by optical scanner, ensuring a voter-verified paper audit trail (VVPAT).
- **Phase out touch-screen voting machines** – especially the most vulnerable direct-recording electronic (DRE) devices
- **Update pollbooks** used to check-in voters.
- Verify voting results by requiring election officials to conduct **"Risk-Limiting Audits" (RLAs)**, a statistical post-election audit before certification of final results.

## Protect Voting Networks & Databases



- **Secure voting infrastructure, especially voter registration databases**, using time-tested cyber hygiene tools such as the CIS "20 Critical Security Controls" or NIST's Cybersecurity Framework.
- **Call upon outside experts** to conduct cyber assessments – DHS, white-hat hackers, cybersecurity vendors and security researchers – where needed.
- **Provide resources and training** to state and local election leaders for cyber maintenance and on-going monitoring.
- **Promote information-sharing** on cyber threats and incidents in and across the entire voting industry.

## Coordinate with Stakeholders



- **Appropriate federal funding** to states to implement infrastructure upgrades, audits, and cyber hygiene measures.
- **Establish clear channels for coordination** between local, state, and federal agencies, including real-time sharing of threat and intelligence information.
- Maintain DHS's **designation of elections as a Critical Infrastructure Subsector.**
- **Require DHS to institute a pre-election threat assessment plan** to bolster its technical support capacity to state and locals requesting assistance.

# Citations:
# Further Reading & Resources

This compilation of best practices draws upon and acknowledges the contributions of multiple best practices and policy-development sources.





Belfer Center for Science and International Affairs, Harvard Kennedy School, Defending Digital Democracy, *The State & Local Election Cybersecurity Playbook*, February 2018

Brennan Center for Justice at New York University, *America's Voting Machines at Risk*, 2015

Center for American Progress, *Nine Solutions to Secure America's Elections*, August 16, 2017

Center for Internet Security (CIS), *A Handbook for Elections Infrastructure Security*, Version 1.0, February 2018

Congressional Task Force on Election Security, *Preliminary Findings and Recommendations*, 2017

DEFCON, *Voting Village: Report on Cyber Vulnerabilities in U.S. Election Equipment, Databases, and Infrastructure*, September 2017

Halderman, J. Alex, University of Michigan, Expert testimony to the U.S. Senate Select Committee on Intelligence, June 21, 2017

ICA: Intelligence Community Assessment, *Assessing Russian Activities and Intentions in Recent US Elections: The Analytic Process and Cyber Incident Attribution,* January 2017

Praetz, Noah, Office of Cook County, IL Clerk David Orr, *2020 Vision: Election Security in the Age of Committed Foreign Threats*, December 7, 2017

Verified Voting Foundation, *Principles for New Voting Systems*, February 2015

Wharton School, University of Pennsylvania, *The Business of Voting: Market Structure and Innovation in the Election Technology Industry,* 2016


MEDIA CONTACT
Jaclyn Houser, Cambridge Global Advisors
jhouser@cambridgeglobal.com

# EXHIBIT C




# DEF CON 27 VOTING MACHINE HACKING VILLAGE

AUGUST 2019

**REPORT CO-AUTHORED BY:**
MATT BLAZE, GEORGETOWN UNIVERSITY
HARRI HURSTI, NORDIC INNOVATION LABS
MARGARET MACALPINE, NORDIC INNOVATION LABS
MARY HANLEY, UNIVERSITY OF CHICAGO
JEFF MOSS, DEF CON
RACHEL WEHR, GEORGETOWN UNIVERSITY
KENDALL SPENCER, GEORGETOWN UNIVERSITY
CHRISTOPHER FERRIS, GEORGETOWN UNIVERSITY

# Table of Contents


Introduction 3

Executive Summary 4

Equipment Available at the Voting Village 8

Overview of Technical Issues Found or Replicated by Participants 11

- ES&S ExpressPoll Tablet Electronic Pollbook 11
- ES&S AutoMARK 14
- Dominion Imagecast Precinct 18
- AccuVote-OS Precinct Count 20
- EVID 22
- ES&S M650 23

Recommendations 24

DARPA Secure Hardware Technology Demonstrator 26

Conclusion 27

Acknowledgments 28

Appendix A: Voting Village Speaker Track 29



# INTRODUCTION

The Voting Machine Hacking Village (Voting Village) returned to DEF CON in August 2019 with a dramatic expansion in election equipment research and evaluation. DEF CON, the world's largest and best-known hacker conference, brings together a wide range of attendees including hackers; cybersecurity professionals; journalists; academics; lawyers; and local, state and federal government leaders. The Voting Village, now in its third year, saw a dramatic increase in attendance and participation, particularly from state, local, and federal government officials.

Since its launch in 2017, the Voting Village has served as an open forum to identify vulnerabilities within the U.S. election infrastructure and to consider solutions to mitigate these vulnerabilities. This year, the Voting Village demonstrated the role that hackers and other cybersecurity experts can, and should, have in the national endeavor to improve election security.

Over the course of two and a half days, hackers, technologists, academics, and other experts had full access to over 100 Voting-Village-owned voting machines to study, as well as the opportunity to attend talks and panels on topics ranging from the challenges involved in reporting on election security to the types of risk-limiting audits.

***The clear conclusion of the Voting Village in 2019 is that independent security experts and hackers are stepping into the breach - providing expertise, answers, and solutions to election administrators, policymakers, and ordinary citizens where few others can.***

While the discovery and replication of voting system security vulnerabilities are critical tasks for which the Voting Village plays an important role, that is not, in our view, its main contribution. Hundreds of security experts passed through the doors over the course of the weekend, many of whom had no previous experience with the particular problems and risks inherent to election technology. It is vital that we expand the pool of security experts equipped with the specialized knowledge required to evaluate, and ultimately improve, voting system security. We are especially proud of the success of the Voting Village in this essential education and outreach role.

From the outset, the mission of the Voting Village has been to highlight vulnerabilities in election equipment used in the United States and throughout the world and to serve as a resource for those whose goal is to improve the state of election security. As Voting Village organizer Harri Hursti emphasized, "As always we welcome everyone, but especially we welcome officials. We are here to help and get everyone informed - and let everyone experiment to verify the facts."



# EXECUTIVE SUMMARY

***1. Commercially-Available Voting System Hardware Used in the U.S. Remains Vulnerable to Attack***

As in previous years, the 2019 Voting Village presented a range of currently marketed touch-screen direct recording electronic (DRE), optical scan paper voting devices, paper ballot marking devices (BMDs) and electronic poll books (e-poll books). While the Village did not attempt to (and could not) provide samples of every piece of voting equipment currently in use throughout the United States, every piece of equipment at the Village is currently certified for use in at least one U.S. jurisdiction.

And once again, Voting Village participants were able to find new ways, or replicate previously published methods, of compromising every one of the devices in the room in ways that could alter stored vote tallies, change ballots displayed to voters, or alter the internal software that controls the machines. In many cases, the DEF CON participants tested equipment they had no prior knowledge of or experience with, and worked with any tools they could find - in a challenging setting with far fewer resources (and far less time) than a professional lab (or even the most casual attacker) would typically have. In most cases, vulnerabilities could be exploited under election conditions surreptitiously by means of exposed external interfaces accessible to voters or precinct poll workers (or to any other individual with brief physical access to the machines). In particular, many vectors for so called “Advanced Persistent Threat (APT)” attacks continue to be found or replicated. This means that an attack that could compromise an entire jurisdiction could be injected in any of multiple places during the lifetime of the system.

As disturbing as this outcome is, we note that it is at this point an unsurprising result. It is well known that current voting systems, like any hardware and software running on conventional general-purpose platforms can be compromised in practice. However, it is notable - and especially disappointing - that many of the specific vulnerabilities reported over a decade earlier (in the California and Ohio studies, for example), are still present in these systems today.*

* See California Top-to-Bottom Review (2007): “Top-to-Bottom Review.” California Secretary of State. Accessed September 26, 2019. https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review/. and
Ohio EVEREST (2007): McDaniel, Patrick, Matt Blaze, Giovanni Vigna, Joseph Lorenzo Hall, Laura Quilter, Kevin Butler, William Enck, et al. “EVEREST: Evaluation and Validation of Election- Related Equipment, Standards, and Testing.” Secretary of State of Ohio, December 7, 2007. https://www.eac.gov/assets/1/28/EVEREST.pdf.

## 2. There is an Urgent Need for Paper Ballots and Risk-Limiting Audits

It is beyond the current and foreseeable state of the art to construct computerized (software and hardware based) voting devices that effectively resist known, practical forms of malicious tampering. However, this need not mean that elections must forever be vulnerable to compromise. Certain classes of voting equipment, including some (but not all) of the devices displayed at the Voting Village, can still be used to conduct high-integrity elections— in spite of their vulnerabilities — by conducting statistically rigorous post-election audits. Whether this is possible depends on the specific category of voting technology in use and, critically, whether a properly designed post-election audit process is routinely performed as a part of every election.

Systems that use paper ballots, such as optical scan voting devices, are physically designed to preserve a voter-marked record of each voter's intended choices (the original paper ballots themselves) which cannot be altered by even the most maliciously compromised software. These paper ballots are a prerequisite for the use of routine post-election Risk Limiting Audits (RLAs), which are a state-of-the-art, statistically rigorous technique for comparing (by human eye) a sample of ballots with how they were recorded by machine. This allows us to reliably determine the correct outcome of even an election conducted with compromised machines.

In particular, we emphasize that these audits can only be performed on paper-ballot-based systems. DRE ("touchscreen") voting devices cannot be used to conduct reliable or auditable elections in this way, because the stored vote tallies (as well as the ballot display) are under the control of precinct voting machine software that can be maliciously altered (in both theory and practice). The experience of the Voting Village strongly reinforces the widely understood risk that these machines might be compromised under election conditions in practice. The authors strongly endorse the recommendations of the National Academies 2018 consensus report, Securing the Vote,** that DRE voting machines, which do not have the capacity for independent auditing, be phased out as quickly as possible. This is an increasingly urgent matter, especially as foreign state actors (which may be highly motivated to disrupt our elections and which enjoy especially rich resources) are recognized as part of the threat to U.S. election integrity.

Unfortunately, the recommended practice of auditable paper ballots coupled with routine post-election risk limiting audits remains the exception, rather than the rule, in U.S. elections. While a growing number of states are already implementing paper ballots, legislation requiring routine risk-limiting audits has so far been advanced in only a few states.*** We strongly urge all states to adopt legislation mandating routine post-election risk-limiting audits. This is especially important because current optical scan paper ballot scanners (including those at the Voting Village) are known to be vulnerable in practice to compromise. Post-election audits are the only known way to secure elections conducted with imperfect hardware and software (as all modern computer-based hardware ultimately is).

** National Academies of Sciences, Engineering, and Medicine, Securing the Vote: Protecting American Democracy (Washington, DC: The National Academies Press, 2018). https://doi.org/10.17226/25120.
*** "Post-Election Audits." National Conference of State Legislatures, August 5, 2019. http://www.ncsl.org/research/elections-and-campaigns/post-election-audits635926066.aspx.

### *3. New Ballot Marking Device (BMD) Products are Vulnerable*

One of the most vigorously debated voting technology issues in 2019 is the appropriate role of paper ballot marking devices (BMDs) and how they relate to widely recognized requirements for software independence and compatibility with meaningful risk-limiting audits. Originally, BMDs were conceived of narrowly, specifically for use by voters with disabilities to assist them in marking optical scan paper ballots, bringing such systems into compliance with Help America Vote Act (HAVA) requirements for accessible voting. However, certain recent voting products greatly expand the use of BMD technology, integrating a BMD into the voting process for all voters, whether they require assistive technology or not.

As a relatively new technology, ballot marking devices have not been widely studied by independent researchers and have been largely absent from practical election security research studies. In the Voting Village this year, we had two ballot marking devices, representing two commercial models of this technology: a traditional ballot-marking device and a hybrid device. The findings only underscore the need for more comprehensive studies.

Participants in the Voting Village found that both BMD models were vulnerable to practical attack. In particular:

1. The hybrid machine outwardly appears to be a separate ballot-marking device and ballot optical scanner as two units physically integrated but architecturally separate. However, it was found that the ballot-marking device was connected to the ballot-scanning device over an internal network, and in fact was an active device in vote processing. This means that hacking the ballot marking device enables altering votes at the scanning stage.
2. Both devices stored information that could allow an attacker to compromise the secrecy of individual ballots.

The weaknesses in the current generation of ballot marking devices raises broad questions about their security and impact on overall election integrity if they were to be put into general use in elections. Aside from their potential to be maliciously configured to subtly mis-record voter choices, current ballot marking devices also offer potential avenues for election disruption via denial-of-service attacks. Voting Village participants observed that clearing many simple error situations (including those that could be deliberately induced by an attacker) required rebooting the device. This can easily create long lines at a polling place, since, as we also observed, it can take up to 15-20 minutes for these devices to complete a reboot cycle.

### *4. Infrastructure and Supply Chain Issues Continue to Pose Significant Security Risks*

The Voting Village explored threats to election security from the supply chain. Participants continued to observe a wide array of hardware component parts of foreign origin, as well as other aspects of the supply chains for software and operational software maintenance. For example, participants found in one machine a hard-wired IP address pointing to an overseas address block.

The exact purpose and nature of whatever underlying feature used this address remains undetermined, but it underscores questions about foreign control over voting system supply chains, which should be understood to include not just the sourcing of physical hardware, but also of software and cloud-based and other remote services.

There are also significant practical issues of local election administration and resources. Local election offices are, overwhelmingly, under-resourced and under-funded, especially relative to the threats they face. Many county and local voting jurisdictions have no full-time IT staff, and many rely on outside contractors for election system configuration and maintenance. This reliance on outsourcing means that election officials often lack internal tools and other capabilities to effectively manage, understand and control their election infrastructure and as a consequence are without direct control over the security of their IT environment. With rapid deployment of new IT technology into the election infrastructure, election offices are especially exposed to remote attack (including by hostile state actors). Unfortunately, very few election offices have the resources to effectively counter this increasingly serious type of threat.

It is important to recognize that IT and cybersecurity are distinct disciplines with only a partial overlap in expertise. To promote discussion and collaboration between election officials and security specialists, the Voting Village conducted the first “Unhack the Ballot” initiative to create an opportunity for election officials to connect with, ask questions, and find answers from security specialists. This “off the record session” was held for the first time in a private room at the Voting Village.



# EQUIPMENT AVAILABLE AT THE VOTING VILLAGE

**Direct-Recording Electronic Voting Machines**

A direct-recording electronic (DRE) voting machine allows voters to electronically cast their ballots by manually touching their choice of candidate on a screen, monitor, or other similar device. The DRE records and tallies the votes directly into its computer memory, without a paper ballot. Only some DRE models feature a Voter-Verified Paper Audit Trail (VVPAT).

*Dominion: Premier/Diebold AccuVote TSx*

The AccuVote TSx is a DRE voting machine manufactured by Premier Voting Solutions, later acquired by Dominion Voting Systems. The product line currently belongs to ES&S.

As of 2018, the AccuVote TSx was in use in 18 states.*

*Dominion: AVC Edge*

The AVC Edge is an electronic voting machine manufactured by Sequoia Voting Systems, later acquired by Dominion Voting Systems. It is a touch-screen machine with direct-recording electronic capabilities. It is activated by a smart card, and records votes on internal flash memory. Each unit contains a slot for a vote activation card. After the voter's ballot is cast, the smart card is deactivated to prevent multiple votes from being cast. Votes are subsequently documented. When polls close, the votes recorded in each machine are either physically or electronically transmitted to election headquarters.

As of 2018, the AVC Edge was in use in 10 states.**

*ES&S: iVotronic DRE*

The iVotronic DRE is an electronic voting system that allows voters to make their choices on a touch screen interface and records and tabulates votes in internal memory.

As of 2018, the iVotronic DRE was in use in 16 states.***

* "Polling Place Equipment - November 2018." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/#year/2018/.

** According to survey of publicly available information conducted by DEF CON Voting Village.

*** "Polling Place Equipment." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/.

**Electronic Poll Books**

An electronic poll book, also commonly called an e-poll book, is typically either a dedicated device with embedded software or a standard commercial laptop/tablet with a software application that allows election officials to review, maintain, and/or enter voter register information for an election, functions that had traditionally been handled using a paper-based system. These systems are limited to the check-in process and do not participate in counting the votes. The usual functions of an e-poll book include voter lookup, verification, identification, precinct assignment, ballot assignment, voter history update and other registry maintaining functions such as name change, address change and/or redirecting voters to correct voting location. In the states that allow same-day registration, e-poll books are also used to enter new voter information and interact with statewide voter registration systems.

*ES&S: Diebold ExpressPoll-5000*

The Diebold ExpressPoll-5000 is an e-poll book, designed for use by individual poll workers. It is used in precincts to check voters in before they are permitted to vote. The product line currently belongs to ES&S, but the ones used at DEF CON were models running Diebold/Premier-branded software, which is also still in use in several places in the U.S. Its operating system is a version of Windows CE, a system built by Microsoft for embedded applications.

*ES&S: ExpressPoll Pollbook Tablet with Integrated Pollbook Stand*

ExpressPoll Pollbook Tablet is an e-poll book designed for use by individual poll workers and is used in precincts to check voters in before they are permitted to vote. This product was introduced to the market in 2015 and consists of a Toshiba Encore 2 standard 10-inch tablet running Windows 8.1 operating system. It is mounted to an integrated stand which has an internal USB hub for connected peripheral devices like a printer, smart card reader, ethernet, extra battery and magnetic stripe reader.

