UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

**STEVEN HARVEY**

Petitioner,

v.

**DWIGHT D. SULLIVAN,**
**MARK HENRY,**
**ROBIN ARMSTRONG,**
**JOE GUISTI,**
**STEPHEN D. HOLMES,**
**DARRELL APFFEL,**

Respondents.

No. 3:22-cv-00337

United States Courts
Southern District of Texas
FILED

SEP 2 8 2022

Nathan Ochsner, Clerk of Court

# FIRST AMENDED PETITION FOR DECLARATORY JUDGMENT AND EMERGENCY RELIEF AGAINST ELECTRONIC VOTING SYSTEMS AND DESTRUCTION OF RECORDS

STEVEN HARVEY
12511 32nd Street
Santa Fe, Texas 77510
(409)599-5691
Scharvey69@yahoo.com
*Pro se* Petitioner

BRYAN ROBERT LASSWELL
STATE BAR OF TEXAS ID :00784450
PO BOX 629, GALVESTON, TX 77553
(409)763-2481
email brlasswell@mapalaw.com
ATTORNEYS FOR DEFENDANTS

# FIRST AMENDED PETITION FOR DECLARATORY JUDGMENT AND EMERGENCY RELIEF AGAINST ELECTRONIC VOTING SYSTEMS AND DESTRUCTION OF RECORDS

*TO THE HONORABLE COURT:*

COME NOW, PETITIONER STEVEN HARVEY , (hereinafter collectively referred to as "Petitioners"), file this First Amended Petition for Declaratory and Injunctive Relief for preservation of records and against electronic voting systems, barring Defendants from using computerized equipment to administer the collection, storage, counting, and tabulation of votes in any election indefinitely until proper investigations and reconciliation of the elections for 2020 general, 2021 special, and 2022 primaries are conducted.

## Table of Contents

**TABLE OF AUTHORITIES** 3
**PARTIES AND SERVICE** 7
**JURISDICTION AND VENUE** 7
**MEMORANDUM OF POINTS AND AUTHORITIES** 8
**CONSTITUTIONAL QUESTIONS** 9
**PRELIMINARY STATEMENT** 11
**NATURE OF THIS ACTION** 13
**STANDING UNDER NATURE OF THE CAUSE** 13
**FACTUAL ALLEGATIONS** 14
***ELECTION SYSTEM & SOFTWARE (ES&S) VOTING SYSTEM*** 14

*HASH MISMATCH DUE TO UNCERTIFIED INSTALLATION METHOD* 17

*BUG IN ES&S HASH VERIFICATION SCRIPT* 24

*ES&S CONDUCTING ITS OWN HASH VALIDATION TESTS* 24

**DECLARATIONS FROM AUTHORITIES** **27**

*Terpsehore Maras* 27

*J. Alex Halderman* 28

*Shawn Smith* 29

*John R. Mills* 30

Douglas Logan 31

**FAILURES, NEGLECT, AND OFFENSIVE VIOLATIONS** **32**

**EMERGENCY RELIEF IS NECESSARY** **34**

**A.** 41

**B.** 43

**C.** 43

**D.** 45

**COUNTS** **40**

**COUNT I - Violation of Procedural Due Process** 40

**COUNT II - Violation of Equal Protection Clause** 42

**COUNT III – Deprivation of Civil Rights** 44

**COUNT IV – Deprivation of Constitutional Rights** 45

**COUNT V – Voting Rights Violation** 46

**COUNT VI – Declaratory Judgment** 47

**CONCLUSION** **48**

**PRAYER FOR RELIEF** **49**

## TABLE OF AUTHORITIES

### Cases

Assoc. Indus. of New York v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943) 46

Azul Pacifico, Inc. v. City of Los Angeles, 948 F.2d 575, 586 (9th Cir. 1991) 13, 46

Baker v. Carr 369 US 186, 208 (1962) 46

Baker v. Carr, 369 U.S. 186, 208 (1962) 35
Burdick v. Takushi, 504 U.S. 428, 433 (1992) 35
Bush v. Gore, 531 U.S. 98, 104-05 (2000) 37
Bush v. Gore, 531 U.S. at 104–05, 121 S.Ct. 525(2000) 12
Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958) 48, 49
Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008) 39
Curling v. Raffensperger, 397 F. Supp. 3d 1334, 1404 (N.D. Ga. 2019 12
DeVries v. Secretary of State, 329 Mich. 68 (1950). 44 N.W.2d 872 48
DeVries v. Secretary of State, 329 Mich. 68 (1950). 44 N.W.2d 872. 48
Dobbs v. Jackson Women's Health Organization, No. 19-1392 (June 24, 2022) 13
Dunn v. Blumstein, 405 U.S. 330, 336 (1972) 37
Elrod v. Burns, 427 U.S. 347, 373 (1976) 37
Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa. 1973) 45
Gray v. Sanders, 372 U.S. 368, 380 (1963) 36
Hernandez v. Sessions, 872 F.3d 976, 989-90 (9th Cir. 2017) 34
Karen Wiseman v. Tarrant County, Texas and Heider Garcia (2021) No. 096-330696-21, Texas 48
Kari Lake, et al. v. Karie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt) 30
Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) 37
Ohio Republican Party v. Brunner, 544 F.3d 711, 718 (6th Cir. 2008) 40
Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) 39
Purcell v. Gonzalez, 549 U.S. 1 (2006) 39
Reynolds v. Sims, 377 U.S. 533, 555 (1964) 40
*Reynolds v. Sims*, 377 U.S. 533, 558 (1964) 11
Reynolds v. Sims, 377 U.S. 533, 562 (1964) 36
Rice v. Cayetano. http://cdn.loc.gov/service/ll/usrep/usrep528/usrep528495/usrep528495.pdf 43
San Diego Gas Electric Co. v. City of San Diego,450 U.S. 621, 654-55, 101 S.Ct. 1287, 1305-06, 67 L.Ed.2d 551 (1981) 13, 46
Sherar v. Cullen, 481 F 946 (1973) 48
State v. Johnson, 821 S.W.2d 609 (Tex. Crim. App. 1991) 14
State v. Terrazas, 962 S.W.2d 38, 40 n.2 (Tex. Crim. App. 1998) 14
*Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit* 49
Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit. 49
United States v. Classic, 313 U.S. 299, 315 (1941) 36
United States v. Saylor, 322 U.S. 385, 386 (1944) 36
*Weeks v. United States*, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 656 (1914) 13
Wesberry v. Sanders, 376 U.S. 1, 17 (1964) 12
Wesberry v. Sanders, 376 U.S. 1, 17 (1964) 35
Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008) 34

**Statutes**


| | |
|---|---|
| 13 TAC § 7.125(a)(10) | 33 |
| 18 U.S.C. § 245 | 10 |
| *18 U.S.C. 245* | 41, 42 |
| 18 USC Section 245(1)(a) | 43 |
| 28 U.S.C. § 1331 | 49 |
| 28 U.S.C. § 1343 | 49 |
| 28 U.S.C. § 1343(a)(3) | 35, 50 |
| 28 U.S.C. § 1367 | 49 |
| 28 U.S.C. § 2201 | 47, 49, 50 |
| **28 U.S.C. § 2202** | 47, 49, 50 |
| 28 U.S.C. §1367 | 32 |
| 28 U.S.C. 1943 | 46 |
| 42 U.S.C. § 1983 | 45 |
| 42 U.S.C. §15371(b) | 27 |
| *42 U.S.C. §1983* | 41, 42, 46 |
| 42 U.S.C. §1985 | 32 |
| 42 U.S.C. §1986 | 32 |
| 42 U.S.C. 1985 | 44 |
| 52 U.S.C § 20511 (2)(a)(b) | 46 |
| 52 U.S.C. § 10307(a) | 10 |
| 52 U.S.C. § 20105 | 46, 47 |
| 52 U.S.C. § 20510 | 46 |
| 52 U.S.C. § 20511 (2)(a)(b) | 47 |
| 52 U.S.C. § 20701 | 12 |
| 52 U.S.C. §10101 | 46 |
| HAVA § 231(b)(1) | 28 |
| HAVA § 231(b)(2)(B) | 28 |
| Help America Vote Act (HAVA) | 27 |
| TEX. ADMIN. CODE § 81.60 | 34 |
| TEX. ADMIN. CODE § 81.61 | 34 |
| TEX. CIV. PRAC. & REM. CODE § 65.011 | 35, 50 |
| TEX. ELEC. CODE § 1.013 | 12 |
| TEX. ELEC. CODE § 122.01(3)(4) | 47 |
| TEX. ELEC. CODE § 122.031(c) | 47 |
| TEX. ELEC. CODE § 122.032 | 34 |
| TEX. ELEC. CODE § 123.001 | 34, 47 |
| TEX. ELEC. CODE § 123.002 | 34, 47 |
| TEX. ELEC. CODE § 129.054(a)(b)(c) | 47 |
| Tex. Elec. Code § 273 | 45 |

TEX. ELEC. CODE § 273 45
TEX. ELEC. CODE § 273.081 35, 50
TEX. ELEC. CODE § 276.013 42
TEX. ELEC. CODE § 276.019 10
TEX. ELEC. CODE § 51.007(b) 33
TEX. ELEC. CODE § 51.008(d) 33
TEX. ELEC. CODE § 51.010(c) 33
TEX. ELEC. CODE § 52.062 34, 47
TEX. ELEC. CODE § 66.02 48
TEX. ELEC. CODE § 66.058 48
TEX. ELEC. CODE Chp. 65 13, 49
Tex. Elec. Code, Title 8 48
TEX. GOV. CODE § 23. 302 49
TEX. GOV. CODE § 23.301 49
TEX. GOV. CODE § 23.302 35, 50
TEX. GOV. CODE § 24.008 8
TEX. GOV. CODE § 24.011 8
TEX. GOV. CODE Chp. 552 51
TEX. PEN. CODE § 37.11 11
TEX. PEN. CODE § 37.03 10
*TEX. PEN. CODE § 37.03, § 37.10* 44
TEX. PEN. CODE § 37.09 10
TEX. PEN. CODE § 37.10 10, 44
TEX. PEN. CODE § 37.10(3) 33
*TEX. PEN. CODE § 39.02* 47
*TEX. PEN. CODE § 39.06* 42
*TEX. PEN. CODE §39.03(2)* 45
U.S. CONST. amend. 14 45

## Other Authorities

Accardi doctrine 47
Declaration of Douglas Logan (Appendix P-5) 32
Declaration of John R. Mills (Appendix P-4) 31
Declaration of Mr. J. Alex Halderman (Appendix P-2) 29
Declaration of Shawn Smith (Appendix P-3) 30
Declaration of Terpsehore Maras (Appendix P-1) 27
Justice Oliver Wendell Holmes 49