**Ballot Marking Devices**

Ballot marking devices (BMDs) are machines that allow voters to make choices on a screen and then print out a paper ballot with the voter's choices, which is the ballot of record. The paper ballot is then hand counted or tabulated using an optical scanner (see description below). In general, BMDs should neither store nor tabulate votes, but only allow the voter to record votes on ballots that are then stored and tabulated elsewhere. Some BMDs produce paper print-outs of barcodes or QR codes instead of a voter-verifiable paper ballot, which has become a source of much controversy.

The first ballot marking devices emerged in the late 19th century, but were only widely used in the last few decades. Today, electronic BMDs have come into widespread use as assistive devices in the context of optical scan voting systems to provide compliance with HAVA, though in recent years vendors have proposed that the devices be used by all voters.

Case 2:22-cv-03307 Document 39-1 Filed 09/14/22 Page 61 of 133

*ES&S AutoMARK*

The AutoMARK is an optical scan ballot marker that is designed for use by voters who are unable to personally mark an optical scan ballot. The AutoMARK works in conjunction with an optical scanner. It was developed by Vogue Election Systems and the product line was purchased by ES&S. The machine features several features to enhance accessibility for voters with physical impairments or language barriers.

As of 2018, the AutoMARK was in use in 28 states.^

**Optical Scanners**

Optical scanners are digital scanning devices that tabulate paper ballots that have been marked by the voter. Ballots are either scanned at the precinct (in a precinct count system) or at a central location (in a central count system).

*Diebold AccuVote OS*

The AccuVote OS is an optical scan voting system. It can be used by precinct count systems and central count systems. Voters cast their ballots by inserting them into the AccuVote OS system, where votes are digitally tabulated, recorded, and stored. Originally marketed as the Unisys ES-2000, the machine later became known as the Global Election Systems AccuVote-OS Precinct Count (AVOS-PC) paper ballot scanner. In recent years, the machine has also been marketed and/or supported under the brands Diebold, Premier, ES&S, and Dominion.

As of 2018, the AccuVote OS was in use in 26 states.^

*ES&S: M650*

The M650 is an electronic ballot scanner and tabulator manufactured by ES&S. The ES&S M650 is used for counting both regular and absentee ballots. It launches ballots through an optical scanner to tally them, and keeps count on an internal 128 MB SanDisk Flash Storage card (pictured below). Election staff are responsible for configuring the M650 for each election.

As of 2018, the M650 was in use in 23 states.^

**Hybrid Systems**

*Dominion: ImageCast Precinct*

The Dominion ImageCast Precinct is an optical scanner paper integrated with DRE ballot marking device. It scans human-marked ballots, allows voters with disabilities and other voters requiring assistance to use the ballot-marking device to mark and review their ballots, and stores ballots for tabulation after the election period.

As of 2018, the ImageCast Precinct was in use in 10 states.^^

^ "Polling Place Equipment." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/.
^^ According to survey of publicly available information conducted by DEF CON Voting Village.

# OVERVIEW OF TECHNICAL ISSUES FOUND OR REPLICATED BY PARTICIPANTS

**ES&S: ExpressPoll Tablet Electronic Pollbook**




Picture: ES&S Electronic Pollbook System on an integrated stand with built-in printer, smart card reader, and other integrated peripheral devices.

The ES&S ExpressPoll Tablet Electronic Pollbook is an e-poll book which uses a standard commercial unencrypted Toshiba tablet held in place to a dock by a rubber locking mechanism. The specific model of the tablet was a Toshiba Encore 2 with Intel Atom CPU and running Windows 8.1 32-bit operating system.

The tablet can be popped out of its dock, exposing an SD port and a USB port of the tablet itself. Additionally, a USB hub is built into the mounting stand, which exposes additional USB ports. All these ports are active. The ports outside the mount are accessible to voters and poll workers without any physical locks or mechanical support for tamper-evident seals.



Picture: Internal electronics of the e-poll book stand. Internal USB hub visible is also directly connected to externally exposed USB connector. The researchers in the Village were able to print out with the voter permission slip directly by connecting into external USB.

While the SD card, which contains voter data, is encrypted, all keys are stored in plain text in a standard xml file allowing all data to be easily accessed and modified, thereby rendering encryption meaningless.

A card or USB device may be placed into the machine directly even when the dock is locked; the locking mechanism does not prevent access to the externally exposed ports on either on the tablet or on the stand.



None of the BIOS passwords were set. This allows unrestricted access to all system settings. By default, the device booted from a USB first without any password required.

The supervisor maintenance password is stored in plaintext on this device. In this case, the password for the tablet was “ESS”.

Security features supported by the underlying commercial hardware were turned off or not activated. The tablet supported Secureboot, a common security feature designed to check to see if the system has been tampered with and prevent the machine from running code of unknown origin. This was disabled by default on the tablet, allowing the e-poll book to load unsigned code from any source.

Picture: Externally exposed USB port on the side of the Electronic Pollbook Stand. The port does not get locked when the stand is locked and it does not have a lid or hook on which to place a seal.

As the Toshiba tablet is a standard off-the-shelf 'PC compatible' general-purpose device, it is supported by a wide range of general-purpose operating systems. This machine can be booted from a version of Linux using, for example, the external USB port and USB memory stick. Booting from Linux allows an attacker to access data on the device without encountering any Windows operating system-based defenses. Voting Village participants confirmed that an attacker would then be able to freely access data and run custom software, including software that would allow extraction of voter data. An attacker could also change or delete any voter registration data (like party registration) stored on the machine once the machine has been accessed.

The e-poll book operating system stack lacked any attempt to perform even the most rudimentary platform hardening. In fact, none of the bloatware that would come with a standard Toshiba tablet was removed. Apps for Netflix, Hulu, and Amazont were present in the e-poll book.

The lack of hardening is especially dangerous given that for one of the recommended deployments the system is intended to communicate over WiFi with wireless internet access to either Amazon Web Services or Microsoft Azure-based cloud services. Given that the operating system is unhardened and given that the standard bloatware provided by the vendor is present on the machine, there is an extremely wide, unprotectable, exposed attack surface.

**ES&S AutoMARK**



Picture: ES&S AutoMARK Ballot-Marking Device

The ES&S Automark is a ballot marking device that allows keyboard and ethernet ports to be plugged in after removing the top of the machine's case. The casing is closed only by 3 screws and does not include any tamper-evident seals. Immediate root access to the device was available simply by hitting the Windows key on the keyboard.

The lock to this device can be picked manually, allowing root and physical access to the unencrypted drive.

A RJ45 jack appears to be hidden behind a sticker on the front of the machine, accessible by removing the sticker without any tools.

The ES&S AutoMARK runs Windows CE Embedded Operating System 5.0. The application software in the machine appears to be last updated around the end of 2007, and the system appears to have been last used in a special election in late 2018.




Picture: Election database manifest file from the AutoMARK showing details of the last election for which it was used.




Picture: AutoMARK software version screen.

Case 2:22-cv-00677-JJT Document 39-1 Filed 06/08/22 Page 87 of 133

Operating system implementation has not been hardened or unneeded elements removed to minimize attacking surface. For example, Internet Explorer is present on this device.

Because the operating system is not hardened, an attacker can, before the machine boots up, drop malware onto the device after holding the “screen” button for five seconds.

Collectively, a few people were able to change the group IDs of political parties still stored in the device from the previous election. However, this triggered a warning screen, indicating some form of integrity-checking for the stored data.

The embedded Windows operating system has special feature "Allow data connections on device when connected to PC" to enable Windows Mobile Device Center to allow the general purpose Windows version communicate with embedded windows. This feature was turned on.

The machine used several passwords/pins which were very simple, including passwords listed as default passwords in online manuals. These codes include “1111” as the pin code to replace the entire firmware of the device.

Participants were able to adjust the load address which caused the voting applications software to consistently crash. In this instance, the reason for the machine crashing would not be obvious to nontechnical people, such as the volunteers helping to run the polls, thereby creating an effective denial of service attack which would be hard to remotely diagnose.

Additionally, the administrator password was stored in the clear in the configuration file and participants were able to use it to enter admin mode. This enabled them to look at the binaries and replace the header on the voting machine with one of their choosing. Nick Bishop was one of the participants responsible for these discoveries, and has willingly identified himself.




Picture: AutoMARK firmware function enabling automated extraction of the whole system image.

Participants managed to place the DEF CON logo in the header portion of the screen and were able to edit the registry. Using a screwdriver to open up the machine, participants were able to plug a keyboard into an exposed USB port and operate the voting machine as a standard Windows CE machine after exiting the specialized voting software.

Participants Minoo Hamilton and William Baggett also discovered the default system maintenance password by searching on Google, revealing “admin” as the identification name and “vogue” as the password. This allowed both of them to gain access to the securities section on the machine, enabling them to make changes and access vital information. From the securities section they were able to run a remote integrity check that displayed the files and the integrity of each file. Mr. Baggett discussed potential implications for these risks for issues involving a forensic change of evidence. Depending on the protocol adopted by an election office, it is possible that if an attacker modified the access database or central tabulator after hacking their way in, the integrity of the modified data would not be checked against the centralized system.

## Dominion Imagecast Precinct



Picture: Dominion ImageCast Precinct with Ballot-Marking Device screen turned to face the scanner (back) side of the machine.

The Dominion ImageCast Precinct is an integrated hybrid voting equipment. It combines an optical paper ballot scanner and ballot marking device and allows for nonvisual accessibility for the blind and visually impaired, in compliance with HAVA. This machine provides voters with disabilities the same opportunities for access and participation as other voters.

This device integrates the devices and the ballot box to store the cast ballots into one unit, but has a single locking mechanism that holds the entire ballot box together. If picked, ballots could easily be stolen using common items such as a standard trash picker.

Participants were able to access USB, RJ45, and CF slots on this machine without using destructive force.

The system also runs Busybox Linux 1.7.4, which has twenty currently known medium to high level vulnerabilities including the ability to allow remote attackers to allow a DNS through CPU/bandwidth consumption via a forged NTP packet which triggers a communication loop with the effect of Denial-of-Service attacks.*

* Search Results. Common Vulnerabilities and Exposures. Accessed September 26, 2019. https://cve.mitre.org/cgi-bin/cvekey.cgi?keyword=busybox.

Boot settings also allow for the system to be booted from an external USB on startup.

Importantly, the CF card and card readers on the front and back of the machine are physically exposed, and could be replaced.

Additionally there is an internal USB port that is not exposed and an external CF slot that is covered by a tiny door. Either slot can be used to load the OS. Boot order is USB then CF.

The door opens by unscrewing one of the screws. The screws in question were so-called secure screws. Participants made a quick run to a nearby electronics store to purchase “Security Bits Set with Ratchet Driver” for under $28 which was used to open all ‘security screws’ used in any of the machines.



Picture: Small unmarked lid on the side of the machine for accessing CF card slot inside of the machine. So-called “secure screw” tips can be commonly purchased from any electronic store.

When participants removed the CF card on the front of the machine, they found scanned ballots and the configuration file in the clear. In the absence of other protections, modifying configuration data could allow an attacker to edit which X/Y locations on the scanned ballots matched with which candidate. Participants found no digital signing or encryption protecting those digital files.

Participants responsible for much of the work on this machine identified themselves willingly: Zander Work, Lyell Read, Cody Holiday, Andrew Quach, Steven Crane, Henry Meng, and Nakul Bajaj. As a group, they were able to boot an operating system of their choice and play video games on the voting machine, including a popular game called “Pong”. These participants averred that by bringing a simple screwdriver and CF card into the voting area, an attacker could use a screwdriver to access the machine’s intended CF card and swap it with the card they brought, allowing the attacker to boot an arbitrary operating system and take control over the machine.

The group was able to browse the file system on the CF card, proving that the filesystem was unencrypted and unprotected.

## AccuVote-OS Precinct Count




Picture: Originally marketed as Unisys ES-2000 later become Global Election Systems AccuVote-OS Precinct Count (AVOS-PC) paper ballot scanner. Later also marketed/supported under brands Diebold, Premier, ES&S and Dominion.

Participants also discovered a set of previously undocumented functions in the Dominion/Diebold/Premier/ES&S AccuVote, enabling remote manipulation of the machine's memory card when the machine is connected to a network – without any physical access to the memory card, and without breaking or circumventing any physical seals. Researchers confirmed the existence of these features with a person who has previously been involved with the maintenance of these machines, and an election official who had encountered the feature before. The investigation of these functions and possible mitigations is ongoing at the time of this report.

The Voting Village acquired two dozen devices from the same jurisdiction. From the circumstantial evidence of documents in the travel cases, it appears that the machines were put in use and subsequently retired together. However, the devices did not have the same software version installed. Despite possibly having been used in the same elections, some of the machines had software version 1.96.6, whereas others were running 1.96.4, an older version.

In this device, the software is installed on a socketed EPROM microchip. EPROM stands for Erasable Programmable Read-Only Memory and it is a type of programmable read-only memory (programmable ROM) that can be erased and reused. This type of chip has to be physically removed from the circuit board, placed into a separate programmer device, and completely erased before it can be reprogrammed. Erasing the chip is done by shining an intense ultraviolet light through a window through which the silicon chip is visible. The erasing window must be kept covered with an opaque label to prevent accidental partial or unstable erasure by the UV by sunlight or camera flashes and therefore the window is always covered by a sticker as seen in the picture.




Picture: AVOS circuit board with socketed EPROM chip containing election software. Software upgrades to this machine are installed by physically replacing the chip; as the chip is socketed, this can be done in a matter of seconds. The chip inside a socket is a SmartWatch CMOS real time clock with an NVRAM controller circuit and an embedded lithium energy source.

This machine was originally developed in 1986 and first introduced to market in 1989, and it is believed to have been used for the first time in U.S. general elections in Minnesota in 1990. The CPU of the system is NEC V25, which was the microcontroller version of the NEC V20 processor. The V20 was a processor made by NEC that was a reverse-engineered, pin-compatible version of the Intel 8088 with an instruction set compatible with the Intel 80186. It has 16-bit internal architecture and 8-bit external data bus. The V20 was introduced in 1982 and V25 was officially phased out in early 2003. The EPROM containing the programming was 128KBytes in size and the system had two RAM chips 128KBytes each.




Picture: Human readable strings from the chip contained in the programming. As is typical for embedded systems of the era, the programming contains a lot of clear text strings. In this era of technology, compression and encryption were things of the future.

**EVID**



Picture: VR System EViD electronic poll book system.

Participants confirmed that the hardware for this machine is a normal general purpose PC hardware which is very low-end by today's standards. There was no BIOS password set on the machine. Consequently, participants were able to boot an arbitrary operating system off a live CD, which had the ability to run on 32-bit and limited to 128M RAM. Ultimately, the device was used as an entertainment device, amusing visitors with Nyan Cat.

## ES&S M650



Picture: Inside of ES&S M650 Optical Paper Ballot scanner. Storage devices and other electronics are quick and easy to replace in a card rack in the upper left. Note the overpowered for the purpose electric motor for moving the paper ballots.

Last year, the Village made accessible to participants two M650 units which had been used in Oregon. This year, the Voting VIllage acquired an additional unit used in the state of Washington. Based on documentation, all three devices were from the same year and same hardware revision. Based on that, the researchers were surprised to discover that the hardware and the features between the devices were not identical. It is unclear who had carried out the modifications.

The paper maintenance log inside the machine did not answer that question, but showed that maintenance personnel periodically have physical access to the inside of the machine. With physical access, this type of machine has no security protections against any kind of modifications.



# RECOMMENDATIONS

While the DEF CON Voting Village is heavily focused on the technical aspects of the election infrastructure, the Unhack the Ballot initiative underlined the importance of all levels of the human factor aspects in an election ecosystem. Election officials need more training and better access to parties who can help them to navigate the consequences of technological choices around them. Bearing in mind that at the moment many of those choices take place in the long out-sourcing supply chains of the ecosystem and election officials are left into the tail-end of the process to design mitigation strategies into deployments which they were not participating in design. Election officials also need help to train their own staff to be more security-minded and to gain the ‘muscle memory’ instincts to protect day-to-day operations, both during election cycles and between them.

The security implications of ballot marking devices should be further studied. This calls for multi-disciplined research looking into the various aspects of the election process from integrity and security to usability and reliability. Current and proposed next-generation ballot marking devices have not been designed with security considerations in mind. They open the door for various methods to attack the election process. In the simplest end are denial-of-service attacks and attacks to compromise the secrecy of the ballot. Depending on the deployment strategy, the ballot-marking device will know a lot about the voter and therefore ballot-marking devices can be hacked specifically to, for example, disenfranchise vulnerable populations: voters who use audio interface, sip-and-puff, large fonts, non-English language ballots, or who take a long time to vote. The discussion about ‘detecting’ hacked devices is dangerous, because in the absence of remedies even if irregularities are reported there is almost no way to properly investigate. Ballot-marking devices as currently deployed have an insurmountable security design and delegation flaw: the protocols make voters responsible for checking whether devices are performing correctly, and voters cannot get any evidence to prove to others that a malfunction occurred and therefore even if voter detects and reports an error, it would often be the only remaining course of action for poll workers to assume a mistake on the voter’s part.

The use of barcodes should be carefully analyzed from various security aspects. Malicious fraudulent advanced barcodes have been causing a lot of problems to Point-of-Sale systems and utilizing bar codes in elections opens a new avenue for injection and scripting type of attacks. The

election integrity, auditability and transparency aspects of using barcodes are even more important. Paper ballots have been promoted because they make those various methods of audits possible. This is true only if the significant record of the vote is human readable. At this point in time, we have to recognize that there are two aspects: technological soundness and the public trust. In elections, it is important that the losing parties and their supporters accept the results as fair. Any method of voting which is not completely transparent and understandable by everyone can be contested in the court of public opinion.