## Constitutional Provisions

Declaration of Independence 14

| | |
|---|---|
| Declaration of Independence | 10 |
| Due Process Clause | 8, 11 |
| Enforcement Clause | 43 |
| Equal Protection Clause | 8, 11 |
| Guarantee Clause | 10, 32 |
| Preamble to the U.S. CONST | 14 |
| Right to Vote Clause | 10, 43 |
| TEX. CONST. art I § 3 | 11 |
| TEX. CONST. art VI § 4 | 10 |
| TEX. CONST. art. I § 13 | 11 |
| TEX. CONST. art. I § 17 | 8 |
| TEX. CONST. art. I § 19 | 8, 11, 44, 45 |
| TEX. CONST. art. I § 27 | 11 |
| TEX. CONST. art. I § 28 | 11 |
| TEX. CONST. art. I § 29 | 11 |
| TEX. CONST. art. I § 3 | 8, 11 |
| TEX. CONST. art. V § 8 | 8 |
| TEX. CONST. art. VI § 2 | 10 |
| TEX. CONST. art. VI § 4 | 10, 34 |
| TEX. CONST. art. XVI § 1 | 43 |
| U.S. CONST. amend 1 | 10, 11 |
| U.S. CONST. amend 13 § 1 | 11 |
| U.S. CONST. amend 15 | 10 |
| U.S. CONST. amend. 1 | 45 |
| U.S. CONST. amend. 10 | 11 |
| U.S. CONST. amend. 11 | 49 |
| U.S. CONST. amend. 14 | 45, 49 |
| U.S. CONST. amend. 15 | 11, 45 |
| U.S. CONST. amend. 17 | 11 |
| U.S. CONST. amend. 19 | 11 |
| U.S. CONST. amend. 5 | 44, 45 |
| U.S. Const. Amendment I | 41 |
| U.S. Const. Ann., Amendment XV | 41, 42 |
| US Const 15 Amen. | 43 |


**Rules**


| | |
|---|---|
| Fed. R. Civ. P. Rule 57 | 49, 50 |

**PARTIES AND SERVICE**

Petitioners are Galveston County, Texas citizens and registered voters who voted in the Nov 2020 election and intend to vote in the Nov 2022 elections.

Steven Harvey
12511 32nd Street
Santa Fe, Texas 77510
409)599-5691
Scharvey69@yahoo.com

DWIGHT D. SULLIVAN, Galveston County Clerk, 600 59th Street, Suite 2001, Galveston, Texas 77551, phone (409)766-2200;

MARK HENRY, Galveston County Judge, 722 Moody, Suite 200, Galveston, Texas 77550, phone (409)766-2244;

DARREL APFFEL, Galveston County Commissioner Precinct 1, P.O.Box 8327, Bacliff, Texas 77518, phone (409)770-5474;

JOE GIUSTI, Galveston County Commissioner Precinct 2, 11730 Hwy.6, Santa Fe, Texas 77510, phone (409)770-5475;

STEPHEN D. HOLMES, Galveston County Commissioner Precinct 3, 9850-A Emmett F. Lowry Expressway SuiteA100, Texas City, Texas 77591, phone (409)770-5806;

ROBIN ARMSTRONG, Galveston County Commissioner Precinct 4, 174 Calder Road, League City, Texas 77573, phone (281)236-3309.

## JURISDICTION AND VENUE

The U.S. Constitution: First, Fourteenth, Fifteenth Amendments. The Constitution itself provides both the cause of action and the remedy. *Jacobs v. United States*, 290 U.S. 13, 16, 54 S.Ct. 26, 27, 78 L.Ed. 142 (1933). 28 U.S.C. § 1343(a) describes the federal district courts' jurisdiction regarding civil rights and elective franchise allegations. 28 U.S.C § 1331 federal question. 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986 Constitutional violations enforcement.

## MEMORANDUM OF POINTS AND AUTHORITIES

The right to vote and know that one's vote is fairly and accurately counted is foundational to our democracy. With this case Petitioner seeks to eliminate the black box voting system that has developed in this country as it is used in this State. Texas voters no longer know whether their vote has been accurately tabulated or manipulated, and there can be no spot check within reasonable levels of confidence. This is a violation of Petitioner's Constitutional rights.

Petitioner has a vested interest in protecting the quality, accuracy, and effectiveness of individual votes to ensure the representative servants are lawfully elected by the consent of the governed for the protection against tyranny and for healthy maintenance of our Republican form of government afforded to us by our ancestors and for the benefit of our successors.

For centuries, American voters recorded their votes by hand on paper ballots and were counted by human beings. In the last two decades, all states including Texas adopted electronic, computerized voting systems. Expert analyses, studies, and investigations have determined that even the most sophisticated computers can be and have been hacked. The equipment used in our elections is often assembled or made in countries like China which grants unauthorized access to foreign nations. Indeed, countries such as Russia, China, and Iran have thousands of highly trained individuals whose sole function is to penetrate commercial and government computers in the United States— including our election systems. Countries like France have responded to these threats by banning the use of computerized voting machines due to their inherent security flaws and opaqueness.

Experience has now proven the move to computerized voting in Texas was a mistake – an unnecessary, unsecure change that opened election results to manipulation by unauthorized persons. This is not a partisan issue. Experts across the political spectrum have long sounded the alarm about the inherent lack of both security and transparency in computerized voting systems such as those used in Texas. It is time to reverse this mistake. The right to vote is constitutionally guaranteed. Computerized voting systems leave an open door for votes to be changed, deleted, or fabricated in violation of constitutional requirements. A return to the tried-and-true paper ballots of the past – and of the present, in countries like France, Taiwan, and Israel – is necessary.

Petitioner submits this memorandum and related expert declarations and documentary evidence in support of their request that this Court enter an emergency injunction barring Respondents from using computerized equipment to administer the collection, storage, counting, and tabulation of votes in any election for the protection of the Petitioner's voice and will through elections (U.S. CONST. 1st AMEND., TEX. CONST. art. VI § 2) and the preservation of records

of the elections for 2020 general, 2021 special, and 2022 primaries until such time that proper accounting of said elections are conducted.

## CONSTITUTIONAL QUESTIONS

The specific questions brought before this court are:

a. If the electronic voting systems are not lawfully certified in compliance with voting system standards, does it impede the Petitioner(s)' lawful vote in elections? TEX. CONST. art VI § 4, U.S. CONST. amend 15.

b. If the electronic voting systems and their various devices are not lawfully certified, does it cause the Petitioner(s) to cast illegal ballots? 52 U.S.C. § 10307(a), Due Process Clause.

c. Since Texas officials presented uncertified voting systems as certified, did they abridge the Petitioner(s)' federally protected right to vote, as well as affronted TEX. PEN. CODE § 37.03, § 37.09, § 37.10, 18 U.S.C. § 245

d. Would it dilute the expressed intent and effectiveness of the Petitioner(s)' voice if the electronic voting systems and their various devices are vulnerable to hacking, tampering, and algorithmic preprogramming? TEX. CONST. art. VI § 4, Right to Vote Clause.

e. If the electronic voting systems are unreliable mechanisms for accurately collecting, retaining, and communicating the expression of the Petitioner(s)' vote, is it acceptable to injure the Petitioner(s)' voice and will under the Constitutional premise of the consent of the governed.? Declaration of Independence, Guarantee Clause.

f. Were Constitutionally protected free and fair elections negatively impacted by Texas officials' modification of election laws? TEX. ELEC. CODE § 276.019 and TEX. CONST. art. I § 28.

g. If the acting representative servants were unlawfully elected as a result of unreliable, unlawful vote collection devices are they acting in their official capacity? TEX. CONST. art. I § 19 and § 29.

h. Would they not, then, be impersonating public servants? TEX. PEN. CODE § 37.11.

i. The "elected" officials within the Texas courts prevent a fair hearing of cases involving the election. Where can Petitioner(s) find an objective perspective without being denied redress of grievances? TEX. CONST. art. I § 3, § 13 § 27, and U.S. CONST. amend 1.

j. What is the Constitutional remedy for the usurpation of the Petitioner(s)' role as the underlying governmental authority, and for forcing the Petitioner(s) to participate in their own

servitude through fraudulent policies, systems, and measures? TEX. CONST. art. I § 29, U.S. CONST. amend 13 § 1 and U.S. CONST. amend. 10.

## PRELIMINARY STATEMENT

This action is an action to bring transparency, fairness, honesty, and exemplary quality to Texas elections and to hold responsible government officials who violate the equal protection and due process rights of Petitioner (and all Texas citizens) guaranteed by the U.S. and Texas Constitution. Petitioner (and all Texas citizens) has a fundamental legal right to the clearly established principles of election equality, integrity, accuracy, honesty, and justice.

Texas law recognizes the clearly established principle of one-citizen, one-vote. This is the bedrock of Texas law and the most cherished and valuable right of any Texas citizen, including Petitioner, guaranteed by the U.S. and Texas Constitution. "The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing - one person, one vote." *Reynolds v. Sims*, 377 U.S. 533, 558 (1964). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Texas law adopts these fundamental principles. This case seeks to enforce these clearly established fundamental principles of Texas law.

"In any state-adopted electoral scheme, '[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" (*Curling v. Raffensperger*, 397

F. Supp. 3d 1334, 1404 (N.D. Ga. 2019) (quoting *Bush v. Gore*, 531 U.S. at 104–05, 121 S.Ct. 525(2000)). Thus, it is the paramount duty of all government, with respect to election justice, to ensure that one-citizen, one-vote is clearly and proactively protected. This foundational principle of Texas law and its constitutional republic is at issue.

In Texas, election officials must preserve election information and such information must be transparent to the citizens if democracy and a constitutional republic are to be upheld. For these reasons, pursuant to federal law, 52 U.S.C. § 20701, TEX. ELEC. CODE § 1.013, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general…election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives… are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…

Petitioner seeks a Declaratory Order that the Respondents adhere to the constitutionally protected process of collecting and counting votes that ensures integrity and transparency. This is to require hand-marked paper ballots that can be cast with anonymity, following all Texas state election laws, and hand-counted by residents of the state of Texas, not machines as Texas Election law specifies. (TEX. CONST. art. VI § 4 and TEX. ELEC. CODE Chp. 65). Additionally, Petitioner(s) seek redress for the abuse and devastation of our Constitutional rights and protections by our elected officials. Computerized equipment is, by nature, vulnerable to manipulation by unauthorized persons. The true results of an election that relies upon computerized equipment can never be known with full confidence, and Petitioner's constitutional rights to vote will be denied if computerized equipment is used.