Hybrid machines, which offer users the option of inspecting their ballot before printing, should be avoided because they increase the risk of undetectable attacks. Because the machine knows which ballots are inspected and which are not, it can modify only those that are not inspected — essentially undermining the purpose of voter-verifiable ballots. Such attacks would be very hard to detect exactly because the attacked ballots are those not inspected. With today's razor-thin margins of victory in elections, even the ability to modify a small percentage of the votes undetectably can have a huge impact.

Inspection of newer models of e-poll books further underlines the absence of security design both in software, hardware and physical security aspects. E-poll books are inherently networked devices to synchronize across all devices at a polling place and to avoid cabling, which is often done wirelessly. Furthermore, many new makes and models of the e-poll books actively communicate in real-time over the Internet to back-end servers hosted in commodity cloud services. So far, the e-poll books studied in the Voting Village have been utilizing general-purpose operating systems on commercial off-the-shelf hardware with no special hardening or security measures.

Historically, security measures provided by the hardware / low-level programming have been systematically turned off in all classes of devices used as part of the election infrastructure. Unfortunately, this was found to be true also with newer generations of voting equipment in the Village. These practices greatly simplify paths to attack the machines and also place increased to unbearable burdens to physical security and chain-of-custody management of the machines over the entire lifetime of the devices.

Election reporting was increasingly an area of concern in the Village discussions. With the election night beginning of the process happening over the internet as well as the end of the process as reporting happening over the Internet, discussions in the Village were drawn into similar information flow designs in other industries and how irregularities in those setting had managed to go unnoticed when the ends of the process are seemingly matching. There needs to be a process in place to verify that the reporting truly is sum-of-its-parts.



# DARPA SECURE HARDWARE TECHNOLOGY DEMONSTRATOR

For the past four years, DARPA has been working to build next-generation secure hardware through its System Security Integrated Through Hardware and Firmware (SSITH) program. This new hardware was unveiled for the first time to the public in the Voting Village.

The SSITH program develops methodologies and designs tools that enable the use of hardware advances to protect systems against software exploitation of hardware vulnerabilities. To evaluate progress on the program, DARPA has incorporated the secure processors researchers are developing into a very early prototype application of a secure voting ballot box. At the Voting Village this year, they turned the system loose for public review by thousands of hackers and DEF CON community members. The purpose of this application is solely to provide a demonstration system that facilitates open challenges. To be clear, the SSITH program will not produce a voting system, nor will it provide a specific solution to election system security issues for use during elections.

During DEF CON 2019, the SSITH system demonstrator consisted of a set of RISC-V processors that the research teams will modify to include their SSITH security features. Since SSITH's research is still in the early stages, only one prototype version of the 15 processors in development was available for evaluation. DEFCON 27 was the first small step on a path to evaluate the hardware design. In 2020, DARPA plans to return to DEF CON with an entire demonstrator system, which will incorporate fixes to the issues discovered during this year's evaluation efforts.




As in previous years, this year's Voting Village demonstrated vulnerabilities inherent in the election environment and highlighted the enormity of the task of securing our nation's elections. Among the many issues highlighted at the Voting Village this year, particularly on machines previously unavailable to the hacker community, three serious vulnerabilities stood out:

1. Widespread use of current ballot-marking device architectures poses new systemic security risks
2. Previously studied commercial election equipment continues to surprise with new weaknesses
3. Many systems are shipped with basic security features disabled

If we as a nation are serious, as we must be, about improving election security in the United States, particularly ahead of the 2020 presidential election, the Voting Village recommends that the following as urgent priorities:

I. Nationwide deployment of mandatory post-election risk-limiting audits
II. Nationwide deployment of voter-marked paper ballot systems
III. Dramatically increased funding and other resources to help local election officials protect their IT infrastructure from foreign state actors and other threats.

Without taking these steps to support election administrators at the frontlines of this clear national security threat, we fear that the 2020 presidential elections will realize the worst fears only hinted at during the 2016 elections: insecure, attacked, and ultimately distrusted.



# ACKNOWLEDGMENTS

A number of individuals contributed to the success of the DEF CON Voting VIllage and the production of this report. A special thanks to:

- The organizers, subject matter experts, and partners who collaborated to make the Voting Village concept a reality and helped to author this report;
- The speakers and moderators of the Voting Village speaker track, including Senator Wyden, Representative Eric Swalwell, representatives of the U.S. Department of Homeland Security, the Defense Advanced Research Projects Agency (DARPA), and many others;
- The state and local election administrators who attended the Voting Village to share their wealth of experience and learn from the hacker community about the latest election system security concerns;
- The outstanding support and contributions of Jake Braun, Phil Stupak, Morgan Ryan, Jaclyn Houser, Analiese Wagner, Casey Dolen, Claire Martin, and Caroline Hymel;
- The indispensable legal advice and guidance provided by Kendra Albert, Sunoo Park, and Thomas Hopkins of the Cyberlaw Clinic at the Berkman Klein Center for Internet & Society, Harvard Law School; and
- Verified Voting and the Michael and Paula Rantz Foundation, for their generous support of this work.



# APPENDIX A: VOTING VILLAGE SPEAKER TRACK

This year's Voting Village speaker track spanned all three days of the conference and featured members of Congress, representatives from the Department of Homeland Security and the Department of Defense, private sector pioneers, academics, researchers, and hackers of all stripes. Below is an overview of each day's talks, as well as each speaker's biographical information.

## Friday, August 9, 2019

### Welcome and Voting Village Kick-off Remarks

- **Harri Hursti, *Co-Founder, DEF CON Voting Village; Founding Partner, Nordic Innovation Labs***
  Harri Hursti is among the world's leading authority in data and election voting security, critical infrastructure, and network security systems. Beginning his career as one of the minds behind the first commercial, public email and online forum system in Scandinavia, he went on to cofound EUnet-Finland. Hursti has authored many studies on election security and vulnerability in both academic and corporate publications. He worked for Black Box Voting where he performed voting machine hacking tests, which became known as the Hursti Hacks. These tests were filmed and later turned into the acclaimed HBO documentary Hacking Democracy.

- **Matt Blaze, *Co-Founder, DEF CON Voting Village; Professor of Law and McDevitt Chair for the Department of Computer Science, Georgetown University***
  Matt Blaze holds the McDevitt Chair of Computer Science and Law at Georgetown University. His research focuses on the architecture and design of secure systems based on cryptographic techniques, analysis of secure systems against practical attack models, and on the intersection of computing and communication technology and public policy. In addition to his position at Georgetown University, he sits on the board of directors of the Tor Project. Blaze received his PhD in Computer Science from Princeton University.

- **Jake Braun, *Co-Founder, DEF CON Voting Village; Executive Director, University of Chicago Harris Cyber Policy Initiative***
  Jake Braun serves as the Executive Director for the University of Chicago Harris School of Public Policy's Cyber Policy Initiative where he works at the center of politics, technology and national

security to advance the field of cyber policy. Prior to joining CPI, Braun was appointed White House Liaison to the Department of Homeland Security (DHS) by President Obama where he was instrumental in the passage of the unprecedented Passenger Name Record (PNR) Agreement, one of the largest big data agreements in history. In addition, he worked on the development and implementation of the Homeland Security Advisory Council's Task Force on CyberSkills. Braun is also a fellow at the Council on CyberSecurity and is a strategic advisor to DHS and the Pentagon on cybersecurity.

**Remarks by CISA Director Chris Krebs**

- **Christopher Krebs, *Director, Department of Homeland Security's Cybersecurity and Infrastructure Security Agency***
  Christopher Krebs serves as the first director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA). Mr. Krebs joined DHS in March 2017, first serving as Senior Counselor to the Secretary, where he advised DHS leadership on a range of cybersecurity, critical infrastructure, and national resilience issues. Prior to coming to DHS, he was a member of Microsoft's U.S. Government Affairs team as the Director for Cybersecurity Policy, where he led Microsoft's U.S. policy work on cybersecurity and technology issues.

**DARPA SSITH Program at DEF CON**

- **Linton Salmon, *Program Manager, Defense Advanced Research Projects Agency (DARPA)***
  Dr. Linton Salmon joined the Defense Advanced Research Projects Agency as a program manager in September 2014. Prior to joining DARPA, Dr. Salmon spent 15 years in executive roles directing development of CMOS technology at GlobalFoundries, Texas Instruments and Advanced Micro Devices. Before joining Advanced Micro Devices, Dr. Salmon was vice president for Research and Technology Transfer at Case Western Reserve University and an associate professor of electrical engineering and physics at Brigham Young University (BYU), where his research areas included CMOS processes, micro-battery research, packaging and MEMS.

**What Role Can Journalists Play in Securing Elections?**

- **Maggie MacAlpine *(moderator), Co-Founder, Nordic Innovation Labs***
  Margaret MacAlpine is an election auditing specialist and system testing technologist. She has worked on a variety of projects that include electronic testing of voting registration systems, election security and election fraud for a variety of countries, states and counties. Ms. MacAlpine has served as an advisor for the office of the Secretary of State of California for the Risk Limiting Audit Pilot Program 2011-2012, and is widely regarded as an expert on the use of high-speed scanners for conducting post-election audits.

- **Kevin Collier, *Reporter, CNN***
  Kevin Collier is a reporter who covers the intersection of cybersecurity and national security, including efforts to safeguard election integrity. He has previously worked for BuzzFeed News, Vocativ, and the Daily Dot.

Case 3:22-cv-00367 Document 30 Filed 06/08/22 Page 494 of 549

- **Kim Zetter, *Longtime cybersecurity/national security reporter for various publications including WIRED, Politico and The New York Times Magazine and author of the book* Countdown to Zero Day: Stuxnet and the Launch of the World's First Digital Weapon**
  Kim Zetter is a longtime cybersecurity and national security reporter for various publications including Wired, Politico and the New York Times Magazine and author of the book Countdown to Zero Day: Stuxnet and the Launch of the World's First Digital Weapon. She has broken numerous national stories over the years about NSA surveillance, digital warfare, Wikileaks and the hacker underground, and has been one of the nation's leading journalists covering voting machine and election security since 2003.

- **Eric Geller, *Cybersecurity Reporter, Politico***
  Eric Geller is a journalist on Politico's cybersecurity team. His primary beat consists of cyber policymaking at the White House, the Justice Department, the State Department, and the Commerce Department, but he also regularly covers election security, data breaches, malware outbreaks, and other cyber issues affecting the government, the private sector, and society at large.

**While the Bots Distracted You: Hacking the Electorate**

Omelas and White Ops provide the most comprehensive ever look at the day to day tactics of Russian disinformation campaigns against elections. Using Omelas' subject matter expertise and AI, we show the extent of Russian propaganda shared on Reddit in the lead up to an election, the performance of different narratives and different domains, and the sentiment expressed in articles compared to the sentiment induced in the audience in comments. White Ops's state-of- the-art bot detection demonstrates how Russia has automated the process of spreading these narratives, the added reach attributable to bots, and the techniques employed by bots.

- **Evanna Hu, *CEO and Partner, Omelas***
  Evanna Hu is CEO and Partner of Omelas and non-resident Senior Fellow at the Atlantic Council. Omelas is a cutting edge technology company that exposes imminent risks among digital data. By utilizing machine learning/ artificial intelligence and data analytics, Omelas focuses on physical threats and identifies online campaigns of adversarial state and non-state actors. Evanna is also an expert in Counter-terrorism and Countering Violent Extremism, with fieldwork in Syria, Iraq, Afghanistan, Gaza, and Sweden, working on Neo-Nazi and Islamist violent extremists.

- **Ben Dubow, *CTO and President, Omelas***
  Ben Dubow is the CTO and President of Omelas. Ben began his career tracking the online propaganda of jihadists, Shiite extremists, white supremacists, and the militia movement before joining Google where he aided YouTube in detecting ISIS content, helped to develop Project SHIELD, and provided subject matter expertise for the Redirect Method. In 2017, Ben co-founded Omelas with the mission to stop the weaponization of the internet by providing precise data and analysis on how state actors and foreign terrorist organizations manipulate the web to achieve their geopolitical goals.

**Trustworthy Elections: Evidence and Dispute Resolution**

Suitably designed and operated paper-based voting systems can be strongly software independent, contestable, and defensible, and they can make risk-limiting audits and evidence-based elections possible. (These terms will be defined.) Not all paper-based voting systems have these properties. Systems that rely on ballot-marking devices and voter verifiable paper audit trails produced by electronic voting machines generally do not, because they cannot provide appropriate evidence for dispute resolution, which has received scant attention. An ideal system allows voters, auditors, and election officials to provide public evidence of any problems they observe--and can provide convincing public evidence that the reported electoral outcomes are correct despite any problems that might have occurred, if they are correct.

- **Philip Stark, *Professor of Statistics and Associate Dean of Mathematical and Physical Sciences, University of California, Berkeley***

  Philip B. Stark is Professor of Statistics and Associate Dean of Mathematical and Physical Sciences at the University of California, Berkeley. He works on inference and uncertainty quantification in many applications including the census, elections, information retrieval, and Internet filters. He also studies foundational questions in the philosophy of science and statistics. He developed "risk limiting audits" as a method to check election results, which are now in law in six states and required by pending federal legislation. Stark currently serves on the Board of Advisors of the U.S. Election Assistance Commission. He has testified as an expert witness in a range of civil and criminal cases on issues including antitrust, elections, employment, equal protection, food safety, intellectual property, product liability, and vaccines.

**Keynote Remarks: Senator Ron Wyden (D-OR)**

- **Senator Ron Wyden**

  Senator Ron Wyden is the foremost defender of Americans' civil liberties in the U.S. Senate, and a tireless advocate for smart tech policies. Years before Edward Snowden blew the whistle on the dragnet surveillance of Americans, Wyden warned that the Patriot Act was being used in ways that would leave Americans shocked and angry, and his questioning of NSA Director James Clapper in 2013 served as a turning point in the secret surveillance of Americans' communications.

  Since then, Wyden has fought to protect Americans' privacy and security against unwanted intrusion from the government, criminals and foreign hackers alike. He has opposed the government's efforts to undermine strong encryption, proposed legislation to hold companies accountable for protecting their users' data, and authored legislation with Rand Paul to protect Americans' Fourth Amendment rights at the border.

  Wyden is a senior member of the Senate Select Committee on Intelligence and the top Democrat on the Senate Finance Committee. He lives in Portland, Oregon.

**If the Voting Machines are Insecure, Let's Just Vote on Our Phones!**

Despite the consensus that Russian actors targeted multiple points of U.S. election infrastructure, there are persistent calls for voting over internet-connected devices. This is not new: 31 states and

the District of Columbia allow military and overseas voters to send voted materials to their home counties via the internet, including by fax and email. Now, several jurisdictions are piloting another internet system that allows voters to send their votes via a mobile application which stores those votes in a blockchain. Such programs undermine the efforts made since 2016 to secure the election administration offices from attacks. Our military and overseas voters need to successfully cast their ballots on time – but we owe it to them to find ways that do not increase the security risk.
This talk will take a look at the current landscape of election security leading into 2020, examining the implications that technologies like blockchain could have on our elections and what the role of responsible technology looks like on our voting infrastructure.

- **Marian Schneider, *President, Verified Voting***

  Marian Schneider is the president of Verified Voting, a role to which she brings a strong grounding in the legal and constitutional elements governing voting rights and elections, as well as experience in election administration at the state level. Immediately before becoming President of Verified Voting, Marian served as Special Advisor to Pennsylvania Governor Tom Wolf on Election Policy. Previously, Governor Wolf appointed her as the Deputy Secretary for Elections and Administration in the Pennsylvania Department of State where she served from February 2015 until May 2017.

  Throughout her legal career, Marian has focused on the intersection of civil rights and election law. Formerly, she was a Senior Attorney with Advancement Project's Voter Protection program and was trial counsel in Applewhite v. Commonwealth, successfully challenging Pennsylvania's restrictive photo ID law on behalf of voters as an unconstitutional infringement on the fundamental right to vote.

  Marian received her J.D. from The George Washington University, where she was a member of the Law Review, and earned her B.A. degree cum laude from the University of Pennsylvania.

**State and Local Preparations on Election Security in the Aftermath of the Mueller Report**

- **Eric Geller *(moderator), Cybersecurity Reporter, Politico***

  Eric Geller is a journalist on Politico's cybersecurity team. His primary beat consists of cyber policymaking at the White House, the Justice Department, the State Department, and the Commerce Department, but he also regularly covers election security, data breaches, malware outbreaks, and other cyber issues affecting the government, the private sector, and society at large.

- **Alex Padilla, *Secretary of State of California***

  Alex Padilla was sworn in as California's Secretary of State on January 5, 2015. He is committed to modernizing the office, increasing voter registration and participation, and strengthening voting rights.

  Padilla previously served in the California State Senate from 2006 to 2014 where he chaired the Committee on Energy, Utilities, and Communications. As chair, he shepherded legislation to combat climate change and create a greener and more sustainable economy. In 1999, at the age of 26, Padilla was elected to the Los Angeles City Council to represent the same east San

Fernando Valley community where he grew up. In 2001, his colleagues elected him to the first of three terms as Council President, becoming the youngest member and the first Latino to serve in this capacity.

- **Noah Praetz, *Election Consultant; former Director of Elections, Cook County, Illinois***

  Noah is an election consultant and the former Director of Elections for Cook County, Illinois. In this capacity he was responsible for the overall management of elections in one of the largest election jurisdictions in the country.

  Noah is an adjunct professor at DePaul University College of Law teaching Election Law and sits on the advisory board of the University of Chicago Harris Cyber Policy Initiative. Noah has presented extensively on Election Security, Sustainability, Election Day Management, Voter Registration Modernization and other Election Related items. He has also published articles on cyber security, election day administration and referendum law in Illinois.