## NATURE OF THIS ACTION

This is an action in law and equity under the United States Constitution for violation of Petitioners' Equal Protection and Due Process rights by Respondents. Petitioners seek only equitable, injunctive, and declaratory relief against Respondents for violation of Petitioners' clearly established Equal Protection and Due Process rights guaranteed to them by and through the United States Constitution. Petitioner does not seek damages. The Constitution itself provides both the cause of action and the remedy. *Jacobs*, 290 U.S. at 16, 54 S.Ct. at 27; *San Diego Gas Electric Co. v. City of San Diego*,450 U.S. 621, 654-55, 101 S.Ct. 1287, 1305-06, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting); see also *Dickinson*, 331 U.S. at 748, 67 S.Ct. at 1384. *Azul Pacifico, Inc. v. City of Los Angeles*, 948 F.2d 575, 586 (9th Cir. 1991). It would make no sense to provide for a constitutional right; require judges to preserve, protect, and defend that constitutional right; but prohibit judges from enforcing that constitutional right and from remedying a violation of that constitutional right. See also *Weeks v. United States*, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 656 (1914) (if a remedy for the violation of a constitutional right is not provided, that right might as well be stricken from the Constitution). See *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (June 24, 2022) Justice Alito's opinion on the Doctrine of Stare Decisis. Constitutional rights are not simply grandiose, advisory principles. They are the foundation upon which our system of the orderly administration of justice is structured. (citing *State v. Johnson*, 821 S.W.2d 609 (Tex. Crim. App. 1991)), *State v. Terrazas*, 962 S.W.2d 38, 40 n.2 (Tex. Crim. App. 1998).

## STANDING UNDER NATURE OF THE CAUSE

Using voting systems that were not properly certified means that my vote was taken from me and the officials holding a position from the use of improperly certified machines are

fraudulently and unlawfully holding a seat, leaving the residents of Galveston County and I without proper representation. Dec. of Ind. and Preamble to the U.S. CONST.

## JUDICIAL NOTICE

Due to the dispositive nature of the facts presented in this case, judicial economy warrants the Court to take judicial notice of the public record contained in the petition and subsequent filings regarding electronic voting equipment and systems certifications published by the Texas Secretary of State, the Elections Assistance Commission, Department of Homeland Security, Center for Information Security, and communications from all Respondents' official email addresses. "It is not uncommon for courts to take judicial notice of factual information found on the world wide web. See City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 655 n. 1 (6th Cir.2005) (taking judicial notice of a term defined on the website of the National Association of Securities Dealers, Inc.); Schaffer v. Clinton, 240 F.3d 878, 885 n. 8 (10th Cir.2001) (taking judicial notice of information found in a political reference almanac and citing to the almanac's website). Cf. Grimes v. Navigant Consulting, Inc., 185 F.Supp.2d 906, 913 (N.D.Ill.2002) (taking judicial notice of published stock prices found on the world wide web). Under the circumstances of this case, we conclude the district court abused its discretion by failing to take judicial notice of the actual earnings history provided by Northrop Grumman on the internet as required by Rule 201(d). (O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007))."

## FACTUAL ALLEGATIONS

*HART INTERCIVIC VERITY*

1. No universal definition exists for what constitutes a "paper ballot", thus enabling vendors and their surrogates to characterize "machine-marked paper printouts from ballot marking devices" (BMD) as "paper ballots".
2. The machine-marked ballot is then counted on a separate scanner.
3. Most independent cybersecurity election experts caution against putting these insecure BMDs between voters and their ballots and instead recommend hand-marked paper ballots as primary voting system.[1]
4. Currently "hybrid" systems that combine both a BMD and a scanner into a single unit are considered more controversial.
5. The Verity Touch Writer DUO is a daisy chained configuration comprised of a Verity controller device, a proprietary cord, and is capable of connecting up to twelve BMD devices.[2]
6. The software application, Verity Relay, is a remote transmission software application that receives election data transmissions sent by Verity Scan device (tabulator) unit that scans the ballots, Verity Touch Duo scanner firmware, and digital scanner devices that are equipped with the Relay modem accessory. Per the contract obtained through PIA requests, it appears that Tarrant County purchased this capability.
7. Two manufacturers of the voting machines utilized in Texas, ES&S and Hart, testified before the House Administration Committee that some tabulators have wireless modem capabilities.[3]
8. Several aspects/components of Hart InterCivic Verity Voting are concerning when in close proximity to the internet.
9. One known county contract of the Hart InterCivic tabulators indicates that (9) nine of the add-on modems were purchased.

---

[1] https://whowhatwhy.org/politics/elections/philly-ignores-cybersecurity-and-disability-access-in-voting-system-selection/ Last visited 06/21/22

[2] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf See page 21 Last visited 06/21/22

[3] https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 Last visited 06/21/22

a. Per Hart contract, a modem kit is required for electronic transmission from Verity Scan.

C. Voting Devices continued

| | | | Price breakdown per year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | | | Year 2 | | | Year 3 | | |
| Component | Version | Description | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) |
| Relay Modem Kit | | Modem kit required for electronic transmission from Verity Scan. May be shipped separately pending customer carrier selection; invoicing and testing will be independent if shipped separately. | $ 300 | 9 | $ 4,500 | | | | | | |
| AutoBallot Kit | | Barcode scanner kit for automatic Verity access code creation from VR/electronic pollbook data | $ 419 | 400 | $ 167,600 | | | | | | |
| License & Support for Verity Hardware | | Annual License & Support Fee | $ 471,880 | 1 | $ 471,880 | $ 471,880 | 1 | $ 471,880 | $ 471,880 | 1 | $ 471,880 |
| TOTAL | | | $ | | 13,303,792 | $ | | 471,880 | $ | | 471,880 |

b. On August 1, 2019, the SoS Office sent a letter of approval for the above contract, which included the add-on modems, to Heider Garcia. (Relay Modem Kit).

c. The Relay Modem Kit is listed as required by Hart for the ENR to function but is not a listed component on the SoS examination or on the certification.

10. Brandon Hurley, a SOS appointed examiner, pointed out the connectivity capabilities of this make and version of voting system in his examination report.[4]

11. The exact component that allows these connectivity capabilities was not identified in Hurley's report. The visuals of Verity Voting, however, as well as several item descriptions in SLI Compliance's testing report could be points of vulnerability given the lack of

[4] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf

compliance with VVSG.[5] See 1.6.1 Block Diagram



## 1.6 Scope of Testing

### 1.6.1 Block Diagram




Overview of the diagram:

- The components are displayed as touch points of data access, transfers, and verification.
- Dotted lines show the flow of data and air gaps using vDrives and are also used to separate the deployment models shown within the polling place.
- Verity Print is a ballot production device that provides unmarked printed ballots.
- Verity Touch Writer and Scan may be installed in polling places to support paper-based voting.
- Verity Controller, Touch Writer Duo, and Scan may be installed in polling



6

[5] https://www.eac.gov/sites/default/files/voting_system/files/Attachment%20F1%20-%20Hart%20Verity%20Voting%202.4%20Modification%20Test%20Plan%20As%20Run%20v1.2.pdf Last visited 06/21/22

[6] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf Last visited 06/21/22.

12. "Air-gapping" measures are intended to prevent internet/network access. Several experts have presented testimonies and demonstrations that contradict "air-gapping" as fail safe.

13. "Most traditional air gaps involve what is popularly known as a "sneakernet," a physical method of transferring data, e.g., a Wi-Fi dongle or USB port."[7]

> At this point, human nature takes over. Even well-intentioned users will accidentally leave doors unlocked or USB ports unguarded. They may get lazy and neglect to follow security procedures. One worrisome example of this risk occurs on merchant ships and naval vessels, whose mechanical control and navigation systems are air-gapped because, well, they're on a ship and generally not connected to the Internet (though even that is starting to change.) Once a ship is docked, however, a malicious actor can gain access to the ship and use a USB stick to insert malware into the system. When a ship undergoes maintenance, and hundreds of semi- or non-vetted workers are aboard the vessel while the regular crew is away, it's easy to see how an air gap will fall apart.

**2.5 Materials**

Items identified in the table reflect materials required to perform hardware, software, telecommunications, security, accuracy and integrated system tests in a manner that reflects real world use and needs.

The following test materials are required for the performance of testing including, as applicable, test ballot layout and generation materials, test ballot sheets, and any other materials used in testing.

- Ballots & blank ballot grade paper
- Thumb drives
- USB dongles
- Ballot marking pens
- Printer paper rolls

[8]

14. Further, Brandon Hurley noted an *over vote issue* ".... bring up a warning when more than one candidate can be voted for in a specific race. However, when you make your selection to continue, there is an automatic de-selection of another candidate chosen rather than

[7] https://www.rubrik.com/insights/what-is-an-air-gap-and-why-is-it-important Last visited 06/21/22

[8] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EA Last visited 06/21/22

allowing the voter to decide who gets deselected……. led to a voter confusion…. casting of an unintended vote without voter's knowledge."[9]

***HART INTERCIVIC BALLOT ISSUES***

15. Hood County District Attorney Matthew Mills contacted Attorney General Ken Paxton requesting clarification of ballot numbering issues associated with the use of Hart InterCivic voting systems.

16. Mills pointed out the following issues with electronic voting systems, specifically Hart's hybrid voting system.[10]

    a. Questions arising about compliance with election code.[11]

    b. Who has the authority to select the method for numbering ballots?

17. Texas Secretary of State legal director of the elections division informed election administrators of two ways to comply.[12]

    a. First method: Pre-print numbers on blank ballot stock, email deems "simplest and easiest way"

    b. Second method: The voting machine generates random numbers on blank ballots.

18. Mills poses (3) three questions regarding the ballot numbering issues with Hart.[13]

19.

> The relevant language in § 52.062 is the following: "[t]he ballots prepared by each authority responsible for having the official ballot prepared." Does this indicate that using pre-printed numbers on blank ballot stock is the only legal way to comply with the statute? Or does the machine generation method also comply with the numbering requirement?

    a. A memorandum from a staff attorney, Chuck Pinney, to the Director of Elections, Keith Ingram, dated May 18, 2020, states machine-generated numbering on the Hart Verity 2.4 system complies with Texas ballot numbering requirements.

---

[9] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf#search=hart%202.4.2

[10] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/24/22

[11] See Tex. Elec Code § 52.062

[12] https://www.sos.texas.gov/elections/forms/sysexam/chuck-pinney-hart-2.4.pdf See page 3 Last visited 06/22/22

[13] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 12 Last visited 06/22/22

b. According to Elec. Code Ann § 31.032 the election commission has the authority to appoint an election administrator as well as suspend or terminate the administrator under § 31.037. Under § 31.039, the commissioners court maintains authority over various budgetary issues including salary and staffing.

   i. A 1988 Tex. Att'y Gen. Op. No. LO-88-62 (1988)[14] the AG's office opined that election administrators should be "largely independent of both the commissioners court and election commission.", essentially stating that the elections commission does not possess the authority to suspend an elections administrator.

   ii. Senate Bill 12333 from 2011 may render the AG opinion moot which gave new authority to elections commissions to suspend elections administrators.

   iii. In 1997, the San Antonio Court of Appeals provided a different conclusion in Krier v. Navarro, 952 S.W.2d 25. The elections administrator was greatly restricted in the exercise of his duties from "...selecting polling places and early voting sites, issuing orders calling for elections, adopting a voting system, selecting election judges and phone bank clerks...leasing voting systems...The evidence presented establishes that the governmental functions performed by Navarro were not exercised 'largely independent of the control of others."*Id*

Assuming the reasoning in *Krier* is correct, is the method of ballot numbering akin to "adopting a voting system," which is controlled by the commissioners court? Or has the commissioners court already determined the voting system by purchasing voting equipment, and the elections administrator may then determine which method of ballot numbering is appropriate?