- **Barb Byrum, Ingham County Clerk, Ingham County, Michigan**

  Barb Byrum is currently in her second term as Ingham County Clerk, serving as the county's chief elections official. As Clerk of one of the most populous counties in the State of Michigan, Byrum has successfully conducted 21 elections, 4 union elections, and the 2016 Presidential Recount. Byrum currently serves on Michigan's Election Security Commission, the Secretary of State's team of advisors tasked with strengthening and better securing elections in the state.

  Byrum has been a consistent advocate for the voting rights of qualified registered voters, with a focus on voting rights of military and overseas voters. Byrum serves on the Overseas Voting Initiative, which is a joint effort by the Federal Voting Assistance Program and Council of State Governments.

  Byrum graduated from Michigan State University with a Bachelor of Science degree in agribusiness management. She also holds a law degree from the MSU College of Law. Byrum previously served three terms as a Michigan State Representative. During her time in the Legislature, Byrum served as the ranking Democrat on the House Committee on Redistricting and Elections.

- **Amber McReynolds, Executive Director, National Vote at Home Institute**

  Amber McReynolds is the Executive Director for the National Vote At Home Institute and is the former Director of Elections for the City and County of Denver, Colorado. As one of the country's leading experts on election administration and policy, she has proven that designing pro-voter policies, voter-centric processes, and implementing technical innovations will improve the voting process for all voters. During her time in Denver, the Elections office was transformed into a national and international award-winning election office. Amber was also recognized as a 2018 Top Public Official of the Year by Governing Magazine for her transformational work to improve the voting experience in Denver and across Colorado. She is now focused on improving the voting experience across the country.

**2020: Ready? Or Not?**

- **Sherri Ramsay, *Senior Advisor, CyberPoint International; Senior Advisor: Cyber & NSA, Cambridge Global Advisors; former Director of the National Security Agency/Central Security Service Threat Operations Center (NTOC)***

  Sherri Ramsay is a consultant, engaged in cybersecurity strategy development and planning, cyber assessments, leadership, partnership development, and marketing & development of cybersecurity tools and security operations centers.

  Ms. Ramsay is the former Director of the National Security Agency's (NSA) Threat Operations Center. She led discovery and characterization of threats to national security systems, provided situational awareness for those threats, and coordinated actionable information to counter those threats with the Department of Defense, Department of Homeland Security, and Federal Bureau of Investigation. She also served as a senior leader in NSA's Signals Intelligence Directorate, Technology Directorate, and Information Assurance Directorate.

  Ms. Ramsay holds a Bachelor of Science degree from the University of Georgia, a Master of Science Degree from Johns Hopkins University, and Master's Degree from the Industrial College of the Armed Forces, National Defense University. She is on the Board of Advisors for Virginia Tech's Hume Research Center, the University of Chicago Cyber Policy Initiative, and TruSTAR Technology.

**Beyond the Voting Machine: Other High Value Targets in Today's Election System**

Since the U.S. Presidential election in 2016, there has been a heightened interest in election hacking. While electronic voting machines have been the primary focus, there are other high value targets could topple our election system if they were manipulated or compromised.

Brian will share his years of research into election systems to give you an insider's view of these high value targets and how and why they could be used by an adversary. In addition to a technical analysis of the components of an electronic voting machine, he will discuss the potential weaknesses of other key pieces of today's election system that many have overlooked.

- **Brian Varner, *Special Projects Researcher, Symantec Cyber Security Services***

  Since 2010 Brian Varner has been a special projects researcher on Symantec's Cyber Security Services team, leading the company's CyberWar Games and emerging technologies development. He previously worked at the National Security Agency as a tactical analyst.

  Brian holds a bachelor's degree in Computer Science from Florida Southern and master's degree in Information Assurance from Norwich University. Since early 2016, Brian has researched electronic voting machines and campaign security issues and is often called on by peers and media for his unique perspective on the potential threats facing today's election systems.

**Putting Voters First: Expanding Options to Vote**

- **Amber McReynolds, *Executive Director, National Vote at Home Institute***

  Amber McReynolds is the Executive Director for the National Vote At Home Institute and is the former Director of Elections for the City and County of Denver, Colorado. As one of the country's

leading experts on election administration and policy, she has proven that designing pro-voter policies, voter-centric processes, and implementing technical innovations will improve the voting process for all voters. During her time in Denver, the Elections office was transformed into a national and international award-winning election office. Amber was also recognized as a 2018 Top Public Official of the Year by Governing Magazine for her transformational work to improve the voting experience in Denver and across Colorado. She is now focused on improving the voting experience across the country.

**Thirty Years Behind the Ballot Box: A firsthand look at the multiple factors preventing fair, effective and secure elections in America**

- **Ion Sancho, *former Supervisor of Elections, Leon County, Florida***

  Ion Sancho served 28 years as Supervisor of Elections of Leon County, Florida. Elected in November of 1988, Sancho was sensitized to problems in elections when 5,000 voters were disenfranchised in a 1986 state and local primary election due to the misprogramming of the voting machines. Sancho was candidate in that election, and since then has dedicated his professional career to properly administering elections in Leon County, working for fair, accessible and verifiable elections nationwide.

  Concerned by voting machine security, Supervisor Sancho sanctioned a number of red team attacks on his voting system in the spring and summer of 2005, captured in HBO's 2007 Emmy-nominated documentary "Hacking Democracy", showing how the system could be hacked to alter the outcome of any election without being detected unless the paper ballots themselves were audited.

  Ion Sancho retired after the 2016 presidential election. He has remained active in the elections field, appearing as an expert witness in election cases and working with public and private entities heightening awareness to the threat of foreign intrusion to the American voting process, particularly the critical need for audits.

**UnclearBallot: Automated Ballot Image Manipulation**

As paper ballots and post-election audits gain increased adoption in the United States, election technology vendors are offering products that allow jurisdictions to review ballot images---digital scans produced by optical-scan voting machines---in their post-election audit procedures. Jurisdictions including the state of Maryland rely on such image audits as an alternative to inspecting the physical paper ballots.We show that image audits can be reliably defeated by an attacker who can run malicious code on the voting machines or election management system. Using computer vision techniques, we develop an algorithm that automatically and seamlessly manipulates ballot images, moving voters' marks so that they appear to be votes for the attacker's preferred candidate. Our implementation is compatible with many widely used ballot styles, and we show that it is effective using a large corpus of ballot images from a real election. We also show that the attack can be delivered in the form of a malicious Windows scanner driver, which we test with a scanner that has been certified for use in vote tabulation by the U.S. Election Assistance Commission. These results demonstrate that post-election audits must inspect physical ballots, not merely ballot images, if they are to strongly defend against computer-based attacks on widely used voting systems.

Case 2:22-cv-00677-JJT Document 39-1 Filed 06/08/22 Page 500 of 549

- **Kart Kandula, *Graduate Student, University of Michigan***

  Kart Kandula received his B.S.E. degree in computer science engineering from the University of Michigan in 2019 and is currently pursuing an M.S.E in the same area. He conducts research in the UM-Security lab under the supervision of Professor J. Alex Halderman. Currently, his research interest lies in problems affecting society and public policy, specifically election security. He has held internships at Microsoft and J.P. Morgan in the past.

- **Jeremy Wink, *Undergraduate Student, University of Michigan***

  Jeremy Wink is an undergraduate student at the University of Michigan currently pursuing a BSE in Computer Science. He has taken multiple security courses and has spent time researching topics surrounding election cybersecurity under J. Alex Halderman.

## Saturday, August 10, 2019

### Organizational Cybernetics: A Key to Resilience for the Digital Village

- **Kimberly Young-McLear, *Assistant Professor, U.S. Coast Guard Academy***

  Lieutenant Commander Kimberly Young-McLear is currently an Assistant Professor at the U.S. Coast Guard Academy. She holds engineering and technical degrees from Florida A & M, Purdue, and The George Washington University, including a Ph.D in Systems Engineering. She has taught a breadth of courses including Operations and Project Management, Crisis Mapping & Cybernetics, and Cybersecurity Risk Management. She has been instrumental in enhancing the inclusion of cybersecurity training and education program at the Academy for cadets and faculty. Lieutenant Commander Young-McLear was a key thought leader for the development of the Coast Guard Academy's first cyber undergraduate major. Furthermore as Vice Chair, she leads a multidisciplinary faculty Cyber Council to advance cyber curriculum and research at the Academy. Her research niche is focused on protecting critical infrastructure from cyber threats in the Maritime Domain. LCDR Young-McLear is also the program developer for NET21, a middle school outreach program, designed to systematically close STEM gaps amongst underrepresented students and teachers of color in the field of cybersecurity.

### Ideas Whose Time Has Come: CVD, SBOM, and SOTA

From their origins in general purpose computing, Coordinated Vulnerability Disclosure (CVD), Software Bill of Materials (SBoM), and Secure Over-The-Air (SOTA) updates have been implemented or considered in safety sectors including industrial control systems, medical device manufacturing, and ground transportation. These common software security practices are becoming widespread global norms, turning up in public policy, international standards, and national law (often in sector-specific safety regulation). This talk will briefly review the practices (what), provide examples of successful implementations and supporting information (how), and (why).

- **Katie Trimble, *Section Chief, Vulnerability Management and Coordination, U.S. Cybersecurity and Infrastructure Security Agency, Department of Homeland Security***

  Katie Trimble currently serves as the Section Chief of the Vulnerability Management and

Coordination section of the Cyber Threat & Risk Analysis (CTRA) branch of the Department of Homeland Security's National Cybersecurity and Communications Integration Center (NCCIC). In that capacity, she leads the Department's primary operations arm for coordination of the responsible disclosure and mitigation of identified cyber vulnerabilities in control systems and enterprise hardware and software used in the 16 critical infrastructure sectors and all levels of U.S. government organizations. Ms. Trimble started her career as an intelligence analyst with the United States Air Force, specializing in counterinsurgency, antiterrorism & force protection, counter explosive devices and communications systems. Ms. Trimble holds a Bachelors of Arts in International Relations & Global Studies from Antioch University Seattle.

- **Art Manion, *Vulnerability Analysis Technical Manager, CERT Coordination Center, Software Engineering Institute, Carnegie Mellon University***

  Art Manion is the Vulnerability Analysis Technical Manager at the CERT Coordination Center, part of the Software Engineering Institute at Carnegie Mellon University. He has studied software security and coordinated responsible disclosure efforts since joining CERT in 2001. Having gaining mild notoriety for saying "Don't use Internet Explorer" and "Replace CPU hardware" in public, Manion now focuses on policy, advocacy, and rational tinkering approaches to software security, including standards development in ISO, OASIS, and FIRST. Prior to joining CERT, Manion was the Director of Network Infrastructure at Juniata College.

**Incident Lifecycle and Incident Response Management Planning**

In the past few years, the volume, types, and quality of cybersecurity - related attacks in elections have become more damaging and disruptive, and new types of security-related incidents have emerged. This white paper describes the best-known method for analyzing the stages of cybersecurity incidents and identifies actions that can be taken to avoid or minimize impacts at each incident lifecycle stage. We discuss the overarching workflow for elections security incident response and management and describe the Point and Line analysis approach, which considers factors such as attack vectors, motives, probability, and imp act to develop a set of Incident Response Templates in this paper. In addition, we include reusable templates for analyzing cybersecurity Incident Lifecycle and Incident Response Management, which can be customized for specific needs of any election jurisdiction in this paper.

- **Rahul K. Patel, *Elections Information Security Officer, Office of the Cook County Clerk and Chicago Board of Elections Commissioners***

  Rahul Patel is a seasoned Cyber & Information Security professional with over 25 years of experience defending the availability, confidentiality, and integrity of information assets. He is presently leading elections information security and risk management efforts at the office of the Cook County Clerk and Chicago Board of Elections Commissioners as an Elections Information Security Officer. Patel holds a PhD from Northcentral University, an M.B.A. from DePaul University, and an M.S. from Illinois Institute of Technology

- **Tonya Rice, *Director of Elections, Cook County, Illinois***

  Tonya Rice was appointed Director of Elections by Cook County Clerk Karen A. Yarbrough in 2019,

in which capacity she supports operations for one of the largest election jurisdictions in the country. Rice began her career in elections in 2005 as a political science graduate student at the University of Michigan, where she was a National Science Foundation Graduate Research Fellow, specializing in public opinion on voting technology and post-election audits, as well as the political participation of language minority citizens. Rice holds a J.D. from Northwestern University School of Law and B.A. from Northwestern University.

**Assessing Election Infrastructure**

- **Jason Hill, *Chief, National Cybersecurity Assessments and Technical Services (NCATS)***
  Jason Hill is the Chief of the National Cybersecurity Assessment and Technical Services (NCATS) Branch of the Cybersecurity and Infrastructure Security Agency (CISA). In this capacity Jason has primary responsibility to deliver quality security testing and analysis to customers that include the Federal government, State, Local, Tribal and Territorial governments, as well as Private Sector/Critical Infrastructure stakeholders. Mr. Hill has worked with several tech companies creating and teaching red team course work and conducting penetration testing in the commercial industry and DOD. Jason also spent 22 years as a US Army National Guardsmen for the Commonwealth of Virginia. As Master Sergeant of the 91st Cyber Brigade he led the Cyber Opposition Forces which provides red team & pen testing capabilities. He has achieved certifications for the Offensive Security Certified Professional and the Certified Ethical Hacker trainings.

- **Genevieve Marquardt, *IT Specialist, National Cybersecurity Assessments and Technical Services (NCATS)***
  Genevieve Marquardt serves as a member of the National Cybersecurity Assessments and Technical Services (NCATS) Cyber Hygiene team which is responsible for continuously assessing the "health" of external stakeholders' endpoints reachable via the internet and maintaining an updated enterprise view of the cyber security posture of their systems to drive proactive mitigation of vulnerabilities and reduce risk. Genevieve provides technical support pertaining to public IP scans and testing of .gov public facing networks for stakeholders.

- **Derrick Thornton, *Federal Lead, National Cybersecurity Assessments and Technical Services (NCATS)***
  Derrick Thornton joined the National Cybersecurity Assessments and Technical Services (NCATS) team in June 2017 as an Information Security Specialist. Derrick serves as a Federal Lead leading NCATS RVA teams conducting two week penetration tests. An 11-year veteran of the U.S. Air Force, Derrick was stationed at Robins Air Force Base, Georgia and at White Sands Missile Range, New Mexico while also serving 2 tours in the Middle East. The 4 years of military service at White Sands Missile Range was an assignment to the National Reconnaissance Office, which led to a 21-year career within the NRO. Derrick has a Bachelor of Science in Technical Management from DeVry University.

Case 3:22-cv-00767-DJH Document 1-4 Filed 09/08/22 Page 503 of 549

**Securing America: How DHS, States, and Cybersecurity Startups are Working Together Before the 2020 Presidential Election**

In 2016, 50 states' election systems were targeted by Russian nation-state hackers. Russian actors visited election websites, tested vulnerabilities by trying to exploit SQL database vulnerabilities, and even managed to access voter registration files and a county ballot. DHS deemed US election infrastructure "critical" and now CISA, DHS' critical infrastructure office, is actively providing scanning technology and technical assistance to states. States, which have direct authority over the issue, are doing a great job with their own efforts including working with the National Guard, looking public-private partnerships to provide DDoS mitigation and in some cases trying bug bounties and working with ethical hackers to keep elections secure. However, there is still much to be done to secure our democratic/election systems before 2020 - we need YOU. Election security will require a united effort with the scale and vigilance of a crowd of top talent. How are states innovating before the 2020 Presidential Election? How can hackers help?

- **Joseph Marks *(moderator), Reporter, The Washington Post***
  Joe Marks is a reporter for The Washington Post, where he writes The Cybersecurity 202 newsletter focused on the policy and politics of cybersecurity. Before joining The Washington Post, Marks covered cybersecurity for Politico and Nextgov. He also covered patent and copyright trends for Bloomberg BNA and federal litigation for Law360. Marks began his career at Midwestern newspapers covering city and county governments, crime, fires and features. He spent two years at the Grand Forks Herald in North Dakota and is originally from Iowa City.

- **Rita Gass, *CIO, California Secretary of State's Office***
  Rita established her career and progressed throughout the roles to become a chief information officer in 2008 with CCC. Remaining in this role for eight years, she eventually moved to the same role with California Secretary of State (SOS), where she continues to work now.

- **Wayne Thorley, *Deputy Secretary for Elections, Nevada Secretary of State's Office***
  Wayne Thorley is the Deputy Secretary of State for Elections for the Nevada Secretary of State's office and is responsible for administering the Nevada's election process including enforcing state and federal election laws and procedures and the Help America Vote Act.

- **Trevor Timmons, *CIO, Colorado Secretary of State's Office***
  Trevor Timmons has served the Colorado Secretary of State as Chief Information Officer since 2007, after eight years as Deputy CIO and Director of Software Development. Mr. Timmons has served under several Secretaries of State, during which time Colorado has gained a national reputation in several areas, including elections administration and cybersecurity operations.

- **Alex Joves, *Regional Director, Region V, Cybersecurity and Infrastructure Security Agency***
  Alex Joves is the Regional Director for Region V of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency. He has served in various roles for DHS since 2007, including Regional Supervisor of Chemical Facility Anti-Terrorism Standards and Director of the National Infrastructure Coordinating Center. Prior to joining DHS, Mr. Joves was an

Associate Attorney at Perkins Coie LLP. He has a JD from The George Washington University Law School and a Bachelor of Science in Government from the U.S. Coast Guard Academy.

- **Josh Benaloh, *Senior Cryptographer, Microsoft Research***

  Josh Benaloh is a Senior Cryptographer at Microsoft Research and has worked on verifiable election technologies for more than thirty years. His 1987 doctoral dissertation at Yale University, entitled “Verifiable Secret-Ballot Elections”, introduced the use of homomorphic encryption as a means to enable public verifiability in elections.