Chapter 52 of the Election Code contains various provisions for the preparation of ballots. Under § 52.001, ballots are for the "vote in *an election*." (emphasis added) Does the suggestion in the director's advisory that jurisdictions may conduct subsequent elections with ballot numbers starting higher than "1" comply with § 52.062? Or should ballots begin with the number "1" for each election?

[14] https://www2.texasattorneygeneral.gov/opinions/opinions/47mattox/lo/1988/pdf/lo1988062.pdf Last visited 06/22/22

c. On October 23, 2019, Keith Ingram of the Texas Secretary of State office published Election Advisory 2019-23. Sec. 13(1)(a)(iv)(1)[15]. The director suggests that jurisdictions *MAY* start with the number "1" and then start subsequent elections with ballots with much higher starting numbers. *(Emphasis added)* See below Election Advisory 2019-23, which reads as follows:

iv. The jurisdiction can pre-number the ballots and split them into batches for each election, with each batch beginning with a number that ends in the number "1". Those batches must be no smaller than units of 100, though a jurisdiction could batch in larger units if needed (1000, 10,000, etc.).

1. **Example:** For the November election, the jurisdiction could use ballots 1-1500, and for the May election that jurisdiction could then use ballots 1501-2400, and for the following November election the jurisdiction could use ballots 2401-4200, etc.

20. Is the Director of Elections advising jurisdictions to ignore Tex. Elec Code § 52.001?

21. Hood County Attorney Matthew Mills raises three very specific questions concerning the numbering of the ballots in which Hart InterCivic voting systems does not comply in accordance with Tex. Elec Code.[16]

22. In response to Mills' request for an opinion regarding numbering of the ballots, Roger B. Borgelt of Borgelt Law provided an opinion to the Attorney General's office on July 29, 2021.[17]

23. The Texas legislature is constitutionally required to provide for ballot numbering in Texas.[18]

24. The Texas legislature passed the consecutive ballot number statute 35 years ago[19] and provides integrity of the ballot by detecting counterfeited, missing, or duplicate ballots.

25. Tex. Elec Code § 52.062 requires consecutive ballot numbering consecutively beginning with number "1" and is referenced in (6) six other Election Code provisions, therefore making it an established mandatory procedure.

**a. § 51.006. PREPARING BALLOTS FOR DISTRIBUTION**

The authority responsible for distributing election supplies shall package and seal each set of ballots before their distribution and shall mark the package with the number of ballots enclosed and the range of the ballot serial numbers.

---

[15] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

[16] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009

[17] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 3 Last visited 06/22/22

[18] See TEX. CONST. art. VI § 4

[19] See Tex. Elec Code § 52.062

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.47; Acts 1991, 72nd Leg., Ch. 554, Sec. 18, eff. Sept. 1, 1991.

**b. § 51.007. RECORD OF BALLOT DISTRIBUTION**

(a) As soon as practicable after the ballots are packaged for distribution, the authority responsible for distributing election supplies shall prepare a record of the number of ballots and the range of serial numbers on the ballots to be distributed to each presiding judge and the early voting clerk.

(b) The authority shall preserve the record for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.48; Acts 1991, 72nd Leg., Ch. 554, Sec. 19, eff. Sept. 1, 1991.

**c. § 51.008. SUPPLEMENTING DISTRIBUTED BALLOTS**

(a) The authority responsible for distributing election supplies shall retain a reserve of ballots to supplement the distributed ballots and on election day may reallocate previously distributed ballots among the polling places.

(b) The authority shall enter on the record of ballot distribution the number of ballots reserved and the number of ballots distributed from the reserve to each polling place. The range of serial numbers on the ballots shall be included in the record.

(c) If distributed ballots are reallocated, the authority shall indicate the reallocation on the record of ballot distribution and shall issue a receipt to each presiding election judge showing the number of ballots and the range of serial numbers on the ballots taken from the judge's polling place for redistribution. Each presiding judge shall indicate on the ballot register any reallocation of ballots affecting that polling place.

(d) The authority shall retain the undistributed reserve for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**d. § 51.010. FAILURE TO DISTRIBUTE OR DELIVER SUPPLIES**

(a) A person commits an offense if the person is responsible for distributing election supplies for an election and intentionally fails to distribute any of the supplies by the deadline prescribed by Section 51.004(b).

(b) A person commits an offense if the person is entrusted with the delivery of election supplies for use at polling places and intentionally fails to deliver any of the supplies within the time specified by the person who entrusted the delivery to the person.

(c) An offense under this section is a Class C misdemeanor.

Acts 1985, 69th Leg., Ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., Ch. 864, Sec. 46, eff. Sept. 1, 1997.

**e. § 62.007. EXAMINING BALLOTS**

(a) An election officer shall unseal the ballot package, remove the ballots, and examine them to determine whether they are properly numbered and printed.

(b) An unnumbered or otherwise defectively printed ballot shall be placed in ballot box no. 4.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**f. § 62.009. DISARRANGING BALLOTS FOR VOTERS' SELECTION**

(a) As needed for voting, an election officer shall disarrange a supply of the ballots so that they are in random numerical order.

(b) The disarranged ballots shall be placed face down on a table in a manner preventing an election officer or other person from ascertaining the number of a ballot selected by a voter.

(c) The provisional ballots shall be placed separately from the regular ballots.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 1078, Sec. 6, eff. Sept. 1, 1997; Acts 2003, 78th Leg., ch. 1315, Sec. 22, eff. Jan. 1, 2004.

26. As noted above in Election Advisory 2019-23, the SoS notates that jurisdiction using ES&S and Hart InterCivic systems does not comply with § 52.062.[20]

**ES&S ExpressVote – Tracking Ballot Numbers Through the ExpressVote Activation Card Printer/ExpressLink Software**

1. Each ExpressVote Activation card printer that is assigned to a specific polling place will be given a two to three digit alpha code. This code will be printed on each Ballot Card as it is generated for the voter.
2. In addition to the alpha code, each polling place will print a randomly generated serial number between 1 to 99,999 on the card along with the identifying information related to the election.
3. The system will generate a report showing which ballots (based on their serial number) were used at each location. This report must be retained with your precinct election records.
4. For tracking purposes, you will continue to have the presiding judge fill out the Ballot Register (PDF), and the original and duplicate forms will be returned in the applicable envelopes. The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the exception of notating the serial number of the ballot ranges.

27. Randomized ballot numbering procedures will cause jurisdictions to violate several election codes.[21]

28. In the same advisory[22] the SoS Office does not advise how jurisdictions will comply with the following Tex. Elec Codes:

   **a.** § 51.010 – how will officials distribute serial numbered range records to polls.

   **b.** § 62.007 - how officials at polls determine if ballots are properly numbered.

   **c.** § 62.009 – how will election judges place numbered ballots face down.

29. Allowing voting machines to generate random text values on ballots will cause confusion and violate several Tex. Elec Code statues, and these violations are punishable by law.[23]

30. The SoS is provided the authority to prescribe "operating procedures" related to voting systems. The Tex. Elec Code does not provide the SoS the authority to advise election

[20] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[21] See Tex. Elec Code § 52.062, 51.006, 51.008
[22] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[23] See Tex. Elec Code § 51.010(c), § 51.007(b), 51.008 (d) and 13 TAC § 7.125(a)(10) and Tex. Penal Code § 37.10(3)

administrators to ignore any sections of the Election Code, as law and procedure are not the same.

31. The Legislative Branch did not provide the SoS the authority to ignore Tex. Election code nor the authority to advise to jurisdiction to do the same, which is a violation of TEX. CONST. art. VI §4. in regards to numbering of the tickets/ballots. No authority grants the SoS the ability to *interpret* Tex. Elec. Code for the following:
    **a.** Advising jurisdictions to ignore Tex. Elec Code § 52.062.
    **b.** Hindering jurisdictions' ability to "detect and punish fraud and preserve the purity of the ballot box. ....as randomized ballot numbers prevent election judges from recording, validating, and tracking the official ballot serial number ranges they were in possession of, personally distributed, and retained at their polling locations, again violating TEX. CONST. art. VI § 4."[24]
32. The Election Code specifically assigns the SoS duties[25] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code.[26]
33. The SoS and County Officials disregard for Tex. Elec. Code in their guidance to jurisdictions violates the Separation of Powers Clause of art. 2 § 1 of the Texas Constitution.
34. The Texas Constitution provides that only the Legislature can suspend laws, not the SoS, a member of the Executive Branch.
35. These actions are in contradiction to the Election Code and its interpretation and application to ensure uniformity across the state of Texas in all voting systems.[27]
36. By suspending laws and authorizing exceptions to the Election Code, the SoS have and continue to unlawfully modify election law.[28]

[24] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/22/22
[25] See Elec. Code § 31.003
[26] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)
[27] See Tex. Elec Code § 122.032
[28] See Tex. Elec Code § 276.019. UNLAWFUL ALTERING OF ELECTION PROCEDURES - A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code.

37. The Legislature provided a very clear and specific mandate: prepare and distribute detailed and comprehensive written directives and instructions that comply with the Election Code to state and local election authorities.[29]

38. The SoS and County Officials' defiance of Election Code knowingly caused the Petitioner, a registered voter of Texas to:

    **a.** Cast a vote under false pretense[30]

    **b.** Prevent a cast of a legal vote in which Petitioner is eligible to vote.[31]

    **c.** Cause the ballot not to reflect the intent of the Petitioner/voter[32]

    **d.** Respondents committed the offense while acting in the capacity of an elected official.[33]

39. Randomized ballot numbering generated by Hart InterCivic Verity 2.4 results in multiple violations of election law, the Texas Constitution, and the Texas Penal Code.