  Dr. Benaloh served seventeen years on the Board of Directors of the International Association for Cryptologic Research and currently serves on the Coordinating Committee of the Election Verification Network. He has published and spoken extensively and testified before Congress on election technologies and was an author of the 2018 National Academies of Science, Engineering, and Medicine report “Securing the Vote – Protecting American Democracy”.

- **Alissa Starzak, *Head of Policy, Cloudflare***

  Alissa Starzak is the Head of Public Policy at Cloudflare, an Internet performance and security company that is on a mission to help build a better Internet.

- **Jay Kaplan, *Co-Founder and CEO, Synack***

  Jay co-founded Synack after serving in several security-related capacities at the Department of Defense, including the DoD’s Incident Response and Red Team.

**Bootstrapping Vulnerability Disclosure for Election Systems**

Seven months. It look seven months to make contact with a major city after discovering a critical vulnerability in their election registration website, which could have exposed (or worse, modified) information of millions of voters. As seen in the Mueller report, election systems are under active attack by foreign adversaries. Yet while vulnerability disclosure policies are becoming the norm in most industries, exactly zero states or election vendors have established vulnerability disclosure policies to allow reporting vulnerabilities in election systems. In a time where accepting feedback from the public is the best defense against these attacks, the lack of vulnerability disclosure policies hinders improvements in securing systems. In a talk by security researcher Jack Cable and Katie Trimble from the Department of Homeland Security’s Cybersecurity and Infrastructure Security Agency, learn industry best practices for vulnerability disclosure and how election systems can benefit from additional public scrutiny. Hear Jack’s experiences disclosing critical vulnerabilities in several major election registration systems, and how this can be channeled to protect our nation ahead of the 2020 elections.

- **Jack Cable, *Security Researcher and Student, Stanford University***

  Jack Cable is a coder turned white hat hacker and a rising sophomore at Stanford University. Jack is a top ranked hacker on the HackerOne bug bounty platform, having identified over 350 vulnerabilities in companies including Google, Facebook, Uber, Yahoo, and the U.S. Department of Defense. After placing first in the Hack the Air Force challenge, Jack began working this past summer at the Pentagon’s Defense Digital Service. At Stanford, Jack studies computer science and launched Stanford’s bug bounty program, one of the first in higher education.

- **Katie Trimble, *Section Chief, Vulnerability Management and Coordination, U.S. Cybersecurity and Infrastructure Security Agency, Department of Homeland Security***
  Katie Trimble currently serves as the Section Chief of the Vulnerability Management and Coordination section of the Cyber Threat & Risk Analysis (CTRA) branch of the Department of Homeland Security's National Cybersecurity and Communications Integration Center (NCCIC). In that capacity, she leads the Department's primary operations arm for coordination of the responsible disclosure and mitigation of identified cyber vulnerabilities in control systems and enterprise hardware and software used in the 16 critical infrastructure sectors and all levels of U.S. government organizations. Ms. Trimble started her career as an intelligence analyst with the United States Air Force, specializing in counterinsurgency, antiterrorism & force protection, counter explosive devices and communications systems. Ms. Trimble holds a Bachelors of Arts in International Relations & Global Studies from Antioch University Seattle.

- **Trevor Timmons, *CIO, Colorado Secretary of State's Office***
  Trevor Timmons has served the Colorado Secretary of State as Chief Information Officer since 2007, after eight years as Deputy CIO and Director of Software Development. Mr. Timmons has served under several Secretaries of State, during which time Colorado has gained a national reputation in several areas, including elections administration and cybersecurity operations.

**"The Election System: Can We Fix It?" "YES WE CAN!"**

As the previous DEF CON Voting Villages have proved, our voting equipment and infrastructure are very vulnerable to multiple types of attacks. Instead of focusing on problems and broken things, this talk will focus on simple fixes that vendors and governments can put into action right now.

Starting with the machines themselves, then moving through parts of the entire system, BiaSciLab will offer suggestions on how simple practices and changes in thinking and hiring can improve the security of the entire system.

Last year at r00tz BiaSciLab was one of the first to hack the mock election reporting system set up by the Voting Village. Some have pointed out that this was a purposely flawed system designed for the the kids to break. However, as outlined in the Mueller report, Russian hackers used the same SQL injection technique to break into an election reporting system. If our systems are so secure, how was this able to happen? Lack of secure coding practices and both peer and outside review. If proper coding review and application testing had happened, this SQL injection vulnerability would have been found and fixed.

Breaking down these flaws and offering real solutions for each one, BiaSciLab will bring hope in the face of this daunting and complex security problem.

- **BiaSciLab, *Founder and CEO, Girls Who Hack***
  BiaSciLab is a 12 year old hacker and maker. She was the youngest speaker at the Hackers on Planet Earth conference and has spoken at DEF CON previously in both the Bio Hacking Village and the r00tz Asylum kids con. She received national attention when she hacked the voting reporting system at DEF CON 26. BiaSciLab is alsothe Founder and CEO of Girls Who Hack, an organization focused on teaching girls the skills of hacking so that they can change the future.

### Securing Voting Systems (Beyond Paper Ballots!)

While much "headline hacking" is devoted to exposing vulnerabilities on voting machines themselves, there is more to election systems security than simply popping shells on old, unsupported kiosks. In this session, attendees will learn what real world IT personnel in the 3071 counties and parishes across the U.S. face on and around Election Day, beyond the voting machine.

- **Tod Beardsley, *Director of Research, Rapid7***

  Tod Beardsley is the Director of Research at Rapid7. He has over 30 years of hands-on security experience, stretching from in-band telephony switching to modern Internet of Things implementations. He has held IT Operations and Security positions in large organizations such as 3Com, Dell, and Westinghouse, as both an offensive and defensive practitioner.

### Machine Voting: The Bulgarian Experience

First machine voting experiments in Bulgaria started in 2009. Since then machine voting found its place in legislation with the usage of offline DRE kiosks with VVPAT. Latest developments in information security and the rising threads require flexible technical approach with still lagging legislation. The talk will pass through our machine voting experience, problems and solutions we came up with. We'll share detailed security requirements for voting machines and their implementation in practice. Special emphasis will be put on latest European parliament elections, held in May 2019 and upcoming municipal elections in October 2019.

- **Alex Stanev, *CTO, Information Services JSC***

  Alex started as a software developer in late 90s working on a wide range of projects – from specialized hardware drivers to large scale information systems for private and public sectors, including e-government services, elections management and smart cities.

  Since 2003 Alex has been leading computer processing of all election results and referendum projects in Bulgaria. As a consultant for the Central Election Commission of Bulgaria Alex is the primary author of technical and security requirements for election machines used in Bulgaria. As a security consultant, Alex has lead penetration test audits in Europe, America and Africa for financial and government institutions.

  Currently Alex serves as CTO in the largest Bulgarian systems integrator - Information Services JSC.

### Addressing the election security threats posed by Very Small Jurisdictions

While most election administrators in the US are working in jurisdictions with populations in the tens or hundreds of thousands, there are states with jurisdictions as small as a dozen or so voters. In these Very Small Jurisdictions, the local interface with the state election system can be as crude as a Windows XP computer directly connected to an ISP and used by an Election Administrator with little computer experience or understanding of anti-social engineering practices. These are administrators with direct user access to statewide election systems containing voter roles and responsible for posting official election results. And while there are creative approaches to improving election worker training to offset social engineering threats underway in several states, they are virtually all designed for the more typical "macro" jurisdiction level (country-level

jurisdictions) and are not scaleable to these "micro" levels, leaving secretaries of state to run generalized safety trainings with little follow-up and few options for addressing these vulnerabilities. The talk will briefly explore the threat and why creating public logical network structures are best suited not just to mitigate the problem, but to potentially make these jurisdictions even more secure than their larger counterparts.

- **John Odum, *CMC, CEH, CNDA, MCP, CIW; City Clerk, Montpelier, Vermont***
  John Odum has been the elected City Clerk of Vermont's Capital, Montpelier, for 7 years. In this capacity he also serves as the the Election Administrator for Montpelier. Prior to being elected clerk, John worked in communications and IT for non-profits and political campaigns. His work has been published on websites of The Guardian, Governing, Huffington Post, as well as numerous Vermont area publications.

**The Devil Went Down to Georgia. Did He Steal Souls? (Georgia's Electronic Voting Saga)**

- **Marilyn Marks, *Executive Director, Coalition for Good Governance***
  In 2009, after a narrow loss to become the Mayor of Aspen, Marilyn Marks recognized the vulnerabilities in Colorado's election systems and chose to devote herself full time to election integrity litigation and lobbying efforts for more transparent and verifiable elections. She successfully litigated the effort to make Colorado ballots open public records for postelection reviews, followed by more than 25 election-related cases involving election transparency or voter privacy. She is currently the driving force behind the legal challenge to Georgia's unverifiable electronic voting system.

- **Rich DeMillo, *Professor of Computer Science and Executive Director, Center for 21st Century Universities, Georgia Tech***
  Richard DeMillo is the Charlotte B. and Roger C. Warren Chair of Computer Science and Professor of Management at Georgia Tech, where he founded and now directs the Center for 21st Century Universities. The Center is Georgia Tech's living laboratory for fundamental change in higher education. He is responsible for educational innovation at Georgia Tech and is a national leader and spokesman in the online revolution in higher education. Under his leadership, Georgia Tech has developed a pipeline of 50 Massive Open Online Courses that together enroll a million learners.

- **Logan Lamb, *Cybersecurity researcher***
  Logan Lamb is a Senior Security Engineer at Bird. Previously he has served as a Cyber Security Researcher at Bastille Networks and Oak Ridge National Laboratory. He has Master of Science and Bachelor of Science degrees in Computer Engineering, both from the University of Tennessee, Knoxville.

- **Jordan Wilkie, *Freelance journalist covering election integrity***
  Jordan Wilkie is pursuing a career as an investigative journalist covering criminal and social justice by combining data-driven reporting with long-form, narrative storytelling. My expertise to-date is in incarcerated juvenile and LGBTQ populations.

Case 3:22-cv-00307-DJH Document 39-1 Filed 06/08/22 Page 508 of 549

- **Robert McGuire, *Attorney for Coalition plaintiffs***

  Robert McGuire is the attorney for the National Election Defense Coalition plaintiffs in their current legal challenge to Georgia's unverifiable electronic voting system. His previous experience includes serving as a Senior Associate at Allen & Overy LLP, as a lecturer at the University of Denver's Sturm College of Law, and as a law clerk for the U.S. Court of Appeals for the Eighth Circuit. He earned his JD from Yale Law School.

- **Susan Greenhalgh *(moderator), Vice President of Policy and Programs, National Election Defense Coalition***

  Susan Greenhalgh is Vice President for Programs at National Election Defense Coalition. Susan performs extensive research, assembling and reviewing documents that may influence and impact state and federal policy regarding election verifiability and security. She also works with cyber security experts and advisors on the federal level to bridge the gap between national cyber security policy and election administration. Susan has a bachelor's degree from the University of Vermont in chemistry.

## Sunday, August 11, 2019

### Exploring Voter Roll Manipulation and Fraud Detection with Voter Files

Qualified Voter Files are published by states and contain information on registered voters. These files are used by political campaigns and analysts to gather data on registered voters. The public nature of these files also makes it easier for the public to detect voter fraud and can be used by third parties to help detect large scale voter registration attacks. The data contained in these files, however, could be used by attackers to impersonate voters and update or delete a voter's registration information and subsequently prevent the targeted voters from exercising their right to vote. Use of Qualified Voter Files could also inform attackers on what scale voters' information could be changed without raising suspicion.

- **Nakul Bajaj, *High School Researcher, University of Michigan***

  Nakul Bajaj is a rising high school senior at The Harker School. He is interested in computer science and public policy, and frequently participates in hackathons and debate competitions to learning more about each of these fields. Previously, he has done analysis on election datasets, finding patterns between race and income and voter turnout. In addition, he has worked on projects dealing with a combination of law and computer science, having built an expert system that helps inventors file their own patents. This summer, he is helping conduct research in Professor J. Alex Halderman's lab at the University of Michigan regarding electronic voting machines and other election security topics with help from PhD candidate Matthew Bernhard.

### Defending Democracy: Working with Election Officials to Improve Election Security

Four years after documented foreign interference in the 2016 presidential election put election security in the headlines, cybersecurity experts and election officials still face challenges in working together. The need for collaboration is clear - especially in smaller and less well-resourced jurisdictions - so how can we bridge the gap? Hear from current and former election officials and election security advocates about how successful partnerships have moved the needle, and what to do if you want to engage your local election office.

- **Liz Howard, Counsel, *Democracy Program, Brennan Center for Justice***
  Liz Howard currently serves as Counsel for the Brennan Center's Democracy Program, with a focus on cybersecurity and elections. Prior to joining the Brennan Center, Ms. Howard was Deputy Commissioner for the Virginia Department of Elections. During her tenure overseeing election modernization projects in Virginia, she coordinated the state's decertification of all paperless voting systems, implementation of the e-Motor Voter program, and adoption of online, paperless absentee ballot applications. Ms. Howard earned her J.D. from the William & Mary School of Law in 2009.

- **Justin Burns, *Chief Information Security Officer, Washington Secretary of State***
  Justin Burns joined the elections security community in January, as CISO for the Washington Secretary of State. Prior to this, he served as a Solutions Architect and Technical Assistant to the Washington State CIO.

- **Trevor Timmons, *Chief Information Officer, Colorado Secretary of State***
  Trevor Timmons became Chief Information Officer for the Colorado Secretary of State in 2007, after eight years as Deputy CIO and Director of Software Development. During this time, Mr. Timmons served under several Secretaries of State and Colorado gained a national reputation in several areas, including elections administration and cybersecurity operations.

- **Jared Dearing, *Executive Director, Kentucky State Board of Elections***
  Jared Dearing is the Executive Director of the Kentucky State Board of Elections and has worked in the elections space for over ten years. Jared has public and private sector experience working both at the local and state level, including working for the City of Louisville as well as the Office of California Governor Jerry Brown. His private sector work includes several tech startups located in the Bay Area and Boston. He is a graduate of the University of California, Berkeley where he studied public policy and engineering.

- **Monica Childers *(moderator), Product Manager for Risk-Limiting Audits, VotingWorks***
  Monica Childers is a civic technologist with a background in digital product design and project management. As Product Manager at the VotingWorks she champions collaborative design, partnering with state and local election officials to build low cost, flexible tools for election administration. Over the past decade she has designed online voter engagement platforms, vote-by-mail ballot tracking systems, text & email election reminders, and a national trouble-ticket system for reporting problems with election mail. Having served as the project manager for Colorado's post-election audit software for the past year, she is currently working with election officials implementing risk-limiting audits (RLAs) and is helping shepherd the development of nationwide RLA software.

**Securing Your Election Infrastructure: Plan and Prepare to Defend Your Election Systems, People, and Processes**

Robert Anderson will provide some background of Election Security and the threat research that is on-going for Election Security.  An overview for election teams to plan and prepare to defend their

Election Systems, People, and Processes. Provide guidance to update your Security Policies and Incident Response Plan. Help election teams understand their Attack Surface and where your election systems are most vulnerable. Review the primary Threat Actors poised to attack your election systems. Then review several approaches that could be deployed to protect Election Security Assets, and direct to some organizations that could support election teams.

- **Robert Anderson, *Chief Cyber Security Practitioner and President, Preying Mantis***
  Robert Anderson is a highly trained IT & Cyber Security professional with over 25 years of experience in a variety of cybersecurity domains. As a former Intelligence Officer working in the Middle East, he brings a unique perspective to security operations and incident response. Robert has deployed and led over 500 security programs and projects to Fortune 500 companies, federal, state, and local governments, and NATO. Robert has over 15 years hacking experience and is a Certified Ethical Hacker. He is an expert in Cyber Threat Intelligence and Information Warfare and has led Incident Response Teams during many high-profile breaches.

**Keynote Remarks: Representative Eric Swalwell (CA-15)**

- **Representative Eric Swalwell (CA-15)**
  In 2012 Eric Swalwell was elected to represent California's Fifteenth Congressional District, which includes a large part of the East Bay. Now in his fourth term, he's working hard to bring new energy, ideas, and a problem-solving spirit to Congress, with a focus on advancing policies that support equality, opportunity, and security.
  Congressman Swalwell serves on the House Permanent Select Committee on Intelligence, and believes protecting Americans is Congress' most solemn duty. He chairs the Intelligence Modernization and Readiness Subcommittee, which oversees overall management of the Intelligence Community: the policies and programs focused on making sure that all 17 U.S. intelligence agencies have the workforce, infrastructure and services they need to succeed. This involves fostering greater collaboration and better use of resources across the entire Intelligence Community in personnel management, security clearance reform, information technology modernization, and other areas.

# APPENDIX P-6

## ACCREDITATION FAILURES

1. The Help America Vote Act of 2002 (HAVA)[1] was passed by the United States Congress to address improvements to voting systems and voter access following the 2000 election hanging chads.[2]
2. HAVA creates mandatory minimum standards for states to follow for several areas of election administration.[3]
3. HAVA law provides funding to help states meet new standards, replace, and purchase new voting systems, and improve election administration such as security.
4. HAVA established the Election Assistance Commission (EAC) to assist states in HAVA compliance and to distribute HAVA funds.
5. EAC is also charged with regulating and creating voting system guidelines and operating/managing the first federally run voting system certification program.[4]
6. HAVA provided directives to the National Institute of Standards and Technology (NIST) to assist the EAC in its accreditation of voting system testing laboratories (VSTL).[5] [6]

> When the NIST evaluates laboratories to assess whether they can be accredited or not, the NIST relies on the National Voluntary Laboratory Accreditation Program (NVLAP) to determine competency. An on-site review of the lab is to take place and the lab is to demonstrate competency in

---

[1] https://www.eac.gov/about_the_eac/help_america_vote_act.aspx (Last visited 5/20/22)
[2] See U.S.C. § 20922
[3] https://www.eac.gov/sites/default/files/eac_assets/1/6/HAVA41.PDF (Last visited 5/20/22)
[4] See 52 U.S.C.§ 20962, 20971
[5] See 42 U.S.C. § 15371(b)
[6] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (Last visited 5/20/22)

performing multiple tasks in a voting system review.[7]

7. EAC and NIST work together assessing laboratories to evaluate whether they can be accredited. The NIST relies on the NVLAP to determine competency.