***HART INTERCIVIC ESLATE***

40. During the 2018 midterms a number of "straight-ticket" voters complained that Hart's eSlate system had switched their choices to the opposite party. [34]

41. Others reported that the Hart eSlate machines appear to remove any selection for the U.S. Senate. [35]

42. In 2008, the Texas Democratic Party sued then-Secretary of State Roger Williams over a similar straight ticket voting error affecting the same Hart eSlate machine.[36]

43. April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification.[37]

44. California Secretary of State Debra Bown released results of the state's review of the voting systems used in the state.[38]

---

[29] See Elec. Code § 31.003
[30] See Tex. Elec Code 273.013(1)
[31] See Tex. Elec Code 273.013(2)
[32] See Tex. Elec Code 273.013(6)
[33] See Tex. Elec Code 273.013(b)(1)
[34] https://techcrunch.com/2018/10/26/texas-voting-machines-changing-votes-hart-eslate/ Last visited 06/21/22
[35] https://www.houstonchronicle.com/news/politics/texas/article/Voting-machine-errors-changed-some-Texans-13339298.php Last visited 06/21/22
[36] https://www.austinchronicle.com/news/2008-08-08/658341/ Last visited 06/21/22
[37] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[38] https://www.wired.com/2007/07/ca-releases-res/ Last visited 06/23/22

a. Red Team, led by UC Davis computer scientist Mathew Bishop, was tasked with examining security vulnerabilities and found that Hart InterCivic could be compromised. Many of the attacks could be mitigated but *not all. (Emphasis added)*

b. Red Team also noted that they did not have enough time to fully examine the systems and were confident that further examination would reveal additional security vulnerabilities in the voting system.

c. Samples of the kinds of attacks the team was able to conduct on the Hart InterCivic System:

> 1. Election Management System. The testers did not test the Windows systems on which the Hart election management software was installed because Hart does not configure the operating system or provide a default configuration. Hart software security settings provide a restricted, Hart-defined environment that the testers bypassed, allowing them to run the Hart software in a standard Windows environment. They also found an undisclosed account on the Hart software that an attacker who penetrated the host operating system could exploit to gain unauthorized access to the Hart election management database. 2. eScan. The testers were able to overwrite the eScan firmware. The team also accessed menus that should have been locked with passwords. Other attacks allowed the team to alter vote totals; these attacks used ordinary objects. The team, in cooperation with the source code review team, was able to issue administrative commands to the eScan.
>
> 3. JBC. The team developed a surreptitious device that caused the JBC to authorize access codes without poll worker intervention. The team verified that the mobile ballot box (MBB) card can be altered during an election. The team also found that post-election safeguards to prevent the altered data on a tampered MBB card from being counted can be easily bypassed.
> 4. eSlate. The testers were able to remotely capture the audio from a voting session on an eSlate with audio enabled, thereby providing an attack that violates voter privacy.
> The team was also able to force an eSlate to produce multiple barcodes after printing
> "BALLOT ACCEPTED" on the VVPAT records. This could cause a county that used bar code readers to read the VVPAT to produce erroneous vote totals.

45. Brandon Hurley, a SoS examiner, notates on his examination report dated February 19, 2008: "…January 18, 2008, all of the appointed Examiners gather with Hart officials for remainder of the inspection and testing of the 6.2.1 System…. The examiner and the Hart officials held a lengthy discussion concerning past published issues and issues in other states that have come up with the Hart InterCivic 6.2.1 System and its predecessors. In particular, a previous "decertification" by the California Secretary of

State was discussed…Hart officials represented that California immediately recertified the system after it was decertified."[39]

46. Hurley further noted: "…recommendation is conditioned on satisfactory answers being provided by Hart to the Secretary of State's office in response to the list provided to Hart on February 6, 2006. The answers to these questions are due from Hart on February 22, 2008. If any of the questions or additional issues, then I would suspend this recommendation pending the resolution of such issues."

47. Tom Watson, a SoS examiner, notates on his examination report the following:

a. "Tally, Rally, and SERVO employ the "secure desktop" feature which is supposed to prevent access to the operating system by the operator during the election processing. A flaw in the "secure desktop" was discovered during the Tally examination. The standard Windows file dialog is used to select a file when exporting VR data…This is a significant flaw because it allows an operator to delete files or launch a program that could manipulate the data files."

b. "…but there is a security issue. The file dialog flaw is significant and must be corrected."

48. Stephen Berger prepared a report for the SoS on Hart InterCivic Voting System Version 6.2.1 in which he recommended that this system NOT be certified until Hart InterCivic addressed the issues he cited below.[40]

a. Conditions of Certification

i. "All files installed with the system must be filed with the NIST NSRL. Hart InterCivic's response is egregiously deficient. To support incoming inspection of new systems a list of all files installed is need so that the new system can be verified as having only the system as certified. Pre- and post-election checks to confirm that software has not been changed or tampered with are recommended. To do this local jurisdiction must have HASH codes of all static files. Further, to avoid the system having a single point vulnerability the non-static files, that change with use, should be evaluated by an entity other than the vendor. Why

[39] https://www.sos.texas.gov/elections/forms/sysexam/brandonhurley.pdf#search=hart%206.2.1 Last visited 06/23/22

[40] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 Last visited 06/23/22

non-static files change should be understood by state and local authorities. Election officials should make their own independent determination that files that change with use and are not included in pre- and post-election checks are appropriate and do not represent a security vulnerability."

ii. In response to the question:

"Beyond the files installed with the Hart software, what other files in the operating system and elsewhere do the applications in the Hart 6.2.1 system use?"

Hart responded:

"Like most Windows based software, System 6.2.1's HVS applications make broad use of Windows resources, including hundreds of DLLs and other executable files. Hart would be happy to provide information on the identification of each of these individual files and their respective purpose and characteristics (e.g. why does its HASH code value change from one day to the next or one install to the next), but the information was not required during the original ITA and NASED certification testing, nor during subsequent "

"In its response Hart illustrates the importance of this point. The Hart software makes "broad use of Windows resources, including hundreds of DLLs and other executable files". Each of those files represents a potential vulnerability, an opportunity to introduce malicious code into the system. For that very reason it is essential that the information be available to verify these files both in the certification process and pre- and post-election. Past deficiencies are no reason to propagate a vulnerability into the future. Being able to confirm that the software certified at the national and state level is identical to that installed and used in elections is one of the most significant improvements to total election system security that can be made. Implementing such checks requires not modification or recertification of a voting system, unlike many changes. The tools to verify HASH codes are readily available and do not require extensive training to use. It is hard to imagine why a change that is this beneficial is being resisted."

iii. In response to the HASH code issue, Hart InterCivic states:

"These criteria have been imposed on Hart HASH code submissions by arrangements agreed between Hart and NIST in the absence of other specific authoritative requirements for vendor reference files."

"This statement is inaccurate and misleading. This examiner has met personally and had multiple telephone conversations with NIST NSRL staff. NIST NSRL will HASH and post any files a vendor gives them to post."

iv. "Although the Hart InterCivic system is NASED certified it fails to meet some requirements for NASED certification dealing with operating system configuration. A secure configuration of the operating systems provided must be provided with instructions on how to check the configuration. To assure that the system is adequately secure Hart must specify an operating system configuration, with adequate safeguards to assure that the Hart applications will only run in a secure configuration of the operating system. The configuration should be consistent with industry practice as represented in the NIST security configuration checklist for its operating system, Windows 2000 Professional?"

v. In response to questions about the Hart InterCivic recommended configuration, the company stated:

> "Setup and configuration of HVS application computers is accomplished only by qualified Hart technical personnel and includes all Windows updates as of the date of the install."
>
> "This practice is not acceptable. Voting system applications use many operating system functions. Changes to the operating system should only be made after approve by the Texas Director of Elections after appropriate review. Further, safeguards are needed to assure that only the approved update is installed on systems. The current practice potentially allows additional software to be installed under the guise that it is part of the operating system update."
>
> "To assure a secure election system there should never be a point at which individuals from a single organization can change software. At a minimum individual from two different organizations should approve and verify any changes to the operating system. In the case of operating system upgrades it would be preferable that the vendor recommend and the Director of Elections approve any patches to the operating system. Then that the vendor install the patches and the local jurisdiction have the tools and information to verify that the system delivered to them have only certified software, including the version and updates to the operating system. Further local jurisdictions should have the tools and information to confirm that no additional software has been added to the system."

vi. Recommended administrative use procedures for this system are needed.

49. Hart InterCivic has a history of issues regarding hash validations, including version 6.2.1, yet the SoS's office did certify without publishing answers regarding if condition had been met.

50. Berger's report listed a multitude of security flaws presented in the Hart InterCivic 6.2.1 voting system.

3. **VSS 2002 Vol. 1 Sec. 2.2.5.3**

"2.2.5.3 **COTS General Purpose Computer System Requirements**

Further requirements must be applied to COTS operating systems to ensure completeness and integrity of audit data for election software. These operating systems are capable of executing multiple application programs simultaneously. These systems include both servers and workstations (or "PCs"), including the many varieties of UNIX and Linux, and those offered by Microsoft and Apple. Election software running on these COTS systems is vulnerable to unintended effects from other user sessions, applications, and utilities, executing on the same platform at the same time as the election software.

"Simultaneous processes" of concern include unauthorized network connections, unplanned user logins, and unintended execution or termination of operating system processes. An unauthorized network connection or unplanned user login can host unintended processes and user actions, such as the termination of operating system audit, the termination of election software processes, or the deletion of election software audit and logging data. The execution of an operating system process could be a full system scan at a time when that process would adversely affect the election software processes. Operating system processes improperly terminated could be system audit or malicious code detection.

To counter these vulnerabilities, three operating system protections are required on all such systems on which election software is hosted. First,

25 of 33

Version: 2.0
Date: March 3, 2008 41

51. These security vulnerabilities provide access to election system in a way in which vote totals may be altered.

52. The SoS's office issued a "Preliminary Statement" on April 30, 2009 under the conditions the examiners discovered two potential security concerns and advised security protocols to follow to mitigate these vulnerabilities.

53. If these security protocols are not followed, then it is theoretically possible to have access to the operating system and run or delete other programs. Jurisdictions are advised to (1) restrict usage of the voting system[42] and (2) restrict what software is loaded onto the voting system computer.

54. The SoS's office further "conditioned" the certification of version 6.2.1 by applying procedures for jurisdictions. (1) Two-person access with one person login on Windows 2000 OS and one person to start the application. (2) Two-person control team on the Tally when open. (3) Windows 2000 audit logs which tracks log-ons and attempts. (4) Windows

[41] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 See page 25 Last visited 06/23/22

[42] Election Advisory 2008-09, Section 5(f)(i-iii)

2000 to harden operating systems. (5) Jurisdiction must file an initial written confirmation with the SoS that they are in compliance with the procedures.[43]

55. By the SoS's current website, there are 35 counties utilizing this version of Hart.[44]

**GALVESTON COUNTY**

1. **The elections office claims the use of Hart Intervivic 2.4.2 on the specific election November 3,2022 in Galveston County. According to the Secretary of State documents show record of Hart Intercivic 2.0 being used. The County claims to use voting systems that randomize votes. As well as not having matching contracts with the Secretary of State.**

**DECLARATIONS FROM AUTHORITIES**

*Terpsehore Maras*

56. The Affidavit of Terpsehore Maras attests that the 2017 elections is null and void due to lack of Election Assistance Commission (EAC) certifications of Voting Systems and the Voting System Test Laboratories (VSTL) used to certify the Voting Systems. (APPENDIX P-1) [45]

RULE: Section 231(b) of the Help America Vote Act (HAVA) of 2002 (*42 U.S.C. §15371(b)*) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA § 231(b)(1). However, consistent with HAVA § 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those

[43] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[44] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf Last visited 06/23/22
[45] https://storage.courtlistener.com/recap/gov.uscourts.wied.92717/gov.uscourts.wied.92717.9.13.pdf

recommended by NIST upon publication of an explanation of the reason for any such accreditation.