8. EAC developed the EAC's Voting System Test Laboratory Accreditation Program. The procedural requirements of this program are contained in:
   a. EAC's Voting System Test Laboratory Accreditation Program Manual[8]
   b. EAC's Voting System Test Laboratory Program Manual (OMB 3265-0018)[9]

9. Pro V&V and SLI Compliance, per the EAC, were the only two accredited VSTLs during elections from 2020 to present.

10. VSTLs are responsible for the examination of the use of Commercial Off-The-Shelf (COTS) components as well as the examination of other applications, software, and components deemed to be proprietary.[10]

11. Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1. Certificate of Accreditation: A Certificate of Accreditation shall be issued to each laboratory by vote of the Commissioners. The certificate shall be signed by the **CHAIR** of the Commission and state:

---

[7] https://www.thegatewaypundit.com/2022/05/exclusive-based-thorough-review-election-regulations-not-single-voting-system-testing-lab-used-2020-election-accredited-based-law-part/ (Last visited 5/20/22)
[8] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf (Last visited 5/20/22)
[9] https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf (Last visited 5/20/22)
[10] https://www.eac.gov/sites/default/files/EAC_FACT_SHEET_Testing_and_Certification_Program.pdf (Last visited 5/20/22)

3.6.1. Certificate of Accreditation. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners. The certificate shall be signed by the Chair of the Commission and state:

*3.6.1.1.* The name of the VSTL;

*3.6.1.2.* The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;

*3.6.1.3.* The effective date of the certification, which shall not exceed a period of two (2) years; and

*3.6.1.4.* The technical standards to which the laboratory was accredited.

12. "The effective date of the certification, which shall not exceed a period of two (2) years…."

13. So not just the date is important but the signature on the Lab Certification of Accreditation is very crucial.

14. Commission Chairman only serve one (1) year, but their signature is good on these certificates for two (2) years.

15. Both Donald Palmer AND Benjamin Hovland were appointed by President Trump and confirmed in the senate on Feb. 4, 2019, as EAC Commissioners but not Chairman.[11]

**Note title of press release:**


U.S. ELECTION ASSISTANCE COMMISSION

Need Help?

I am...

I want

Home › News › Commissioners Hovland, Palmer Sworn In to Restore Quorum at EAC

Media

NEWS

COMMISSIONERS HOVLAND, PALMER SWORN IN TO RESTORE QUORUM AT EAC

[11] https://www.eac.gov/news/2019/02/06/commissioners-hovland-palmer-sworn-restore-quorum-eac (Last visited 5/20/22)

16. Donald Palmer was elected Commission Chairman Feb. 24, 2021. [12]

17. Benjamin Hovland was appointed Commission Chairman Feb. 2020.[13]

18. Neither of the above could be valid signatures on the Laboratory Certificates of Accreditation since none were issued in 2020. Quorum according to the EAC was not restored until appointment of Palmer and Hovland on February 4, 2019.

19. Christy McCormick was elected as Commission Chairwoman on Feb. 24, 2019.[14]

20. For the 2020 General Election, Christy McCormick's signature should be on **ALL EAC** Laboratory Certificates of Accreditation.

21. According to a list of the state's own requirements posted on the EAC's website and the U.S. Election Assistance Commission Voting System Testing and Certification Program, the State of Texas participates as set forth:[15]

---

[12] https://www.eac.gov/news/2021/02/24/donald-palmer-begins-term-eac-chairman Last visited 5/20/22
[13] https://www.eac.gov/news/2020/02/27/benjamin-hovland-begins-term-eac-chairman Last visited 5/20/22
[14] https://www.eac.gov/news/2019/02/22/mccormick-elected-new-eac-chairwoman Last visited 5/20/22
[15] https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf Last visited 5/20/22

# TEXAS

| | |
|---|---|
| *State Participation:* | **Requires federal certification.** TX requires that its voting systems meet the current FEC standards as well as state requirements. |
| *Applicable Statute(s):* | "A voting system may not be used in an election unless the system: (3) operates safely, efficiently, and accurately and complies with the error rate standards of the voting system standards adopted by the Federal Election Commission…" TX Elec Code § 122.01 (2019) |
| *Applicable Regulation(s):* | "For any voting machine … to be certified for use in Texas elections, the system shall have been certified, if applicable, by means of a qualified testing by a Nationally Recognized Test Laboratory (NTRL) and shall meet or exceed the minimum requirements set forth in the Performance and Test Standards for Punch Card, Mark Sense, and Direct Recording Electronic Voting Systems, or in any successor voluntary standard document developed and promulgated by the FEC." 1 TX Admin. Code § 81.61 (2019) |
| *State Certification Process:* | The Secretary of State accepts applications to examine and certify voting systems and appoints four people to examine the voting system. While the Attorney General appoints two people as examiners. Each examiner inspects the voting system and submits a report to the Secretary of State. The Secretary of State will conduct a public hearing to provide interested persons an opportunity to express their views for or against the approval of the voting system. Following the public hearing, the Secretary of State shall prepare a written report stating why the voting system was approved or denied. 1 TX Admin. Code § 81.61 (2019) |

22. The manual also states that VSTLs must renew their accreditation in a timely manner.

**3.8. Expiration and Renewal of Accreditation.** A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

23. The EAC issued the modifications to the manual regarding 3.8 on July 23, 2021[16] without proper action under 52 U.S.C. §551 *et seq.*, HAVA, 52 U.S.C. §20901 *et seq*, and Federal Advisory Committee Act (FACA), 5 U.S.C. app. 2 §1-15. Modifications shall be reviewed and commented on by the EAC Board of Advisors and the EAC Standards Board or the requirement by HAVA and the APA guidelines of any modifications shall be provided to the public for notice and comment prior to approval. *52 U.S.C. §20962, APA 5 U.S.C. §551 et seq.*

a. HAVA prohibits the EAC from voting to adopt final guidelines until it has given both the Board of Advisors and the Standards Board 90 days to review and comment on the proposed guidelines and has "tak[en] into consideration" their comment process and recommendations. *Id. § 20962(d)(1)-(2).*

b. HAVA additionally requires a public notice and comment process that includes publication of the proposed guidelines in the Federal Register, opportunity for public comment on the proposed guidelines, and opportunity for a public hearing on the record. *Id. §20962(a)(1)-(3).*

24. SLI Compliance Certification Issued January 10, 2018, Effective January 10, 2021. (Exceeding, more than two (2) years – Should be signed by Chair of Commission)[17]

---

[16] https://www.eac.gov/sites/default/files/2021-07/NOC%2021.01_VSTL%20Accreditation%20Status_1.pdf (Last visited 5/20/22)

[17] https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Certificate_of_Accreditation011018.pdf (Last visited 5/20/22)

United States Election Assistance Commission

## Certificate of Accreditation

### SLI Compliance,
### Division of Gaming Laboratories International, LLC
### Wheat Ridge, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards, the Voluntary Voting Systems Guidelines versions 1.0 and 1.1 under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SLI Compliance is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

January 10, 2021

Date: 1/10/18

*Brian Newby,*
*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **0701**

25. ProV&V - EAC Certification, Issued February 24, 2015, Effective Through February 24, 2017.[18] (Should be signed by Chair of Commission)



United States Election Assistance Commission

Certificate of Accreditation

**Pro V&V, Inc.**
**Huntsville, Alabama**

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

February 24, 2017

Date: 2/24/15

*Acting Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **1501**

18 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_accreditation_certificate_2015.pdf (Last visited 5/20/22)

26. SLI Compliance Certification Original Issued February 28, 2007, Dated February 1, 2021. (Exceeding, more than two (2) years – Should be signed Chair of Commission)[19]



VSTL Program Manual v 2.0 page 37
3.6. Grant of Accreditation. Upon a vote of the EAC Commissioners to accredit a laboratory, the Testing and Certification Program Director shall inform the laboratory of the decision, issue a Certificate of Accreditation and post information regarding the laboratory on the EAC Web site.

United States Election Assistance Commission

Certificate of Accreditation

Certificate for the Lab

SLI Compliance
Division of Gaming Laboratories International, LLC
Wheat Ridge, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 and 2015 Voluntary Voting Systems Guidelines (VVSG 1.0 & 1.1) under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SLI Compliance is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

VSTL Program Manual v 2.0 page 36
3.6.1. Certificate of Accreditation. ... The certificate shall be signed by the Chair of the Commission and state
3.6.1.3. The effective date of the certification, which shall not exceed a period of two (2) years, and

Should be signed by EAC Chairman NOT Executive Dir

*Original Accreditation Issued on: 2/28/2007*

*Accreditation remains effective until revoked by a vote of the EAC pursuant to 52 U.S.C. § 20971(c)(2).*

Mona Harrington Date: 2/1/21
Mona Harrington
Executive Director, U.S. Election Assistance Commission

EAC Lab Code: 0701

(c)Continuing review by National Institute of Standards and Technology
(2)Approval by Commission required for revocation
The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission.

---

19 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI%20Certificate%20of%20Accreditation%202021.pdf (Last visited 5/20/22)

27. ProV&V EAC Certification, Original Issued February 24, 2015, Dated February 21, 2021. (Exceeding, more than two (2) years – Should be signed by Chair of Commission)[20]


United States Election Assistance Commission

Certificate for the Lab

Certificate of Accreditation

Pro V&V, Inc.
Huntsville, Alabama

VSTL Program Manual v 2.0 page 37
3.6. Grant of Accreditation. Upon a vote of the EAC Commissioners to accredit a laboratory, the Testing and Certification Program Director shall inform the laboratory of the decision, issue a Certificate of Accreditation and post information regarding the laboratory on the EAC Web site.

is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 and 2015 Voluntary Voting Systems Guidelines (VVSG 1.0 & 1.1) under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.

VSTL Program Manual v 2.0page 38
3.6.1. Certificate of Accreditation; ... The certificate shall be signed by the Chair of the Commission and state
3.6.1.3. The effective date of the certification, which shall not exceed a period of two (2) years; and

Should be signed by EAC Chairman NOT Executive Dir.

Original Accreditation Issued on: 2/24/2015

Accreditation remains effective until revoked by a vote of the EAC pursuant to 52 U.S.C. § 20971(c)(2).

Date: 2/1/21

Mona Harrington
Executive Director, U.S. Election Assistance Commission

EAC Lab Code: 1501

(c)Continuing review by National Institute of Standards and Technology
(2)Approval by Commission required for revocation
The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission

28. Taking into consideration of just the certificates issued in 2021; the Certificates of Accreditation have multiple issues with them indicating they are still **NOT** in compliance with laws and guidelines set by HAVA and the state of Texas. *(Emphasis added)*

29. The accreditations are not signed by the Chair of the Commission but by the EAC Executive Director, Mona Harrington. The Chair is Thomas Hicks. Mona Harrington has never even been a commissioner.

---

20 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro%20V%26V%20Accreditation%20Certificate.pdf (Last visited 5/20/22)

## EAC's Commissioners

Thomas Hicks and Christy McCormick were sworn in January 13, 2015 as EAC commissioners following their nomination by President Barack H. Obama and unanimous confirmation by the U.S. Senate. Benjamin Hovland and Donald Palmer were sworn in on February 4, 2019 as EAC commissioners following their nomination by President Donald Trump and unanimous confirmation by the U.S. Senate.

Commissioner Thomas Hicks, Chairman

Commissioner Christy McCormick, Vice Chair

Commissioner Benjamin W. Hovland

Commissioner Donald L. Palmer

30. A vote for a VSTL's reaccreditation is taken by the EAC and shall be passed by a vote of (3) three commissioners. The EAC did not met quorum for the year of 2018 due to only having (2) commissioners. Until Hovland and Palmer were nominated; no quorum was met until February of 2019 in which Christy McCormick's signature would be required.

31. This means that no VSTLs were properly accredited for the 2020 Presidential election on November 3, 2020 and continue to be unaccredited due to lack of compliance.






32. EAC provided the following for SLI Compliance[21] and Pro V&V[22] dated January 21, 2021, stating Covid-19 circumstances which was not in accordance to VSTL Version 2.0 Section 3.8. (“**PRE**” Covid-19 pandemic)

33. Reaccreditation should have been properly issued in 2017 and 2018 respectively prior to Covid 19. The Covid excuse falls flat and crosses over to dishonesty.

34. During quorum, the EAC is required to vote on reaccreditation. There was no quorum for a year prior to 2019.

35. Accreditation would not have been possible in order to be in accordance with HAVA of 2002 Section 231(b) and the Voluntary Voting System Guidelines in clear violation of law. Quorum would have and needed to be held well before any real or perceived complications due to COVID-19.

---

21 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Accreditation_Renewal_delay_memo012721.pdf (Last visited 5/20/22)

22 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_Accreditation_Renewal_delay_memo012721.pdf (Last visited 5/20/22)

U.S. ELECTION ASSISTANCE COMMISSION
633 3rd St. NW, Suite 200
Washington, DC 20001

**FROM:** Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:** SLI Compliance EAC VSTL Accreditation

**DATE:** 1/27/2021

---

SLI Compliance, a division of Gaming Laboratories International, LLC (SLI) has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> ***Expiration and Renewal of Accreditation.*** *A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, SLI retains its EAC VSTL accreditation.

U.S. ELECTION ASSISTANCE COMMISSION
633 3rd St. NW, Suite 200
Washington, DC 20001

**FROM:** Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:** Pro V&V EAC VSTL Accreditation

**DATE:** 1/27/2021

---

Pro V&V has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> ***Expiration and Renewal of Accreditation.*** *A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, Pro V&V retains its EAC VSTL accreditation.

36. EAC again provided on it's website July 22. 2021 on both Pro V&V[23] and SLI Compliance[24] VSTL accreditation pages yet another excuse regarding the lack of proper and legal accreditations.

[1] Pro V&V was accredited by the EAC on February 24, 2015, and SLI Compliance was accredited by the EAC on February 28, 2007. Federal law provides that EAC accreditation of a voting system test **laboratory cannot be revoked unless the EAC Commissioners vote to revoke the accreditation**: "The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission." 52 U.S. Code § 20971(c)(2). The EAC has never voted to revoke the accreditation of Pro V&V. Pro V&V has undergone continuing accreditation assessments and had new accreditation certificate issued on February 1, 2021.

37. "3.6.1.3. The effective date of the certification, which shall not exceed a period of two (2) years." To revoke is the process of **"taking away".** The accreditation was not "taken away". The regulation clearly states that the accreditation is for (2) two-year periods only. The EAC's use of this section is disingenuous.

38. 52 U.S. Code § 20971(c)(2) is not applicable to 3.6.1.3 and the effective date of the accreditation as the accreditation **EXCEEDED** the period of two (2) years. The statute does not refer to continued accreditation due to any failure of action by the private laboratories and or the EAC Program Director. This is erroneous reasoning at best, fraud at worst. Pro V&V and SLI Compliance were not accredited laboratories in accordance with HAVA of 2002 § 231(b). The EAC is not a legislative body and cannot create or establish law but must abide by HAVA of 2002. This is an overreach of power by disregarding the law set forth by HAVA of 2002 Section 231(b) and the federal legislative body.

[23] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv (Last visited 5/20/22)
[24] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/sli-compliance-division-gaming-laboratories (Last visited 5/20/22)

39. Note that the same document provides another excuse as to why the VSTLs are not properly accredited. Accordingly, the "Accardi" decision requires that even governmental officials must follow agency regulations and guidelines. By the EAC's own admission of "administrative error"; the foundation of the rule of law under the Accardi doctrine; the EAC did not observe their own rules and guidelines, therefore violating the laws set by HAVA affording a domino effect of substantive restraints and violations of protected persons (class) from arbitrary or capricious treatment thus violating Plaintiffs' voting rights.

> **Due to administrative error** during 2017-2019, the EAC did not issue an updated certificate to Pro V&V causing confusion with some people concerning their good standing status. Even though the EAC failed to reissue the certificate, Pro V&V's audit was completed in 2018 and again in early 2021 as the scheduled audit of Pro V&V in 2020 was postponed due to COVID-19 travel restrictions. Despite the challenges outlined above, throughout this period, Pro V&V and SLI Compliance remained in good standing with the requirements of our program and retained their accreditation. **In addition, the EAC has placed appropriate procedures and qualified staff to oversee this aspect of the program ensuring the continued quality monitoring of the Testing and Certification program is robust and in place.**

40. Following the elections of 2016, Senator Ron Wyden sent a letter[25] to Traci Mapps, Director of Operations for SLI Compliance, specifically asking if the company had implemented the best practices described in the National Institute of Standard and Technology (NIST) 2015 VVSG 1.1.

41. According to the "General Information on Texas Voting System Certification Process" found on the SoS' website[26]

a. "The Secretary of State requires new systems and modifications to previously-certified systems be qualified by the Election Assistance

[25] https://www.wyden.senate.gov/imo/media/doc/wyden-sli-compliance-election-cybersecurity-letter.pdf (Last visited 5/20/22)
[26] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/20/22)

Commission (EAC), with 2002 Voting System Standards/guidelines (VSSG) or newer, prior to being submitted for examination."

b. "The vendor applying for certification must complete and deliver application forms (Form 100[27], Form 101[28], and if applicable, Form 100 Schedule A), user operating and maintenance manuals, training material, final report(s) from an independent testing laboratory accredited by the EAC, a change log detailing changes from any previously-certified system or component, and application fee(s), to the Secretary of State no later than 45 days prior to examination."