57. CONCLUSION: This affidavit presents unambiguous evidence of:

a. Foreign interference
b. Complicit behavior by the previous administrations from 1999 to present to hinder the voice of the American people
c. Knowingly and willingly colluding with foreign powers to manipulate the outcome of the 2020 election
d. Foreign nationals, through investments and interests, assisted in the creation of the Dominion software
e. Akamai Technologies merged with a Chinese company that makes and distributes the COTS components of election machines
f. US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections
g. The EAC failed to abide by standards set in HAVA ACT 2002
h. The IG of the EAC failed to address complaints since their appointment regarding vote integrity
i. Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002
j. Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then

k. The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

l. AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations

*J. Alex Halderman*

58. This is a summary of the Declaration of Mr. J. Alex Halderman regarding the case of Curling et al v. Raffensperger et al.[46] Mr. Halderman makes these claims under oath, and this summary will neither make inferences from nor inflate his statements. APPENDIX P-2

59. The DRE machines do not create a paper record of each vote. Paperless DRE machines are notoriously vulnerable to cyber-attacks that can cause a multitude of issues. Votes can be changed or erased. Extra votes can be cast, and machines can be made to not work at all. He goes on to state that paperless DRE machines do not provide even adequate security against cyber-attacks.

60. Mr. Halderman claims the 2016 presidential election was subject to multiple attempts to interfere with and undermine the election process through cyberspace. He cites incidents such as compromised email accounts belonging to the Democratic National Committee and John Podesta. He also cites attempted intrusions into election-related systems via cyberspace in at least eighteen States. Voter data was successfully exfiltrated in two states, and in a subset of those eighteen, attackers could have altered or deleted voter registration data.

*Shawn Smith*

[46] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Halderman

61. Shawn Smith, retired Military officer with a Master's degrees in National Security Affairs and in Aeronautical Science, filed a declaration on 6/8/2022 into Kari Lake, et al. v. Katie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt)[47]. APPENDIX P-3

62. He states: "I have been asked to testify about the threat of the compromising of our supply chain and attack(s) to U.S. national security systems and critical infrastructure, in particular to election related systems, including voting systems and consequently, to elections." As noted in other expert affidavits and declarations, Smith describes the vulnerability of the United States' critical systems resulting from compromised supply chains, which includes U.S. elections. He states that it is his, "conclusion that U.S. elections are critically vulnerable to exploitation by foreign adversaries through compromising of our computerized election systems through supply chains."

63. "Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in 50 states, much less over our 3,000 U.S. Counties. Hart InterCivic appears to use Hewlett-Packard computers, which are remanufactured and assembled overseas, containing overseas-manufactured components, built by foreign workers, and all without U.S government oversight and "effectively no safeguards in the entirety of the testing and certification regime for voting systems"

64. "ES&S is owned by the private equity firm McCarthy Group, which doesn't disclose the information of investors, including if any other investments or financial interests, have a controlling interest in ES&S."

*John R. Mills*

---

[47] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith

65. The Declaration of John R. Mills and the testimony of Mr. Mills regarding the use of remote access operations for the unlawful entry and purposes into computer networks was requested. The information is unclassified and based on his personal experience, publicly available reporting, and open-source information. (APPENDIX P-4)

66. Remote access operations are designed to gain access to computer networks to avoid detection and residual forensic evidence. This is accomplished via implanted malware, other software, and/or algorithms that facilitate access to the targeted system.

67. Electronic election infrastructure is considered critical infrastructure and can be subjected to remote access operations. A successful remote access operation could change vote totals, rendering elections null and void. Mr. Mills states he has very low confidence in the security of American election critical infrastructure.

68. Mr. Mills states there is no independent third-party review of electronic voting systems. The level of expertise by those officials who review or access these systems is woefully inadequate.

69. He states contractors use intellectual property rights or contractual terms to deny any third-party review of the election systems they provide.

70. Mr. Mills points out that ES&S has admitted to building in remote access to their machines. He goes on to state that many of the security procedures designed to restrict the ability of remote access operations are not being used.

71. Mr. Mills concludes by assessing the current voting process has become over-sophisticated and asks why this is necessary for elections. He raises legitimate questions of why counties are spending inordinate amount of resources on a technology environment without an evaluation of whether it is truly required. He further assesses there are no checks and

balances on sworn elected officials and states the entire notion of electronic voting machines needs to be revisited.

Douglas Logan

72. The Declaration of Douglas Logan (APPENDIX P-5) concurs with the aforementioned affidavits and presents evidence from DEFCON Reports (Exhibits A, B, C).

73. See Appendix P-6 for issues related to the accreditation of electronic voting systems.

74. See Appendix P-7 for foreign countries involved in election infrastructure, manipulation, and supply chain management.

## FAILURES, NEGLECT, AND OFFENSIVE VIOLATIONS

UNDER 42 U.S.C. §1985, 42 U.S.C. §1986, GUARANTEE CLAUSE,
28 U.S.C. §1367

Respondent County Officials: Dwight Sullivan, County Clerk; Mark Henry, County Judge; Joe Giusti, County Commissioner Precinct 2; Darrell Apfell, County Commissioner Precinct 1; Robin Armstrong, County Commissioner Precinct 4; Stephen D.Holmes, County Commissioner Precinct 3 have violated state and federal law with violations that include:

a. Approving and adopting operating systems lacking proper certifications.

Allowing fhh or unmonitored network communications.

b. Restricting access to public information.
c. Concealing and refusing to release voting system software/firmware versions.
d. Once informed of any problematic issues with voting systems/software, proceeded with elections without informing the public nor issued any public statement as the malfunction continued to affect casting of ballots during the election.
e. Under the advice of SoS, violated Tex. Elec Code § 52.062 requiring the numbering of ballots, which produced a violation of TEX. CONST. art. I § 28.
f. Under the advice of SoS, violated TEX. CONST. art. VI § 4 by providing for numbering of tickets specifically reserved for the Legislative Branch.

g. Impeded election workers and staff from the ability to "detect and punish fraud and preserve the purity of the ballot box." Randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations, violating TEX. CONST. art. VI § 4.

h. Set off a chain reaction of violations of several ballot numbering statues that are not only illegal but also criminally punishable in the election code. TEX. ELEC. CODE § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and TEX. PEN. CODE § 37.10(3).

i. Certified not only the November 3, 2020 election results but every subsequent election after receiving evidence from constituents that cast doubt on the integrity of the ballot.

j. Knowingly remiss in their duties, acting under the color of law, and are in violation of Texas statute. These officials did not acknowledge the expiration of certification of accreditations of VSTLs nor the lack of legal signature per HAVA, thereby continuing to allow these voting machines to be used in county elections since 2020. What is confirmed is that Pro V& V and SLI Compliance were ***Not Accredited*** VSTL. *(Emphasis added)*

k. Under the guise of 'protecting the vote', County Officials with undisputed knowledge of HAVA have nefariously sought to suppress the violations of federal and state law from Petitioner. After multiply attempts in the form of PIA(s), the county actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

l. Officials and employees, under the directive of the SoS office, withheld from the public that the malfunctions of the voting equipment/software were not resolved but were, in fact, affecting multiply counties during the elections.

m. Acting under the color of law, administered elections with non HAVA complaint voting system equipment, software, and modifications for the state of Texas that have been used in state and federal elections from 2020 through 2022, violating TEX. ELEC. CODE §§ 52.062, 122.032, 123.001, 123.002, TEX. ADMIN. CODE

§§ 81.60 and § 81.61, and are also apparent violations of TEX. CONST. art. VI § 2 and § 4 and federal 52 U.S.C. 20971.

n. By Officials' own admission via the State of Texas' Secretary of State website regarding education of the HAVA, they knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation from the EAC.

o. Respondents' duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

p. Respondents have, by their actions, demonstrated an intention to continue to allow these same failures to be repeated in future elections.

## EMERGENCY RELIEF IS NECESSARY

The Constitution requires that elections be free, fair, and accurately counted. Changing reported votes or vote totals in a public election violates Petitioner's fundamental right to vote and Petitioner's rights under the Due Process clause and the Equal Protection clause. The only way to prevent these violations is to refrain from using vulnerable Electronic Voting Systems to administer future elections, including the 2022 November Election. The relief requested by Petitioner is the only way to eliminate the likelihood that Texas election results will be secretly changed by malicious programs hidden in Electronic Voting Systems. Accordingly, a emergency relief is appropriate and necessary to remedy the impending violations of Petitioner's constitutional rights. "In order to obtain a restraining order a plaintiff must establish (1) 'that he is likely to succeed on the merits,' (2) 'that he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in his favor,' and (4) 'that an injunction is in the public interest.'" *Hernandez v. Sessions*, 872 F.3d 976, 989-90 (9th Cir. 2017) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "Under our 'sliding scale' approach, 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may

offset a weaker showing of another.'" *Hernandez,* 872 F.3d at 990 (quotations omitted). Petitioner meets each of the four elements here. Due to irreparable harm to Petitioner's personal property (my vote) and under principles of the balance of equity, Petitioner is entitled to emergency writ of injunction. TEX. CIV. PRAC. & REM. CODE § 65.011, TEX. GOV. CODE § 23.302, TEX. ELEC. CODE § 273.081, 28 U.S.C. § 1343(a)(3) and Federal Rule of Civil Procedure 65.

**A. Petitioner Is Likely to Succeed on the Merits.**

Petitioner will prevail on the merits of their claims because the right to vote and have one's vote counted correctly together with all other votes is a basic right guaranteed by multiple constitutional provisions, and the use of Electronic Voting Systems as Texas intends grossly infringes that right.

Voting is an indisputable right "of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks and citation omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Therefore, states may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. *Baker v. Carr*, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest." *Curling*, 493 F. Supp. 3d at 1280 (citing *Burdick*, 504 U.S. at 434). "Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

The scope of the right to vote requires states to adopt methods of voting, vote collection, vote counting, and vote tallying that ensure fair, accurate, and secure counting of all legal ballots and exclude any attempt to change the total results reported to differ from the true sum of the votes legally cast. The fundamental right to vote is "the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). It necessarily encompasses the right to have all votes counted accurately. "Every voter's vote is entitled to be counted once. It must be correctly counted and reported." *Gray v. Sanders*, 372 U.S. 368, 380 (1963). Because the significance of a vote is inherently comparative – the meaning of a vote is destroyed by improper inflation of opposing vote totals, just as much as if the vote itself was wrongfully prevented – a state's entire system of collecting, counting, and tallying votes must prevent any manipulation of the reported totals.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds,* 377 U.S. at 555. See also *United States v. Saylor*, 322 U.S. 385, 386 (1944) ("'[T]he free exercise and enjoyment of the rights and privileges guaranteed to the citizens by the Constitution and laws of the United States'" entails "the right and privilege . . . to have their expressions of choice given full value and effect by not having their votes impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified.").

A voting system that counts ballots cast by some voters using different standards from ballots cast by other voters also violates the Equal Protection rights of the voters. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05

(2000); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). Electronic Voting Systems are inherently vulnerable to improper manipulation of votes and vote totals. They cannot be effectively secured against improper manipulation. Therefore, they cannot be constitutionally used to administer Texas elections.