**FORM 100**

[27] https://www.sos.texas.gov/elections/forms/form100.pdf#search=form%20100 (Last visited 5/20/22)
[28] https://www.sos.texas.gov/elections/forms/form101.pdf#search=form%20101 (Last visited 5/20/22)

**Materials Checklist (Indicate materials submitted with an "X")**

| | |
|---|---|
| 7 copies of the following (5 copies in electronic format and 2 hard copies): | |
| | Completed application Forms 100 and Form 101 |
| | If applicable, attach Form 100 - Schedule A, listing recommendations/issues made from previous Texas examination. List how they have been corrected or addressed. If the have not, explain why. |
| | If component has been modified, include log detailing changes from the previously Texas certified version |
| | Nationally accredited voting system test laboratory reports of all tests (including summary) conducted on items submitted |
| | Operating Manual(s) |
| | Maintenance Manual(s) |
| | Training Manual(s) |
| | Technical Specifications |
| | Operational Specifications |
| | List all COTS hardware/software used with the system and their version numbers – If listed in a nationally accredited test laboratory reports, state where |
| | List all configurations that will be marketed and sold in Texas<br>- indicate if the optical scan will be used as a precinct count, central count, or both |
| | Provide complete step-by-step installation instructions for all software installs and configurations specific to Texas |
| | List of other election jurisdictions where system is in use or has been in use |

**Acknowledge which voting system test laboratory has been notified to send a copy of the software and source code and expected delivery date to our office.**

| Nationally accredited voting system test laboratory Name | Delivery Date |
|---|---|
| | |
| | |

42. According to "*The Certification Procedures for Electronic Pollbooks*," certification involves "Technical examination by a NIST-certified testing laboratory." However, which laboratories perform this type of testing, as well as their findings, are not listed on the SoS's website and remain in question.[29]

43. Not only must voting systems in Texas be EAC certified by an accredited VSTL...they must also be examined and approved for use by the Secretary of State and the Attorney General.[30]

a. Before a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state as provided by this subchapter.

[29] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/23/22)
[30] See Tex. Elec § 122.031

b. The secretary of state may seek a temporary restraining order, or a writ of injunction obtained through the attorney general to prevent the use of any part of a voting system or voting system equipment that has not been approved.

c. A person commits an offense if the person executes a contract to sell, lease, or otherwise provide a voting system or voting system equipment that the person knows has not been approved. An offense under this subsection is a Class A misdemeanor.

44. "Accreditation is the independent evaluation of conformity assessment bodies against recognized standards to carry out specific activities to ensure their impartiality and competence. Through the application of national and international standards, government, procurers and consumers can have confidence in the calibration and test results, inspection reports and certifications provided."[31]

45. Accreditation and certification are used in many aspects of our society. For example, universities and colleges are accredited by private agencies known as an accrediting agency or accreditor. The Department of Education administers and approves these accreditors under CFR Title 34, § 602.[32] Accreditation for the private accreditors is for five years; accreditors must reapply for renewal two years before accreditation lapses.

46. There are currently over 60 accreditors approved for accrediting our nation's colleges and universities[33]. The Harvard University of Institutional Research website explains:

[31] https://ilac.org/about-ilac

[32] https://www.ecfr.gov/current/title-34/subtitle-B/chapter-VI/part-602

[33] https://www2.ed.gov/admins/finaid/accred/accreditor-federal-recognition-process-steps.pdf

47. Accreditation is a voluntary, peer review process. It serves 4 main purposes: (1) to assure quality to the public, (2) to ease student transfer between institutions by signaling quality, (3) provides institutions with access to federal financial aid, and (4) certifies a graduate's credentials to employers.

48. An "accredited" university meets the Standards for Accreditation established by an accrediting agency. The Standards ensure that an institution has appropriate and clear goals, sufficient resources to achieve them, is fulfilling its objectives, and will continue to do so.

49. The process provides colleges and universities with an opportunity for reflection, honest assessment of strengths and weaknesses, along with a chance to develop strategies for continued improvement.[34]

50. Both accredited and non-accredited colleges and universities accept money, deliver a product (courses) and then award certificates and diplomas to attendees and graduates to document course and program completion. Imagine the public response if colleges and universities turn out to not be accredited due to an accreditor's lack of credentials. This would inspire demands for action loudly across the country, as should the lack of VSTL accreditation.

51. ES&S EVS 6.1.1.0 was only "certified" by the Election Assistance Commission (EAC) on July 27, 2020, by Pro V&V which did so with an expired EAC accreditation and was not certified to do the examination at the time.

52. On August 21, 2020, Election Systems & Software ("ES&S" or the "Vendor") presented the EVS 6.1.1.0 system for examination and certification by the Texas Secretary of State.

[34] https://oir.harvard.edu/faq/what-accreditation-why-should-university-be-accredited

53. Travis county officials have confirmed that Election Systems & Software's EVS 6.1.1.0 system was used to conduct the November 3, 2020, elections.

54. On December 9, 2020, pursuant to TEX ELEC § 122.0371 of the Texas Election Code, the Office held a public hearing, by telephone, for interested persons to express views for or against the certification of the EVS 6.1.1.0 system.

55. On January 8, 2021, The Secretary of State's office pursuant to Section 122.039 wrote and filed their official report certifying Election Systems & Software's EVS 6.1.1.0 system for use in Texas elections.

56. ES&S EVS 6.1.1.0 was NOT CERTIFIED for use in any election prior to the state certification on January 8, 2021.

> "Words do have a limited range of meaning, and no interpretation that goes beyond that range is permissible." --Antonin Scalia, From 1995 speech at Stanford University
> https://time.com/4220735/antonin-scalia-dead-quotes-opinions/

# APPENDIX P-7

FOREIGN COMPANIES IN TEXAS INFRASTRUCTURE

MANIPULATION AND SECURITY VULNERABILITIES

SUPPLY CHAIN VULNERABILITIES

**FOREIGN COMPANIES IN TEXAS INFRASTRUCTURE**

**Scytl and Election Night Reporting (ENR)**

1. Scytl Election Technologies S.L.U. is a Spanish provider of electronic voting systems and election technology. Founded in 2001 in Barcelona, its products and services are used in elections and referenda across the world.[1]
2. Scytl grew out of a cryptography research project[2] at the Autonomous University of Barcelona. The name is a reference to the scytale, an ancient cryptographic tool.[3]
3. In 2017, Scytl divided itself into three companies.
   a. Original Scytl Secure Electronic Voting, which develops voting software
   b. Scytl Voting Hardware SL, which develops voting hardware (Owned by Scytl and an anonymous Dubai-based investor)
   c. Civiti (formerly OpenSeneca) which focuses on civic participation services
4. Paragon Group acquired Scytl in October of 2020.[4]
5. Scytl's products cover the entire election process, including election planning, online voter registration, poll worker management, electronic ballot delivery, online voting, results consolidation, and Election Night Reporting (ENR) and asset tracking.
6. Investors:
   a. Venture Capital (Wall Street)
   b. Balderton Capital (London, UK)
   c. Nauta Capital (Barcelona, London, and Berlin)
   d. Vulcan Capital (Privately held company by Microsoft co-founder Paul Allen and Jody Allen)
   e. Sapphire Ventures (Austin, Palo Alto, London and San Francisco)
   f. Paul Allen (co-founder of Microsoft with Bill Gates)
7. Scytl is headquartered at Travessera de Gràcia 17-21, 7th floor, 08021 Barcelona, Spain, Tel: +34 934 230 324.

---

[1] https://www.forbes.com/sites/rebeccaheilweil1/2017/12/02/eight-companies-that-want-to-revolutionize-voting-technology/?sh=5168353212c1 Last visited 07/16/22
[2] https://www.politico.com/story/2018/02/24/elections-vendors-russia-423435 Last visited 07/16/22
[3] https://www.scytl.com/about-us/company-overview/ Last visited 07/16/22
[4] Last visited 07/19/22

8. Scytl systems have been implemented in numerous countries, but problems have cropped up over the years with its solutions and voting systems, including those used in Australia, Ecuador, Norway and Switzerland.[5]

a. Ecuador: 2014-Bungled regional elections so badly that all the scanned election ballots had to be counted manually at the company's Barcelona headquarters. Several Scytl managers were even temporarily arrested as a result for breach of contract. It took Scytl one month to count all of the ballots. Former employees now say it is strange that the case did not attract international attention.

   i. In some districts the software didn't work at all

   ii. The program couldn't read and interpret a large portion of the scanned ballots

   iii. Vast amounts of data caused several servers to crash completely[6]

b. Australia: Australian state of New South Wales where serious vulnerability was discovered. Researchers Alex Halderman at the University of Michigan and Vanessa Teague at the University of Melbourne examined the system more closely and discovered a serious vulnerability that allowed them to circumvent the encryption between the voter's browser and the e-voting system.[7]

c. Norway: In 2011 when Norway introduced electronic voting, the code was so flawed it was unusable.

   i. Reto Koenig, a professor of computer science at the Bern University of Applied Science (BFH) who examined the Norwegian e-voting system at the time, said the <<pile of code>> they received would not have worked to get it up and running.

   ii. The group working with Koenig, using simple programs, found <<a bug that had hidden itself deep in the cryptography>>after the voting systems had been used for two years.[8]

---

[5] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy Last visited 07/16/22

[6] http://www.ecuadorinmediato.com/index.php?module=Noticias&func=news_user_view&id=2818765879&umt=unasur_entrega_informe_final_observacion_electoral_2014 Last visited 07/16/22

[7] https://arxiv.org/pdf/1504.05646.pdf Last visited 07/16/22

[8] https://www.bfh.ch/ti/de/ueber-das-ti/ Last visited 07/16/22

iii. Norway has since restricted e-voting and one year later the e-voting project was shelved completely due to the concerns of citizens.[9]

d. Switzerland: In 2019, a cryptographic trap door could let someone change votes cast using Switzerland's online sVote system without being detected.[10]

i. Verification: The specific issue is the way the system receives and counts votes before shuffling them and anonymizing. The trap door means someone could switch all the legitimately cast ballots for fraudulent ones, undetected.

ii. Scytl, who provides electronic voting services to over 35 countries, including the United States, says it's working to fix the flaw.

9. The worrying aspect in the countries mentioned above is how did the "flaws" manage to creep into these systems in the first place. Researchers state that they have only tested a fraction of the code base as Scytl has not released source codes.

10. Scytl withholds important information about the testing of its e-voting systems and services (ENR) or requires expansive licenses for those reviews to be carried out.

11. The company had also spent Spanish public funds and EU research money into client acquisition instead of investing them into further development as stipulated (1.5 million euros Spanish Government and 9,000,000 euros EU funds on the Ecuadorian election)[11]

12. In 2008, Scytl made an international breakthrough when it won its first American client: Florida.

13. Researchers at the University of California, Berkeley, wanted to investigate voting-machine software in Florida as early as 2008, but did not have access to the documents that were crucial to their research. As a result, the researchers could not verify whether the system worked properly and weren't able to carry out test attacks on the system.[12]

14. Scytl then began offering software for voting machines as well as infrastructure and on-site support.

[9] https://www.technologyreview.com/2019/03/12/136676/a-major-flaw-has-been-found-in-switzerlands-online-voting-system/ Last visited 07/16/22
[10] https://www.technologyreview.com/2019/03/12/136676/a-major-flaw-has-been-found-in-switzerlands-online-voting-system/ Last visited 7/16/22
[11] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy
[12] https://people.eecs.berkeley.edu/~daw/papers/scytl-odbp.pdf Last visited 07/16/22

15. In 2012, Scytl acquired the American company SOE Software ("Supervisors of Elections")[13]

16. SOE Software, based in Tampa, FL, has developed Clarity, a suite of 8 software modules.

17. In 2013, Scytl acquired the software division of Gov2U.[14]

    a. "Gov2U, based in Brussels, is a non-profit, non-governmental organization by a group of visionary professionals from the field of Legislative Information and Communication Technology (ICT), and community activism who share…"

18. The EAC has since posted that SOE Software, A Scytl Company is an inactive voting system registered manufacturer but does not provide dates of when active or inactive.[15]

19. In 2020, SOE d/b/a Scytl provided various products and services in over 800 countries and several states in the United States.[16]

20. 


[13] http://eon.businesswire.com/news/eon/20120111005636/en/Scytl/SOE/election-software Last visited 07/16/22
[14] https://www.marketwatch.com/story/scytl-acquires-gov2us-software-division-expanding-its-edemocracy-solutions-portfolio-2013-04-30 Last visited 07/16/22
[15] https://www.eac.gov/voting-equipment/registered-manufacturers/soe-software-scytl-company Last visited 07/16/22
[16] https://web.archive.org/web/20120527202144/http://www.soesoftware.com/customers.aspx Last visited 07/16/22

21.

### Partial Customer List

| | | | |
|---|---|---|---|
| Arapahoe, CO | Erie, NY | Martin, FL | Putnam, FL |
| Bloomington, IL | Escambia, FL | McHenry, IL | Riverside, CA |
| Broward, FL | Fort Bend, TX | Miami-Dade, FL | Rockford City, IL |
| Butte, CA | Highlands, FL | Monroe, NY | Sacramento, CA |
| Charlotte, FL | Hillsborough, FL | Nassau, NY | Salt Lake, UT |
| Chicago, IL | Indian River, FL | Niagara, NY | San Diego, CA |
| Citrus, FL | Jefferson, CO | Oakland, MI | Santa Clara, CA |
| Clay, FL | Jefferson, TX | Okaloosa, FL | Sarasota, FL |
| Cochise, AZ | Johnson, KS | Okeechobee, FL | Shasta, CA |
| Contra Costa, CA | King, WA | Olmsted, MN | St. Lucie, FL |
| Cortland, NY | Lake, IL | Orange, FL | Tarrant, TX |
| Dallas, TX | Lee, FL | Orange, NY | Ventura, CA |
| Dona Ana, NM | Los Angeles, CA | Palm Beach, FL | Volusia, FL |
| Dupage, IL | Madison, IL | Pasco, FL | Will, IL |
| Dutchess, NY | Manatee, FL | Pinellas, FL | Williamson, TX |
| Duval, FL | Marion, FL | | Winnebago, IL |

22. In 2018, Scytl became a partner of Amazon Web Services which hosts their services on Amazon's cloud platform.

23.

DATA CENTER SECURITY AND COMPLIANCE

Scytl products and services are hosted on Amazon Web Services, a secure cloud service platform built on sound network infrastructure. AWS has multiple certifications, including SSAE 16, adhering to an extensive list of global security standards.

For more information on AWS and their security processes, please visit http://aws.amazon.com/compliance and http://aws.amazon.com/security

[17]

24. The state of Texas via Department of Information Resources (DIR) has contracted with Amazon Web Services, Inc.[18]

25. Tarrant County contracted with Amazon Web Services via DIR contract #DIR-TSO-4221 which is a statewide contract that is subcontracted out to all Texas counties voluntarily.[19]

---

[17] https://scytl.us/scytl-secure-election-technology/ Last visited 07/16/22

[18] https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:70191bd6-f30f-3bbd-92d9-ca55c3115659#pageNum=1 Last visited 07/16/22

[19] https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:5ec4ae30-77db-33be-89d2-664d92cfe7ff#pageNum=1 Last visited 17/16/22

26. Our election system infrastructure is currently housed under the same web services as the vendor who reports our election results.

27. Texas counties contracted with SOE d/b/a Scytl are part of its international customers and are as follows: Tarrant, Comal, Gregg, Parker, Denton, Hood, Liberty, Jefferson, and Galveston.[20]

28. The United States has implemented several of Scytl's voting tools.[21]

    a. Election Night Reporting (ENR)
    b. Electoral administration: digitizing their training content and making it available to polling station workers through an online training platform.
    c. The launching of a voter portal: a tool used to create websites for public administrations in order to provide electoral information before, during and after elections.

29. "Electronic election infrastructure is one example of critical infrastructure[22] which can be subject to remote access operations. Foreign remote access operation capabilities threaten critical infrastructure in the United States, such as election systems."[23]

30. Mills further states that successful "...remote access operations conducted against the United States election infrastructure could change vote totals reported by the elections equipment, thereby nullifying the election as an expression of the collective will of the voters."[24]

31. When Scytl was queried about the subject of potential risks, a spokeswoman answered flippantly. "(Voters) don't have the ability to review the source code of their (online) banking either." The company claims that a public examination of the documentation would jeopardize its business model.[25]

32. How can Scytl's business practices be reconciled with the counties and states in the United States or Texas own government high security and transparency requirements?

33. How secure will Texas elections offerings be?

---

[20] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Tarrant, Comal, Gregg, Parker, Denton, Hood, Galveston, Liberty, and Jefferson
[21] https://www.scytl.com/resources-and-references/customers/u-s-elections/ Last visited 07/16/22
[22] https://www.cisa.gov/election-security
[23] https://files.ttttexas.com/static/docs/txsos/John-Mills.pdf See Declaration of John Mills 9
[24] Id. 10
[25] https://www.parliament.vic.gov.au/images/stories/committees/emc/2010_Election/submissions/14_Scytl_EMC_Inquiry_No.6.pdf Last visited 07/16/22

34. What exactly is the arrangement between Texas and the Spanish voting giant?

35. When it comes to transparency and auditability, Scytl's statements have been contradictory. At a 2017, trade conference called Swiss Cyber Storm, Jordi Puiggali, Scytl's longtime head of technology, gave a presentation.[26] When a participant asked him whether Scytl was prepared to release its source code, he stated it was out of the question of him.[27]

36. Two companies in particular that produce COTS are Huawei and Akamai, the latter of which is partnered with SCYTL and linked to Dominion Software. In the Election Whistleblower Affidavit Ms. Terpsehore Maras attests that the tallied votes on behalf of Dominion and, under contract with the Associated Press (AP), provide the results for reporting.[28]

37. A very similar contractual relationship is noted between several counties in Texas as noted above via SOE d/b/a Scytl.