### B. Petitioner Will Suffer Irreparable Harm Absent Emergency Relief.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Hernandez*, 872 F.3d at 994-95. Texas's intended use of Electronic Voting Systems in future elections, including the 2022 Election, will deprive Petitioner of constitutionally-protected rights. Petitioner, and all Texas voters, will suffer irreparable harm absent the grant of preliminary relief. Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioner if the requested injunctive relief is not granted Immediate preservation of ballots, followed by a thorough forensic examination of each ballot by highly qualified, independent document examiners, will serve to restore the public's confidence in the state's election process. Petitioner shows that a basic tenet of a free republic requires that the counting and tabulation of fraudulent ballots cannot be allowed to stand unchallenged.

### C. The Balance of Equities Favors an Injunction.

The balance of equities favors entering the injunction sought by Petitioner. It will cause little, if any, harm to the Respondents, because the system currently intended to be used already calls for the creation of paper ballots. TEX. CONST. art. VI § 4, TEX. ELEC. CODE Chp. 65. By Texas law, the Respondents are already able to carry out the relief sought by Petitioner. The requested injunction would merely require the use of hand counting for all voters and all contests.

In contrast, failing to enter the injunction and permitting use of the currently intended system would inflict immeasurable harm. In addition to the deprivation of Petitioner's constitutional rights, the true election results would never be known with certainty, casting a shadow of illegitimacy over the subsequent official acts of the winning candidates. If the defining feature of self-government is the selection of governing officials by majority vote, then conducting an "election" process in which the people cannot confidently know which candidate received the majority vote means intentionally casting aside self-government. That enormous harm would be felt by all persons, whether citizen, voter, or neither, because it would bring into dispute the governance of the public authorities. The resulting loss of legitimacy and increase in political strife would be felt by all.

The Petitioner seeks to have the Court ensure, by an appropriate order, the safe-keeping and non-spoliation of all original ballots and all other related election information – tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic election equipment, including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR) archives, project database backups, and any other form of backups – from the November 2020 election until such time that an extensive forensic inspection by qualified independent document examiners and experts is conducted to determine which ballots are original and which are counterfeit, if any. Petitioner requests all other and further relief, at law and in equity, which the Court deems necessary to ensure accurate certifications of the elections occur in the State of Texas, given that the current certification is plagued with demonstrable errors. Petitioner shows that the preservation of records

and evidence – with subsequent investigation – will have the resulting benefit of ensuring that Galveston County implements the necessary changes, safeguards and best practices to ensure that future elections are conducted in strict accordance with Texas law.

### D. The Requested Injunction Is in the Public Interest.

The public interest requires free, fair, and accurately counted elections in which the votes of all legal voters are counted equally and are not diluted by altered votes or phantom votes. This is also the constitutional right of Petitioner, and all Texas voters. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Hernandez*, 872 F.3d at 996 (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). Further, eliminating even the appearance of unsecure elections serves the public interest. "[P]public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). The use of Electronic Voting Equipment creates large, invisible risks of vote dilution and/or alteration. Therefore, the injunction against the use of this equipment sought by Petitioner strongly serves the public interest. The principle that a federal court should not cause confusion among voters by enjoining state election laws immediately before an election, *Purcell v. Gonzalez*, 549 U.S. 1 (2006), does not apply in these circumstances.

The 2022 Election is three months away. "When an election is 'imminent[t]' and when there is 'inadequate time to resolve . . . factual disputes,'" Purcell will "often" (though "not always") prompt courts to "decline to grant an injunction to alter a State's established practice." *Ohio Republican Party v. Brunner*, 544 F.3d 711, 718 (6th Cir. 2008). The 2022 Election is

upcoming, but not so imminent that inadequate time remains to allow for the relief sought by Petitioner. In light of the clear risk that illegal manipulation of vote totals may occur through unauthorized access to electronic election equipment, another policy affirmed by Purcell weighs in favor of granting injunctive relief:

Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will be disenfranchised. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). *Purcell*, 549 U.S. at 4.

Furthermore, it is the objective of these Petitioner to evidence preserved for investigations and inspection in order to answer the question, once and for all, whether there was corruption and, in the end, to restore the public confidence in the principle of one-citizen one-vote, The public's faith and trust in this core principle is essential to the future of Texas and the Republic. Petitioner does not seek to overturn or contest the General Election of 2020—but rather to discover uncontroverted evidence of an accurate account of legal, not counterfeit ballots, and to play a role in fashioning a remedy in order to prevent the harm and injury from occurring in the future.

## COUNTS

### COUNT I - Violation of Procedural Due Process UNDER 42 U.S.C. § 1983, 28 U.S.C. §1331dp (First, Fourteenth, and Fifteenth Amendments)

(Seeking declaratory and injunctive relief against All Respondents)

Petitioner incorporates the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a Petitioner must prove a Respondent: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. *42 U.S.C. § 1983.* For this matter, Respondents violated the federally protected rights of voting. *18 U.S.C. 245.* In the instant case, Respondents unquestionably acted under the color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the First Amendment to the Constitution, no official may abridge the freedom of speech. The Fourteenth Amendment applies the protections of the First and Fifteenth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

Petitioner has constitutionally protected interests in the benefits that come from the right to vote. Petitioner has been subjected to the illegal voting systems/equipment, software, and modifications. We have also been hindered in our ability to pursue our First Amendment right to legal elections without being subjected to casting an illegal vote that violates federal and state laws. Respondents knowingly approved voting system/equipment, software, and modifications, which unlawfully deprives Petitioner of these and other constitutionally protected interests without due process of law.

Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose these communications to the public nor gave notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioner prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas laws, Federal laws, and other applicable laws. Such deprivation violates the First, Fourteenth, and

Fifteenth Amendments of the Unites States Constitution, thereby depriving Petitioner's guaranteed civil rights in regard to casting a "legal" vote (TEX. ELEC. CODE § 276.013). Despite Respondents' knowledge of voting systems noncompliance with state and federal law, Respondents intend to continue to utilize these non-compliance systems in future elections. Petitioner was harmed and continue to be irreparably harmed by these unlawful acts, which also includes suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.06.*

## COUNT II - Violation of Equal Protection Clause UNDER 42 U.S.C. § 1983, 18 U.S.C. § 245 (Fourteenth and Fifteenth Amendment, Equal Rights)

(Seeking declaratory and injunctive relief against All Respondents)

Petitioner incorporates the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a Petitioner must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. 42 U.S.C. §1983. For this matter, Respondents violated the federally protected rights of voting. *18 U.S.C. §245.* In the instant case, Respondents unquestionably acted under the color of state law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the Fourteenth Amendment of the Constitution, and as established by state law, including the state created Accardi doctrine, Petitioner has a fundamental right to cast a ballot and vote in a legal and fair election. Under the Fifteenth Amendment to the Constitution, the right to vote for each citizen of the United States shall not be denied or abridged by any state on account of servitude by those in power without due process of law. U.S. Const. Ann., Amendment XV.

Petitioner is entitled to free and fair elections of our representatives, affirmed by the U.S. Constitution, Article 1. The government provides the means by which we exercise that Right. Petitioner does not have an alternate means of ensuring our election process. Therefore, we are burdened by the system put in place through our elected officials. In *Rice v. Cayetano*, the Court ruled the Fifteenth Amendment, "...reaffirms the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." The Court did not specify the 15th Amendment applies only to a protected class, but rather it applies to everyone.[48]

As part of their sworn duty (TEX. CONST. art. XVI § 1), our elected officials have an imperative responsibility to guarantee protection of the election process from any form of fraud or profiteering as this could lead to discrimination of voters, regardless of classification. Additionally, when elected officials fail to provide the level of protection necessary to secure the election franchise, it is the Right and Duty of the American people to correct this deficiency. The Court cannot deny this Right to the people even when the injury is widespread. It is infeasible to imagine an entire population advancing on the Court for relief.

Failure to perform their sworn duty has allowed discrimination to occur across the equality of races in the State of Texas. This violates the Right to Vote Clause of the Fifteenth Amendment. Furthermore, by failing to protect against private interference (i.e.: vendor voting systems, Scytl, et al) of the election process by not adhering to Federal election/ voting system certification standards (HAVA 2002), and the most basic cyber security defense and hardening frameworks, Respondents failed to comply with 18 USC Section 245(1)(a). Therefore, Respondents do not comply with the Enforcement Clause of the Fifteenth Amendment.[49] Petitioner was harmed and

[48] http://cdn.loc.gov/service/ll/usrep/usrep528/usrep528495/usrep528495.pdf

[49] https://uscode.house.gov/view.xhtml?req=(title:18%20section:245%20edition:prelim)%20OR%20(granuleid:USC-prelim-title18-section245)&f=treesort&num=0&edition=prelim

continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. ELEC. CODE § 276.013(a)(4).*

**COUNT III – Deprivation of Civil Rights**
**UNDER 42 U.S.C. § 1983vp, 42 U.S.C. 1985**

**(Declaration of Independence, Preamble to the U.S. Constitution)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioner incorporates the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him, in his land, goods, person, or reputation, shall have remedy by due course of law." Fifth and Fourteenth Amendment U.S. Constitution affords the people of Texas with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law. Petitioner has constitutionally protected interests in the benefits that come from the right to vote and not being subject to the illegal voting systems/equipment, software, and modifications. This includes the ability to pursue our First Amendment right to legal elections without being subjected to casting illegal votes in violation of both state and federal laws.

Respondents knowingly approved voting system/equipment, software, and modifications unlawfully, which deprives Petitioner of these and other constitutionally protected interests without due process of law. Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose to the public and gave no notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioner prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas and Federal laws and other applicable laws. Such deprivation violates the U.S. Constitution thereby depriving Petitioner civil rights regarding casting a "legal" vote. *TEX. PEN. CODE § 37.03, § 37.10.* Petitioner was harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications.

Petitioner recognizes the illegality of the certifications and questions if Petitioner was caused to cast an illegal ballot, unknowingly at the time? Since at least 2020, we have been **Forced** to continue this illegal practice by our own government due to their reckless disregard for the law and constitution. Our only remedy thus far has been:

a. Notify the proper authorities in our respective counties and our state government in pursuant with TEX. ELEC. CODE § 273 in which the Petitioner has made attempts for over a year.
b. Not to participate in unlawful elections and thereby denied our right to vote as our last alternative.
c. Seek legal means via the Peoples' court.

This brings us here today as we seek redress of our First, Fourteenth, and Fifteenth amendment rights under 42 U.S.C. § 1983, "taking on the mantel of the sovereign," guarding for all of us the individual liberties enunciated in the Constitution. Section 1983 represents a balancing feature in our governmental structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." *Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D. Pa. 1973).