38. Maras Affidavit corroborates to the vulnerabilities from COTS which are still culpable to domestic, as well as foreign hacking.[29]

**MANIPULATION AND SECURITY VULNERABILITIES**

39. In January of 2021, DNI Ratcliffe issued an unclassified letter to Congress that assessed that China interfered in the 2020 federal elections.[30]

40. CISA also released an Industrial Controls System Advisory (ICSA) detailing vulnerabilities affecting versions of the Dominion Voting Systems.[31]

41. The exploitation of these vulnerabilities would require physical access to individual Election Management System (EMS) or the ability to modify files.

42. These EMS systems are similar to, or the same as, the Decl. of Halderman detailed a number of these critical vulnerabilities in litigation with the state of Georgia.[32]

---

[26] https://2017.swisscyberstorm.com/2017/09/26/Introducing_Jordi_Puiggali.html Last visited 07/16/22
[27] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy Last visited 07/16/22
[28] Id. 25-26
[29] Id. https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Terpsehore Maras Election Software Whistleblower
[30] https://context-cdn.washingtonpost.com/notes/prod/default/documents/6d274110-a84b-4694-96cd-6a902207d2bd/note/733364cf-0afb-412d-a5b4-ab797a8ba154.#page=1

[31] https://www.cisa.gov/uscert/ncas/current-activity/2022/06/03/cisa-releases-security-advisory-dominion-voting-systems-democracy

43. After the 2016 general elections, then Georgia Secretary of State, Brian Kemp, confirmed that 10 separate cyberattack attempts on Georgia's network had been discovered --all of which were traced back to a U.S. DHS IP address.[33]

44. On December 6, 2019 Democrat Senators (Senators Elizabeth Warren, Ron Wyden, Amy Klobuchar, and Representative Mark Pocan) sent letters[34] to the private equity firms that own the major election machine vendors (Hart InterCivic, Dominion Voting Systems, ES&S) stating their concerns regarding vulnerabilities of election machines, but also requesting disclosure of a range of such information including ownership, finances and research investments, compliance with Election Assistance Commission's (EAC) Voluntary Voting System Guidelines (VVSG), as well as violations of any federal or state laws or regulations.

45. In August of 2020, the Bipartisan Senate Intelligence Committee report[35]_was released with the findings of the investigation into foreign interference of the 2016 elections. The report disclosed the lack of security in election systems utilized by the vast majority of the nation and warned of the likelihood of fraud and hacking in the November 3, 2020 elections.

46. Other significant findings were reported: regular targeting of numerous election infrastructures, security vulnerabilities with not only all major voting machine vendors, but also of all aspects of other election infrastructure (e.g., election night reporting (ENR), electronic poll book equipment, software, databases and cloud servers), and supply chains, lack of adherence to basic security practices, identification of two components of election infrastructure that required immediate, cybersecurity fixes: voter registration databases, and election night reporting websites, as well as no plausible means to audit elections.

47. Dr. Alex J. Halderman,[36] Professor of Computer Science at the University of Michigan, presented before the committee. He testified "our highly computerized election

---

32 https://www.documentcloud.org/documents/21069743-2021-09-21-notice-of-filing-dckt-1177_1
33 https://www.wsbtv.com/news/georgia/georgia-secretary-of-state-says-cyberattacks-linked-back-to-dhs/475707667/
34 https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf
35 https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf
36 https://www.c-span.org/video/?c4674512/user-clip-j-alex-halderman-voting-structure-vulnerable-sabotage-attacks-change-votes

infrastructure is vulnerable to sabotage and even to cyber-attacks that could change votes." He concluded "Voting machines are not as distant from the internet as they may seem."

48. Both the FBI[37] and CISA[38] issued two alerts regarding Iranian interference in the U.S. November 3, 2020, election in October of 2020.

49. The FBI and CISA reported targeting of state election websites with "intentional effort to influence and interfere with the 2020 U.S. presidential election".[39]

50. "The exploitation of key supply chains by foreign adversaries – especially when executed in concert with cyber intrusions and insider threat activities – represents a complex and growing threat to strategically important U.S. economic sectors and critical infrastructure".[40]

51. Several attacks on local, county and state government agencies have been reported over a short course of time. Texas was not and is not immune to these hacks, including in our own election systems[41].

a. "The U.S. intelligence community developed substantial evidence that state websites or voter registration systems in seven states were compromised by Russian-backed covert operatives prior to the 2016 election — but never told the states involved, according to multiple U.S. officials.

b. Top-secret intelligence requested by President Barack Obama in his last weeks in office identified seven states where analysts — synthesizing months of work — had reason to believe Russian operatives had compromised state websites or databases.

c. Three senior intelligence officials told NBC News that the intelligence community believed the states as of January 2017

[37] https://www.fbi.gov/news/pressrel/press-releases/iranian-cyber-actors-responsible-for-website-threatening-us-election-officials
[38] https://www.ncsc.gov.uk/files/NCSC%20CISA%20Alert%20-QNAP%20NAS%20Devices.pdf
[39] https://www.cisa.gov/uscert/ncas/alerts/aa20-304a Last line of Summary Paragraph
[40] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Shawn Smith 15
[41] https://www.nbcnews.com/politics/elections/u-s-intel-russia-compromised-seven-states-prior-2016-election-n850296

were Alaska, Arizona, California, Florida, Illinois, Texas and Wisconsin."

52. According to the Declaration of John R. Mills; the "U.S. Government has pioneered and advanced the art and techniques of remote access operations targeting critical infrastructure."[42]

53. Based on his personal experience, Mr. Mills states that the U.S. Government has the capability to project significant effects[43] toward critical infrastructure worldwide. This would include Texas' own election systems. The capability to project "effects" exists in China, Russia, Iran, North Korea, and Venezuela as well as other countries. These foreign powers now use these same or similar, and improved remote access operation methodologies to advance their own national agendas. A growing talent base of personnel, software, and network enabled capabilities that are becoming global in the hands of companies and personnel outside of the U.S. Government.[44]

54. The Texas Election Systems are not the only state systems to have been hacked since 2016 even as recently as this year are the Texas Department of Agriculture, Public Utility Commission of Texas, Office of Court Administration, Department of Transportation, Texas Health and Human Services Commission and Texas Medicaid – in which information exposed included names, addresses, dates of birth, social security numbers and more – were compromised The state's answer was to pay a ransom to bad actors in an attempt to restore systems.[45]

55. Local county and city agencies reported – in which our tax dollars were paid to hackers – are Brooks County, Bexar County Appraisal District, Harris County US Port, City of Austin, Aransas County, Bowie County, Parker County, City of Odessa, George W. Bush Presidential Center in Dallas County, Nacogdoches County, Calhoun County, Grayson County Government Systems, Burnet County Government Systems, City of Waco in McLennan County, City of Fort Worth in Tarrant County, City of College Station in

---

[42] https://files.ttttexas.com/static/docs/txsos/John-Mills.pdf
[43] "Effects" an operator's and planner's term of art which implies the ability to degrade, exfiltrate, manipulate, change, or destroy See Mills Declaration 15-footnote 4
[44] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 15-16
[45] https://www.dallasnews.com/news/politics/2021/03/05/terminated-texas-medicaid-subcontractor-dumped-after-data-breach-in-ransomware-attack-from-russia/

Brazos County, Travis County Appraisal District , Lubbock County Government Systems, and other state agencies.

56. If the state of Texas or any federal agencies cannot secure itself or our health and personal data from security breaches and exposure how are our elections safe or secure from manipulation? How do Plaintiffs know that our votes cast are not free from manipulation and dilution due to the former? The short answer is we cannot be sure. Plaintiffs know the electronic systems/machines are susceptible due to network connections and vulnerabilities of the electronic voting systems/machines themselves.

57. CISA acknowledged as early as October 2020 that hackers targeted not only Federal government, but also state, local, tribal, and territorial government -- that is critical infrastructure, and election organizations including unauthorized access to election support systems.[46]

*58.* "however, CISA has no evidence to date that integrity of elections data has been compromised…CISA's credibility in their conclusion must be tempered by the knowledge that this was during the same period that CISA was unaware that its own networks had been compromised."[47] *Id.*

59. In the litigation case of Curling and at its conclusion the federal court stated,

a. "Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in the voting systems and this particular system through a variety of routes-whether through physical access and use of a USB flash drive or another form of mini-computer, or connection with the internet. As discussed in the declarations and testimony of the proffered national cybersecurity experts in this case, a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data. In these experts' views, these

[46] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Shawn Smith Line 35
[47] https://www.cisa.gov/uncert/ncas/alerts/aa20-283a

risk issues are in play…" Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1280 (N.D. Ga. 2020)

**SUPPLY CHAIN VULNERABILITIES**

60. The Affidavit of Terpsehore Maras highlights voting systems rely on foreign made Commercial Off The Shelf (COTS) components rather than custom components manufactured in the United States.[48]

61. While this presents an affordable and economic solution to meet the voting demand, it also means these COTS components introduce vulnerabilities into the Voting Systems. These vulnerabilities can take the form of proprietary hardware and software that has not been through vulnerability testing. [49]

62. The components are manufactured in countries that have strained political and economic relations with the United States. There are numerous intelligence reports, both US Government and Commercial-sourced, highlighting the vulnerabilities in hardware and software components manufactured by foreign countries.[50]

   a. In the light of CISA's inability to defend even its own computer systems from nation-state level supply chain attacks from March through December 2020, little credence can be given to CISA's July declaration that the 2020 election would be 'the most secure election in modern history, and its declaration in November 2020 that the 2020 election was the "most secure in American history. [51]

   b. In fact, the EAC's "test assertions" for the Voluntary Voting System Guidelines (VVSG) "which are meant to translate each VVSG requirement into unambiguous, specific, testable condition so that the Voting System Testing Lab (VSTL) may verify the conformance of a given voting system to the VVSG

---

[48] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 20
[49] Id. Line 22-24
[50] Id. Line 22, 25
[51] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 41

standard. Here is what the EAC's VVSG Test Assertions state for supply chain security of voting system components:" [52]

c. 2.1.1-A – General build quality…TA211A-2: If components from third-party suppliers are used for their intended purpose within the voting system, THEN the voting system manufacturer MUST ensure that third-party suppliers document the quality assurance procedures used to ensure components supplied from third-parties are free from damage or defect [53]

63. This is the proverbial fox guarding the hen house situation in which we trust third-party vendors in our supply chain. As the VSTL's are now to verify their conformance with Voting System Standards and VVSG, and that their tests ensure the security and integrity of voting systems but do not address the supply chain attack threats or their mitigation or assessment. [54]

64. Terpsehore Maras emphasized the significance of a VSTL's role in the certification process, stating the significance of VSTLs being accredited and examining the hardware is key.[55]

65. COTS software updates are the avenues of entry. While the use of outsourced COTS, manufactured outside the US presents an affordable and economic solution to meet the voting demand, it also means these COTS components introduce vulnerabilities into the Voting Systems. [56]

66. These vulnerabilities can take the form of proprietary hardware and software, which lack vulnerability testing and are outsourced for manufacturing in countries that have strained political and economic relations with the United States.[57]

67. COTS components by voting system machine manufactures can be used as "Black Box" and due to changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient, cost effective, end of life extension and or even complete reworks to meet new standards. The key issue is that

---

[52] Id. 47
[53] Id. 47
[54] Id. 46-48
[55] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 22
[56] Id. 23
[57] Id. 23

MOST of the COTS are outsourced to China and makes us vulnerable to "Black Box" antics and backdoors.[58]

68. "The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability. Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates."[59]

69. "…country of manufacture or origin for a representative sampling of computers and computer hardware components used in those voting systems…The voting systems used in these counties represent three of the top four U.S. voting systems vendors, whose voting systems are used to cast and or tabulate over 80% of votes in the U.S. elections." The third largest voting system vendor is Hart InterCivic, which unlike Dell used by ES&S, used Hewlett-Packard (HP) computers. It is a difference without distinction, as HP computers are manufactured and assembled primarily in the People's Republic of China by foreign workers with no U.S. government oversight. Effectively, there are no safeguards in the entirety of testing or EAC certification for these electronic voting system/machines. All electronic voting systems/machines utilize COTS software with thousands of known vulnerabilities which can be exploited both before and after delivery.[60]

70. One such component was found in the ES&S contracts for Collin County and Bexar County.[61]

71. Listed under Dell PowerEdge T430 is listed a component "iDRAC8" which is installed in the EMS.

---

[58] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 22

[59] Id. 23

[60] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 79

[61] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Collin and Bexar County ES&S Contract

| Qty Ord. | Description | Price | Ext. Price |
|---|---|---|---|
| | EMS FILE SERVER | | |
| 1 | DELL POWEREDGE T430 | $7,200.00 | $7,200.00 |
| | PowerEdge T430 Server, No TPM<br>• Chassis with up to 8, 3.5" Hot Plug Hard Drives, Tower Configuration Intel® Xeon® E5-2620 v3 2.4GHz, 15M Cache, 8.00GT/s QPI, Turbo, HT, 6C/12T(85W) Max Mem 1866MHz<br>• 1 CPU Standard<br>• 2133MT/s RDIMMS<br>• (2) 4GB RDIMM, 2133MT/s, Single Rank, x8 Data Width<br>• RAID 1+ RAID 1 for H330/H730/H730P (2 + 2 HDDs or SSDs)<br>• PERC H730 RAID Controller, 1GB NV Cache<br>• (4) 2TB 7.2K RPM SATA6Gbps 3.5" Hot-Plug Hard Drive<br>• On-Board Broadcom 5720 Dual Port 1Gb LOM<br>• iDRAC8, Basic<br>• DVD+/-RW, SATA, Internal<br>• Casters for PowerEdge TowerChassis<br>• Power Saving Dell active Power Controller<br>• Dual, Hot-Plug, Redundant Power Supply (1+1), 750W (2) NEMA 5-15P to C13 Wall Plug, 125 Volt, 15 AMP, 10 Feet (3m), Power Cord, North America<br>• Keyboard and Optical Mouse, USB, Black, English Windows Server 2016, Standard Ed, Factory Inst, No MED, 2SKT, 2VM, NO CAL - Downgraded to Windows Server 2008 R2 Windows Server 2016, STD Ed, Media Kit w/Factory Inst ENT DGRD Images 5-pack of Windows Server 2016 Device CALs (Standard or Datacenter)<br>• 5 Year ProSupport and NBD On-Site Service | | |

72.




73.

74. iDRAC is a Dell Remote Access Controller. "iDRAC….is part of a larger datacenter solution that helps keep business critical applications and workloads available at all times…allows administrators to deploy, monitor, manage, configure, update, troubleshoot and remediate Dell servers from any location, and without the use of agents."

75. "Leveraging the incomparable agent-free capabilities of the embedded, integrated Dell Remote Access Controller (iDRAC) with Lifecycle Controller technology, server deployment, configuration and updates are streamlined across the OpenManage portfolio and through integration with third-party management solutions."[62]

76. "Remote management: iDRAC8 with Lifecycle Controller, iDRAC8 Express (default), iDRAC8 Enterprise (upgrade), 8GB vFlash media (upgrade), 16GB vFlash media (upgrade)"

77. The Declaration of John R. Mills describes remote access operations as generally "... activities used to access computer networks, data centers, and other equipment, conducted in a manner to avoid leaving behind forensic evidence of the access. Remote access operations are often enabled by planted malware, enabling software, and/or algorithms in the targeted computer system."[63]

78. "Remote access operations are different from remote maintenance monitoring which is intended by network designers for transparent and auditable access to network enabled devises for maintenance and updates." These remote maintenance monitoring can be subverted or co-opted for reasons that do not involve or are in accordance with remote maintenance monitoring tenets, design or intent, network owners/operators, or for lawful access or purposes.[64]

79. The iDRAC8 modem creates a serious security breach and violates a multitude of election and penal codes.[65]

80. Bruce Sherbet, an Elections Administrator, stated via email that the county must receive an approval from the SoS's office prior to purchasing a voting system.[66]

81. If electronic systems are continued to be used in any Texas elections and are compromised, which there is opportunity, then it is more than reasonable to conclude that U.S. elections are compromised through our voting system vendors' supply chains. What resource is more valuable to this country than the vote of the American people?

---

[62] https://i.dell.com/sites/csdocuments/Shared-Content_data-Sheets_Documents/en/aa/Dell-PowerEdge-T430-Spec-Sheet.pdf Last visited 06/23/22
[63] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 4
[64] *Id.* 5
[65] See Tex. Elec Code 122.001(a)(4), TEX. PEN. CODE § 16.02, § 33.05, 18 U.S.C. § 1030
[66] See Line 447 of this document, Tex. Elec Code 122.005(a)

a. Without access to comprehensive real-time and post-election data, and a cadre of cyber expertise that exceeds U.S. workforce quantity and quality resources, we may never know. This is true not only because supply chain attacks can be extraordinarily difficult to detect, but also because the safeguards inherent in the U.S. voting system testing and certification regime are practically non-existent, and because the nation in which most of the systems and their components are manufactured and assembled is engaged in a decades-long campaign to infiltrate, corrupt, and compromise Western, and especially U.S., computers and computer-based systems, including government and election systems."[67]

b. "The employment of machine-based algorithms to access electronic voting systems in the United States to impose a pre-determined election outcome through remote access operations is well within the capabilities of many nation-state actors such as China, Russia, Iran, and Venezuela, as well as even non-nation state actors." [68]

---

[67] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 80
[68] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 11