**COUNT IV – Deprivation of Constitutional Rights**
**UNDER 28 U.S.C. 1331vc, U.S. CONST. amend. 1, 14, and 15**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioner incorporates the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." Fifth and Fourteenth Amendment U.S. Constitution affords the people of Texas with the right to be free from violations of the substantive due process rights, and no person may be deprived of life, liberty, or property without due process of law. Petitioner has a fundamental right to cast a ballots and vote in a legal and fair election. Petitioner was harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE §39.03(2).*

Each day Petitioner has suffered irreparable harm living under a government that no longer represents we the people and deprives the Petitioner, and all voters of the state of Texas, of the Republic that the Constitution of the State of Texas and United States Constitution outlined as protection from a tyrannical government. The general public benefits from the remedy against the constitutional infringements where any citizen can bring a case before the court as long as it impacts the public interest, and benefits the general public, not just the Petitioner. *Assoc. Indus. of New York v. Ickes,* 134 F.2d 694, 704 (2d Cir. 1943).

It is our constitutional duty to invoke our authority as free persons to petition and address this court regardless of the outcome of this complaint, it serves as notice to all acting officials and non-officials within our government that we demand justice for any and all criminal behavior and fraud. 'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' *Baker v. Carr* 369 US 186, 208 (1962) *citing* 364 U.S. at 347, 81 S.Ct. at 130.57. The Constitution itself provides both the cause of action and the remedy. *Jacobs*, 290 U.S. at 16, 54 S.Ct. at 27; *San Diego Gas Electric Co. v. City of San Diego*,450 U.S. 621, 654-55, 101 S.Ct. 1287, 1305-06, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting); see also *Dickinson*, 331 U.S. at 748, 67 S.Ct. at 1384. *Azul Pacifico, Inc. v. City of Los Angeles*, 948 F.2d 575, 586 (9th Cir. 1991).

**COUNT V – Voting Rights Violation**
**UNDER 52 U.S.C. § 20105, 52 U.S.C. § 20510, 52 U.S.C § 20511 (2)(a)(b), 52 U.S.C. §10101, 28 U.S.C. 1943**
**(First, Fourteenth, and Fifteenth Amendment)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioner incorporates the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 20511(a)(b) of Title 52-Voting and Elections, a Petitioner must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. *42 U.S.C. §1983.* In the instant case, Respondents unquestionably acted under the color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statues for the State of Texas. Under the First and Fourteenth Amendment to the Constitution, and as

established by state law including the state created Accardi doctrine, Petitioner has a fundamental right to cast a ballot and vote in a legal and fair election. Petitioner was harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.02.*

The immediate injury continues as Texas officials continue to allow us to vote in another election conducted on uncertified and networked machines is a violation of our First, Fourteenth, and Fifteenth amendment rights and a violation of TEX. ELEC. CODE § 52.062, § 122.01(3)(4), § 123.001, § 123.002, § 129.054(a)(b)(c), § 122.031(c), 52 U.S.C. § 20105, 52 U.S.C. § 20510, and 52 U.S.C. § 20511 (2)(a)(b), which is criminal. The Petitioner stands to lose more of our freedoms as each day passes without resolution.

We, the people, have the Right to elect our representatives. The government provides the means by which we exercise that Right. The Framers could not foresee the day computerized touch screens or FROG ciphers would be used any more than they could an AR-15. But we, the people, have the Right to ensure elections are free and fair. We are not just ensured the Right to CAST the vote. We, the people, are guaranteed the Right to ELECT our government. This entire process must be guaranteed. Anything that circumvents that process is inherently infringing upon the Right we are granted to pursue life, liberty, and the pursuit of happiness.

**COUNT VI – Declaratory Judgment**
**UNDER 28 U.S.C. § 2201, § 2202**

(Against All Respondents)

Petitioner incorporates the foregoing paragraphs as set forth in full herein: Respondents conduct has and will continue to violate the rights of citizens of Texas, as set forth above. The Court has the authority pursuant to 28 U.S.C. § 2201, § 2202 to issue an Order enjoining the State from conducting an election in which the votes are not accurately or securely tabulated. If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an insecure, vulnerable electronic voting systems that are susceptible to manipulation and intrusion. If Bexar County and the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an election on illegally certified voting systems in violation of both the State of Texas and Federal election laws.

The Court should issue an Order enjoining the State from using any electronic voting system and respective devices to include, but not limited, to poll pads, tabulators, printers, etc. Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioner if the requested emergency relief against the destruction of the 2020 general election records does not occur. The Court should issue order enjoining officials from the spoilation, destruction, alteration of all records including, but not limited to: paper ballot, absentee ballots, tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic, election equipment (including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR)archives, project database backups, and any other form of backups). TEX. ELEC. CODE § 66.02, § 66.058 (ITALICIZED); and further, to order a thorough independent forensic examination of each ballot by highly qualified document examiners, will serve to restore the public's confidence in the state's election process. See *Karen Wiseman v. Tarrant County, Texas and Heider Garcia* (2021) No. 096-330696-21, Texas.

## CONCLUSION

Respondents knowingly allowed Texans to vote on noncompliant machines that were not certified due to lack of accredited VSTL(s) since at least the November 3, 2020 elections in violation of the Tex. Elec. Code, Title 8. This onerous conduct renders the results void. The Respondents continued to certify election results knowing they violated Texans' civil liberties, subsequently forcing Petitioner(s) into fraudulent contracts with illegally elected government officials. Officials were provided unlawful power to enforce actions under the color of law and used this power to coerce and subject Petitioner(s) into servitude through unlawful elections. Petitioner(s)' liberty to determine our own course and way of life has been strong-armed from us. Respondents have "no authority to pass upon the question of negligence or freedom from negligence. He has no discretion but is obliged to act as the law provides." *DeVries v. Secretary of State,* 329 Mich. 68 (1950). 44 N.W.2d 872.

*Sherar v. Cullen,* 481 F 946 (1973), "There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights." "No state legislator or executive or judicial

officer can war against the Constitution without violating his undertaking to support it." *Cooper v. Aaron,* 358 U.S. 1, 78 S. Ct. 1401 (1958). Although Respondents may assert immunity against these claims, the Constitutional theory is that we the people are the sovereigns, the state and federal officials only our agents. As Judge P. Higginbotham dissented, "the 11th Amendment does not bar these claims under the 14th Amendment… The role of the Court in protecting the most vital right of a democratic government: the right to vote; should not be denying the right to vote." *Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit.*

We maintain a Right to defend ourselves and others from attack. We also maintain the same Right to defend our election process when it is subject to profiteering by actors who would seek to abolish our sovereignty in favor of a dictatorship. We, the people, carry this Right and every other Right in the same manner we would a physical firearm. Every single Right we enjoy, as affirmed in the Constitution, is a weapon and protection against tyranny. A violation of one Right is a violation of all Rights. We exercise our free will and choose, through our Rights, to remain free. As Justice Oliver Wendell Holmes put it: "We do not inquire what the legislature meant; we ask only what the statute means."

## PRAYER FOR RELIEF

WHEREFORE, "For there is no authority except from God, and the authorities that exist are appointed by God." *Romans 13:1* (NKJV). Petitioner prays that the Court grant the following relief:

a. ASSUMES jurisdiction of this action in the interest of justice. 28 U.S.C. §§ 1331, 1343, 1367.

b. ISSUES and EXPEDITES judgment. Rule 501, TEX. GOV. CODE §§ 23.301, 23. 302;

c. Vacates and sets aside all uncertified and illegal voting systems/equipment, software, and modifications and implement a precinct level hand-marked paper ballot and hand counting system as permissible by Tex. Elec. Code Chp 65.

d. DECLARES that the Respondents have violated the Texas Constitution Equal Protection Clause; 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

e. DECLARES that the Respondents have violated the Texas Constitution Due Process Clause; 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

f. GRANTS an emergency injunction prohibiting Respondents from requiring or permitting voters to have votes cast or tabulated using any electronic voting systems, pollbooks, or devices. TEX. CIV. PRAC. & REM. CODE § 65.011, TEX. GOV. CODE § 23.302, TEX. ELEC. CODE § 273.081, 28 U.S.C. § 1343(a)(3) and Federal Rule of Civil Procedure 65.

g. GRANTS an emergency injunction prohibiting Respondents from destruction/deletion of any and all election records created under Title 8 of the Tex. Elec Code to include all paper ballots created by voting systems, USB devices, memory cards, electronic storage devices, mail in ballots, tabulation tapes, USB final counts from precincts and all other election records not specifically stated from the 2020, 2021, and 2022 elections. TEX. CIV. PRAC. & REM. CODE § 65.011, TEX. GOV. CODE § 23.302, TEX. ELEC. CODE § 273.081, 28 U.S.C. § 1343(a)(3) and Federal Rule of Civil Procedure 65.

h. DECLARES that the Respondents approvals/adoptions of all voting system/equipment, software, and modifications are void and without legal force or effect; 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

i. DECLARES that the Respondents approval/adoption policies are arbitrary, capricious, and based on negligence and disregard, in accordance with law and without observance of both the required procedure and Accardi doctrine; 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

j. DECLARES that the approvals/adoptions and the actions taken by Respondents are in violation of the Constitution and contrary to the laws of the United States and the State of Texas; 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

k. Temporarily restrains, as well as preliminarily and permanently enjoins Respondents, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing and/or enforcing the certifications of all voting systems/equipment, software and modifications that are not in compliance with the applicable law; TEX. CIV. PRAC. & REM. CODE § 65.011, TEX. GOV. CODE § 23.302, TEX. ELEC. CODE § 273.081, 28 U.S.C. § 1343(a)(3) and Federal Rule of Civil Procedure 65.

l. ORDERS to unseal absentee ballots, absentee ballot return envelopes, the absentee ballot election reports, and other paper and electronic information election materials from the General Election 2020 and to permit Petitioner to review, examine, inspect, and duplicate such materials including, but not limited to electronic images of electronic drives used by Respondents in the General Election; TEX. GOV. CODE Chp. 552

m. ORDERS Respondents to terminate all employees, agents, and contractors shown to have had knowledge of or acquiesced in the improper acts described herein;

Grant such other and further relief as may be just, equitable, and proper, including, without limitation, an award of any attorneys' fees and costs to Petitioner.

Respectfully submitted this 28th day of September, 2022,

By: /s/ *Steven Harvey*
Steven Harvey
12511 32nd Street
Santa Fe, Texas 77510
(409)599-5691
scharvey69@yahoo.com
*Pro se*

# Affidavit

Pursuant to 28 U.S.C. 1746, I, STEVEN HARVEY, make the following declaration:

**Affiant** supports in writing a cause that demonstrates Respondents' actions as outlined above in this complaint/petition violate several state and federal laws, which are against The People of Texas, and also , against the peace and dignity of the State.

1. In Galveston County a voting system was used that was not properly certified or approved by the Secretary of State. Public information about our election system was withheld from us until the Texas Attorneys General sent them a letter to release the information, and a foreign owned company called Scytl was used for vote reporting.

2. I believe my vote could have been changed and possibly illegal votes casted.

3. If this continues, I cannot trust that my vote will be counted correctly.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this September 28, 2022

Affiant: /s/*Steven Harvey*

Contact information

Steven Harvey
12511 32nd street
Santa Fe, Texas 77510
(409)599-5691
scharvey69@yahoo.com